UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Joseph T. Carmack | ) | Civil Action No. 03-12488-PBS |
| | ) | |
| Plaintiff, Pro Se | ) | |
| | ) | FIRST AMENDED COMPLAINT |
| v. | ) | |
| | ) | AND |
| The National Railroad Passenger | ) | |
| | ) | DEMAND FOR JURY TRIAL |
| Corporation | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

COMPLAINT

I. Nature and history of action.

1. By this action, the Plaintiff, Joseph Thomas Carmack seeks injunctive, compensatory and declarative relief against the Defendants' medical disqualification of Plaintiff from employment as Locomotive Engineer and Defendant's subsequent wrongful discharge of Plaintiff from employment.

2. This action was commenced on February 5, 2002 as a complaint of discrimination on the basis of disability filed with the Massachusetts Commission Against Discrimination ("MCAD") at One Ashburton Place Room 601, Boston, MA 02108. MCAD dismissed the case.

3. Upon dismissal by MCAD, Plaintiff requested a substantial weight review by the Equal Employment Opportunity Commision ("EEOC"), Boston Area Office, John F. Kennedy Federal Office Building, Government Center, Room 475, Boston, MA 02203.

4. On September 5, 2003, the EEOC issued a Dismissal and Notice of Rights including notice of right to initiate this action.

II. Parties, Jurisdiction and Venue

5. The Plaintiff, Joseph Thomas Carmack, is a natural person residing at 592 Tremont Street, Boston, County of Suffolk Massachusetts.

6. The Plaintiff, Joseph Thomas Carmack, uses a mailing address of 398 Columbus Avenue, Private Mail Box 130, Boston, County of Suffolk Massachusetts.

7. The Defendant, the National Railroad Passenger Corporation ("NRPC", hereinafter also referred to as "Amtrak") is a for profit corporation and quasi-governmental entity organized and existing under the laws of the United States and the Commonwealths of Massachusetts and Pennsylvania. The Defendant's corporate headquarters is located at 60 Massachusetts Avenue, NE Washington, DC. The NRPC also maintains offices at Two South Station in Boston, Massachusetts, 30th Street Station, Philadelphia Pennsylvania.

8. This court has subject matter jurisdiction over this action pursuant to 42 U.S.C. s. 12101 et seq., 29 U.S.C. s. 701 et seq., the First Amendment of the Constitution of the United States of America, 45 U.S.C. s. 50 et seq., 45 U.S.C. s. 151 et seq., 42 U.S.C. s. 2000e and 28 U.S.C. s. 1331.

9. This court has personal jurisdiction over the Defendant who resides within this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred in this district. Venue is proper in this district under 28 U.S.C. s 1391 (b) and 1391 (c).

10. This court has supplemental jurisdiction over ancillary claims that are so related to claims in this action, of which this court has original jurisdiction, that such ancillary claims form part of the same case or controversy under 28 U.S.C. s. 1367.

11. At all times relevant to this action Defendants David Gunn, George Warrington, Lorraine Green, Larry Hriczak, Pat Dogerty, Michael J. O'Bryan, Mark B.

2

Kenny, Gerard L. DeModena, Lou DePhillips, Suzanne Allan, Michael J. O'Malley, Dr. Tim Pinsky, Dr. Russell Vasile, William C. Rae, Deborah Gaines, Francis J. O'Connor, Jr., Delvine Okereke and Ted Campbell, acting in their capacities as employees, servants or agents of the Defendant, did independently and conjointly act or fail to act so as to give rise to the causes of action contained in this Complaint.

## III. Background of Complaint

12. Plaintiff has been an employee of Defendant in various capacities from October 1979 until on or about May 13, 2002 when he was discharged in all capacities as Locomotive Engineer in commuter rail service.

13. During the time of Plaintiff's employment for the Defendant, Plaintiff engaged in union activities including, but not limited to: regular attendance of union meetings; participation in oral and written union discussions; and the preparation and filing of union grievances.

14. On or about December 20, 1996, Plaintiff was promoted to the position of Locomotive Engineer in commuter rail service.

15. On or about March 1998 Plaintiff's application for membership in Division 57 of the Brotherhood of Locomotive Engineers ("BLE") was approved by vote in accordance with the BLE Constitution.

16. Throughout Plaintiff's service as an engineer in Amtrak Commuter Services, Plaintiff has dutifully reported mechanical Federal Railroad Administration ("FRA") defects of rolling stock equipment and violations of FRA regulations and said reporting was in accordance with Defendant's Rules and Regulations.

17. On or about February 17, 2000 Plaintiff prepared a grievance regarding Defendant's attendance policy and submitted said grievance to Michael J. O'Bryan, Local Chairman of Division 57 for consideration and assistance.

18. Although O'Bryan agreed with the merits of the grievance regarding Defendant's attendance policy, O'Bryan refused to provide assistance in accordance with the BLE Constitution and advised Plaintiff against filing the grievance.

19. On or about March 27, 2000, Plaintiff filed the grievance regarding application of Defendant's attendance policy in a letter to Michael J. O'Malley, the Manager of Operations for Amtrak Commuter Services.

20. Plaintiff's submission of said grievance regarding application of Defendant's attendance policy was was pursuant to Plaintiff's rights in accordance with the Railway Labor Act, 45 U.S.C. s. 152, the Constitution of the Brotherhood of Locomotive Engineers and BLE collective bargaining agreements with Defendant.

21. Beginning on or about March 27, 2000 until on or about September 4, 2000 Plaintiff and O'Malley maintained a written dialogue that was copied and distributed to union employees. Said dialogue concerned the grievance regarding application Defendant's attendance policy submitted to O'Malley on March 27, 2000.

22. Beginning on or about March 27, 2000 O'Malley and other administrative agents of Defendant complained to O'Bryan concerning Plaintiff's union activities including, but not limited to, Plaintiffs grievance regarding application of Defendant's attendance policy and the ensuing written dialogue between Plaintiff and O'Malley.

23. Beginning on or about March 27, 2000 and continuing on various occasions thereafter O'Bryan, acting outside his capacities and privileges as Local Chairman of Division 57 of the BLE met and communicated with O'Malley and other administrative agents of Defendant in order to advise and assist O'Malley and other administrative agents of Defendant concerning responses to Plaintiff's union activities including, but not limited to, Plaintiff's grievance regarding Defendant's attendance policy and the ensuing written dialogue between Plaintiff and O'Malley.

24. On or about May 15, 2000, Gerard L. DeModena, in his capacity as Division Road Foreman of Engines for Amtrak Commuter Services, left his office at South Station

4

in Boston to go to North Station in Boston to confront Plaintiff on a train Plaintiff was assigned to as Locomotive Engineer. DeModena confronted Plaintiff to admonish Plaintiff about Plaintiff's union activities, particularly Plaintiff's writing of grievances and writing in general.

25. On or about May 15, 2000, DeModena warned Plaintiff of retaliatory consequences of Plaintiff's union activities.

26. On or about October 9, 2000, two (2) commuter rail trains for which Defendant was responsible were delayed approximately fifteen minutes each when Plaintiff reported Defendant's failure to comply with FRA service and inspection regulations on said trains. Both trains were reported to DeModena and others.

27. Plaintiff's job assignment as Locomotive Engineer for Defendant required Plaintiff to report Defendant's failure to comply with FRA regulations.

28. On or about October 9, 2000, Plaintiff provided documentary and material evidence to DeModena that Defendant was operating trains on Defendant's right of way with rolling stock equipment that failed to comply with FRA regulations.

29, On or about October 9, 2000, Plaintiff provided documentary and material evidence to DeModena that trains for which Plaintiff was responsible for operating on Defendant's right of way were in compliance with FRA regulations.

30. On or about October 9, 2000, DeModena acknowledged to Plaintiff that the FRA violations that were reported by Plaintiff were actual violations, but DeModena advised Plaintiff that DeModena was not concerned about the FRA violations that Plaintiff was reporting because Defendant's employees who operated the Defendant's non-compliant trains had not reported the violations.

31. On or about October 9, 2000, DeModena advised Plaintiff that DeModena was disappointed that Plaintiff was reporting FRA violations because O'Malley would be displeased.

32. On or about October 9, 2000, DeModena advised Plaintiff that DeModena would report Plaintiff's reports of FRA violations to O'Malley and that O'Malley would have questions about Plaintiff's reports of FRA violations.

33. On or about October 9, 2000, DeModena advised Plaintiff that DeModena would recommend to O'Malley that Plaintiff be disciplined by O'Malley for reporting FRA violations.

34. On or about October 9, 2000 and at various times thereafter, Plaintiff reminded DeModena that trains for which Plaintiff was responsible for operating on Defendant's right of way were in compliance with FRA regulations.

35. On or about October 9, 2000 and at various times thereafter, Plaintiff advised DeModena that there was no basis to discipline Plaintiff and that Plaintiff was willing to discuss any questions about Plaintiff's work performance or FRA violations with O'Malley and/or DeModena at any time which O'Malley and/or DeModena may find convenient.

36. On or about October 10, 2000, DeModena met with O'Bryan to discuss and agree upon retaliatory discipline of Plaintiff. Plaintiff was to be disciplined in retaliation for reporting mechanical defects of commuter rail equipment, violations of FRA regulations and mechanical violations of Defendant's rules and policies.

37. On or about October 11, 2000, after a BLE union meeting, O'Bryan advised Plaintiff that Plaintiff was to be disciplined by Defendant.

38. On or about October 11, 2000, Plaintiff advised O'Bryan that there was no basis for any discipline.

39. On or about October 11, 2000, Plaintiff advised O'Bryan that if Defendant had any concerns about Plaintiff's job performance, Defendant should approach Plaintiff directly. Plaintiff also advised that O'Bryan's involvement in any matter concerning Plaintiff and Defendant was unnecessary and unwanted.

6

40. On or about October 11, 2000, Plaintiff expressed the opinion to O'Bryan that O'Bryan's manner of intervention between Plaintiff and Defendant was morally and ethically bankrupt and that O'Bryan was acting as agent of Defendant and on O'Bryan's own behalf for personal reasons.

41. On or about October 11, 2000, Plaintiff arranged a meeting with O'Bryan to discuss a number of union and rail business issues unrelated to any complaints about Plaintiff. When making the arrangements, Plaintiff expressly stated to O'Bryan that Plaintiff did not care nor intend to discuss with O'Bryan the particular matter of Defendant's desire to discipline Plaintiff.

42. On or about October 13, 2000 Plaintiff and O'Bryan met informally and discussed a number of union and rail business issues unrelated to any complaints about Plaintiff. Said discussion lasted approximately three hours.

43. On or about October 13, 2000, after approximately 3 hours discussing a number of union and rail business issues unrelated to any complaints about Plaintiff, O'Bryan again advised Plaintiff that Plaintiff was to be disciplined by Defendant through Defendant's agent O'Malley.

44. On or about October 13, 2000, O'Bryan advised Plaintiff that O'Malley would not discuss any matters with Plaintiff, including, but not limited to, intended discipline of Plaintiff.

45. On or about October 13, 2000, O'Bryan further advised Plaintiff that Plaintiff was required by Defendant to cease and desist from filing any grievances or engaging in any written correspondence.

46. On or about October 13, 2000, O'Bryan advised Plaintiff that O'Bryan was to meet with O'Malley to prepare a letter of discipline against Plaintiff.

47. On or about October 13, 2000, Plaintiff acknowledged to O'Bryan that Plaintiff had no control over actions of O'Bryan or O'Malley.

48. On or about October 13, 2000, Plaintiff advised O'Bryan that Plaintiff would not cease any union activities, other political endeavors or community involvement including, but not limited to, the filing of grievances Plaintiff thought were warranted.

49. On or about October 13, 2000, Plaintiff expressed the opinion to O'Bryan that grievances were necessary to encourage engineers to comply with FRA safety regulations and Defendant's own policies and regulations.

50. On or about October 13, 2000, Plaintiff expressed the opinion to O'Bryan that O'Bryan and Defendant were knowingly and willingly acting to discourage and intimidate Plaintiff and other engineers employed by Defendant in order to discourage engineers from complying with FRA safety regulations and Defendant's own policies and regulations.

51. During the time of Plaintiff's employment for the Defendant, Defendant has allowed, permitted and encouraged employees to post cartoons, altered newspaper articles and altered photographs depicting and identifying various of Defendant's employees. Said cartoons, articles and photographs related social, union and rail business matters (real and fictitious) in a jovial and creative manner. Said postings were allowed in the North Station operations center in Boston and in the employee resting and lounge areas at various locations including rail yards and stations.

52. On or about October 16, 2000, Plaintiff delivered a letter to O'Bryan which was accompanied by a one page political and religious satire of commuter rail business (hereinafter referred to as the "Rail Satire").

53. The Rail Satire contained a parody of Shakespeare's play Hamlet.

54. The Rail Satire contained reference to Plaintiff, O'Bryan and other of Defendant's employees comparing business roles of Plaintiff, O'Bryan and other employees to character roles in Shakespeare's Hamlet.

8

55. The Rail Satire was inspired by the ideas of John O. Whitney of Columbia Business school which compare business management situations and issues to the plots and themes of Shakespeare plays.

56. The Rail Satire was further inspired by Plaintiff's own religious beliefs and the play <u>Rosencranz and Guildenstern are Dead!</u> which was written by the playwright Tom Stoppard.

57. The Rail Satire was intended as a creative presentation of moral and ethical considerations of railroad and union business designed to encourage compliance with FRA rules and regulations and Defendant's own rules and policies.

58. The Rail Satire and its considerations were specifically directed at and delivered to BLE Local Chairman O'Bryan for O'Bryan's own consideration of the various thoughts, ideas, principles and conjectures that the Rail Satire might invoke for O'Bryan's own consideration.

59. Beginning on or about May 4, 2001 and on various occasions thereafter, Division 57 of the Brotherhood of Locomotive Engineers, acting through their agent Local Chairman Michael J. O'Bryan acknowledged in various communications to O'Malley, DePhillips and other agents of the Defendant that the Rail Satire was a legitimate business document dealing with legitimate union business relating to union business and utilized within the inner workings of Division 57 of the Brotherhood of Locomotive Engineers.

60. On or about October 16, 2000 O'Bryan began sharing the Rail Satire with other employees.

61. On or about October 24, 2000 O'Bryan met with O'Malley and jointly composed and executed discipline of Plaintiff.

62. On or about October 24, 2000, O'Bryan and O'Malley openly acknowledged to one another that discipline of Plaintiff by O'Bryan and O'Malley on October 24, 2000 was executed outside the scope, regulations and procedures of the Railway Labor Act

9

(U.S.C. 45 s. 151 et seq.), the BLE constitution and the collective bargaining agreement between the BLE and the Defendant.

63. Employee was disciplined on October 24, 2000 in retaliation for reporting mechanical and other violations of FRA regulations and Defendant rules and regulations.

64. On or about November 1, 2000, Plaintiff advised O'Bryan that Plaintiff intended to grieve discipline imposed on Plaintiff by the Defendant and that Plaintiff would further expose violation of FRA Rules and Regulations in grievance of unfair discipline by Defendant.

65. On or about November 1, 2000, O'Bryan warned Plaintiff that O'Bryan would have Plaintiff discharged from service by Defendant for grieving unfair discipline of October 24, 2000.

66. Plaintiff expressed the opinion to O'Bryan that if O'Bryan were able to have Plaintiff discharged from service with Defendant for grieving unfair discipline of October 24, 2000, O'Bryan could only do so by working secretly as an agent of the Defendant against the interests of Division 57 of the Brotherhood of Locomotive Engineers.

67. On or about November 1, 2000, O'Bryan warned Plaintiff that Plaintiff would be discharged from service with Defendant for exposing violations of FRA Rules and Regulations.

68. On or about December 15, 2000 Plaintiff began grievance proceedings against discipline of Plaintiff and said grievance pursuant of rights and privileges in accordance with the Railway Labor Act (45 U.S.C. s 151 et seq.), the collective bargaining agreement between the BLE and Defendant, and the BLE constitution.

69. On or about December 22, 2000 Defendant's agent O'Malley denied Plaintiff's grievance of December 15, 2000.

70. On or about February 20, 2001, Plaintiff made formal appeal of Plaintiff's December 15, 2000 grievance to O'Bryan. Said appeal to O'Bryan was pursuant to rights and privileges in accordance with the Railway Labor Act (45 U.S.C. s 151 et seq.), the

collective bargaining agreement between the BLE and Defendant, and the BLE constitution.

71. On or about March 5, 2001 Plaintiff had a prearranged meeting with Mr. DeModena to discuss Defendant's violations of FRA regulations and Defendant's retaliation against Plaintiff for reporting such violations.

72. On or about March 5, 2001 Mr. DeModena asked Plaintiff about Plaintiff's personal religious beliefs.

73. On or about March 5, 2001 DeModena became agitated with Plaintiff and offered general criticism of Plaintiff's union activities, work ethic and religious beliefs. Mr. DeModena told Plaintiff that DeModena makes paper airplanes out of Plaintiff's grievances and said: "I read your writings and I say to myself, 'Forgive them, for they know not what they do'".

74. On or about March 11, 2001, O'Bryan sent an open letter to Plaintiff which was copied to other union members. Said open letter complained about and criticized Plaintiff's job performance and union activities.

75. On or about March 11, 2001, O'Bryan's open letter to Plaintiff which was directed to Plaintiff and copied to other union members, O'Bryan made reference to the Rail Satire.

76. Beginning on or about March 11, 2001, O'Bryan successfully solicited the assistance of other union employees of Defendant to distribute copies of his March 11, 2001 open letter which was addressed to Plaintiff and directed to Plaintiff.

77. Beginning on or about March 11, 2001, O'Bryan and other of Defendant's employees distributed copies of O'Bryan's open letter written to Plaintiff on Defendant's property.

78. At the request of other union members, Plaintiff responded to O'Bryan's open letter on or about April 4, 2001.

79. On or about April 4, 2001, in areas of general public access while Plaintiff was off duty, Plaintiff began sharing copies of Plaintiff's April 4, 2001 written response to O'Bryan's letter of March 11, 2001.

80. Said sharing of copies of Plaintiff's April 4, 2001 written response to O'Bryan's letter of March 11, 2001 was with specific union employees at the request of said union employees.

81. On or about April 4, 2001, in areas of public access while Plaintiff was off duty, Plaintiff began sharing copies of the Rail Satire with other of Defendant's employees for reference from O'Bryan's March 11, 2001 open letter and Plaintiff's response to said letter.

82. On or about April 11, 2001, William C. Rae, Amtrak Trainmaster, intercepted a copy of the Rail Satire from union employees.

83. On or about April 11, 2001, Rae delivered copies of Plaintiff's April 4, 2001 written response to O'Bryan's letter of March 11, 2001, a copy of the Rail Satire and other documents to DeModena.

COUNT I:<br>LIBEL AND DEFAMATION OF CHARACTER;

84. Plaintiff here repeats and realleges the allegations of paragraph 6 through 83 of this Complaint, the same as if said Paragraphs were expressly restated here.

85. On or about April 11, 2001, DeModena met with Lou DePhillips, Defendant's Manager of Labor Relations in Boston, and planned a misrepresentation of Plaintiff's activities and writings.

86. On or about April 11, 2001, DeModena and DePhillips prepared a formal Workplace Violence Complaint against Plaintiff wherein DeModena and DePhillips libeled Plaintiff and falsely stated that Plaintiff identified Plaintiff's own self as "Lucifer, Prince of Darkness".

87. By virtue of the willful conduct of DeModena and DePhillips, the Defendant, through its agents, servants and employees, has written and distributed false statements regarding Plaintiff's medical condition, state of mind and performance abilities. The Defendant, NRPC, through its agents, servants and employees, has knowingly, willingly and intentionally libeled and defamed Plaintiff intending to prejudice Plaintiff in his reputation, community standing, office, trade, business, and means of livelihood. As a direct and Proximate result of Defendant's actions: Plaintiff has suffered damage to his professional reputation and reputation generally; Plaintiff is deprived of gainful employment in his chosen profession; Plaintiff is deprived of opportunities of community involvement; Plaintiff is deprived of access to the usual terms, conditions and privileges of employment; Plaintiff is deprived of gainful employment generally; Plaintiff is suffering from severe emotional distress with physical repercussions; Plaintiff has suffered injury and will continue to suffer injury ; Plaintiff requires medical treatment, will continue to require medical treatment and is deprived of means of medical treatment.

COUNT II:
## RETALIATION FOR INDIVIDUAL AND SYSTEMIC ADVOCACY AND COMMUNITY INVOLVEMENT: 29 U.S.C. 701 (c)(5);

88. Plaintiff here repeats and realleges the allegations of paragraph 6 through 87 of this Complaint, the same as if said Paragraphs were expressly restated here.

89. By virtue of the willful conduct of DeModena and DePhillips, the Defendant, through its agents, servants and employees, the Defendant has retaliated against Plaintiff in order to defame and undermine Plaintiff's union, social and community activities and exercise of free expression. In so defaming and undermining Plaintiff's union, social and community activities and free expression by libeling and stigmatizing Defendant as having a mental illness, Defendant has disrespected Plaintiff's individual dignity, personal responsibility, self-determination, and pursuit of meaningful career as one regarded as

13

having mental illness in pursuit of such individual dignity, personal responsibility, self-determination and meaningful career and said undermining of Plaintiff is in violation of the Rehabilitation Act of 1973: 29 U.S.C. s. 701 (c)(1).

## COUNT III:
### INVASION OF PRIVACY

91. Plaintiff here repeats and realleges the allegations of paragraph 6 through 90 of this Complaint, the same as if said Paragraphs were expressly restated here

92. On or about April 11, 2001 DeModena and DePhillips maliciously and intentionally filed a false workplace violence complaint in order to coerce Plaintiff to undergo a non-confidential psychiatric exam and psychological testing.

93. By virtue of the willful conduct of DeModena and DePhillips, the Defendant, through its agents, servants and employees, has put the Plaintiff in a false position in the public eye, attributed to Plaintiff views which he doesn't hold . As a direct and Proximate result of Defendant's actions: Plaintiff has suffered damage to his professional reputation and reputation generally; Plaintiff is deprived of gainful employment in his chosen profession; Plaintiff is deprived of opportunities of community involvement; Plaintiff is deprived of access to the usual terms, conditions and privileges of employment; Plaintiff is deprived of gainful employment generally.

## COUNT IV:
### PERSONAL INJURY: FEDERAL EMPLOYERS LIABILITY ACT,
#### 45 U.S.C s. 51 et seq.

94. Plaintiff here repeats and realleges the allegations of paragraph 6 through 93 of this Complaint, the same as if said Paragraphs were expressly restated here.

95. For the purpose of carrying on commerce the defendant maintained a railway within Massachusetts and connecting to railway services maintained by the defendant throughout the continental United States.

14

96. The Defendant has engaged in said commerce at all times relevant to this complaint.

97. The plaintiff was employed by the defendant in such commerce on April 11, 2001.

98. On or about April 11, 2001 DeModena and DePhillips maliciously and intentionally filed a false workplace violence complaint in order to coerce Plaintiff to undergo a non-confidential psychiatric exam and psychological testing.

99. By virtue of the willful conduct of DeModena and DePhillips, acting as agents the Defendant, Plaintiff is suffering from severe emotional distress with physical repercussions; Plaintiff has suffered injury and will continue to suffer injury ; Plaintiff requires medical treatment, will continue to require medical treatment and is deprived of means of medical treatment.

COUNT V: UNFAIR LABOR PRACTICES, 45 U.S.C. s. 151 et. seq.

100. Plaintiff here repeats and realleges the allegations of paragraph 6 through 93 of this Complaint, the same as if said Paragraphs were expressly restated here.

101. By virtue of the willful conduct of DeModena and DePhillips, acting as agents the Defendant,  Defendant has retaliated against defendant for labor activities pursuant to rights and privileges in accordance with the Railway Labor Act (45 U.S.C. s 151 et seq.), the collective bargaining agreement between the BLE and Defendant, and the BLE constitution.

COUNT VI:  SLANDER AND DEFAMATION OF CHARACTER; COUNT VII: RETALIATION FOR INDIVIDUAL AND SYSTEMIC ADVOCACY AND COMMUNITY INVOLVEMENT: 29 U.S.C. 701 (c)(5);

102. Plaintiff here repeats and realleges the allegations of paragraph 6 through 101 of this Complaint, the same as if said Paragraphs were expressly restated here.

103. On or about April 11, 2001 and at various times thereafter DeModena, DePhillips and other employees of Defendant falsely stated that Plaintiff thinks Plaintiff is the devil.

104. By virtue of the willful conduct of DeModena and DePhillips, the Defendant, through its agents, servants and employees, has spoken false statements regarding Plaintiff's medical condition, state of mind and performance abilities. The Defendant, NRPC, through its agents, servants and employees, has knowingly, willingly and intentionally slandered and defamed Plaintiff intending to prejudice Plaintiff in his reputation, community standing, office, trade, business, or means of livelihood. Defendant has disrespected Plaintiff's individual dignity, personal responsibility, self-determination, and pursuit of meaningful career. As a direct and Proximate result of Defendant's actions:  Plaintiff has suffered damage to his professional reputation and reputation generally; Plaintiff is deprived of gainful employment in his chosen profession; Plaintiff is deprived of opportunities of community involvement;  Plaintiff is deprived of access to the usual terms, conditions and privileges of employment;  Plaintiff is deprived of gainful employment generally.

## COUNT VIII: SLANDER AND DEFAMATION OF CHARACTER; COUNT IX: RETALIATION FOR INDIVIDUAL AND SYSTEMIC ADVOCACY AND COMMUNITY INVOLVEMENT: 29 U.S.C. 701 (c)(5);

105. Plaintiff here repeats and realleges the allegations of paragraph 6 through 104 of this Complaint, the same as if said Paragraphs were expressly restated here.

106. On or about April 11, 2001 and at various times thereafter, DeModena falsely stated that Plaintiff wished to do harm to DeModena or cause the death of DeModena.

107. By virtue of the willful conduct of DeModena, the Defendant, through its agent, servant and employee, has spoken false statements regarding Plaintiff's medical condition, state of mind and performance abilities. The Defendant, NRPC, through its

agent, servant and employee, has knowingly, willingly and intentionally slandered and defamed Plaintiff intending to prejudice Plaintiff in his reputation, community standing, office, trade, business, and means of livelihood. Defendant has disrespected Plaintiff's individual dignity, personal responsibility, self-determination, and pursuit of meaningful career. As a direct and Proximate result of Defendant's actions: Plaintiff has suffered damage to his professional reputation and reputation generally; Plaintiff is deprived of gainful employment in his chosen profession; Plaintiff is deprived of opportunities of community involvement; Plaintiff is deprived of access to the usual terms, conditions and privileges of employment; Plaintiff is deprived of gainful employment generally; Plaintiff is suffering from severe emotional distress with physical repercussions; Plaintiff has suffered injury and will continue to suffer injury ; Plaintiff requires medical treatment, will continue to require medical treatment and is deprived of means of such treatment.

### COUNT X: LIBEL AND DEFAMATION OF CHARACTER; COUNT XI: RETALIATION FOR INDIVIDUAL AND SYSTEMIC ADVOCACY AND COMMUNITY INVOLVEMENT: 29 U.S.C. 701 (c)(5);

108. Plaintiff here repeats and realleges the allegations of paragraph 6 through 107 of this Complaint, the same as if said Paragraphs were expressly restated here.

109. On or about April 13, 2001, DePhillips sent an electronic mail letter to O'Malley and DeModena and said electronic mail letter directed O'Malley and DeModena to falsely advise Plaintiff that Plaintiff's letters "are troubling and that [O'Malley and DeModena] have concern for [Plaintiff's] own well-being and by extension, the traveling public".

110. By virtue of the willful conduct of DePhillips, the Defendant, through its agent, servant and employee, has written and distributed false statements regarding Plaintiff's medical condition, state of mind and performance abilities. The Defendant, NRPC, through its agent, servant and employee, has knowingly, willingly and

17

intentionally libeled and defamed Plaintiff intending to prejudice Plaintiff in his reputation, community standing, office, trade, business, and means of livelihood. Defendant has disrespected Plaintiff's individual dignity, personal responsibility, self-determination, and pursuit of meaningful career. As a direct and Proximate result of Defendant's actions: Plaintiff has suffered damage to his professional reputation and reputation generally; Plaintiff is deprived of gainful employment in his chosen profession; Plaintiff is deprived of opportunities of community involvement; Plaintiff is deprived of access to the usual terms, conditions and privileges of employment; Plaintiff is deprived of gainful employment generally; Plaintiff is suffering from severe emotional distress with physical repercussions; Plaintiff has suffered injury and will continue to suffer injury ; Plaintiff requires medical treatment, will continue to require medical treatment and is deprived of means of medical treatment.

#### COUNT XII: LIBEL AND DEFAMATION OF CHARACTER; COUNT XIII: RETALIATION FOR INDIVIDUAL AND SYSTEMIC ADVOCACY AND COMMUNITY INVOLVEMENT: 29 U.S.C. 701 (c)(5); COUNT XIV: DISCRIMINATION ON THE BASIS OF RELIGION: 42 U.S.C. s. 2000e

111. Plaintiff here repeats and realleges the allegations of paragraph 6 through 110 of this Complaint, the same as if said Paragraphs were expressly restated here.

112. On or about April 11, 2001 and at various times thereafter, DeModena falsely stated that Plaintiff is a threat because Plaintiff thinks Plaintiff is the devil.

113.. The Workplace Violence Complaint prepared by DeModena and DePhillips complained exclusively of writings which DeModena and DePhillips alleged to be written by Plaintiff. The Workplace Violence Complaint prepared by DeModena and DePhillips falsely stated that writings alleged to be authored by Plaintiff were a threat because Plaintiff thinks Plaintiff is Lucifer, Prince of Darkness.

114. By virtue of the willful conduct of DeModena and DePhillips, the Defendant, through its agents, servants and employees, has written and distributed false

statements regarding Plaintiff's medical condition, state of mind and performance abilities. The Defendant, NRPC, through its agent, servant and employee, has knowingly, willingly and intentionally libeled and defamed Plaintiff intending to prejudice Plaintiff in his reputation, community standing, office, trade, business, or means of livelihood. Defendant has disrespected Plaintiff's individual dignity, personal responsibility, self-determination, and pursuit of meaningful career. As a direct and Proximate result of Defendant's actions: Plaintiff has suffered damage to his professional reputation and reputation generally; Plaintiff is deprived of gainful employment in his chosen profession; Plaintiff is deprived of opportunities of community involvement; Plaintiff is deprived of access to the usual terms, conditions and privileges of employment; Plaintiff is deprived of gainful employment generally; Plaintiff is suffering from severe emotional distress with physical repercussions; Plaintiff has suffered injury and will continue to suffer injury ; Plaintiff requires medical treatment, will continue to require medical treatment and is deprived of means of such treatment.

COUNT XV: UTILIZING STANDARDS OF CRITERIA, OR METHODS OF ADMINISTRATION THAT HAVE THE EFFECT OF DISCRIMINATION ON THE BASIS OF DISABILITY: 42 U.S.C. s. 12112 (3)(A); COUNT XVI: UTILIZING STANDARDS OF CRITERIA OR METHODS OF ADMINISTRATION THAT HAVE THE EFFECT OF DISCRIMINATION ON THE BASIS OF RELIGION: 42 U.S.C. s. 2000e;

115. Plaintiff here repeats and realleges the allegations of paragraph 6 through 114 of this Complaint, the same as if said Paragraphs were expressly restated here.

116. In formal investigation proceedings held on April 23, 2002, DeModena admitted that on or about April 11, 2001 Defendant required DeModena to file Workplace Violence Complaint against the Plaintiff because Plaintiff allegedly believed Plaintiff was the devil.

117. On or about April 11, 2001 DeModena, DePhillips and other employees of Defendant falsely stated amongst themselves and to others within Defendant's corporate

19

organization that Plaintiff was suffering from mental illness which poses a direct threat to Plaintiff himself and others.

118. On or about April 11, 2001, DePhillips activated Defendant's Threat Assessment Response Team ("TART"), because Plaintiff was allegedly suffering from mental illness which poses a direct threat to Plaintiff himself and others.

119. TART members included DePhillips, Suzanne Allen and Captain Robert Smith of the Amtrak Police who were all servants, agents or employees of the Defendant.

120. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that they did not perceive a threatening act in the writings that were the basis of the Workplace Violence Complaint against the Plaintiff.

121. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that they were concerned that the writings that were the basis of the Workplace Violence Complaint against the Plaintiff gave the TART cause to doubt whether Plaintiff's mental state would allow Plaintiff to perform Plaintiff's job safely.

122. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that The TART concluded that the writings that were the basis of the Workplace Violence Complaint against the Plaintiff needed to be assessed by the medical department and medical professionals for evidence of mental illness because mental illness in the workplace is allegedly unsafe.

123. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that The TART concluded that the Defendant's Workplace Violence Policy required TART to regard mental illness as a threat whether or not TART perceived a threat.

124. Beginning on or about May 4, 2001, O'Malley mailed, copied and distributed various letters primarily directed to the Brotherhood of Locomotive Engineers alleging that Defendant's Workplace Violence Policy required Defendant to medically disqualify Plaintiff from service as a Locomotive Engineer in passenger services because Plaintiff's alleged writings indicated obvious mental disorder that precluded the ability of Plaintiff to perform his duties.

125. Defendant identifies their workplace violence policy as "PERS-42" of the Amtrak Policies and Procedures.

126. Page 2 of PERS-42 states that the Defendant's Corporate Vice President of Human Resources shall be responsible for the interpretation, application and administration of the Defendant's Workplace Violence Policy.

127. At all times relevant to this action Defendant's Corporate Vice President of Human Resources was Lorraine A. Green.

128. Defendant's Workplace Violence Policy was approved by Defendant's Corporate Presidents George D. Warrington and David Gunn.

129. By virtue of the willful conduct of Green, Warrington, Dunn, DePhillips, and DeModena, Defendant, through its agents, servants and employees, has required agents design, administer and interpret Defendant's Workplace Violence Policy with criteria and methods of administration that screen out and discriminate against individuals with mental illness. In so administering policies, Defendant has discriminated against Plaintiff in their regard of Plaintiff with mental illness in violation of 42 U.S.C. s. 12112 (3)(A). As a direct and Proximate result of Defendant's actions: Plaintiff has suffered damage to his professional reputation and reputation generally; Plaintiff is deprived of gainful employment in his chosen profession; Plaintiff is deprived of opportunities of community involvement; Plaintiff is deprived of access to the usual terms, conditions and privileges of employment; Plaintiff is deprived of gainful employment generally; Plaintiff is suffering from severe emotional distress with physical repercussions; Plaintiff

21