UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Joseph T. Carmack ) | Civil Action No. 03-12488-PBS |
| Plaintiff, Pro Se ) | |
| ) | SECOND AMENDED COMPLAINT |
| v. ) | |
| ) | AND |
| The National Railroad Passenger ) | |
| ) | DEMAND FOR JURY TRIAL |
| Corporation ) | |
| ) | |
| Defendant ) | |

COMPLAINT

I. Nature and history of action.

1. By this action, the Plaintiff, Joseph Thomas Carmack seeks injunctive, compensatory and declarative relief against the Defendants' medical disqualification of Plaintiff from employment as Locomotive Engineer and Defendant's subsequent wrongful discharge of Plaintiff from employment.

2. This action was commenced on February 5, 2002 as a complaint of discrimination on the basis of disability filed with the Massachusetts Commission Against Discrimination ("MCAD") at One Ashburton Place Room 601, Boston, MA 02108. MCAD dismissed the case.

3. Upon dismissal by MCAD, Plaintiff requested a substantial weight review by the Equal Employment Opportunity Commision ("EEOC"), Boston Area Office, John F. Kennedy Federal Office Building, Government Center, Room 475, Boston, MA 02203.

1

4. On September 5, 2003, the EEOC issued a Dismissal and Notice of Rights including notice of right to initiate this action.

## II. Parties, Jurisdiction and Venue

5. The Plaintiff, Joseph Thomas Carmack, is a natural person residing at 592 Tremont Street, Boston, County of Suffolk Massachusetts.

6. The Plaintiff, Joseph Thomas Carmack, uses a mailing address of 398 Columbus Avenue, Private Mail Box 130, Boston, County of Suffolk Massachusetts.

7. The Defendant, the National Railroad Passenger Corporation ("NRPC", hereinafter also referred to as "Amtrak") is a for profit corporation and quasi-governmental entity organized and existing under the laws of the United States and the Commonwealths of Massachusetts and Pennsylvania. The Defendant's corporate headquarters is located at 60 Massachusetts Avenue, NE Washington, DC. The NRPC also maintains offices at Two South Station in Boston, Massachusetts, 30th Street Station, Philadelphia Pennsylvania.

8. This court has subject matter jurisdiction over this action pursuant to 42 U.S.C. s. 12101 et seq., 29 U.S.C. s. 701 et seq., the First Amendment of the Constitution of the United States of America, 45 U.S.C. s. 50 et seq., 45 U.S.C. s. 151 et seq., 42 U.S.C. s. 2000e and 28 U.S.C. s. 1331.

9. This court has personal jurisdiction over the Defendant who resides within this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred in this district. Venue is proper in this district under 28 U.S.C. s 1391 (b) and 1391 (c).

10. This court has supplemental jurisdiction over ancillary claims that are so related to claims in this action, of which this court has original jurisdiction, that such ancillary claims form part of the same case or controversy under 28 U.S.C. s. 1367.

11. At all times relevant to this action Defendants David Gunn, George Warrington, Lorraine Green, Larry Hriczak, Pat Dogerty, Michael J. O'Bryan, Mark B.

Kenny, Gerard L. DeModena, Lou DePhillips, Suzanne Allan, Michael J. O'Malley, Dr. Tim Pinsky, Dr. Russell Vasile, William C. Rae, Deborah Gaines, Francis J. O'Connor, Jr., Delvine Okereke and Ted Campbell, acting in their capacities as employees, servants or agents of the Defendant, did independently and conjointly act or fail to act so as to give rise to the causes of action contained in this Complaint.

### III. Background of Complaint

12. Plaintiff has been an employee of Defendant in various capacities from October 1979 until on or about May 13, 2002 when he was discharged in all capacities as Locomotive Engineer in commuter rail service.

13. During the time of Plaintiff's employment for the Defendant, Plaintiff engaged in union activities including, but not limited to: regular attendance of union meetings; participation in oral and written union discussions; and the preparation and filing of union grievances.

14. On or about December 20, 1996, Plaintiff was promoted to the position of Locomotive Engineer in commuter rail service.

15. On or about March 1998 Plaintiff's application for membership in Division 57 of the Brotherhood of Locomotive Engineers ("BLE") was approved by vote in accordance with the BLE Constitution.

16. Throughout Plaintiff's service as an engineer in Amtrak Commuter Services, Plaintiff has dutifully reported mechanical Federal Railroad Administration ("FRA") defects of rolling stock equipment and violations of FRA regulations and said reporting was in accordance with Defendant's Rules and Regulations.

17. On or about February 17, 2000 Plaintiff prepared a grievance regarding Defendant's attendance policy and submitted said grievance to Michael J. O'Bryan, Local Chairman of Division 57 for consideration and assistance.

18. Although O'Bryan agreed with the merits of the grievance regarding Defendant's attendance policy, O'Bryan refused to provide assistance in accordance with the BLE Constitution and advised Plaintiff against filing the grievance.

19. On or about March 27, 2000, Plaintiff filed the grievance regarding application of Defendant's attendance policy in a letter to Michael J. O'Malley, the Manager of Operations for Amtrak Commuter Services.

20. Plaintiff's submission of said grievance regarding application of Defendant's attendance policy was pursuant to Plaintiff's rights in accordance with the Railway Labor Act, 45 U.S.C. s. 152, the Constitution of the Brotherhood of Locomotive Engineers and BLE collective bargaining agreements with Defendant.

21. Beginning on or about March 27, 2000 until on or about September 4, 2000 Plaintiff and O'Malley maintained a written dialogue that was copied and distributed to union employees. Said dialogue concerned the grievance regarding application Defendant's attendance policy submitted to O'Malley on March 27, 2000.

22. Beginning on or about March 27, 2000 O'Malley and other administrative agents of Defendant complained to O'Bryan concerning Plaintiff's union activities including, but not limited to, Plaintiffs grievance regarding application of Defendant's attendance policy and the ensuing written dialogue between Plaintiff and O'Malley.

23. Beginning on or about March 27, 2000 and continuing on various occasions thereafter O'Bryan, acting outside his capacities and privileges as Local Chairman of Division 57 of the BLE met and communicated with O'Malley and other administrative agents of Defendant in order to advise and assist O'Malley and other administrative agents of Defendant concerning responses to Plaintiff's union activities including, but not limited to, Plaintiff's grievance regarding Defendant's attendance policy and the ensuing written dialogue between Plaintiff and O'Malley.

24. On or about May 15, 2000, Gerard L. DeModena, in his capacity as Division Road Foreman of Engines for Amtrak Commuter Services, left his office at South Station

4

in Boston to go to North Station in Boston to confront Plaintiff on a train Plaintiff was assigned to as Locomotive Engineer. DeModena confronted Plaintiff to admonish Plaintiff about Plaintiff's union activities, particularly Plaintiff's writing of grievances and writing in general.

25. On or about May 15, 2000, DeModena warned Plaintiff of retaliatory consequences of Plaintiff's union activities.

26. On or about October 9, 2000, two (2) commuter rail trains for which Defendant was responsible were delayed approximately fifteen minutes each when Plaintiff reported Defendant's failure to comply with FRA service and inspection regulations on said trains. Both trains were reported to DeModena and others.

27. Plaintiff's job assignment as Locomotive Engineer for Defendant required Plaintiff to report Defendant's failure to comply with FRA regulations.

28. On or about October 9, 2000, Plaintiff provided documentary and material evidence to DeModena that Defendant was operating trains on Defendant's right of way with rolling stock equipment that failed to comply with FRA regulations.

29. On or about October 9, 2000, Plaintiff provided documentary and material evidence to DeModena that trains for which Plaintiff was responsible for operating on Defendant's right of way were in compliance with FRA regulations.

30. On or about October 9, 2000, DeModena acknowledged to Plaintiff that the FRA violations that were reported by Plaintiff were actual violations, but DeModena advised Plaintiff that DeModena was not concerned about the FRA violations that Plaintiff was reporting because Defendant's employees who operated the Defendant's non-compliant trains had not reported the violations.

31. On or about October 9, 2000, DeModena advised Plaintiff that DeModena was disappointed that Plaintiff was reporting FRA violations because O'Malley would be displeased.

5

32. On or about October 9, 2000, DeModena advised Plaintiff that DeModena would report Plaintiff's reports of FRA violations to O'Malley and that O'Malley would have questions about Plaintiff's reports of FRA violations.

33. On or about October 9, 2000, DeModena advised Plaintiff that DeModena would recommend to O'Malley that Plaintiff be disciplined by O'Malley for reporting FRA violations.

34. On or about October 9, 2000 and at various times thereafter, Plaintiff reminded DeModena that trains for which Plaintiff was responsible for operating on Defendant's right of way were in compliance with FRA regulations.

35. On or about October 9, 2000 and at various times thereafter, Plaintiff advised DeModena that there was no basis to discipline Plaintiff and that Plaintiff was willing to discuss any questions about Plaintiff's work performance or FRA violations with O'Malley and/or DeModena at any time which O'Malley and/or DeModena may find convenient.

36. On or about October 10, 2000, DeModena met with O'Bryan to discuss and agree upon retaliatory discipline of Plaintiff. Plaintiff was to be disciplined in retaliation for reporting mechanical defects of commuter rail equipment, violations of FRA regulations and mechanical violations of Defendant's rules and policies.

37. On or about October 11, 2000, after a BLE union meeting, O'Bryan advised Plaintiff that Plaintiff was to be disciplined by Defendant.

38. On or about October 11, 2000, Plaintiff advised O'Bryan that there was no basis for any discipline.

39. On or about October 11, 2000, Plaintiff advised O'Bryan that if Defendant had any concerns about Plaintiff's job performance, Defendant should approach Plaintiff directly. Plaintiff also advised that O'Bryan's involvement in any matter concerning Plaintiff and Defendant was unnecessary and unwanted.

6

40. On or about October 11, 2000, Plaintiff expressed the opinion to O'Bryan that O'Bryan's manner of intervention between Plaintiff and Defendant was morally and ethically bankrupt and that O'Bryan was acting as agent of Defendant and on O'Bryan's own behalf for personal reasons.

41. On or about October 11, 2000, Plaintiff arranged a meeting with O'Bryan to discuss a number of union and rail business issues unrelated to any complaints about Plaintiff. When making the arrangements, Plaintiff expressly stated to O'Bryan that Plaintiff did not care nor intend to discuss with O'Bryan the particular matter of Defendant's desire to discipline Plaintiff.

42. On or about October 13, 2000 Plaintiff and O'Bryan met informally and discussed a number of union and rail business issues unrelated to any complaints about Plaintiff. Said discussion lasted approximately three hours.

43. On or about October 13, 2000, after approximately 3 hours discussing a number of union and rail business issues unrelated to any complaints about Plaintiff, O'Bryan again advised Plaintiff that Plaintiff was to be disciplined by Defendant through Defendant's agent O'Malley.

44. On or about October 13, 2000, O'Bryan advised Plaintiff that O'Malley would not discuss any matters with Plaintiff, including, but not limited to, intended discipline of Plaintiff.

45. On or about October 13, 2000, O'Bryan further advised Plaintiff that Plaintiff was required by Defendant to cease and desist from filing any grievances or engaging in any written correspondence.

46. On or about October 13, 2000, O'Bryan advised Plaintiff that O'Bryan was to meet with O'Malley to prepare a letter of discipline against Plaintiff.

47. On or about October 13, 2000, Plaintiff acknowledged to O'Bryan that Plaintiff had no control over actions of O'Bryan or O'Malley.

7

48. On or about October 13, 2000, Plaintiff advised O'Bryan that Plaintiff would not cease any union activities, other political endeavors or community involvement including, but not limited to, the filing of grievances Plaintiff thought were warranted.

49. On or about October 13, 2000, Plaintiff expressed the opinion to O'Bryan that grievances were necessary to encourage engineers to comply with FRA safety regulations and Defendant's own policies and regulations.

50. On or about October 13, 2000, Plaintiff expressed the opinion to O'Bryan that O'Bryan and Defendant were knowingly and willingly acting to discourage and intimidate Plaintiff and other engineers employed by Defendant in order to discourage engineers from complying with FRA safety regulations and Defendant's own policies and regulations.

51. During the time of Plaintiff's employment for the Defendant, Defendant has allowed, permitted and encouraged employees to post cartoons, altered newspaper articles and altered photographs depicting and identifying various of Defendant's employees. Said cartoons, articles and photographs related social, union and rail business matters (real and fictitious) in a jovial and creative manner. Said postings were allowed in the North Station operations center in Boston and in the employee resting and lounge areas at various locations including rail yards and stations.

52. On or about October 16, 2000, Plaintiff delivered a letter to O'Bryan which was accompanied by a one page political and religious satire of commuter rail business (hereinafter referred to as the "Rail Satire").

53. The Rail Satire contained a parody of Shakespeare's play Hamlet.

54. The Rail Satire contained reference to Plaintiff, O'Bryan and other of Defendant's employees comparing business roles of Plaintiff, O'Bryan and other employees to character roles in Shakespeare's Hamlet.

55. The Rail Satire was inspired by the ideas of John O. Whitney of Columbia Business school which compare business management situations and issues to the plots and themes of Shakespeare plays.

56. The Rail Satire was further inspired by Plaintiff's own religious beliefs and the play <u>Rosencranz and Guildenstern are Dead!</u> which was written by the playwright Tom Stoppard.

57. The Rail Satire was intended as a creative presentation of moral and ethical considerations of railroad and union business designed to encourage compliance with FRA rules and regulations and Defendant's own rules and policies.

58. The Rail Satire and its considerations were specifically directed at and delivered to BLE Local Chairman O'Bryan for O'Bryan's own consideration of the various thoughts, ideas, principles and conjectures that the Rail Satire might invoke for O'Bryan's own consideration.

59. Beginning on or about May 4, 2001 and on various occasions thereafter, Division 57 of the Brotherhood of Locomotive Engineers, acting through their agent Local Chairman Michael J. O'Bryan acknowledged in various communications to O'Malley, DePhillips and other agents of the Defendant that the Rail Satire was a legitimate business document dealing with legitimate union business relating to union business and utilized within the inner workings of Division 57 of the Brotherhood of Locomotive Engineers.

60. On or about October 16, 2000 O'Bryan began sharing the Rail Satire with other employees.

61. On or about October 24, 2000 O'Bryan met with O'Malley and jointly composed and executed discipline of Plaintiff.

62. On or about October 24, 2000, O'Bryan and O'Malley openly acknowledged to one another that discipline of Plaintiff by O'Bryan and O'Malley on October 24, 2000 was executed outside the scope, regulations and procedures of the Railway Labor Act

9

(U.S.C. 45 s. 151 et seq.), the BLE constitution and the collective bargaining agreement between the BLE and the Defendant.

63. Employee was disciplined on October 24, 2000 in retaliation for reporting mechanical and other violations of FRA regulations and Defendant rules and regulations.

64. On or about November 1, 2000, Plaintiff advised O'Bryan that Plaintiff intended to grieve discipline imposed on Plaintiff by the Defendant and that Plaintiff would further expose violation of FRA Rules and Regulations in grievance of unfair discipline by Defendant.

65. On or about November 1, 2000, O'Bryan warned Plaintiff that O'Bryan would have Plaintiff discharged from service by Defendant for grieving unfair discipline of October 24, 2000.

66. Plaintiff expressed the opinion to O'Bryan that if O'Bryan were able to have Plaintiff discharged from service with Defendant for grieving unfair discipline of October 24, 2000, O'Bryan could only do so by working secretly as an agent of the Defendant against the interests of Division 57 of the Brotherhood of Locomotive Engineers.

67. On or about November 1, 2000, O'Bryan warned Plaintiff that Plaintiff would be discharged from service with Defendant for exposing violations of FRA Rules and Regulations.

68. On or about December 15, 2000 Plaintiff began grievance proceedings against discipline of Plaintiff and said grievance pursuant of rights and privileges in accordance with the Railway Labor Act (45 U.S.C. s 151 et seq.), the collective bargaining agreement between the BLE and Defendant, and the BLE constitution.

69. On or about December 22, 2000 Defendant's agent O'Malley denied Plaintiff's grievance of December 15, 2000.

70. On or about February 20, 2001, Plaintiff made formal appeal of Plaintiff's December 15, 2000 grievance to O'Bryan. Said appeal to O'Bryan was pursuant to rights and privileges in accordance with the Railway Labor Act (45 U.S.C. s 151 et seq.), the

collective bargaining agreement between the BLE and Defendant, and the BLE constitution.

71. On or about March 5, 2001 Plaintiff had a prearranged meeting with Mr. DeModena to discuss Defendant's violations of FRA regulations and Defendant's retaliation against Plaintiff for reporting such violations.

72. On or about March 5, 2001 Mr. DeModena asked Plaintiff about Plaintiff's personal religious beliefs.

73. On or about March 5, 2001 DeModena became agitated with Plaintiff and offered general criticism of Plaintiff's union activities, work ethic and religious beliefs. Mr. DeModena told Plaintiff that DeModena makes paper airplanes out of Plaintiff's grievances and said: "I read your writings and I say to myself, 'Forgive them, for they know not what they do'".

74. On or about March 11, 2001, O'Bryan sent an open letter to Plaintiff which was copied to other union members. Said open letter complained about and criticized Plaintiff's job performance and union activities.

75. On or about March 11, 2001, O'Bryan's open letter to Plaintiff which was directed to Plaintiff and copied to other union members, O'Bryan made reference to the Rail Satire.

76. Beginning on or about March 11, 2001, O'Bryan successfully solicited the assistance of other union employees of Defendant to distribute copies of his March 11, 2001 open letter which was addressed to Plaintiff and directed to Plaintiff.

77. Beginning on or about March 11, 2001, O'Bryan and other of Defendant's employees distributed copies of O'Bryan's open letter written to Plaintiff on Defendant's property.

78. At the request of other union members, Plaintiff responded to O'Bryan's open letter on or about April 4, 2001.

79. On or about April 4, 2001, in areas of general public access while Plaintiff was off duty, Plaintiff began sharing copies of Plaintiff's April 4, 2001 written response to O'Bryan's letter of March 11, 2001.

80. Said sharing of copies of Plaintiff's April 4, 2001 written response to O'Bryan's letter of March 11, 2001 was with specific union employees at the request of said union employees.

81. On or about April 4, 2001, in areas of public access while Plaintiff was off duty, Plaintiff began sharing copies of the Rail Satire with other of Defendant's employees for reference from O'Bryan's March 11, 2001 open letter and Plaintiff's response to said letter.

82. On or about April 11, 2001, William C. Rae, Amtrak Trainmaster, intercepted a copy of the Rail Satire from union employees.

83. On or about April 11, 2001, Rae delivered copies of Plaintiff's April 4, 2001 written response to O'Bryan's letter of March 11, 2001, a copy of the Rail Satire and other documents to DeModena.

COUNT I:
SLANDER, LIBEL AND DEFAMATION;

84. Plaintiff here repeats and realleges the allegations of paragraph 6 through 83 of this Complaint, the same as if said Paragraphs were expressly restated here.

85. On or about April 11, 2001, DeModena met with Lou DePhillips, Defendant's Manager of Labor Relations in Boston, and planned a misrepresentation of Plaintiff's activities and writings.

86. At said meeting on or about April 11, 2001, DeModena and DePhillips reiterated concerns about Plaintiff's reports of FRA concerns, Plaintiff's reports of safety concerns in general and Plaintiffs union discussions and activities.

87. At said meeting on or about April 11, 2001, DeModena and DePhillips discussed the intention to inhibit and prevent Plaintiff's reports of FRA concerns,

12

Plaintiff's reports of safety concerns in general and Plaintiffs union discussions and activities.

88. At said meeting on or about April 11, 2001, DeModena and DePhillips discussed the intended goal of terminating Plaintiff from employment.

89. At said meeting on or about April 11, 2001, DeModena related personal knowledge about Plaintiff gained from DeModena's developing personal relationship with Plaintiff, including matters of Plaintiff's personal philosophies, aesthetics, artistic inclinations and religious beliefs.

90. At said meeting on or about April 11, 2001, DeModena and DePhillips discussed the consequences of filing a Workplace Violence Complaint against Plaintiff including the requirement that Plaintiff undergo comprehensive psychological testing and psychiatric evaluation and investigation.

91. At said meeting on or about April 11, 2001, DeModena and DePhillips discussed the intention to acquire a professional medical concurrence that Plaintiff was suffering from a psychiatric disorder that made Plaintiff a safety threat to himself and others.

92. At said meeting on or about April 11, 2001, DeModena and DePhillips discussed the intention to acquire a professional medical concurrence that Plaintiff was suffering from a psychiatric disorder that made Plaintiff unable to safely perform his duties as locomotive engineer.

93. On or about April 11, 2001, DeModena and DePhillips prepared a formal Workplace Violence Complaint against Plaintiff wherein DeModena and DePhillips libeled Plaintiff and falsely and maliciously stated that Plaintiff identified Plaintiff's own self as "Lucifer, Prince of Darkness".

94. As part of the Workplace Violence Complaint, Mr. DeModena and Mr. DePhillips supplied the defendant with a "Workplace Violence Report Form".

95. On the "Workplace Violence Report Form", Mr. DeModena arbitrarily, maliciously and falsely wrote in the Plaintiff's name to identify Plaintiff as "person Accused of threats or Workplace Violence".

96. On the "Workplace Violence Report Form", Mr. DeModena arbitrarily, maliciously and falsely wrote the word "threat" as the type of incident.

97. On the "Workplace Violence Report Form", Mr. DeModena references the Rail Satire and arbitrarily, maliciously and falsely misrepresents the Rail Satire.

98. On the "Workplace Violence Report Form", Mr. DeModena arbitrarily, maliciously and falsely identified the Plaintiff as "Lucifer, Prince of Darkness" referenced in the Rail Satire where no such identification of Plaintiff is indicated in the Rail Satire.

99. On the "Workplace Violence Report Form", Mr. DeModena arbitrarily, maliciously and falsely wrote that Plaintiff "maintains that [Plaintiff] is in 'control'(sic) now then proceeds to recast 'Hamlet' (sic) w/mgrs (sic), proclaiming to change the ending to [Plaintiff's] liking and kills off [DeModena's] character."

100. On the "Workplace Violence Report Form", Mr. DeModena arbitrarily, maliciously and falsely wrote that Plaintiff threatened DeModena and that "this episode followed a few incidents where [DeModena] had to speak w/[Plaintiff] re his conduct."

101. On or about April 11, 2001 and at various times thereafter DeModena, DePhillips and other employees of Defendant falsely and maliciously stated to superiors and other employees and agents of the Defendant that Plaintiff thinks Plaintiff is the devil.

102. On or about April 11, 2001 and at various times thereafter, DeModena, DePhillips and Transportation Manager William Rae falsely and maliciously stated between each other and to other employees and agents of the Defendant that Plaintiff wished to do harm to DeModena or cause death to DeModena.

103. On or about April 13, 2001, DePhillips sent an electronic mail letter to O'Malley, DeModena and Suzanne Allan and said electronic mail letter directed O'Malley

14

and DeModena to falsely and maliciously advise Plaintiff that Plaintiff's letters "are troubling and that [O'Malley and DeModena] have concern for [Plaintiff's] own well-being and by extension, the traveling public".

104. On or about April 11, 2001 and at various times thereafter, DeModena, DePhillips and other agents of defendant falsely and maliciously stated to other defendant employees that Plaintiff is a threat because Plaintiff thinks Plaintiff is the devil.

105. On or about April 11, 2004 DeModena and DePhillips prepared written Workplace Violence Complaint reports that complained exclusively of writings which DeModena and DePhillips alleged to be written by Plaintiff. The Workplace Violence Complaints prepared by DeModena and DePhillips falsely and maliciously stated that writings alleged to be authored by Plaintiff were a threat because Plaintiff thinks Plaintiff is Lucifer, Prince of Darkness.

106. Beginning on or about May 3, 2001, Defendant's Medical Director, Dr. Tim Pinsky began publishing a series of documents within various of Defendant's organizational departments that falsely and maliciously stated that Plaintiff is suffering from a "severe psychiatric disorder that presents a threat to not only [Plaintiff's] co-workers but to [Plaintiff] himself and the traveling public". Dr. Pinsky falsely and maliciously repeated such statements orally to various of Defendant's administrative staff, including, but not limited to, DePhillips, O'Malley, DeModena, and O'Bryan.

107. Beginning on or about May 3, 2001, Defendant's Medical Director, Dr. Tim Pinsky began publishing a series of documents within various of Defendant's organizational departments and said documents falsely and maliciously stated that "samples of materials reportedly written by [Plaintiff] justify [Plaintiff] being deemed medically disqualified immediately pending a...FFD exam."

108. Beginning on or about May 4, 2001, O'Malley mailed, copied and distributed various letters primarily directed to the Brotherhood of Locomotive Engineers falsely and maliciously stating: that Plaintiff was suffering from mental disorder and that

15

said mental disorder justified a charge of workplace violence because the mental disorder which O'Malley falsely and maliciously stated Plaintiff was suffering from posed a direct threat to Plaintiff and others.

109. Beginning on or about May 4, 2001, O'Malley mailed, copied and distributed various letters primarily directed to the Brotherhood of Locomotive Engineers and said letters falsely and maliciously stated that Plaintiff's alleged writings indicated an obvious mental disorder that precluded the ability of Plaintiff to perform his duties.

110. On or about May 15, 2001, O'Malley wrote, published and distributed a letter addressed to Mr. Michael J. O'Bryan and directed to the Brotherhood of Locomotive Engineers (BLE) and said letter falsely and maliciously implicated Plaintiff as one suffering from "mental impairment".

111. In said letter dated May 15, 2001, O'Malley introduces the letter by announcing that the letter is a response to correspondence "concerning" the Plaintiff.

112. In said letter dated May 15, 2001, O'Malley then proceeds to quote Rule 25 of the collective bargaining agreement (CBA) between the BLE and Defendant corporation to describe the manner in which correspondence 'concerns' the Plaintiff.

113. In said letter dated May 15, 2001, O'Malley quotes Rule 25 of the CBA as follows: "Rule 25 B of the BLE Agreement states in pertinent part: 'When it is obvious that a Passenger Engineer is medically (physically or mentally) impaired in a way that affects his service, the Corporation may hold that Passenger Engineer out of service pending the outcome of a medical examination.' "

114. In said letter dated May 15, 2001, as indicated in paragraph 110, O'Malley refers to a section of the CBA concerning occasions "when it is obvious that a Passenger Engineer is medically (physically or mentally) impaired" and O'Malley also clearly, maliciously and falsely indicates that said reference is "pertinent" (as in 'pertaining to') an occasion "concerning" the Plaintiff.

115. In said letter dated May 15, 2001, O'Malley clearly, maliciously and falsely indicates to O'Bryan and the Brotherhood of Locomotive Engineers that it is "obvious" that the Plaintiff, "is medically (physically or mentally) impaired in a way that affects his service".

116. In said letter dated May 15, 2001, O'Malley states that [Plaintiff] "is being held out of service with pay as a result of our physician's review of material provided to him by the Threat Assessment Response Team."

117. In said letter dated May 15, 2001, O'Malley falsely and maliciously states that "Our Physician deemed [Plaintiff] 'medically disqualified'. This is no different than an engineer being categorized as medically disqualified for failing to provide sufficient documentation to explain an existing medical condition."

118. With the words quoted above in paragraphs 113 and 114 from O'Malley's letter to O'Bryan and the BLE where such words are offered as an explanation of how the CBA quoted above is applied, O'Malley clearly, maliciously and falsely indicates that Plaintiff was "medically disqualified" because the Plaintiff is "medically (mentally or physically) impaired" due to an "existing medical condition".

119. In O'Malley's letter to O'Bryan and the BLE dated May 15, 2001, O'Malley offers further malicious and false explanation of Plaintiff's medical disqualification by maliciously and falsely stating that "our physician's concern, as well as ours, was engineer [Plaintiff]'s dark parody."

120. With the words quoted in paragraph 116 above from O'Malley's letter to O'Bryan and the BLE dated May 15, 2001, O'Malley associates the Plaintiff with an undescribed parody in an undescribed way and O'Malley clearly indicates that the Plaintiff was medically disqualified due to his association to the undescribed parody.

121. Defendant has made no complaints regarding O'Bryan's publication or distribution of documents directed to Plaintiff which O'Bryan publicized and distributed on Defendant's property.

17

122. Defendant has made no complaints regarding publication or distribution of cartoons, altered newspaper articles, altered photographs or other documents depicting and identifying various of Defendant's employees when said documents were copied distributed publicized and distributed by employees other than Plaintiff on or off of Defendant's property.

123. On or about September 16, 2002, Delvine Okereke, Defendant's Manager of EEO Compliance, wrote and mailed a letter to the Massachusetts Commission Against Discrimination and said letter falsely and maliciously stated that Plaintiff "would like to see physical harm, if not death, come to Mr. DeModena".

124. Beginning on or about May 13, 2002, Deborah Gaines, Defendant's hearing officer published a "Decision Letter" falsely and maliciously alleging that Plaintiff's alleged writings indicated Plaintiff believed Plaintiff to be Lucifer.

125. On or about August, 16, 2002, at an appeal of dismissal of Plaintiff which was held pursuant to the collective bargaining agreement between BLE and the Defendant, Pat Dogerty, Manager of Labor Relations in Philadelphia Pennsylvania, falsely and maliciously declared that Plaintiff was dismissed from Plaintiff's position as Locomotive Engineer in commuter rail service because Plaintiff believes Plaintiff himself to be the devil.

126. By virtue of the willful conduct of DeModena, DePhillips, O'Malley, Okereke, Suzanne Allan, Pinsky, Okereke, Rae, Gaines Dogerty and others, the Defendant, through its agents, servants and employees, has maliciously written and distributed false statements regarding Plaintiff's medical condition, state of mind and performance abilities.

127. The Defendant, NRPC, through its agents, servants and employees, has knowingly, willingly and intentionally libeled and defamed Plaintiff intending to prejudice Plaintiff in his reputation, community standing, office, trade, union, business and means of livelihood.

128. As a direct and Proximate result of Defendant's actions: Plaintiff was terminated from employment with Defendant in all capacities. Plaintiff has suffered damage to his professional reputation and reputation generally with the result that new and further employment is unavailable to Plaintiff; gainful employment in his chosen profession particularly with reference to his experience is unavailable to Plaintiff; Plaintiff has lost opportunities of community involvement; Plaintiff has lost access to the usual terms, conditions and privileges of employment; Plaintiff is suffering from severe emotional distress with physical repercussions; Plaintiff has suffered injury and will continue to suffer injury due to loss of access to personal emotional resources; Plaintiff requires medical treatment, will continue to require medical treatment and is deprived of means of medical treatment; Plaintiff has lost medical insurance and an employee and for retirement; fellow union members are denying Plaintiff membership privileges and opportunities for union office; Plaintiff has fallen into bankruptcy.

## COUNT TWO:
## INVASION OF PRIVACY

129. Plaintiff here repeats and realleges the allegations of paragraph 6 through 128 of this Complaint, the same as if said Paragraphs were expressly restated here.

130. On or about October 16, 2000, Dr. Ann Gurian, Plaintiff's personal physician, evaluated number of medical symptoms which had suddenly been exacerbated.

131. On or about October 16, 2000, Dr. Ann Gurian discussed with Plaintiff the possible need for an extended medical leave from employment if symptoms continued.

132. On or about November 1, 2000, Plaintiff spoke with Francis O'Connor, Defendant's Director of Crew management services and Plaintiff advised O'Connor that he would be taking an extended medical leave due to a bono fide illness in accordance with Collective Bargaining Agreement.

133. On or about November 1, 2000, O'Connor warned Plaintiff that Plaintiff would be disciplined if he were absent due to illness.