Exhibit G

# DECISION LETTER

May 13, 2002

Joseph T. Carmack
398 Columbus Avenue # 130
Boston, MA 02116

File No.: 01-049

Dear Mr. Carmack:

By Notice of Investigation, dated September 10, 2001, you were charged with the following:

> Charge I: Development of the facts and determination of your responsibility, if any, in that on August 27, 2001, and at 4:00 P.M., you allegedly failed to appear for a fitness for duty evaluation with Dr. Vasile. In a letter dated July 24, 2001, you were instructed by Mr. O'Malley, Director of Operations, that "your failure to appear, your refusal to cooperate with the physician, or adopt some other tactic to frustrate this evaluation would initiate the formal discipline process for gross insubordination."
>
> Your alleged failure to comply with this directive constitutes a direct violation of Amtrak's 'Standard of Excellence', under the section titled 'Professional and Personal Conduct', specifically Teamwork, which reads in pertinent part: "[F]ollowing instructions . . ..you must comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers."

The undersigned-hearing officer conducted an investigation into the above-quoted charges on the following dates: April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, after one postponement at the request of your Organization. You were present throughout the entire proceeding and represented by your BLE Representative, Richard Prone.

Testimony adduced and documentation submitted established the following:
1. At all times during your employment, Amtrak's Standards of Excellence were in effect and applicable to you, as they are to all Amtrak employees.
2. Carrier maintains a Workplace Violence Policy (PERS –42). The policy's stated purpose is to "establish guidelines and protocols for the handling of threats or acts of violence in the Amtrak workplace." Threats, under the policy, can include written communications or acts to instigate or encourage violence. The policy indicates that "even without an actual threat, employees should report any behavior they have witnessed which they regard as threatening or violent . . ."

3. On April 11, 2001, Joseph DeModena, Division Road Foreman for Commuter Service, found a large packet of written materials, entitled "Letters From Hell", on his desk. According to Mr. DeModena, he did not know how the packet got on his desk, but the majority of the materials within the packet were authored by you.
4. Mr. DeModena testified that he found portions of the packet to be very disturbing. Specifically, he noted the parody of Hamlet, which included a casting page which was addressed to God and provided that "this play has a messy ending more to my liking" and was signed under the name, "Lucifer". The parody had Mr. DeModena cast as Rosencrantz, a character who is murdered.
5. Mr. DeModena testified that he reported the situation to Lou DePhillips, Director of Labor Relations by phone that day because he found the materials disturbing and threatening. He was provided a complaint form that he completed the next day.

The Organization argues that Mr. DeModena had no reason to feel threatened by the material. First, they note that the material was not directed at Mr. DeModena. The material was related to an internal union dispute between you and BLE local president, Mr. O'Bryan. They note that the material had been written several months earlier. While that may be true, I find no reason to discredit Mr. DeModena's testimony regarding his perception of the materials. He found them on his desk and had previous disputes with you. Therefore, the vague nature of the materials, especially the parody, in which his character was murdered, and your commentary that you liked this ending better than the Shakespearean history plays, could reasonably cause a person to feel threatened. The workplace violence policy is clear that the nature of reportable incidents includes a broad range of behaviors and threats do not have to be imminent.

6. The evidence established that Mr. Lou DePhillips, Labor Relations Director, is a member of the Threat Assessment and Review Team (TART), which is charged with evaluating workplace violence complaints and determining what, if any, action should be taken. Mr. DePhillips testified that he reviewed the materials left on DeModena's desk and consulted with fellow TART team members, Captain Smith of the Amtrak Police and Suzanne Allen, Director of Human Resources. He stated that he came to the conclusion that the materials should be reviewed by the Medical Department. Both Ms. Allen and Detective Smith corroborated this account.
7. The evidence established that initially, Dr. Pinsky, Medical Director for the Northeast Corridor, was provided with only a select number of pages from the "Letters from Hell" packet. Dr. Pinsky testified that he reviewed the selected pages at their request. He found them disturbing and questioned your fitness for duty. As a result, he concurred that you should be disqualified from service pending a fitness for duty examination. The Medical Department notified Mr. O'Malley of this finding by email communication on May 3, 2001.
8. By letter dated May 4, 2001, Mr. O'Malley, Director of Operations for Commuter Rail, advised you that you were being held out of service, with pay, pending a fitness for duty examination, based upon the writings that were submitted to Dr.

Pinsky. An appointment with Dr. Vasili was arranged for you by the Medical Department for June 4, 2001. You were advised of this appointment by letter dated May 17, 2001.

9. On June 5, 2001, Mr. O'Malley received an email from the Medical Department advising him that you had canceled the appointment with Dr. Vasili. As a result, Mr. O'Malley wrote you a letter on June 8, 2001 in which he advised you that as a result of your canceling the appointment, your pay status was changed to "without pay". In addition, he advised you that you needed to reschedule the appointment.

10. On June 27, 2001, you went to Dr. Vasili's office with your local President, Mike O'Brien. After discussing your concerns about confidentiality and the need for a psychiatric examination, you refused to submit for the evaluation.

11. On July 24, 2001, Mr. O'Malley advised you by letter that he was providing you one last opportunity to attend the fitness for duty examination. His letter advised:

> "If you either fail to appear, refuse to cooperate with the physician, or adopt some other tactic to frustrate the evaluation, I will then place your behavior within the formal process. Such behavior will lead me to issue charges for gross insubordination and possibly contrary activities. If you have any doubts or questions as to what is expected, please contact me at (717) 222-3650."

12. On September 5, 2001, Mr. O'Malley received an email from the Medical Department advising him that a letter from Dr. Vasili was being sent to him. The letter, which was received by the Medical Department on September 4, 2001, indicated that you refused to undergo the exam.

While you testified that you did not specifically refuse, I find that the conditions you placed upon the exam constituted a refusal.

13. Based upon the record as a whole, I find sufficient evidence to sustain the charge against you. Carrier's Medical Director determined that a fitness for duty exam was necessary based upon his review of materials that contained references to Amtrak supervisors and co-workers. After several attempts to have you undergo the examination, you failed to do so, even after being warned that such failure would be considered insubordination.

The Organization argues that Mr. DeModena's complaint was an attempt to get back at you for causing him problems. While there was evidence that you had been counseled for operational incidents, I do not find that to be sufficient to determine that Mr. DeModena manufactured this incident. While it is not clear how the "Letters from Hell" were delivered to Mr. DeModena, it is reasonable that upon finding them, Mr. DeModena would consider them disturbing and threatening, especially if you and he had been having any kind of difficulties. The materials in question contain dark humor that has the potential to be interpreted in many ways. The fact that Mr. DeModena was cast in the role of a character that is murdered could reasonably cause him concern. The workplace violence policy

While the Organization argues that Dr. Pinsky's decision to disqualify you pending a fitness for duty examination constituted the determination of the Carrier's physician, I find that reading of the contract to be wrong. Dr. Pinsky did not examine you. Rather, he reviewed a situation (your writings) and found that there was a question about whether you were fit for duty. As a result, he disqualified you pending a FFD exam.

Finally, I do not find sufficient justification for your decision not to comply with Mr. O'Malley's directive to you to undergo the fitness for duty examination. Amtrak's Standards of Excellence Provide, in pertinent part:

> "Therefore, you must comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers.
>
> The only exception to the above requirement arises when compliance with a particular instruction would cause a clear, immediate danger to you, your fellow employees, our customers, the public or company property."

Refusal to obey a directive is justified only when compliance will cause clear and imminent danger. While I credit your testimony that you had fears regarding the confidentiality of the exam and the repercussions of the exam on you, I do not find them to be the type of clear and imminent harm contemplated under the Standards of Excellence. The examination results would have been reported to Amtrak's Medical Department. Thus there was no objective harm that could result. Being held out of service based upon the finding is not a danger as defined under the standards of excellence.

Nor do I find Dr. Anne Gurion's notes sufficient evidence that complying with the fitness for duty exam would result in imminent danger to you. Dr. Gurion's May note indicates that she agreed "with Mr. Carmack that a forced, nonconfidential psychiatric consultaon would be inadvisable for medical reasons". This letter provides no basis to determine what type of harm you would face. Moreover, the May 30, 2001 letter suggests she bases this opinion on your representation of what the exam would entail. Given the documentation from Dr. Vasili, I don't believe that you properly characterized the exam to Dr. Gurion and, therefore, her opinion seems based upon incomplete information.

14. Finally, although you apparently refused to meet with Dr. Vasili on August 28, 2001, the information was not forwarded to the Medical Department until September 4, 2001 and to Mr. O'Malley on September 5, 2001. While Rule 21 of the BLE agreement provides that charges must be issued within seven days of the incident, unless it is a criminal offense, I cannot find that the Carrier had any undue delay in this case. First, because the incident involved a medical examination, Mr. O'Malley would not have any ability to determine your

compliance until he received information from the Medical Department. He received it on September 5, 2001, the date the charges were issued.

Based on the foregoing, I find that Carrier proved the charges against you. A copy of the transcript and copy of the exhibits are enclosed.

Signed:

_Deborah Gaines_   5-13-02
Deborah M. Gaines          Date
Hearing Officer

Cc: R. Prone
    W. Rae
    M. O'Connell

BASED ON THE FINDINGS OF THE HEARING OFFICER IN THIS CASE, AND IN CONSIDERATION OF THE SERIOUS NATURE OF THE PROVEN OFFENSE, I HEREBY ASSESS THE FOLLOWING DISCIPLINE:

## DISMISSAL IN ALL CAPACITIES
## EFFECTIVE IMMEDIATELY

Please return any and all items of Company property, Including your Rail Travel Privilege Pass, to this office as soon as possible.

Francis J. O'Connor Jr.
Assistant General Manager
Commuter Operations
253 Summer Street
Boston, MA 02210