134. On or about November 16, 2000, Plaintiff mailed O'Connor a notice from Dr. Gurian advising that Plaintiff was absent from employment for medical reasons due to a bona fide illness.

135. On or about January 18, 2001, Plaintiff advised O'Malley that Plaintiff was prepared to return to work with advice to do so from Plaintiff's personal physician.

136. On or about January 20, 2001 Plaintiff reported to HEALTH RESOURCES, INC. for a "return-to-work" physical examination where Plaintiff was examined by Dr. Brian Morris.

137. Dr. Brian Morris and HEALTH RESOURCES INC. were contracted by Defendant to provide discreet examinations the results of which were reported to Defendant's Health Services Department in Philadelphia, Pennsylvania.

138. Plaintiff reported to Dr. Brian Morris that Plaintiff had been unable to work for several months due to exacerbated psychiatric symptoms.

139. After describing symptoms to Dr. Morris, Dr. Morris pursued matters of treatment, symptoms and diagnosis and Plaintiff requested special accommodation by asking Dr. Morris to speak with Plaintiff's attending physician, Dr. Ann Gurian, rather than discuss treatment, symptoms and diagnosis any further with Plaintiff.

140. On or about January 21, 2001, Dr. Morris spoke with Dr. Gurian concerning Plaintiffs medical condition and ability to return to work.

141. When Dr. Morris spoke with Dr. Gurian on January 21, 2001, Dr. Morris asked about Plaintiff's ability to return to work.

142. When Dr. Morris spoke to Dr. Gurian on January 21, 2001, Dr. Morris asked Dr. Gurian if Plaintiff was suffering from Bi-Polar disorder or Personality disorder.

143. When Dr. Morris spoke to Dr. Gurian on January 21, 2001, Dr. Morris asked Dr. Gurian if Plaintiff was able to return to work without posing a direct threat to Plaintiff's self or others.

144. On or about January 21, 2001, Dr. Ann Gurian advised Dr. Brian Morris that Plaintiff was neither suffering from Bi-Polar disorder nor Personality disorder.

145. On or about January 21, 2001, Dr. Ann Gurian advised Dr. Brian Morris that Plaintiff was no longer suffering any symptoms that would prevent Plaintiff from safely performing his duties as Locomotive Engineer in commuter rail.

146. On or about January 23, 2001, after Dr. Morris' conversation with Dr. Gurian, Dr. Morris reported the conversation with Dr. Gurian to the Defendant's Health Services Department.

147. On or about January 25, 2004, Plaintiff was directed by Defendant to call Defendant's Health Services Department in Philadelphia, Pennsylvania.

148. On or about January 25, 2004,  Marianne Letterio of Defendant's Health Services Department advised Plaintiff that Plaintiff's concerns about privacy and confidentiality on medical matters would be respected and accommodated.

149. On or about January 25, 2004, Marianne Letterio advised Plaintiff that Plaintiff should not discuss specific matters with supervisors or managers and that Plaintiff could call Defendant's Health Services Department directly to confidentially address all medical matters.

150. On or about January 25, 2004, Plaintiff was called by Jonathan White of Defendant's Crew Management Services Department and Plaintiff was instructed by White to report for duty.

151. On or about January 25, 2004, Plaintiff reported for duty to Plaintiff's assignment as Locomotive Engineer on Defendant's railroad property.

152. At all times relevant to this complaint Defendant has maintained a company policy entitled a "Workplace Violence Policy" which is also known as "PERS-42".

153. At all times relevant to this complaint, construction and enforcement of the Defendant's Workplace Violence Policy has been the specific responsibility of

21

Defendant's Corporate Vice President of Human Resources, Lorraine Green and the Defendant's Corporate Presidents George Warrington and David Gunn.

154. At all times relevant to this complaint, Corporate Vice President Green, under the direction of Corporate Presidents Warrington and Gunn, has been responsible for "interpretation, application and administration" of Defendant's Workplace Violence Policy.

155. At all times relevant to this complaint, Ms. Green was responsible for assigning employees to be members of various division and regional "Threat Assessment Response Teams" also referred to as "TART" teams throughout defendant corporation.

156. At all times relevant to this complaint, Mr. Lou DePhillips, Defendant's Railroad Police Captain Robert Smith and Ms. Suzanne Alan were members of Defendant's Boston Division TART team in Boston, Suffolk County, Massachusetts.

157. At all times relevant to this complaint, Defendant agents Green, Warrington and Gunn promoted an interpretation of Defendant's Workplace Violence policy that allows that when any employee is accused of workplace violence without cause or reason, any supervisor or member of the TART may arbitrarily consider the mere accusation against the employee as "basis to doubt whether [the] employee's physical condition or mental state will allow him/her to perform his/her job safely".

158. At all times relevant to this complaint, Defendant agents Green, Warrington and Gunn promoted an interpretation of Defendant's Workplace Violence policy that allows any of Defendant's supervisors to arbitrarily direct employees to undergo a non-confidential fitness-for-duty physical examination including complete non-confidential psychiatric evaluation and non-confidential psychological testing, provided that defendant's Regional Director, Dr. Tim Pinsky, concurred with the direction to the accused employee to undergo the examination when said employees, without cause or reason, are accused of workplace violence.

22

159. Defendant agents Green, Warrington and Gunn directed defendant's Regional Medical Director, Dr. Tim Pinsky, to concur at all times relevant with this complaint with any of Defendant's supervisors who arbitrarily directs employees to undergo a non-confidential fitness-for-duty physical examination including complete non-confidential psychiatric evaluation and psychological testing when, without cause or reason, said employees are accused of workplace violence.

160. At all times relevant to this complaint, DeModena, DePhillips, Suzanne Allan, Defendant's Railroad Police Captain Robert Smith and Transportation Manager William Rae had specific knowledge that Defendant agents Green, Warrington and Gunn directed defendant's Regional Medical Director, Dr. Tim Pinsky, to concur at all times relevant with this complaint with any of Defendant's supervisors who arbitrarily directs employees to undergo a non-confidential fitness-for-duty physical examination including complete non-confidential psychiatric evaluation, examination and non-confidential psychological testing when said employees are accused of workplace violence without cause or reason.

161. On or about April 11, 2001 DeModena and DePhillips maliciously and intentionally filed a false workplace violence complaint against Plaintiff in order to solicit the concurrence of Defendant's Regional Medical Director Dr. Tim Pinsky with an order to coerce Plaintiff to undergo a non-confidential psychiatric evaluation, psychiatric examination and psychological testing.

162. On or about April 11, 2001 DeModena and DePhillips individually and separately faxed various portions of the above mentioned Workplace Violence Report to Defendant's Medical Director Dr. Tim Pinsky and Defendants Manager of Health Services Marianne Letterio in order to solicit the concurrence of Defendant's Regional Medical Director Dr. Tim Pinsky with an order to coerce Plaintiff to undergo a non-confidential psychiatric evaluation, psychiatric examination and psychological testing.

23

163. On or about May 3, 2001 Ms. Suzanne Alan, Manager of Human Resources in Defendant's Boston Division office in Boston, Suffolk County, Massachusetts, sent an electronic mail letter to Ms. Letterio soliciting the concurrence of Defendant's Regional Medical Director Dr. Tim Pinsky with an order to coerce Plaintiff to undergo a non-confidential psychiatric evaluation, psychiatric examination and psychological testing.

164. On or about May 3, 2001, Pinsky prepared internal personnel documents indicating that "samples of materials reportedly written by [Plaintiff]" were indicators of mental illness and/or personality disorder and/or bi-polar disorder and as such indicators "samples of materials reportedly written by [Plaintiff]" were bases to "doubt whether [Plaintiff's]...mental state will allow [Plaintiff] to perform his job safely".

165. On or about May 3, 2001, Pinsky directed Marianne Letterio, Defendant's Manager of Health Services, to inform DeModena, DePhillips, Suzanne Allan and O'Malley that Dr. Pinsky concurred with an order to coerce Plaintiff to undergo a non-confidential psychiatric evaluation, psychiatric examination and psychological testing.

166. On or about May 3, 2001, Pinsky directed Marianne Letterio, Defendant's Manager of Health Services, to inform DeModena, DePhillips, Suzanne Allan and O'Malley that "samples of materials reportedly written by [Plaintiff] ...justify [Plaintiff] being deemed medically disqualified immediately pending a...FFD exam" including a non-confidential psychiatric evaluation, psychiatric examination and psychological testing.

167. On or about May 3, 2001, Marianne Letterio, Defendant's Manager of Health Services, sent an electronic mail letter to O'Malley, DeModena, DePhillips and Suzanne Allan to inform Mr. O'Malley, DeModena, DePhillips and Suzanne Allan that "samples of materials reportedly written by [Plaintiff]" were bases to "doubt whether [Plaintiff's]...mental state will allow [Plaintiff] to perform his job safely".

168. On or about May 3, 2001, Marianne Letterio, Defendant's Manager of Health Services, sent an electronic mail letter to O'Malley, DeModena, DePhillips and

Suzanne Allan to inform O'Malley, DeModena, DePhillips and Suzanne Allan that Dr. Pinsky concurred with an order to coerce Plaintiff to undergo a non-confidential psychiatric evaluation, psychiatric examination and psychological testing.

169.  On or about May 3, 2001, Marianne Letterio, Defendant's Manager of Health Services, sent an electronic mail letter to O'Malley, DeModena, DePhillips and Suzanne Allan to inform O'Malley, DeModena, DePhillips and Suzanne Allan that "samples of materials reportedly written by [Plaintiff] ...justify [Plaintiff] being deemed medically disqualified immediately pending a...FFD exam" including a non-confidential psychiatric evaluation, psychiatric examination and psychological testing.

170.  On or about May 4, 2001, as a direct result of receiving information provided in Ms. Letterio's e-mail of May 3, 2001, O'Malley medically disqualified Plaintiff from service as Locomotive Engineer with Defendant Railroad.

171.  On or about May 4, 2001, O'Malley directed Plaintiff that he was not to report for duty as Locomotive Engineer with Defendant Railroad

172.  On or about May 4, 2001, O'Malley advised Plaintiff that O'Malley had no specific information for Plaintiff concerning O'Malley's directive to Plaintiff that he was not to report for duty and that there was "nothing [O'Malley] could tell [Plaintiff]".

173.  On or about May 4, 2001, O'Malley directed Plaintiff to call Defendant's Health Services Department in Philadelphia, Pennsylvania for instructions and information concerning O'Malley's directive to Plaintiff that Plaintiff was not to report for duty..

174.  On or about May 8, 2001, O'Malley advised Plaintiff that Plaintiff was medically disqualified from service.

175.  On or about May 4, 2001, Plaintiff had no knowledge of any workplace violence report nor was Plaintiff contacted regarding any accusation of Workplace Violence.

176. On or about May 4, 2001, Plaintiff called Defendant's Health Services Department in Philadelphia, Pennsylvania in accordance with O'Malley's instructions.

177. On or about May 4, 2001, Plaintiff spoke to Marianne Letterio who advised Plaintiff that Letterio knew of no medical reason for a medical disqualification.

178. On or about May 4, 2001 Plaintiff spoke to Marianne Letterio who advised Plaintiff that Defendant's Health Services Department had no information that Plaintiff was in any way impaired, mental or physically, in a way that would prevent Plaintiff from performing Plaintiff's duties as Locomotive Engineer.

179. On or about May 4, 2001, Letterio advised Plaintiff that Letterio was directed to contact a psychiatrist in Boston so that Plaintiff could report to said psychiatrist for psychiatric evaluation and extensive psychological testing.

180. On or about May 4, 2001, Letterio advised Plaintiff that "Dr. Tim Pinsky, has reviewed samples of materials reportedly written by [Plaintiff]. Following his review, Doctor Pinsky stated that the samples 'justify [Plaintiff] being deemed medically disqualified immediately pending a FFD exam.'".

181. On or about May 4, 2001, Ms. Letterio did not identify for Plaintiff any specific "samples of materials reportedly written by [Plaintiff]".

182. On or about May 4, 2001, Ms. Letterio advised Plaintiff that Dr. Pinsky would not speak to Plaintiff on the phone and that Plaintiff would have to contact Dr. Pinsky by mail.

183. On or about May 16, 2001, Pinsky directed Letterrio to e-mail a memorandum to O'Malley to advise O'Malley that a non-confidential psychiatric evaluation and extensive non-confidential psychological testing had been scheduled for Plaintiff with Dr. Russell Vasile at 25 By State Road, Suite 1. Boston, MA 02215.

184. In the e-mail Memorandum sent by Letterio to O'Malley Letterio asked O'Malley to "Please **direct [Plaintiff] to attend the evaluation.**" (Emphasis in original).

185. On or about May 17, 2001, O'Malley sent Plaintiff a letter that stated "please be advised that fitness for duty examination has been scheduled for you".

186. Beginning on or about May 4, 2001, and at various times thereafter, Plaintiff attempted to contact Dr. Pinsky and Defendant's health services department seeking information on a basis for medical disqualification of Plaintiff and said attempts to contact Dr. Pinsky were made on the presumption that Dr. Pinsky had information concerning medical symptoms afflicting Plaintiff about which Plaintiff was unawares and which Plaintiff wanted to address.

187. On or about May 4, 2001, and at various times thereafter Plaintiff attempted to contact Dr. Pinsky and Defendant's health services department seeking information on a basis for medical disqualification in an attempt to seek special accommodation in that Plaintiff would have his own attending physician, Dr. Gurian, address any specific symptoms so that Dr. Gurian could report to Defendant about any specific symptoms giving rise to Defendant's concern.

188. On or about June 4, 2001, Plaintiff left a voice-mail message for Dr. Vasile explaining that without further information the appointment for non-confidential psychiatric evaluation and psychological testing was canceled.

189. On or about June 8, 2001, O'Malley sent a certified mail letter to Plaintiff and gave Plaintiff a "direct order" to undergo a non-confidential psychiatric evaluation and psychological testing.

190. On or about June 12, 2001, Plaintff again contacted Marianne Letterio to ascertain a specific accounting of Defendant's safety concerns regarding fitness for duty.

191. On or about June 12, 2001, Letterio reiterated to Plaintiff that Letterio knew of no basis for medical disqualification of Plaintiff.

192. On or about June 12, 2001, Letterio advised Plaintiff that Plaintiff was disqualified from service as Locomotive Engineer on commuter rail because of Plaintiff's

27

writings, specifically, Plaintiff was disqualified for writing numerous letters to O'Malley over the previous years.

193. On or about June 12, 2001, Letterio advised Plaintiff that Plaintiff was medically disqualified from service pending a fitness-for-duty exam because Greene and Warrington ordered defendant's medical department to medically disqualify Plaintiff.

194. On or about June 12, 2001, when Plaintiff called Letterio, Letterio did not advise Plaintiff that Plaintiff had at anytime been accused of workplace violence.

195. On or about June 12, 2001, Plaintiff contacted Letterio to request special accommodation in that Defendant would limit exam to address solely symptoms specifically related to Defendant's alleged safety concerns of which Plaintiff had yet to be informed.

196. On or about June 12, 2001, Letterio advised Plaintiff that Plaintiff himself should arrange meeting with Vasile and request medical accounting of medical and safety concerns of Defendant that warranted medical disqualification of Plaintiff.

197. On or about June 12, 2001, Plaintiff requested from Letterio a copy of Defendant's medical file on Plaintiff to which request Letterio responded that Plaintiff should ask Dr. Vasile for a copy of Plaintiff's medical file and Plaintiff should arrange any limitation of the exam or other such accommodation with Dr. Vasile.

198. On or about June 12, 2001, Plaintiff explained to Letterio that Plaintiff would need specific medical basis, including an explanation of symptoms which were the cause of the medical disqualification of Plaintiff in order that Plaintiff could address those concerns with his own physician and for any fitness-for-duty exam.

199. On or about June 12, 2001, Letterio advised Plaintiff that she did not have access to medical information and she further advised Plaintiff that he would have to write to Pinsky directly for that information or ask Vasile for it.

200. On or about June 14, 2001, Plaintiff sent a letter to O'Malley requesting special accommodation in that O'Malley would refrain from intervening in Plaintiff's

28

medical affairs and permit Plaintiff to address Defendant's concerns directly and solely through the Defendant's Health Services Department.

201. On or about June 27, 2001, Plaintiff, accompanied by BLE Local Chairman Michael J. O'Bryan, reported for fitness-for-duty exam with Dr. Vasile at 25 Bay State Road in Boston, Massachusetts.

202. On or about June 27, 2001, prior to meeting with Vasile, O'Bryan and Plaintiff agreed that O'Bryan and Plaintiff would request that Vasilie provide Plaintiff with Plaintiff's medical file:

203. On or about June 27, 2001, prior to meeting with Vasile, O'Bryan and Plaintiff agreed that O'Bryan and Plaintiff would ask Vasile to explain any medical symptoms to Plaintiff that were basis of Defendant's medical disqualification of Plaintiff.

204. On or about June 27, 2001, prior to meeting with Vasile, O'Bryan and Plaintiff agreed that O'Bryan and Plaintiff would explain to Vasile that Plaintiff wanted to ask Defendant for the opportunity to address any symptoms independently with his personal physician to satisfy any safety concerns of Defendant before Plaintiff would be required to submit to a psychiatric fitness-for-duty examination.

205. On or about June 27, 2001, prior to meeting with Vasile, O'Bryan and Plaintiff agreed that O'Bryan and Plaintiff would explain to Dr. Vasile that Plaintiff wanted to ask the Defendant for the opportunity to address any safety concerns that Defendant had about Plaintiff's writings before Plaintiff would be required to submit to a psychiatric fitness-for-duty examination.

206. On or about June 27, 2001, prior to meeting with Vasile, O'Bryan and Plaintiff agreed that O'Bryan and Plaintiff would explain to Dr. Vasile that Plaintiff safety concerns directly with Defendant Managers and independently of any medical setting before Plaintiff would be required to submit to a psychiatric fitness-for-duty examination.

207. On or about June 27, 2001, prior to meeting with Vasile, O'Bryan and Plaintiff agreed that, whether or not Vasile would be willing or able to comply with

Plaintiff's requests, If and when Vasile was prepared to examine Plaintiff, O'Bryan would Leave Vasile's office and Plaintiff would submit to the fitness-for-duty psychiatric exam.

208. On or about June 27, 2001, Vasile refused to supply Plaintiff with Defendant's medical file on Plaintiff.

209. On or about June 27, 2001, Vasile informed Plaintiff and O'Bryan that Vasile had seen documents "reportedly written by Plaintiff" that gave rise to Defendant's medical disqualification of Plaintiff and subsequent order of Defendant that Plaintiff submit to Psychiatric fitness-for-duty examination.

210. On or about June 27, 2001, Vasile informed Plaintiff and O'Bryan that there were no indicators of mental or physical impairment of Plaintiff in Plaintiff's medical file nor were there any indicators of mental or physical impairment in Plaintiff's alleged writings.

211. On or about June 27, 2001, Vasile informed Plaintiff and O'Bryan that there were not indicators of violence or a propensity for violence of Plaintiff in Plaintiff's medical file, nor were there any indicators of violence or a propensity for violence in Plaintiff's alleged writings.

212. On or about June 27, 2001, Vasile informed Plaintiff and O'Bryan that Vasile was contracted with Defendant to conduct a complete psychiatric examination on Plaintiff and said psychiatric examination would reveal very personal and private information about Plaintiff to Defendant and Defendant managers including Pinsky, O'Malley, DePhillips and DeModena.

213. On or about June 27, 2001, Vasile informed Plaintiff and O'Bryan that no part of Vasile's examination of Plaintiff would be confidential.

214. On or about June 27, 2001 when Plaintiff asked Dr. Vasile if Plaintiff could receive a specific written explanation of medical basis of Defendant's medical disqualification of Plaintiff and Defendant's order requiring examination of Plaintiff Dr.

30

Vasile informed Plaintiff and O'Bryan that Vasile would have to contact the Defendant to ask if "some other resolution" could be found.

215. On or about June 27, 2001, Vasile refused to conduct a fitness-for-duty examination of Plaintiff.

216. On or about July 16, 2001, Vasile called Pinsky to discuss Plaintiff's request for special accommodation.

217. On or about July 16, 2001, Pinsky informed Vasile that Defendant had expected a request for special accommodation and that Defendant had intended to treat Plaintiff's requests for special accommodation as basis to charge Plaintiff with insubordination.

218. On or about July 16, 2001, Pinsky informed Vasile that Defendant had expected a request for special accommodation and that Defendant had intended to treat Plaintiff's requests for special accommodation as basis terminate Plaintiff from his position as Locomotive Engineer with Defendant.

219. On or about July 16, 2001, Pinsky directed Vasile to write a letter to Defendant falsely stating that Plaintiff declined to submit to a fitness-for-duty psychiatric examination to which directive Dr. Vasile promptly complied.

220. On or about July 27, 2001, O'Malley directed Plaintiff to schedule another appointment with Dr. Vasile or Plaintiff would be charged with insubordination and Plaintiff would be terminated from his employment.

221. On or about July 27, 2001 Plaintiff called Vasile to schedule another appointment with Dr. Vasile, but Dr. Vasile told Plaintiff that Vasile needed to hear from Defendant before scheduling any examination of Plaintiff.

222. On or about July 27, 2001 Plaintiff reported his conversation with Vasile that date to O'Malley at North Station in Boston, Massachusetts.

223. On or about July 30, 2001 Plaintiff wrote to Pinsky and Vasile and reiterated requests for access to Plaintiff's medical file and basis for medical disqualification of Plaintiff.

224. On or about July 30, 2001 Plaintiff wrote to Pinsky and Vasile and requested that Plaintiff be medically cleared to report for duty if there was no medical basis for disqualification of Plaintiff by Defendant.

225. On or about July 30, 2001, Plaintiff sent to Pinsky and Vasile copies of correspondence from Plaintiff's personal Physician, Dr. Gurian, stating that Plaintiff was medically cleared to return to work on January 2001 and that Plaintiff continues to be able to return work and perform duties safely.

226. On or about August 16, 2001, at O'Malley's request, Plaintiff contacted Vasile again to discuss and arrange a fitness-for-duty examination.

227. On or about August 16, 2001, Vasile requested the opportunity to speak with Plaintiffs personal physician, psychiatrist Ann Gurian, to which request Plaintiff assented.

228. On or about August 16, 2001, Vasile reiterated to Plaintiff that Vasile would be conducting an examination that would expose deeply personal and private matters including personal medical information to Defendant, Defendant managers, O'Malley, DeModena, DePhillips, O'Bryan, the BLE and others.

229. On or about August 16, 2001 Vasile reiterated to Plaintiff that no part of Vasile's examination of Plaintiff would be in any way confidential.

230. In various conversations with Dr. Vasile on or about August 16, 17 and 22, 2001, Plaintiff acknowledged to Vasile that Plaintiff did not wish to submit to any non-confidential evaluation, but Plaintiff emphasized to Vasile that Plaintiff would nonetheless submit to such examination in an effort to avoid termination from his employment with the Defendant.

231. In various conversations with Dr. Vasile on or about August 16, 17 and 22, 2001, Plaintiff expressed concern to Vasile that Plaintiff's mental health and medical

treatment with Dr. Gurian would be compromised by a non-confidential psychiatric examination by Dr. Vasile.

232. In conversation with Dr. Vasile on or about August 16, 2001, Vasile told Plaintiff that Vasile would be requiring Plaintiff to sign a waiver of confidentiality.

233. In conversation with Dr. Vasile on or about August 16, 2001, Plaintiff told Vasile that Plaintiff would ask for directions from O'Malley before signing a waiver of confidentiality.

234. In various conversations with Dr. Vasile on or about August 17 and 22, 2001, Vasile informed Plaintiff that he was going to withdraw Plaintiff's requirement that Plaintiff sign a waiver of confidentiality.

235. In various conversations with Dr. Vasile on or about August 17 and 22, 2001, Dr. Vasile maliciously and falsely declared to Plaintiff that Vasile was going to tell Defendant that Vasile was declining to perform examination of Plaintiff and that Defendant would have to find another Doctor.

236. On or about August 27, 2001 Vasile declared to Dr. Pinsky and Defendant that Vasile had declined to perform any examination on Plaintiff.

237. On or about August 27, 2001 Dr. Pinsky and Defendant asked Dr. Vasile to send a letter to Defendant falsely declaring that Plaintiff "decided not to present for psychiatric evaluation" to which request Vasile falsely and maliciously complied on or about August 28, 2001 and said letter was intended to place Plaintiff in a false light in his position with Defendant and in his standing in the community and with his union.

238. On or about April 2, 2002, Dr. Vasile sent another letter to O'Malley and Defendant said letter falsely and maliciously implicated Plaintiff as a threat to others and stated that "evidence in the Workplace Violence report needed to be placed in the context of a comprehensive psychiatric evaluation before any assessment of fitness for duty could be made".

239. By virtue of the willful conduct of DeModena, DePhillips, Green, Warrington, Gunn, Pinsky, O'Malley, Rae, Allan, Smith, Vasile and others, the Defendant, through its agents, servants and employees, has put the Plaintiff in a false position in the public eye, attributed to Plaintiff views which he doesn't hold and has written, spoken and distributed false statements regarding Plaintiff's medical condition, state of mind and performance abilities.

240. By virtue of the willful conduct of DeModena, DePhillips, Green, Warrington, Gunn, Pinsky, O'Malley, Rae, Allan, Smith and others, Defendant has knowingly, willingly and intentionally induced the Plaintiff to reveal confidential matters relative to his diagnosis and treatment by his personal psychiatrist and physician and thereby caused injury and loss to the Plaintiff.

241. As a direct and Proximate result of the willful conduct of Green, Warrington, Gunn, DeModena, DePhillips, Pinsky and others:  Plaintiff has suffered unreasonable, substantial and serious interference with his privacy in violation of M.G.L. 214 SS 1B.

242. As a direct proximate result of the above-mentioned wrongful conduct of defendant and defendant agents, Plaintiff was scorned by his colleagues, exposed to contempt and has suffered injury to his career, termination from his position of employment and the loss of reputation and standing in the community, all of which caused Plaintiff humiliation, severe depression, anxiety, worry, emotional distress and injury and other incidental and consequential damages and expenses.

243. As a direct and proximate result of the above-mentioned wrongful conduct of defendant and defendant agents, Plaintiff has suffered damage to his professional reputation and reputation generally; Plaintiff is deprived of gainful employment and union membership in his chosen profession; Plaintiff is deprived of opportunities of community involvement;  Plaintiff is deprived of access to the usual terms, conditions

34

and privileges of employment including health benefits currently and upon retirement;
Plaintiff is deprived of gainful employment generally.

COUNT THREE:
DISCRIMINATION ON THE BASIS OF DISABILITY
AMERICANS WITH DISABILITIES ACT; 42 U.S.C.ss. 12101 et. seq.
MASSACHUSETTS CIVIL RIGHTS ACT; M.G.L. c. 151B
REHABILITATION ACT OF 1973; 29 U.S.C. 701 et. seq.

1. UTILIZING STANDARDS OF CRITERIA, OR METHODS OF ADMINISTRATION
THAT HAVE THE EFFECT OF DISCRIMINATION ON THE BASIS OF
DISABILITY: 42 U.S.C. s. 12112 (3)(A);

244.  Plaintiff here repeats and realleges the allegations of paragraph 6 through
243 of this Complaint, the same as if said Paragraphs were expressly restated here.

245.  In formal investigation proceedings held on April 23, 2002, DeModena
admitted that on or about April 11, 2001 Defendant required DeModena to file
Workplace Violence Complaint against the Plaintiff because Plaintiff allegedly believed
Plaintiff was the devil.

246.  On or about April 11, 2001 DeModena, DePhillips and other employees of
Defendant falsely stated amongst themselves and to others within Defendant's corporate
organization that Plaintiff was suffering from mental illness which poses a direct threat to
Plaintiff himself and others.

247. On or about April 11, 2001, DePhillips activated Defendant's Threat
Assessment Response Team ("TART"), because Plaintiff was allegedly suffering from
mental illness which poses a direct threat to Plaintiff himself and others.

248.  TART members included DePhillips, Suzanne Allen and Captain Robert
Smith of the Amtrak Police who were all servants, agents or employees of the Defendant.

249.  In formal investigation proceedings held on April 4, 2002, April 23, 2002,
April 24, 2002 and May 7, 2002, members of the TART admitted that they did not

35

perceive a threatening act in the writings that were the basis of the Workplace Violence Complaint against the Plaintiff.

250. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that they were concerned that the writings that were the basis of the Workplace Violence Complaint against the Plaintiff gave the TART cause to doubt whether Plaintiff's mental state would allow Plaintiff to perform Plaintiff's job safely.

251. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that The TART concluded that the writings that were the basis of the Workplace Violence Complaint against the Plaintiff needed to be assessed by the medical department and medical professionals for evidence of mental illness because mental illness in the workplace is allegedly unsafe.

252. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that The TART concluded that the Defendant's Workplace Violence Policy required TART to regard mental illness as a threat whether or not TART perceived a threat.

253. Beginning on or about May 4, 2001, O'Malley mailed, copied and distributed various letters primarily directed to the Brotherhood of Locomotive Engineers alleging that Defendant's Workplace Violence Policy required Defendant to medically disqualify Plaintiff from service as a Locomotive Engineer in passenger services because Plaintiff's alleged writings indicated obvious mental disorder that precluded the ability of Plaintiff to perform his duties.

254. Defendant identifies their workplace violence policy as "PERS-42" of the Amtrak Policies and Procedures.

255. Page 2 of PERS-42 states that the Defendant's Corporate Vice President of Human Resources shall be responsible for the interpretation, application and administration of the Defendant's Workplace Violence Policy.

256. At all times relevant to this action Defendant's Corporate Vice President of Human Resources was Lorraine A. Green.

257. Defendant's Workplace Violence Policy was approved by Defendant's Corporate Presidents George D. Warrington and David Gunn.

258. By virtue of the willful conduct of Green, Warrington, Gunn, DePhillips, and DeModena, Defendant, through its agents, servants and employees, has required agents design, administer and interpret Defendant's Workplace Violence Policy with criteria and methods of administration that screen out and discriminate against individuals with mental illness. In so administering policies, Defendant has discriminated against Plaintiff in their regard of Plaintiff with mental illness in violation of 42 U.S.C. s. 12112 (3)(A).

## II: UTILIZING STANDARDS OF CRITERIA, OR METHODS OF ADMINISTRATION THAT PERPETUATE THE DISCRIMINATION OF OTHERS THAT ARE SUBJECT TO COMMON ADMINISTRATIVE CONTROL: 42 U.S.C. s. 12112 (3)(B)

259. Plaintiff here repeats and realleges the allegations of paragraph 6 through 258 of this Complaint, the same as if said Paragraphs were expressly restated here.

260. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that Defendant's TART team concluded that the Defendant's Workplace Violence Policy required TART to regard mental illness as a threat whether or not TART perceived a threat.

261. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that Defendant's TART concluded that the Defendant's Workplace Violence Policy required TART to regard any

person accused of threatening behavior to be regarded as having mental illness whether or not TART perceived threatening behavior..

262. In formal investigation proceedings held on April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, members of the TART admitted that Defendant's TART concluded that the Defendant's Workplace Violence Policy required TART to have any person accused of threatening behavior medically examined for mental illness whether or not TART perceived a threat.

263. By virtue of the willful conduct of Green, Warrington, Gunn, DePhillips, and DeModena, Defendant, through its agents, servants and employees, has designed, administered and interpreted Defendant's Workplace Violence Policy with arbitrary criteria and methods of administration that permit Defendant to arbitrarily and falsely accuse employees of violent behavior and regard said employees as mentally ill in violation of 42 U.S.C. s. 12112 (3)(A). As a direct and Proximate result of Defendant's application of such arbitrary and false assertions against Plaintiff: Plaintiff has suffered damage to his professional reputation and reputation generally; Plaintiff is deprived of gainful employment in his chosen profession; Plaintiff is deprived of opportunities of community involvement; Plaintiff is deprived of access to the usual terms, conditions and privileges of employment; Plaintiff is deprived of gainful employment generally; Plaintiff is suffering from severe emotional distress with physical repercussions; Plaintiff has suffered injury and will continue to suffer injury ; Plaintiff requires medical treatment, will continue to require medical treatment and is deprived of means of such treatment.

III: LIMITING, SEGREGATING, OR CLASSIFYING AN EMPLOYEE IN A WAY THAT ADVERSELY AFFECTS THE OPPORTUNITIES OR STATUS OF SUCH APPLICANT OR EMPLOYEE BECAUSE OF THE DISABILITY OF SUCH APPLICANT OR EMPLOYEE: 42 U.S.C. 12112 (b)(1);

264. Plaintiff here repeats and realleges the allegations of paragraph 6 through 263 of this Complaint, the same as if said Paragraphs were expressly restated here.

265. On or about April 13, 2001, DePhillips sent copies of Plaintiff's alleged writings by electronic transfer to Defendant's Health Services Department to be reviewed by Dr. Tim Pinsky, Defendant's Director of Health Services.

266. On or before May 2, 2001, DePhillips directed Suzanne Allan, Defendant's Manager of Human Resources, to have Plaintiff medically disqualified from Plaintiff's position as Locomotive Engineer.

267. On or about May 2, 2001, Suzanne Allan, telephoned Marianne Letterio, RN, BSN, Defendant's Manager of Health Services, and directed Letterio to disqualify Plaintiff on the basis of Mental Disability posing a direct threat to Plaintiff and others.

268. On or about May 2, 2001, Letterio advised Suzanne Allan that Dr. Pinsky had reviewed materials that were reportedly written by Plaintiff and electronically transferred to Defendant's Health Services Department by DePhillips on or about April 11, 2001.

269. On or about May 2, 2001, Letterio advised Suzanne Allan that Dr. Pinsky and Defendant's Health Services Department had not found basis for medical disqualification in materials that were reportedly written by Plaintiff and electronically transferred to Defendant's Health Services Department on or about April 11, 2001.

270. On or about May 2, 2001, DePhillips contacted Larry Hriczak and Pat Dogerty of Defendant's Corporate Labor Relations office at 30th Street Station in Philadelphia, Pennsylvania and asked for Hriczak and Dogerty to intervene and convince Defendant's Law Department officials and Pinsky to medically disqualify Plaintiff.

271. On or about May 3, 2001 DePhillips, Hriczak, Dogerty and officials of Defendant's Law Department directed Dr. Pinsky to medically disqualify Plaintiff. DePhillips instructed Dr. Pinsky to falsely report that Plaintiff had a mental disability that poses a direct threat to Plaintiff himself and others.

272. On or about, May 3, 2001, after receiving directions from DePhillips, Hriczak, Dogerty and officials of Defendant's Law Department to disqualify Plaintiff, Pinsky prepared medical reports copied to various of Defendant's employees in Defendant's Health Services department and Corporate Headquarters and said reports falsely stated that Plaintiff suffered form Bi-polar disorder and/or Personality disorder.

273. On or about May 3, 2001, Pinsky directed Letterio to falsely inform O'Malley, DePhillips, Suzanne Allen and DeModena that Pinsky deemed Plaintiff medically disqualified pending a psychiatric evaluation and psychological testing.

274. On or about May 3, 2001 and at various times thereafter Dr. Pinsky alleged in reports to O'Malley, DeModena, DePhillips, Suzanne Allen and other of Defendant's employees that Plaintiff's alleged Bi-polar and/or Personality disorder posed a direct threat to Plaintiff's self and others.

275. On or about May 3, 2001, Letterio, acting under the direction of Pinsky, sent an electronic mail to O'Malley, DeModena, DePhillips and Suzanne Allan informing various employees of the Defendant that Dr. Pinsky supported medical disqualification of Plaintiff because Plaintiff allegedly had Bi-polar and/or Personality disorder which allegedly posed a direct threat to Plaintiff's self and others.

276. On or about May 4, 2001 O'Malley medically disqualified Plaintiff from service in his position as Locomotive Engineer in Commuter Rail because Plaintiff allegedly had Bi-polar and/or Personality disorder which allegedly posed a direct threat to Plaintiff's self and others.

277. In investigation held on April 23, 2002 O'Malley admitted that when O'Malley disqualified Plaintiff from service in Plaintiff's position as Locomotive Engineer in commuter rail, O'Malley did not believe that any materials written by Plaintiff were threatening in any way.

278. In investigation held on April 23, 2002 O'Malley admitted that when O'Malley disqualified Plaintiff from service in Plaintiff's position as Locomotive

40