UNITED STATES DISTRICT COURT

2005 MAR 23  P 5: 59  FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Joseph T. Carmack                    ) | Civil Action No. 03-12488-PBS |
|                                       ) | |
| Plaintiff, Pro Se   ) | |
|                                       ) | |
| v.                                    ) | |
|                                       ) | |
| The National Railroad Passenger       ) | |
| Corporation                           ) | |
|                                       ) | |
| Defendant                             ) | |
| _____ ) | |

**PLAINTIFF JOSEPH CARMACK'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR A PROTECTIVE ORDER AND OPPOSITION TO DEFENDANT'S MOTION TO COMPEL THE DISCLOSURE OF INFORMATION AND MEDICAL RECORDS PERTINENT TO PLAINTIFF'S MENTAL HEALTH AND PSYCHIATRIC TREATMENT**

## I.      INTRODUCTION

In response to Defendant National Railroad Passenger Corporation's ("Amtrak" or "Defendant") "MOTION TO COMPEL THE DISCLOSURE OF INFORMATION AND MEDICAL RECORDS PERTAINING TO PLAINTIFF'S MENTAL HEALTH AND PSYCHIATRIC TREATMENT", Plaintiff, Joseph T. Carmack, hereby moves for a protective order limiting disclosure of Plaintiff's mental health and psychiatric treatment. Plaintiff submits that Defendant's pursuit of private medical information is outside the scope of the intended aversions in the complaint. In their memorandum in support of their motion to compel disclosure of medical and psychiatric information, Defendant has obfuscated the facts and issues raised by Plaintiff's Second Amended Complaint. Furthermore, Defendant has averted the legal protections that originally gave rise to the complaint by narrowing the focus of discovery on an artificial presumption of actual or

i

compensatory damages rather than cooperating with the Plaintiff to frame litigation around legal issues averred (primarily based on Defamation and the Americans with Disabilities Act) that allow consideration of general and special damages which flow naturally from proof or disproof of the allegations averred. Plaintiff hereby prays for an order permitting the parties to pursue a review of the issues regarded in Plaintiff's Second Amended Complaint without the Plaintiff being further aggrieved by inquiry into confidential matters.

Plaintiff denies having intentionally placed his psychiatric condition directly in issue in this civil action. In their motion to compel, Defendant has misrepresented and distorted the issues in the complaint in order to sharpshoot the allegations and turn the complaint into a negative pregnant permitting the Defendant to violate the Americans with Disabilities Act. Defendant has attempted to focus on the fact that Plaintiff has been treated by a Psychiatrist to intimate that their discrimination is justified. Plaintiff takes issue with the following statement in Defendant's motion to compel:

> Plaintiff denies that he was terminated for insubordination and suggests that Amtrak's explanation is pretext for disability discrimination. Moreover, he claims that Amtrak refused to accommodate his request under the Americans with Disabilities Act ("ADA") by ignoring his statement and communications from his psychiatrist that undergoing a non-confidential psychiatric examination would be harmful to his health.

Plaintiff does not deny that he was terminated for insubordination. Rather, Plaintiff avers that the charge of insubordination was fraudulent pretext for retaliation when Plaintiff requested special accommodation. Furthermore, Plaintiff was fraudulently assessed with posing a direct threat to himself and others. Said assessment was based on an a fraudulent accusation that Plaintiff was suffering from a "severe psychiatric disorder". Plaintiff avers that these fraudulent accusations constituted defamation while at the same time the accusations qualified the Plaintiff with a disability in accordance with the third

2

prong ADA definition of a disabled person as an individual "regarded as having in impairment". These averments are based solely on the actions of the Defendant and place the actions of the Defendant at issue. Plaintiff has not placed his psychiatric condition directly in issue. Plaintiff merely asserts that mental anquish and suffering are a natural result of Defendant's actions and can be gleaned by objective indicia. Defendant has wantonly and maliciously distorted these natural averments in Plaintiff's complaint in order to fraudulently expose Plaintiff to a negative pregnant and use discovery as a weapon to further aggrieve the Plaintiff.

As regards the defamation claim, Defendant's motion to compel averts the specific allegations in the complaint and reverses the investigation process to expose the Plaintiff to a negative proof by vaguely asserting that "statements made by [Defendant's} representatives were indeed true". In order to assess the truth of any statements or the relevance of medical records, the Defendant should specify what statements are to be verified. Following this acknowledgment, Defendant would need to admit or deny the statements. If the Defendant is to acknowledge that the statements were made and are true, the burden of proof is on the Defendant to prove that those statements they have admitted to making are based in fact. Only the Defendant would know what such bases are. Whether Defendant's accusations of Mental Illness are based on medical records or some other source, those records would already be in the possession of the Defendant and such possession would preclude the need to abuse the discovery process by using it as a weapon to invade the Plaintiff's privacy and breach Plaintiff's confidentiality privileges and other legal protections. Plaintiff will continue to claim these privileges and request that this honorable court acknowledge and support them. To the extent that causes for action preclude such privileges by averring personal injury and claims for compensatory and actual damages that cannot be directly assessed through objective indicia or without specific measure other than showing violation of common law or statute, Plaintiff will

3

agree to amend his complaint or abide by what other course of accommodation this honorable court will order or allow.

It is agreed among the parties that Plaintiff alleges numerous causes of action that include attach and incorporate damages claims consisting of mental anguish and suffering, intentional infliction of emotional distress, increased inability to form belief systems and engage in rational thought and future pain and suffering as a direct result of Defendant's alleged actions. However, Plaintiff asserts that the allowance of such damages were intended by law, rules of evidence and legislative intent without any requirement that such claims be attached to specific measure of effect on the subject victim of the infringements. Hence, Plaintiff has not placed his psychological state and history directly at issue. Plaintiff asserts that disclosure of the psychiatric information and records is not warranted by law.

**II FACTUAL BACKGROUND**

On or about October 9, 2000, Plaintiff reported equipment violations of Federal Railroad Administration (FRA) regulations to Gerard DeModena, Division Road Foreman (supervisor of locomotive engineers). Mr. DeModena acknowledged the need to report said violations and the necessary of delays resulting therefrom. However, Mr. DeModena expressly refused to address the failure of other locomotive engineers who had not reported such violations as required by rule and Mr. DeModena further took issue with Plaintiff for the manner in which he complied with rule requirements. Mr. DeModena complained that his own immediate supervisor, Mr. Michael O'Malley would "have questions" regarding the delays and Mr. DeModena did not appreciate having to address them.

In retaliation against the Plaintiff for reporting FRA violations of inspection rules, Mr. DeModena conspired with Plaintiff's union representative, Mr. Michael O'Bryan, to discipline Plaintiff outside the process and scope of Plaintiff's union agreement. On several occasions during that same week (October 11 and 13, specifically) Mr. O'Bryan

4

approached Plaintiff seeking Plaintiff's approval of discipline. Plaintiff responded that he would grieve any discipline because discipline was unwarranted. Mr. O'Bryan stated to Plaintiff that Mr. O'Bryan would discuss the matter with Mr. O'Malley and decline any support of the grievance process. Plaintiff stated to O'Bryan that the matter would then become a political issue within the union itself.

On or about October 24, 2000, O'Bryan met with O'Malley and O'Bryan agreed to the discipline. On or about December 18, 2000, Plaintiff grieved the discipline with O'Malley in accordance with the Railway Labor Act and union agreement procedures. On or about January 25, 2000, at O'Malley's request, Plaintiff met with O'Malley to discuss the grievance and the circumstances involved. Mr. O'Malley expressed to Plaintiff that Mr. O'Malley felt he was misled by Mr. O'Bryan and regretted that Plaintiff took exception to discipline. In the interest of good faith cooperation and good business, Plaintiff agreed that the union should take some responsibility and Plaintiff would leave the grievance to the appeals process where O'Bryan would refuse to pursue the grievance. After discussing other business matters of train operation, Mr. O'Malley admitted that Mr. O'Malleys experience was clerical and administrative and was lacking in an understanding of engineer's duties. Mr. O'Malley requested of Plaintiff that Plaintiff clarify FRA and operation concerns with DeModena.

After several attempts at a meeting with Mr. DeModena, Plaintiff met with DeModena (on Plaintiff's own time without pay) to discuss FRA inspection issues and the events of October 9, 2000. At this meeting, DeModena became heated and anxious whereupon Plaintiff broke off the discussion and changed the subject. At this point, DeModena opened a discussion of art, literature, philosophy and religion which were items of common interest between DeModena and Plaintiff over the previous three years. Plaintiff explained to DeModena that such discussion should continue at another time off the property and off the clock. Mr. DeModena agreed and the meeting ended amicably

This is not a play by Shakespeare. Hamlet is merely used as a metaphor. Shakespeare is merely used as a template to be placed against real persons and events so that the knowledgeable observer, in this case, O'Bryan, can evaluate the metaphorical value in relation to the moral and ethical issues proposed. Although, Plaintiff makes no claim that the satire is successful as an artistic aid to the presentation, it was warmly greeted by union employees who witnessed it. To use it as a claim that Plaintiff intended the satire as a threat is deceitful and Defendant, including DeModena, has used it to implicate Plaintiff as one suffering from mental illness.

Plaintiff denies that DeModena considered the satire a threat. Plaintiff further denies that "DeModena had recently spoken to Plaintiff on a few occasions about problems with Plaintiff's conduct". DeModena was concerned that the documents in the "Letters from Hell" compilation (including records of train movements, equipment reports and FRA documents) reflected badly on DeModena's own performance as Division Road Foreman. In retaliation against Plaintiff, DeModena filed a workplace violence report.

The evidence indicates that Defendant's assertions of threats and mental aberration were deceitful pretexts designed in a plan or "scenario" which was intended to result in Plaintiff's termination. Defendant's Labor relations manager outlined the "scenario" for defendants termination in an e-mail to DeModena and O'Malley on April 11, 2001. The e-mail states that their was not basis for medical disqualification or discipline, but that Defendant would nonetheless accuse Plaintiff of aberrant behavior (Exhibit A). In investigation held in 2002, the Threat Assessment Response Team ("T.A.R.T") admitted that they didn't consider the satire a threat, but that they intended to send the satire to the medical director as a matter of course. Later, DeModena sent the letters related to FRA and union matters to the Medical Director with a cover claiming that they represented behavior that would give cause for concern (Exhibit B). The TART prodded the Manager of Health Services to have the Medical Director disqualify the Plaintiff and order a

7

Psychiatric evaluation (Exhibit C). Finally, after having held the documents in his possession for almost a month, when the Medical Director learned that the Manager of Labor Relations was requesting that the Medical Director disqualify the Plaintiff and order a psychiatric evaluation, the Medical Director, an M.D., fraudulently disqualified the Plaintiff and claimed that Plaintiff's writings represented a "severe psychiatric disorder...bi-polar disorder or personality disorder" (Exhibit D).

However, the Medical Director, per se, did not have authority to disqualify Plaintiff alone. His role was to sponsor disqualification and removal of service of Plaintiff by a supervisor or manager in compliance with Defendant policies and procedures (Exhibit E). Ultimately, it was O'Malley who disqualified Plaintiff from service and ordered evaluation. Mr. O'Malley admitted that he did not believe Plaintiff represented a threat, but that O'Malley disqualified Plaintiff and ordered the psychiatric evaluation because the medical director believed Plaintiff was suffering from a "severe psychiatric disorder...bi-polar disorder or personality disorder" which posed a threat to Plaintiff's self and others, including the traveling public. Therefore, Plaintiff was disqualified and ordered to undergo examination by reason of a perceived disability ("severe psychiatric disorder...bi-polar disorder or personality disorder") in clear violation of the ADA.

Over the next several months, while being out of work, (ultimately without pay), Plaintiff made repeated requests for special accommodation which were ignored to the consternation of the contracted Psychiatrist, Dr. Russell Vasile. Finally, Defendant deceitfully colored requests for special accommodation as a refusal to undergo exam and charged the Plaintiff with insubordination in retaliation for said requests for special accommodation. Plaintiff was charged with insubordination on September 10, 2001. At no time, between May 4, 2001 and April 2002 did Plaintiff offer the letter from his physician dated May 30, 2001 to the Defendant (Exhibit F from Defendant's Exhibit D). Said letter, which challenges the medical viability of the non-confidential exam ordered

8

by the defendant was only offered this letter to Defendant in April 2002, to show that he believed, in good faith, that the order to undergo the exam would be detrimental to Plaintiff's health. From May to September 2001, Plaintiff only offered letters giving Plaintiff medical release to return to work for the Defendant. In May of 2002, the hearing officer found that Plaintiff was insubordinate, although she countered that claim by crediting Plaintiff's testimony's good faith belief that the exam ordered would be harmful to Plaintiff. Plaintiff contends that hearing officer's statement crediting Plaintiff's testimony precludes termination pursuant to Federal Statute (29 U.S.C. s. 143) and Defendant company policy (Exhibit G).

Plaintiff did not request special accommodation based on an independent claim of disability. Plaintiff did not refuse to undergo the exam. Plaintiff merely asked that the examiner release only that information which was job-related and consistent with business necessity. In the instant case, that would limit the examination to an inquiry related to Plaintiff's writings. O'Malley stated that he ordered an examination of Plaintiff because "samples of materials reportedly written by [Plaintiff]...'justify [Plaintiff] being deemed medically disqualified immediately pending a psychiatric FFD exam'" (Exhibits H and I). When Plaintiff requested that examination be limited to matters that are Job-Related and essential to the requirements of his job plaintiff was charged with insubordination. After 4 days investigation over two months, Plaintiff was terminated in May of 2002.

## III. MATERIAL ISSUES OF COMPLAINT AND LEGAL STANDARD FOR LIMITED DISCLOSURE OF PSYCHIATRIC RECORDS.

As basis for his motion for a protective order, Plaintiff denies that he has placed his psychiatric condition at issue in his complaint. Plaintiff states that the primary issue of Plaintiff's complaint is related to Plaintiff's employment with defendant. More specifically, the primary issue of Plaintiff's complaint is related to protections guaranteed by the American's with Disabilities Act (ADA). All other claims are ancillary and grow

9

out of the primary issue, being the ADA. Plaintiff avers that defendant discriminated against Plaintiff on the basis of a perceived disability and on the basis of religion under a pretext of workplace violence in a fraudulent application of defendant's workplace violence policy. Discrimination is averred as a matter related to employment. The aversions to slander, libel, invasion of privacy and unfair labor practice are the product of the alleged fraudulent application of the workplace violence policy and were employment related. The aversions of unfair labor practice and retaliation in violation of public policy are also alleged as motives on information and belief arising out of the same transactions and or occurrences as the discrimination allegation and they are employment related. All union business of the Brotherhood of Locomotive Engineers related to the allegations is union business related to the performance of duties of employment with defendant. Any medical related evidence and its relevance to the above captioned matter pertains solely to the transactions or occurrences related to the employment discrimination complaint and/or are recorded in defendant's medical records pertaining to Plaintiff in employment-related medical files. Any discovery outside of parameters which are "job-related and consistent with business necessity" as required of employers covered by the Americans with Disabilities Act would only serve to further aggrieve Plaintiff in denial of protections guaranteed under the Act.

Legal Basis for Motion

As legal basis for this motion Plaintiff asserts Section 102(d)(4) of the Americans with Disabilities Act entitled "Examinations and inquiries" which in subparagraph (A) states: "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." This assertion is further specified by The Americans with Disabilities Act Manual of the Bureau of National Affairs at 70:1286 page 82 which states that an inquiry which is "job-related and

10

> 307. At various times from on or about February 1, 1995 Plaintiff has
> consulted with Dr. Ann Gurion of Cambridge, Massachusetts while continuing to
> consult with Dr. Martha Stark and Plaintiff consulted with both doctors in order to
> continue monitoring and maintaining his mental health.

As noted, these paragraphs reference communications to Defendant regarding Plaintiff's
mental health. However, these communications were initiated by the Defendant when the
Defendant made inquiries concerning his mental health that were job-related and
consistent with business necessity (Exhibit J). The inquiries were made by the Defendant
on two occasions: both were in 1985. 1985 was a year during which during which
Defendant accommodated the Plaintiff for a period greater than six months. In response
to these inquiries, Plaintiff produced communications to Defendant from a
psychotherapist and Dr. Martha Stark. Subsequent to 1985, as referenced above from
Plaintiff's Second Amended Complaint, Plaintiff continued to mitigate against any
possible future disability with continued treatment maintaining Plaintiff's mental health.
Since 1985, these mitigating measures (consultations designed to monitor mental health)
successfully mitigated against any need for special accommodation. Throughout the
discovery process, the parties have exchanged numerous documents, including four boxes
of documents (including originals) which are at this time in the possession of the
Defendant. After four months of discovery, Defendant has only produced one of the
documents from 1985 inquiring into Plaintiff's mental health and Defendant has produced
none of Plaintiff's responses to Defendant from 1985 which should still be in Defendant's
medical files on Plaintiff. Plaintiff states that he can only surmise two possible
explanations for these omissions. Either Defendant has removed and destroyed the
documents in order to protect the Plaintiff against stigmatization, or Defendant refuses to
produce the documents in order that they can deny knowledge of Plaintiff having a
"record of impairment" that would qualify Plaintiff under the second prong of the ADA.
Despite numerous requests, Defendant has yet to produce those documents or provide

12

explanation as to why they would be missing. Until Defendant responds with their own copies of Plaintiffs 1985 answers to Defendant's inquiries, Plaintiff requests that this honorable court impound the documents subject to further order from the court.

The supreme court has recognized the value of mitigating measures which militate against disability and an individual who successfully mitigates an impairment is no longer "substantially limited in a major life activity" in accordance with the ADA, U.S.C. 42 s. 12102(2)(A). At the same time, the court recognized that "a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limi[t]' a major life activity" (Sutton v. United Air Lines, Inc. 527 U.S. 471 [1999] at 482, 483). Conversely, should the mitigating measures be removed, the individual would again be "substantially limited" in a major life activity and would potentially become disabled. To sabotage, remove or deny an individual those measures which mitigate and correct impairments will necessarily disable such an individual and thereby do such an individual harm.

## V.  PSYCHOTHERAPIST-PATIENT PRIVILEGE, CONFIDENTIALITY AND PERSONAL INJURY

Defendant has acknowledged that the supreme court acknowledges that a Psychotherapist-Patient privilege exists. (Defendants motion to compel, page 7, citing *Jaffee v. Redmond*, 518 U.S. 1, 14 [1996]). Such recognition is based on congressional understanding for the need for such a privilege when adopting Federal Rule of Evidence 501:

> It should be clearly understood that, in approving this general rule as privileges, the action of Congress should not be understood as disapproving any recognition of a psychiatrist-patient, or husband-wife, or any other of enumerated privileges contained in Supreme Court Rules. Rather, our action should be understood as reflecting the view that the recognition of a privilege based on confidential relationship and other privileges should be determined on a case-by-case basis.

13

*Taylor v. United States,* 222 f.2d 398, 401 (D.C. Cir. 1955) quoting Guttmacher and Weihofen, Psychiatry and The Law (1952). p. 272 quoted here from *In Re Zuniga* (CA6) 714 F2d 632.

Based on the logic of these statements, Plaintiff avers that the type of psychotherapeutic treatment referred to here has been acknowledged as a reasonable measure mitigating against mental illness. As recognized in the quote above, to intrude on confidentiality of the psychotherapist-patient privilege is to intrude on successful treatment of a potential impairment. It seems logical to the Plaintiff to conclude that such and invasion of Psychotherapist-patient would include personal injury as a natural consequence. Therefore, Plaintiff included personal injury as an item in his complaint. This inclusion has ironically exposed Plaintiff to the threat of further personal injury through discovery.

In addition to the explanation above, Plaintiff has relied on definitions of General and Special Damages as bases of claim of injury: "general damages are those which are traceable to, and the probable and necessary result of the injury, or which presumed by, or implied in. law to have resulted therefrom. They are the direct natural, logical and necessary consequences of the injury, or usually from the breach. ...they must occur without reference to the special character, condition, or circumstance of the person wronged." (22 Am Jur 2d s. 37). Likewise, special damages "arise from the special circumstances of the case" and "are directly traceable to a defendant's failure to discharge his ...duties as are imposed upon him by law" (22 Am Jur 2d s. 37). Furthermore, although Plaintiff may not be able to claim all the compensatory damages generally available for discrimination cases, penalty damages may still be available (42 U.S.C. s. 1981a [b][1]). Also, conclusions may be based on objective indicia rather than communications of a patient see *Adoption of Seth* (1990) 29 Mass App 343, 560 NE 2d 708.

Wherefore, Plaintiff respectfully requests that this honorable fashion a protective order that limits discovery to communication between Plaintiffs psychotherapists and his

employer that have previously occurred through limited release given by the Plaintiff. Any further release should be subject to similar limitations, approved by Plaintiff, and focusing solely on work related maters and inquiries that are job-related and consistent with business necessity. All references in Defendant's Motion to compel fall within such parameters. A blanket order permitting full exposure of Plaintiff's entire medical and psychiatric history is unwarranted and potentially harmful to Plaintiff.

Furthermore, although Defendant has focused on the application of federal common law to issues concerning privileges and that the instant case is predominantly federal, it is not exclusively federal. In addition the Supreme Court has acknowledged "that the privilege law as developed in the states is [not] irrelevant," and "has taken note of state privilege laws in the federal system." *(United States v. Gillock, supra*, 445 U.S. at 369 n. 8, 100 S. Ct. at 1191 n. 8). Therefore, Plaintiff prays that this honorable court considers Massachusetts law in application of privilege to this case. Defendant has noted that federal common law waives privilege when the Plaintiff places his mental health at issue. *Vanderbuilt v. Town of Chilmark*, 174 F.R.D. 225, 299-30 (D. Mass. 1997). (Defendant's Motion to Compel at page 12).   However, Massachusetts Law leaves discretion of the waiver up to the Judge. Under Massachusetts law,  Psychotherapist-Patient "privilege...shall not apply to... the following communications:--...(d) In any proceeding, except one involving child custody, adoption or adoption consent, in which the patient introduces his mental or emotional condition as an element of his claim or defense, and the judge or presiding officer finds that it is more important to the interests of justice that the communication be disclosed that the relationship between patient and psychotherapist be protected." M. G. L. 233 s. 20B. In addition, Plaintiff references Massachusetts laws regarding public records. "'Public records' shall mean all...documentary materials or data... made or received by any officer or employee of any agency.. or of any authority established by the general court to serve a public purpose, unless such materials or data fall within the following exemptions in that they are: ...(c)

16

personnel and medical files or information; also any other materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy;" M.G.L. 4 s 7 cl. Twenty-sixth. Also, privileged communications may be subject to in camera review. *Pennsylvania v. Richie* 480 U.S. 39 (1987) *Commonwealth v. O'Brien* 1989 27 Mass App 184, 536 NE2d 361. *Commonwealth v. Jones* 404 Mass 344, 535 NE2d 221. Also consider that defense may have access to disclosed information, but not other documents. *Commonwealth v. Clancy* (1988) 402 Mass 664, 524 NE2d 395. ("Counsel may not examine...because purpose is to protect confidentiality that people... have right to expect.")

Wherefore, Plaintiff prays for the following elements to be included in a protective order:

1. All medical documents will be impounded.

2. The Judge or court appointed officer will decide which items are to be viewed by the defense based on whether they are related to Plaintiff's employment or communication from practitioners to Defendant or their agents.

3. Plaintiff will submit redacted copies of Psychiatric files along with originals for court to approve for review by defendant

4. Deposition questions regarding medical information will be limited to information that is job-related and consistent with business necessity.

5. Defendant will not be permitted to know any diagnosis not previously communicated to the defendant

Should this order not be acceptable to the court regarding personal injury claims, Plaintiff requests leave for a motion to dismiss personal injury claims separate from other damages.

17

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
LR 37.1 Certificate of Compliance:
Plaintiff Joseph T. Carmack States
that he has complied with the
requirements of LR 37.1.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Respectfully submitted,

DATED:  March 23, 2005

Joseph T. Carmack, Plaintiff, Pro Se.

### Certificate of Service

I, Joseph T. Carmack, hereby certify that a true copy of the above document was served upon the attorney of record for the defendant party, Steven E. Hughes, NRPC, by Hand Delivery to and First Class U.S. Mail to : Steven E. Hughes, One Liberty Square - 6th Floor, Boston, MA  02109.

Date:  March 23, 2005

Joseph T. Carmack, Plaintiff, Pro Se.

18