Westlaw

174 F.R.D. 225                                                                                                    Page 1
174 F.R.D. 225, 74 Fair Empl.Prac.Cas. (BNA) 685, 47 Fed. R. Evid. Serv. 1188
**(Cite as: 174 F.R.D. 225)**

▷

**Motions, Pleadings and Filings**


United States District Court,
D. Massachusetts.
C. Dona VANDERBILT, Plaintiff,
v.
TOWN OF CHILMARK, Pamela Goff, Herbert
Hancock, and Alexander Preston, as they
constitute the Board of Selectmen of the Town of
Chilmark, Defendants.
**Civil Action No. 95-12403-JLT.**


June 18, 1997.


Employee brought discrimination and retaliation
action against employer seeking damages for, inter
alia, emotional distress. On employer's motion to
compel employee to produce her psychiatric and
psychotherapeutic records, and on employee's motion
for protective order as to such records, the District
Court, Tauro, Chief Judge, held that employee did
not waive psychotherapist-patient privilege by
seeking emotional distress damages.


Employee's motion allowed; employer's motion
denied.


**\*225** Joseph G. Sandulli, John M. Becker, Sandulli,
Grace, Shapiro & Horwitz, Boston, MA, for Plaintiff.


Richard W. Renehan, Patrick J. Bannon, Hill &
Barlow, Boston, MA, for Defendants.


**\*226** *MEMORANDUM*


TAURO, Chief Judge.


Plaintiff, C. Dona Vanderbilt, claims that Defendants
discriminated against her in violation of federal and
state law. She also alleges that Defendants retaliated
against her when she complained of the unlawful
discrimination. She seeks damages for, *inter alia,*
emotional distress. On February 18, 1997, the court
denied Defendants' motion to compel the production
of evidence relating to Plaintiff's psychotherapy and
allowed Plaintiff's motion for a protective order that
would shield that evidence from Defendants. This
opinion sets forth the court's reasoning.

I.
*BACKGROUND*
Plaintiff began working for Defendant Town of
Chilmark ("Chilmark") in October 1990 as an
Administrative Assistant for the Planning Board and
the Conservation Commission. She alleges that, in
December 1993, she discovered that Chilmark was
paying William Elbow, whom it had hired as an
Administrative Assistant to the Board of Health at
about the same time she was hired, more than it was
paying her. Plaintiff claims this wage disparity
continued throughout their tenure at Chilmark.


Plaintiff alleges that she made numerous requests
that her pay, and that of another female
administrative assistant, be raised to a level in line
with Elbow's pay. Defendants refused. Plaintiff
then filed a complaint of gender discrimination with
the Massachusetts Commission Against
Discrimination ("MCAD"). On July 24, 1995,
MCAD issued a right-to-sue letter.


Plaintiff filed a complaint in this court on November
3, 1995, in which she alleges violations of state and
federal discrimination and retaliation laws. In six of
the eight counts, Plaintiff seeks damages for
emotional distress.


On January 10, 1997, Defendants filed a motion to
compel Plaintiff, (1) to produce her psychiatric and
psychotherapeutic records, (2) to answer questions at
a deposition concerning the substance of any
psychiatric treatment, counseling, or psychotherapy
she may have undergone, and (3) to allow the
deposition of any mental health professionals who
have provided such treatment to Plaintiff. Plaintiff
filed an opposition to the motion and filed her own
motion for a protective order on January 23, 1997.
She contends that all information regarding the
substance of her psychiatric care, counseling, and
psychotherapy is privileged. This court agrees.


II.
*CHOICE OF LAW*
Plaintiff's complaint alleges violations of both
federal and state claims. This court has jurisdiction
pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §
1367(a).


[1] Federal Rule of Evidence 501 ("Rule 501") states

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

671 F.2d 100                                                                                          Page 2
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

that:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

According to Rule 501, if federal substantive law controls a civil case, federal common law would control questions of privilege. On the other hand, if state substantive law controls, as in a diversity case, Rule 501 instructs a federal court to use the applicable state law of privilege.

[2] Rule 501 does not instruct a federal court on which law of privilege to use in a federal question case where the court is also hearing a state law claim pursuant to supplemental jurisdiction. Every circuit that has reached this issue has held that, in a situation *227 such as the one before this court, the federal law of privilege applies. *See, e.g.* *Hancock v. Hobbs,* 967 F.2d 462, 467 (11th Cir.1992); *Hancock v. Dodson,* 958 F.2d 1367, 1373 (6th Cir.1992); *von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); *Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 104 (3rd Cir.1982); *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061 n. 3 (7th Cir.1981). Furthermore, the legislative history of Rule 501 supports the use of the federal law of privilege in this situation. The Senate Report accompanying Rule 501 states that "[i]t is also intended that the Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case." S.Rep. No. 1277, 93rd Cong., 2d Sess. (1974), *reprinted in,* 1974 U.S.C.C.A.N. 7051, 7059 n. 16. This court, therefore, will use the federal law of privilege to decide the issue before it.

III.
*ANALYSIS*

*A. Jaffee v. Redmond*

The court begins its analysis with the recent Supreme Court case of *Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). In *Jaffee,* the Court held that, under Rule 501, there exists a psychotherapist-patient privilege (the "privilege") under federal common law. [FN1] *Jaffee,* 518 U.S. at ----, 116 S.Ct. at 1931.

> FN1. The Court extended the privilege to licensed social workers engaged in psychotherapy. *Jaffee,* 518 U.S. at ----, 116 S.Ct. at 1931. The Defendants do not allege that Plaintiff's therapy was with a person for whom *Jaffee* would not apply. This court will assume, therefore, that the privilege, as found in *Jaffee,* if not waived, protects the communications at issue here.

In *Jaffee,* Mary Lu Redmond, a police officer in the Village of Hoffman Estates, Illinois, shot and killed Ricky Allen, whom Officer Redmond claimed was about to stab someone. *Id.* at ----, 116 S.Ct. at 1925. The administrator of Allen's estate filed a complaint in Federal District Court claiming that Redmond had used excessive force and had violated Allen's constitutional rights in violation of Rev. Stat. § 1979, 42 U.S.C. § 1983, and the Illinois wrongful death statute. *Id.* at ----, 116 S.Ct. at 1926.

During discovery, the plaintiff in *Jaffee* learned that Redmond had participated in psychotherapeutic counseling after the shooting. *Id.* The plaintiff sought Redmond's counselor's notes, taken during the psychotherapy. *Id.* Redmond refused to allow the disclosure of the notes. *Id.*

In upholding Redmond's refusal, the Supreme Court, for the first time, held that "reason and experience" leads to the conclusion that the privilege exists under Rule 501. *Id.* at ---- - ----, 116 S.Ct. at 1928-31. The Court noted that the privilege, "[l]ike the spousal and attorney-client privileges ... is 'rooted in the imperative need for confidence and trust.' " *Id.* at ----, 116 S.Ct. at 1928 (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980)). The Court recognized both the private interest that patients have in speaking freely during psychotherapy, and the public interest in encouraging troubled people to seek therapy. *Id.* at ---- - ----, 116 S.Ct. at 1928-29. The fact that all fifty states plus

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

671 F.2d 100                                                                                          Page 3
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

the District of Columbia have enacted some version of the privilege bolstered the Court's view that "reason and experience" mandated a recognition of the privilege in federal law. *Id.* at ----, ----, 116 S.Ct. at 1929-30.

In order to create an effective privilege that would protect the interests of individuals, the Court explicitly held that decisions regarding the privilege should not be made by balancing the interests of the patient and the value of the evidence. *Id.* at ----, 116 S.Ct. at 1932. The Court was very clear:

Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege.... [I]f the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain ***228** privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."

*Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393, 101 S.Ct. 677, 684, 66 L.Ed.2d 584 (1981)).

The Court recognized that the psychotherapist-patient privilege can be waived. *Id.* at ---- n. 14, 116 S.Ct. at 1931 n. 14. The Court, however, did not elaborate on what would constitute waiver of the privilege. In fact, the Court expressly refused to examine the scope of the privilege, noting that "it is neither necessary nor feasible to delineate [the privilege's] full contours in a way that would 'govern all conceivable future questions in this area.' " [FN2] *Id.* (quoting *Upjohn*, 449 U.S. at 386, 101 S.Ct. at 681).

FN2. The Court did, however, suggest one situation in which the privilege would not apply--when "a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist." *Jaffee*, 518 U.S. at ---- n. 19, 116 S.Ct. at 1932 n. 19.

*B. The Present Case*

In the case presently before this court, Defendants argue that Plaintiff has waived the privilege, and they request that this court order Plaintiff to provide certain materials pertaining to the substance of her psychotherapy. They contend that merely by seeking damages for emotional distress, Plaintiff has waived the privilege.

[3][4] There are a number of ways for a patient to waive the privilege. A patient could explicitly waive it. It is also possible to waive the privilege through disclosure. That is, if a patient uses the privileged material as evidence herself, she may not then contend that the material is privileged.

[5] It is a more complicated theory of waiver, however, that occupies the court here. Defendants argue that by seeking damages for emotional distress, Plaintiff has put her emotional state at issue and, therefore, has waived the privilege. [FN3] This court disagrees and holds that Plaintiff must use the privileged communication as evidence herself before she waives the privilege.

FN3. This court assumes, for the sake of argument only, that Plaintiff has put her emotional state at issue by seeking emotional distress damages. It is unclear, however, whether she has in fact done so. In the pre-*Jaffee* case of *Sabree v. United Brotherhood of Carpenters & Joiners of America, Local No. 33*, 126 F.R.D. 422 (D.Mass.1989), a court in this district found that a plaintiff did not place his mental condition at issue by "[making] a 'garden-variety' claim of emotional distress, not a claim of psychic injury or psychiatric disorder resulting from the alleged discrimination." *Sabree*, 126 F.R.D. at 426. Because this court holds that, after *Jaffee*, Plaintiff does not waive the privilege simply by placing her emotional state at issue, it does not reach the questions of whether it is necessary for Plaintiff to do more than claim "garden-variety" emotional distress to place her emotional condition at issue or whether she has, in fact, claimed more than "garden-variety" emotional distress.

Since *Jaffee*, a number of courts have held that, solely by placing her mental or emotional state at issue, a patient waives the privilege. *Vasconcellos v.*

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Case 1:03-cv-12488-PBS    Document 54-2    Filed 05/13/2005    Page 4 of 57

Westlaw.

671 F.2d 100                                                                                    Page 4
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

Cybex International, Inc., 962 F.Supp. 501, 508-09 (D.Md.1997); Doolittle v. Ruffo, 1997 WL 151799 at *2 (N.D.N.Y. March 31, 1997); Sarko v. Penn-Del Directory Company, 170 F.R.D. 127, 130 (E.D.Pa.1997). All three courts offered variations of the same reasoning, with Sarko going to the greatest depth. It offered three specific reasons for adopting the "mental-state-at-issue" test: (1) that courts ruling before Jaffee found waiver when a plaintiff put her emotional or mental state at issue: (2) that, by analogy to the attorney-client privilege, there is waiver in these circumstances; and, (3) that it would be unfair to enforce the privilege in this situation. This court will now examine these three points.

*1. Decisions before Jaffee*

First, the Sarko court noted that, in Jaffee, the Supreme Court did not explicitly address waiver or the scope of the privilege, and that cases pre-dating Jaffee found waiver when a patient placed her "mental condition at issue." Sarko, 170 F.R.D. at 130. But, when deciding cases prior to Jaffee, courts did not have Jaffee's mandate against balancing the need for the evidence against the patient's interest in the privilege.

*229 [6] Jaffee's "no balancing" instruction drastically changes the waiver formula. When a patient pleads emotional injury, she has not explicitly waived the privilege. All she has done is make her communication with her psychotherapist potentially relevant. That evidence may be harmful, or helpful, to her case. See Sav v. Sav, 136 F.R.D. 541, 542 (D.Mass.1991) (stating that in attorney-client privilege, "[t]he test is not whether the information which is the subject of the privilege is 'relevant', the information is usually highly relevant.") After Jaffee, a court cannot force disclosure of that evidence solely because it may be extremely useful to the finder of fact. Giving weight to the usefulness of the evidence as a factor in a decision regarding the scope of the privilege would be a balancing exercise that was barred by Jaffee.

The Sarko court may have read Jaffee to stand for the proposition that bright-line certainty is required when delineating the scope of the privilege. But, Sarko's "mental-state-at-issue" test does not provide that certainty. Indeed, different courts have come to very different conclusions as to when and under what circumstances a patient actually places her mental or

emotional state at issue. Compare Sabree, 126 F.R.D. at 426 (holding that plaintiff does not put mental state at issue by "making a 'garden-variety' claim of emotional distress") with Topol v. Trustees of the University of Pennsylvania, 160 F.R.D. 476, 477 (E.D.Pa.1995) (holding that plaintiff places mental state at issue simply by "seeking damages for mental and emotional" distress).

Under the "mental-state-at-issue" test, therefore, a patient would not know with certainty, at the time of her psychotherapy, whether the communication would be privileged at a later date. This uncertainty could "eviscerate the effectiveness of the privilege." Jaffee, 518 U.S. at ----, 116 S.Ct. at 1932.

*2. Analogy to attorney-client privilege*

Second, the Sarko court, following the example of the Supreme Court in Jaffee, analogized the privilege to the attorney-client privilege. Sarko, 170 F.R.D. at 130. The court recognized that the attorney-client privilege "is waived when the advice of counsel is placed at issue." Id. (cites omitted). As a result, the court found that a patient waives the privilege when she places her "mental condition at issue." Id.

This court agrees with the process of analogy found in Sarko, but disagrees with the result. The attorney-client privilege and the psychotherapist-patient privilege are both "rooted in the imperative need for confidence and trust." Jaffee, 518 U.S. at ----, 116 S.Ct. at 1928 (quoting Trammel v. United States, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980)). It is reasonable, therefore, to suggest that the scope of the two privileges should be similar.

The attorney-client privilege is undoubtedly waived if the privileged communication is placed at issue by the client. That is, when the client uses the substance of the attorney-client relationship to further her own cause, she cannot claim that the communication is privileged. For example, if a client uses her reliance on her attorney's advice as a defense, she waives the privilege. Also, if a client sues her attorney for malpractice, she waives the privilege. In contrast, a client does not waive the privilege solely by seeking attorney's fees.

[7] Similarly, this court reasons that the privilege is waived if the communication between a psychotherapist and a patient is, itself, put at issue by

Westlaw.

671 F.2d 100                                                                                        Page 5
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

the patient. A patient whose cause of action relies on the advice or findings of her psychotherapist cannot claim the privilege. If a patient were to sue her psychotherapist for malpractice, the privilege would obviously be waived.

The act of seeking damages for emotional distress is analogous to seeking attorney's fees. The fact that a privileged communication has taken place may be relevant. But, the fact that a communication has taken place does not necessarily put its content at issue.

*3. Fairness*

Lastly, the court in *Sarko* found "that allowing a plaintiff to hide ... behind a claim of privilege when that condition is placed directly at issue in a case would simply be contrary to the most basic sense of fairness **\*230** and justice.'" *Sarko*, 170 F.R.D. at 130 (quoting *Premack v. J.C.J. Ogar, Inc.*, 148 F.R.D. 140, 145 (E.D.Pa.1993)). This argument harkens back to the understanding that a privilege "cannot and should not at once be used as a shield and a sword." *Inserra v. Hamblett & Kerrigan, P.A.*, 1995 WL 54402 (D.N.H.1995) (citations omitted) (commenting on attorney-client privilege). Once again, this court agrees with the premise, but not its application.

Plaintiff, here, is not using the privileged communication as a sword. Were she to introduce evidence regarding the substance of her conversations with her psychotherapist in order to further her claim of emotional damage, this court would agree that she could not shield the communication from others. She has, however, done no such thing.

*C. The Scope of Waiver*

[8] This court recognizes that it would be possible for Plaintiff to waive the privilege. Should she use the substance of her communication, by calling her psychotherapist as a witness, for example, or by testifying to the substance of the communication herself, then she would waive the privilege. These would be situations where Plaintiff puts the privileged communication itself at issue.

[9] To clarify the scope of the privilege, it is also important to note what it does not protect. Facts regarding the very occurrence of psychotherapy, such

as the dates of treatment, are not privileged. And so, for example, if Plaintiff was seeing a psychotherapist before any actionable emotional injury allegedly occurred, the dates of such pre-existing treatment would be available to Defendants. The substance of the psychotherapist-patient communication is privileged. The fact that such communication took place is not.

IV.
*CONCLUSION*

For the reasons discussed above, on February 18, 1997, the court ordered that, so long as Plaintiff does not call as a witness a person who has provided her with psychotherapy, and does not introduce into evidence the substance of any communication with such a person, the communication between her and her psychotherapist is privileged. The court, therefore, allowed Plaintiff's motion for a protective order and denied Defendants' motion to compel discovery.

174 F.R.D. 225, 74 Fair Empl.Prac.Cas. (BNA) 685, 47 Fed. R. Evid. Serv. 1188

END OF DOCUMENT

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw

▷

United States Court of Appeals,
Sixth Circuit.
Joan P. HANCOCK, Individually and as Guardian
and Conservator of the Estate of
Danny L. Hancock, a legally incapacitated person;
Deborah Gerber, Plaintiffs-
Appellants,
v.
Barry DODSON; Art Schrah; City of Lake Orion, a
Municipal Corporation;
Gordon Pizzini; J. Duke; D. Finney; D. Feneley;
Oakland County Sheriff's
Department; Oakland County, a Municipal
Corporation; Lake Orion Police
Department, Defendants-Appellees.
Blue Cross & Blue Shield of Michigan, Claimant.
No. 90-2372.

Argued Nov. 13, 1991.
Decided March 23, 1992.

Wife of arrestee brought § 1983 action against city, city police officer, and others, alleging that arrestee was rendered incompetent as result of encounter with police which terminated in his arrest. The United States District Court for the Eastern District of Michigan, George E. Woods, J., granted summary judgment for officer and city, and entered judgment on jury verdict in favor of others. Wife appealed. The Court of Appeals, Contie, Senior Circuit Judge, held that: (1) evidence that arrestee pled guilty to misdemeanor assault and battery charge arising from his encounter with police was admissible; (2) testimony of arrestee's treating physician was properly admitted; and (3) evidence did not support wife's claim that officer used excessive force during arrest.

Affirmed.

Nathaniel R. Jones, Circuit Judge, issued dissenting opinion.

*1369 Geoffrey N. Fieger (briefed), Dennis M. Fuller (argued), Fieger, Fieger & Schwartz, Southfield, Mich., for plaintiffs-appellants.

Robert D. Brignall (argued and briefed), Vandeveer, Garzia, Tonkin, Kerr, Heaphy, Moore & Sills, Detroit, Mich., John J. Lynch, David B. Timmis,

Birmingham, Mich., James L. DeGrazia, Maura D. Corrigan (argued and briefed), Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Detroit, Mich., for defendants-appellees.

Before: KENNEDY and JONES, Circuit Judges; and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Appellant John P. Hancock appeals the district court's entry of summary judgment in favor of appellees Art Schrah and City of Lake Orion, and the jury verdict in favor of appellees Oakland County, Oakland County Sheriff's Department and Officers Dodson, Duke, Pizzini, Finney and Feneley in this section 1983 civil rights action.

I.

On July 19, 1986 appellant and her husband Danny L. Hancock ("Hancock") had an argument at their home. Hancock became upset and went out to the barn, taking one of his guns with him. Hancock had a history of depression and had threatened suicide in the past. Therefore, appellant was concerned by her husband's actions, and called her psychologist Dr. Kostere. Appellant told the doctor that she either heard a gun go off or thought she heard a gun shot. In response, Dr. Kostere called the Oakland County Sheriff's Department, because he thought that the situation posed a threat of severe danger.

A police radio dispatcher called Hancock's home to determine the scope of the problem. In response, Hancock stated that it was of no concern to the police department, and "if you send any cops over here, I'll kill them." Appellee's (Oakland) Brief at 7 n. 4. The radio communications thus alerted the officers that the incident involved a man with a gun, who was suicidal, possibly homicidal, and threatened to kill any officer who attempted to intervene.

Officer Gordon Pizzini was the first officer at the scene. Officer Dodson arrived shortly thereafter. Art Schrah of the Lake Orion police department was the next to arrive and was the only city police officer at the scene that evening. Officers Finney and Feneley joined the group, which met at Finney's car to discuss how best to handle the situation.

The officers decided that Dodson and Schrah would proceed behind the house while the other three

Westlaw.

671 F.2d 100                                                                                          Page 7
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases  P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

officers remained in front of the house.    While
Dodson and Schrah walked to the back of the house,
Dodson heard someone yelling inside in an "agitated,
angry, hostile" tone.    Looking through the back of
the house, Dodson apparently could see a weapon
positioned near the front door.    Dodson opened the
back screen door in order to determine if there were
any victims in the house and to retrieve the weapon.
Dodson worked his way through the house toward
the front door.   He heard Hancock screaming at the
other three officers in the front of the house.
Hancock then stepped out on to the front porch, at
officer Pizzini's request.

As Dodson approached the front door from behind
Hancock, he drew his gun, opened the door, stepped
out on to the porch, and said:  "We are the police,
let's talk."   At that instant, Hancock whirled around
and struck Dodson on his inner thigh with his fist.
At that point, a struggle to subdue Hancock ensued,
but Officer Schrah was knocked away from the
scene.   He attempted to grab Hancock's arm, but was
bumped out of the way before any physical contact
occurred.    Hancock was eventually handcuffed,
driven to the police station and booked.    Hancock
was charged with assault and battery, disorderly
conduct and resisting and obstructing arrest.   **1370
The resisting and obstructing charges were later
dropped, and Hancock plead guilty and paid a $60.00
fine for assault and battery and disorderly conduct.

At the time Hancock was brought into the police
station, there was no evidence that he was severely
injured.    Hancock made no complaints about his
treatment, and the nurse at the facility examined
Hancock and found nothing wrong with him.
Nevertheless, appellant alleged that Hancock was
severely beaten by the arresting officers.    Appellant
contends that, immediately after his release from jail,
he went to the Pontiac Osteopathic Hospital.
Although no further medical treatment was
recommended, and Hancock received no further
treatment regarding this incident, the hospital's report
clearly exhibited that Hancock had received some
blows about the head and neck, as evidenced by the
numerous bruises and other injuries noted by the
physician in his Emergency Room Report.    Joint
Appendix at 524-27.

On January 5, 1987 Hancock was involved in a one-
vehicle rollover accident when he lost control of his
truck.    Appellant claimed that Hancock did not

appear to be seriously injured and he did not seek
immediate medical care.    Appellant stated that
Hancock suffered no loss of consciousness or
apparent physical injury from the accident.
However, as a result of the accident, Hancock
received a knot on the side of his head.

About seven weeks after the accident, Hancock
began experiencing severe headaches, dizziness, loss
of balance and pain.    On February 25, 1987 he was
taken to the emergency room where a subdural
hematoma was diagnosed.    The doctors performed
emergency surgery on Hancock, which involved
draining the hematoma.

The experts at trial testified that the fluid drained
from the hematoma was a  "crankcase oil" coloration.
Appellant's experts testified that this was indicative
of a longstanding injury, and that they believed that
the hematoma originated with the police encounter.
The appellees' experts testified that this fluid
indicated an injury two weeks to two months old,
which coincided with the vehicle accident.

Because of the pressure caused by the hematoma,
Hancock developed permanent cognitive dysfunction
which left him in a chronic vegetative state.    On
February 24, 1989, appellant brought suit alleging a
violation of section 1983, assault and battery,
excessive use of force and other state law claims.
Appellant also filed a prior auto negligence action in
another forum against a party not involved in this
action seeking to recover for the same injuries.

Appellees Schrah and Lake Orion first moved for
summary judgment on November 17, 1989.    On
January 19, 1990 appellants moved to amend their
complaint to add a claim that Hancock's fourth and
fourteenth amendment rights were also violated.

On February 26, 1990, the district court ordered that
appellant's claims against the Lake Orion Police
Department were dismissed with prejudice, that
appellant's fifth and eighth amendment claims against
the City of Lake Orion and Officer Schrah were
dismissed with prejudice and that appellant's assault
and battery claims against Schrah were dismissed
with prejudice pursuant to the stipulation of the
parties.    The stipulation occurred because discovery
had established that Schrah had never touched
Hancock.    In the same order, the district court denied
without prejudice appellees' motion for summary

Westlaw.

671 F.2d 100                                                                                      Page 8
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

judgment on the fourth and fourteenth amendments and section 1983 claims against Schrah and Lake Orion.

On February 27, 1990, the U.S. Magistrate granted appellant's motion to amend their complaint. Appellant again filed an amended complaint, ignoring the order of February 26, 1990. Accordingly, appellees renewed their motion for summary judgment on the fourth and fourteenth amendments and section 1983 claims. On July 26, 1990, the district court granted summary judgment as to all remaining fourth and fourteenth amendment claims against Schrah and Lake Orion. Appellant appealed this order, but later decided to address the order on appeal after trial.

**\*1371** The case proceeded to trial against the remaining appellees, including Oakland County and the county sheriff's department. After a lengthy trial, at which numerous disputed evidentiary issues were addressed, the jury returned a verdict for appellees.

Appellant then filed a notice of appeal, challenging the district court's grant of summary judgment for Schrah and the city of Lake Orion. Appellant also challenges numerous evidentiary issues which emerged at trial.

II.

Appellant first contends that the district court erred in allowing into evidence Hancock's guilty plea to the misdemeanor of assault and battery because it was hearsay and does not come within the exception to Federal Rules of Evidence 803(22) which permits hearsay evidence of final judgments entered on a plea of guilty.

[1] A district court's evidentiary determinations are subject to an abuse of discretion standard of review. See United States v. Rios, 842 F.2d 868, 872 (6th Cir.1988), cert. denied, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989). However, a district court's conclusions of law, such as whether proffered evidence constitutes hearsay within the meaning of the Federal Rules of Evidence, are reviewed de novo. United States v. Levy, 904 F.2d 1026, 1029 (6th Cir.1990), cert. denied, 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991).

[2] A guilty plea to a misdemeanor charge made by a non-party is hearsay, and is not made an exception to

the general rule barring admissibility of hearsay evidence by application of FRE 803(22). That exception allows the admission of evidence of a final judgment upon a guilty plea only if the crime is punishable by death or imprisonment of one year. However, where a guilty plea to a misdemeanor charge is made by a party, such an out of court statement is not hearsay by virtue of FRE 801(d)(2)(A) which excludes admissions by parties opponent from the definition of hearsay.

Appellant contends, however, that the policy behind the FRE 803(22) exception precludes admitting the guilty plea to a misdemeanor charge. Appellant reasons that FRE 803(22) does not embrace misdemeanor convictions because individuals have little motivation to defend the charges, and so the resulting guilty plea is unreliable. See Advisory Committee's Notes to FRE 803(22).

We need not address appellant's challenges to the reliability of guilty pleas to misdemeanor charges made by a party because such evidence is not hearsay, but is admissible non-hearsay under FRE 801(d)(2)(A). Where other courts have confronted this question, they have concluded that such guilty pleas, not made an exception under FRE 803(22), are admissible as non-hearsay under FRE 801(d)(2)(A). In United States v. Gotti, 641 F.Supp. 283 (E.D.N.Y.1986), the court held that

pleas and allocutions to misdemeanors by defendants may be made under circumstances indicating that they are quite as reliable as many admissions routinely admitted under Rule 801(d)(2)(A). In fact that subsection of the Rule does not even require that the declarant manifest his belief in the truth of the admission. Under Rule 403 the court can exclude a plea to a misdemeanor made under conditions that suggest its untrustworthiness. But unless those conditions appear, the court will admit such a plea and the accompanying allocution as an admission of a party.

Id. at 290. Accord Hinshaw v. Keith, 645 F.Supp. 180 (D.Me.1986). See, e.g., Romine v. Parman, 831 F.2d 944 (10th Cir.1987) (guilty plea in traffic offense is admissible in subsequent civil case); Rain v. Pavkov, 357 F.2d 506 (3d Cir.1966) (same).

We agree with the district court that Hancock's guilty plea to the assault and battery charges was admissible "in the nature of admissions." Joint Appendix at

Westlaw.

671 F.2d 100                                                                                    Page 9
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

748. Even though Hancock was not physically able to rebut the guilty plea at trial, we believe that he had ample opportunity to contest his plea prior to trial. Therefore, *1372 the guilty plea was sufficiently reliable to be admitted under FRE 403.

[3] In the alternative, the district court held that the guilty plea was admissible under the catch-all exception FRE 803(24). We see no reason why such guilty pleas cannot be admitted provided they meet the requirements of FRE 803(24). "The omission from Rule 803(22) of a hearsay exception for a misdemeanor conviction does not imply a prohibition against admission of such a conviction under some other exception to the hearsay rule." *Gotti*, 641 F.Supp. at 289. [FN1] Therefore, we conclude that guilty pleas to misdemeanor charges may be admissible under FRE 803(24). In the present case we find the guilty plea to be trustworthy because Hancock was represented by counsel, and he had sufficient opportunity to challenge the guilty plea after it was entered. Under the circumstances, even though the plea was not admissible under FRE 803(22), it had "equivalent circumstantial guarantees of trustworthiness" to permit its admission under FRE 803(24).

> FN1. Even though *Gotti* involved a misdemeanor conviction and not a guilty plea to a misdemeanor, we are unable to find a distinction which would make misdemeanor convictions categorically more reliable than guilty pleas to misdemeanor charges.

### III.

[4] Appellant next claims that the district court committed reversible error by allowing appellee to cross-examine appellant regarding an earlier no-fault lawsuit filed by appellant against another party. Appellant cites no authority to support this claim, arguing only that the evidence affected appellant's substantial rights. For the following reasons, we disagree.

The district court may admit evidence if it is relevant and if its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. FRE 403. A trial court's decision to admit or exclude evidence on the grounds of relevancy may not be reversed absent an abuse of discretion. *Rios*, 842

F.2d at 874. In the present case, the evidence of appellant's earlier civil suit against the insurance company was probative of the issue of causation and supported the jury's inference that Hancock's condition was caused by the accident and not the arrest. Evidence that appellant sought to recover for injuries incurred in the automobile accident tended to demonstrate that the accident was at least a contributing cause of Hancock's injuries. Since causation became the crux of appellant's case, this evidence was admissible unless the probative value is substantially outweighed by the danger of prejudice. Appellant, however, never explains how this evidence substantially prejudiced her rights. Indeed, the testimony at trial was limited to a single question about the prior lawsuit to which appellant replied, "we did feel the auto accident contributed to the problem and therefore they should be partially liable." We are unable to find that this evidence was unfairly prejudicial. "The hiring of an attorney and the filing of a lawsuit are generally done with considerable thought and care. Absent unauthorized conduct on the part of the attorney, there is nothing unfair about having to explain one's past lawsuits." *Williams v. Union Carbide Corp.*, 790 F.2d 552, 556 (6th Cir.), cert. denied, 479 U.S. 992, 107 S.Ct. 591, 93 L.Ed.2d 592 (1986).

Therefore, we hold that the district court did not abuse its discretion in admitting this limited amount of evidence regarding the prior lawsuit.

### IV.

Appellant next argues that the district court erred in admitting the testimony of Hancock's treating physician because counsel for the defense had improper, ex-parte contacts with the doctor. For the following reasons, we find this testimony was admissible.

[5] As an initial matter, this court must first decide which law of physician-patient privilege should govern this case. The parties both briefed the merits according to the Michigan law of privilege. However, in federal court when dealing with a federal *1373 question FRE 501 states that privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." In cases like the present, however, where state law claims are raised pendent to federal claims, the question of choice of law becomes more difficult.

In *Perrignon v. Bergen Brunswig Corp.,* 77 F.R.D. 455 (N.D.Cal.1978) the court held that "in federal question cases where pendent state claims are raised the federal common law of privileges should govern all claims of privilege raised in the litigation." *Id.* at 459. This approach appeared to be most consistent with the congressional policy that "in nondiversity jurisdiction civil cases, federal privilege law will generally apply." *Id. citing* H.R.REP. NO. 1597, 93d Cong., 2d Sess. 7 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7101. The court concluded that this policy should not be "cast aside simply because pendent state claims are raised in what is primarily a federal question case." *Id.; accord Von Bulow v. Von Bulow,* 811 F.2d 136, 141 (2d Cir.1987); *William T. Thompson Co. v. General Nutrition Corp.,* 671 F.2d 100, 104 (3rd Cir.1982); *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061 n. 3 (7th Cir.1981); *Sirmans v. City of South Miami,* 86 F.R.D. 492, 495 (S.D.Fla.1980). Since the instant case is a federal question case by virtue of the appellant's section 1983 claim, we hold that the existence of pendent state law claims does not relieve us of our obligation to apply the federal law of privilege.

[6] In *G.M.C. v. Director of the Nat'l Institute for Occupational Safety & Health,* 636 F.2d 163 (6th Cir.1980), *cert. denied,* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981) the Sixth Circuit held that

> [t]he common law did not recognize a physician-patient privilege at all. *Whalen v. Roe,* 429 U.S. 589, 602 n. 28 [97 S.Ct. 869, 877 n. 28, 51 L.Ed.2d 64] (1977). Neither has Congress codified the concept in a federal statute. A decision in this case based on considerations of the physician-patient relationship would, in effect, expand the scope of the "federal common law." This we decline to do.

*Id.* at 165; *Fisher v. City of Cincinnati,* 753 F.Supp. 692, 694 (S.D.Ohio 1990); *see, e.g., In re Zuniga,* 714 F.2d 632 (6th Cir.), *cert. denied,* 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983). Because the federal courts do not recognize a federal physician-patient privilege, appellant's arguments regarding the scope of that privilege must be rejected, and the district court's decision affirmed.

[7] Even if we were required to apply Michigan law, however, appellant's challenge would still fail. In the present case, the appellant voluntarily produced medical records of the treating physician Dr. Doyle, but did not assert the privilege. It was subsequent to appellant's release of these medical records that the purported ex parte interviews occurred between defense counsel and the treating physician. The district court admitted the physician's testimony at trial, holding that "the privilege was waived when the material was released without a written assertion that the privilege was not waived." We agree with the district court.

Michigan Court Rule 2.314(B)(1) provides that a party who has a valid privilege may assert the privilege to prevent discovery of medical information if that privilege is asserted in response to a request to produce documents. "A privilege not timely asserted is waived in that action." *Id.* Although the Michigan courts are not in agreement in their interpretation of this rule, we believe that the decision in *Schuler v. United States,* 113 F.R.D. 518 (W.D.Mich.1986) is well reasoned and should be followed. In *Schuler,* the court held that a patient waived the privilege by voluntarily producing medical documents without asserting the privilege. *Id.* at 521. Therefore, any attempt to later assert the privilege must fail. [FN2]

> FN2. Appellant's reliance on *Jordan v. Sinai Hospital,* 171 Mich.App. 328, 429 N.W.2d 891 (1988) is not helpful. *Jordan* completely failed to consider the application of MCR 2.314(B)(1) to cases where the patient releases medical records without objection. Therefore, *Schuler* and not *Jordan* controls our analysis here.

***1374** In the present case, appellant's counsel executed a release to allow defense counsel to have access to the medical records. Since appellant did not assert the privilege at that time, MCR 2.314(B)(1) mandates that the privilege be deemed waived for purposes of this lawsuit.

V.

Appellant next argues that the district court erred in granting summary judgment for Officer Schrah on appellant's section 1983 claims for unreasonable use of force and unlawful entry, and for the City of Lake Orion on appellant's claim that it inadequately trained its police force in violation of the fourteenth amendment.

[8][9] Since the entirety of the issues challenged under this assignment of error were dismissed by the

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

671 F.2d 100                                                                                  Page 11
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

district court on summary judgment, we must review all of the following questions de novo. *Klepper v. First American Bank*, 916 F.2d 337, 341 (6th Cir.1990). Summary judgment is appropriate only where no genuine issue of material fact exists so that the movant is entitled to a judgment as a matter of law. If there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment may not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When making this determination, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Once the non-movant demonstrates that there is an absence of evidence to support the non-moving party's case, the movant must then set forth specific facts showing that there is an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

                                 A.

Appellant first claims that the district court erred in granting summary judgment for appellee Schrah on the issue of whether he used excessive force in arresting Hancock in violation of the fourth and fourteenth amendments.

Claims of excessive force under section 1983 are properly analyzed under the fourth amendment's prohibition against unreasonable seizures of the person, and its corresponding reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The fourth amendment reasonableness inquiry is an objective one: "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397, 109 S.Ct. at 1872.

[10] In the present case appellant states that there were two pieces of evidence which created a genuine issue of material fact: (1) "Defendant SCHRAH's own testimony that he 'grabbed' MR. HANCOCK's right hand;" and (2) "Defendant DODSON's statement that 'it took five of us to subdue him.' " Appellant's Brief at 27. Appellant, however,

mischaracterizes much of this testimony. Appellee Schrah never stated that he "grabbed" Hancock's right hand, but testified only that he "grabbed for" Mr. Hancock's right hand. Joint Appendix at 273-74. Therefore, this evidence does not create a question of fact as to whether Officer Schrah touched Mr. Hancock. In addition, Hancock's counsel earlier stipulated to dismiss the assault and battery claims against Schrah because discovery disclosed that Schrah never touched Hancock. Joint Appendix at 401-02. If Hancock's counsel stipulated that it would be impossible to succeed in an assault and battery claim against Schrah because Schrah never touched him, it can only be concluded that *1375 appellant could have no section 1983 claim against Schrah based on excessive force because Schrah could not have deprived him of his fourth amendment rights. *McDowell v. Rogers*, 863 F.2d 1302 (6th Cir.1988).

The only other evidence from which the trier of fact could infer that Schrah was involved in the confrontation was Dodson's deposition testimony that "it took five of us to subdue him." Joint Appendix at 185-86. Dodson's response was to the question: "Was it necessary to have five officers subdue him?" Dodson merely answered affirmatively without explicitly stating that Schrah participated. Although it can be inferred that Schrah participated, we find that in light of all the other evidence presented, this was not sufficient to create an issue of material fact. Therefore, summary judgment was appropriately granted for Schrah on the excessive force claim.

Appellant next alleges that Schrah violated Hancock's fourth and fourteenth amendment rights by entering appellant's home without a search warrant. The district court granted Schrah's motion for summary judgment on this issue, in which Schrah argued that there were exigent circumstances which allowed him to enter appellant's home without a warrant, and alternatively that he was protected by qualified immunity because he acted reasonably under the circumstances. We will address each issue in sequence.

[11] Although a police officer normally is prohibited from entering a residence without a warrant, *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), an officer is justified in so acting if exigent circumstances exist. *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir.1989).

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw

671 F.2d 100                                                                                              Page 12
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

Federal courts have traditionally found exigent circumstances in the following three instances: (1) when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers and public; (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals. *United States v. Morgan,* 743 F.2d 1158, 1162-63 (6th Cir.1984), cert. denied, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985).

[12][13] In a civil action, the determination of whether exigent circumstances exist is properly resolved by the jury. *Jones,* 874 F.2d at 1130; *Yancey v. Carroll County,* 876 F.2d 1238, 1244 (6th Cir.1989); *Reardon v. Brown,* 811 F.2d 1025 (7th Cir.1987). However, it is equally clear that in a case where the underlying facts are essentially undisputed, and where a finder of fact could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law. *Jones,* 874 F.2d at 1130, 1133; *Reardon,* 811 F.2d at 1029-30; *Llaguno v. Mingey,* 763 F.2d 1560, 1565 (7th Cir.1985) (en banc); *Hindman v. City of Paris,* 746 F.2d 1063, 1067-68 (5th Cir.1984).

[14] In the case at bar, we find that the factual record amply demonstrates that exigent circumstances existed. First, the officers received a call over the police radio that there existed a situation involving a suicidal and possibly homicidal gunman. The dispatch reported that shots had been fired. At least one of the radio communications indicated that the subject had threatened to kill any police officer who arrived on the scene. Given these facts possessed by the officers upon their arrival at appellant's home, we believe that it was reasonable for the officers to perceive this situation as representing "an immediate threat to the arresting officers and public." *Morgan,* 743 F.2d at 1162-63. When Schrah circled around to the back of the house, he had no idea where the suspect was located. Once he arrived at the back entrance to the house, he looked through the rear door and saw a .22 caliber long gun against the wall next to the front door. He could see Hancock standing on the front porch, but could not see whether he was armed. Schrah decided to go through the house because it was the quickest route to get to the suspect to determine the extent of the threat

which he posed. Under these circumstances, the officers were truly *1376 faced with an emergency situation, and were entitled to enter the house without a warrant. *United States v. Dart,* 747 F.2d 263, 267 (4th Cir.1984).

Moreover, appellant cannot be heard to complain about the warrantless police encounter which took place on appellant's front porch. Arguably, Hancock had a reasonable expectation of privacy in his front porch, as the area immediately surrounding his residence is protected by the fourth amendment. *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984); *See United States v. Thomas,* 757 F.2d 1359, 1367 (2d Cir.) (reasonable expectation of privacy around front door of home), cert. denied, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985). However, like the entry into the home itself, we hold that appellee Schrah was justified by exigent circumstances in entering the front porch area of appellant's home.

B.

[15] Lastly, appellant argues that the City of Lake Orion is liable under section 1983 for failing to train its police officers, with the result that appellant's constitutional rights were violated by one of those inadequately trained officers.

Because the only city police officer present committed no constitutional violation, the city cannot be liable for failure to train its police officers. *City of Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989).

VI.

For the foregoing reasons, the district court's ruling is AFFIRMED.

NATHANIEL R. JONES, Circuit Judge, dissenting. Although I agree with parts IV and V of the majority opinion, I disagree with parts II and III and, therefore, would remand this case for a new trial. Accordingly, I respectfully dissent.

I

Plaintiff-appellant contends that the trial court abused its discretion in holding that plaintiff's prior guilty plea to the charges of assault and battery and disorderly conduct was admissible evidence, because the plea was hearsay and its probative value was substantially outweighed by the danger of unfair

Westlaw

671 F.2d 100                                                                    Page 13
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

prejudice and by its tendency to mislead the jury.   I agree.

Federal Rule of Evidence 803(22) excludes the following from the hearsay rule: "Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment...." As a threshold matter, this case indeed involves "[e]vidence of a final judgment ... entered upon a plea of guilty"--in other words, a piece of paper recording the fact that Mr. Hancock was convicted, upon a plea of guilty. The majority evidently reasons that this piece of paper is a statement of Mr. Hancock; thus, when offered against him, the statement is admissible as an admission.

Of course, the piece of paper is not a statement of Mr. Hancock; instead, it is a public record, which records the fact that Mr. Hancock pleaded guilty. In other words, the piece of paper is a statement of the court that it convicted Mr. Hancock after he pleaded guilty. That statement by the court, that public record, that piece of paper, is hearsay. An admission is contained within the hearsay, but that admission is admissible only if the hearsay is admissible.

Federal Rule of Evidence 803(22) provides the rule for this form of hearsay. It provides an exception for only hearsay statements evidencing a crime punishable by death or imprisonment in excess of one year. Because Mr. Hancock's conviction does not meet the criteria, the report of his conviction remains "[e]vidence of a final judgment, entered ... upon a plea of guilty" that is excluded as hearsay.

Lest there be any doubt, the advisory committee included the following explanation of the policy behind this rule: "[p]ractical considerations require exclusion of **\*1377** convictions of minor offenses, not because the administration of justice in its lower echelons must be inferior, but because motivation to defend at this level is often minimal or nonexistent." Fed.R.Evid. 803(22) advisory committee's note. This policy rationale, coupled with the fact that the record of conviction is hearsay containing an admission but not an admission itself, leads to only one logical conclusion: "[i]n order to effectuate the express policy of Rule 803(22) barring evidence of convictions punishable by imprisonment for less than

one year, evidence of guilty pleas in non-felony cases should not be allowed as admissions under Rule 801(d)(2), or as statements against interest pursuant to Rule 804(b)(3)."   4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(22)[01], at 354-55 (1975).

This case provides a classic example. Faced with felony charges, Mr. Hancock was motivated to, and did in fact, defend against the charges. But then the state offered a deal. It offered to drop the felony charges in return for a guilty plea to misdemeanor charges and the payment of a $60 fine. Now Mr. Hancock had to weigh $60 against legal fees. He had to weigh $60 against the possibility of conviction, no matter how remote. In short, the state's offer of such an outstanding plea bargain effectively removed any motivation that Mr. Hancock may have had to defend against the charges.

The majority rejects the straightforward application of Rule 803(22). First, it erroneously reasons that the record of conviction is itself an admission of Mr. Hancock, rather than merely hearsay containing an admission. This reasoning, however, leads to the anomalous result that misdemeanor convictions entered after a trial or a hearing would still be excluded, because they are not admissions. To admit misdemeanor convictions upon a guilty plea yet exclude misdemeanor convictions following a hearing is inconsistent with the first line of Rule 803(22), which treats "[e]vidence of a final judgment, entered after a trial or upon a plea of guilty" in equal terms. Furthermore, there is no reason to assume that one is any more probative of guilt than the other, as the majority expressly acknowledges in footnote 1.

The majority avoids this inconsistency by doing an end run around the Rules of Evidence. The majority holds, in the alternative, that even if the conviction is hearsay, it is admissible under the catch-all exception of Rule 803(24). That rule provides an exception for the following type of statement:

A statement *not specifically covered by any of the foregoing exceptions* but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; *and* (C) the general purposes of these rules and the interests of

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw

671 F.2d 100                                                                Page 14
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
(Cite as: 671 F.2d 100)

justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 803(24) (emphasis added).

The first problem with applying the catch-all exception here is that the exception only applies to types of hearsay that are not covered by the other exceptions. "Evidence of a final judgment, entered ... upon a plea of guilty" is, however, covered by Rule 803(22). A fair response to this contention would be that Rule 803(22) technically only applies to "[e]vidence of a final judgment, entered ... upon a plea of guilty .... *adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year.*" The note of the advisory committee, however, resolves this ambiguity by noting that "[p]ractical considerations require *exclusion of convictions of minor offenses.*" Thus, Rule 803(22) does express an intention to exclude misdemeanor convictions. It does not leave the issue ambiguous.

The majority omits the above discussion and, instead, focuses on the trustworthiness of the statement. Superficially, statements of courts and public records are certainly the most trustworthy of all hearsay statements. The issue here, however, is *1378 whether Mr. Hancock's admission, within the hearsay record, is probative of guilt. On this precise issue, the advisory committee has ruled that records of conviction are untrustworthy whenever used for this purpose, because potential misdemeanants often lack motivation to defend against the charges. [FN1] To ignore the advisory committee's statement is in direct conflict with part (C) of the catch-all exception, which explicitly requires that a court's utilization of the catch-all exception must be consistent with "the general purposes of these rules."

FN1. The same problem arises if any of the other hearsay exceptions are used to avoid the requirements of Rule 803(22). *See, e.g.*, Fed.R.Evid. 803(8) (public record exception).

II

Plaintiff-appellant contends also that the trial court committed reversible error when, after ruling that evidence of a prior action to recover no-fault benefits from Mr. Hancock's insurer was inadmissible, the trial court nevertheless allowed defense counsel to question plaintiff regarding the existence of the action. The record supports appellant's contention:

[THE COURT:] Then we have the plaintiffs' motion in limine to exclude evidence of no fault insurance coverage regarding the auto accident and evidence of other insurance coverage for certain medical expenses and bills. Now, that is one to which you have not had an opportunity to address yourself; is that correct?

MR. LYNCH: That is true, Judge Woods.

THE COURT: I can see no basis at this point for projecting into this lawsuit insurance.

MR. LYNCH: I will stipulate that the issue of insurance, I believe according to the law and collateral source at this point, is not a matter for the jury to hear.

There is, however, a pleading in that particular case, sworn pleading under oath where Ms. Hancock, through her attorney, states that, as a result of a rollover accident, "I was caused to be mentally incapacitated and, further, physically incapacitated for life as a result of the rollover accident." It's my position, at least that paragraph of the complaint, a sworn document under oath is an admission against interest in this case; whereas they are attempting to say that the incident with the Oakland County Sheriff's Department seven months earlier caused them to be mentally incapacitated and physical non-function. So, that's the purpose that I would introduce that paragraph out of the complaint that relates exactly to that issue.

MR. FIEGER: Your Honor, Mr. Lynch plays fast with the rules.

THE COURT: I thought we were talking no fault insurance regarding the auto accident, evidence of other insurance coverage for other bills and motions in that regard.

Now, I don't see how that is germane to what I was talking about.

MR. LYNCH: Judge, I agree. I will not get into those questions.

THE COURT: So much for that.

MR. FIEGER: He wants to put in the complaint filed against the auto insurance, which they denied coverage. There are no sworn statements anywhere. There is a complaint filed against the auto insurer. If he is going to put in portions, who has already admitted liability--

THE COURT: We are not going to do that. We are not trying that lawsuit.

J.A. at 740-42.

The district court's subsequent decision (apparently

Westlaw.

671 F.2d 100                                                                                    Page 15
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases  P 64,564, 9 Fed. R. Evid. Serv. 1505
**(Cite as: 671 F.2d 100)**

off the record) to admit the statement in the
complaint as an admission was an abuse of
discretion. First, the admission of the evidence
violates the court's ruling on the motion in limine.
At the very least, therefore, the court should have
stated on the record its reason for subsequently
admitting the evidence.  Second, the allegation in the
complaint that the auto accident "caused" Mr.
Hancock's condition is in no way inconsistent with
the theory that the accident aggravated a preexisting
condition.      *1379 Thus, the statement does not
constitute an admission.

 In fact, the evidence is not even relevant.  The issue
of whether the auto accident aggravated a preexisting
condition, or instead, was the initial cause of the
injury, is not relevant to the insurer's liability.  If Mr.
Hancock had medical payments coverage, he was
covered for any injuries sustained.    For example,
consider an individual with a broken arm--the result
of an attack--who later re-breaks the arm in an auto
accident.  If the individual's insurer denies coverage
for the injury, the individual may sue the insurer.  In
a later suit against the attacker, however, evidence of
the suit against the insurer is not probative of whether
the attacker broke the arm in the first place.
Similarly, Mrs. Hancock's attempt to obtain medical
payments coverage is not probative of the ultimate
cause of the injury.  The fact that the auto accident
occurred was not concealed from the jury, and the
insurance coverage was not relevant.

 The court's decision to admit the evidence was not
harmless error.  Introduction of the "admission" in
the prior complaint deceived the jury by suggesting
that Mrs. Hancock claimed elsewhere that the injuries
were due to the roll-over accident rather than the
alleged beating.     The jury may have used this
supposed evidence of fabrication to support its
conclusion that the beating did not even take place.
Thus, introduction of the evidence was inconsistent
with substantial justice.      Combined with the
admission of the misdemeanor conviction, I would
find that this is the type of error that necessitates a
remand for new trial.  *See* Fed.R.Evid. 103.

 958 F.2d 1367, 35 Fed. R. Evid. Serv. 211

END OF DOCUMENT

ⓒ 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

671 F.2d 100                                                                    Page 16
671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505
(Cite as: 671 F.2d 100)

▷

United States Court of Appeals.
Third Circuit.
WM. T. THOMPSON CO.
v.
GENERAL NUTRITION CORP., INC., et al.
General Nutrition Corporation and General
Nutrition Center, Inc., Appellants.
No. 81-1930.

Argued Dec. 14, 1981.
Decided Feb. 8, 1982.

In two civil actions consolidated for purposes of discovery, the United States District Court for the Western District of Pennsylvania, Hubert I. Teitelbaum, J., denied parties' motion for protective order enforcing Pennsylvania statutory accountant-client privilege, and party appealed. Other party moved to dismiss appeal for lack of jurisdiction. The Court of Appeals, Gibbons, Circuit Judge, held that: (1) party claiming property right or privilege could appeal with respect to third-party subpoena, but (2) federal law favoring admissibility rather than state law privilege controlled.

Motion to dismiss appeal denied; order of District Court affirmed.

*101 Michael D. Fox, John P. Edgar (argued), Gary L. Goldberg, Vasilis C. Katsafanas, Berkman, Ruslander, Pohl, Lieber & Engel, Pittsburgh, Pa., for appellants, General Nutrition Corp. and General Nutrition Center, Inc.

Les J. Weinstein (argued), Aaron M. Peck, Robert G. Badal, C. Steven McMurry, Scott P. Cooper, McKenna, Conner & Cuneo, Los Angeles, Cal., Roger C. Wiegand, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee Wm. T. Thompson Co.

Before ADAMS, GIBBONS and GARTH, Circuit Judges.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

General Nutrition Corporation (General) appeals from an order of the District Court enforcing a subpoena for a deposition of a third party. Wm. T. Thompson Co. (Thompson), the appellee, moves to dismiss General's appeal. We deny the motion to dismiss the appeal, and we affirm the District Court's order.

I

Thompson and General are parties to two civil actions, consolidated for purposes of discovery, pending in the United States District Court for the Central District of California.[FN1] On November 21, 1980 Thompson, having served notice provided in Fed.R.Civ.P. 30(b) to take a deposition of Touche Ross and Company in Pittsburgh, Pennsylvania, obtained from the Clerk of the District Court of the Western District of Pennsylvania a subpoena duces tecum directing Touche Ross to appear and produce documents on January 21, 1981. Within the time permitted by Fed.R.Civ.P. 45(d)(1) Touche Ross objected in writing to the subpoena, whereupon Thompson, as that rule provides, moved in the Western District of Pennsylvania for a court order enforcing it.[FN2]

> FN1. Wm. T. Thompson Co. v. General Nutrition Corp., No. 78-3206 (C.D.Cal. filed Aug. 17, 1978); General Nutrition Corp. v. Wm. T. Thompson Co., No. 78-3891 (C.D.Cal. filed Aug. 18, 1978).

> FN2. Rule 45(d)(1) provides in relevant part:
> The person to whom the subpoena is directed may, within 10 days after the service thereof or on or before the time specified in the subpoena for compliance if such time is less than 10 days after service, serve upon the attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials except pursuant to an order of the court from which the subpoena was issued. The party serving the subpoena may, if objection has been made, move upon notice to the deponent for an order at any time before or during the taking of the deposition.

In response to the motion both Touche Ross and

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

779 F.Supp. 21                                                          Page 17
779 F.Supp. 21
**(Cite as: 779 F.Supp. 21)**

General asserted that the materials for which discovery was sought fell *102 within the protection of the Pennsylvania's statutory accountant-client privilege.[FN3]  The district court rejected this contention and by order of February 18, 1981 directed Touche Ross to comply.  A Touche Ross representative appeared at the place designated for the deposition on March 12, 1981, but at General's direction refused to answer any substantive questions or produce any documents.  Thompson then renewed its motion to compel discovery, while General filed a cross-motion for a protective order enforcing the Pennsylvania statutory privilege.  On May 4, 1981 the district court granted Thompson's motion to enforce, and denied General's motion for a protective order.  From the May 4, 1981 order, General on May 15, 1981 filed a notice of appeal.[FN4]  Subsequently, Thompson moved to dismiss the appeal for lack of jurisdiction.

> FN3. Pa.Stat.Ann. tit. 63, s 9.11a (Purdon Supp. 1981-82) provides:
> Except by permission of the client ... a certified public accountant ... shall not be required to, and shall not voluntarily, disclose or divulge information of which he may have become possessed relative to and in connection with any professional services as a certified public accountant ...  The information derived from or as a result of such professional services shall be deemed confidential and privileged ...

> FN4. After the notice of appeal was filed Thompson moved to hold Touche Ross and General in contempt for failure to appear at the renoticed deposition.  On July 7, 1981 the district court found them in contempt and levied a civil contempt coercive fine of $1,000.00 a day.  The court also entered a protective order prohibiting disclosure of any of the material obtained from Touche Ross to anyone except counsel for Thompson and their retained consultants, and the deposition went forward subject to its provisions.  Because of the protective order General's appeal is not moot.  Touche Ross has not appealed either the May 4, 1981 order or the order adjudicating it in contempt.

II

[1] We turn first to Thompson's motion to dismiss the appeal.  In ruling on that motion, it is important to note that this case does not involve a discovery order directed to a party, and thus does not concern the sanctions for failure to make or cooperate in discovery provided for in Fed.R.Civ.P. 37.  Rather, it involves a subpoena to a third party witness, for which the only enforcement mechanism is that provided in Rule 45(d).  Moreover, because the deposition in this instance is noticed for a district other than that in which the action is pending, enforcement takes place entirely separate from the underlying action, since Rule 45(d) expressly so provides.  Thus there is no way in which any record made in the enforcement proceeding can be reviewed either by the District Court for the Central District of California where the action is pending, or by the Court of Appeals for the Ninth Circuit.

A Rule 45 proceeding to enforce a subpoena against a third party witness in another district might well, therefore, fall within that category of cases such as Ellis v. Interstate Commerce Commission, 237 U.S. 434, 35 S.Ct. 645, 59 L.Ed. 1036 (1915), Harriman v. Interstate Commerce Commission, 211 U.S. 407, 29 S.Ct. 115, 53 L.Ed. 253 (1908) and Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894), involving judicial enforcement of agency subpoenas.  In those situations, the order directing a witness to answer is considered final and reviewable without the necessity for the witness standing in contempt.  As the court explained in Cobbledick v. United States, 309 U.S. 323, 330, 60 S.Ct. 540, 543, 84 L.Ed. 783 (1940), a proceeding to enforce a subpoena in a tribunal other than where the main action is pending is likened to "an independent suit in equity in which appeal will lie from an injunction without the necessity of waiting for disobedience."  See Clarke v. Federal Trade Commission, 128 F.2d 542, 543 (9th Cir. 1942).  We need not decide that question in this case, however, for under the governing case law in the Supreme Court and here, even if the Rule 45 enforcement proceeding is not considered an action separate from the main case, it results in an order from which General may take an appeal to protect its Pennsylvania law privilege.

*103 In In re Grand Jury (C. Schmidt & Sons ), 619 F.2d 1022 (3d Cir. 1980), a federal grand jury issued subpoenas to six employees of a corporation.  The employee witness and the corporation as intervenor

Westlaw.

779 F.Supp. 21                                                                    Page 18
779 F.Supp. 21
**(Cite as: 779 F.Supp. 21)**

moved to quash the subpoenas, and the motions of both were denied. On appeal this court, relying on Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918), held that although the employees could not appeal prior to being held in contempt, the employer could appeal because it had a property interest. We observed:

Schmidt's appeal, however, involves different considerations. It was not subpoenaed, and is in the case as an intervenor. The option of resisting compliance and standing in contempt is not available to it, and it is unlikely that a third party, even an employee, would risk a contempt citation in order to provide it with immediate review. Thus, in contrast with the Alexander-Cobbledick-Ryan rule on finality, it has been recognized that when a party, other than the one to whom a subpoena has been addressed, moves to quash the subpoena, the denial of his motion disposes of his claim fully and finally. Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918). See also Gravel v. United States, 408 U.S. 606, 608 n.1, 92 S.Ct. 2614, 2618 (n.1), 33 L.Ed.2d 583 (1972); United States v. Nixon, 418 U.S. (683) at 691, 94 S.Ct. (3090) at 3099, (41 L.Ed.2d 1039).

619 F.2d at 1024-25. The Schmidt opinion holding that one asserting a property right or privilege may as intervenor appeal also relied on other recent opinions in this court interpreting the holdings in United States v. Nixon and Perlman v. United States in the same manner. In re Grand Jury Proceedings (FMC), 604 F.2d 798, 800-01 (3d Cir. 1979); United States v. RMI Co. (N.L. Industries), 599 F.2d 1183, 1186-87 (3d Cir. 1979). The Nixon, Perlman, Schmidt, FMC, N.L. Industries decisions control this case, for General in the Rule 45(d) proceeding in the Western District of Pennsylvania against Touche Ross is situated identically with those intervening parties. General is seeking to invoke a Pennsylvania statutory privilege intended for its benefit, and it could not expect that Touche Ross would stand in contempt and undertake an appeal to vindicate General's interests. Indeed Touche Ross did not appeal, but produced the subpoenaed materials when faced with a coercive contempt order. When a claim of property or privilege is made with respect to a third party subpoena our cases are clear that the party claiming the property right or privilege may appeal.

We hold, therefore, that Thompson's motion to dismiss General's appeal must be denied.

### III

[2][3][4] We turn, then, to the merits of General's appeal. That appeal raises the contention that the District Court erred in failing to enforce Pennsylvania's statutory certified public accountant's privilege. Our starting point, however, is not Section 9.11a of the Pennsylvania Certified Public Accountant law, but Fed.R.Ev. 501, which provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme court pursuant to statutory authority, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness ... shall be determined in accordance with State law.

Under this rule, in federal question cases the federal common law of privileges applies. E.g., Gannet v. First National State Bank of New Jersey, 546 F.2d 1072 (3d Cir. 1976), cert. denied, 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977). Where state law provides the rule of decision, however, state privilege law will govern. E.g., Samuelson v. Susen, 576 F.2d 546 (3d Cir. 1978) (diversity jurisdiction). Under the federal common law there is no confidential accountant-*104 client privilege. Couch v. United States, 409 U.S. 322, 335, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973).

In the California litigation Thompson has alleged that various business practices of General are violations of the federal anti-trust laws. It also claims violations of state law, although not specifically, we are informed, of Pennsylvania law. For the anti-trust claims the rule of Couch v. United States, supra, suggests the absence of a privilege. What state's law would govern questions of privilege at the trial of the state law claims, were they to be tried alone, is an interesting question of choice of law which General has not addressed. It is at least arguable that Pennsylvania privilege law would not apply. But we need not speculate about the choice of law problem, for in this case the anti-trust and state law claims apparently will be tried together. Obviously applying two separate disclosure rules with respect to different claims tried to the same jury would be unworkable.

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

See 2 Weinstein's Evidence s 501, 502 (1981); Memorial Hospital v. Shadur, 664 F.2d 1058 at 1061 n.3 (7th Cir. 1981); Perrignon v. Bergen Brunswig Corp., 77 F.R.D. 455, 458 (N.D.Cal.1978). One rule or the other must govern. Thus, assuming the Pennsylvania privilege is in fact applicable as a matter of choice of law, we must decide whether it or the rule of Couch v. United States, supra, will control.

[5][6] We hold that when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule. The question is one of first impression in this court, but our holding is consistent with the legislative history [FN5] of Rule 501 and the decisions of a number of trial courts.[FN6] It is also consistent with the general rule in federal practice disfavoring privileges not constitutionally based. E.g., United States v. Nixon, 418 U.S. 683 (1974); American Civil Liberties Union of Mississippi v. Finch, 638 F.2d 1336, 1344 (5th Cir. 1981). Our holding does not, of course, preclude resort to state law analogies for the development of a federal common law of privileges in instances where the federal rule is unsettled. See, e.g., Riley v. City of Chester, 612 F.2d 708 (3d Cir. 1979). In this case, however, the governing federal rule with respect to accountant privilege is settled by Couch v. United States, supra.

> FN5. The Senate Report accompanying Rule 501 states that "(i)t is also intended that the Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case." S.Rep.No.93-1277, reprinted in, (1974) U.S.Code Cong. & Ad.News 7051, 7059 n.16.

> FN6. See, e.g., Sirmans v. City of South Miami, 86 F.R.D. 492, 494-95 (S.D.Fla.1980); FDIC v. Mercantile National Bank of Chicago, 84 F.R.D. 345, 349 (N.D.Ill.1979); Robinson v. Magovern, 83 F.R.D. 79 (W.D.Pa.1979); Lewis v. Capital Mortgage Investments, 78 F.R.D. 295, 313 (D.Md.1978); Perrignon v. Bergen Brunswig Corp., 77 F.R.D. 455 (N.D.Cal.1978).

IV

We have before us an appealable order. Since there are federal law claims pleaded in the underlying actions the district court did not err in rejecting General's claim of an accountant privilege under Pennsylvania law. The motion to dismiss the appeal will be denied, and the order appealed from will be affirmed.

671 F.2d 100, 33 Fed.R.Serv.2d 990, 1982-1 Trade Cases P 64,564, 9 Fed. R. Evid. Serv. 1505

END OF DOCUMENT

Westlaw.

779 F.Supp. 21
779 F.Supp. 21
(Cite as: 779 F.Supp. 21)

▷

**Motions. Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
John DOE and Mary Doe, his wife pseudonyms for
the true identities of
plaintiffs in this action, Plaintiffs,
v.
SPECIAL INVESTIGATIONS AGENCY, INC.,
Anthony Padrone, Thomas G. Murtaugh,
Virginia E. Yeager and Thomas Watts, Defendants.
John DOE and Mary Doe, his wife pseudonyms for
the true identities of
plaintiffs in this action, Plaintiffs,
v.
Anthony PADRONE and Thomas Watts, Defendants.
**Civ. A. Nos. 90-1762, 90-6612.**

Nov. 21, 1991.

Plaintiffs brought federal Racketeer Influenced and
Corrupt Organizations (RICO) claim and asserted
pendent state claims. Defendants sought discovery of
records of psychiatric treatment and other counseling
which they received over the years, and plaintiffs
sought protection. A magistrate ordered disclosure
of the records, and plaintiffs appealed. The District
Court, Troutman, Senior District Judge, held that the
records were subject to disclosure, even though the
records were only relevant to pendent claims.

So ordered.

**\*22** Charles W. Elliott, Diane V. Elliott, Thomas R.
Elliott, Brose, Poswistilo, Elliott & Elliott, Easton,
Pa., for plaintiffs.

Nicholas Noel, III, Richard P. Kovacs, Teel, Stettz,
Shimer & Di Giacomo, Ltd., Easton, Pa., Alan S.
Gold, Monaghan & Gold, Paula A. Campbell, James
Lewis Griffith, Griffith & Burr, P.C., Philadelphia,
Pa., for defendants.

Alan M. Black, Black, McCarthy, Eidelman and
Feinberg, Allentown, Pa., for movant.

MEMORANDUM

TROUTMAN, Senior District Judge.

In the plaintiffs' most recent appeal from a decision
of the Magistrate in a discovery dispute, we revisit
the issue of privilege in another context. [FN1]

> FN1. We recently affirmed an order of the
> Magistrate which held that attorney-client
> privilege did not protect from disclosure to
> defendants' counsel a document prepared by
> the plaintiff concerning problems which
> arose between the parties and ultimately led
> to the instant lawsuits. *See, Doe v. Special
> Investigations Agency, et al.,* CA No. 90-
> 1762, *Doe v. Padrone,* CA No. 90-6612 slip
> op., 1991 WL 197325 (E.D.Pa. Sept. 24,
> 1991).

Here the plaintiffs seek to protect from disclosure to
defendants' mental health expert records of
psychiatric treatment and other counseling which
they have received over the years, including records
generated prior to their relationship with the
defendants as well as during and after the period of
their association.

Defendants contend that examination of such records
by their expert witness is essential to preparation of
their defense to plaintiffs' claim for intentional
infliction of emotional distress.

Plaintiffs argue that this claim, asserted as a pendent
state claim to the federal RICO claim which confers
jurisdiction on the district court, is unrelated thereto
in the sense that damages recoverable under the state
law claim are completely dissimilar to those available
under RICO. Consequently, plaintiffs argue, state
law provides the rule of decision for the claim as to
which the purportedly privileged records are sought,
and such evidence is neither admissable nor relevant
with respect to the federal claim. Thus, plaintiffs
further argue that, pursuant to Fed.R.Evid. 501, we
are required to apply Pennsylvania state law to the
issue whether the plaintiffs' psychiatric psychological
records are privileged, [FN2] and, therefore, not
discoverable. **\*23** Pennsylvania, by statute,
completely prohibits disclosure of such records
absent the client's written consent. *See,* 42
Pa.Cons.Stat.Ann. § 5944 (Purdon's Supp., 1991).
This statute further provides that communications
between psychiatrist psychologist and patient are

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

714 F.2d 632

Page 2

714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
**(Cite as: 714 F.2d 632)**

privileged to the same extent as those between attorney and client. *Id.*

> FN2. Fed.R.Evid. 501 provides, in pertinent part, that.
> [T]he privilege of a witness, person, government, State, or political subdivision thereof shall be governed by principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with state law.

The Magistrate concluded, however, that federal common law, not state law applies to the privilege issue. This conclusion was based upon the case of *Wm. P. Thompson Co. v. General Nutrition Corp.,* 671 F.2d 100 (3d Cir.1982), in which the court discussed the application of Rule 501 where a federal question case also includes pendent state claims. Noting that, "[A]pplying two separate disclosure rules with respect to different claims tried to the same jury would be unworkable", *Id.,* at 104, the court fashioned a bright line rule for such situations, stating unequivocally, "We hold that when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility rather than any state law privilege, is the controlling rule." *Id.*

It is likely that the federal question pendent claim issue will commonly arise where the evidence is relevant to the entire case, providing a strong and practical rationale for the *Thompson* holding under most circumstances. Although plaintiffs argue that this rule is, or should be, limited to those situations, the court's holding makes no such distinction. Moreover, we are not convinced that the Court of Appeals would alter the general rule to reach a different result if confronted with the present circumstances, since there are sound policy reasons for maintaining a bright line rule even where the material claimed to be privileged is relevant only to the state claim.

[1] In the first instance, federal procedural rules, including rules of evidence, are generally applicable in federal court, even in diversity cases, where state law provides the substantive rule of decision. *See, Bushman v. Halm,* 798 F.2d 651, 660, n. 11 (3d Cir.1986). Thus, Fed.R.Evid. 501 itself represents a

departure from generally applicable federal court practices and procedures.

Second, both broad pretrial discovery and narrow construction of privileges are favored in federal practice. *See, e.g., Wei v. Bodner,* 127 F.R.D. 91 (D.N.J.1989) and cases cited therein.

[2] These accepted and well-settled policies are consistent with a narrow construction of Rule 501 insofar as it addresses application of state law to issues of privilege and, therefore, amply support a general rule that federal common law is applicable to privilege issues in all cases involving a federal question, regardless of the presence or nature of any pendent claims.

In addition, plaintiffs alone delineate the issues in a case by deciding which claims to plead and by choosing the forum in which to proceed. It is true that considerations of judicial economy reasonably suggest that pendent state claims should be tried in the same action with federal claims. The same set of facts often support several causes of action, however, and plaintiff is entirely free to balance the various risks and benefits to the litigation of framing a federal claim from the operative facts or foregoing it in order to gain the applicability of state procedures which, for a variety of reasons, may be more favorable in specific circumstances. Similarly, plaintiffs with a substantial federal claim may elect not to plead a particular pendent claim in light of the discovery and evidentiary burdens imposed by proceeding on that claim in federal court. Finally, with respect to some federal claims, state courts have concurrent jurisdiction with the district courts. Thus, it is often possible to pursue a federal claim in state court. We do not believe that it is the function of the federal courts to lighten plaintiffs' burden of balancing the various considerations involved in making **\*24** such choices by carving out an exception to a general rule for a particular set of difficult circumstances, applicable to particular plaintiffs, in an attempt to eliminate a particular disadvantage of proceeding in federal court. This is especially true where, as here, easing the potential disadvantage of a narrower construction of privilege under Rule 501 of the Federal Rules of Evidence can only be accomplished by complicating a definitive and precedential interpretation of the Rule. To distinguish the *Thompson* case as plaintiffs here suggest would shift the burden to the courts to first create, and then, ever afterward, determine the applicability of an obscure exception to the accepted interpretation of Rule 501, tailored to uncommon circumstances. Such a result,

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

714 F.2d 632                                                                                                    Page 3
714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
**(Cite as: 714 F.2d 632)**

reached solely to accommodate the plaintiffs in this case, would prove to be a perfect exemplar of the old truism that hard cases make bad law.

[3] Plaintiffs next argue that even if we determine, as we now have, that the federal rule of privilege applies, we should give it the same content as the Pennsylvania statute, *i.e.*, hold that communications to licensed psychologists or psychiatrists are absolutely privileged to the same extent as attorney client communications. Alternatively, plaintiffs ask us to hold that, under the circumstances of this case, the plaintiffs' interest in protecting the absolute confidentiality of the psychotherapeutic relationship outweighs the defendants' interest in obtaining the information.

We see nothing clearly erroneous or contrary to law in the Magistrate's decision to permit defendants' mental health expert to examine the plaintiffs' psychotherapeutic records. As noted in the Magistrate's memorandum, defendants face serious and very damaging allegations in this case. They are entitled to all available information relating to the plaintiffs in order to pursue a vigorous defense, provided, of course, that the Court maintains sufficient safeguards to protect the plaintiffs' equally serious and important interest in maintaining the privacy of their medical records.

Contrary to plaintiffs' suggestion, we do not reach this conclusion because we believe that the plaintiffs have waived an absolute privilege by pleading a claim for intentional infliction of emotional distress. Rather, our conclusion is based upon the policies underlying the Federal Rules of Evidence and Civil Procedure, which, as noted, favor full access to information necessary to pursuing or defending against claims made in litigation, for the benefit of all parties involved. Moreover, we conclude that the legitimate interests of both sides have been served by the Magistrate's order, particularly since the plaintiffs' real names have not been disclosed in this case.

To the extent, however, that plaintiffs feel the need for additional protection, the Court will fashion an order to make explicit the protections already inherent in the Magistrate's order. In addition, we note that our decision concerning privilege in this matter applies only to the discovery phase of this case, including the preparation of an expert report. We are not, at present, ruling on the admissibility at trial of any document or record relating to the psychotherapeutic treatment of the plaintiffs.

ORDER

And now, this 20th day of November, 1991, upon consideration of plaintiffs' appeal from and objections to the order of the Magistrate dated August 29th, 1991 (Doc. # 79), IT IS HEREBY ORDERED that the appeal is DENIED and the order of the Magistrate is AFFIRMED.

IT IS FURTHER ORDERED that plaintiffs shall produce their psychological and psychiatric records within ten (10) days of the entry of this order upon the record, subject to the following restrictions:

1. Disclosure of such records is limited to a psychiatrist or licensed psychologist engaged by the defendants, and shall be used by such mental health expert for the purposes of this case only;

2. Plaintiffs' names shall be redacted from such records;

**\*25** 3. Disclosure of any expert report generated by examination of such records shall be limited to defendants' attorneys, plaintiffs' attorneys, plaintiffs' mental health expert, if any, plaintiffs themselves and the Court, if necessary;

4. Motions relying upon or making any reference to defendants' expert report or the records upon which such report is based, if any, shall be filed under seal.

IT IS FURTHER ORDERED that plaintiff's Motion to Stay Order of the Magistrate, (Doc. # 80) is DISMISSED as moot.

END OF DOCUMENT

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

714 F.2d 632                                                                    Page 4
714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
(Cite as: 714 F.2d 632)

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Lisa M. BEARD, Plaintiff,
v.
CITY OF CHICAGO, Defendant.
**No. 03 C 3527.**

Jan. 10, 2005.
Lisa M. Beard, Chicago, IL, pro se.

Eugene A. Boyle, Michael E. Hughes, Neal, Gerber & Eisenberg, Chicago, IL, for Plaintiff.
Nancy L. Van Allen, Naomi Ann Avendano, Joseph Francis Graham, James Arthur Filkins, Mara Stacy Georges, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

SCHENKIER, Magistrate J.

*\*1* Plaintiff, an African-American female who suffers from major depression, was employed as a paramedic for the City of Chicago Fire Department (the "Department") from April 1, 1993 until her termination on November 14, 2002. Ms. Beard has filed this federal-question lawsuit asserting discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; race discrimination in violation of Title VII, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981; gender discrimination in violation of Title VII; and race, color and gender discrimination in violation of 42 U.S.C. § 1983.

As part of discovery in this case, plaintiff has sought production of documents related to "lay ups" (that is, leaves of absences) taken by other paramedics employed by the Department for psychological or substance abuse issues, on the ground that these other paramedics are similarly situated to plaintiff and that evidence of their treatment by the Department is discoverable on the issue of plaintiff's discrimination claims. The parties agree that the presiding district judge has found these records "relevant" as defined by Federal Rule of Civil Procedure 26(b)(1). However, defendant has resisted production of the documents on grounds of privilege. As a result, plaintiff has filed a motion to compel (doc. # 49), which has been referred by the district judge to this

Court for ruling (doc. # 48). [FN1]

FN1. In oral argument on the motion, the parties disagreed as to whether the district judge also has ruled that this discovery (if not protected by privilege) should not be limited by any of the considerations set forth in Federal Rule of Civil Procedure Evidence 26(b)(2). That dispute is beyond the scope of the referral, and we do not address it in this opinion. In any event, for the reasons we explain below (*see* note 3, *infra* ), we do not believe that a Rule(b)(2) analysis ultimately will affect the production of the documents in issue.

Defendant resists production on the grounds that medical records concerning other paramedics are privileged from production by virtue of three separate statutory schemes: the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d, *et seq.*; the federal Public Health Service Act ("the Public Health Act"), 42 U.S.C. § 290dd-2; and the Illinois Mental Health and Developmental Disabilities Confidentiality Act ("the Illinois Confidentiality Act"), 740 ILCS 110-1, *et seq.* For the reasons that follow, the Court finds that none of these statutory schemes bars production of the documents in issue. However, we find that a privilege that neither side has addressed--the federal psychotherapist-patient privilege--may apply to some of the documents at issue.

I.

All of the documents at issue presently appear to be in the possession of the Department. But, they originally were generated in different ways.

*First,* the Department maintains medical records prepared by outside medical personnel. Some of the records are generated by an employee's treating physician, or other outside treating medical personnel, as part of the ordinary course of an employee's treatment. Other records are generated by the treating physicians at the request of the Department, for the purpose of documenting an employee's progress, and are provided to the Department directly by the employee. According to the parties' representations during argument, these records are obtained by the Department in at least two different ways. In some instances, they are obtained directly from the physician pursuant to a consent form signed by the employee. At least one version of the consent form (*see* Def. Mem., Ex. 4) specifies what information the physician is

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
**(Cite as: 714 F.2d 632)**

authorized to provide; specifies the use that may be made of the information ("[e]valuation for return to work; maintaining treatment and follow-up care, and any other matter related to my employment with the Chicago Fire Department, ..."); and further specifies that the Department may not re-disclose the information without the employee's specific consent. In other instances, the records may be obtained directly from the employee (who presumably requested them from the physician), without any consent form being signed and without any express, written limitation on the use of the information.

**\*2** *Second,* the Department may obtain medical records from physicians specifically designed to assess an employee's fitness to return to work. The doctors who perform these evaluations are not treating physicians, but are outside doctors whom the Department contracts to perform this service. An employee who is sent for this evaluation completes a Fitness for Duty Evaluation Consent Form (Pl.Mem., Ex. 5). In this form, the employee acknowledges that there is no "therapist-client relationship" with the evaluating doctor, and that the information provided to the evaluating doctor is not confidential.

*Third,* the Department maintains its own medical section, which employs physicians and other medical personnel. The medical section is a subset of the Department's personnel division, and the employees of the medical section do not render medical or mental health treatment to employees. Rather, the function of the medical section is to determine whether an employee is fit to return to duty. The records created by this section include initial lay up interview forms and summaries of medical reports forms, which are prepared by nurses of the medical section, and medical progress notes, which are prepared by physicians employed by the medical section.

*Fourth,* the medical section maintains various administrative or clerical records concerning the employee's status. These include appointment sheets and medical action reports.

During argument, the parties disclosed that the withheld documents have been identified on a privileged document log. That log discloses the employees to whom the documents relate, and--at least in general terms--whether each employee's medical records relate to substance abuse or mental health treatment. By informal agreement, the parties have treated the log on an "attorneys' eyes only" basis, with neither the log nor the information on it

being disclosed to the plaintiff, herself.

### II.

With that brief overview, we now turn to an analysis of whether the statutory provisions upon which the defendant relies authorizes the defendant to withhold these records from production. For the reasons set forth below, we conclude that they do not.

### A.

We begin by considering whether the documents at issue are protected from production under HIPAA. We find that the documents are not protected from disclosure for several reasons.

*First,* HIPAA provides that standards concerning the handling of health information shall apply to "a health plan," "a healthcare clearinghouse," or "a healthcare provider who transmits any health information in an electronic form in connection with a transaction referred to in Section 1320d-2(a)(1) of this title." 42 U.S.C. § 1320d-1(a)(1)-(3). Section 1320d-2(a)(1), in turn, provides for standards to govern the electronic transfer of health information. We have been offered no evidence that the Department meets the definition of a "health plan" or "healthcare clearinghouse." Moreover, it is questionable whether the defendant is a healthcare provider, which the implementing regulations define as a provider of medical services or "any other person or organization who furnishes, bills, or is paid for health care in the normal course of business." 45 C.F.R. § 160.103. It does not appear that the Department's medical section actually provides medical care; it evaluates medical conditions (and pays for fitness for return to duty evaluations) not for the purpose of treatment, but for the purpose of determining fitness to return to work. But, even if the defendant met the definition of a healthcare provider, there is no evidence in this case that the Department is engaged in the transmission of the health information in "electronic form," as required for the HIPAA standards to be applicable. If there were any doubt about that statutory requirement, it is eliminated by the implementing regulations. The regulations provide that a "covered entity" includes only those healthcare providers who "transmit[ ] any health information *in electronic form* in connection with a transaction covered by this subchapter," 45 C.F.R. § 160.103 (emphasis added), and that the restrictions on use or disclosure of health information apply only to a covered entity. *See* 45 C.F.R. § 164.502(a).

**\*3** *Second,* even if the defendant qualified as a

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

714 F.2d 632                                                                                          Page 6
714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
**(Cite as: 714 F.2d 632)**

covered entity, the restrictions on use or disclosure apply only to "protected health information." And, under the regulations, the definition of protected health information excludes "individually identifiable health information in ... [e]mployment records held by a covered entity *in its role as employer*." 45 C.F.R. § 160.103 (emphasis added). Plainly, the only reason that the Department maintains any records of an employee's substance abuse or mental health treatment in connection with a lay up is because of the Department's role as an employer.

*Third,* the regulations provide that a covered entity may disclose protected health information "in the course of any judicial or administrative proceeding." 45 C.F.R. § 164.512(e)(1); *see also* 45 C.F.R. § 164.502(a)(1)(vi). Section 164.512(e) allows disclosure of protected health information in response to a discovery request, even if unaccompanied by a court order, if reasonable efforts have been made to insure that individuals who are the subject of the protected health information requested are given notice of the request, or the covered entity receives satisfactory assurance that the requesting party has made reasonable efforts to secure a qualified protective order that provides that the parties (a) will not use or disclose the information for purposes other than the pending proceeding, and (b) will return the information (or destroy it) at the end of the litigation or proceeding. 45 C.F.R. § 164.512(e)(1)(ii), (v). Moreover, the regulations specifically authorize disclosure of the protected health information by a covered entity in response to a court order, so long as the entity discloses "only the protected health information expressly authorized by such order." 45 C.F.R. § 164.512(e)(1)(i).

For each of the foregoing independent reasons, we reject the defendant's argument that the production of the requested documents is barred under HIPAA.

### B.

We now turn to defendant's argument that production of documents is barred under the Public Health Act. That Act states that patient records maintained in connection with substance abuse diagnosis, prognosis or treatment shall be treated as confidential, and may be disclosed only in limited circumstances, if the records are maintained in connection "with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States ..." 42 U.S.C. § 290dd-2. The

Seventh Circuit has stated that the purpose of this statute is to protect not only the privacy rights of individual patients, but also "the continued effectiveness and viability of important substance abuse treatment programs," as "[p]atients will be less willing to seek treatment if patient confidentiality is not strictly protected." *U.S. ex rel. Chandler v. Cook County, Illinois,* 277 F.3d 969, 981 (7th Cir.2002).

*\*4* That said, Section 290dd-2 does not create a privilege that covers any and all records of substance abuse treatment. Rather, the statute applies only to those records maintained in connection with the performance of any "program or activity" relating to substance abuse education, prevention, training, treatment, rehabilitation or research, and only if those programs or activities are "conducted, regulated or directly or indirectly assisted by any department or agency of the United States." 42 U.S.C. § 290dd-2(a). Certainly, in the attorney-client privilege context, a party asserting the privilege bears the burden of establishing all of its elements. *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983), and we see no reason why the rule should be different with respect to the privilege defendant asserts under the Public Health Act. Here, defendant has fallen short of establishing that the documents are protected under the Public Health Act for several reasons.

*First,* defendant has failed to establish that the documents at issue were maintained in connection with a "program or activity" within the meaning of Section 290dd-2. The regulations promulgated under Section 290dd-2 define a "program" as follows:

(a) an individual or entity (other than a general medical care facility) who holds itself out as providing, and provides, alcohol or drug abuse diagnosis, treatment or referral for treatment; or

(b) an identified unit within a general medical facility which holds itself out as providing, and provides, alcohol or drug abuse diagnosis, treatment or referral from treatment; or

(c) medical personnel or other staff in a general medical care facility whose primary function is the provision of alcohol or drug abuse diagnosis, treatment or referral for treatment and who are identified as such providers.

42 C.F.R. § 2.11.

Some of the documents at issue here were provided directly by an employee's treating physician or other treating medical personnel to the Department, pursuant to a signed consent. Defendant has offered no evidence concerning the identity of these outside medical personnel, or that they fall within any of the

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

714 F.2d 632                                                                                            Page 7

714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
**(Cite as: 714 F.2d 632)**

regulatory definitions of "program." Likewise, the medical records obtained by the Department's medical section directly from the employee have not been shown to be maintained pursuant to a defined "program."

Nor is there any evidence that the Department's medical section, which generates some of the records at issue, falls within the definition of a covered program. The Department deals with an array of medical issues other than substance abuse, and thus does not appear to fall within the subpart (a) definition of an entity that holds itself out as providing substance abuse "diagnosis, treatment or referral for treatment."    [FN2] Nor does the Department appear to fall within the subpart (b) definition of a program, because the Department is not an identified unit of a more general medical facility that holds itself out as providing treatment or referral for treatment for substance abuse. Finally, the Department does not appear to qualify as a program under the subpart (c) definition, because its "primary function" is not the provision of substance abuse diagnosis, treatment or referral, but is rather to determine fitness for return to duty.

> FN2. We note that the regulations elsewhere state that defined "programs" include "employee assistance programs." 42 C.F.R. § 2.12(e)(1). However, given the description we have received of the Department and how it works, it does not appear to fall within that definition.

**\*5** *Second,* even if the records at issue were maintained pursuant to a defined "program," defendant has offered no evidence that such a program is "conducted, regulated or directly or indirectly assisted by any department or agency of the United States." 42 U.S.C. § 290dd-2(a). There is no evidence that any of the activities of the Department in connection with dealing with employees on lay-ups for substance abuse are conducted or regulated by the United States. Nor has defendant offered any evidence that those activities are directly or indirectly "supported by funds provided by any department or agency of the United States." 42 C.F.R. § 2.12(b)(3). Section 2.12(b)(3)(iii) provides that indirect financial assistance may be established by showing that the activity is "[c]onducted by a State or local government unit which, through general or special revenue sharing or other forms of assistance, receives Federal funds which could be (but are not necessarily) spent for the alcohol or drug abuse program." The regulations

eliminate any doubt about the necessity of federal assistance in order to render Section 290dd-2 applicable. The regulations state that if a patient receives treatment provided by a program which is not "federally conducted, regulated or supported in a manner which constitutes Federal assistance under § 2.12(b), that patient's record is not covered by these regulations." 42 C.F.R. § 2.12(e)(2). Defendant has made no showing of such financial support here, and in the absence of evidence, we will not assume what the defendant has failed to prove. See *Ley v. Blose,* 698 N.E.2d 381, 383 and n. 1 (Ind.Ct.App.1998).

*Third,* the regulations make clear that where records are maintained in connection with a covered program that receives assistance by the United States, what may not be disclosed is limited to those records that "[w]ould identify a patient as an alcohol or drug abuser either directly, by reference to other publicly available information, or through verification of such an identification by another person." See also 42 C.F.R. § 2.12(e)(3) ("[t]he restrictions on disclosure apply to any information which would identify a patient as an alcohol or drug abuser"). Thus, even if the restrictions on disclosure were applicable, they would apply only to those records pertaining to substance abuse diagnosis or treatment. It would not apply to records that pertain to mental health treatment unrelated to any substance abuse issues, which also was sought by plaintiff. Moreover, it strikes the Court that production could be made in a way that kept confidential the identity of individual employees who received lay ups for substance abuse treatment, by redacting from the records "patient identifying information," which the regulations define as "name, address, social security number, fingerprints, photograph, or similar information by which the identity of the patient can be determined with reasonable accuracy and speed either directly or by reference to other publicly available information." 42 C.F.R. § 2.11.

**\*6** Accordingly, for all of these reasons, the Court finds that the Public Health Act does not bar production of the documents sought in this case.

C.

We now turn to defendant's argument that state law bars production of the records sought by the plaintiff. In particular, defendant relies on the Illinois Confidentiality Act, 740 ILCS 110/3, which prohibits disclosure of mental health records and communications except as provided under the Act. See *McGreal v. Ostrov,* 368 F.3d 657, 688 (7th Cir.2004).

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

However, the Illinois statute has no applicability in this federal-question case. Federal Rule of Evidence 501 provides that in a non-diversity case, "the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." The Seventh Circuit has held that under Rule 501, in a federal-question case, "the contours and exceptions of such privileges are clearly a matter of federal common law: state-created principles of privilege do not control." In Re Pebsworth, 705 F.2d 261, 262 (7th Cir.1983); see also Northwestern Memorial Hospital v. Ashcroft, 362 F.3d 923, 925 (7th Cir.2004) ("the Illinois privilege does not govern in federal-question suits"). We might be presented with a different question if this lawsuit involved both federal and state law claims, see Jaffee v. Redmond, 518 U.S. 1, 15-16 n. 15, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), but the only state law claim that ever was in the case has been dismissed (see doc. # 24: 02 02 04 Mem. Op. and Order at 2-4).

### III.

Although none of the statutory schemes cited by defendant bars production here, during argument we raised the issue with the parties about whether the documents in issue are protected by a privilege the parties have not addressed: the federal psychotherapist-patient privilege announced in Jaffee, which protects "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment." 518 U.S. at 15. This federal privilege applies to confidential communications not only between a patient and psychotherapist, but also the confidential communications with licensed social workers. Id. at 15-16.

Of course, this privilege is "rooted in the imperative need for confidence and trust." Jaffee, 516 U.S. at 10 (quoting Trammel v. United States, 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)). Thus, in the absence of a legitimate expectation of confidentiality, there can be no privilege. Scott v. Edinburgh, 101 F.Supp.2d 1017, 1020 (N.D.Ill.2000). Moreover, even a communication that was confidential and privileged when made may be subject to production if the privilege is later waived. Jaffee, 518 U.S. at 14 n. 14 ("[l]ike other testimonial privileges, the patient may of course waive the protection").

Because the parties have not addressed the federal

psychotherapist-patient privilege, we are not in a position to rule on whether particular documents sought by the plaintiff may be withheld on the basis of that privilege. To assist the Court in making that determination, we direct defendant to review the withheld records to determine which ones the defendant legitimately can assert were subject to the psychotherapist-patient privilege when originally created. On that score, we note that it appears certain records plainly would not be subject to such a privilege: for example, those records conveyed to the Department pursuant to the fitness for duty evaluation consent form (see Pl. Mem., Ex. 5), which reflects the employee's understanding that his or her conversations with the medical professional were not pursuant to a therapist-client relationship and were not confidential. It also may be that many (if not all) of the documents generated by the Department's medical group did not fall within the Jaffee privilege when created, since those records were not created for the purpose of medical treatment but, instead, were for purposes of evaluating the ability of an employee to return to work. On the other hand, records created by outside mental health professionals who treated the employees may have been privileged when created. Defendant is directed to engage in a document-by-document review to determine those documents for which it believes there is a legitimate psychotherapist-patient privilege to assert.

*7 For any such documents, defendant then must consider whether there has been a waiver of any such privilege by the disclosure of the document to the Department. As we have set forth above, the records in issue were received by the Department through different paths. Some were conveyed directly by outside treating physicians pursuant to consent forms that authorized distribution only for a limited purpose, and did not authorize redisclosure without specific written authorization. It appears that, in other situations, records created by outside treaters were conveyed to the Department directly by the employees, without any consent form that limited the distribution or use of the information. There may be other forms of consent that were used as the means of authorizing distribution of the documents to the Department. In assessing whether a particular record may be subject to a good faith assertion of the psychotherapist-patient privilege, defendant is instructed to consider all of these manners in which the documents were conveyed to the Department to determine whether any privilege has been waived.

Based on the arguments the Court has received in the case, as well as the governing case law, it appears

714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
**(Cite as: 714 F.2d 632)**

likely that certain records will be produced. In anticipation of that production, the Court further directs that the parties work on a protective order to govern the distribution and use of any records produced. We believe that there is good cause for such a protective order because, even if certain records may not be withheld on the basis of privilege, they are nonetheless sensitive medical records of individuals who are not parties to this lawsuit. In these circumstances, a protective order is appropriate in order to protect these non-parties from the embarrassment of public dissemination of sensitive, personal information. *See* Fed.R.Civ.P. 26(c). Any such protective order should include, at a minimum, the following elements: (a) a provision stating that the medical records produced may be used only for purposes of this lawsuit, and for no other purpose; (b) "an attorneys' eyes only" provision, that bars plaintiff from access to the medical records or the information in them; (c) a methodology for redacting from any of the records used during depositions the names of the individuals whose records are being produced, using in place of their names some alphanumeric or other code; and (d) a provision requiring that plaintiff return to defendant (or destroy) all copies of the medical records produced, and retain no copies of them. [FN3]

> FN3. In these circumstances, we consider it unlikely that the analysis of what documents should be produced would be affected by a Rule 26(b)(2) analysis. To the extent the documents are privileged, they will not be produced. To the extent they are not privileged (or the privilege has been waived), this is not a situation where there would be an undue administrative burden in producing the documents. Defendant concedes that the documents are not so voluminous that it would be burdensome to locate or produce them. And, if the documents are not privileged, then it is hard to see how the burden on non-parties' confidentiality interests would outweigh the benefit of producing documents that are relevant-and, indeed, are the type of discovery materials concerning "similarly situated" persons that often are central to proving (or disproving) a discrimination claim. The relevance of the information sought here distinguishes this case from *Northwestern Mem. Hosp. v. Ashcroft*, 362 F.3d 923 (7th Cir.2004), in which the appeals court affirmed an order quashing a subpoena for sensitive non-party medical records where there was no articulated

relevance for the information being sought.

CONCLUSION

For the foregoing reasons, plaintiff's motion to compel (doc. # 49) is GRANTED, to the extent that the Court rejects defendant's assertion that production of the requested medical records is barred by HIPAA, the Public Health Act, and or the Illinois Confidentiality Act. The Court holds in abeyance the issue of what particular records must be produced to plaintiff, pending the review process set forth in this memorandum opinion and order. At the next status conference (set for January 20, 2005 at 8:30 a.m.), defendant is directed to be prepared to discuss the result of its document review, and the parties are directed to be prepared to discuss the form of protective order that would be appropriate in this case.

2005 WL 66074 (N.D.Ill.)
END OF DOCUMENT

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

714 F.2d 632    Page 10
714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
(Cite as: 714 F.2d 632)

⊳

United States Court of Appeals,
Sixth Circuit.
In re Subpoena Served Upon Jorge S. ZUNIGA,
M.D., et al.
In re Subpoena Served Upon Gary R. PIERCE, M.D.,
et al.
**Nos. 82-1906, 82-1907 and 82-1964.**

Argued Feb. 2, 1983.
Decided Aug. 3, 1983.

Psychotherapists appealed from orders of the United States District Court for the Eastern District of Michigan, Philip Pratt and Patricia J. Boyle, JJ., adjudging them in civil contempt for failing to appropriately respond to subpoena duces tecum issued by grand jury. The Court of Appeals, Krupansky, Circuit Judge, held that: (1) information as to the identity of psychotherapists' patients, the dates on which they were treated, and the length of the treatment on each date did not fall within the scope of the psychotherapist-patient privilege; (2) enforcement of subpoena duces tecum which commanded psychotherapists to produce information as to the identity of psychotherapists' patients, the dates on which they were treated and the length of the treatment on each date, did not unconstitutionally infringe on the privacy rights of patients, because identity of the patients was already known to the grand jury from insurance forms in its possession, and the information sought would be protected by the veil of secrecy attending grand jury proceedings; and (3) psychotherapists could not raise the Fifth Amendment as a bar to production of the information, because psychotherapists' practices were maintained as professional corporations and the billing records were corporate rather than private records.

Affirmed.

**\*634** Gordon S. Gold (argued), Evans & Luptak, Detroit, Mich., for appellant in Nos. 82-1906 and 82-1907.

Neil H. Fink (argued), Detroit, Mich., Lori R. Fregolle, for appellant in No. 82-1964.

Leonard R. Gilman, U.S. Atty., Richard L. Delonis, Asst. U.S. Atty. (argued), Detroit, Mich., for appellee in 82-1906, 82-1907 and 82-1964.

Before ENGEL and KRUPANSKY, Circuit Judges and BROWN, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

These are consolidated appeals from two orders of separate courts of the Eastern District of Michigan adjudging appellants, Jorge S. Zuniga, M.D. (Zuniga) and Gary S. Pierce, M.D. (Pierce), in civil contempt for failing to appropriately respond to subpoenas duces tecum issued by the grand jury of that district. In both cases the grand jury sought records relevant to an investigation of alleged schemes to defraud in billings submitted to Michigan Blue Cross-Blue Shield.

Pierce

Pierce is a practicing psychiatrist licensed to practice medicine in the State of Michigan. Pierce's practice is organized as a professional corporation. On November 24, 1980 a subpoena duces tecum was issued by the Grand Jury for the Eastern District of Michigan commanding Pierce, or an authorized custodian of records, to appear and produce the following records:

> Patient files, progress notes, ledger cards, copies of insurance claim forms and any other documentation supporting dates of service rendered and identity of patient receiving said service for the years 1978 and 1979 for the following individuals and all dependents thereof covered under the individuals' Blue Cross Blue Shield contract:

The names and addresses of 18 persons were listed thereunder.

The subpoena directed Pierce to appear before the grand jury on December 11, 1980. On December 3, 1980 he filed a motion to quash the subpoena in the district court. A hearing on the motion was conducted before the Honorable Patricia J. Boyle, and on February 26, 1981, Judge Boyle issued an order denying the motion to quash. The district court, in accordance with the Government's concession, held that the records to be produced would be redacted of information other than the data showing the patient's name and the fact and time of treatment.

Pierce persisted in his refusal to produce the subpoenaed documents and the Government filed a motion to show cause why he should not be held in contempt. Another hearing was conducted subsequent to which the court found Pierce in civil

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

714 F.2d 632                                                                                    Page 11
714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
**(Cite as: 714 F.2d 632)**

contempt and remanded him to the custody of the United *635 States Marshal until such time as he was prepared to purge himself of contempt by compliance with the subpoena.   The court stayed execution of the order pending this appeal.

Zuniga

Zuniga is also a practicing psychiatrist licensed to practice medicine in Michigan and his practice is organized as a professional corporation.   On March 30, 1982, the Grand Jury for the Eastern District of Michigan issued a subpoena commanding Zuniga, or an authorized custodian of records, to appear before the grand jury and produce the following records:

with respect to each of the followed (sic) names on the list attached, the following documents:
1.   Redacted copies of patient files indicating patient name, date of service, type of psycho-therapy session rendered (i.e., full, half, brief) [FN1] and billed.

FN1.   The billing procedure under which Zuniga is compensated is allegedly structured in time segments--full session, 50 minutes;   half session, 25 minutes;   brief session, 20 minutes.   Govt's Brief at 5.

2. Original ledger cards for patients.

```
May 3, 1978          October 19, 1978
June 9, 1978         November 3, 1978
July 17, 1978        November 20, 1978
July 24, 1978        December 1, 1978
August 9, 1978       May 8, 1979
August 10, 1978      May 23, 1979
August 14, 1978      June 2, 1979
September 11, 1978   June 7, 1979 [FN2]
October 9, 1978
```

In accordance with the above-referenced resolutions, on or about July 2, 1974, Zapata lent the six officers the following amounts in return for a note on terms as above-described (see note

```
Flynn      $   789,750
Naess          252,720

Shiels         255,150
Harrison       352,350
Lassiter       185,895
```

3. Original of any intra-office forms in support of service rendered and date thereof.

The attached list included the names of 268 persons.

On April 2, 1982, Zuniga filed a motion in the district court to quash the subpoena.   A hearing was conducted before the Honorable Phillip Pratt and on May 3, 1982, Judge Pratt denied the motion but limited the subpoena to the production of records for 75 individuals.   Judge Pratt also confined the scope of the subpoena to the five preceding years.

On June 18, 1982, the Government moved the district court to reconsider its May 3rd ruling.   The Government proposed to limit the scope of the subpoena to 21 specific dates rather than a five year period.   The Government requested, however, that the records for all of the initially named 268 individuals be produced.   The lower court ruled that, in effect, the Government was proposing an entirely new subpoena and refused to grant the request.

In response, the grand jury, on July 15, 1982, issued a second subpoena ordering the production of the following documents:
Bring with you, with respect to the following dates:

8, supra ) from each officer for the amount of the loan:

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

714 F.2d 632                    FOR EDUCATIONAL USE ONLY                    Page 12
714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350
**(Cite as: 714 F.2d 632)**

```
Mall        181,035
            ----------


TOTAL      $2,016,900
            ----------
```

FN2. A supplemental subpoena issued September 24, 1982 added four dates to this list.

the following documents:

1. Patient appointment books, or pages therefrom, setting forth all patient names and type or length of services rendered by Dr. Zuniga, for both hospital and office services, on the above-listed dates.

2. Patient sign-in sheets for all patients treated by Dr. Zuniga on the above-listed dates.

3. Doctor's daily activity log, book or sheets, listing all patients treated by Dr. Zuniga on the above-listed dates.

4. Redacted copies of patient files, indicating patient name, date of service and type of psychotherapy session rendered (i.e. full, half, brief) for the persons listed on pages Two and Three herein.

5. Original patient ledger cards for the persons listed on pages Two and Three.

6. Original of any intra-office forms, records, or memoranda in support of service rendered on the above-listed dates to the persons listed on pages Two and Three herein.

**\*636** The attached pages included the names of 268 persons.

On August 11, 1982 Zuniga moved to quash the second subpoena, which motion the district court denied on September 30, 1982. Zuniga persisted in his refusal to comply with the subpoena and the Government filed a motion to show cause why Zuniga should not be held in contempt. A hearing was conducted on November 4, 1982 at which Zuniga's counsel indicated that Zuniga would continue to refuse compliance. The district court found Zuniga in contempt and remanded him to the custody of the United States Marshal until such time as Zuniga purged himself of contempt by compliance. Execution of the order was stayed pending this appeal.

These appeals were consolidated pursuant to Rule 3(b), Fed.R.App.P., inasmuch as the issues joined and arguments presented in both are identical. Zuniga and Pierce contended below and maintain on appeal that the documents sought by the grand jury are protected from disclosure for three reasons: (1) a psychiatrist-patient privilege, (2) the patients' constitutional privacy right and (3) the Fifth Amendment's privilege against self-incrimination.

With respect to appellants' first argument, the point of departure for analysis is Rule 501, Fed.R.Ev. That Rule provides:

RULE 501--GENERAL RULE

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law.

[1][2] Two preliminary observations are necessary. Initially, inasmuch as the subpoenas in issue are the product of a federal grand jury investigation into alleged violations of federal criminal law, questions of privilege are governed by federal law. *United States v. Gillock*, 445 U.S. 360, 369, 100 S.Ct. 1185, 1191, 63 L.Ed.2d 454 (1980). Second, although the subpoena powers of the grand jury are extremely broad, it may not use its authority to "violate a valid privilege, whether established by the Constitution, statutes, or the common law." *United States v. Calandra*, 414 U.S. 338, 346, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). Thus, the Court must determine if federal law recognizes a psychiatrist-patient privilege and, if so, whether enforcement of the grand jury subpoenas would violate that privilege.

Rule 501 was substituted by Congress for specific

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Case 1:03-cv-12488-PBS    Document 54-2    Filed 05/13/2005    Page 32 of 57

Westlaw.

705 F.2d 261                                                    Page 13
705 F.2d 261, 13 Fed. R. Evid. Serv. 60
**(Cite as: 705 F.2d 261)**

rules of privilege submitted in the rules proposed by the Judicial Conference Advisory Committee on Rules of Evidence and approved by the Supreme Court. 56 F.R.D. 183, 230- 261 (1972) (hereafter "Proposed Rules"). Rule 504 of the Proposed Rules embodies a psychotherapist-patient privilege:

PSYCHOTHERAPIST-PATIENT PRIVILEGE

(1) Definitions.

(1) A "patient" is a person who consults or is examined or interviewed by a psychotherapist.

(2) A "psychotherapist" is (A) a person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be, while engaged in the diagnosis or treatment of a mental or emotional condition, including drug addiction, or (B) a person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged.

(3) A communication is "confidential" if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or *637 persons who are participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family.

(b) General rule of privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purposes of diagnosis or treatment of his mental or emotional condition, including drug addiction, among himself, his psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

(c) Who may claim the privilege. The privilege may be claimed by the patient, by his guardian or conservator, or by the personal representative of a deceased patient. The person who was the psychotherapist may claim the privilege but only on behalf of the patient. His authority so to do is presumed in the absence of evidence to the contrary.

(d) Exceptions.

(1) *Proceedings for hospitalization.* There is no privilege under this rule for communications relevant to an issue in proceedings to hospitalize the patient for mental illness, if the psychotherapist in the course of diagnosis or treatment had determined that the patient is in need of hospitalization.

(2) *Examination by order of judge.* If the judge orders an examination of the mental or emotional condition of the patient, communications made in the course thereof are not privileged under this rule with respect to the particular purpose for which the examination is ordered unless the judge orders otherwise.

(3) *Condition an element of claim or defense.* There is no privilege under this rule as to communications relevant to an issue of the mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense, or, after the patient's death, in any proceeding in which any party relies upon the condition as an element of his claim or defense.

[3][4] The fact that Congress elected not to accept proposed Rule 504 does not preclude recognition of a psychiatrist-patient privilege. On the contrary, "[t]he Federal Rules of Evidence acknowledge the authority of the federal courts to continue the evolutionary development of testimonial privilege in federal criminal trials 'governed by the principles of the common law as they may be interpreted ... in the light of reason and experience.' " *Trammel v. United States,* 445 U.S. 40, 48, 100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980) *quoting* Fed.R.Evid. 501. Congressional enactment of Rule 501 thus, "provide[s] the courts with greater flexibility in developing rules of privilege on a case-by-case basis." *United States v. Gillock, supra* 445 U.S. at 368, 100 S.Ct. at 1191.

Specifically, with regard to a psychotherapist-patient privilege, the Senate Report to the new Federal Rules stated:

The committee has received a considerable volume of correspondence from psychiatric organizations and psychiatrists concerning the deletion of Rule 504 of the rule submitted by the Supreme Court. It should be clearly understood that, in approving this general rule as to privileges, the action of Congress should not be understood as disapproving any recognition of a psychiatrist-patient, or husband-wife, or any other of the enumerated privileges contained in the Supreme Court rules. Rather, our action should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-

Westlaw

705 F.2d 261                                                                                              Page 14
705 F.2d 261, 13 Fed. R. Evid. Serv. 60
**(Cite as: 705 F.2d 261)**

case basis.

S.Rep. No. 93-1277, 93d Cong., 2d Sess. (1974) *reprinted in* [1974] U.S.Code Cong. & Ad.News 7051, 7059.

[5] Clearly then, the Court has the authority to recognize a psychiatrist-patient privilege. This authority must be exercised with caution. As the Supreme Court has noted "[e]videntiary privileges in litigation are not favored." *Herbert v. Lando,* 441 U.S. 153, 176, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979), and "[w]hatever their origins, *638 these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for the truth." *United States v. Nixon,* 418 U.S. 683, 711, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974).

The rationale to support a psychotherapist-patient privilege, however, is readily apparent:

Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule .... there is wide agreement that confidentiality is a *sine qua non* for successful psychiatric treatment. The relationship may well be likened to that of the priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment.

Report No. 45, Group for the Advancement of Psychiatry 92 (1960) *quoted in* Advisory Committee's Notes to Proposed Rules, 56 F.R.D. at 242. Similarly, the D.C. Circuit has observed:

Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him. "The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say--and all that the psychiatrist learns from what they say--may be revealed to the whole world from a witness stand."

*Taylor v. United States,* 222 F.2d 398, 401 (D.C.Cir.1955) *quoting* Guttmacher and Weihofen, Psychiatry and The Law (1952), p. 272.

Despite these compelling considerations, the psychotherapist-patient privilege has received a mixed reception in the federal courts. *See United States v. Lindstrom,* 698 F.2d 1154 (11th Cir.1982) (indicating privilege does not exist); *United States v. Meagher,* 531 F.2d 752 (5th Cir.), *cert. denied* 429 U.S. 853, 97 S.Ct. 146, 50 L.Ed.2d 128 (1976) (rejecting privilege); *Ramer v. United States,* 411 F.2d 30 (9th Cir.), *cert. denied* 396 U.S. 965, 90 S.Ct. 445, 24 L.Ed.2d 431 (1969) (assuming privilege exists); *United States v. Witt,* 542 F.Supp. 696 (S.D.N.Y.) *aff'd* 697 F.2d 301 (2d Cir.1982) (refusing to recognize privilege); *United States v. Layton,* 90 F.R.D. 520 (N.D.Cal.1981) (privilege did not exist at common law and therefore not at federal law); *United States v. Brown,* 479 F.Supp. 1247 (D.Md.1979) (no general federal privilege); *Flora v. Hamilton,* 81 F.R.D. 576 (M.D.N.C.1978) (recognizing privilege to limited extent); *United States v. Williams,* 337 F.Supp. 1114, 1117 (S.D.N.Y.1971) (no need to decide status of the psychologist-patient privilege at federal law). In both *Lindstrom* and *Meagher* in which the Eleventh and Fifth Circuits refused to accept the privilege, the courts simply equated it with the physician-patient privilege without analyzing the unique aspects of the psychotherapist-patient relationship. This Court, therefore, does not find these authorities persuasive.

Contrawise, the states have demonstrated their willingness to recognize the privilege and a substantial number, including Michigan, have adopted some form of psychotherapist-*639 patient privilege. [FN3] In this regard it should be noted that, although federal law controls, the Supreme Court has indicated "that the privilege law as developed in the states is [not] irrelevant," and "has taken note of state privilege laws in determining

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

705 F.2d 261                                                                                                    Page 15

705 F.2d 261, 13 Fed. R. Evid. Serv. 60
**(Cite as: 705 F.2d 261)**

whether to retain them in the federal system." *United States v. Gillock, supra,* 445 U.S. at 369 n. 8, 100 S.Ct. at 1191 n. 8.

FN3. *See e.g.* Alaska Rules of Court, Rule 504; Ala.Code § 34-26- 2; Ariz.Rev.Stat.Ann. § 32-2085; Ark.Stat.Ann. § 28-1001. Rule 503; Cal.Evid.Code § 1010 *et seq.;* Colo.Rev.Stat. § 13-90-107(g); Conn.Gen.Stat.Ann. § 52-146c *et seq.;* Delaware Rules of Ev.R. 503; Fla.Stat.Ann. § 90-503; Ga.Code Ann. 38-418; Hawaii Rev.Stat. Title 33, ch. 626. 1980 Special Rules Pamphlet, Rule 504.1; Idaho Code § 54-2314; Ill.Rev.Stat., ch. 911 2 , § 801 *et seq.* Ind.Stat. § 25-33-1-17; Ky.Rev.Stat. § 421.215; La.Rev.Stat. § 13:3734; Maine Rules of Ev. 503; Md.Cts. & Jud.Proc.Code § 9-109; Mass.Gen.Laws Ann. ch. 233, § 20B; Mich.Comp.Laws Ann. § 330.1750; Minn.Stat.Ann. § 595.02; Miss.Code § 73-31-29; Mo.Rev.Stat.Ann. § 337.055; Mont.Code Ann. § 26-1-807; Neb.Rev.Stat. § 27-504; Nev.Rev.Stat. § 49.215 *et seq.;* N.H.Rev.Stat.Ann. § 330-A.19; N.J.Stat.Ann. § 45:14B-28; N.M.Rules of Ev. 504; N.Y.Civ.Prac.Law and Rules § 4507; N.C.Gen.Stat. § 8-53.3; N.D.Rules of Ev. 503; Okla.Stat.Ann.Tit. 12 § 2503; Ore.Rev.Stat. § 40.230; Tenn.Code Ann. § 24-1-207; Utah Code Ann. § 58-25-8, Vt.Stat.Ann.Tit. 12 § 1612, Va.Code § 8.01-400.2; Wash.Rev.Code § 18.83.110; Wis.Stat.Ann. § 905.04; Wyo.Stat.Ann. § 33-27-103. *See also* D.C.Code § 14.307. The foregoing enactments vary in scope and application and no attempt is made here to classify them or the decisions construing the provisions and their exceptions. *See generally* 44 A.L.R.3d 24.

Furthermore, the Court observes that the psychotherapist-patient privilege is advocated by several respected commentators. *See e.g.* Weinstein's Evidence *supra* at ¶ 504 *et seq.;* Slovenko, Psychiatry and a Second Look at the Medical Privilege, 6 Wayne L.Rev. 175 (1960).

In the final analysis, the issue to be decided is "whether the privilege ... promotes sufficiently important interests to outweigh the need for probative

evidence in the administration of criminal justice." *Trammel v. United States, supra* 445 U.S. at 52, 100 S.Ct. at 913.

[6] The interests promoted by a psychotherapist-patient privilege are extensive. As the Advisory Committee Notes stated: "confidentiality is the *sine qua non* for successful treatment." 56 F.R.D. at 242, *quoting* Report No. 45, Group For the Advancement of Psychiatry 92 (1960). The inability to obtain effective psychiatric treatment may preclude the enjoyment and exercise of many fundamental freedoms, particularly those protected by the First Amendment. "Mental illness may prevent one from understanding religious and political ideas, or interfere with the ability to communicate ideas. Some level of mental health is necessary to be able to form belief and value systems and to engage in rational thought." Smith, Constitutional Privacy in Psychotherapy, 49 Geo.Wash.L.Rev. 127 (1980).

The interest of the patient in exercising his rights is also society's interest, for society benefits from its members active enjoyment of their freedom. Moreover, society has an interest in successful treatment of mental illness because of the possibility that a mentally ill person will pose a danger to the community.

This Court has evaluated these interests, taking into account the aforementioned position of the states, the Judicial Conference Advisory Committee and various commentators, and finds that these interests, in general, outweigh the need for evidence in the administration of criminal justice. Therefore, we conclude that a psychotherapist-patient privilege is mandated by "reason and experience." Rule 501.

[7][8] Having recognized the compelling necessity for the privilege, it remains for the Court to determine its applicability to the instant action. It should be emphasized in this regard that no attempt is made here to define the appropriate perimeters of the privilege. Just as the recognition of privileges must be undertaken on a case-by-case basis, so too must the scope of the privilege be considered. *See. Upjohn Co. v. United States,* 449 U.S. 383, 396-97, 101 S.Ct. 677, 686, 66 L.Ed.2d 584 (1981). This is necessarily so because the appropriate scope of a **\*640** privilege, like the propriety of the privilege itself, is determined by balancing the interests protected by shielding the evidence sought with those

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

705 F.2d 261                                                        Page 16
705 F.2d 261, 13 Fed. R. Evid. Serv. 60
(Cite as: 705 F.2d 261)

advanced by disclosure.

[9] In the case at bar the information sought by the grand jury subpoenas is limited to the identity of the patients, the dates on which they were treated and the length of the treatment on each date. [FN4] Appellants acknowledge that, with respect to the attorney-client [FN5] or physician-patient privilege, [FN6] these facts do not generally fall within the privilege.

FN4. *See* pp. 634-636 *supra.*

FN5. *See* Weinstein's Evidence *supra* at ¶ 503(a)(4)[02].

FN6. *See* McCormick, Evidence § 100 (2d ed. 1972).

The appellants argue with some force, however, that the *identity* alone of the patient must be privileged to maintain the effective psychotherapist-patient relationship the general privilege seeks to promote. *See* Weinstein's Evidence ¶ 504[05]; Slovenko, *supra* at 188 n. 46.

It may be true that some persons would be hesitant to engage the services of a psychiatrist if confronted with the prospect that the mere fact of their treatment might become known. This consideration is not insubstantial. However, as indicated, the interest of society in obtaining all evidence relevant to the enforcement of its laws commands a high priority.

In weighing these competing interests, the Court is constrained to conclude that, under the facts of this case, the balance tips in favor of disclosure. The essential element of the psychotherapist-patient privilege is its assurance to the patient that his innermost thoughts may be revealed without fear of disclosure. Mere disclosure of the patient's identity does not negate this element. Thus, the Court concludes that, as a general rule, the identity of a patient or the fact and time of his treatment does not fall within the scope of the psychotherapist-patient privilege. Accordingly, the information sought by the grand jury subpoenas is not privileged. [FN7]

FN7. The Court would hasten to add that this holding does not mean that a court could not, in its discretion, or compelled by considerations of constitutional privacy, *see*

*infra* pp. 641-642, protect the identity of patients. *See generally, Lora v. Board of Ed. of City of New York,* 74 F.R.D. 565 (E.D.N.Y.1977).

[10] Even assuming arguendo that the identity of a patient and the times and dates of his treatment were within the scope of the psychotherapist-patient privilege, the patients in this case could not benefit from that privilege. The patients in the case at bar have already disclosed their identities to a third party, i.e. Blue Cross Blue Shield. In so doing they have waived the privilege to the extent of their disclosure.

A recent case from the Seventh Circuit is directly on point. In *In Re: Pebsworth,* 705 F.2d 261 (7th Cir.1983), a federal grand jury issued a subpoena to the authorized representative of Blue Cross Blue Shield of Illinois commanding production of all records pertaining to an Illinois psychiatrist. The information in the records included the names of the psychiatrist's patients, an enumeration of their visits and, in some cases, the patient's diagnosis.

Blue Cross and the psychiatrist opposed enforcement of the subpoena, urging that enforcement would violate the Illinois psychotherapist-patient privilege. Ill.Rev.Stat., ch. 911 2 , § 801 *et seq.* The lower court granted enforcement concluding that the patients had waived their privilege by virtue of their consent to disclosure to the insurance carriers.

The Seventh Circuit affirmed, stating, in pertinent part:

In assenting to disclosure of these documents, a reasonable patient would no doubt be aware that routine processing of reimbursement claims would require these records to be brought into the hands of numerous anonymous employees within a large corporation. While we might well have decided differently if the information sought under the subpoena **\*641** involved detailed psychological profiles of patients or substantive accounts of therapy sessions, it cannot be said that the subsequent disclosure of such fragmentary data as is involved here as part of the insurance company's legal duties in assisting a federal criminal investigation would be beyond the contemplation of the patients' waiver.

*Id.* 705 F.2d at 262-63.

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

705 F.2d 261                                                    Page 17
705 F.2d 261, 13 Fed. R. Evid. Serv. 60
**(Cite as: 705 F.2d 261)**

The Seventh Circuit's waiver analysis is sound and fully applicable to the case at bar and this Court adopts that analysis. The Court again emphasizes, *see supra* n. 7, that despite the waiver, it is permissible, and even advisable, for the appropriate investigative agency or the court to "take scrupulous measures to ensure that there occurs no unnecessary disclosure of patients' names or diagnoses." *In Re Pebsworth, supra,* 705 F.2d at 265.

[11] In their second argument appellants assert that a constitutional right of privacy attaches to the psychiatrist-patient relationship. There is precedent for this assertion. *See e.g. Caesar v. Mountanos,* 542 F.2d 1064 (9th Cir.1976), *cert. denied* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977); *United States v. Layton, supra; Hawaii Psychiatric Soc. v. Ariyoshi,* 481 F.Supp. 1028 (D.Hawaii 1979); *Lora v. Board of Ed. of City of New York, supra. See also,* Smith, Constitutional Privacy in Psychotherapy, *supra.*

Appellants maintain that this constitutional right encompasses their patients' interest in prohibiting disclosure of the personal information sought by the grand jury. [FN8] Assuming arguendo the existence of such a right [FN9] it is not absolute. [FN10]

    FN8. The Court accepts, for purposes of this Opinion, the standing of the appellants to assert this right of their patients. *See generally, Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1972); *Lora v. Board of Ed. of New York, supra* at 569.

    FN9. Compare, *J.P. v. DeSanti,* 653 F.2d 1080 (6th Cir.1981) (no constitutional right to non-disclosure of juveniles' social histories).

    FN10. See generally, *United States v. Lindstrom, supra,* (privacy interest of witnesses in criminal case regarding her psychiatric records must yield to the right of the defense to effective cross-examination).

In *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), for example, a New York statute which required that the names of all persons who obtained certain drugs be forwarded to the State Department of Health was challenged by patients and physicians charging that the law invaded the patients' privacy rights. The Supreme Court noted that "disclosures of private medical information to doctors, to hospital personnel, *to insurance companies,* and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient," *Id.* at 603, 97 S.Ct. at 878 (emphasis added). Thus, a person possesses no reasonable expectation that his medical history will remain *completely* confidential.

This is not to say that a person has no interest in protecting, to some extent, the confidentiality of his medical records. The Supreme Court stressed that the New York statute provided safeguards designed to insure proper utilization of the information and to prevent wholesale public disclosures of the information. The Court commented:

    New York's statutory scheme, and its implementing administrative procedures, evidence a proper concern with, and protection of, the individual's interest in privacy. We therefore need not, and do not, decide any question which might be presented by the unwarranted disclosure of accumulated private data--whether intentional or unintentional--or by a system that did not contain comparable security provisions.

*Id.* at 606-07, 97 S.Ct. at 879-81.

The Supreme Court concluded, balancing the limited invasion of privacy with the State's interest in prohibiting illegal drug activity, that the statute did not effect an unconstitutional infringement of privacy interests.

***642** A recent decision from this Circuit is also instructive. In *General Motors Corp. v. Director of the National Institute for Occupational Safety and Health,* 636 F.2d 163 (6th Cir.1980) *cert. denied* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981), the National Institute for Occupational Safety and Health (Institute) issued a subpoena duces tecum directing General Motors Corporation to produce the medical records of all employees engaged in a certain manufacturing process at General Motors' plant in Dayton. General Motors sought relief from the subpoena, contending, *inter alia,* that enforcement would invade the privacy rights of the employees.

The district court ordered General Motors to produce

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw

705 F.2d 261                                                                                    Page 18
705 F.2d 261, 13 Fed. R. Evid. Serv. 60
**(Cite as: 705 F.2d 261)**

the records but authorized deletion of the employees' names and addresses.  Both parties appealed.

This Court, while acknowledging the privacy rights of the employees, concluded that the Institute was entitled to enforcement of its subpoena including the request for specific names.  The Court was confident that the district court would formulate and implement appropriate measures to protect "the constitutional rights of the individuals involved." *Id.* at 166.

In the case at bar the grand jury is seeking limited information pertaining to individual patients.  The identity of these patients, as indicated, is already known to the grand jury from the insurance forms in its possession.  Thus, as in *Whalen,* the patients' interest in the privacy of the information is diminished.

Furthermore, the information sought will be protected by the veil of secrecy attending grand jury proceedings.  Accordingly, as in *Whalen* and *General Motors Corp.,* the information will be disclosed only to the minimal extent necessary to promote a proper governmental interest and will not be subject to widespread dissemination. [FN11]

> FN11. The Court need not presently decide what procedures will be appropriate should the grand jury investigation lead to criminal proceedings wherein the Government would seek to utilize the information as evidence.

In sum, weighing the slight intrusion on the patients' privacy interest against the need for the grand jury to conduct an effective and comprehensive investigation into alleged violation of the law, the Court concludes that enforcement of the subpoenas does not unconstitutionally infringe on the rights of the patients.

[12] The appellants' final argument needs only brief comment.  Appellants assert that the records sought are protected by the Fifth Amendment's privilege against self-incrimination.  As indicated, appellants' practices are maintained as professional corporations and the billing records are corporate rather than private records.  Thus the Fifth Amendment may not be raised as a bar to production of this information. *Bellis v. United States,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974).

In accordance with the foregoing, the Court concludes that the appellants' refusal to comply with the grand jury subpoenas was unjustified and the lower courts' judgments of contempt were therefore proper.  Accordingly, the judgments are hereby affirmed.

714 F.2d 632, 72 A.L.R. Fed. 380, 13 Fed. R. Evid. Serv. 1350

END OF DOCUMENT

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

705 F.2d 261
705 F.2d 261, 13 Fed. R. Evid. Serv. 60
(Cite as: 705 F.2d 261)

▷

United States Court of Appeals.
Seventh Circuit.
In re Donald PEBSWORTH, A Witness Before the
Special January 1982 Grand Jury.
Appeal of Dr. Kersey ANTIA.
No. 82-2726.

Argued Feb. 25, 1983.
Decided April 22, 1983.

Appeal was taken from order of the United States District Court for the Northern District of Illinois, Eastern Division, Frank J. McGarr, Chief Judge, granting government's petition to enforce subpoena issued in connection with investigation of possible criminal misconduct by psychotherapist in fraudulently obtaining reimbursements from medical insurance companies through submission of false psychiatric patient care records. The Court of Appeals, Harlington Wood, Jr., Circuit Judge, held that any arguable psychotherapist-patient privilege as to specific kinds of billing and administrative records was waived through patient's assent to publicizing aspect of reimbursement and claims procedure.

Affirmed.

William P. Gray, Senior District Judge, sitting by designation, filed concurring opinion.

*261 Kenneth L. Cunniff, Faber & Cunniff, Ltd., Chicago, Ill., for appellant.

Patrick E. Deady, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for appellee.

Before WOOD and ESCHBACH, Circuit Judges, and GRAY, Senior District Judge. [FN*]

FN* The Honorable William P. Gray, Senior District Judge of the Central District of California, is sitting by designation.

HARLINGTON WOOD, Jr., Circuit Judge.

This is an appeal from the district court's order granting the government's petition to *262 enforce a subpoena issued by the Special 1982 Grand Jury in connection with its investigation of possible criminal misconduct by an Illinois psychotherapist, Dr. Kersey Antia, in fraudulently obtaining reimbursements from medical insurance companies through the submission of false psychiatric patient care records. That subpoena commanded Donald Pebsworth, as the authorized representative of Blue Cross Blue Shield of Illinois, to produce

[a]ny and all records concerning Dr. Kersey Anita [sic], Provider Number 0001672026, from January 1, 1978 to the present. Such records to include but not limited to physician service records, claim submission records, checks, bank drafts and other records of payment.

The requested records include, *inter alia*, the names of some of Dr. Antia's patients, a listing of their visits, and, in some cases, the patient's diagnosis.

Blue Cross and Dr. Antia as intervenor-appellant opposed the government's petition on the basis that the production of the targeted materials would violate the psychotherapist-patient privilege established by the Illinois Mental Health and Developmental Disabilities Confidentiality Act, Ill.Rev.Stat., ch. 91 1/2 § 801 *et seq.* (1981), the common law, and the federal Constitution. The district court, while also discussing the substantive merits of the privilege claim, held that, even assuming *arguendo* such a privilege existed, it was waived through the patients' explicit authorization of disclosure of such records to medical insurance carriers, and their consequent expectation that the confidential character of the records would necessarily be compromised pursuant to the reimbursement process. Accordingly, the district court ordered Blue Cross to produce the documents, and subsequently denied appellant Dr. Antia's motion to reconsider. We need not reach the question of the existence or extent of the asserted psychotherapist-patient privilege, for we affirm the district court's determination that the patients' explicit authorization of disclosure of the requested records to third parties, the medical insurers, waived any privilege that might arguably have existed.

[1] We note at the outset that Rule 501 of the Federal Rules of Evidence provides that the privilege of a witness in non-diversity cases "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Thus the contours and exceptions of such privileges are clearly a matter of federal common law: state-created principles of

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

183 F.R.D. 619                    FOR EDUCATIONAL USE ONLY                    Page 20
183 F.R.D. 619
**(Cite as: 183 F.R.D. 619)**

privilege do not control. *United States v. Craig,* 528 F.2d 773, 776, aff'd en banc per curiam, 537 F.2d 957 (7th Cir.1976). Thus, even though the Illinois Mental Health and Developmental Disabilities Confidentiality Act prevents rediscloure by insurance companies of the kind of information sought here without the patients' written consent, Ill.Rev.Stat., ch. 91 1 2 § 806, and provides that any agreement purporting to waive this requirement is void, *id* at § 814, we are required to independently analyze whether the patients' authorization of disclosure to the insurance carriers effected a waiver of confidentiality with respect to the limited and special uses for which they are sought by the government.

[2, 3] An express waiver is "the intentional, voluntary relinquishment of a known right." *Black's Law Dictionary* 1417 (5th ed.). Well-settled principles of testimonial privilege compel the conclusion that any arguable psychotherapist-patient privilege as to these specific kinds of billing and administrative records was intentionally and knowingly relinquished through the patients' assent to the publicizing aspect of the reimbursement and claims procedure. *United States v. Radetsky,* 535 F.2d 556, 569 n. 14 (10th Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *Leach v. Ohio Life Ins. Co. of Texas,* 400 F.2d 179, 182 (5th Cir.1968); *Lora v. Board of Education of City of New York,* 74 F.R.D. 565, 585 (E.D.N.Y.1977); *Jones v. Prudential Life Ins. Co. of America,* 388 A.2d 476, 483 (D.C.Ct.App.1976); McCormick, *Evidence,* § 103 & n. 55 (2d ed.); Wigmore, *Evidence,* § 7(a) (McNaughton Rev. 1961). In assenting to disclosure of these documents, a reasonable patient **\*263** would no doubt be aware that routine processing of reimbursement claims would require these records to be brought into the hands of numerous anonymous employees within a large corporation. While we might well have decided differently if the information sought under the subpoena involved detailed psychological profiles of patients or substantive accounts of therapy sessions, it cannot be said that the subsequent disclosure of such fragmentary data as is involved here as part of the insurance company's legal duties in assisting a federal criminal investigation would be beyond the contemplation of the patients' waiver.

Our interpretation has been embraced by numerous other courts. For example, in a factually

indistinguishable case involving a federal investigation of a physician's submission of false insurance claims, the Tenth Circuit held that the grand jury was properly entitled to subpoena service records and diagnosis forms, and that any arguable reliance upon the physician-patient privilege was prevented by the patients' explicit consent to disclosure of these records for the purpose of Medicare reimbursement. *United States v. Radetsky,* 535 F.2d 556, 559 n. 14 (10th Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976). [FN1] Analogously, while not invoking the specific term "waiver," the court in *Lora v. Board of Education of the City of New York,* 74 F.R.D. 565 (E.D.N.Y.1977) (Weinstein, J.), held that students receiving psychological therapy had effectively foregone their reliance on any protection of detailed, substantive records of their psychological and personal problems from disclosure *in a civil action,* through their knowledge that records of that therapy were routinely forwarded under school regulations to other school system employees. As the court observed,

> FN1. While the court in *Radetsky* noted additionally that the patient possessed power to waive the physician-patient privilege under state law, that fact was certainly not crucial to the court's disposition of the waiver issue, since it was entitled to, and did, find a "broad waiver" as a matter of federal common law. *See United States v. Craig,* 528 F.2d at 776.

A crucial element of the privilege is intent. If a patient makes a communication expecting it to be disclosed to other persons ... there is no privilege. That such an expectation was entertained by students ... seems significantly more probable than not.... [T]he evaluation procedures in use up to a short time ago explicitly provided access to confidential data by third parties to whom the privilege arguably does not extend.... [T]he very fact that this data is so widely disseminated suggests that students and their parents could harbor little subjective expectation of secrecy. The additional anonymous disclosure contemplated in this case cannot realistically be found to involve any disappointment of the conscious anticipations of the communicants.

*Id.* at 585. We are *a fortiori* reluctant to artificially restrict the scope of the patients' waiver where, as

Westlaw

here, that waiver was explicit, the records are administrative rather than substantive in nature, and the success of a criminal investigation into the abuse of the psychotherapeutic care system, and not just a voluntary civil action, is at stake. *Also see Jones v. Prudential Life Ins. Co. of America,* 388 A.2d 476, 483 (D.C.Ct.App.1976) (waiver of privilege in civil action where patient consented to disclosure of information to insurance company); *Leach v. Millers Life Ins. Co. of Texas* (same); McCormick, *Evidence* § 103 & n. 55 (2d ed.) (waiver of doctor-patient privilege through disclosure clause in insurance policy is valid and effectual; holding that waiver does not extend to in-court disclosure described as "eccentric interpretation" that would "emasculate" waiver); Wigmore, *Evidence*, § 7(a) (McNaughton Rev. 1961) (contractual waiver of privilege valid).

Our finding that a waiver of any arguable psychotherapist-patient privilege exists in the specific circumstances present here is indeed less harsh than is authorized by the accepted regime governing waiver of privilege. In connection with the attorney-client, husband-wife, and usual doctor-patient privilege, for example, virtually *any* disclosure of the privileged communications to third parties vitiates the privilege. *See, e.g.* McCormick, *Evidence,* § 93 & n. 15 (partial disclosure of attorney-client communication *264 acts as full waiver); Wigmore, *Evidence,* § 2327 (same); McCormick, *Evidence,* § 82 (marital privilege does not apply to conversations made even inadvertently in presence of third parties); McCormick, *Evidence* § 101 (doctor-patient consultations made in presence of third parties not privileged). Here, we need not reach so far, but merely hold that such limited information as is present here was no longer protected (if, indeed, it ever was) in view of the patients' explicit authorization of disclosure and the easily anticipatable and important purposes to which that disclosed information is now sought to be put.

Dr. Antia strenuously argues that the result of our waiver holding will be to put prospective psychotherapy patients to the unconscionable Hobson's choice of either receiving no treatment or receiving treatment only at the cost of making public their illness. We trust, however, that the grand jury, related investigative bodies, and, if an indictment is returned, the trial court, will take scrupulous measures to ensure that there occurs no unnecessary disclosure of patients' names or diagnoses.

Additionally, as we have already observed, this unpleasant dilemma is to a large degree already inherent in the system of third party medical reimbursement, and patients were aware that substantial intrusion upon their privacy was entailed in their consent to the processing and verification of the information at issue by numerous employees in a large, anonymous corporation. We do not believe that our very limited finding of waiver through application of traditional waiver and privilege principles will radically upset patient expectations or discourage the procurement of psychotherapeutic care.

AFFIRMED.

WILLIAM P. GRAY, Senior District Judge, concurring.

I agree with my colleagues and the district court that the grand jury is engaged in a matter of such importance that it should receive the information that it reasonably needs pertaining to the patients of Dr. Antia. I also join with Judge Wood in his expression of confidence that "... the grand jury, related investigative bodies, and, if an indictment is returned, the trial court, will take scrupulous measures to ensure that there occurs no unnecessary disclosure of patients' names or diagnoses." Accordingly, I join in the affirmance of the order requiring adherence to the subpoena.

However, I do not share Judge Wood's view that "... the patients' explicit authorization of disclosure of the requested records to third parties, the medical insurers, waived any privilege that might arguably have existed." It seems to me that the traditional waiver doctrines are inappropriate in the context of present-day medical insurance. Such insurance plans have gained national prevalence and exist to encourage the creation of doctor-patient relationships where necessary to protect a person's physical and mental well-being. Moreover, they are designed to lessen the considerable financial burdens that, in the absence of insurance, would force many people to gamble with their health. Since the doctor-patient privilege exists to encourage such relationships and protect them when they are made, policies behind health insurance and the privilege go hand in hand.

Thorough reliance upon the confidential relationship with the doctor is particularly important to a

Westlaw.

psychiatric patient, because of the very nature of the problem that brings the two together. Such a patient may, with reluctance, recognize the practical necessity for disclosure of his identity and perhaps other information to the insurance carrier. But it by no means follows that because of this he may be deemed to have consented to become involved in a criminal investigation. It is well established that a patient or a client may consent, tacitly or otherwise, that a secretary or a nurse or a paralegal may be exposed to his disclosures, without destruction of the relevant privilege of confidentiality. This also stems from practical necessity. I think the same should be true with respect to medical insurance personnel.

In *Ryan v. C.I.R.*, 568 F.2d 531, 543 (7th Cir.1977), this court said: "The intention of Congress in enacting Rule 501 [of the Evidence Code] was that 'recognition of a privilege based on a confidential relationship *265 and other privileges should be determined on a case-by-case basis.' 1974 U.S.Code Cong. & Admin.News, p. 7059. *See United States v. Allery*, 526 F.2d 1362, 1366 (8th Cir.1975). In making the case-by-case determination, it is helpful to weigh the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." I believe that, under the circumstances of this case, a weighing of the factors requires that the valid privilege here concerned give way to the need for most, perhaps all, of the information sought. But I would commend to the trial judge that the "... scrupulous measures to ensure that there occurs no unnecessary disclosure of patients' names or diagnoses ..." be considered with respect to the subpoenaed material, as well as after any resulting indictment.

705 F.2d 261, 13 Fed. R. Evid. Serv. 60

END OF DOCUMENT

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

183 F.R.D. 619                    FOR EDUCATIONAL USE ONLY                    Page 23
183 F.R.D. 619
**(Cite as: 183 F.R.D. 619)**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
Aaron D. SMITH Plaintiff,
v.
CITY OF PLANO, Steven S. Eaves, Harry Haggard
Defendant.
**No. 01 C 7111.**

July 9, 2002.

In action for discrimination and racial harassment,
police officer sought discovery of records of
psychiatrist's examination of police lieutenant.
Defendants moved to quash subpoena. The District
Court, Mason, United States Magistrate Judge, held
that findings of examination were not privileged.

Motion denied.

MEMORANDUM OPINION AND ORDER

MASON, Magistrate J.

**\*1** The defendants, City of Plano, Steven S. Eaves,
and Harry Haggard, have brought a motion to quash
plaintiff Aaron Smith's subpoena to obtain the
records of Eric Ostrov, M.D., a psychiatrist who
performed a psychological examination of defendant
Haggard. Haggard was employed by the City of
Plano Police Department as a lieutenant at the time
the facts alleged in the complaint occurred. He was
ordered to submit to a "fitness for duty" examination
by Dr. Ostrov after the City of Plano received
complaints from police officers, including the
plaintiff, that Haggard was mistreating them. Plaintiff
is suing the defendants for racial harassment and
discrimination and seeks Dr. Ostrov's records as part
of his discovery.

The defendants brought a motion to quash the
subpoena, arguing that the records are privileged
under the patient-doctor privilege, and that Haggard
never voluntarily waived the privilege, but was
compelled to waive under threat of discipline. [FN1]
For the reasons set forth below, the motion to quash
the subpoena is DENIED.

FN1. By analogizing to the Fifth
Amendment, defendant also argues that any
waiver should be limited to the purpose for
which it was given, in this case, for report to
the disciplinary board within the police
department. However, limited waivers are
used only in specific circumstances--
primarily in the attorney-client context--that
are not present in this case. *See
Westinghouse Electric Corp. v. Republic of
the Philippines,* 951 F.2d 1414, 1425 (3rd
Cir.1991)(selective waiver used to promote
cooperation with government
investigations). Further, the existence of the
limited waiver is generally disfavored.
*Dellwood Farms, Inc. v. Cargill Inc.,* 128
F.3d 1122, 1126 (7th Cir.1997). The
Defendants also claim that the information is
protected as being a "self-critical analysis,"
but this argument fails because the
defendants are unable to prove the required
elements, most notably that the individual
seeking to assert the privilege, Haggard, is
not the entity who chose to undertake a self
critical analysis in order to discover
potential liabilities within the police
department prior to a formal investigation.
*Morgan v. Union Pacific R.R. Co.,* 182
F.R.D. 261, 266 (N.D.Ill.1998).

In *Jaffee v. Redmond,* the Supreme Court established
a privilege for communications between mental
health therapists and their patients because the
relationship between the two is "rooted in the
imperative need for confidence and trust." 518 U.S.
1, 10-15, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996),
518 U.S. 1, 15, 116 S.Ct. 1923, 135 L.Ed.2d 337
(1996). While this privilege extends to fitness for
duty examinations such as the one here, it is limited
to circumstances where the recommendations of the
doctors are communicated to the patient's employer
in general terms, not including "any specific
diagnosis or clinical observations." *Caver v. City of
Trenton,* 192 F.R.D. 154, 157 (D.N.J.2000). [FN2]

FN2. In most such situations, the therapist
merely provides the patient's employer with
a single word diagnosis of "pass" or "fail".
The therapist's underlying notes and
conclusions remain privileged.

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

If it is known that privileged information will be given to those other than the doctor and the patient, the privilege will not survive. *In Re Pebsworth,* 705 F.2d 261, 263 (7th Cir.1983); *Scott v. Edinburg,* 101 F.Supp.2d 1017, 1021 (N.D.Ill.2000)(an expectation that the information told to the doctor will remain only with the doctor is mandatory for a privilege to exist). Also, the fact that an individual was directed to undergo a fitness for duty evaluation or face disciplinary action does not destroy the voluntariness of any valid waiver of the privilege. *See Gav; *192 F.R.D. at 162.

The letter directing Haggard to attend the fitness for duty examination stated that both the doctor's conclusions and reasons for those conclusions would be given to the Chief of Police. Further, the letter clearly stated that "[a]t no time and in no way shall there be any type of Doctor-Patient privilege between you and Doctor Ostrov." Haggard argues that only he can waive the privilege, and that he appeared at the evaluation under duress, nullifying the waiver. However, such scenarios are common in cases concerning police officers ordered to undergo fitness for duty evaluations, and we have seen no cases where the threat of discipline affected the voluntary nature of the waiver. In *Scott,* 101 F.Supp.2d at 1020, for example, the police officer undergoing a fitness for duty examination specifically refrained from making certain comments because he knew that the evaluation may be shown to others.

**\*2** Haggard argues that he did not waive the privilege because he believed the information would only be shown to the Chief of Police. However, it is the very fact that he knew the information would be shown to the Chief that breaks the privilege. Indeed, by informing Haggard that no privilege attached to his conversation with Dr. Ostrov, the Chief faced the possibility that Haggard might not be completely forthright with the psychiatrist, such as was the situation in *Scott.* Haggard knew that he was being sent to the examiner to determine if he was fit to continue working as a police officer and that he should expect no privacy in the information he related to Dr. Ostrov. This alters the nature of Haggard's relationship with the doctor. Haggard "failed to establish the expectation of confidentiality that is the prerequisite for the existence of the [doctor]-patient privilege." *Scott,* 101 F.Supp.2d at 1021.

Our conclusion does not mean that the information from Dr. Ostrov's examination may be disclosed to anyone connected with the case, however. The parties should work together to draft a confidentiality agreement that will allow the information to be shown to attorneys and their support staff, experts, and relevant representatives of defendants only. If there are additional categories of individuals that plaintiff believes should have access to the information, they may address their requests to the Court. Plaintiff should not be given access to the information without prior agreement of the parties. Further, plaintiff's attorney may depose Dr. Ostrov and question defendants and any other witnesses about their communications with Dr. Ostrov, but such deposition transcripts should be subject to the protective order as well.

For the foregoing reasons, defendants' motion to quash is DENIED.

2002 WL 1483902 (N.D.Ill.)

END OF DOCUMENT

Westlaw.

▷

United States District Court,
N.D. Illinois,
Eastern Division.
Perry L. SCOTT, Sr., individually and as Special
Administrator of the Estate of
Phillip Scott, deceased, et al., Plaintiffs,
v.
Rodney L. EDINBURG and Village of Glenwood, a
municipal corporation,
Defendants.
No. 99 C 4766.

May 5, 2000.

In wrongful death action arising from shooting by
police officer, plaintiffs' moved to compel production
of documents concerning psychological evaluation
that officer underwent at direction of police chief
following shooting. The District Court, Schenkier,
United States Magistrate Judge, held that: (1)
psychotherapist-patient privilege did not apply to
statements in documents; (2) official executive
privilege did not apply to statements; and (3)
documents were discoverable material.

Motion granted.

*1018 James D. Montgomery, Thomas Charles
Marszewski, Randall W. Schwartz, James D.
Montgomery & Associates, Ltd., Chicago, IL, for
Plaintiffs.
Steven M. Puiszis, Robert Thomas Shannon,
Hinshaw & Culbertson, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

SCHENKIER, United States Magistrate Judge.
This case arises out of the May 17, 1999 shooting
death of Phillip Scott at the hand of defendant
Rodney L. Edinburg, who at the time was a member
of the Village of Glenwood Police Department.
Plaintiffs, who are the administrator of Phillip Scott's
estate and various surviving family members, have
filed this action against Mr. Edinburg and the Village
of Glenwood alleging common law actions for
survival (Count I) and wrongful death (Count II).
Plaintiffs also allege a federal cause of action against
Mr. Edinburg alone under 42 U.S.C. § 1983 (Count
III).

This matter comes before the Court on plaintiffs'
motion to compel production of five documents
concerning psychological evaluation that Mr.
Edinburg underwent after the shooting, at the
direction of the Chief of Police for the Village of
Glenwood Police Department [doc. # 19-1]. [FN1]
Defendants assert that the documents are privileged
and that even if not privileged, the documents are not
discoverable under Fed.R.Civ.P. 26(b)(1), because
the information contained in them does not appear
"reasonably calculated to lead to the discovery of
admissible evidence." For their part, plaintiffs assert
that the documents are not privileged because there
was no expectation of privacy in them to begin with;
that any privilege has been waived because the
contents of the evaluation was disclosed to a third
party (the Village police chief); and that the
documents are discoverable because they are likely to
contain highly relevant information.

> FN1. This request is part of a motion to
> compel that also sought production of other
> categories of documents. In a ruling dated
> April 27, 2000, the Court ruled on the other
> aspects of this motion to compel, leaving for
> decision only this remaining dispute
> concerning the records of Mr. Edinburg's
> post-accident psychological evaluation.

On April 27, 2000, the Court ordered defendants to
produce the five documents at issue for an *in camera*
review, which they have done. In addition, all the
parties accepted the Court's invitation to submit any
supplemental argument they wished to offer on this
issue by May 3, 2000. The Court has conducted an
*in camera* review of these documents and has
reviewed the supplemental briefs offered by the
parties. Based on its review of the documents and
the authorities, the Court concludes that the
documents are not privileged, and that they do indeed
contain discoverable information. Accordingly, for
the reasons set forth more fully below, the motion to
compel production of these records is granted.

**I.**

[1] In *Jaffee v. Redmond*, 518 U.S. 1, 15, 116 S.Ct.
1923, 135 L.Ed.2d 337 (1996), the Supreme Court
held that "confidential communications between a
licensed psychotherapist and her patients in the
course *1019 of diagnosis or treatment are protected
from compelled disclosure under Rule 501 of the
Federal Rules of Evidence." [FN2] *Jaffee* involved a
fatal shooting of a man by a police officer, and the

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

discoverability *vel non* of records concerning some fifty counseling sessions that the officer had with a clinical social worker after the shooting. The Supreme Court decision in *Jaffee* upheld the Seventh Circuit's recognition of a psychotherapist-patient privilege (and, indeed, strengthened that privilege by holding it is not subject to a balancing test based on the need for the protected information), and upheld the decision that the privilege protected the records from compelled production.

> FN2. Defendants have asserted that the communications are privileged under Illinois state law. *See* 740 ILCS 110 1 *et seq.* However, because this case presents, among other things, a Section 1983 claim based on federal law, the question of privilege is governed by federal common law. *See Jaffee*, 518 U.S. at 5, 116 S.Ct. 1923 (applying federal common law of privilege where the case presented both a Section 1983 claim and a state law claim under the wrongful death statute).

Significantly, there is no indication in the *Jaffee* decision that the records of those counseling sessions ever were disclosed to members of the police force or other third parties, or that the defendant officer had authorized such disclosure. The court of appeals opinion in *Jaffee* suggests the contrary, as reflected by the observation that "the officer's ability, through counseling, to work out the pain and anguish undoubtedly caused by Alan's death in all probability depended to a great deal upon her trust and confidence in her counselor ..." *Jaffee v. Redmond*, 51 F.3d 1346, 1358 (7th Cir.1995). *See also Kamper v. Gray*, 182 F.R.D. 597, 599 (E.D.Mo.1998)(stating that in *Jaffee*, it appears that "no report regarding these [counseling] sessions were submitted by the counselor to third parties"); *Barrett v. Vojtas*, 182 F.R.D. 177, 179 (W.D.Pa.1998)(stating that in *Jaffee* "no reports were submitted by the counselor to a third party").

Other courts also have relied on the psychotherapist patient privilege to bar compelled production of psychiatric records of officers in police shootings and other cases, where the confidential communications to the psychotherapist were not disclosed to third parties. In *Caver v. City of Trenton*, 192 F.R.D. 154 (D.N.J.,2000), the court held that the psychotherapist patient privilege barred production of psychological

evaluation records of one of the defendants. The court explained that the defendant "clearly had an expectation of confidentiality," based on being "reassured that the psychological records and reports would be kept strictly confidential, and would not be disclosed to the City of Trenton personnel." *Id.* at 162. The court rejected the argument that the privilege did not apply because the purpose of the psychological evaluation was not for treatment but for diagnosis of any mental illness or emotional disorder that would render the defendant unfit to be a police officer, reasoning that there is no "bright line distinction" between psychiatric counseling for purposes of treatment rather than diagnosis. *Id.* Moreover, the Court found that there was no waiver of the privilege, because the only information provided by the psychologist to the police department was a one-word statement of "pass" or "fail" with respect to fitness for duty; the psychological evaluation reports themselves were kept "completely confidential." *Id.* at 162.

To the same effect is *Williams v. District of Columbia*, Civ. A. 96-0200, 1997 WL 224921 (D.D.C. Apr.25, 1997). In that case, which also involved a fatal police shooting, the plaintiffs sought to compel production of records concerning consultations by the defendant officer with a psychiatrist after the shooting. The court found that the privilege applied even though the consultation was to determine fitness to return to active duty, rather than for "treatment." *10201*997 WL 224921, *2. In addition, the court found that there was no waiver of the privilege, because the only information communicated by the psychiatrist to the police department was "a 'Yes or No' recommendation regarding whether the officer should return to active duty." *Id.*

By contrast, in *Siegfried v. Easton*, 146 F.R.D. 98 (E.D.Pa.1992), a pre-*Jaffee* decision that recognized the psychotherapist-patient privilege, the court compelled production of documents relating to the psychological or psychiatric evaluation or treatment of one of the defendant officers in a police brutality case. The particular psychiatric records at issue were various psychological records compiled when the defendant officer interviewed for a position with the police department, which were then supplied to the police department. On those facts, the court found there was no expectation of confidentiality between the psychologist and the defendant officer:

Westlaw.

"[i]t is obvious from this description that when an applicant consults with [the] psychologist, he understands that the psychologist will be reporting back to the police department." 146 F.R.D. at 101. *See also Kamper,* 182 F.R.D. at 599 (reports of post-shooting counseling sessions attended by police officer held non-privileged, since the officer "was aware that his evaluations would be reported to his employer"); *Barrett,* 182 F.R.D. at 179 (post-shooting counseling reports regarding police officer held non-privileged where the reports were submitted to public officials).

[2] The consistent thread that runs through all of these cases is that the threshold requirement for the existence of the psychotherapist patient privilege is that there be an expectation by the patient that the communications with the psychotherapist will remain with the psychotherapist and will not be disclosed to others. Indeed, in recognizing that privilege, the Supreme Court emphasized that, "[l]ike the spousal and attorney-client privileges, the psychotherapist-patient privilege is 'rooted in the imperative need for confidence and trust.'" *Jaffee* at 10, 116 S.Ct. 1923 (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)); *see also Kamper,* 182 F.R.D. at 599 ("[t]he psychotherapist-patient privilege cannot be invoked ... in the absence of intended confidential communications"); *Barrett,* 182 F.R.D. at 179 ("[t]he Court's reasoning [in *Jaffee*] clearly shows that confidentiality is the foundation upon which the psychotherapist-patient privilege rests").

That expectation of confidentiality is absent in this case. The documents produced for *in camera* review reveal that prior to the onset of his discussions with the psychologist, Mr. Edinburg was informed that "the interviews with him and the testing results would be reviewed with [the Village police chief] as they pertained to the referral questions." *See* Opinion: Fitness for Duty, dated August 5, 1999, at page 3. Mr. Edinburg was further informed that the psychologist's "written report and oral testimony might be subpoenaed in a civil litigation lawsuit," and the psychologist reported that Mr. Edinburg reflected his understanding of that fact: at various times during the interview, he refrained from making certain statements with the explanation that "[t]his is not confidential." *Id.*

[3] Those statements make it clear that Mr. Edinburg

embarked on the consultation fully aware that what he said would not be confidential, and would be shared with others. In fact, it was made clear to him that the information would not only be shared with the Village police chief, but also might be produced in civil litigation. And, in fact, the evaluation *was* shared with others: not only with the police chief, but also with the Village of Glenwood Mayor and members of the board of Trustees (*see* Pls.' 05 03 00 Mem., Ex. D). Because the defendants have failed to establish the expectation of confidentiality that is the prerequisite for the existence of the psychotherapist-patient privilege, the privilege was never established. **\*1021** *See Kamper,* 182 F.R.D. at 598. And, even if it was, the disclosures to third parties waived any privilege. *See Jaffee,* 518 U.S. at 15 n. 14, 116 S.Ct. 1923 ("[l]ike other testimonial privileges, the patient may of course waive the protection" of the psychotherapist-patient privilege). In either event, the documents are not privileged from production.

## II.

Defendants also argue that the reports are privileged under an "official executive" privilege or a "deliberative privilege." The Court disagrees.

[4] As to an "official executive privilege," which the Court believes is more accurately denominated as an "official information" privilege, defendants have failed to establish the basis for asserting that privilege under the factors set forth in *King v. Conde,* 121 F.R.D. 180 (E.D.N.Y.1988), and *Kelly v. City of San Jose,* 114 F.R.D. 653 (N.D.Cal.1987). In particular, the Court rejects the proposition urged by defendants that the privilege should be applied here because disclosure of the evaluation would "chill" police departments from thoroughly investigating police shootings and from sending police officers involved in such shootings for counseling. The Court believes that when a police shooting occurs, police departments and municipalities have more than ample incentive--even in the face of potential disclosure in litigation--to take the steps necessary to ensure that the involved police officers are fit for duty. In light of the strong policy favoring broad discovery, a defendant's "case for restricted disclosure must be extremely persuasive." *King,* 121 F.R.D. at 195. Defendants have not made out such a case here.

[5] The assertion of a deliberative privilege fares no better. Illinois does not recognize such a privilege,

*People ex rel. Birkett v. City of Chicago*, 184 Ill.2d 521, 235 Ill.Dec. 435, 705 N.E.2d 48 (Ill.1998), and this Court is wary about extending such a protection as a matter of federal common law. *See Jaffee*, 518 U.S. at 12-13, 116 S.Ct. 1923 (the decision of a state as to whether to extend a privilege "bear[s] on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one"). This Court's prior application of a deliberative privilege in *Parmelee v. Page True*, 93 C 7362, 1999 WL 104713, *1 (N.D.Ill. Feb.25, 1999), is of no assistance to defendants, as that decision involved an application not of federal common law, but of the Federal Freedom of Information Act. In any event, such a privilege would not bar production of the evaluation, since that document does not reflect the Village's deliberative process. Rather, it contains factual matter available to the Village to use (or not) in its decisional process, and such factual information is not protected by a deliberative process privilege. *Parmelee*, 1999 WL 104713, at *2.

## III.

Since the records of Mr. Edinburg's psychological evaluation are not privileged, they are producible if they fall within the broad scope of discovery afforded by Rule 26. Rule 26(b)(1) permits discovery into "*any* matter, not privileged, which is relevant to the subject matter involved in the pending action, ..." (emphasis added). Discoverable material is not limited to that which would be admissible at trial, but also includes non-privileged information that "appears reasonably calculated to lead to the discovery of admissible evidence." *See Craig v. Exxon Corp.*, 97 C 8936, 1998 WL 850812, *1 (N.D.Ill. Dec.2, 1998). Rule 26 vests this Court with broad discretion in determining the scope of discovery, which the Court exercises mindful that the standard for discovery under Rule 26(b)(1) is "widely recognized as one that is necessarily broad in its scope in order to allow the parties essentially equal access to the operative facts." *Id.* (quoting *Onwuka v. Federal Exp. Corp.*, 178 F.R.D. 508, 516 (D.Minn.1997)).

[6] The documents at issue here plainly meet this liberal standard of discoverability. **\*1022** The psychological evaluation itself contains information revealed by Mr. Edinburg concerning his military and employment history prior to joining the Village of Glenwood police force, and other background information that reasonably may lead to admissible

evidence. In addition, the report also relates information (obtained from records, Mr. Edinburg, and other employees of the police department) concerning Mr. Edinburg's performance during his training program with the Glenwood Police Department, including events that occurred within a few months of the incident in question. The report contains information related by Mr. Edinburg concerning the circumstances surrounding the shooting itself, as well as references to statements by his superiors in the police department about that event. And, there are the results of the psychological testing itself, as well as the psychologist's evaluation of those results. All of this information may lead to the discovery of admissible evidence concerning what happened in connection with the shooting, and why.

The other four documents also are discoverable. The letters dated May 18 and June 3, 1999, as well as the consent form dated June 14, 1999, all show the manner in which the psychological consultation was arranged, and are discoverable to show the purpose of the consultation and what was done to arrange it. The remaining document, an invoice by the psychologist for the services rendered, shows the amount of time spent by the psychologist in preparing the evaluation, what she did in connection with the evaluation, and the cost of the evaluation. Those matters also may lead to the discovery of admissible evidence and thus must be produced.

## IV.

To say that the documents concerning Mr. Edinburg's psychological consultation are non-privileged and discoverable, of course, is not to say that plaintiffs are entitled to disseminate them to the world. The records contain personal and sensitive information that is not generally available to the public, and that Mr. Edinburg is entitled to keep that way during discovery. Accordingly, the Court will require that production of these records be subject to a protective order that prohibits their use for any purpose other than the prosecution of this lawsuit; allows them to be reviewed only by the attorneys of record for plaintiffs (including the law firm's support personnel and any experts retained for this lawsuit); and that prohibits the documents or information in them from being disseminated in any form or fashion to other persons, including the named plaintiffs in this case.

Westlaw.

## CONCLUSION

For the foregoing reasons, plaintiffs' amended motion to compel production of certain records relating to Mr. Edinburg's psychological evaluation (doc. # 19-1) is granted. The parties are to submit to the Court an agreed protective order consistent with these requirements by the close of business on May 12, 2000. However, the documents shall be produced to plaintiffs' counsel by the close of business on May 9, 2000; pending entry of the written protective order, plaintiffs' counsel shall not

**Motions, Pleadings and Filings**

United States District Court,
E.D. Tennessee.
Elaine KENNEDY, et al., Plaintiffs,
v.
DERMATOLOGY ASSOCIATES OF KNOXVILLE, P.C., and Ricardo M. Mandojana, M.D.,
Defendants.
**No. 3:97-CV-534.**

Feb. 22, 1999.

On motion to compel production of records of psychiatric treatment, the District Court, Murrian, United States Magistrate Judge, held that under Tennessee law, authorizations which patient of psychiatrist signed authorizing a release of medical information to third parties did not constitute a blanket waiver of the psychiatrist patient privilege; rather, privilege was waived by patient only with respect to the actual information transmitted to the third parties.

Motion granted in part and denied in part.

**\*620** David E. Waite, Ralph Brown & Associates, Donna Keene Holt, Knoxville, TN, for Elaine and Jack Kennedy.

Edward G. White, II, Hodges, Doughty & Carson, Knoxville, TN, for Dermatology Associates of Knoxville, P.C.

James G. O'Kane, Baker, McReynolds, Byrne, O'Kane, Shea & Townsend, Knoxville, TN, for Ricardo M. Mandojana, M.D.

disclose the documents or any information from them to any other persons.

101 F.Supp.2d 1017, 47 Fed.R.Serv.3d 720, 55 Fed. R. Evid. Serv. 165

END OF DOCUMENT

*MEMORANDUM AND ORDER*

MURRIAN, United States Magistrate Judge.

The plaintiffs' Motion to Compel and Notice to Defendants and Tennessee Psychiatry and Psychopharmacology Clinic, P.C. has been referred to the undersigned pursuant to Fed.R.Civ.P. 72(a) and the Rules of this Court [Docs. 82, 84]. A response has been filed by the Tennessee Psychiatry and Psychopharmacology Clinic, P.C. ("TPP Clinic") and a response has been filed by the defendants in this case [Docs. 89, 91]. TPP Clinic is not a party to this case; rather, it is the custodian of the records which are at issue in connection with this motion to compel discovery. The factual background of this case is set forth in a Memorandum and Order filed June 24, 1998 [Doc. 45]. That background will not be repeated here. Suffice it to say that TPP Clinic holds records and information pertaining to the treatment of defendant Dr. Ricardo M. Mandojana pertaining to his psychiatric treatment on an out-patient basis. Dr. Mandojana allegedly committed malpractice by failing to diagnose Mrs. Kennedy's melanoma cancer after reading her slide on August 18, 1988. Plaintiffs contend that the psychiatric records compiled by the TPP Clinic between August, 1988 and December, 1990 are relevant and discoverable in connection with the following claims which the plaintiffs are making: (1) That Dr. Mandojana and defendant Dermatology Associates of Knoxville, P.C. ("DAK") were guilty of malpractice in connection with the removal of a skin lesion from Mrs. Kennedy's arm, the diagnosis of her disease and her treatment, (2) that DAK was negligent in the hiring and employment of Dr. Mandojana, and (3) that Dr. Mandojana fraudulently or negligently misrepresented his qualifications and competence to practice medicine in Tennessee and obtained his employment at DAK and his Tennessee medical

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

license under false pretenses. In a Memorandum and Order filed July 1, 1998, the Honorable Leon Jordan granted defendants' motion dismissing the claims for fraudulent and negligent misrepresentation and the allegations for negligence *per se*. The claim regarding the alleged negligent hiring was not dismissed, however [Doc. 59]. The claim against DAK and Dr. Mandojana concerning malpractice remains in the case also.

Pursuant to Fed.R.Civ.P. 45(d)(2), TPP Clinic has produced a privilege log setting forth the documents withheld and statutes relied upon. Exhibit 1 to Doc. 79.

The plaintiffs claim that Dr. Mandojana has waived any privilege he may have had in regard to these documents. Plaintiffs state that four of the documents produced by TPP Clinic pursuant to the undersigned's Memorandum and Order filed June 24, 1998, were releases signed by Dr. Mandojana. Those releases are Exhibits 1 through 4 to Doc. 83.

Exhibit 1 is a communication from Equifax to TPP Clinic and it is an authorization to provide to Equifax as agent for Provident Life and Accident Insurance Company records that can be transmitted to Provident Life. Exhibit 2 is an authorization to Shenandoah Life Insurance Company pursuant to an application for insurance. It appears to be a *621 communication made by Dr. Jobson and Dr. Cord at TPP Clinic to Shenandoah. Defendants represent that this is the authorization and the disclosure to the third party with regard to Shenandoah Life Insurance Company.

Similarly, both an authorization and disclosure to another insurance company appear in Exhibit 3.

Exhibit 4 is an authorization to release information to the Department of the Army and a notation on Exhibit 4a that records of lithium levels had been sent. A list of drugs and those drug levels are part of the disclosure to plaintiffs and there is no indication in Exhibit 4 that any other records or information have been sent.

Defendants and TPP Clinic argue that these limited disclosures do not constitute a waiver of privilege as to confidential communications between psychiatrist and patient and that the confidential, intimate conversations between patient and psychiatrist have not been waived by these disclosures. Defendants and

TPP Clinic argue that these documents do not constitute a blanket waiver as to the entire records of TPP; that the authorizations contemplate that information will be sent to the designated party and only that information deemed appropriate and necessary by the doctor; that the authorizations do not constitute a waiver of or an exception to the psychiatrist patient privilege; that the disclosure of some information to these third parties, such as Shenandoah Life Insurance Company, does not constitute a waiver of everything in TPP Clinic's file; and finally, that further disclosure should not be required.

The plaintiffs argue that Dr. Mandojana has, on four separate occasions, executed unrestricted authorizations for the release of his records from TPP Clinic to third parties; that release of information to third parties is a waiver of any privilege; that the caselaw supports the proposition that patients may not benefit from the psychotherapist--patient privilege where they had already disclosed that information to a third party; and that by executing these releases Dr. Mandojana has authorized release of his entire file at TPP Clinic to third parties.

### I. *Choice of Law*

Jurisdiction in this case is based upon the citizenship of the parties and is not in controversy. 28 U.S.C. § 1332. Therefore, pursuant to Fed.R.Evid. 501 the substantive law of privilege of the State of Tennessee applies in this case.

### II. *Legal Principles*

Tennessee recognizes a privilege for communications between a psychiatrist and patient.

**Communications between Psychiatrist and Patient.**--(a) Communications between a patient and a licensed physician when practicing as a psychiatrist in the course of and in connection with a therapeutic counseling relationship regardless of whether the therapy is individual, joint, or group, are privileged in proceedings before judicial and quasi--judicial tribunals. Neither the psychiatrist nor any member of the staff may testify or be compelled to testify as to such communications or otherwise reveal them in such proceedings without consent of the patient....

T.C.A. § 24-1-207 (1998 Supp.). Plaintiffs in the instant action do not dispute in any way that the privilege is applicable but they claim that it has been waived.

Westlaw.

Not Reported in F.Supp.                                                Page 31
1997 WL 256950 (E.D.Pa.)
**(Cite as: 1997 WL 256950 (E.D.Pa.))**

The undersigned agrees with the plaintiffs that whatever information has been disclosed to third parties like Shenandoah Life Insurance Company or Equifax pursuant to the four authorizations signed by Dr. Mandojana is not privileged. The privilege has been waived. I do not agree, however, with plaintiffs that these four authorizations to release confidential information constitute a blanket waiver of all records in the possession of TPP Clinic.

> Clearly, disclosure of part of a privileged communication waives the privilege as to the disclosed information.

> \* \* \* \* \* \*

> If part of a privileged communication is disclosed, the court may find that the remainder of the communication is also no longer privileged. In making this determination some courts find that the waiver **\*622** applies to at least those other portions that are needed to make the disclosed part comprehensible. Other courts find waiver for communications on the topics which the disclosed material places in issue. These courts exercise their discretion in light of the objectives of the particular privilege involved.

> 3 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Federal Evidence* § 511.06 (Joseph M. McLaughlin, ed., Mathew Bender 2d ed.1997) (footnotes omitted).

All parties here rely on the case of *In re Zuniga*, 714 F.2d 632 (6th Cir.1983). This case involved two psychiatrists who were held in civil contempt for failing to respond to subpoenas duces tecum issued by a federal grand jury. The doctors argued that the documents sought by the grand jury were protected from disclosure by the psychiatrist--patient privilege. This case involved federal common law with regard to privileges, but I have no reason to believe that Tennessee law would demand any different result than that reached in *Zuniga*. The federal grand jury was investigating alleged schemes to defraud in billings of health care providers to Michigan Blue Cross and Blue Shield. The information sought by the grand jury was limited to the identification of patients, the dates on which they were treated, and the length of treatment on each date. 714 F.2d at 640. The district court, in accordance with the government's concession, held that the records to be produced would be redacted of information other than the data showing the patient's name and the fact

and time of treatment. 714 F.2d at 634. Thus, the facts in *Zuniga* are very different from the facts in the instant case. Plaintiffs in the instant case contend that there has been a blanket waiver of any privilege with regard to all documents in the possession of TPP Clinic.

The court in *Zuniga* first held that the information sought by the grand jury subpoenas was not privileged and concluded that as a general rule the identification of a patient or the fact and time of treatment did not fall within the scope of the psychotherapist--patient privilege. The court went on to say that, assuming arguendo that the identity of a patient and the times and dates of his treatment were within the scope of the psychotherapist--patient privilege, the patients in *Zuniga* "have already disclosed their identities to a third party, *i.e.*, Blue Cross-Blue Shield. In so doing they have waived the privilege **to the extent of their disclosure.**" 714 F.2d at 640 (emphasis added).

The plaintiffs also rely on *In re Pebsworth*, 705 F.2d 261 (7th Cir.1983). That case also involved a federal grand jury subpoena to Blue Cross Blue Shield of Illinois commanding production of all records pertaining to an Illinois psychiatrist. Information included the names of the patients, an enumeration of their visits, and, in some cases, the patients' diagnoses.

> In assenting to disclosure of these documents, a reasonable patient would no doubt be aware that routine processing of reimbursement claims would require these records to be brought into the hands of numerous anonymous employees within a large corporation. **While we might well have decided differently if the information sought under the subpoena involved detailed psychological profiles of patients or substantive accounts of therapy sessions,** it cannot be said that the subsequent disclosure of such fragmentary data as is involved here as part of the insurance company's legal duties in assisting a federal criminal investigation would be beyond the contemplation of patients' waiver.

> 705 F.2d at 263 (emphasis added).

Thus, both *Zuniga* and *Pebsworth* make the point that authorizations to release medical information to third parties such as insurance companies is a waiver of the privilege but only to the extent of any disclosure that is made. This seems to be a very

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw

Not Reported in F.Supp.                                                                     Page 32
1997 WL 256950 (E.D.Pa.)
**(Cite as: 1997 WL 256950 (E.D.Pa.))**

reasonable approach since the patient signing the authorization to release information would be contemplating that the information released would be that necessary for the particular matter involved, *e.g.*, the issuance of a life insurance policy. It does not stand to reason that the patient's authorization to release medical information to a third party like a life insurance company would be contemplated by the patient as a release of all information in the file of the psychiatrist.

**\*623** Tennessee appears to follow the same rule with regard to waiver. *Taylor v. State*, 814 S.W.2d 374 (Tenn.Cr.App.1991) involved the waiver of a privileged communication between attorney and client. In that case a convicted criminal objected to testimony by his attorney in a post-conviction proceeding contending that the testimony violated the attorney-client privilege. The attorney was allowed to testify on the issue of whether the defendant had voluntarily entered a plea of guilty. The Court of Criminal Appeals found that Taylor had waived his privilege since he had executed a petition for acceptance of his guilty plea in which he stated that his attorney had discussed with him the nature of the charges and his rights pertaining thereto. The court found that since the attorney's testimony was limited to the question of whether the guilty plea had been entered voluntarily, the execution of the petition for acceptance by the criminal defendant constituted a waiver of the privilege to that extent only. Thus, *Taylor* stands for the proposition that the privilege is only waived when the very communication sought to be protected has been disclosed. As indicated by the quotation by Weinstein's treatise on evidence set out above, the court has considerable discretion in light of the objections of the particular privilege involved. Obviously, Tennessee law provides protection for communications between psychiatrists and patients subject to very limited exceptions. This is a privilege which is worth protecting because it encourages people who might not otherwise seek treatment to seek treatment from psychiatrists without fear that the records and communications of such treatment will be divulged.

### III. *Application of Law to the Facts of this Case*
The undersigned concluded in my Memorandum and Order filed June 24, 1998, that there was no privilege for any communications written or oral originating with TPP Clinic and transmitted to DAK concerning Dr. Mandojana's treatment at TPP Clinic. Memorandum and Order at 13 [Doc. 45].

It was understood that it was a condition of his employment at DAK that TPP Clinic would regularly report to DAK on Dr. Mandojana's fitness to practice medicine. To that extent, Dr. Mandojana consented to such information being released to DAK, a third party. The privilege is therefore waived as to that information.

*Id.* The undersigned went on to order that TPP Clinic produce for inspection and copying whatever written information went from TPP Clinic and its doctors and other employees to Dr. Rist and/or DAK concerning Dr. Mandojana's treatment and evaluation at TPP Clinic at any time from May, 1988 until Dr. Mandojana's employment at DAK ended. It was also ordered that Drs. Jobson and Pool be deposed about their written and oral communications with Dr. Rist and/or DAK concerning Dr. Mandojana's treatment and evaluation.

This previous ruling is entirely consistent with the holdings in *Zuniga*, *Pebsworth*, and *Taylor*. TPP Clinic was ordered to reveal written and oral communications that went from it to a third party, DAK Clinic and/or Dr. Rist. To that extent, the psychiatrist-patient privilege was deemed waived. In a similar vein, the undersigned finds that the four authorizations which Dr. Mandojana signed authorizing a release of medical information do not constitute a blanket waiver of the psychiatrist-patient privilege; rather, the undersigned finds that all that has been waived by Dr. Mandojana is the actual information transmitted to third parties like Equifax and Shenandoah Life Insurance Company by TPP Clinic. This result serves the salutary policies behind the psychiatrist-patient statutory privilege. As indicated by the quote from the Weinstein treatise, the court has considerable discretion in fashioning the scope of any waiver. The patient of a psychiatrist who signs a medical release authorization for purposes of obtaining, for example, a life insurance policy does not reasonably contemplate that the entire files containing detailed psychological profile of the patient or substantive accounts of therapy sessions will be disclosed. *See In re Zuniga*, 714 F.2d at 640-41.

> The rule of partial disclosure as a qualification on the privilege should not be applied without reference both to the objectives of the privilege and the qualification. Wigmore **\*624** explains the rule of partial disclosure as one dictated by considerations of fairness.... The rule has also been explained as an attempt to prevent the use of the

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw

Not Reported in F.Supp.                                                                  Page 33
1997 WL 256950 (E.D.Pa.)
**(Cite as: 1997 WL 256950 (E.D.Pa.))**

privilege as an "additional weapon."
*IBM v. Sperry Rand Corp.*, 44 F.R.D. 10, 13
(D.Del.1968).

### IV. *Conclusion*

For the reasons indicated, it is **ORDERED** that TPP
Clinic produce for inspection and copying any
written communications between it and third parties
that resulted from the four authorizations for
disclosure signed by Dr. Mandojana.   Of course, if
those disclosures have been made previously, they
need not be made again.   Any such disclosure shall
be made within 10 days of entry hereof.   Except to
the extent indicated, the plaintiffs' motion to compel
production of documents is hereby **DENIED.**

**IT IS SO ORDERED.**

183 F.R.D. 619
END OF DOCUMENT

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
1997 WL 256950 (E.D.Pa.)
(Cite as: 1997 WL 256950 (E.D.Pa.))

Page 34

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
William E. GOULD, Plaintiff,
v.
Ernest John DURKIN, Joseph Dipalantino & Sons
Paving and Excavating
Contractors, Inc., Defendants.
**No. CIV.A. 96-CV-6249.**

May 15, 1997.

*MEMORANDUM OF DECISION*

McGLYNN, J.

*1 Before the Court is Plaintiff William E. Gould's Motion for Protective Order, Defendants' Response thereto, Defendants' Supplemental Response, Plaintiff's Reply to the Defendants' Response, and Defendants' Response to the Plaintiff's Reply. For the reasons stated below, the motion is DENIED.

*I. FACTUAL BACKGROUND*

This is an action arising out of a fatal motor vehicle accident which occurred on February 21, 1995. The first count is a survival action brought on behalf of plaintiff's wife, Jane H. Gould ("Mrs. Gould"), who was killed in the accident. The second count is a wrongful death action brought by plaintiff, on his own behalf and that of his two sons. The relevant facts are as follows.

On February 21, 1995, Mrs. Gould, a resident of New Jersey, was driving a 1989 Nissan Stanza in a northerly direction on U.S. Route 1 in Bensalem Township, Bucks County, Pennsylvania. Mrs. Gould had an earlier appointment in the Conshohocken area with her psychiatrist, Dr. Serruya. Dr. Serruya was one of Mrs. Gould's treating physicians with whom she consulted approximately once a week. According to plaintiff, Dr. Serruya was helping Mrs. Gould make the transition from a full-time mother and homemaker to a professional artist. Pl. Dep. Tr. at 128-29. To ease her anxiety over this transition, Dr. Serruya

proscribed Lithium. It is unknown, at this point, whether Mrs. Gould took Lithium on the day of the accident.

As Mrs. Gould drove north on Route 1 in the afternoon of February 21, 1995, defendant Durkin, an employee of defendant DiPalantino, was operating a 1989 Mack dump truck in a northerly direction in the outside lane on U.S. Route 1 and to the rear of Mrs. Gould's vehicle. Defendant DiPalantino owned the 1989 dump truck.

At approximately 4:30 p.m., defendants' dump truck collided into the back of Mrs. Gould's car and pushed her car into the rear of a 1994 Freightliner in the same lane of Route 1. Defendants' dump truck then climbed over the top of Mrs. Gould's car and crushed it. The back of Mrs. Gould's car was rolled upward and forward, and the roof of the car was collapsed down into the region of the hood. Although emergency medical personnel arrived soon after the accident, Mrs. Gould showed no signs of life at 4:39 p.m. The coroner determined that she died of "positional asphyxia, or suffocation due to a crushing blunt impact to the chest." *See* Letter from Neil A. Hoffman, M.D. to David M. Kozloff, Esquire, of 6/3/96, at 2. A toxicology report revealed that specimens were not tested for Lithium Carbonate. *See* Letter from Timothy J. Michaels, M.D., P.C. to Joseph F. Van Horn, Jr., Esquire, of 4/1/97, at 2.

On September 13, 1996, plaintiff commenced this action to recover damages for, *inter alia*, emotional trauma, shock and fright, conscious pain and suffering, loss of future income of Mrs. Gould, and loss of consortium of the plaintiff. During discovery, defendant served plaintiff with interrogatories relating to any medical treatment Mrs. Gould received during the last five years of her life. [FN1] In his Amended Answers to Interrogatories, plaintiff responded that Mrs. Gould had received treatment from "Dr. Roberto Serruya." Thereafter, on February 21, 1997, defendants served a subpoena on Dr. Serruya for records relating to the care, treatment and counseling of Mrs. Gould. Dr. Serruya responded that during a recent office relocation, he had lost or misplaced all records pertaining to Mrs. Gould. Def. Resp. at 2. As an alternative, defendants requested that Dr. Serruya appear for an oral deposition. Plaintiff also objected to the deposition on the grounds of relevancy, and both parties agreed to

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

174 F.R.D. 225                                                                                                      Page 2
174 F.R.D. 225, 74 Fair Empl.Prac.Cas. (BNA) 685, 47 Fed. R. Evid. Serv. 1188
**(Cite as: 174 F.R.D. 225)**

postpone the deposition until the issue was resolved.

>       FN1. Specifically, Interrogatory No. 14
>       sought to discover, in relevant part,
>       "whether or not decedent had incurred any
>       disease or sustained any accident during the
>       last five years of his her life which required
>       treatment by a physician or surgeon or
>       hospitalization in any institution If so, please
>       give ... (a) The names and addresses of all
>       physicians or surgeons by whom he she was
>       treated." Def.'s Resp. at 2.

**\*2** During the course of plaintiff's deposition on
March 6, 1997, he identified Fortis Benefits
Insurance Company ("Fortis") as Mrs. Gould's health
insurance carrier. He indicated that Mrs. Gould's
records, including her diagnosis, had been forwarded
by Dr. Serruya to Fortis for payment. *See* Pl. Dep.
Tr. at 160-61. Defendants subsequently served a
subpoena on Fortis for records relative to Mrs.
Gould. Again, plaintiff objected, and thereafter,
defendants advised Fortis that the subpoena was
placed on "hold status." Def. Resp. at 4.

On March 21, 1997, plaintiff filed this motion for
protective order seeking to preclude defendants from
obtaining records regarding the mental condition of
Mrs. Gould including, without limitation, records
provided to Fortis regarding psychiatric care or
treatment provided to Mrs. Gould by Dr. Serruya.
Pl. Mot. Prot. Order at 1. Plaintiff avers that
because Mrs. Gould's mental condition is not in issue,
some or all of the records subject to defendants'
subpoena are irrelevant and beyond the permissible
scope of discovery. *Id.* at 2. Plaintiff further
contends that even if the records are relevant, they
are nevertheless subject to the psychiatrist-patient
privilege under Pennsylvania law. *Id.* at 3.

In response, defendants argue that the records are
relevant and subject to discovery since any applicable
psychiatrist patient privilege has been waived in one
of two ways. First, defendants assert that Mrs.
Gould waived her privilege by submitting her
information to Fortis, a third party medical insurer.
Second, defendants claim that plaintiff waived the
privilege by placing Mrs. Gould's mental condition in
issue through claims of (1) loss of future earnings as
an artist, (2) emotional trauma, shock and fright, and
conscious pain and suffering, and (3) loss of
consortium.

## II. DISCUSSION
### A. Legal Standard

Rule 26(b)(1) provides, in relevant part, that
"[p]arties may obtain discovery regarding any matter,
not privileged, which is relevant to the subject matter
involved in the pending action." Fed. R. Civ. Pro.
26(b)(1). Relevancy is broadly construed for
discovery purposes and is not limited to the precise
issues set out in the pleadings or to the merits of the
case. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S.
340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978);
*Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*,
Civ.A.No. 88-9752, 1992 WL 394425 *3 (E.D.Pa.
Dec.28, 1992). Rather, "discovery requests may be
deemed relevant if there is any possibility that the
information may be relevant to the general subject
matter of the action." *Rhone-Poulenc*, 1992 WL
394425, at *3. Because the relevancy of information
under Rule 26 depends on the context of the
particular action, "the determination of relevance is
within the district court's discretion." *Barnes
Foundation v. Township of Lower Merion, et al.*,
Civ.A.No. 96-372, 1997 WL 169442 *3 (E.D.Pa.
April 7, 1997); *see Sempier v. Johnson & Higgins*,
45 F.3d 724, 734 (3d Cir.)(citing examples), *cert.
denied*, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d
854 (1995).

**\*3** In the instant action, it seems clear that Dr.
Serruya's records are relevant to Mrs. Gould's state of
mind on the day of the accident. Because Mrs.
Gould met with Dr. Serruya just hours before her
fatal accident, his records might reveal the condition
of Mrs. Gould, including her alertness and anxiety
level, and whether she ingested Lithium prior to the
accident, which may or may not have affected her
ability to operate her car.

However, the complicating factor in this case arises
from plaintiff's assertion of a psychiatrist-patient
privilege, which, if not waived, would serve to bar
the discovery of Dr. Serruya's information. Plaintiff
seeks to enforce this restriction on discovery through
a Rule 26(c) protective order, which allows the court
to "make any order which justice requires to protect a
party or person from annoyance, ... oppression, or
undue burden or expense, including ... (1) that the
disclosure of discovery not be had." Fed.R.Civ.P.
26(c).

Because this is a diversity case, under Federal Rule
of Evidence 501, state law of privilege applies. Rule
501 states, in relevant part:

>       [I]n all civil actions and proceedings, with respect
>       to an element of a claim or defense to which State
>       law supplies the rule of decision, the privilege of a
>       witness, person, government, State or political

174 F.R.D. 225                                                                                                                                    Page 3
174 F.R.D. 225, 74 Fair Empl.Prac.Cas. (BNA) 685, 47 Fed. R. Evid. Serv. 1188
(Cite as: 174 F.R.D. 225)

subdivision thereof shall be determined in accordance with State law. Fed.R.Evid. 501. Therefore, since Pennsylvania law supplies the rule of decision, it also governs the privilege issues presented here. [FN2]

> FN2. Since the accident occurred in Pennsylvania and the plaintiff resides in New Jersey, an apparent conflict of law issue arises. To determine whether Pennsylvania's or New Jersey's privilege law applies, the Court looks to the law of the forum state. Pennsylvania has adopted the "interest analysis" approach to conflict of laws questions. *Samuelson v. Susen,* 576 F.2d 546, 551 (3d Cir.1978); *see also Griffith v. United Air Lines,* 416 Pa. 1, 203 A.2d 796 (1964). Because the accident occurred in Pennsylvania and the defendants are residents of this state, Pennsylvania has a more significant relationship to the dispute. Therefore, the state law of Pennsylvania applies.

The Pennsylvania privilege protecting confidential communications to psychiatrists, codified at 42 Pa.C.S.A. § 5944, provides that "[n]o psychiatrist ... shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in his professional services in behalf of such a client." 42 Pa.C.S.A. § 5944 (Supp.1997). The statute further adds that the "confidential relations and communications" between a psychiatrist and his client are on the "same basis as those provided or prescribed by law between an attorney and client." *Id.* In civil cases, the privilege can be implicitly waived when the client makes the information known to third parties, *see Rost v. State Bd. of Psychology,* 659 A.2d 626, 629 (Pa.Cmwlth.1995), or when the client places the confidential information at issue in the case. *See Premack v. J.C.J. Ogar, Inc.,* 148 F.R.D. 140, 144 (E.D.Pa.1993). [FN3]

> FN3. Although § 5944 of the Pennsylvania Code does not expressly mention "waiver," it does state that the confidential communications between psychiatrist and patient will be treated on the same basis as attorney-client communications. *See* 42 Pa.C.S.A. § 5944. Because the statute governing the attorney-client privilege in civil cases states that the privilege may be "waived," the waiver principle is equally applicable to the psychiatrist patient

privilege. *See* 42 Pa.C.S.A. § 5916 (1982).

In the present case, defendants allege that Dr. Serruya's records are not subject to any privilege, by virtue of an implicit waiver by Mrs. Gould and by plaintiff on behalf of Mrs. Gould, and are therefore, discoverable.

B. Waiver by Disclosure of Records to Fortis
Defendants first contend that Mrs. Gould waived her privilege by providing her medical records, including her diagnosis, to Fortis for payment. In his deposition, plaintiff testified that Dr. Serruya submitted Mrs. Gould's diagnosis as a medical claim to the insurance company in a "standard category which they paid under without any objection." *See* Pl. Dep. Tr. at 160-61. Plaintiff testified that he did not remember the diagnosis, but that Fortis was the only insurance carrier to which such records were forwarded. *See id.* Defendants argue that through this disclosure, Mrs. Gould eliminated her expectation of privacy and waived her privilege.

*4 To support their argument, defendants initially rely on the analogous nature of the attorney-client privilege, which recognizes waiver if communications occur "in the presence of a third person." *See* Def. Resp. at 6 (quoting *In re Cridge's Estate,* 289 Pa. 331, 137 A. 455 (1927)); *see also Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3d Cir.1991) ("it is well-settled that when a client voluntarily discloses privileged communications to a third party, the privilege is waived.").

Defendants also buttress this analogy by citing two other federal courts which have examined a similar issue of waiver in the psychiatrist-patient context. *See In re Pebsworth,* 705 F.2d 261, 262 (7th Cir.1983) (psychotherapist-patient privilege waived through patients' assent to the publicizing aspect of the insurance company's reimbursement and claims procedure); *In re Zuniga,* 714 F.2d 632, 640-41 (6th Cir.), *cert. denied,* 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983) (adopting the analysis in *Pebsworth* to find that the patients waived their psychotherapist-patient privilege to the extent of their disclosure to a third party, i.e., Blue Cross Blue Shield).

In response, plaintiff contends that any records in Fortis' possession are "oppressed [sic] with the same privilege as they would have held in the possession of Dr. Serruya." *See* Pl. Reply to Def. Resp. at 4. Plaintiff relies on the absence of any provision in 42

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

174 F.R.D. 225                                                                                  Page 4
174 F.R.D. 225, 74 Fair Empl.Prac.Cas. (BNA) 685, 47 Fed. R. Evid. Serv. 1188
(Cite as: 174 F.R.D. 225)

Pa.C.S.A. § 5944 which specifically states that disclosure of information to a third party insurance carrier constitutes waiver. Additionally, plaintiff opines that Fortis treats the medical information it receives as private information, not subject to public disclosure. Therefore, the patient's expectation of privacy is preserved, and the psychiatrist-patient privilege is not waived.

Although it seems that this issue is an issue of first impression in this district, this Court is inclined to agree with the defendants, notwithstanding the increasing national prevalence and importance of medical insurance plans in present day doctor-patient relationships. Although courts have made exceptions where disclosure is made to a third party "agent," such as a secretary or nurse, [FN4] that exception is inapplicable here, since Fortis is not an "agent" of Dr. Serruya. By consenting to the reimbursement process, Mrs. Gould was aware that her records, including her diagnosis, would fall into the hands of numerous employees of Fortis. Accordingly, Mrs. Gould's expectation of privacy was diminished, and she had, in effect, waived her psychiatrist-patient privilege.

> FN4. See Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1424 (3d Cir.1991); Kalenevitch v. Finger, 407 Pa.Super. 431, 595 A.2d 1224 (1991) (finding that communications made to an agent of a licensed psychiatrist, such as an employee, are privileged under Pa.C.S.A. § 5944); Commonwealth v. Hutchinson, 290 Pa.Super. 254, 434 A.2d 740 (1981) (holding that statement to an investigator hired by the attorney was subject to the attorney-client privilege).

The Court is mindful that this traditional waiver doctrine seems inconsistent with the ever-increasing emphasis on comprehensive health insurance. In the context of third party medical reimbursement, strict waiver principles will pose a significant dilemma for prospective psychotherapy patients who must choose to receive treatment at the risk of making their illness public, or receive no treatment at all. As Judge Gray recognized in Pehsworth:

> *5 such insurance plans ... encourage the creation of doctor-patient relationships where necessary to protect a person's physical and mental well-being ... and are designed to lessen the considerable financial burdens that, in the absence of insurance, would force many people to gamble with their health. Since the doctor patient privilege exists to

encourage such relationships and protect them when they are made, policies behind health insurance and the privilege go hand in hand. Pehsworth, 705 F.2d at 264 (Gray, J., concurring). However, the Court is reluctant to preserve the psychiatrist-patient privilege in all information disclosed to the patient's insurance company, since this type of restriction on discovery might subject insurance companies to unreasonable risks "that falsified applications would be enforced by the courts through an artificial suppression of the truth." Jones v. Prudential Ins. Co. of America, 388 A.2d 476, 483 (D.C.App.1978).

Instead, this Court endorses a case-by-case analysis to determine whether a recognition of waiver through the disclosure of information to an insurance company would serve the specific factual circumstances of the case. See Pehsworth, 705 F.2d at 265. In the present action, the information sought is both relevant and necessary to ascertain Mrs. Gould's state of mind and physical well-being on the day of the accident. As noted above, Dr. Serruya's records may also reveal whether Mrs. Gould ingested Lithium on that day. Therefore, the valid privilege must give way to the need for the subpoenaed information.

C. Waiver by Placing Mental Condition in Issue
In his complaint, plaintiff alleges that Mrs. Gould "suffered serious and grievous personal injuries, emotional trauma, shock and fright, and conscious pain and suffering ..." Compl. at ¶ 21. Because of these claims, defendants argue that plaintiff has placed the mental condition of Mrs. Gould in issue, and as a result, has implicitly waived any valid psychiatrist patient privilege. See Smith v. J.I. Case Corp., 163 F.R.D. 229 (E.D.Pa.1995) (discovery may be obtained regarding psychological treatment only when the mental condition of the plaintiff is in issue); Premack v. J.C.J. Ogar, Inc., 148 F.R.D. 140, 144 (E.D.Pa.1993) ("in a civil action in which one's mental condition is placed directly at issue the privilege afforded an individual by 42 Pa.C.S.A. § 5944 is implicitly waived.").

In his motion for a protective order, plaintiff contends that a claim of emotional distress, without more, is insufficient "to make the plaintiff's mental condition an issue in the suit." Pl. Mot. at 4; Smith, 163 F.R.D. at 230 (citing Turner v. Imperial Stores, 161 F.R.D. 89 (S.D.Cal.1995) and Cody v. Marriott Corp., 103 F.R.D. 421 (D.Mass.1984)). While defendants recognize this limitation, they further allege that plaintiff's claim for pain and suffering

© 2005 Thomson West. No Claim to Orig. U.S. Govt. Works.

174 F.R.D. 225                                                                    Page 5
174 F.R.D. 225, 74 Fair Empl.Prac.Cas. (BNA) 685, 47 Fed. R. Evid. Serv. 1188
**(Cite as: 174 F.R.D. 225)**

encompasses a psychic injury, which necessarily makes relevant Dr. Serruya's records of the psychological condition prior to the accident.

  **\*6** Since the Court has already determined that Mrs. Gould's waived her privilege prior to her death, *see supra* Part II.B, the Court need not delve too deeply into defendants' expert reports which address the psychic component of pain and suffering. Yet the Court does agree that Mrs. Gould's level of consciousness preceding her death as well as her ability to perceive suffering, which was possibly affected by her use of Lithium, are relevant to plaintiff's claims.

  Accordingly, plaintiff's motion for protective order will be denied. An appropriate order will follow.

                              *ORDER*
  AND NOW, this        day of May, 1997, upon consideration of Plaintiff's Motion for Protective Order, Defendants' Response and Supplemental Response thereto, Plaintiff's Reply, and Defendants' Response to Plaintiff's Reply,

  IT IS ORDERED that Plaintiff's Motion is DENIED. It is further ordered that:

  1. Dr. Roberto Serruya is compelled to comply with the subpoena and produce any and all medical records regarding the mental condition of Jane H. Gould, or appear for an oral deposition within twenty (20) days from the date of this Order; and,

  2. Fortis Benefits Insurance Company is compelled to comply with the subpoena and produce any and all records of psychiatric treatment provided to Jane H. Gould within twenty (20) days from the date of this Order.

  1997 WL 256950 (E.D.Pa.)

END OF DOCUMENT

©  2005 Thomson West. No Claim to Orig. U.S. Govt. Works.