**Exhibit A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH T. CARMACK )
)
Plaintiff, )
)
v. ) Civil Action No. 03 12488 PBS
)
NATIONAL RAILROAD PASSENGER )
CORPORATION )
)
Defendant. )

## DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S ANSWERS TO THE PLAINTIFF JOSEPH T. CARMACK'S INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant, National Railroad Passenger Corporation ("Amtrak"), hereby responds as follows to Plaintiff Joseph Carmack's ("Plaintiff") Interrogatories:

### GENERAL OBJECTIONS

The following General Objections are incorporated by reference into each specific answer set forth below:

1. Amtrak objects generally to Plaintiff's Interrogatories to the extent that they attempt or purport to impose on Amtrak obligations other than or beyond those imposed or authorized by Rules 26 and 33 of the Federal Rules of Civil Procedure.

2. Amtrak objects to Plaintiff's Interrogatories to the extent they seek information protected from discovery by the attorney-client privilege, the work product doctrine, or any other privilege.

### SPECIFIC RESPONSES

Subject to the foregoing General Objections, and without waiving same, Amtrak hereby responds as follows to the respective-numbered specific Interrogatories contained in Plaintiff's Interrogatories:

**INTERROGATORY NO. 1:**

State all facts which form the basis of medical disqualification of Plaintiff Joseph Carmack from his position as Locomotive Engineer on May 4, 2001, including, but not limited the following:

    a.    The medical basis for the disqualification including medical condition and diagnosis of plaintiff and means by which Amtrak became aware of said diagno and medical condition including names and addresses of witnesses.

    b.    List of symptoms from which plaintiff was suffering due to the medical conditi of plaintiff and which defendant became aware. Include in your response: whe and where plaintiff was perceived to have been suffering from said symptoms; how Amtrak became aware of said symptoms; and names and addresses of any witnesses.

    c.    Any direct threat to the health and safety of others and/or the plaintiff himself, including direct threat to employees of Amtrak or the traveling public which resulted from plaintiff's medical condition and/or symptoms of said condition.

    d.    Any injury to the health and safety of others and/or the plaintiff himself, includ injury to employees of Amtrak or the traveling public which resulted from plaintiff's medical condition and/or symptoms of said condition.

    e.    List all "materials reportedly written by [plaintiff]" which formed the basis of a medical disqualification of plaintiff.

    f.    Statement whether are not Doctor Tim Pinsky was solely responsible for assessment of medical disqualification of plaintiff or whether or not medical disqualification of plaintiff would have been permitted by Amtrak had Dr. Pin or some other doctor employed by Amtrak not approved.

**ANSWER NO. 1:**

Plaintiff was temporarily medically disqualified from his position as a locomotive engineer for Amtrak on or about May 3, 2001 by Timothy Pinsky, M.D., Amtrak's Northeast Corridor Medical Director at the time, after Dr. Pinsky reviewed the "Letters from Hell" documents (produced in Plaintiff's initial disclosures) which appeared to make threatening statements against Mr. DeModena and others. This raised questions in Dr. Pinsky's mind abc Plaintiff's emotional stability. No medical diagnosis of Plaintiff related to this incident was made or reviewed by Dr. Pinsky. The mental and emotional health of Mr. DeModena was harmed to some extent by the "Letters from Hell." The health and safety of others was not harmed due to any condition of Plaintiff in part because Amtrak temporarily removed Plaintif possible threat, from its workforce where his conduct could affect the health and safety of fell

2

employees and passengers at the station or riding Amtrak's trains. Dr. Pinsky was solely responsible for the temporary medical disqualification of Plaintiff.

**INTERROGATORY NO. 2:**

Amtrak has submitted a "Workplace Violence Report Form" dated April 11, 2001 as part of initial disclosures on the above-captioned case which said "Workplace Violence Report Form" charges the Plaintiff with workplace violence; please state all the facts which form the basis of the charge of workplace violence against the plaintiff. Please include the following in your response:

- a. A complete description of any workplace violence perpetrated by the plaintiff.

- b. Means by which Amtrak became aware of such workplace violence perpetrated by plaintiff.

- c. Names and addresses of any witnesses to workplace violence perpetrated by plaintiff.

- d. A complete description of any threat to commit violence made by plaintiff which was cause for complaint of workplace violence.

- e. Means by which Amtrak became aware of any threat to commit violence made by the plaintiff.

- f. A complete description of Amtrak's response to any act of violence committed by plaintiff.

- g. A complete description of Amtrak's response to any threat to commit violence committed by plaintiff.

- h. Names and addresses to employees injured by plaintiff in any act of workplace violence committed by plaintiff.

- i. A complete description of any injuries caused by plaintiff to anyone while committing an act of workplace violence.

**ANSWER NO. 2:**

- a. Amtrak lacks knowledge of any workplace violence actually perpetrated by plaintiff.

- b. Not applicable.

- c. Not applicable.

3

d.  A document with a cover page entitled "Letters from Hell" was found by Mr. DeModena on his desk in his office at approximately 7:30 on the morning of April 11, 2001. It was written by Plaintiff. Plaintiff was a locomotive engineer the time whose supervisor was Mr. DeModena. On several occasions, while acting in his capacity as Road Foreman or Division Road Foreman, Mr. DeModena had conferred with Plaintiff about inappropriate conduct as an engineer and employee of Amtrak. Plaintiff identifies himself as the devil in th document. On the second page appears the phrase, "[a]ll is not as it appears. There's more to what you see and hear." Beneath that text, Plaintiff wrote "De God, I hear a fat lady singing. Very, very <u>truthfully</u> yours, Lucifer, Prince of Darkness." [emphasis as it appears in the text].

A subsequent page in the group of documents provides the names of the player who will play the roles of a version of Shakespeare's "Hamlet" entitled, "Haml Prince of Commuter Rail." For the part of "Horatio, friend of Hamlet," Plainti wrote "? (too bad GD couldn't play this)" apparently referencing disappointme about the change he perceived had taken place in his relationship with Mr. DeModena, who has those initials. Subsequently, he identifies Mr. DeModena and Michael O'Bryan, Plaintiff's union representative, individuals who were Amtrak employees at the time, as individuals to play the parts of Rosencrantz ¿ Guildenstern. In Shakespeare's "Hamlet," these men had been friends of Ham who spied on him at the behest of Claudius, Hamlet's uncle, who had murdered Hamlet's father. These two characters are executed in the play due to the machinations of Hamlet. In addition, again referring to himself as Lucifer, Prin of Darkness, Plaintiff states that his version of the play will have a "messy end more to my liking. Sinisterly, Lucifer, Prince of Darkness"

On the following page there are several quotes from Shakespeare in which Plaintiff (Hamlet) appears to be frustrated with how he is being treated by his Amtrak colleagues and in which Hamlet/Plaintiff is described as "dangerous" ¿ someone who may be vindictive toward Amtrak management and act as a "scourge." On the following line Plaintiff wrote, in upper case, "ROSENCRANTZ AND GUILDENSTERN ARE DEAD!" Mr. DeModena a other managers of Amtrak reasonably interpreted the text in the pages of this document as containing a threat from Plaintiff, who envisioned himself as the devil, that he wanted to kill Mr. DeModena. In addition, since Hamlet kills several people and drives another mad in Shakepeare's play, the "Letters from Hell" constituted threats against a number of Amtrak managers who are descri as the players in Plaintiff's play.

On another page, Plaintiff shows the threatening image of a giant monster mov through a city. The text beneath provides three options for its interpretation, o: of which states, "[a]nother futile attempt by Carmack to resist discipline." Thi text suggests threateningly that Plaintiff might act dangerously like a monster i response to the discipline that Amtrak's managers had assessed, or were going assess, against him. Finally, beneath that text, Plaintiff wrote threateningly, "[

4

      answers and/or petitions should be sent to 'Institution of Devastation Awareness'...."

e. Mr. DeModena found the "Letters from Hell" on his desk in his office. S thereafter, he spoke about the document and his concerns with William F Senior Trainmaster, Michael O'Malley, his supervisor, and Lou DePhill Amtrak's New England Labor Relations Director. Within a few days, DeModena also spoke with Robert Smith, Amtrak's Inspector for the N England Division of its Police Department.

f. Not applicable.

g. Mr. DeModena conferred with Mr. DePhillips about his concerns for his safety After hearing Mr. DeModena's account and reviewing the "Letters from Hell," Mr. DePhillips counseled Mr. DeModena to file a workplace violence report. or about April 12, 2001, Mr. DeModena filed his report with Amtrak's Threat Assessment Response Team ("T.A.R.T.") which, in this instance, consisted of New England Director of Human Resources Suzanne Allan, New England Amtrak Police Inspector, Robert Smith, and New England Labor Relations Director, Lou DePhillips. Mr. DePhillips stated that he did not recommend discipline be assessed against Plaintiff. Rather, he suggested that an in-service psychiatric examination might be appropriate. Mr. DePhillips faxed the five n threatening pages of the "Letters from Hell" to Dr. Pinsky. The T.A.R.T. committee accepted Mr. DePhillips' recommendation and sent an e-mail to Dr Pinsky asking him to evaluate Mr. DePhillips' suggestion. Dr. Pinsky disrega Mr. DePhillips suggestions that Plaintiff be required to undergo an in-service psychiatric examination. Rather, he concluded that Plaintiff's writings justifie his being deemed medically disqualified immediately pending a psychiatric fitness for duty exam. Ms. Letterio, an employee in the Medical Department, an e-mail to Mr. O'Malley, the senior supervisor overseeing the department in which Plaintiff worked, indicating that Dr. Pinsky had medically disqualified Plaintiff pending a psychiatric fitness for duty exam. As a result, on May 4, 2 Mr. O'Malley sent Plaintiff a letter informing him of his medical disqualificati and that he was being held out of service with pay, and that he was to contact Letterio in the Medical Department for further instructions. On or about May 2001, Ms. Marianne Letterio scheduled an appointment for Plaintiff with an independent outside psychiatrist, Russell Vasile, M.D., for June 4, 2001. Subsequently, Mr. O'Malley sent Plaintiff letters instructing him to undergo a fitness for duty exam with Dr. Vasile.

h. Not applicable because Amtrak does not claim that Plaintiff committed any ac violence.

i. Not applicable because Amtrak does not claim that Plaintiff committed any ac violence.

5

**INTERROGATORY NO. 3:**

Please provide address and means of contacting Mary Ann Letterio who is the former Manager of Health Services at Amtrak.

**ANSWER NO. 3:**

Ms. Letterio's last known address is 3334 Fordham Road, Philadelphia, PA 19114.

**INTERROGATORY NO. 4:**

Please provide full name and addresses of former Amtrak employees which Ms. Delvi Okereke reported to Massachusetts Commission Against Discrimination (MCAD) as employe who were similarly situated to facts of the incident of discrimination reported by plaintiff to MCAD. Please state all facts which form the basis of Amtrak's claim that said employees we similarly situated to the plaintiff and include the employee whose last name was Rafferty: Ple include in your response any action that Amtrak took against such employees so similarly situated to the plaintiff and states whether or not employees were ever returned to work as employees with Amtrak or Massachusetts Bay Commuter Rail

**ANSWER NO. 4:**

Amtrak objects to providing the names and addresses of the three persons Ms. Delv Okereke reported to the Massachusetts Commission Against Discrimination ("MCAD") grounds that the disclosure of this highly confidential information may violate their priv rights under M.G.L. c. 214 §1B and the Common Law. Moreover, Amtrak objects to provic the names and addresses of these persons on grounds that said information is not relevant to issues in this civil action and not reasonably calculated to lead to the discovery of admiss evidence. Furthermore, Amtrak objects to providing information as to whether any of tł persons work for the Massachusetts Bay Commuter Rail on grounds that said information is relevant to the issues in this civil action and not reasonably calculated to lead to the discover admissible evidence. Without waiving these objections, Amtrak provides the follov information. Amtrak states that, in each of these instances, an employee felt threatened by conduct of another employee and notified Amtrak to that effect. In each instance, Am removed the alleged wrongdoers from service and investigated the allegations. In two instar administrative hearings resulted in the termination of the employees with the threater conduct. Amtrak refers Plaintiff to the letter from Ms. Okereke to MCAD dated April 12, 2 which provides additional information about these incidents and action taken by Amtrak aga these persons. Amtrak further states that, after investigation, the accused in Case No. CT-01- received a 25 day suspension from service held in abeyance. That individual continues to w for Amtrak. The other persons have never returned to work for Amtrak. Amtrak la knowledge or information whether they have ever worked for MBCR.

**INTERROGATORY NO. 5:**

The above referenced "Workplace Violence Report Form" dated April 11, 2001 states that Gerald L. DeModena found a group of documents on his desk "authored by" the plaintiff entitled "LETTERS FROM HELL", please state the name and address of the person responsible for putting the documents on Mr. DeModena's desk and how said person came to be in possession of said documents; please include in your response how such person gained access Mr. DeModena's office; please include in your response all knowledge and information that trainmaster Mr. William Rae had and currently has regarding this incident.

**ANSWER NO. 5:**

Mr. Rae lacks any knowledge or information about how the "Letters from Hell" appeared on Mr. DeModena's desk. Amtrak lacks specific knowledge or information about how someone gained access to Mr. DeModena's office to leave the "Letters from Hell" on his desk whether that person used a key or entered through an open doorway. Amtrak further states that on or about the years 2000 and 2001, the door to the office shared by Mr. DeModena and Rae was occasionally left open. Furthermore, from time to time, the secretary whose desk just outside that door, left the area without locking the door to the office shared by DeModena and Mr. Rae. In such instances, it was possible for someone to have access to office without a key and without the knowledge of Mr. DeModena, Mr. Rae, and their secretary Ms. Cheri Thompson.

**INTERROGATORY NO. 6:**

Did Mr. Lou DePhillips, Amtrak Manager of Labor Relations, ever indicate to Michael O'Bryan, the Local Chairman of the Brotherhood of Locomotive Engineers that Mr. DePhillips thought that it was wrong to medically disqualify the plaintiff based on plaintiff's writings or Mr. DePhillips thought it was wrong that Amtrak would charge plaintiff with an act of workplace violence based on plaintiff's writings?

**ANSWER NO. 6:**

No.

**INTERROGATORY NO. 7:**

Did Gerard L. DeModena, Lou DePhillips, William Rae or Engineer J. Corcoran ever discuss the sexuality of the plaintiff with any other employee at Amtrak? With whom did they discuss plaintiff's sexuality? Who witnessed the discussion and what are their addresses?

**ANSWER NO. 7:**

Amtrak answers in the negative with respect to Mr. DeModena, Mr. DePhillips, and Rae. Amtrak lacks knowledge or information as to the conduct or statements of Mr. Corcoran

7

**INTERROGATORY NO. 8 :**

Did Gerard L. DeModena seek and obtain the opinions and assistance from plaintiff regarding courses or projects related to such courses that Mr. DeModena was taking at local universities or other educational institutions? Did the plaintiff respond with opinions or assistance? Please describe the assistance. Did Plaintiff assist Gerard L. DeModena with a project requiring the analysis of a poem by Wallace Steven's entitled "The Emperor of Ice Cream"? Did Gerard L. DeModena report this assistance to any teachers or to the class or classmates of Gerard L. DeModena? Please provide names of said teacher(s) or classmate(s).

**ANSWER NO. 8:**

Amtrak objects to this Interrogatory on grounds that it seeks information which is not relevant to the issues in this civil action and not reasonably calculated to lead to the discovery admissible evidence. Without waiving this objection, Amtrak states that Mr. DeModena did seek or obtain assistance from Plaintiff regarding courses or projects related to such courses t Mr. DeModena was taking at local universities or other educational institutions. Amtrak furtl states that, in one instance, Mr. DeModena spoke with Plaintiff about an assignment in which analyzed a poem by Wallace Steven entitled "The Emperor of Ice Cream." Plaintiff gave opinions about the poem during this discussion. Subsequently, Plaintiff offered to provide assistance with the written assignment. Mr. DeModena did not accept Plaintiff's offer.

**INTERROGATORY NO. 9 :**

Did Trainmaster William Rae intercept or any way obtain a copy of a document numbering approximately 40 pages and entitled LETTERS FROM HELL? Did William Rae obtain said document entitled LETTERS FROM HELL from another Amtrak employee? If s was the employee a member of any railroad union? What union? Who was the employee? What is the address of that employee? Did Trainmaster William Rae put a copy of the docum entitled LETTERS FROM HELL on the desk of Gerard L. DeModena in the basement of Sou Station, Boston?

**ANSWER NO. 9:**

Mr. Rae did not intercept or otherwise obtain a copy of "Letters from Hell" or place a copy of said document on the desk of Gerard L. DeModena in the basement of South Station, Boston on or prior to April 11, 2001.

**INTERROGATORY NO. 10:**

Please describe and state the facts which form the basis of Dr. Pinsky's recognized credentials and qualifications to medically disqualify plaintiff from employment including, bu not limited to:

    a.    Whether Dr. Pinsky is a licensed medical professional and in what states

8

        Dr. Pinsky is licensed to practice medicine.

   b.    The type of medical profession to which Dr. Pinsky is licensed to practice (i.e. neurology, psychiatry, oncology, orthopedics, osteopathy, etc.)

**ANSWER NO. 10 :**

        Dr. Pinsky, one of Amtrak's Regional Medical Directors, is a physician licensed to practice medicine in Pennsylvania and New Jersey. He specializes in occupational health matters.

**INTERROGATORY NO. 11 :**

        Please state all the facts which form the basis of Amtrak's second defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that the Complaint fails in whole or in part state a claim upon which relief can be granted.

**ANSWER NO. 11 :**

        Plaintiff has failed to provide any competent evidence in his Second Amended Compl and his supplemental answers to interrogatories, or anywhere else that support his allegations that Amtrak committed the offenses of (1) slander, libel, and defamation (e.g. many of Plainti factual allegations in support of this claim are false: Mr. DeModena did not state on his Workplace Violence form that Plaintiff identified himself as "Lucifer, Prince of Darkness;" M DeModena received the Letters from Hell subsequent to several instances in which he spoke t Plaintiff about his inappropriate conduct; Mr. DePhillips did not direct anyone to do anything his April 13, 2001 e-mail); (2) invasion of privacy (he cites no instances where Amtrak's managers divulged highly private information to third parties or employees); (3) disability discrimination (in which he makes contradictory allegations that he was discriminated against the basis of a disability and that he was discriminated against because he was mistakenly presumed to be disabled, and he has made pronouncements that he is not disabled); (4) violati his rights under M.G.L. c. 12, Section 11 H and 11 I, and c. 265 Section 37; (5) unfair labor practices; (6) discrimination on the basis of religion; (7) causing personal injury protected by Federal Employee Liability Act ("FELA"); and intentionally inflicting emotional distress (he not evidenced any physical injury caused by Amtrak's failure to provide him with a safe workplace); and (8) wrongful discharge in violation of public policy (he has produced no information or documents to indicate that his termination for insubordination violates public policy).

**INTERROGATORY NO. 12 :**

        Please state all the facts which form the basis of Amtrak's third defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that plaintiff's claims are barred in whole in part by applicable statutes of limitations or other time limitations including what statutes b said claims.

**ANSWER NO. 12 :**

Amtrak states that it lacks knowledge or information of any such facts at this time but notes that discovery is ongoing and reserves its right to supplement this answer reasonably in advance of trial.

**INTERROGATORY NO. 13 :**

Please state all the facts which form the basis of Amtrak's seventh defense in Amtrak' Answer to Plaintiff's Second Amended Complaint that plaintiff's alleged injuries and damage were caused by his own actions.

**ANSWER NO. 13 :**

Plaintiff prepared a threatening document, "Letters from Hell," which raised questions about his ability to interact in a safe manner with his peers and supervisors at Amtrak, and whether he could perform his duties as a locomotive engineer without jeopardizing the safety the train crew and the traveling public. His refusal to undergo a psychiatric fitness for duty exam, despite repeated orders from Amtrak to do so, led to insubordination charges being brought against him. These charges were proven and led to the termination of his employmer with Amtrak.

**INTERROGATORY NO. 14 :**

Please state all the facts which form the basis of Amtrak's eighth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that if plaintiff sustained damages or injuri such damages or injuries were caused by the acts of third persons which Amtrak had no reaso anticipate and of which Amtrak had no knowledge, or over whom Amtrak had no control, and for whose conduct Amtrak is not responsible.

**ANSWER NO. 14 :**

Amtrak states that it lacks knowledge or information of any such facts at this time but notes that discovery is ongoing and reserves its right to supplement this answer reasonably in advance of trial.

**INTERROGATORY NO. 15 :**

Please state all the facts which form the basis of Amtrak's ninth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that plaintiff's alleged injuries and damage if any, were caused by a superseding, intervening act which was beyond the knowledge or control of Amtrak .

## ANSWER NO. 15:

Amtrak states that it lacks knowledge or information of any such facts at this time but notes that discovery is ongoing and reserves its right to supplement this answer reasonably in advance of trial.

## INTERROGATORY NO. 16:

Please state all the facts which form the basis of Amtrak's thirteenth defense in Amtra Answer to Plaintiff's Second Amended Complaint that Amtrak is protected from plaintiff's defamation claim because it was investigating, in good faith and within the bounds of the employment relationship, plaintiff's ability to safely perform his job duties.

## ANSWER NO. 16:

Amtrak's Medical Department never disseminated confidential medical information about Plaintiff to Plaintiff's department managers, employees, or anyone else. Amtrak manag never publicly published derogatory information about Plaintiff and never maliciously did so order to cause Plaintiff harm. Rather, the record of communications in this matter indicates tl Amtrak's T.A.R.T. committee and Medical Department acted appropriately to investigate a workplace violence claim without any defamation of Plaintiff.

## INTERROGATORY NO. 17:

Please state all the facts which form the basis of Amtrak's sixteenth defense in Amtral Answer to Plaintiff's Second Amended Complaint that Amtrak's alleged defamatory writing ; statements were the natural and immediate consequences of plaintiff's provocative misconduc

## ANSWER NO. 17:

Mr. DeModena's workplace violence report, subsequent communications between, on one hand, Amtrak's Medical Department and Mr. O'Malley, and on the other hand, Plaintiff a Michael O'Bryan, his union representative, and any other internal Amtrak communications concerning Plaintiff during 2001 that are alleged to have been defamatory all arose because ol Plaintiff's provocative misconduct as exemplified by his drafting and dissemination of the threatening and disturbing "Letters from Hell," and his refusal to undergo a fitness for duty examination.

## INTERROGATORY NO. 18:

Please state all the facts which form the basis of Amtrak's eighteenth defense in Amtr; Answer to Plaintiff's Second Amended Complaint that Amtrak's alleged defamatory writings and statements were true.

11

**ANSWER NO. 18 :**

Mr. DeModena's workplace violence report accurately reflected his concerns about the threatening nature of Plaintiff's "Letters from Hell." In addition, the communications in 2001 Mr. O'Malley, Ms. Letterio, and Dr. Pinsky consisted of accurate statements about Plaintiff, h writings, and his conduct in refusing to undergo a fitness for duty exam. To the extent this Interrogatory considers the decision letter prepared by Deborah Gaines to be one of Amtrak's alleged defamatory writings, Amtrak responds by stating that Ms. Gaines only wrote informat and conclusions that were true to her best knowledge and belief at that time.

**INTERROGATORY NO. 19:**

Please state all the facts which form the basis of Amtrak's twenty-fifth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that plaintiff's medical condition disability or perceived disability were not factors in Amtrak's legitimate business decision to charge him with insubordination and terminate his employment.

**ANSWER NO. 19 :**

Amtrak and its Medical Department had made no determination that Plaintiff suff from any medical condition or disability in the spring and summer of 2001. Rat communications from Mr. O'Malley from May through September 2001 and his testimony at Amtrak hearing, and communications from Dr. Vasile from June 2001 through April 2 indicate that the only factors in the decision to charge Plaintiff with insubordination v Plaintiff's refusal to follow the directives of the Medical Department and Mr. O'Malley undergo the fitness for duty exam with Dr. Vasile.

**INTERROGATORY NO. 20 :**

Please state all the facts which form the basis of Amtrak's twenty-eighth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that plaintiff committed a violati of a job regulation which contributed to the injury or damage complained of.

**ANSWER NO. 20 :**

Plaintiff refused direct orders from his supervisor, Mr. O'Malley, to undergo a fitness duty exam with Dr. Vasile, thereby violating Amtrak's Standards of Excellence

**INTERROGATORY NO. 21:**

Please state all the facts which form the basis of Amtrak's forty-first defense in Amtra Answer to Plaintiff's Second Amended Complaint that accommodation of plaintiff's alleged religious beliefs would constitute an undue burden upon Amtrak.

**ANSWER NO. 21:**

Based upon Plaintiff's evasive answers to Amtrak's interrogatory about the basis for h claim of religious discrimination, Amtrak lacks sufficient knowledge and information at this to answer this Interrogatory. Nonetheless, if Plaintiff's religious beliefs require him to disseminate threatening written publications concerning his supervisors and fellow workers, i would be an undue burden upon Amtrak, its management and agreement employees, and possibly its passengers, to have to accommodate such beliefs and conduct.

**INTERROGATORY NO. 22:**

Please state all the facts which form the basis of Amtrak's forty-fourth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that plaintiff has failed to mitiga his damages, if any, as claimed.

**ANSWER NO. 22 :**

Plaintiff failed to comply with his department's orders to undergo a fitness for duty examination with Dr. Vasile from May 2001 until charges were brought against him in September 2001. Had he done so, and had he been found fit for duty, he might have had no damages or they would have been much smaller. Moreover, had he cooperated prior to the issuance of the hearing officer's decision in May 2002, it is possible that his employment wou not have been terminated, also substantially lessening his alleged damages. In addition, to the extent that Plaintiff alleges that he is disabled and suffered discrimination from Amtrak's failu to accommodate his alleged disability, Plaintiff failed to mitigate his damages by declaring hi disability to Amtrak and specifically requesting an accommodation for that particular disabili Furthermore, upon information received from Plaintiff's written discovery responses, Plaintif did not seek employment with railroads as an engineer or train dispatcher or other relevant positions outside of the Boston area after the termination of his employment. Discovery is no yet complete and Amtrak reserves its right to supplement this answer reasonably in advance o trial.

**INTERROGATORY NO. 23:**

Please state all the facts which form the basis of Amtrak's forty-fifth defense in Amtra Answer to Plaintiff's Second Amended Complaint that plaintiff's injuries, if any, were merely aggravation of a pre-existing condition and the damages, if any, recovered by him from Amtra should be reduced by the amount of damages which would have resulted due to the pre-existir condition if there had been on aggravation. Please include in your response a statement of all facts which form the basis of Amtrak's assessment of pre-existing condition.

**ANSWER NO. 23 :**

Dr. Gurion's records indicate that Plaintiff suffered from severe psychiatric conditions and emotional distress long before, and up to, the date of his medical disqualification (pending

13

fitness for duty examination). Records, information, and oral testimony provided by Plaintiff his condition subsequent to his medical disqualification and the subsequent termination of his employment indicate that his psychological and emotional status was not significantly worser if it was worsened at all, by the conduct of Amtrak to which Plaintiff takes exception in his Complaint. Discovery is not yet complete and Amtrak reserves its right to supplement this answer reasonably in advance of trial.

**INTERROGATORY NO. 24:**

Please state all the facts which form the basis of Amtrak's forty-sixth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that Plaintiff's claims are barred the doctrine of "unclean hands" including how defenses situate plaintiff within the doctrine of "unclean hands".

**ANSWER NO. 24 :**

Under this doctrine, Plaintiff's own insulting and defamatory written and oral communications to and about Amtrak and its managers, including correspondence from January 2000 through at least May 2002 with his union representatives and Amtrak managers, including the "Letters from Hell," about collusion with the union and deliberate efforts by Amtrak's managers to defy their own rules, bar Plaintiff from bringing a claim of defamation.

Under this doctrine, efforts by Plaintiff to obtain information about Mr. DeModena's personal background, his classes, his writings, and even his birth date, and, in August 2002, to obtain keys or information about obtaining keys to the office shared by Mr. DeModena and M Rae all constitute invasions of the privacy of others and bar him from bringing such a claim.

Under this doctrine, Plaintiff's refusal to cooperate with Dr. Vasile and undergo a fitne for duty examination at various times from June through August 2001 bars him from bringing claim of denial of reasonable accommodation.

Under this doctrine, Plaintiff's threatening letters and notes from Lucifer to God bar h from bringing a claim of religious discrimination.

Under this doctrine, Plaintiff's threatening "Letters from Hell" bar him from bringing claim of intentional infliction of emotional distress.

Under this doctrine, both Plaintiff's threatening "Letters from Hell," and his insubordinate conduct that led to his discharge, bar him from bringing a claim of wrongful discharge in violation of public policy.

Discovery is not yet complete and Amtrak reserves its right to supplement this answer reasonably in advance of trial.

**INTERROGATORY NO. 25:**

Please state all the facts which form the basis of Amtrak's forty-seventh defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that plaintiff's claims are barred by the doctrine of laches.

**ANSWER NO. 25:**

Under this doctrine, Plaintiff's failure to provide Amtrak with information about an disability that he may have had on or about May 2001 through May 2002 bars his claim of disability discrimination. Discovery is not yet complete and Amtrak reserves its right to supplement this answer reasonably in advance of trial.

Signed under pains and penalties of perjury this 30th day of August, 2005

Dated: August 30, 2005

Name and Title: Martin M. Bodtmann
EEO Compliance Manager
National Railroad Passenger Corporation (Amtrak)

As To Objections:

John A. Kiernan, BBO# 271020
Stephen E. Hughes, BBO# 629644
BONNER KIERNAN TREBACH & CROCIATA
One Liberty Square
Boston, Massachusetts 02109
(617) 426-3900

**CERTIFICATE OF SERVICE**

I, Stephen E. Hughes, hereby certify that I have on 31 day of August, 2005 served a true copy of the foregoing document by ~~first-class mail, postage prepaid~~ hand delivery (SEH), to:

Plaintiff (Pro Se):
Joseph T. Carmack
398 Columbus Ave., PMB 130
Boston, MA 02116-6008

Stephen E. Hughes

15