**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JOSEPH T. CARMACK**<br>**Plaintiff,**<br>v.<br>**NATIONAL RAILROAD PASSENGER CORPORATION**<br>**Defendant.** | **Civil Action No. 03 12488 PBS** |

**OPPOSITION OF DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION TO PLAINTIFF'S MOTION TO COMPEL DISCLOSURE AND DISCOVERY FROM DEFENDANT PURSUANT TO FED.R.CIV.P. 37 AND REQUEST FOR IN CAMERA REVIEW OF ALLEGED PRIVILEGED COMMUNICATIONS**

Plaintiff's Motion to Compel Further Disclosure and Discovery from Defendant Pursuant to Fed.R.Civ.P. 37 and Request for *In Camera* Review of Alleged Privileged Communications seeks to compel Defendant, National Railroad Passenger Corporation ("Amtrak") to provide further answers to interrogatories, additional responses to his document requests, the disclosure of all communications between Amtrak's Law Department with other departments relative to Plaintiff (as least for *in camera* review), and a more detailed privilege log. Amtrak opposes all elements of Plaintiff's Motion on the following general grounds which are explained in further detail in the rest of this memorandum.

First, Amtrak recently supplemented its voluminous Answers to Plaintiff's

Interrogatories[1] in accordance with the discovery conferences held between counsel for the parties. Amtrak need not further supplement any answers which are fully responsive as they presently exist. Any further information sought by Plaintiff should have been sought by deposition; and any further specificity in Amtrak's answers would be unduly burdensome.

Second, with respect to Plaintiff's Request for Production of Documents, Amtrak has complied with the Court's order of August 31, 2005. At this stage of the proceedings, and based upon the instructions of the Court, no further discovery may be undertaken.

Third, Plaintiff's efforts to compel the disclosure of communications between Amtrak's in-house counsel and its other departments consist only of reckless and scandalous allegations that have no basis in fact or in law. Therefore, this frivolous and highly offensive portion of his Motion must be denied.

Fourth, Plaintiff's efforts to seek a more detailed privilege log is unwarranted because Amtrak's letter of September 1, 2005 concerning documents withheld under the core privileges (attorney-client privilege and work product doctrine) sufficiently explains the nature of the documents withheld and the privilege rationale there for. See Ex. 1, letter from Amtrak's counsel to Plaintiff. Moreover, a declaration from Melissa Rogers, an attorney in Amtrak's Law Department, dispels any further questions about the nature of these communications and shows that any further specificity in Amtrak's response is not necessary.

## I. AMTRAK'S ANSWERS AND SUPPLEMENTAL ANSWERS TO PLAINTIFF'S INTERROGATORIES ARE APPROPRIATE AND LEGALLY SUFFICIENT

During the week of September 12th, counsel for Amtrak had two lengthy telephone conferences with Plaintiff regarding Plaintiff's dissatisfaction with certain of Amtrak's answers to his interrogatories. Amtrak's original answers to Plaintiff's interrogatories were produced in

[1] Amtrak's original answers were 15 pages long

good faith and offered substantial written explanations of Amtrak's perspective that encompassed some 15 pages of single-spaced text. Nonetheless, Amtrak's counsel agreed to make certain changes and consider others, while rejecting certain other complaints and arguments. On September 23, 2005, Amtrak sent Plaintiff its supplemental answers to his interrogatories, providing changes in the text, and usually additional information, relative to Interrogatory Nos. 1, 2, 10, 17, 24, and 25. These are more than sufficient to meet Amtrak's obligations under the Federal Rules of Civil Procedure.

In certain instances, Plaintiff is unhappy or disagrees with the substance of the answer. He has every right to raise his differing perspective in response to a dispositive motion or at trial. However, his different view of the case has no bearing on Amtrak's understanding of the facts. In addition, Plaintiff complained about wanting further explanation of some answers. Amtrak's answers, which are already quite lengthy, provide more information than is customary in such documents. Any more detail, if there is any, should have been obtained by deposition. No further information for each of the interrogatories at issue in Plaintiff's Motion is necessary as shown below, which includes Amtrak's Supplemental Answers.

**PLAINTIFF'S INTERROGATORY NO. 1:**

Interrogatory No. 1:

State all facts which form the basis of medical disqualification of Plaintiff Joseph Carmack from his position as Locomotive Engineer on May 4, 2001, including, but not limited to the following:

a. The medical basis for the disqualification including medical condition and diagnosis of plaintiff and means by which Amtrak became aware of said diagnosis and medical condition including names and addresses of witnesses.

b. List of symptoms from which plaintiff was suffering due to the medical condition of plaintiff and which defendant became aware. Include in your response: when and where plaintiff was perceived to have been suffering from said symptoms; how Amtrak became aware of said symptoms; and names and addresses of any

witnesses.

c. Any direct threat to the health and safety of others and/or the plaintiff himself, including direct threat to employees of Amtrak or the traveling public which resulted from plaintiff's medical condition and/or symptoms of said condition.

d. Any injury to the health and safety of others and/or the plaintiff himself, including injury to employees of Amtrak or the traveling public which resulted from plaintiff's medical condition and/or symptoms of said condition.

e. List all "materials reportedly written by [plaintiff]" which formed the basis of any medical disqualification of plaintiff.

f. Statement whether are not Doctor Tim Pinsky was solely responsible for assessment of medical disqualification of plaintiff or whether or not medical disqualification of plaintiff would have been permitted by Amtrak had Dr. Pinsky or some other doctor employed by Amtrak not approved.

Amtrak Supplemental Answer No. 1:

Plaintiff was temporarily medically disqualified from his position as a locomotive engineer for Amtrak on or about May 3, 2001 by Timothy Pinsky, M.D., Amtrak's Northeast Corridor Medical Director at the time, after Dr. Pinsky reviewed the "Letters from Hell" documents (produced in Plaintiff's initial disclosures) which appeared to make threatening statements against Mr. DeModena and others. This raised questions in Dr. Pinsky's mind about Plaintiff's emotional stability. No medical diagnosis of Plaintiff related to this incident was made or reviewed by Dr. Pinsky. The mental and emotional health of Mr. DeModena was harmed to some extent by the "Letters from Hell," by his experiencing anxiety and worry due to fears for his physical safety. The health and safety of others was not harmed due to any condition of Plaintiff in part because Amtrak temporarily removed Plaintiff, a possible threat, from its workforce where his conduct could affect the health and safety of fellow employees and passengers at the station or riding Amtrak's trains. Dr. Pinsky was solely responsible for making medical disqualifications of Amtrak employees working on the Northeast Corridor at that time, and was solely responsible for the temporary medical disqualification of Plaintiff.

Argument re Interrogatory No. 1

Plaintiff complains that Amtrak has provided no medical diagnosis justifying his medical disqualification. Yet Amtrak states it never diagnosed Plaintiff. Rather, it medically disqualified him pending a fitness for duty exam from which a diagnose might or might not have resulted. These are the facts and nothing further can be offered.

Plaintiff complains that Amtrak does not explain why Dr. Pinsky had questions about his

emotional stability. Yet, as mentioned to him in the discovery conferences of September 14th and 15th, the nature of the threat from which Dr. Pinsky's concerns arose is detailed in Amtrak's Answer to Plaintiff's Interrogatory No. 2(d).

An explanation of the nature of the harm experienced by Mr. DeModena has been provided in Amtrak's Supplemental Answer.

The final sentence of Amtrak's Supplemental Answer No. 1 explains that only Dr. Pinsky had authority to medically disqualify Plaintiff in May 2001.

**PLAINTIFF'S INTERROGATORY NO. 2:**

Interrogatory No. 2:

Amtrak has submitted a "Workplace Violence Report Form" dated April 11, 2001 as part of initial disclosures on the above-captioned case which said "Workplace Violence Report Form" charges the Plaintiff with workplace violence; please state all the facts which form the basis of the charge of workplace violence against the plaintiff. Please include the following in your response:

a. A complete description of any workplace violence perpetrated by the plaintiff.

b. Means by which Amtrak became aware of such workplace violence perpetrated by plaintiff.

c. Names and addresses of any witnesses to workplace violence perpetrated by plaintiff.

d. A complete description of any threat to commit violence made by plaintiff which was cause for complaint of workplace violence.

e. Means by which Amtrak became aware of any threat to commit violence made by the plaintiff.

f. A complete description of Amtrak's response to any act of violence committed by plaintiff.

g. A complete description of Amtrak's response to any threat to commit violence committed by plaintiff.

h. Names and addresses to employees injured by plaintiff in any act of workplace violence committed by plaintiff.

i.     A complete description of any injuries caused by plaintiff to anyone while committing an act of workplace violence.

<u>Amtrak's Supplemental Answer No. 2:</u>

a.     Amtrak lacks knowledge of any workplace violence actually perpetrated by the plaintiff.

b.     Not applicable.

c.     Not applicable.

d.     A document with a cover page entitled "Letters from Hell" was found by Mr. DeModena on his desk in his office at approximately 7:30 on the morning of April 11, 2001. It was written by Plaintiff. Plaintiff was a locomotive engineer at the time whose supervisor was Mr. DeModena. On several occasions, while acting in his capacity as Road Foreman or Division Road Foreman, Mr. DeModena had conferred with Plaintiff about inappropriate conduct as an engineer and employee of Amtrak as follows: on or about October 6, 2000, Mr. DeModena counseled Plaintiff about his responsibility for an unnecessary train delay in Stoughton; and on or about October 9, 2000, Mr. DeModena counseled Plaintiff for operating a train from South Station without having the proper paperwork and for unnecessarily delaying his train and several other trains that were trying to leave the station behind him. Plaintiff identifies himself as the devil in the document. On the second page appears the phrase, "[a]ll is not as it appears. There's more to what you see and hear." Beneath that text, Plaintiff wrote "Dear God, I hear a fat lady singing. Very, very <u>truthfully</u> yours, Lucifer, Prince of Darkness." [emphasis as it appears in the text].

A subsequent page in the group of documents provides the names of the players who will play the roles of a version of Shakespeare's "Hamlet" entitled, "Hamlet, Prince of Commuter Rail." For the part of "Horatio, friend of Hamlet," Plaintiff wrote "? (too bad GD couldn't play this)." This text appears to reference disappointment about the change Plaintiff perceived had taken place in his relationship with Mr. DeModena, who has those initials, because the words suggest that Mr. DeModena was no longer "friend of Hamlet," whose part was to be played by Plaintiff. Subsequently, he identifies Mr. DeModena and Michael O'Bryan, Plaintiff's union representative, individuals who were Amtrak employees at the time, as individuals to play the parts of Rosencrantz and Guildenstern. In Shakespeare's "Hamlet," these men had been friends of Hamlet who spied on him at the behest of Claudius, Hamlet's uncle, who had murdered Hamlet's father. These two characters are executed in the play due to the machinations of Hamlet. In addition, again referring to himself as Lucifer, Prince of Darkness, Plaintiff states that his version of the play will have a "messy ending more to my liking. Sinisterly, Lucifer, Prince of Darkness"

On the following page there are several quotes from Shakespeare in which

Plaintiff (Hamlet) appears to be frustrated with how he is being treated by his Amtrak colleagues and in which Hamlet/Plaintiff is described as "dangerous" and someone who may be vindictive toward Amtrak management and act as a "scourge." On the following line Plaintiff wrote, in upper case, "ROSENCRANTZ AND GUILDENSTERN ARE DEAD!" Mr. DeModena and other managers of Amtrak reasonably interpreted the text in the pages of this document as containing a threat from Plaintiff, who envisioned himself as the devil, that he wanted to kill Mr. DeModena. In addition, since Hamlet kills several people and drives another mad in Shakepeare's play, the "Letters from Hell" constituted threats against a number of Amtrak managers who are described as the players in Plaintiff's play.

On another page, Plaintiff shows the threatening image of a giant monster moving through a city. The text beneath provides three options for its interpretation, one of which states, "[a]nother futile attempt by Carmack to resist discipline." This text suggests threateningly that Plaintiff might act dangerously like a monster in response to the discipline that Amtrak's managers had assessed, or were going to assess, against him. Finally, beneath that text, Plaintiff wrote threateningly, "[a]ll answers and/or petitions should be sent to 'Institution of Devastation Awareness'...."

e. Mr. DeModena found the "Letters from Hell" on his desk in his office. Soon thereafter, he spoke about the document and his concerns with William Rae, Senior Trainmaster, Michael O'Malley, his supervisor, and Lou DePhillips, Amtrak's New England Labor Relations Director. Within a few days, Mr. DeModena also spoke with Robert Smith, Amtrak's Inspector for the New England Division of its Police Department.

**f.** Not applicable.

**g.** Mr. DeModena conferred with Mr. DePhillips about his concerns for his safety. After hearing Mr. DeModena's account and reviewing the "Letters from Hell," Mr. DePhillips counseled Mr. DeModena to file a workplace violence report. On or about April 12, 2001, Mr. DeModena filed his report with Amtrak's Threat Assessment Response Team ("T.A.R.T.") which, in this instance, consisted of New England Director of Human Resources Suzanne Allan, New England Amtrak Police Inspector, Robert Smith, and New England Labor Relations Director, Lou DePhillips. Mr. DePhillips stated that he did not recommend discipline be assessed against Plaintiff. Rather, he suggested that an in-service psychiatric examination might be appropriate. Mr. DePhillips faxed the five most threatening pages of the "Letters from Hell" to Dr. Pinsky. The T.A.R.T. committee accepted Mr. DePhillips' recommendation and sent an e-mail to Dr. Pinsky asking him to evaluate Mr. DePhillips' suggestion. Dr. Pinsky disregarded Mr. DePhillips suggestions that Plaintiff be required to undergo an in-service psychiatric examination. Rather, he concluded that Plaintiff's writings justified his being deemed medically disqualified immediately pending a psychiatric fitness for duty exam. Ms. Letterio, an employee in the Medical Department, sent an e-mail to

Mr. O'Malley, the senior supervisor overseeing the department in which Plaintiff worked, indicating that Dr. Pinsky had medically disqualified Plaintiff pending a psychiatric fitness for duty exam. As a result, on May 4, 2001, Mr. O'Malley sent Plaintiff a letter informing him of his medical disqualification and that he was being held out of service with pay, and that he was to contact Ms. Letterio in the Medical Department for further instructions. On or about May 16, 2001, Ms. Marianne Letterio scheduled an appointment for Plaintiff with an independent outside psychiatrist, Russell Vasile, M.D., for June 4, 2001. Subsequently, Mr. O'Malley sent Plaintiff letters instructing him to undergo a fitness for duty exam with Dr. Vasile.

**h.**    Not applicable because Amtrak does not claim that Plaintiff committed any act of violence.

**i.**    Not applicable because Amtrak does not claim that Plaintiff committed any act of violence.

Argument re Interrogatory No. 2

Contrary to Plaintiff's allegations, Amtrak's voluminous and detailed answers, including the modest supplements incorporated therein, to sub-parts (d) and (g), or any other sub-part, of this Interrogatory need no further explanation.

**PLAINTIFF'S INTERROGATORY NO. 4:**

Interrogatory No. 4:

Please provide full name and addresses of former Amtrak employees which Ms. Delvine Okereke reported to Massachusetts Commission Against Discrimination (MCAD) as employees who were similarly situated to facts of the incident of discrimination reported by plaintiff to MCAD. Please state all facts which form the basis of Amtrak's claim that said employees were similarly situated to the plaintiff and include the employee whose last name was Rafferty: Please include in your response any action that Amtrak took against such employees so similarly situated to the plaintiff and states whether or not employees were ever returned to work as employees with Amtrak or Massachusetts Bay Commuter Rail

Amtrak Answer No. 4:

Amtrak objects to providing the names and addresses of the three persons Ms. Delvine Okereke reported to the Massachusetts Commission Against Discrimination ("MCAD") on grounds that the disclosure of this highly confidential information may violate their privacy rights under M.G.L. c. 214 §1B and the Common Law. Moreover, Amtrak objects to providing the names and addresses of these persons on grounds that said information is not relevant to the issues in this civil action and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, Amtrak objects to providing information as to whether any of these

persons work for the Massachusetts Bay Commuter Rail on grounds that said information is not relevant to the issues in this civil action and not reasonably calculated to lead to the discovery of admissible evidence.    Without waiving these objections, Amtrak provides the following information.  Amtrak states that, in each of these instances, an employee felt threatened by the conduct of another employee and notified Amtrak to that effect.  In each instance, Amtrak removed the alleged wrongdoers from service and investigated the allegations.  In two instances administrative hearings resulted in the termination of the employees with the threatening conduct.  Amtrak refers Plaintiff to the letter from Ms. Okereke to MCAD dated April 12, 2002 which provides additional information about these incidents and action taken by Amtrak against these persons. Amtrak further states that, after investigation, the accused in Case No. CT-01-138 received a 25 day suspension from service held in abeyance.  That individual continues to work for Amtrak.    The other persons have never returned to work for Amtrak.    Amtrak lacks knowledge or information whether they have ever worked for MBCR.

Argument re Interrogatory No. 4

As explained by Amtrak's counsel to Plaintiff in the discovery conferences, information beyond that provided above in Amtrak's answer to the interrogatory is known to him from the letter from Amtrak to the Massachusetts Commission Against Discrimination, dated April 12, 2002, concerning the nature of the incidents of insubordination.  See Ex. 2.  Despite the fact that more than enough information has been provided for him to attempt to compare or contrast his treatment, Plaintiff seeks to invade the privacy of these individuals by obtaining their names. However, this confidential information should not and need not be disclosed because Plaintiff already has possession of the pertinent facts of what is minimally relevant information at best (different people and different circumstances).  Under such circumstances, invading the privacy of these individuals is not warranted.

**INTERROGATORY NO. 5**

Interrogatory No. 5:

The above referenced "Workplace Violence Report Form" dated April 11, 2001 states that Gerald L. DeModena found a group of documents on his desk "authored by" the plaintiff entitled "LETTERS FROM HELL", please state the name and address of the person responsible for putting the documents on Mr. DeModena's desk and how said person came to be in possession of said documents; please include in your response how such person gained access to Mr. DeModena's office; please include in your response all knowledge and information that trainmaster Mr. William Rae had and currently has regarding this incident.

Amtrak Answer No. 5:

Mr. Rae lacks any knowledge or information about how the "Letters from Hell" appeared on Mr. DeModena's desk. Amtrak lacks specific knowledge or information about how someone gained access to Mr. DeModena's office to leave the "Letters from Hell" on his desk and whether that person used a key or entered through an open doorway. Amtrak further states that, on or about the years 2000 and 2001, the door to the office shared by Mr. DeModena and Mr. Rae was occasionally left open. Furthermore, from time to time, the secretary whose desk was just outside that door, left the area without locking the door to the office shared by Mr. DeModena and Mr. Rae. In such instances, it was possible for someone to have access to the office without a key and without the knowledge of Mr. DeModena, Mr. Rae, and their secretary, Ms. Cheri Thompson.

Argument re Answer No. 5:

Plaintiff complains that Amtrak has not provided certain information, e.g. who has access

to the office. Yet his interrogatory does not seek such information. Amtrak's answer to this

interrogatory accurately reflects the conclusion of Amtrak's investigation that it lacks knowledge

or information as to who placed the documents on Mr. DeModena's desk.

**INTERROGATORY NO. 8**

Interrogatory No. 8:

Did Gerard L. DeModena seek and obtain the opinions and assistance from plaintiff regarding courses or projects related to such courses that Mr. DeModena was taking at local universities or other educational institutions? Did the plaintiff respond with opinions or assistance? Please describe the assistance. Did Plaintiff assist Gerard L. DeModena with a project requiring the analysis of a poem by Wallace Steven's entitled "The Emperor of Ice Cream"? Did Gerard L. DeModena report this assistance to any teachers or to the class or classmates of Gerard L. DeModena? Please provide names of said teacher(s) or classmate(s).

Amtrak Answer No. 8:

Amtrak objects to this Interrogatory on grounds that it seeks information which is not relevant to the issues in this civil action and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, Amtrak states that Mr. DeModena did not seek or obtain assistance from Plaintiff regarding courses or projects related to such courses that Mr. DeModena was taking at local universities or other educational institutions. Amtrak further states that, in one instance, Mr. DeModena spoke with Plaintiff about an assignment in which he analyzed a poem by Wallace Steven entitled "The Emperor of Ice Cream." Plaintiff gave opinions about the poem during this discussion. Subsequently, Plaintiff offered to provide

assistance with the written assignment.  Mr. DeModena did not accept Plaintiff's offer.

Argument Re Interrogatory No. 8:

Plaintiff argues that Mr. DeModena's recollections of events concerning advice allegedly provided by Plaintiff about one or more literature classes are at odds with his own.  He is certainly free to try to make that argument at trial or in opposition to any dispositive motion that may concern this point.  Nonetheless, Amtrak's answer is complete as it stands and need not, nor can it, be changed.

**INTERROGATORY NO. 10**

Interrogatory No. 10:

Please describe and state the facts which form the basis of Dr. Pinsky's recognized credentials and qualifications to medically disqualify plaintiff from employment including, but not limited to:

a.    Whether Dr. Pinsky is a licensed  medical professional and in what states
      Dr. Pinsky is licensed to practice medicine.

b.    The type of medical profession to which Dr. Pinsky is licensed to practice (i.e.
      neurology, psychiatry, oncology, orthopedics, osteopathy, etc.)

Amtrak's Supplemental Answer No. 10:

Dr. Pinsky, one of Amtrak's Regional Medical Directors, is a physician licensed to practice medicine in Pennsylvania, New Jersey, New York, and Delaware.  He is board certified in occupational and environmental medicine, preventive medicine, family practice, disability evaluation, and as a medical review officer.

Argument Re Answer No. 10:

The increased specificity of Amtrak's supplemental answer resolves any possible concern that insufficient information was provided about Dr. Pinsky.

**INTERROGATORY NO. 17**

Interrogatory No. 17:

Please state all the facts which form the basis of Amtrak's sixteenth defense in Amtrak's

Answer to Plaintiff's Second Amended Complaint that Amtrak's alleged defamatory writing and statements were the natural and immediate consequences of plaintiff's provocative misconduct.

Amtrak's Supplemental Answer No. 17:

Mr. DeModena's workplace violence report, subsequent communications between, on the one hand, Amtrak's Medical Department and Mr. O'Malley, and on the other hand, Plaintiff and Michael O'Bryan, his union representative, and any other internal Amtrak communications concerning Plaintiff during 2001 that are alleged to have been defamatory all arose because of Plaintiff's provocative misconduct which consisted of his drafting and dissemination of the threatening and disturbing "Letters from Hell," and his refusal to undergo a fitness for duty examination.

Argument re Answer No. 17:

Amtrak's supplemental answer fully describes what is meant by "plaintiff's provocative misconduct."

**INTERROGATORY NO. 18**

Interrogatory No. 18:

Please state all the facts which form the basis of Amtrak's eighteenth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that Amtrak's alleged defamatory writings and statements were true.

Amtrak's Answer No. 18:

Mr. DeModena's workplace violence report accurately reflected his concerns about the threatening nature of Plaintiff's "Letters from Hell." In addition, the communications in 2001 by Mr. O'Malley, Ms. Letterio, and Dr. Pinsky consisted of accurate statements about Plaintiff, his writings, and his conduct in refusing to undergo a fitness for duty exam. To the extent this Interrogatory considers the decision letter prepared by Deborah Gaines to be one of Amtrak's alleged defamatory writings, Amtrak responds by stating that Ms. Gaines only wrote information and conclusions that were true to her best knowledge and belief at that time.

Argument re Answer No. 18:

Amtrak has identified the statements it considers to be at issue in this Interrogatory and has declared all of them to be true. Any further specificity would be redundant and unduly burdensome, and require Amtrak to speculate as to what statements Plaintiff's believes are false and defamatory.

**INTERROGATORY NO. 19:**

Interrogatory No. 19:

Please state all the facts which form the basis of Amtrak's twenty-fifth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that plaintiff's medical condition, disability or perceived disability were not factors in Amtrak's legitimate business decision to charge him with insubordination and terminate his employment.

Amtrak Answer No. 19:

Amtrak and its Medical Department had made no determination that Plaintiff suffered from any medical condition or disability in the spring and summer of 2001. Rather, communications from Mr. O'Malley from May through September 2001 and his testimony at the Amtrak hearing, and communications from Dr. Vasile from June 2001 through April 2002 indicate that the only factors in the decision to charge Plaintiff with insubordination were Plaintiff's refusal to follow the directives of the Medical Department and Mr. O'Malley to undergo the fitness for duty exam with Dr. Vasile.

Argument re Answer No. 19:

Plaintiff erroneously suggests that Amtrak must provide some sort of medical diagnosis

to justify its actions. As explained in this Answer and in Amtrak's Answer to Interrogatory No.

1, no medical diagnosis was ever made. Despite Plaintiff's fervent wish that Amtrak provide

him with a diagnosis, Amtrak cannot do so without making a misstatement of fact. Hence, this

Answer accurately and appropriately answers Plaintiff's Interrogatory.

**INTERROGATORY NO. 20**

Interrogatory No. 20:

Please state all the facts which form the basis of Amtrak's twenty-eighth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that plaintiff committed a violation of a job regulation which contributed to the injury or damage complained of.

Amtrak Answer No. 20:

Plaintiff refused direct orders from his supervisor, Mr. O'Malley, to undergo a fitness for duty exam with Dr. Vasile, thereby violating Amtrak's Standards of Excellence

Argument re Answer No. 20:

As explained in Amtrak's charges against Plaintiff, dated September 10, 2001, with which Plaintiff is intimately familiar, Amtrak has long stated that Plaintiff violated the section of Amtrak's Standards of Excellence which states, "you must comply with all company departmental policies, procedures, and rules as well as all instructions, directions and orders from supervisors and managers."  Although Amtrak has many job regulations and there are many "rules" set forth in its agreements with its unions, none of those are pertinent to this Interrogatory.

**INTERROGATORY NO. 21**

Interrogatory No. 21:

Please state all the facts which form the basis of Amtrak's forty-first defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that accommodation of plaintiff's alleged religious beliefs would constitute an undue burden upon Amtrak.

Amtrak Answer No. 21:

Based upon Plaintiff's evasive answers to Amtrak's interrogatory about the basis for his claim of religious discrimination, Amtrak lacks sufficient knowledge and information at this time to answer this Interrogatory.  Nonetheless, if Plaintiff's religious beliefs require him to disseminate threatening written publications concerning his supervisors and fellow workers, it would be an undue burden upon Amtrak, its management and agreement employees, and possibly its passengers, to have to accommodate such beliefs and conduct.

Argument re Answer No. 21:

Amtrak has fully and clearly answered this Interrogatory.

**INTERROGATORY NO. 24**

Interrogatory No. 24:

Please state all the facts which form the basis of Amtrak's forty-sixth defense in Amtrak's Answer to Plaintiff's Second Amended Complaint that Plaintiff's claims are barred by the doctrine of "unclean hands" including how defenses situate plaintiff within the doctrine of "unclean hands".

Amtrak's Supplemental Answer No. 24:

Under this doctrine, Plaintiff's own insulting and defamatory written and oral communications to and about Amtrak and its managers, including correspondence from January 2000 through at least May 2002 with his union representatives and Amtrak managers, including the "Letters from Hell," about collusion with the union and deliberate efforts by Amtrak's managers to defy their own rules, bar Plaintiff from bringing a claim of defamation.

Under this doctrine, efforts by Plaintiff to obtain irrelevant and highly confidential information about Mr. DeModena's personal background, his classes, and his writings via written discovery requests, and Plaintiff's seeking out and identifying Mr. DeModena's birth date, constitute efforts to invade the privacy of Mr. DeModena. Furthermore, in August 2002, Plaintiff's efforts to obtain keys or information about obtaining keys to the office shared by Mr. DeModena and Mr. Rae constitute an effort to invade the privacy of these two persons. These actions bar him from bringing such a claim.

Under this doctrine, Plaintiff's refusal to cooperate with Dr. Vasile and undergo a fitness for duty examination at various times from June through August 2001 bars him from bringing a claim of denial of reasonable accommodation.

Under this doctrine, Plaintiff's threatening letters and notes from Lucifer to God bar him from bringing a claim of religious discrimination.

Under this doctrine, Plaintiff's threatening "Letters from Hell" bar him from bringing a claim of intentional infliction of emotional distress.

Under this doctrine, both Plaintiff's threatening "Letters from Hell," and his insubordinate conduct that led to his discharge, bar him from bringing a claim of wrongful discharge in violation of public policy.

Discovery is not yet complete and Amtrak reserves its right to supplement this answer reasonably in advance of trial.

Argument re Answer No. 24:

Plaintiff complains that Amtrak did not explain the basis for its statement in this Defense that Plaintiff tried to obtain information about Mr. DeModena's personal background. Amtrak's Supplemental Answer provides this information.

In summary, Amtrak has met its obligations through its answers and supplemental answers to all of Plaintiff's interrogatories.

## II.    DOCUMENTS SOUGHT BY PLAINTIFF

In various locations in Plaintiff's Motion and in his subsequently filed Memorandum, Plaintiff has raised an assortment of complaints about Amtrak's production of documents. None of these have any merit.

On page 2 of Plaintiff's Memorandum, he seeks to compel Amtrak to produce additional documents in response to his Request for Documents. Amtrak produced the index to the "Red Book" as requested by Plaintiff and ordered by the Court. It is a substantial index encompassing many of Amtrak's policies. Plaintiff's concern that it does not cover every possible policy of Amtrak is misplaced. The document is what it is and Amtrak has produced it.

Plaintiff may not seek any further documents from other Requests because he failed to seek them during the discovery period and this Court refused during the hearing on August 31, 2005 to permit any other discovery motions beyond possible motions concerning Plaintiff's deposition, documents withheld by Amtrak on grounds of core privilege, and the sufficiency of Amtrak's answers to interrogatories.

Nonetheless, even if Plaintiff were permitted to make such arguments, they are groundless. Contrary to Plaintiff's allegations, Amtrak has produced the written policies for the Labor Relations Department and the applicable manuals on transportation.

Plaintiff also complains that Amtrak has not produced a manual of policies and procedures for its Law Department. Although this frivolous complaint does not warrant a response, Amtrak notes that Plaintiff did not specify that he was seeking policies or a manual from this department in his Request for Production of Documents. In fact he never mentioned from the date of Amtrak's formal response on April 14, 2005 until the date of his Motion on September 16, 2005 that he was seeking such policies, nor did he complain that they had not

been produced. In addition, Amtrak's internal legal operations are confidential and proprietary. To the extent Plaintiff may be seeking to learn ethical guidelines that may affect the conduct of Amtrak's attorneys, these are available from the Bar under which these attorneys practice.

Plaintiff also tries to revisit his dissatisfaction with Amtrak's response to Request No. 7, an issue which was already resolved by the Court.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7**

Request No. 7:

All documents concerning correspondence, conversations, reports and/or communications, class projects and class reports produced by Gerald L. De Modena, including, but not limited to projects or assignments concerning the poem "The Emperor of Ice Cream" by Wallace Stevens.

Amtrak Response No. 7:

Amtrak objects to this Request on grounds that it seeks documents that are not relevant to the issues in dispute in this matter and not reasonably calculated to lead to the discovery of admissible evidence. Amtrak further objects to this request on grounds that it seeks private and confidential information the disclosure of which may violate Mr. DeModena's privacy rights pursuant to M.G.L. c. 214 §1B or the common law.

Argument Re Response No. 7:

This Request was addressed at the motion hearing held on August 31, 2005 in which this Court recognized that Amtrak and Mr. DeModena lacked possession, custody or control of any such documents, and therefore did not require Amtrak to produce same. Plaintiff improperly assumes that Amtrak must explain why it does not have access to any such documents. There is no such obligation in response to a request for documents.

In summary, Amtrak has no obligation, particularly at this late stage in the case, after discovery has been concluded, to respond to these frivolous, burdensome, and irrelevant requests.

## III.  AMTRAK PROPERLY WITHHELD CERTAIN DOCUMENTS PROTECTED FROM DISCLOSURE BY CORE PRIVILEGES

Plaintiff alleges that Amtrak should not have withheld communications between its lawyers and its employees, including Dr. Pinsky, that are theoretically responsive to Request No. 1 of his request for documents.[2]  In particular, he argues that Amtrak waived its attorney-client privilege during the Amtrak disciplinary hearing in which Plaintiff was charged with insubordination and found guilty thereof.  Furthermore, he outrageously argues that Amtrak cannot rely upon the attorney-client privilege because its internal attorneys supposedly orchestrated a fraudulent scheme with other Amtrak departments to get him fired.

To the contrary, Dr. Pinsky did not and could not waive Amtrak's attorney-client privilege at the Amtrak hearing.  Moreover, there is no evidence of collusion and conspiracy of any Amtrak departments, let alone the Law Department, concerning his employment and therefore he has no basis to bring these offensive and groundless charges and no basis to claim

---

[2]     Plaintiff's Request No. 1:
        All documents concerning any correspondence, conversations, statements, reports and/or communications
        produced by Defendant or on behalf of Defendant by anyone regarding:
        (a)     any alleged workplace violence incident of any type alleged to have been
                committed by Plaintiff;
        (b)     any alleged threat of any type alleged to have  been committed by Plaintiff;
        (c)     any alleged mental condition of Plaintiff which any person may have documented for any reason;
        (d)     any alleged behavioral characteristic of Plaintiff which any person may have documented for any
                reason;
        (e)     any disparaging, derogatory or critical reference to Plaintiff which any person may have
                documented for any reason and in any context;
        (f)     the sexuality of the Plaintiff; and
        (g)     any personal matter regarding Plaintiff.
        Amtrak's Response to Request No. 1:
        Amtrak objects to this Request on grounds that it is vague and ambiguous as to what is meant by the phrases
        "communications produced by Defendant or on behalf of Defendant," and "any personal matter regarding
        Plaintiff." Amtrak further objects to sub-part (f) of this Request on grounds that it seeks documents that are
        not relevant to the issues in dispute in this matter and not reasonably calculated to lead to the discovery of
        admissible evidence because there is no sexual discrimination or harassment component to Plaintiff's
        Complaint. Amtrak also objects to this Request to the extent it seeks documents prepared in anticipation of
        litigation or otherwise protected from disclosure by the attorney-client privilege or the work product
        doctrine. Without waiving these privileges, and to the extent the word "produced" in the phrase
        "communications produced by Defendant or on behalf of Defendant," means "prepared" or "created,"
        Amtrak states that it will produce those non-privileged documents responsive to this Request in its

that the privilege has been voided.

Plaintiff's Memorandum provides voluminous misguided and reckless commentary as to why the attorney-client privilege does not apply to Amtrak in this matter. Moreover, he submits no meaningful evidence, only assumptions in support of his wild and irresponsible allegations, to which Amtrak takes umbrage. Nonetheless, due to the seriousness of these allegations, Amtrak will respond them sequentially.

A. THERE WAS NO WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE AT THE AMTRAK HEARINGS IN APRIL AND MAY 2002

During the Amtrak disciplinary hearing in April and May 2002, Dr. Pinsky was asked why he did not respond to Plaintiff's letter of May 24, 2001 seeking an explanation of the medical and legal bases for his decision to medically disqualify Plaintiff. On page 114 of the hearing transcript, Dr. Pinsky responded, "[t]his is the letter to which I responded earlier that I referred to the legal department and they advised me that I should not respond to that letter." On page 392, Dr. Pinsky also stated, "they advised me that I didn't need to justify my own credentials or explain my medical legal opinions to Mr. Carmack." He provided no other testimony about communications with Amtrak's Law Department.

These two limited comments do not and cannot constitute a waiver by Amtrak of the attorney-client privilege as it pertains to other communications because Dr. Pinsky was a part-time employee who cannot speak for and bind the company.

The application of the attorney-client privilege to corporations has been well defined under the law. The U.S. Supreme Court has ruled that the attorney-client privilege applies in the corporate context and protects communications between in-house counsel and employees at all levels in the company. Upjohn v. U.S., 449 U.S. 383, 390-391 (1981). It exists "to protect the

---

possession, custody or control that have not already been produced in Amtrak's Initial Disclosures.

giving of advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Id. Moreover, due the complexity of modern law, corporations, through employees acting within the scope of their employment, frequently communicate with company lawyers to determine how to obey the law. See id. at 392.

In addition, it is important to recognize that corporations are inanimate entities which act through those managers empowered to do so on its behalf. Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343, 348 (1986). As a result, certain vitally important rights or interests may not be waived by those not empowered to do so. Id. "The power to waive the corporate attorney-client privilege rests with the corporations' management and is normally exercised by its officers and directors." Id. at 348-349. The individuals must do so in accordance with their "fiduciary"[3] duty to act in the best interests of the corporation, not for their own personal benefit. Id.; Stopka v. Alliance of American Insurers, 1996 WL 204324 (N.D.Ill. 1996) (Vice-president of administration could not waive her employer's attorney-client privilege for her own benefit, rather than the benefit of the corporation). In fact, waiving the attorney-client privilege is "an incident of control of the corporation." The Glidden Co. v. Jandernoa, 173. F.R.D. 459, 472 (S.D.Mich. 1997)

Here, Amtrak's Law Department never intentionally or inadvertently produced information about its communications with its clients to Plaintiff, nor did any officers or directors of the corporation. Rather, Dr. Pinsky, a doctor in charge of addressing the health care needs of Amtrak's employees, made a brief reference at a company hearing to instructions received from the Law Department. Lacking the presence of counsel to advise him during his

---

3 A fiduciary is defined in Black's Law Dictionary (8th ed. 2004) as "**1.** A person who is required to act for the benefit of another person on all matters within the scope of their relationship; one who owes to another the duties of good faith, trust, confidence, and candor <**the corporate officer is a fiduciary to the corporation**>. **2.** One who must exercise a high standard of care in managing another's money or property

testimony and lacking the fiduciary responsibility of a corporate officer, he could not bind the company and waive Amtrak's corporate privilege.

Furthermore, Dr. Pinsky's testimony was not done for the purpose of meeting the best interests of the corporation. Rather, his testimony represented his personal explanation of what actions he took that may have led to Amtrak's charges of insubordination against Amtrak. He was called as a fact witness by Plaintiff and the union, not Amtrak. Dr. Pinsky was not called as a corporate officer to waive core privileges of the corporation. Amtrak should not be punished by Dr. Pinsky's good faith efforts to comply with the spirit of the proceedings.

Significantly, these two innocuous statements do not suggest any role by the Amtrak Law Department in the medical disqualification of Plaintiff. Hence, they should not be permitted to open the door to disclosure of whatever communications may have taken place between the Law Department and other departments at Amtrak performed in anticipation of litigation after Plaintiff's conduct and comments suggested he might bring some sort of lawsuit against the company. Moreover, Plaintiff has pointed to no case law which suggests that such a minor statement on a tangential issue somehow forces the disclosure of all attorney-client communications to and from the Law Department.

B.    THE RECORD IN THIS CASE DOES NOT SHOW IMPROPER CONDUCT BY THE LAW DEPARTMENT THAT ABROGATES THE ATTORNEY-CLIENT PRIVILEGE

In scandalous fashion, Plaintiff recites a litany of self-serving conjecture and assumptions as the basis of his argument that the Law Department orchestrated a plan of action enacted by the Medical, Labor Relations, and Transportation Departments to terminate Plaintiff's employment. These allegations as so flimsy and frivolous that Rule 11 sanctions may be applicable.

---

<the beneficiary sued the fiduciary for investing in speculative securities>. [emphasis added]

Plaintiff's house of cards teeters upon two irrelevant and non-dispositive bits of evidence. First, the afore-mentioned comments by Dr. Pinsky that, on one occasion several weeks *after* Plaintiff's medical disqualification, the Law Department advised him not to respond to a letter which sought legal opinions. As mentioned previously, there is no shred of evidence to suggest that there were any other communications between Dr. Pinsky and the Law Department prior or contemporaneous to Dr. Pinsky's decision to medically disqualify Plaintiff. In fact there were no such communications. See Ex. 3, Affidavit of Melissa Rogers.

Second, Plaintiff points to an e-mail from Mr. DePhillips,[4] Amtrak's Labor Relations Director for the New England Division, dated April 13, 2001. This memorandum was addressed to Michael O'Malley, Director of Commuter Rail Operations at the time, and Gerard DeModena, the Division Road Foreman who filled out the workplace violence complaint the day before in response to finding Plaintiff's "Letters from Hell" on his desk. Mr. DePhillips offered advice on how to respond to what Mr. DeModena perceived as Plaintiff's threatening conduct. He stated that he would not recommend that Plaintiff be removed from service in accordance with Rule 25 of the collective bargaining agreement between Amtrak and the Brotherhood of Locomotive Engineers.[5] In addition, he stated that he would not recommend any disciplinary action. Mr. DePhillips recommended that Plaintiff be ordered to undergo a psychiatric fitness for duty examination while continuing to remain in service as a locomotive engineer. He then outlined the consequences if Plaintiff refused to cooperate, i.e. a charge of insubordination and removal from service. Mr. DePhillips never stated that he thought this a likely or a desirable outcome.

Plaintiff cites to this letter as evidence of a conspiracy orchestrated by the Law Department. Yet there is no evidence at all that the Law Department even knew about this letter,

---

4 Unfortunately, Mr. DePhillips passed away several weeks ago.

let alone actually participated in its creation.

Moreover, on or about May 3, 2001, the Threat Assessment Response Team ("TART") forwarded Mr. DePhillips' e-mail recommendations and the threatening pages of the Letters from Hell to Dr. Pinsky. During the hearing concerning Amtrak's charges of insubordination held in the spring of 2002, Dr. Pinsky described Plaintiff's writings as "alarming." Interestingly, Dr. Pinsky chose to disregard Mr. DePhillips' suggestion for an in-service fitness for duty exam. Instead, due to the magnitude of his concern, Dr. Pinsky medically disqualified Plaintiff pending a fitness for duty exam. In other words, he decided to have Plaintiff removed from service until a medical exam showed he could safely perform his duties. Dr. Pinsky's independent course of action further undermines Plaintiff's wild and irresponsible conspiracy theory.

Plaintiff bases some of his theories on the fact that Amtrak's Workplace Violence Policy describes a role for the Law Department in the Threat Assessment Response Team. However, this is not an obligatory role and only occurs when the actual members of the Threat Assessment Response Team seek such guidance or assistance. Plaintiff neglects to mention the description in the Workplace Violence Policy about the Threat Assessment Response Team which states, "[t]his team will consist of *appropriately selected representatives* from the Employee Assistance Program, Human Resources, Labor Relations, Police, Employee Relations, Health Services, and Law Departments." Ex. 4 at 3. In most instances only a few departments are represented on the committee. Furthermore, in most instances, including this one, the Threat Assessment Response Team does not contact the Law Department or seek its advice relative to the appropriate response to Plaintiff's Letters from Hell or his medical disqualification. Ex. 3, Affidavit of Melissa Rogers.

---

[5]    BLE Rule 25 states that a locomotive engineer may be removed from service if it is obvious that he is

Then Plaintiff launches off into a series of allegations that are mere flights of fancy and belong in a novel, not a legal memorandum. First, he erroneously states that the Labor Relations Department works as a subdivision of the Law Department. It has no reporting authority to the Law Department. The Labor Relations Department reports to the Vice-President of Labor Relations and the Law Department reports to the General Counsel. Therefore his claim that the Labor Relations Department's duties are coordinated by the Law Department is equally false and would come as a surprise to the employees of Labor Relations. Plaintiff goes on to say that it is "only natural that the law department would be directing TART activities." Not only is it not natural for the Law Department to undertake such activities, it is simply untrue. Ex. 3.

Plaintiff has no basis to attribute the writings of Mr. DePhillips to the Law Department. Having worked for many years on labor and disciplinary matters, Mr. DePhillips was fully capable of having his own thoughts and expressing them himself.

Plaintiff's references to Law Department considerations regarding "reasonable accommodation" are false as shown by the fact that Plaintiff never claimed to be disabled and therefore no one from Amtrak's management ever addressed that concept prior to Plaintiff's own bizarre mistaken references to reasonable accommodation with respect to his fitness for duty exam scheduled with Dr. Vasile. Again, he is wrong, and has no basis for his absurd claim on page 4 and 5 that the so-called "plan" of entrapment was set up through the Law Department's advice. Subsequently, Plaintiff argues that Amtrak had to follow policy number PERS-19 with regard to requirements to undergo fitness for duty exams. However, as he himself admits, this policy applies only to drug and alcohol issue.

On page 8, after an interlude of irrelevant commentary on some of his literary theories,

---

physically or mentally impaired in a way that affects his service".

Plaintiff again engages in fictional writing. First, he states that the TART team didn't see a threat and so were therefore looking to fabricate a medical condition. However, it is not the province of the Threat Assessment Response Team members to decide if they feel threatened, but to act upon the fears of the employee who files the Workplace Violence report. Plaintiff then goes on to say, with no basis, that "Mr. DeModena wanted the Plaintiff charged with insubordination." Where? When? What documents or testimony support this assumption? There are none. He then speculates about what the "attorney member" (there was none) would have done. Outrageously, Plaintiff states that "Dr. Pinsky was in constant contact with the Law Department so they could reassure him that he was doing the right thing." Again there is no evidentiary support for this claim and there can be none because no such communications ever took place until late May or early June 2001.

Plaintiff's writings about Dr. Pinsky's alleged waiver of the attorney-client privilege have already been addressed. Nonetheless, Plaintiff then goes further, again without basis, to declare that "Dr. Pinsky routinely referred communications regarding his disqualification of Plaintiff to the Law Department." Plaintiff Memorandum at 9. Plaintiff then misstates Dr. Pinsky's testimony at the Amtrak hearing which never indicated "that he was aware of an intention to procure an order for a medical inquiry…." Dr. Pinsky also did not ever state there was "medical basis to conclude Plaintiff was suffering from 'Bi-polar Disorder or Personality Disorder." Rather, Dr. Pinsky testified that the Letters from Hell raised questions about whether Plaintiff was suffering from a severe psychiatric disorder. Dr. Pinsky then states "I'm talking about such things as personality disorder, bi-polar disorder, etc." Ex. 5, Amtrak Hearing transcript at 386.

Plaintiff then reaches a new low in scandalous statements when he declares at the bottom of page 10 that "Dr. Pinsky fraudulently disqualified Plaintiff merely to satisfy request from the

TART." He continues to make the same groundless allegations that attorneys in the Law Department deliberately breached their ethical obligations by advising Dr. Pinsky to undertake wrongful conduct that could jeopardize his license and medical career (as well as their own). Shortly thereafter, Plaintiff provides another offensive conclusory statement that Amtrak had a scheme to "medically disqualify, coerce, intimidate and ultimately terminate the Plaintiff."

In the next paragraph of his argument, Plaintiff exceeds all boundaries of decency and common sense when he makes unsupported allegations that the Law Department deliberately intended to defame him and violate a number of federal and Pennsylvania statutes. He goes on to attempt to smear the integrity of the contract hearing officer, Deborah Gaines, an experienced attorney with ethical obligations of her own, by declaring that she rigged an outcome adverse to him because she was instructed to do so by the Law Department. Plaintiff Memorandum at 11.

Not content with defaming Ms. Gaines, in the next section of his Memorandum, entitled Applicable Law, Plaintiff tries to destroy the reputation of Dr. Pinsky by alleging, again without evidence, that Dr. Pinsky violated a Pennsylvania medical statute and his own ethical obligations as a physician because he "willfully harassed, abused and intimidated a patient." Plaintiff Memorandum at 13. Dr. Pinsky never met, treated, or diagnosed Plaintiff. Hence, it is impossible to conceive how he could have done what Plaintiff alleges.

Based upon these frivolous and empty allegations, Plaintiff points to the crime-fraud exception to the attorney-client privilege. Amtrak recognizes this doctrine which addresses instances when serious ethical violations have been proven. Yet there has been no evidence whatsoever here, let alone the amount of proof that would be necessary to take such draconian measures against a party and its counsel.

Likewise, Plaintiff tries to obtain *in camera* review of Amtrak's privileged documents.

He cites to U.S. v. Zolin in support of his argument.  491 U.S. 554, 574-575 (1989).  This case allows *in camera* review to prove the crime-fraud exception to the attorney-client privilege, but only when a party "present[s] evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability."  Id.  Since Plaintiff has relied completely upon conjecture and surmise to support this wild allegation of fraudulent activity by Amtrak and its law department, he has failed to meet his evidentiary burden.

Plaintiff's appears to include one final argument suggesting that the attorney-client privilege does not pertain to Amtrak's Law Department in this instance because the communications at issue were allegedly about business, not legal matters.  Beyond this self-serving conclusory statement, Plaintiff provides no evidence or even legal argument for how this doctrine applies to the facts in this case.  In fact he cannot do so, because the attorneys in the Law Department, rarely, if ever, provide business advice to Amtrak's Medical Department.  Ex. 3, Affidavit of Melissa Rogers.  Id.

Moreover, all of the Law Department's communications with other Amtrak departments in this matter were conducted in anticipation of litigation after Plaintiff's medical disqualification and only after communications by Plaintiff raised legal issues and sought legal opinions.  Id.  These communications and Plaintiff's defiance against Amtrak's orders to undergo a fitness for duty exam implied that Plaintiff might bring a law suit against Amtrak, as he did early in 2002. See Ex. 6, Plaintiff's letter to Dr. Pinsky of May 24, 2001.  In these circumstances, any advice by Amtrak's Law Department was entirely legal in nature and wholly appropriate.  Hence, it is protected by the attorney-client privilege and as work done in anticipation of litigation.

With regard to Plaintiff's brief statement that Amtrak should provide a "greater explanation of their privilege log," Amtrak replies that such is not necessary.  Rather, in the face

of Plaintiff's reckless all-out assault on the integrity of Amtrak's Law Department, additional information about its activities and role in this matter was provided in the form of an affidavit of one of the Law Department's attorneys, Ms. Rogers. This definitively shows that communications to and from the Law Department relative to this matter consisted of legal advice presented in anticipation of litigation and is therefore protected by the core attorney-client privilege and work product doctrine. Any further detailing of the Law Department's communications in a privilege log would be unduly burdensome and not advance this litigation in any way.

In conclusion, whatever communications the Law Department's attorneys had about Plaintiff with Labor Relations or other departments after his medical disqualification consisted of legal advice prepared in anticipation of litigation and protected from disclosure by the attorney-client privilege.

WHEREFORE, Amtrak moves this Court to deny Plaintiff's Motion to Compel in its entirety and to provide any other relief it deems appropriate.

Respectfully submitted,
**DEFENDANT,**
**NATIONAL RAILROAD PASSENGER CORPORATION,**
By Its Attorneys,

DATED: September 27, 2005

s/Stephen E. Hughes
John A. Kiernan (BBO No. 271020)
Stephen E. Hughes (BBO No. 629644)
BONNER KIERNAN TREBACH & CROCIATA
One Liberty Square - 6th Floor
Boston, MA 02109
(617) 426-3900

**Certificate of Service**

I, Stephen E. Hughes, hereby certify that I have on September 27, 2005 served a true copy of the foregoing document by first class mail, postage prepaid, to:

Plaintiff (Pro Se):
Joseph T. Carmack
398 Columbus Ave., PMB 130
Boston, MA 02116-6008

s/Stephen E. Hughes
Stephen E. Hughes