UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Joseph T. Carmack | ) | Civil Action No. 03-12488-PBS |
| | ) | |
| Plaintiff, Pro Se | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| The National Railroad Passenger Corporation | ) | |
| | ) | |
| Defendant | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY AND REQUEST FOR IN CAMERA REVIEW OF ALLEGED PRIVILEGED COMMUNICATIONS**

Plaintiff Joseph T. Carmack ("Plaintiff") hereby offers memorandum in support of motion submitted to this Honorable Court on September 16, 2005 wherein Plaintiff moved for an order pursuant to Fed.R.Civ.P.37 compelling the Defendant National Railroad Passenger Corporation ("Defendant", "Amtrak" or "carrier") to provide full and proper responses to certain interrogatories and requests for documents propounded by Plaintiff and, likewise, wherein Plaintiff requested in camera review of internal corporate communications to Defendant Law Department during the years 2001 and 2002. As grounds for this motion Plaintiff has submitted that: (1)Defendant has been evasive in response to interrogatories and production of documents; (2) communications between Defendant's Medical Director and Law Department were waived; (3) Defendant's Law department was not in a position to represent employees individually; (4) and internal communications to Defendant's Law Department fall within

1

the exception to the attorney-client privilege for communications in furtherance of future illegal conduct.

**I. ARGUMENT RELATIVE TO INCOMPLETE RESPONSES.**

Plaintiff submitted argument and facts relative to Defendant's responses as part of motion filed September 16, 2005. Plaintiff is seeking full responses to interrogatories propounded upon Defendant. Plaintiff seeks complete responses to interrogatories 1, 2, 4, 5, 9, 10, 17 through 20, 21 and 24. With this memorandum, Plaintiff adds further objection to Defendants response to interrogatory No. 8. Interrogatory No. 8 requests information relative to university class projects of Defendant agent DeModena for which Mr. DeModena requested assistance from the Plaintiff. Plaintiff objects that Plaintiff has personal knowledge contradicting Defendant's response to interrogatory No. 8. Plaintiff states that Mr. DeModena did request assistance from Plaintiff for several university projects. Plaintiff argued relevance of information related to Mr. DeModena's school projects on August 31, 2005 before this Honorable Court. Defendant only responded concerning one of the projects, that which is related to the poem entitled "The Emperor of Ice Cream". Defendant claimed that Mr. DeModena no longer had access to document(s). Plaintiff objects that Defendant has not responded concerning the other projects, nor has Defendant accounted for the fate of the project relative to "The Emperor of Ice Cream". Plaintiff requires elaboration on the fate of the project in order to assess the validity of the claim.

Furthermore, Defendant was ordered to provide a complete index, the production of which was ordered by this Honorable Court, Defendant claims that Defendant's relevant policies and procedures manual has been produced. The index produced by Defendant is woefully inadequate. The index doesn't incorporated procedures from all departments. Defendant has yet to produce manuals for the Labor and Law departments or complete manuals on transportation.

**II. ARGUMENT RELATIVE TO PRODUCTION OF INTERNAL**

**COMMUNICATIONS TO DEFENDANT LAW DEPARTMENT.**

The initial occurrence driving the allegations in the complaint for this case involves a workplace violence report filed with the Defendant by the Plaintiff's Supervisor, Mr. Gerard DeModena, Division Road Foreman. Said report was created by the Defendant on or about April 11, 2001, *Exhibit A*. Plaintiff submits that evidence indicates that the workplace violence report was filed with an intent to discriminate on the basis of a disability. As evidence of said intent to discriminate, Plaintiff submits copy of an internal electronic mail letter dated April 11, 2001 wherein defendant Labor Relations manager, Lou DePhillips outlined a "scenario" for other Defendant supervisors and managers wherein Plaintiff would be ordered to undergo an "in-service psychiatric examination", with an eye towards intimidation and harassment of Plaintiff by means threats of insubordination that would lead to termination of the Plaintiff from his position as Locomotive Engineer, *Exhibit B*.

The scheme was outlined by Defendant's Labor Relations Manager in accordance with his role as a member of the Threat Assessment Response Team" or "TART", which is defined in defendant's Workplace Violence Policy on Page 7 which reads in part: "Provides advice and guidance on developing a course of action with regard to agreement covered employees..."; *Exhibit C, Page 7, Defendant Workplace Violence Policy.*

Defendant's Workplace Violence Policy also indicates that Defendant's Law Department participated in the development of the scheme. Defendant's Workplace Violence Policy prescribes a role for Defendant's Law Department as follows:

- Provides guidance in identifying and resolving policy or legal issues.
- assists Human Resources, Labor Relations or Supervisors in effecting personnel or disciplinary actions
- Ensures that decisions are made at the appropriate level.
- Provides advice and counsel to managers or supervisors who are making decisions.

- Attorney will be assigned to the local TART

Even without this outline of structure, contact with the Law Department would be undeniable. The Labor Relations Department works as a subdivision of the Law Department. The Labor Relations Department functions as the carrier's "representative" in accordance with dispute resolution requirements of *The Railway Labor Act, 45 U.S.C s. 151 et seq*. The Labor Relations Department's duties are coordinated by the Law Department in order to effect compliance with the Railway Labor Act. Similarly, the Law Department coordinates duties of Defendant's Human Resources department to effect compliance with Employment Law. Therefore, it is only natural that the law department would be directing TART activities. The Law Department "assists Human Resources, Labor Relations or Supervisors in effecting personnel or disciplinary actions" on a day to day basis. That is it's central purpose. Given, as indicated by the Workplace Violence Policy, that it is undeniable that the Law Department participated as a member of the TART in application of the workplace violent complaint filed against the Plaintiff, it is obvious that communications to that department were made regarding the plan to require Plaintiff to undergo an examination and inquiry into the nature of the psychiatric condition that Defendant TART perceived to be "troubling" and which gave rise to their "concerns" for Plaintiff's "own well being and, by extension, the traveling public", *Exhibit B*. The inclusion this phrase about "concerns" prepares for a "direct threat" defense which was obviously ensured by the Law department. The law department would also have ensured that the TART accounted for 'reasonable accommodation'. But the TART intended to make reasonable accommodation impossible. The tart was prepared to treat any request for accommodation as a disciplinary offense resulting in termination: "The consequence of the employee's refusal to cooperate could be your issuance of a direct order to undergo the exam and a continued refusal would be grounds for gross insubordination and a removal from service". The TART's course of action was to feign "concern" for "well-being" with an eye towards intimidation and harassment of Plaintiff

4

by means of threats of a charge of "gross insubordination" that would lead to termination of the Plaintiff from his position as Locomotive Engineer, *Exhibit B*.  There can be no doubt that this plan was set up through advice from the Law Department, even if it was simply through discreet communications from Philadelphia to Mr. DePhillips.  Policy provides that "an Attorney will be assigned to the local TART", *Exhibit C, page 7*.

    The problem with Mr. DePhillips "scenario" is that the TART couldn't carry it out.  Defendant policy wouldn't permit it.  To order a medical examination, the TART would need to approach the Medical Director, Dr. Pinsky.  The Medical Director's Role as defined by the Workplace Violence Policy is to provide "guidance on fitness-for-duty evaluations and analyzes documentation for medical-related issues".  The TART's "concerns" about Plaintiff's "well-being" required a medical practitioner to assess "fitness-for-duty" if Plaintiff was going to be directed to undergo an "in-service psychiatric examination".  In order for the TART to effect the Medical Director's "guidance on fitness-for-duty", TART's concern for the Plaintiff's "well-being" had to meet the "criteria" for "fitness-for-duty" as it is defined in the Defendant's Drug and Alcohol policy:

> An Amtrak supervisor may direct an employee to undergo a fitness-for-duty physical examination if there is a basis to doubt whether the employee's physical condition or mental state will allow him/her to perform his/her job safely.  The supervisor's decision must be documented and based on specific contemporaneous articulable observations that an employee may not be able to perform his/her duty safely.  The recommending supervisor must obtain concurrence from Amtrak's Regional Medical Director prior to asking the employee to undergo testing. *Exhibit D.*

The sole observation articulated by the TART in Exhibit B, which the Medical Director claimed entailed the observations required by this rule, was that Plaintiff's "letters are troubling".  TART member had faxed to the Medical Department a few imaginative

5

satirical pages from a union discussion that Plaintiff has referred to in the complaint as the Rail Satire. It is not within the scope of this motion to do an exhaustive analysis of constitutional freedom of expression and the TART's or Defendant's observations regarding these documents. Suffice it to say that any artful and fictional creative device is going to open up the most subjective interpretations from which, Plaintiff has asserted, Plaintiff is protected by the First Amendment of the Constitution of the United States.

  Plaintiff submits that a fiction, drama or any creative artifact, has its own reality utterly imagined within the limits of its medium. However, its application of meaning to such an artifact will always be problematic, particularly when the devices are literary, as in this case. The literary devices (metaphor, simile, allegory or satire) gain their power from being totally isolated from the real. At the same time, they heighten the imagination's infusion into the real through parallels. As an example, I might say "an employee will be 'axed'", but through the evolution of the vernacular application of employment context to this word, the metaphorical value of this usage would be diluted and the phrase would be interpreted to mean an employee would be terminated from his position of employment. Nonetheless, a TART team or supervisor may decide to seize upon such usage and attempt to choose a more literal interpretation of the use of the word ax. The value of a literary device is measured by suspension of belief and allusion to the unreal. The greater the distance between the fantastic and the real, maintained through a unified and applicable parallel within a literary device, the more powerful is the imagination's infusion of inspiration into the real as a consideration of possibility or conjecture. But, inspiration is all that is effected. A subjective interpretation is not real. All that is engendered through a creative literary device is a possibility that is perceived through the imagination in the subjective response of the individual. An employee sees his boss as evil, and empowers his sense of moral indignation with connotations of a violent ax murderer. A supervisor sees himself as a powerful heroic warrior with a battle ax who knocks out a threat to the safety and tranquillity of his community. Neither would really expect

6

to see or commit any real violence; they only imagine it. But, when they use the violent imagery, they transmute and sublimate violent human emotion into accepted cultural norm. Inspiration thrives in its contemplation of an imaginative vision existing only in the mind of the beholder. These connotations are isolated from any truth. But they thrive as creative inspiration and considerations of possibility and conjecture. But, it is only the imagined. Imagination or inspiration are never real or true. That is why the Rail Satire is so open to the TART's attack. The TART can use their own imaginations to assign the parallel meaning to the Rail Satire that is most satisfying to their subjective desires. But their conjectures will never be fulfilled. They will never be true. They are never real. The TART assigned a meaning to the Rail Satire that satisfied their own desires and they perceived a mental instability that was incompatible with engine service in Amtrak Commuter Rail. They asked Medical Director to do the same.

But the Amtrak Medical Director, Dr. Timothy Pinsky saw so much more than the TART saw. The TART only saw a "coward" and "concern" for "well-being" in the Rail Satire. Dr. Pinsky, Defendant's medical director, saw monsters and fiery demons blasting out of a lake of fire and leaving darkness and devastation in their wake:

> Okay. Well when someone identifies themselves as Lucifer, the Prince of Darkness, identifies documentation in a workplace as Letters from Hell, and those are just a couple of examples. I'll give you another one, all answers should be sent to Institute of Devastation Awareness, these are all very concerning types of documentation as to whether or not this individual has a severe psychiatric disorder that presents a threat to not only his co-workers, but to himself and the traveling public. I'm talking about such things as personality disorder, bi-bolar disorder, etc. *Exhibit E, transcript from internal investigation, Page 386.*

7

The TART team didn't see a threat, but they were looking for a medical condition and Dr. Pinsky gave them one.

Mr. DePhillips didn't see a discipline "scenario", he saw a "coward" and had "concern" about the "well-being" of the traveling public. Captain Smith, the Amtrak Police Captain, "didn't see a threat, DeModena did";

> I didn't say it was threatening. Mr. DeModena did...DeModena perceived it as a threat...It might not be a threat to me or other people; but that person perceives it as a threat, then I have to act on good faith. *Exhibit E. page 144 and 146.*

There was no threat, but Mr. DeModena felt threatened, so the TART had to act. There was no "disciplinary scenario", but there was a concern for Mr. DeModena's "well-being" and Mr. DeModena wanted the Plaintiff charged with insubordination. What was the TART to do?

According to Suzanne Allan, the Human Resources member of the TART team, the case needed to be handled by "a professional medical person". They needed a psychiatric examination, but they "wouldn't perceive a medical condition" because they weren't authorized to perceive a medical condition. So they sent the case to a medical professional who could find them the condition they were looking for:

> We felt that in our judgment this instance information needed to be handled by a professional medical person and that it was our judgment that the best thing to do was to contact Amtrak medical department and have the medical department decide how the situation should be handled and make recommendations....
>
> Well we wouldn't perceive medical conditions because we're not medical professionals...
>
> It was in our best judgment that based on the material we had that this was a situation that we needed to forward to Amtrak's medical department so that Dr. Pinsky would be able to make a determination of how to proceed, *Exhibit E. Page 237.*

8

It was not the TART's role to perceive the medical condition that they were looking for, so they forwarded the materials to Dr. Pinsky. That was the appropriate person to find the medical condition for them. Presumably, he had the credentials to give them what they needed. The Attorney member advising the TART would have made sure that they did that. The attorney "ensures that decisions are made at the appropriate level". Mr. DePhillips didn't "decide" to have Plaintiff undergo and "in-service psychiatric examination", he just wanted Plaintiff to undergo one. The attorney would have ensured that DePhillips got the right person to "decide" on it.

In accordance with the protocols outlined above in the various policies, Ms. Suzanne Allan approached the Medical Department with Mr. DePhillips "scenario" e-mail. Ms. Marianne Letterio, the Medical Manager told Dr. Pinsky what Mr. DePhillips wanted, and Dr. Pinsky gave the TART what they wanted *Exhibit F.* Dr. Pinsky went further though, he medically disqualified the Plaintiff. In the meantime, Dr. Pinsky was in constant contact with the Law department so they could reassure him that he was doing the right thing.

During internal investigation of the charges applied against the Plaintiff as part of the scheme engaged by the TART, Dr. Pinsky reported some of his communications with the Law Department and thereby waived privilege regarding those communications, pages 107 and 342 of Exhibit E (select pages from investigation transcript relevant to this motion). Dr. Pinsky sought advice from the Law Department concerning letters of Plaintiff requesting Plaintiff's medical file and basis for disqualification among other issues. Dr. Pinsky routinely referred communications regarding his disqualification of Plaintiff to the Law Department (Exhibit G). (EXHIBIT E p 107)

As part of the scheme by which Defendant coerced and terminated the Plaintiff, the TART team had consulted the Medical Director in order to use his credentials to label Plaintiff with a medical condition that would justify disqualification from service as a Locomotive Engineer, Exhibit B. Ms. Suzanne Allan, Manager of Human resources was

9

responsible for forwarding Mr. DePhillip's "scenario" e-mail to the Medical Department (Exhibit A) and testified to the TART's intentions in the investigation, Exhibit E, pages 233 and 237. Dr. Pinsky made it clear that he was aware of the intention to procure an order for a medical inquiry of the Plaintiff (Ibid., pages 127-128) and he justified his involvement by declaring that there was medical basis to conclude Plaintiff was suffering from ""Bi-polar Disorder or Personality Disorder" Ibid., page 386. When Plaintiff and his union representative requested that Plaintiff's physician be part of the evaluation, Dr. Pinsky refused to permit it and stated he had "no obligation" to contact her, Ibid.. page 388.

Most of the activities outlined in the complaint relative to discrimination claims revolve around actions and 'professional' opinion of Dr. Pinsky. As indicated above, Dr. Pinsky consulted the Law Department for guidance in those activities. He contacted the Law Department for advice regarding Plaintiff's letters and reported that advice in the internal investigation. In spite of Dr. Pinsky's attempt to call the Medical Manager to account for his own failure to supply the Plaintiff with his medical record file, Dr. Pinsky did not ensure that the Plaintiff received the file (after multiple requests over two months, *Exhibit G*) and the Medical Manager, Nurse Marianne Letterio, resigned from her position during the period at point, *Exhibit E, page 391*.

Ultimately, Dr. Pinsky was responsible for the medical disqualification of the Plaintiff and Mr. O'Malley, who ordered Plaintiff to hold himself from service, admitted that O'Malley himself knew of no basis to disqualify the Plaintiff nor charge the Plaintiff with workplace violence, *Exhibit E, Pages 58 through 60 and pages 195 through 201*. As indicated above, Dr. Pinsky consulted with the Law Department for direction regarding Plaintiff and he routinely referred documents from Plaintiff to the Law Department. Plaintiff submits that Dr. Pinsky never had a medical basis for the disqualification and Dr. Pinsky fraudulently disqualified Plaintiff merely to satisfy request from the TART. Dr. Pinsky based his decision to disqualify Plaintiff on advice from the

Law Department. Then, when pressured by Plaintiff and his union, Dr. Pinsky attempted to justify his decision on his own subjective assessment of the Plaintiff's writings and he fraudulently assessed "bi-polar disorder or personality disorder" and he arbitrarily based the disqualification on perception of such diagnoses. Again, Plaintiff submits Dr. Pinsky based his decision on advice from Defendant's Law Department. Plaintiff submits that the privilege regarding communications between Dr. Pinsky and Defendant's Law Department regarding Plaintiff have been waived. . Plaintiff requires a clear description all Dr. Pinsky's communications to the Law Department in order to adequately assess the application of the attorney-client privilege to the Defendant's scheme to medically disqualify, coerce, intimidate and ultimately terminate the Plaintiff.

The Plaintiff also denies that Attorney-Client privilege does not apply to communications regarding the communications regarding his person involving the Amtrak Law department. The communications were made with an intent to defame the Plaintiff and violate the Americans with Disabilities Act, Unfair Labor Practice, confidentiality laws, Pennsylvania medical statutes and the Plaintiffs right to free speech. As such, the communications are not protected. This claim likewise applies to communication between the Hearing officer Deborah Gaines. Ms. Gaines based her decisions on activities of the TART and testimony of Dr. Pinsky. She was instructed to do so by the Defendant's Law Department with whom she contracted to judge the Plaintiff in accordance with the Railway Labor Act and the Collective Bargaining Agreement, *Exhibit E, P. 281.*

### III. APPLICABLE LEGAL STANDARD.

As grounds for his discovery requests, Plaintiff relies on *Fed.Rule Civ. Proc. 26 (b) (1)* permitting "discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party... that is "reasonably calculated to lead to the discovery of admissible evidence." Furthermore, Plaintiff submits that evidence cited above shows a substantial need for privileged materials including all communications "prepared in

11

anticipation of litigation or for trial by or for [the Defendant]or by or for [the Defendant's] representative", *Fed. R. Civ. Proc. 26 (b)(3)*.. As further grounds for this request for complete answers submits, as indicated above, that Defendant's responses to certain interrogatories and requests for documents are evasive and "to be treated as a failure to disclose, answer, or respond, *Fed. R. Civ. Proc. 37 (a)(3)*.

In addition, as indicated above, Defendant's expressed intent to use a presumed psychological condition ("Bi-polar Disorder or Personality Disorder) as basis to medically disqualify Plaintiff. Defendant has intentionally, arbitrarily and capriciously medically disqualified Plaintiff because of the perceived as disability which presents direct threat to "his co-workers,...himself and the traveling public". *42 U.S.C 12112 (a)*; Defendant has intentionally "limit(ed), segregat(ed) or classifi(ed)" Plaintiff "because of the disability" *42 U.S.C 12112(b)(3)(A)*; and Defendant has used qualification standards designed to "screen out an individual with a disability", *42 U.S.C 12112(b)(6)*. Wherein Defendant has intended a charge of insubordination, Defendant has precluded reasonable accommodation *42 U.S.C 12112(b)(5)* and coerced intimidated and threatened Plaintiff in the enjoyment of "right protected by" the Americans with Disabilities Act *42 U.SC. 12203(b)*.

Dr. Pinsky was also aided by the Amtrak Law Department in an intent to violate Pennsylvania medical standards. On information and belief resulting from communication with the Pennsylvania Board of Medicine, Dr. Pinsky is registered in Pennsylvania as an Osteopath. This being the case, Plaintiff submits that Dr. Pinsky's agreement to disqualify Plaintiff violates Pennsylvania Osteopathic and Medical regulations. In accordance with the *Osteopathic Medical Practice Act (Act 261 of 1978) of the Commonwealth of Pennsylvania Section 2.*, Amtrak's Medical Department qualifies as a "health care facility" in that it is a "corporation medical department()". As the physician on duty Dr. Pinsky has made "misleading, deceptive, untrue or fraudulent representations in the practice of osteopathic medicine". *Osteopathic Medical Practice*

12

*Act (Act 261 of 1978) of the Commonwealth of Pennsylvania Section, Section 15* and otherwise "practice(ed) medicine fraudulently or with reckless indifference to the interests of a patient", *PC 49 s. 16.61(a)(6)*, "Willfully harass(ed), abus(ed) and Intimidat(ed) a patient", *PC 49 s. 16.61(a)16)*, and "Fail(ed) to make available to the patient...upon patient's request, the medical record or a copy of the medical record relating to the patient which is in the possession or under the control of the physician", *PC 49 s. 16.61(a)(18)*. Wherein Dr. Pinsky has made a psychological assessment of Plaintiff that was held out by the Defendant as sound and qualified psychiatric medical advice, the Defendant and Dr. Pinsky have violated the *Medical Practice Act of the Commonwealth of Pennsylvania, ACT 112 of 1985, Section 21. Acts outside non-medical doctor license or certificate (c) limitation on providing services.* :

> nothing herein shall be construed as authorizing a health care practitioner or technician to perform any medical service which is not within the scope of that person's practice, as defined by the practitioner's licensing act under which that person is licensed, certified or registered.

(Applicable Pennsylvania Code and the Medical Practice Act of the Commonwealth of Pennsylvania are submitted as *Exhibit H)*. The evidence shows Dr. Pinsky was aided and abetted by the Amtrak Law Department with these activities. The Defendant Law Department was not in a position to advise Dr. Pinsky as a medical practitioner, nor were they in a position to advice Ms. Deborah Gaines as an independent contracting attorney.

Given the evidence these activities, the Lawyer Client privilege doesn't apply:

> because of the policy to foster legitimate legal services, advice about how to commit crimes or frauds would not be privileged... Similarly, attorneys involved in activities for a corporation of a "business" as opposed to "professional legal" nature, frequently find that the communication made pursuant thereto are held not privileged", *Evidence in a Nutshell*, Paul F. Rothstein, et al., referring to Uniform Rules.

Although *Fed.R.Civ.Proc. 26 (c)(3)* explicitly protects the attorney-client privilege and work product, the privilege does not apply to the situation cited above. The privilege "applies only where necessary to achieve its purpose.", *Fisher v. United States, 425 U. S. 391 (1976)*. The Privilege applies to events occurring prior to consultation with an attorney. As indicated above, the Defendant Law Department participated in the occurrences and transactions alleged in this case. Therefore, the purpose of the privilege would not apply. The privilege "ceas[es] to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing." *8 Wigmore, s. 2298, p. 573.* Quoted from *United States v. Zolin, 491 U.S. 554, 562, 563.*

    Plaintiff hereby claims access to all communications between the Amtrak Law Department and other personnel regarding Plaintiff's person occurring during the years 2001 and 2002. As grounds therefor, Plaintiff submits right to obtain "documents and tangible things...prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)...upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means, *Fed.R.Civ.Proc. 26(b)(3)*. Plaintiff submits contents of this motion constitute such a showing.

    Plaintiff, prays that this Honorable Court will fashion an order permitting in camera review to determine application of privilege to materials from Amtrak Law Department requested in this motion, including work product created in anticipation of the commission of the violations related in this motion. As grounds for this motion, Plaintiff submits that an "*in camera* review may be used to determine whether allegedly privileged attorney client communications fall with in the crime-fraud exception" and that "evidence to support a reasonable belief that *in camera* review may yield evidence that

establishes the exception's applicability" is constituted in Exhibits submitted with this motion. *United States v. Zolin*, 491 U.S. 554, 574, 575, Exhibit I.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion in its entirety and order the defendant to comply with discovery and provide full and proper answers to Interrogatory Nos. 1, 2, 4, 5, 9, 10, 17 through 20, 21 and 24 and provide full and proper response to Requests for Production of Documents 1, 2 and 7, including greater explanation of their privilege log, and any other relief this Court may find equitable under the circumstances, including an in camera review of communications to Defendant's Law Department during the years 2001 and 2002.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Certification:**
The provisions of LR 37.1
have been complied with.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

September 20, 2005

**Respectfully submitted,**

*[signature]*
Joseph T. Carmack
Plaintiff, Pro Se
398 Columbus Ave. PMB 130
Boston, MA 02116-6008
Work: 617/727-2310 ext.7045
Pager w/voice mail: 617/798-6466
Home: 617/536-0772

**Certificate of Service**

I, Joseph T. Carmack, hereby certify that I have on September 20, 2005 served a true copy of the foregoing document by First Class U.S. Mail to Stephen A Hughes, Attorney for the Defendant, National Railroad Passenger Corporations at One Liberty Square - 6th Floor, Boston, MA 02109.
DATED: September 20, 2005   *[signature]*
Joseph T. Carmack
Plaintiff, Pro Se
398 Columbus Ave, PMB 130
Boston, MA 02116-6008
Work: 617/727-2310 ext. 7045
Home: 617/536-0772

15