Exhibit E

| | |
|---|---|
| O'Malley: | I'd have to check back here, I believe it was May 4th, but; he sent me a notification on May 3rd, I removed him on May 4th. |
| Prone: | You removed him from service based on the fact that Dr. Pinsky medically disqualified? |
| O'Malley: | That's correct. |
| Prone: | Did you receive any correspondence from Mr. Carmack's physician, subsequent to Dr. Pinsky medically disqualifying Mr. Carmack? |
| O'Malley: | Not to my knowledge. |
| Prone: | Did the Company ever inquire that Mr. Carmack have a personal physician? |
| O'Malley: | I can't speak for the medical department, I didn't inquire. |
| Prone: | And am I correct in saying that no one here knows who picked Dr. Basilli? |
| O'Malley: | I don't know who picked Dr. Basilli. |
| Prone: | Would you agree that Rule 25 was properly adhered to without Mr. Carmack's personal physician even being involved? |
| O'Malley: | Yes I would. |
| Prone: | You would? |
| O'Malley: | Yes. |
| Prone: | Don't you agree that, that Dr. Carmack's physician was bi-passed since the Carrier |
| Gaines: | I'm sorry, can you I didn't understand that question. |
| Rae: | I was just going to raise an objection to it. |
| Gaines: | You named Dr. Carmack. |
| Prone: | Mr. Carmack, I'm sorry. Who is supposed to determine an engineer's fitness for duty and that decision according to, I'll just phrase it as a question. I'm sorry, Ms. Hearing Officer. Who is the doctor that is supposed to determine employees fitness for duty? |

O'Malley: I believe it's Amtrak's Medical Director.

Prone: It is?

O'Malley: Yeah

Prone: Are you sure of that?

Rae: Objection, Mr. O'Malley's answered the question twice. I don't think he's going to get a different answer the third time.

Gaines: Keep going.

Prone: Mr. O'Malley, I'm going to show you Rule 25. I'd like for you to read the underlined portion into the record, please. This is the cover, in case you're interested, Rule 25.

O'Malley: Okay, this is Rule 25.

Rae: Objection. This has been read into the record already by Mr. O'Malley; and to ask him to do it again I think is unnecessary.

Gaines: Just to keep the flow, go ahead and when the reading gets too much, I'll let you know.

O'Malley: This is BLE Rule 25. Physical re-examination, paragraph B. Beginning with the second sentence. Passenger engineers held out of service by the Corporation because they are medically unable to perform services may have an examination by a doctor of their own choosing without expense to the Corporation. In case of disagreement on the passenger engineer's fitness to work, the two doctors will select a third doctor who is a specialist in the medical area involved and the decision of the majority of the three as to the passenger engineer's fitness will be filed.

Prone: Okay, that's fine. I'll take that back now. To your knowledge, was there ever a third neutral doctor selected to determine engineer Carmack's fitness for duty?

O'Malley: Not to my knowledge.

Prone: Who made the determination that it was obvious that engineer Carmack was medically unable to perform service?

O'Malley: Dr. Pinsky, Amtrak's Medical Director sent me an email that justified being, justified Mr. Carmack being deemed medically disqualified?

Prone: And what was that based on? Whose complaint? Whose testimony?

Rae: That seems like a question that would be, should be asked of Dr. Pinsky; isn't that what we're, we heard from the Hearing Officer that Dr. Pinsky will be compelled to testify?

Prone: It's very important to me.

Gaines: I'm not so sure. Dr. Pinsky made the determination ultimately to keep him out of service, but your question is really whose, who made the complaint is the question.

Prone: Do you know who made the complaint?

O'Malley: Dr. Pinsky reviewed documents written by Mr. Carmack and based on that, deemed him to be medically disqualified.

Prone: Who took exception to the alleged documents that were circulating to get the Carrier physician involved?

O'Malley: Mr. DeModena raised concerns about the writings.

Prone: And who is Mr. DeModena?

O'Malley: He's the Division Road Foreman.

Prone: Is he Mr. Carmack's direct supervisor?

O'Malley: Yes he is.

Prone: Ms. Hearing Officer, I think you maybe better you may understand more now why I consider Mr. DeModena.

Gaines: I do, but you know by the same token, Carrier grieves the issue that disagreement also runs the, you know there's the work rule work now grieve later; and he had the ability to grieve this, so I'm I am not going to expand it too far beyond the charge of insubordination so I do understand but we'll go on; but I'm not going to allow it to become over-extensive in you know where the charges go. I mean they could be for all we know, I mean it can be an unjustified act, based upon reasonable you know, in other words it maybe it was

| | |
|---|---|
| Pinsky: | No, I don't think he said that particular statement? |
| Prone: | But you're not sure, right? |
| Pinsky: | Well looking at my notes, I don't see that document that he said, so I conclude that he did not. |
| Prone: | Do you write, did you write everything down that he said? |
| Pinsky: | Pretty much. |
| Prone: | You want to answer your phone? |
| Pinsky: | Not mine. |
| Prone: | Okay. Have you ever personally met Engineer Carmack? |
| Pinsky: | No, I have not. |
| Prone: | Have you ever spoken to him? |
| Pinsky: | I don't believe so. |
| Prone: | Has he ever tried to contact you? |
| Pinsky: | He's written me some letters. |
| Prone: | Has he ever tried to call you? |
| Pinsky: | That I don't recall. |
| Prone: | Did you ever answer his letters? |
| Pinsky: | Not personally. |
| Prone: | Why not? |
| Pinsky: | Well I referred his letter, at least one of them I can recall to the legal department; and they advised me not to. |
| Prone: | Did you know that Engineer Carmack is a student of Shakespeare? |
| Pinsky: | No I'm not aware of that. |
| Prone: | And that the play that he wrote was nothing more than a satirical parody of the play, Hamlet? |

Page 107 of 440
Investigation No. 01-049

Prone: Did he fax them to you?

Smith: I don't recall.

Prone: Wouldn't, wouldn't you recall if someone faxed these documents to yourself?

Rae: Objection, the question's been answered.

Prone: What were the documents, do you know?

Smith: It revolved around writing by Mr. Carmack concerning Shakespeare, I believe and he changed names from Shakespeare's play to Amtrak personnel.

Prone: Was the did certain people play Shakespearean characters, is that what you're trying to say?

Smith: Correct.

Prone: Alright, well, well what's so threatening about that?

Smith: I didn't say it was threatening. Mr. DeModena did.

Prone: But you are a member of the Threat Assessment Response Team?

Smith: That's correct.

Prone: Did you do an investigation as to whether this material was was worthy of a police investigation?

Smith: It was left up to Mr. DeModena to make that decision

Prone: Do you know what the role of the police department is?

Smith: Yes I do.

Prone: In, in the TART, in the Workplace Violence area?

Smith: Yes I do.

Prone: As far as PERS-42 goes?

Smith: Yes.

Smith: DeModena perceived it as a threat. And as perceive it, if anything is perceived as a threat of the person, a threat to that person; it might not be a threat to me or other people; but that person perceives it as a threat, then I have to act on good faith.

Prone: Did you conduct an investigation, into the writings? Did you ever call Engineer Carmack, or interview him?

Smith: No I didn't.

Prone: Do you think there was a potential for criminal conduct, or that Mr. DeModena was put in immediate harm, based on those writings?

Smith: No.

Prone: Captain Smith, do you know that the email that Dr. Pinsky got with these writings in Philadelphia, Medical Department, did not have your name on it; it only had Lou DePhillips and Suzanne Allan's name on it?

Smith: No I don't know that.

Prone: I don't have any further questions Ms. Hearing Officer.

Gaines: Any questions?

Rae: Did you not offer Mr. DeModena the opportunity to pursue these charges in a criminal court?

Smith: Yes we did.

Rae: And he declined, is that correct?

Smith: That's correct.

Rae: He preferred, he told you, did he tell you that he preferred that the TART team handle this locally?

Smith: He preferred that it got handled in-house, "in-house", not necessarily in the court system.

Rae: Okay, in-house, as opposed to court system. I, the, just a couple of questions, the PERS-42 requires the TART team to take action, is that correct?

Smith: That's correct.

| | |
|---|---|
| Gaines: | Would you like me to do it? Okay, did you testify, was your testimony on April 4, 2002, that the materials viewed by Dr. Pinsky come from a workplace violence report filed by Mr. DeModena? |
| O'Malley: | The letters and the writings that Mr. DeModena sent to that TART team and were what was forwarded to Dr. Pinsky. Yes. |
| Prone: | And how many pages did Mr. DeModena forward to Dr. Pinsky? |
| Rae: | Objection. Objection nobody, nobody here testified that Mr. DeModena sent anything, Mr. DeModena testified that that it was forwarded, is what the word said, not sent by Mr. DeModena; they were forwarded. |
| Prone: | I believe, Ms. Hearing Officer, I just believe Mr. O'Malley said that Mr. DeModena forwarded excerpts, or not excerpts, but materials to the TART team. |
| O'Malley: | the TART Team |
| Gaines: | Yes, the TART team. |
| O'Malley: | but not to Dr. Pinsky. |
| Prone: | Right. Do you happen to know what he sent to the TART team? |
| O'Malley: | No I don't. |
| Prone: | Guess. |
| O'Malley: | I'm not sure what exactly he sent to them. I, I, I have read a whole package that is what I assume he sent to them. |
| Prone: | Ms. Hearing Officer, can we show Mr. O'Malley Employee Exhibit 5? |
| Carmack: | E5 |
| Prone: | E5. |
| Gaines: | Here. |
| Prone: | Did you ever look at that package before? Have you ever seen |
| O'Malley: | Yes I've seen |

Gaines: Hold off for one second. Do you have to take that?

Rae: I don't have to take that.

Gaines: Continue.

Prone: And your answer to that question?

O'Malley: Yes, I have seen this package.

Prone: Do you happen to know if Mr. DeModena forwarded that entire package to the TART team?

O'Malley: I don't know, no, I do not.

Prone: Do you know how many pages the TART team forwarded to Dr. Pinsky?

O'Malley: No, I do not.

Prone: Do you happen to know if it was 40 pages or 5 pages?

Rae: Objection

Gaines: Sustained

Rae: He said he said he didn't know.

Prone: I'm sorry, you answered the question. Was the workplace violence complaint one in which Mr. DeModena complained that the conduct of another employee caused Mr. DeModena to fear for his personal safety?

O'Malley: Yes.

Prone: Who is Mr. DeModena's supervisor?

O'Malley: I am.

Prone: I have a copy of Amtrak Policy labeled PERS-42, entitled Workplace Violence. We've already entered this into Exhibit. Mr. O'Malley is PERS-42 Amtrak's Workplace Violence Policy?

O'Malley: Yes it is.

| | |
|---|---|
| Prone: | Mr. O'Malley, could you read from Page 5, PERS-42 and read from where it says, Role of Supervisor or Line Manager; and read it to the bottom of the page, please? |
| O'Malley: | Role of Supervisor or Line Manager. Do you want me to read the whole thing? |
| Prone: | Yep |
| O'Malley: | Attends the appropriate training courses offered by the Company on handling Workplace Violence. Depending on the type of situation, provides necessary intervention and responds to resolve the incident and ensure the safety of all employees. For further information, see attending page, Workplace Violence Supervisor Checklist. Makes an initial assessment of the incident (for example, is the situation under control, do employees have to be moved to a safer location, do you need police or Amtrak management immediately). Makes initial decision on course of action with regard to involved employees (for example, taking people out of service, separating employees, obtaining medical and/or EAP services, or initiating the appropriate counseling or discipline process, etc.) Notifies appropriate managers and resources for assistance in the resolvement of these matters. Documents incident investigation process and conclusion of the situation using workplace violence report form and forwards this form to the local TART. |
| Prone: | Thank you. |
| O'Malley: | Okay. |
| Prone: | Mr. O'Malley, did you provide necessary intervention and response to resolve the incident? |
| O'Malley: | I discussed the incident with Mr. DeModena and advised him to forward the information to the TART team. |
| Prone: | Did you ever employ the services of EAP? |
| O'Malley: | Did I? |
| Prone: | Yes |
| O'Malley: | No. |

Page 197 of 440
Investigation No. 01-049

Prone: Do you happen to know what level threat this was? What the Amtrak Police considered this?

O'Malley: No I don't.

Prone: Do you know it was a level 1 threat?

Rae: Objection. He just answered the question.

Gaines: Sustained.

Prone: Why wouldn't you know, as the line manager, what level of of workplace violence it was considered as?

O'Malley: The TART team did not report back to me on that.

Prone: How could you do your job if you didn't know what level it was? Because it was, aren't there certain parameters attached or certain courses of action to take at each level? As provided under PERS-42?

O'Malley: I considered it my job to advise Mr. DeModena to forward the material to the Amtrak TART team. Beyond that, the TART team did not refer back to me. They went in the other direction and referred it to Dr. Pinsky.

Prone: Did you make the initial decision on the course of action with regard to the involved employees? Strike that. I think he just answered that. Mr. O'Malley, did you document the incident, investigation process and conclusion of the situation, using the workplace violence report form?

O'Malley: No I did not.

Prone: And forward this form to the local TART?

O'Malley: No I did not.

Prone: Were you required to _____

Gaines: Answer the question.

O'Malley: I don't believe so.

Prone: Did you sign the Workplace Violence Report Form that was filed?

Page 198 of 440
Investigation No. 01-049

O'Malley: No.

Prone: Did any supervisor sign the Workplace Violence Report Form that was filed?

O'Malley: I didn't see the Workplace Violence Report Form that was filed.

Prone: Mr. O'Malley, would you please read from Page 9 of PERS-42; and read the first paragraph, under the heading <u>Workplace Violence Supervisor Checklist</u>?

O'Malley: Supervisors must take immediate steps to protect the safety to protect the safety of all employees when potential for immediate harm exists. Supervisors must gather as much information as possible when someone reports an incident in which a threat or violent act occurs. Supervisors must ask basic questions to obtain the facts and prepare a thorough report.

Prone: Thank you. Did you make out a report on this incident?

O'Malley: No I did not.

Prone: Why not?

O'Malley: I didn't feel that it was my place to make out the report on this incident.

Prone: Mr. O'Malley, did you assess that a potential for immediate harm existed?

O'Malley: No I did not.

Prone: Did you document an assessment that a potential for immediate harm exists?

O'Malley: No.

Prone: Mr. O'Malley, are there a number of questions listed on that page?

O'Malley: Yes there are.

Prone: Mr. O'Malley, is one of those questions listed, What was the threatening behavior?

O'Malley: Yes.

Page 199 of 440
Investigation No. 01-049

| | |
|---|---|
| Prone: | Did you document any threatening behavior? |
| O'Malley: | No I did not. |
| Prone: | Was one of the questions on the page, What did the person making the threat or engaging in violent behavior say happened? |
| O'Malley: | Yes. |
| Prone: | Was Mr. Carmack the person accused in the Workplace Violence Report? |
| O'Malley: | I didn't see the Workplace Violence report. |
| Prone: | What did Mr. Carmack say happened? |
| O'Malley: | I didn't talk to Mr. Carmack concerning this. |
| Prone: | Did you ask Mr. Carmack what happened? |
| O'Malley: | No I did not. |
| Prone: | Mr. O'Malley, can you read Paragraph D of the Supervisor Checklist on Page 9 of PERS-42? |
| O'Malley: | Paragraph D says a supervisor can report an incident by preparing a written document of everything that has been gathered by him/her during the investigation and evaluation of the incident. Be sure to identify each of the five basic question: Who, What, Where, When and How? Indicate all the actions taken, was employee taken out of service and disciplinary action initiated, was employee referred to the EAP, Health Services Department, etc.; indicate all notifications made to supervisors, department heads, police, EAP, Health Services, HR, etc. |
| Prone: | Mr. O'Malley, did you make the initial referral of the incident to the Health Services Department? |
| O'Malley: | No I did not. |
| Prone: | Who initially referred the incident to the Health Services Department? |
| Rae: | Objection. This has been answered by Mr. O'Malley more than once. |

Page 200 of 440
Investigation No. 01-049

| | |
|---|---|
| Gaines: | Just answer it one more time. |
| O'Malley: | The Amtrak TART team referred this to the Health Services Department. |
| Prone: | Did anyone else refer the incident to the Health Services Department? |
| O'Malley: | Not that I know of. |
| Prone: | Did you prepare a report, strike that, you've already answered that. Mr. O'Malley, will you read the last the last two paragraphs on page 13 of PERS-42? |
| O'Malley: | On Page 13? |
| Prone: | Yes, last two paragraphs. Starting with the Corporate TART… |
| O'Malley: | The Corporate TART will be responsible for monitor all workplace violence incidents and will ensure that Corporate policies and procedures have been followed and all necessary actions taken. If the TART discovers that Corporate policies and procedures have not been followed, they will notify the appropriate manager and recommend specific compliance actions. |
| Prone: | Did the TART ever question the methodology of all this material went down them without your involvement? |
| O'Malley: | They never questioned me. |
| Prone: | I have no further questions. |
| Carmack: | I have a couple of questions, do you want me to wait till after he's done? |
| Gaines: | No, why don't you continue. |
| Carmack: | Okay. I'm looking for Company Exhibit B, oh I got it here. Yeah, this is it. Got it. Mr. O'Malley, Company Exhibit B, is that the initial letter that advised you that I was deemed medically disqualified? |
| O'Malley: | Yes it is. |
| Carmack: | And what, what day is that dated? |
| O'Malley: | What was the date? |

|          | that this letter, this package of letters is is a combination of letters to the union, letters from the union, from the BLE, Amtrak, letters from Mr. Carmack company documents and a Hamlet play, is it fair to say that? |
|----------|---|
| Allan:   | It appears that that's what it is. |
| Prone:   | Do you happen to know if all of this material was forwarded to Dr. Pinsky for his review when he made his determination Engineer Carmack was medically disqualified? |
| Allan:   | I don't. |
| Prone:   | Don't you think it would be important to send him the entire package rather than edit the package and send him only a few pages? For his thorough understanding? |
| Rae:     | Objection, there's no indication that that anybody edited the package. |
| Gaines:  | What, I'm sorry, what what did you say about editing, I don't understand the objection. Answer my question, I'm not saying that you can't ask it. |
| Prone:   | I'm what I'm trying to ask, Ms. Hearing Officer, is if Ms. Allan thought it was important to send the entire package. |
| Gaines:  | Good question. Did |
| Prone:   | To Dr. Pinsky |
| Gaines:  | did you think it was important? |
| Prone:   | Rather than edit and selectively pick certain items from the package? |
| Allan:   | I don't have any recollection that that it was edited. This, I did not send it to Dr. Pinsky. Lou DePhillips did, to the best of my recollection. |
| Prone:   | Do you know that Dr. Pinsky only received five pages of this package? |
| Allan:   | I don't know what he received. I know that we made a determination that we we wanted this information to be sent for for interpretation or guidance to the professional medical folks at |

Page 233 of 440
Investigation No. 01-049

| | |
|---|---|
| Carmack: | That's fine. |
| Allan: | about what to what to where, you know what experts and who who the experts are in the company that need to handle issues. |
| Carmack: | Okay for levels, level 2, oh, before I do that, did you was any other, what did you decide, did you and Mr. DePhillips decide anything any action to take? |
| Allan: | Yes. We felt that in our judgment this instance information needed to be handled by a professional medical person and that it was our judgment that the best thing to do was to contact Amtrak medical department and have the medical department decide how the situation should be handled and make recommendations. |
| Carmack: | Okay, so is there something in the report that made made you consider that you would want to talk to the the you would need some type of medical professional to look at it? Was there kind of a medical situation that you perceived? Was there a medical condition that you perceived or anything like that? |
| Allan: | Well we wouldn't perceive medical conditions because we're not medical professionals. |
| Carmack: | No I'm not going to stop. Excuse me, I'm sorry |
| Prone: | I was. |
| Allan: | Let me just say, can I just answer it? |
| Carmack: | Yeah, please do, please do. |
| Allan: | It was in our best judgment that based on the material we had that this was a situation that we needed to forward to Amtrak's medical department so that Dr. Pinsky would be able to make a determination of how to proceed. |
| Gaines: | Okay, thank you. I'm going to stop the tape for one moment. Back on the record; and I'm going to hold you to it, Mr. Prone. Two final questions and then we will recall Ms. Allan a little bit later. |
| Prone: | Ms. Allan. |
| Allan: | yes |

Page 237 of 440
Investigation No. 01-049

Gaines: When did you create this publication?

Prone: 1991.

Gaines: Okay. Given its timeframe I don't find it relevant. In the subsequent years since 91 and since the you know what we in the workplace perceive as threatening are outlined procedurally. The time element alone I think makes this stale and that's my ruling on it.

Prone: Are you, are you

Gaines: I know what your objection is going to be.

Prone: I'm going to object, Ms. Hearing Officer, because I think it would show things in their proper prospective and I especially think it would show how Mr. DeModena chose to characterize Mr. Carmack's writing as threatening when in fact they weren't. They were very similar to my writings and no one felt threatened by them, although many many managers were included in my writings. Is that your final determination?

Gaines: Yeah it is.

Prone: Can I ask you one question? An administrative question?

Gaines: Sure.

Prone: Ms. Hearing Officer? Do you work for the Amtrak law department?

Gaines: No I don't. I'm an independent contractor.

Prone: Are you are you contracted by the Amtrak Law Department?
Gaines: Sure I am.

Prone: Okay, thank you.

Rae: I have no more questions for the witness at this time.

Gaines: Okay, do you?

Rae: Can we release Mr. DePhillips?

Page 281 of 440
Investigation No. 01-049

Carmack: They're different trips.

Prone: Okay, but for the record, they they must be different trips then. Depending on the signature. Okay, when, could you just give a brief overview of what this form contains, Mr. O'Bryan?

O'Bryan: Well, the form contains the employee's identification number, and then there is something called an option A, B, C, or D.

Gaines: Have you given a copy to the Carrier?

Rae: Yes, I have it, I've seen these, thank you.

O'Bryan: I don't know what the option stands for, there's an occupational code, crew base, a division code, employee's last name, employee's first name, middle initial, there's a space for supervisor I.D. number, which is blank on all five copies. There's a supervisor's last name, first name, and middle initial. The evaluation date, place operated from, place operated to, the train number, engine number, number of engines, number of cars, and there are a number of blocks for evaluation scoring of the engineer's performance; and those blocks consist of operating rules, special instructions, written authorizations, safety instructions, radio procedures, physical characteristics, which is identified as PC, air, which is relative to air brake handling, speed, signal, which means signal compliance, throttle, throttle handling, independent brake, which means independent brake handling, automatic brake, the same, dynamic brake, the same, blended brake, the same, start, which means starting, how you start the train, stop, which means how you stop the train, schedule, meaning keeping to the schedule, equipment, trouble shooting, and then there is a final block, Number 72, which is an overall score, which is basically based on all the other individual scores. There is also space for supervisor's comments and another space titled, Areas Needing Improvement, which is open for writing. There's a supervisor's signature line, and an employee's signature line.

Prone: On that first page you have there, Mr. O'Bryan, what trains are involved?

O'Bryan: 809, is in the blocks under train number, and then to the right of it is written, "plus 816"

Prone: As far as all those items that you just mentioned, what scores did Mr. Carmack receive?

| | |
|---|---|
| Gaines: | You have. |
| Pinsky: | Should I go ahead and answer the question Ms. Gaines? |
| Gaines: | Yes, you may, go ahead Dr. Pinsky. |
| Pinsky: | The five pages that I was provided with initially on about May 3rd were so alarming and of such concern that any reasonable physician or any reasonable layperson would have deemed them appropriate to medically disqualify Mr. Carmack at that moment, which is what I did. |
| Prone: | Why, what did you find alarming about them? |
| Pinsky: | Okay. Well when someone identifies themselves as Lucifer, the Prince of Darkness, identifies documentation in a workplace as Letters from Hell, and those are just a couple of examples. I'll give you another one, all answers should be sent to Institute of Devastation Awareness, these are all very concerning types of of documentation as to whether or not this individual has a severe psychiatric disorder that presents a threat to not only his co-workers but to himself and the traveling public. I'm talking about such things as personality disorder, bi-polar disorder, etc. |
| Prone: | Yet you felt you felt comfortable with making this decision even today? When you realized there were you received only one tenth of the entire package? |
| Pinsky: | I'm comfortable with all the decisions I've made in this case including that one. |
| Prone: | Are you comfortable with your adherence to the BLE agreement? Rule 25? |
| Pinsky: | I don't see the relevance of that, but I think I've always abided by Amtrak policies. |
| Prone: | Do you feel that you were ever instructed on Rule 25 by any official of the carrier? |
| Pinsky: | As far as I know Rule 25 has not been a part of Mr. Carmack's case or my involvement with it. I've never received any type of request for a third opinion, if that's what you're referring to. |
| Prone: | Are you bound by the contract Dr. Pinsky? |

Page 386 of 440
Investigation No. 01-049

| | |
|---|---|
| Pinsky: | I can comment on the company procedure as I understand it, but I'm not going to talk about any details of Mr. Corcoran or anybody else's case except Mr. Carmack's. |
| Prone: | Right, do you happen to know who disqualified Mr. Corcoran? |
| Gaines: | He just said he wouldn't discuss |
| Rae: | He can't discuss this. |
| Prone: | Well |
| Pinsky: | _____ -- was there just answered that question. I I don't plan on discussing his the details of his case. |
| Prone: | Mr. Dr. Pinsky, are you are you familiar with are you aware or did you ever receive a written certified request from Engineer Carmack to for him to receive his medical file back to him, mail his medical file back to him? |
| Rae: | This is once again. Objection. This is a |
| Prone: | Wait a minute |
| Rae: | question that was asked |
| Prone: | Wait a minute wait a minute |
| Gaines: | Hold, hold |
| Rae: | I have an objection |
| Gaines: | Hold off. |
| Rae: | it's been asked and it's been answered in the record. These are all questions that have been previously answered. |
| Gaines: | They are but can you just answer that question Dr. Pinsky? |
| Pinsky: | I think I did previously answer it, and I believe I answered it affirmatively; but I'd have to go again through the file to see |
| Gaines: | Okay |
| Pinsky: | for sure that we received such a letter. |

Page 391 of 440
Investigation No. 01-049