Exhibit I

# UNITED STATES *v.* ZOLIN ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 88–40. Argued March 20, 1989—Decided June 21, 1989

The Internal Revenue Service (IRS), as part of its investigation of the tax returns of L. Ron Hubbard, founder of the Church of Scientology (the Church), filed in the Federal District Court a petition to enforce a summons it had served upon the Clerk of the Los Angeles County Superior Court demanding that he produce documents, including two tapes, in his possession in conjunction with a pending suit. The Church and Mary Sue Hubbard, intervenors in the state-court action and respondents here, intervened to oppose production of the materials. They claimed, *inter alia*, that the IRS was not seeking the materials in good faith and that the attorney-client privilege barred the tapes' disclosure. The IRS argued, among other things, that the tapes fell within the exception to the attorney-client privilege for communications in furtherance of future illegal conduct—the so-called "crime-fraud" exception—and urged the District Court to listen to the tapes in making its privilege determination. In addition, the IRS submitted a declaration by a special agent which had included partial tape transcripts the IRS lawfully had obtained. The court rejected respondents' bad-faith claim and ordered production of five of the requested documents, but it conditioned its enforcement order by placing restrictions upon IRS dissemination of the documents. The court also ruled that the tapes need not be produced since they contained privileged attorney-client communications to which, the quoted excerpts revealed, the crime-fraud exception did not apply. The court rejected the request that it listen to the tapes, on the ground that that request had been abandoned in favor of using the agent's declaration as the basis for determining the privilege question. The Court of Appeals affirmed the conditional-enforcement order. As to the privilege issue, it agreed with respondents that the District Court would have been without power to grant the IRS' demand for *in camera* review of the tapes, because the Government's evidence of crime or fraud must come from sources independent of the attorney-client communications on the tapes. Reviewing the independent evidence (a review that excluded the partial transcripts), the court affirmed the District Court's determination as to the inapplicability of the crime-fraud exception.





*Held:*

1. Insofar as it upheld the District Court's conditional-enforcement order, the Court of Appeals' judgment is affirmed by an equally divided Court. P. 561.

2. In appropriate circumstances, *in camera* review of allegedly privileged attorney-client communications may be used to determine whether the communications fall within the crime-fraud exception. Pp. 562–575.

(a) Federal Rule of Evidence 104(a), which provides that a court is bound by the rules of evidence with respect to privileges when determining the existence of a privilege, does not prohibit the use of *in camera* review. Pp. 565–570.

(b) However, before a district court may engage in *in camera* review at the request of the party opposing the privilege, that party must present evidence sufficient to support a reasonable belief that such review may reveal evidence that establishes the exception's applicability. Once this threshold showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the court. Pp. 570–572.

(c) The party opposing the privilege may use any relevant nonprivileged evidence, lawfully obtained, to meet the threshold showing, even if its evidence is not "independent" of the contested communications as the Court of Appeals uses that term. Pp. 572–574.

(d) On remand, the Court of Appeals should consider whether the District Court's refusal to listen to the tapes *in toto* was justified by the manner in which the IRS presented and preserved its *in camera* review request. If its demand was properly preserved, that court, or the District Court on remand, should determine whether the IRS has presented a sufficient evidentiary basis for *in camera* review and whether it is appropriate for the District Court, in its discretion, to grant the request. Pp. 574–575.

809 F. 2d 1411, 842 F. 2d 1135, and 850 F. 2d 610, affirmed in part, vacated in part, and remanded.

BLACKMUN, J., delivered the opinion of the Court, in which all other Members joined, except BRENNAN, J., who took no part in the consideration or decision of the case.

*Alan I. Horowitz* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Acting Solicitor General Bryson, Assistant Attorney General Rose, Deputy Solicitor General Wallace, Charles E. Brookhart,* and *John A. Dudeck, Jr.*

*Michael Lee Hertzberg* argued the cause for respondents. With him on the brief were *Eric M. Lieberman* and *David Golove*.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case arises out of the efforts of the Criminal Investigation Division of the Internal Revenue Service (IRS) to investigate the tax returns of L. Ron Hubbard, founder of the Church of Scientology (the Church), for the calendar years 1979 through 1983. We granted certiorari, 488 U. S. 907 (1988), to consider two issues that have divided the Courts of Appeals. The first is whether, when a district court enforces an IRS summons, see 26 U. S. C. § 7604, the court may condition its enforcement order by placing restrictions on the disclosure of the summoned information.[1] The Court of Appeals in this case upheld the restrictions. We affirm its judgment on that issue by an equally divided Court.

The second issue concerns the testimonial privilege for attorney-client communications and, more particularly, the generally recognized exception to that privilege for communications in furtherance of future illegal conduct—the so-called "crime-fraud" exception. The specific question presented is whether the applicability of the crime-fraud exception must be established by "independent evidence" (*i. e.*, without reference to the content of the contested communications themselves), or, alternatively, whether the applicability of that exception can be resolved by an *in camera* inspection of the allegedly privileged material.[2] We reject the "independent evidence" approach and hold that the district court, under

---

*Edward D. Urquhart, Silvia T. Hassell,* and *Charles J. Escher* filed a brief for Bernard M. Barrett, Jr., M. D., as *amicus curiae*.

[1] Compare *United States* v. *Author Services, Inc.*, 804 F. 2d 1520, 1525–1526 (CA9 1986), opinion amended, 811 F. 2d 1264 (1987), with *United States* v. *Barrett*, 837 F. 2d 1341 (CA5 1988) (en banc), cert. pending, No. 87-1705.

[2] Compare *United States* v. *Shewfelt*, 455 F. 2d 836 (CA9), cert. denied, 406 U. S. 944 (1972), with *In re Berkley & Co.*, 629 F. 2d 548 (CA8 1980).



circumstances we explore below, and at the behest of the party opposing the claim of privilege, may conduct an *in camera* review of the materials in question. Because the Court of Appeals considered only "independent evidence," we vacate its judgment on this issue and remand the case for further proceedings.[3]

## I

In the course of its investigation, the IRS sought access to 51 documents that had been filed with the Clerk of the Los Angeles County Superior Court in connection with a case entitled *Church of Scientology of California* v. *Armstrong*, No. C420 153. The *Armstrong* litigation involved, among other things, a charge by the Church that one of its former members, Gerald Armstrong, had obtained by unlawful means documentary materials relating to Church activities, including two tapes. Some of the documents sought by the IRS had been filed under seal.

The IRS, by its Special Agent Steven Petersell, served a summons upon the Clerk on October 24, 1984, pursuant to 26 U. S. C. § 7603, demanding that he produce the 51 documents.[4] The tapes were among those listed. App. 33–38. On November 21, IRS agents were permitted to inspect and copy some of the summoned materials, including the tapes.

On November 27, the Church and Mary Sue Hubbard, who had intervened in *Armstrong*, secured a temporary restrain-

---

[3] Respondents suggest that this case is now moot, because L. Ron Hubbard died January 24, 1986, thus foreclosing any further criminal investigation of him, and because the IRS civil audit of Mr. Hubbard for the relevant tax years was terminated as a "'closed case.'" Brief in Opposition 8–10. The IRS disagrees, largely because the civil tax audit has not been terminated, and its result could affect the liability of Mr. Hubbard's estate. We are satisfied that a live controversy remains.

[4] The current Clerk of the Superior Court, Frank S. Zolin, is a named respondent in this case, but did not participate in briefing or argument before the Court of Appeals or before this Court. We use the term "respondents" to refer to Mary Sue Hubbard and the Church, the only active respondents in this Court.

ing order from the United States District Court for the Central District of California. The order required the IRS to file with the District Court all materials acquired on November 21 and all reproductions and notes related thereto, pending disposition of the intervenors' motion for a preliminary injunction to bar IRS use of these materials. Exh. 2 to Petition to Enforce Internal Revenue Summons. By order dated December 10, the District Court returned to the IRS all materials except the tapes and the IRS' notes reflecting their contents. See App. 30.

On January 18, 1985, the IRS filed in the District Court a petition to enforce its summons. In addition to the tapes, the IRS sought 12 sealed documents the Clerk had refused to produce in response to the IRS summons. The Church and Mary Sue Hubbard intervened to oppose production of the tapes and the sealed documents. Respondents claimed that IRS was not seeking the documents in good faith, and objected on grounds of lack of relevance and attorney-client privilege.

Respondents asserted the privilege as a bar to disclosure of the tapes. The IRS argued, among other things, however, that the tapes fell within the crime-fraud exception to the attorney-client privilege, and urged the District Court to listen to the tapes in the course of making its privilege determination. In addition, the IRS submitted to the court two declarations by Agent Petersell. In the first, Petersell stated his grounds for believing that the tapes were relevant to the investigation. See Declaration in No. CV85-0440-HLH, ¶3 (March 8, 1985). In the second, Petersell offered a description of the tapes' contents, based on information he received during several interviews. Appended to this declaration—over respondents' objection—were partial transcripts of the tapes, which the IRS lawfully had obtained from a confidential source. See March 15, 1985, declaration





(filed under seal).[3] In subsequent briefing, the IRS reiterated its request that the District Court listen to the tapes *in camera* before making its privilege ruling.

After oral argument and an evidentiary hearing, the District Court rejected respondents' claim of bad faith. App. to Pet. for Cert. 27a. The court ordered production of 5 of the 12 documents, *id.*, at 28a, and specified: "The documents delivered hereunder shall not be delivered to any other government agency by the IRS unless criminal tax prosecution is sought or an Order of Court is obtained." *Id.*, at 29a.

Turning to the tapes, the District Court ruled that respondents had demonstrated that they contain confidential attorney-client communications, that the privilege had not been waived, and that "[t]he 'fraud-crime' exception to the attorney-client privilege does not apply. The quoted excerpts tend to show or admit past fraud but there is no clear indication that future fraud or crime is being planned." *Id.*, at 28a. On this basis, the court held that the Clerk "need not produce its copy of the tapes pursuant to the summons." *Id.*, at 29a. The District Court denied the IRS' motion for reconsideration, rejecting the IRS' renewed request that the court listen to the tapes *in toto*. "While this was at one time discussed with counsel, thereafter Mr. Petersell's declaration was submitted, and no one suggested that this

[3] The IRS denied that the transcripts were made using tapes obtained from the Superior Court or from any other illicit source. Agent Petersell declared: "The partial transcripts were not prepared by the United States from the tapes in the custody of the Superior Court for Los Angeles County, California, nor from copies of the tape now in the custody of the Clerk of this Court. The transcripts were obtained from a confidential source by another Special Agent prior to the issuance of this summons. The source was not a party to *Church of Scientology* v. *Armstrong*, No. 410153, nor an attorney for any party in that proceeding." See Declaration of Agent Petersell in No. CV85-0440-HLH (Tx) (March 21, 1985). As the District Court made no finding of illegality, we assume for present purposes that the transcripts were legally obtained.

was an inadequate basis on which to determine the attorney-client privilege question." *Id.*, at 25a–26a.

Respondents appealed to the Court of Appeals for the Ninth Circuit, and the IRS cross-appealed on two relevant grounds. First, the IRS claimed that the District Court abused its discretion by placing conditions on the IRS' future use of the subpoenaed information. The Court of Appeals disagreed, holding: "A district court may, when appropriate, condition enforcement of a summons on the IRS' agreeing to abide by disclosure restrictions." 809 F. 2d 1411, 1417 (1987).

Second, the IRS contended that the District Court erred in rejecting the application of the crime-fraud exception to the tapes. In particular, the IRS argued that the District Court incorrectly held that the IRS had abandoned its request for *in camera* review of the tapes, and that the court should have listened to the tapes before ruling that the crime-fraud exception was inapplicable. Answering Brief for United States as Appellee in No. 85–6065, and Opening Brief for United States as Cross-Appellant in No. 85–6105 (CA9), pp. 48–49 (filed under seal). Respondents contended, in contrast, that the District Court erred in the opposite direction: they argued that it was error for the court to rely on the partial transcripts, because "[i]n this Circuit, a party cannot rely on the communications themselves—whether by listening to the tapes *or reviewing excerpts or transcripts of them*—to bear its burden to invoke the exception but must bear the burden by independent evidence. This is the clear and unambiguous holding of *United States* v. *Shewfelt*, 455 F. 2d 836 (9th Cir.), cert. denied, 406 U. S. 944 (1972)." (Emphasis added.) Answering Brief for Church of Scientology of California and Mary Sue Hubbard as Cross-Appellees in No. 85–6065, and Reply Brief as Appellants in No. 85–6105 (CA9), p. 24 (filed under seal).

The panel of the Court of Appeals agreed with respondents that, under *Shewfelt*, "the Government's evidence of crime or



fraud must come from sources independent of the attorney-client communications recorded on the tapes," 809 F. 2d, at 1418, thereby implicitly holding that even if the IRS had properly preserved its demand for *in camera* review, the District Court would have been without power to grant it. The Court of Appeals then reviewed "the Government's independent evidence." *Id.*, at 1418–1419. That review appears to have excluded the partial transcripts, and thus the Court of Appeals implicitly agreed with respondents that it was improper for the District Court to have considered even the partial transcripts. See Brief for United States 7. On the basis of its review of the "independent evidence," the Court of Appeals affirmed the District Court's determination that the IRS had failed to establish the applicability of the crime-fraud exception. 809 F. 2d, at 1419.

The full Court of Appeals vacated the panel opinion and ordered en banc review, on the basis of a perceived conflict between *Shewfelt* and *United States* v. *Friedman*, 445 F. 2d 1076 (CA9), cert. denied *sub nom. Jacobs* v. *United States*, 404 U. S. 958 (1971). 832 F. 2d 127 (1987). Upon consideration, a majority of the limited en banc court, see Ninth Circuit Rule 35–3, determined that the intracircuit conflict was illusory; it agreed with respondents that *Friedman* did not address the independent-evidence rule. 842 F. 2d 1135, 1136, amended by 850 F. 2d 610 (1988). The limited en banc court vacated the order for rehearing en banc as improvidently granted and reinstated the panel opinion in relevant part. *Ibid.*

## II

This Court is evenly divided with respect to the issue of the power of a district court to place restrictions upon the dissemination by the IRS of information obtained through a § 7604 subpoena-enforcement action. We therefore affirm the judgment of the Court of Appeals insofar as it upheld the District Court's conditional-enforcement order.

III

Questions of privilege that arise in the course of the adjudication of federal rights are "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. Rule Evid. 501. We have recognized the attorney-client privilege under federal law, as "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co.* v. *United States*, 449 U. S. 383, 389 (1981). Although the underlying rationale for the privilege has changed over time, see 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961),[6] courts long have viewed its central concern as one "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U. S., at 389. That purpose, of course, requires that clients be free to "make full disclosure to their attorneys" of past wrongdoings, *Fisher* v. *United States*, 425 U. S. 391, 403 (1976), in order that the client may obtain "the aid of persons having knowledge of the law and skilled in its practice," *Hunt* v. *Blackburn*, 128 U. S. 464, 470 (1888).

The attorney-client privilege is not without its costs. Cf. *Trammel* v. *United States*, 445 U. S. 40, 50 (1980). "[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Fisher*, 425 U. S., at 403. The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—"ceas[es] to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but

[6] See also Hazard, An Historical Perspective on the Attorney-Client Privilege, 66 Calif. L. Rev. 1061 (1978); Developments in the Law—Privileged Communications, 98 Harv. L. Rev. 1450, 1455–1458 (1985).



*to future wrongdoing*." 8 Wigmore, § 2298, p. 573 (emphasis in original); see also *Clark* v. *United States*, 289 U. S. 1, 15 (1933). It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the "seal of secrecy," *ibid.*, between lawyer and client does not extend to communications "made for the purpose of getting advice for the commission of a fraud" or crime. *O'Rourke* v. *Darbishire*, [1920] A. C. 581, 604 (P. C.).

The District Court and the Court of Appeals found that the tapes at issue in this case recorded attorney-client communications and that the privilege had not been waived when the tapes were inadvertently given to Armstrong. 809 F. 2d, at 1417 (noting that Armstrong had acquired the tapes from L. Ron Hubbard's personal secretary, who was under the mistaken impression that the tapes were blank). These findings are not at issue here. Thus, the remaining obstacle to respondents' successful assertion of the privilege is the Government's contention that the recorded attorney-client communications were made in furtherance of a future crime or fraud.

A variety of questions may arise when a party raises the crime-fraud exception. The parties to this case have not been in complete agreement as to which of these questions are presented here. In an effort to clarify the matter, we observe, first, that we need not decide the quantum of proof necessary ultimately to establish the applicability of the crime-fraud exception. Cf. *Clark*, 289 U. S., at 15, quoting *O'Rourke*; S. Stone & R. Liebman, Testimonial Privileges § 1.65, p. 107 (1983).[7] Rather, we are concerned here with

[7] We note, however, that this Court's use in *Clark* v. *United States*, 289 U. S. 1, 14 (1933), of the phrase "*prima facie* case" to describe the showing needed to defeat the privilege has caused some confusion. See Gardner, The Crime or Fraud Exception to the Attorney-Client Privilege, 47 A. B. A. J. 708, 710–711 (1961); Note, 51 Brooklyn L. Rev. 913, 918–919 (1985) ("The *prima facie* standard is commonly used by courts in civil litigation to *shift* the burden of proof from one party to the other. In the context of the fraud exception, however, the standard is used to dispel the privilege altogether *without* affording the client an opportunity to rebut

the type of evidence that may be used to make that ultimate showing. Within that general area of inquiry, the initial question in this case is whether a district court, at the request of the party opposing the privilege, may review the allegedly privileged communications *in camera* to determine whether the crime-fraud exception applies.[7] If such *in camera* review is permitted, the second question we must consider is whether some threshold evidentiary showing is needed before the district court may undertake the requested

---

the *prima facie* showing" (emphasis in original)). See also *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F. 2d 1032, 1039 (CA2 1984). In using the phrase in *Clark*, the Court was aware of scholarly controversy concerning the role of the judge in the decision of such preliminary questions of fact. See 289 U. S., at 14, n. The quantum of proof needed to establish admissibility was then, and remains, subject to question. See, *e. g.*, Maguire & Epstein, Preliminary Questions of Fact in Determining the Admissibility of Evidence, 40 Harv. L. Rev. 392, 400 (criticizing courts insofar as they "have allowed themselves to be led into holding that only a superficial, one-sided showing is allowable on any admissibility controversy"), 414–424 (exploring alternative rules) (1927); 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5052, p. 248 (1977) (suggesting, with respect to the process of proving preliminary questions of fact, that "[p]erhaps it is a task, like riding a bicycle, that is easier to do if you do not think too much about what you are doing"). In light of the narrow question presented here for review, this case is not the proper occasion to visit these questions.

[7] In addition, the facts of this case also suggest the question whether the partial transcripts the IRS possessed may be used by it in meeting its ultimate burden. It is by no means clear that the Government has presented that question for this Court's review. The Government noted in its petition for certiorari that the Court of Appeals had not considered the partial transcripts in making its determination that the IRS had failed to establish the applicability of the crime-fraud exception. See Pet. for Cert. 7–8. The question presented for review, however, relates solely to *in camera* review, as does the relevant discussion in the petition. See *id.*, at 20–23.

The question whether the partial transcripts may be used in meeting the IRS' ultimate burden of demonstrating the applicability of the crime-fraud exception is fairly included within the question presented, however, and we therefore address it. See this Court's Rule 21.1(a). The answer to the question would follow inexorably from our discussion in any event.



review. Finally, if a threshold showing is required, we must consider the type of evidence the opposing party may use to meet it: *i. e.*, in this case, whether the partial transcripts the IRS possessed may be used for that purpose.

## A

We consider first the question whether a district court may *ever* honor the request of the party opposing the privilege to conduct an *in camera* review of allegedly privileged communications to determine whether those communications fall within the crime-fraud exception. We conclude that no express provision of the Federal Rules of Evidence bars such use of *in camera* review, and that it would be unwise to prohibit it in all instances as a matter of federal common law.[8]

### (1)

At first blush, two provisions of the Federal Rules of Evidence would appear to be relevant. Rule 104(a) provides: "Preliminary questions concerning the qualification of a person to be a witness, *the existence of a privilege*, or the admissibility of evidence shall be determined by the court . . . . In making its determination it is not bound by the rules of evidence *except those with respect to privileges.*" (Emphasis added.) Rule 1101(c) provides: "The rule with respect to

---

[8] There is some ambiguity as to whether the Court of Appeals squarely barred all use of *in camera* review for these purposes, although that is the fairest reading of the court's opinion. Respondents at times appear to advocate that position, see Brief in Opposition 19–21, but at times suggest otherwise, see Brief for Respondents 13; see also Reply Brief for United States 15. The ambiguity in respondents' position is perhaps due to the fact that they accept the premise that *in camera* review is permitted under Circuit precedent in different circumstances from those at issue in this case—*i. e.*, where the proponent of the privilege seeks *in camera* review to demonstrate the applicability of the privilege in the first instance, see Brief for Respondents 14, or when the proponent requests *in camera* review to ensure that an order requiring production of some materials held not to be privileged does not inadvertently yield privileged information, see *id.*, at 20–21.

privileges applies at all stages of all actions, cases, and proceedings." Taken together, these Rules might be read to establish that in a summons-enforcement proceeding, attorney-client communications cannot be considered by the district court in making its crime-fraud ruling: to do otherwise, under this view, would be to make the crime-fraud determination without due regard to the existence of the privilege.

Even those scholars who support this reading of Rule 104(a) acknowledge that it leads to an absurd result.

> "Because the judge must honor claims of privilege made during his preliminary fact determinations, many exceptions to the rules of privilege will become 'dead letters,' since the preliminary facts that give rise to these exceptions can never be proved. For example, an exception to the attorney-client privilege provides that there is no privilege if the communication was made to enable anyone to commit a crime or fraud. There is virtually no way in which the exception can ever be proved, save by compelling disclosure of the contents of the communication; Rule 104(a) provides that this cannot be done." 21 C. Wright & K. Graham, Federal Practice & Procedure: Evidence § 5055, p. 276 (1977) (footnote omitted).

We find this Draconian interpretation of Rule 104(a) inconsistent with the Rule's plain language. The Rule does not provide by its terms that all materials as to which a "clai[m] of privilege" is made must be excluded from consideration. In that critical respect, the language of Rule 104(a) is markedly different from the comparable California evidence rule, which provides that "the presiding officer may not require disclosure of information *claimed to be privileged* under this division in order to rule on the claim of privilege." Cal. Evid. Code Ann. § 915(a) (West Supp. 1989) (emphasis





added).[10] There is no reason to read Rule 104(a) as if its text were identical to that of the California rule.

Nor does it make sense to us to assume, as respondents have throughout this litigation, that once the attorney-client nature of the contested communications is established, those communications must be treated as *presumptively* privileged for evidentiary purposes until the privilege is "defeated" or "stripped away" by proof that the communications took place in the course of planning future crime or fraud. See Brief for Respondents 15 (asserting that respondents had "established their entitlement to the privilege," and that the communications had been "determined to be privileged," before the crime-fraud question was resolved). Although some language in *Clark* might be read as supporting this view, see 289 U. S., at 15, respondents acknowledged at oral argument that no prior holding of this Court requires the imposition of a strict progression of proof in crime-fraud cases. See Tr. of Oral Arg. 33–35.

---

[10] A good example of the effect of the California rule is provided by the record in this case. While the disputed matters were being briefed in Federal District Court, the State Superior Court held a hearing on a motion by Government attorneys seeking access to materials in the *Armstrong* case for ongoing litigation in Washington, D. C. The transcript of the hearing was made part of the record before the District Court in this case. Regarding the tapes, the Government argued to the Superior Court that the attorney-client conversations on the tapes reflect the planning or commission of a crime or fraud. Tr. of Hearing of February 11, 1985, in No. C420153 (Super. Ct. Cal.), p. 52. That claim was supported by several declarations and other extrinsic evidence. The Government noted, however, that "the tape recordings themselves would . . . be the best evidence of exactly what was going on." *Id.*, at 53. The intervenors stressed that, as a matter of California law, "you can't show the tapes are not privileged by their contents." *Id.*, at 58; see also *id.*, at 68. The Superior Court acknowledged the premise that "you can't look at the conversation itself to make [the crime-fraud] determination," *id.*, at 74, and concluded that the extrinsic evidence was not sufficient to make out a prima facie case that the crime-fraud exception applies, *id.*, at 75–76.

We see no basis for holding that the tapes in this case must be deemed privileged under Rule 104(a) while the question of crime or fraud remains open. Indeed, respondents concede that "if the *proponent* of the privilege is able to sustain its burden only by submitting the communications to the court" for *in camera* review, Brief for Respondents 14–15 (emphasis in original), the court is not required to avert its eyes (or close its ears) once it concludes that the communication would be privileged, if the court found the crime-fraud exception inapplicable. Rather, respondents acknowledge that the court may "then consider the same communications to determine if the opponent of the privilege has established that the crime-fraud exception applies." *Id.*, at 15. Were the tapes truly deemed privileged under Rule 104(a) at the moment the trial court concludes they contain potentially privileged attorney-client communications, district courts would be required to draw precisely the counterintuitive distinction that respondents wisely reject. We thus shall not adopt a reading of Rule 104(a) that would treat the contested communications as "privileged" for purposes of the Rule, and we shall not interpret Rule 104(a) as categorically prohibiting the party opposing the privilege on crime-fraud grounds from relying on the results of an *in camera* review of the communications.

(2)

Having determined that Rule 104(a) does not prohibit the *in camera* review sought by the IRS, we must address the question as a matter of the federal common law of privileges. See Rule 501. We conclude that a complete prohibition against opponents' use of *in camera* review to establish the applicability of the crime-fraud exception is inconsistent with the policies underlying the privilege.

We begin our analysis by recognizing that disclosure of allegedly privileged materials to the district court for purposes of determining the merits of a claim of privilege does not have the legal effect of terminating the privilege. Indeed, this



Court has approved the practice of requiring parties who seek to avoid disclosure of documents to make the documents available for *in camera* inspection, see *Kerr* v. *United States District Court for Northern District of Cal.*, 426 U. S. 394, 404–405 (1976), and the practice is well established in the federal courts. See, *e. g.*, *In re Antitrust Grand Jury*, 805 F. 2d 155, 168 (CA6 1986); *In re Vargas*, 723 F. 2d 1461, 1467 (CA10 1983); *United States* v. *Lawless*, 709 F. 2d 485, 486, 488 (CA7 1983); *In re Grand Jury Witness*, 695 F. 2d 359, 362 (CA9 1982). Respondents do not dispute this point: they acknowledge that they would have been free to request *in camera* review to establish the fact that the tapes involved attorney-client communications, had they been unable to muster independent evidence to serve that purpose. Brief for Respondents 14–15.

Once it is clear that *in camera* review does not destroy the privileged nature of the contested communications, the question of the propriety of that review turns on whether the policies underlying the privilege and its exceptions are better fostered by permitting such review or by prohibiting it. In our view, the costs of imposing an absolute bar to consideration of the communications *in camera* for purpose of establishing the crime-fraud exception are intolerably high.

"No matter how light the burden of proof which confronts the party claiming the exception, there are many blatant abuses of privilege which cannot be substantiated by extrinsic evidence. This is particularly true . . . of . . . situations in which an alleged illegal proposal is made in the context of a relationship which has an apparent legitimate end." Note, The Future Crime or Tort Exception to Communications Privileges, 77 Harv. L. Rev. 730, 737 (1964). A *per se* rule that the communications in question may never be considered creates, we feel, too great an impediment to the proper functioning of the adversary process. See generally 2 D. Louisell & C. Mueller, Federal Evidence § 213, pp. 828–829 (1985); 2 J. Weinstein & M. Berger, Weinstein's Evi-

dence ¶503(d)(1)[01], p. 503–71 (1988). This view is consistent with current trends in the law. Compare National Conference of Commissioners on Uniform State Laws, Uniform Rules of Evidence, Rule 26(2)(a) (1953 ed.) ("Such privileges shall not extend . . . to a communication if the judge finds that sufficient evidence, *aside from the communication*, has been introduced to warrant a finding that the legal service was sought or obtained in order to enable or aid the client to commit or plan to commit a crime or a tort" (emphasis added)), reprinted in 1 J. Bailey & O. Trelles, The Federal Rules of Evidence: Legislative Histories and Related Documents (1980), with Uniform Rule of Evidence 502 (adopted 1974), 13A U. L. A. 256 (1986) (omitting explicit independent evidence requirement).

B

We turn to the question whether *in camera* review at the behest of the party asserting the crime-fraud exception is *always* permissible, or, in contrast, whether the party seeking *in camera* review must make some threshold showing that such review is appropriate. In addressing this question, we attend to the detrimental effect, if any, of *in camera* review on the policies underlying the privilege and on the orderly administration of justice in our courts. We conclude that some such showing must be made.

Our endorsement of the practice of testing proponents' privilege claims through *in camera* review of the allegedly privileged documents has not been without reservation. This Court noted in *United States* v. *Reynolds*, 345 U. S. 1 (1953), a case which presented a delicate question concerning the disclosure of military secrets, that "examination of the evidence, even by the judge alone, in chambers" might in some cases "jeopardize the security which the privilege is meant to protect." *Id.*, at 10. Analogizing to claims of Fifth Amendment privilege, it observed more generally: "Too much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect, while a complete abandonment of judicial control would lead to intolerable abuses." *Id.*, at 8.



The Court in *Reynolds* recognized that some compromise must be reached. See also *United States* v. *Weisman*, 111 F. 2d 260, 261–262 (CA2 1940). In *Reynolds*, it declined to "go so far as to say that the court *may automatically require* a complete disclosure to the judge before the claim of privilege will be accepted *in any case*." 345 U. S., at 10 (emphasis added). We think that much the same result is in order here.

A blanket rule allowing *in camera* review as a tool for determining the applicability of the crime-fraud exception, as *Reynolds* suggests, would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk. There is also reason to be concerned about the possible due process implications of routine use of *in camera* proceedings. See, *e. g.*, *In re John Doe Corp.*, 675 F. 2d 482, 489–490 (CA2 1982); *In re Special September 1978 Grand Jury*, 640 F. 2d 49, 56–58 (CA7 1980). Finally, we cannot ignore the burdens *in camera* review places upon the district courts, which may well be required to evaluate large evidentiary records without open adversarial guidance by the parties.

There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents. Courts of Appeals have suggested that *in camera* review is available to evaluate claims of crime or fraud only "when justified," *In re John Doe Corp.*, 675 F. 2d, at 490, or "[i]n appropriate cases," *In re Sealed Case*, 219 U. S. App. D. C. 195, 217, 676 F. 2d 793, 815 (1982) (opinion of Wright, J.). Indeed, the Government conceded at oral argument (albeit reluctantly) that a district court would be mistaken if it reviewed documents *in camera* solely because "the government beg[ged it]" to do so, "with no reason to suspect crime or fraud." Tr. of Oral Arg. 26; see also *id.*, at 60. We agree.

In fashioning a standard for determining when *in camera* review is appropriate, we begin with the observation that "*in camera* inspection . . . is a smaller intrusion upon the confidentiality of the attorney-client relationship than is public disclosure." Fried, Too High a Price for Truth: The Exception to the Attorney-Client Privilege for Contemplated Crimes and Frauds, 64 N. C. L. Rev. 443, 467 (1986). We therefore conclude that a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege. *Ibid.* The threshold we set, in other words, need not be a stringent one.

We think that the following standard strikes the correct balance. Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person," *Caldwell* v. *District Court*, 644 P. 2d 26, 33 (Colo. 1982), that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply. The district court is also free to defer its *in camera* review if it concludes that additional evidence in support of the crime-fraud exception may be available that is *not* allegedly privileged, and that production of the additional evidence will not unduly disrupt or delay the proceedings.



C

The question remains as to what kind of evidence a district court may consider in determining whether it has the discretion to undertake an *in camera* review of an allegedly privileged communication at the behest of the party opposing the privilege. Here, the issue is whether the partial transcripts may be used by the IRS in support of its request for *in camera* review of the tapes.

The answer to that question, in the first instance, must be found in Rule 104(a), which establishes that materials that have been determined to be privileged may not be considered in making the preliminary determination of the existence of a privilege. Neither the District Court nor the Court of Appeals made factual findings as to the privileged nature of the partial transcripts,[11] so we cannot determine on this record whether Rule 104(a) would bar their consideration.

Assuming for the moment, however, that no rule of privilege bars the IRS' use of the partial transcripts, we fail to see what purpose would be served by excluding the transcripts from the District Court's consideration. There can be little doubt that partial transcripts, or other evidence directly but incompletely reflecting the content of the contested communications, generally will be strong evidence of the subject matter of the communications themselves. Permitting district courts to consider this type of evidence would aid them substantially in rapidly and reliably determining whether *in camera* review is appropriate.

---

[11] There are no findings as to whether respondents themselves would be privileged to resist a demand that *they* produce the partial transcripts. Nor has there been any legal and factual exploration of whether respondents may claim privilege as a bar to the IRS' use of the copy of the transcripts it lawfully obtained from a third party. See, *e. g.*, Developments in the Law—Privileged Communications, 98 Harv. L. Rev., at 1648, 1660–1661 (discussing controversy concerning the legal effect of an inadvertent disclosure which does not constitute a waiver of the privilege, and citing cases); 8 Wigmore § 2326.

Respondents suggest only one serious countervailing consideration. In their view, a rule that would allow an opponent of the privilege to rely on such material would encourage litigants to elicit confidential information from disaffected employees or others who have access to the information. Tr. of Oral Arg. 40–41. We think that deterring the aggressive pursuit of relevant information from third-party sources is not sufficiently central to the policies of the attorney-client privilege to require us to adopt the exclusionary rule urged by respondents. We conclude that the party opposing the privilege may use any nonprivileged evidence in support of its request for *in camera* review, even if its evidence is not "independent" of the contested communications as the Court of Appeals uses that term.[12]

D

In sum, we conclude that a rigid independent evidence requirement does not comport with "reason and experience," Fed. Rule Evid. 501, and we decline to adopt it as part of the developing federal common law of evidentiary privileges. We hold that *in camera* review may be used to determine whether allegedly privileged attorney-client communications fall within the crime-fraud exception. We further hold, however, that before a district court may engage in *in camera* review at the request of the party opposing the privilege, that party must present evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that

[12] In addition, we conclude that evidence that is not "independent" of the contents of allegedly privileged communications—like the partial transcripts in this case—may be used not only in the pursuit of *in camera* review, but also may provide the evidentiary basis for the ultimate showing that the crime-fraud exception applies. We see little to distinguish these two uses: in both circumstances, if the evidence has not itself been determined to be privileged, its exclusion does not serve the policies which underlie the attorney-client privilege. See generally Note, The Future Crime or Tort Exception to Communications Privileges, 77 Harv. L. Rev. 730, 737 (1964).



establishes the exception's applicability. Finally, we hold that the threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged.

Because the Court of Appeals employed a rigid independent-evidence requirement which categorically excluded the partial transcripts and the tapes themselves from consideration, we vacate its judgment on this issue and remand the case for further proceedings consistent with this opinion. On remand, the Court of Appeals should consider whether the District Court's refusal to listen to the tapes *in toto* was justified by the manner in which the IRS presented and preserved its request for *in camera* review.[13] In the event the Court of Appeals holds that the IRS' demand for review was properly preserved, the Court of Appeals should then determine, or remand the case to the District Court to determine in the first instance, whether the IRS has presented a sufficient evidentiary basis for *in camera* review, and whether, if so, it is appropriate for the District Court, in its discretion, to grant such review.

*It is so ordered.*

JUSTICE BRENNAN took no part in the consideration or decision of this case.

[13] The Court of Appeals also will have the opportunity to review the partial transcripts, and to determine whether, even without *in camera* review of the tapes, the IRS presented sufficient evidence to establish that the tapes are within the crime-fraud exception.