## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JOSEPH T. CARMACK** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**NATIONAL RAILROAD PASSENGER** )<br>**CORPORATION** ).<br>)<br>**Defendant.** )<br>) | **Civil Action No. 03 12488 PBS** |

## DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S
## MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff James T. Carmack ("Plaintiff") has alleged numerous violations of law by the defendant National Railroad Passenger Corporation ("Amtrak") associated with his medical disqualification and the termination of his employment. Amtrak denies that it committed any violations of law, and further asserts that Plaintiff lacks any competent evidence in support of his allegations. As a result, Amtrak moves, pursuant to Fed.R.Civ.P. 56, for summary judgment on all counts of Plaintiff's Second Amended Complaint.

In particular, Amtrak denies that it defamed Plaintiff, violated his privacy rights, discriminated or retaliated against Plaintiff on the basis of disability or religion, violated his civil rights, violated the Unfair Labor Practices Act, is liable under the Federal Employers Liability Act ("FELA), intentionally inflicted emotional distress, or wrongfully terminated him in violation of public policy. Rather, Amtrak acted in accordance with its policy of zero tolerance against workplace violence when it medically disqualified Plaintiff (with pay ) from his duties as

a locomotive engineer for having disseminated the documents entitled "Letters from Hell" which appeared to threaten physical harm to various Amtrak employees. Furthermore, Amtrak appropriately charged Plaintiff with insubordination when he repeatedly refused to undergo a medical examination to determine his mental and emotional fitness for work. After a lengthy hearing in which Plaintiff was represented by his union, an impartial hearing officer found Plaintiff had been insubordinate and his employment was appropriately terminated.

There are no genuine issues of disputed material fact on any of Plaintiff's various counts and sub-counts. Consequently, as a matter of law, summary judgment must be granted on all counts and the case dismissed.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff, a locomotive engineer at Amtrak since late 1996, committed two infractions of Amtrak rules resulting in delays to its south side commuter rail trains in October 2000. Statement of Material Facts (hereinafter "SMF") ¶¶ 30, 32, 33. He was counseled by his supervisor, Gerard DeModena, Division Road Foreman, for his actions. SMF ¶¶ 32, 33. Shortly thereafter, Plaintiff took a medical leave of absence for approximately three months. SMF ¶35. In late January 2001, Amtrak's Medical Director for the region in which Plaintiff worked permitted Plaintiff to return to work with certain restrictions because of a recent medical examination which appeared to show the appearance of two new hernias. SMF ¶¶ 38, 39, 41. Plaintiff returned to work on Amtrak's north side commuter rail operations. SMF ¶40.

On April 11, 2001, Mr. DeModena found a group of documents on his desk entitled the "Letters from Hell," which were assembled and largely written by Plaintiff. SMF at ¶¶ 43, 45.

---

[1]    Amtrak refers the Court to the attached Statement of Material Facts which provides a more detailed description of the facts. Amtrak also states that the facts described herein and in the attached Statement of Material Facts are included herein in accordance with Fed.R.Civ.P. 56 and that Amtrak reserves its right to dispute some of these "facts" in the event this matter is not entirely resolved via this motion.

These contained alarming statements from Lucifer to God suggesting that that a messy ending was about to occur and casting several Amtrak managers in a parody of Shakespeare's Hamlet. SMF at ¶46.  Mr. DeModena was cast in the part of Rosencrantz, a character who is executed in Shakespeare's play due to the machinations of Hamlet.  SMF at ¶¶ 49, 50.  Later in the text Plaintiff wrote, "ROSENCRANTZ AND GUILDENSTERN ARE DEAD!" SMF at ¶55.

Mr. DeModena was alarmed by these documents from one of his subordinates who he had hardly seen in the six months since Mr. DeModena had counseled Plaintiff for improper operation of his trains.  SMF at ¶¶ 32, 33, 57.  As a result, he conferred with Amtrak's Labor Relations Director, Mr. DePhillips, and filed a workplace violence complaint, in keeping with Amtrak's policy of zero tolerance for workplace violence or threats.  SMF at ¶¶ 58, 59, 61.  A Threat Assessment Response Team ("TART") was then assembled to include several Amtrak managers.  SMF at ¶66.  On May 3rd they sent the five most offensive pages of the "Letters from Hell" to Dr. Pinsky along with an e-mail from Mr. DePhillips recommending that no disciplinary action be taken and that Plaintiff be given a psychiatric fitness for duty exam while remaining in service.  SMF at ¶¶ 67, 70.

Dr. Pinsky was sufficiently alarmed by the text of the "Letters from Hell" that he disagreed with Mr. DePhillips' recommendation and chose to medically disqualify Plaintiff immediately, pending the results of a psychiatric fitness for duty exam.  SMF at ¶71.  Based upon Dr. Pinsky's instructions, Plaintiff was removed from service, with pay, and instructed to undergo such an examination with an independent psychiatrist, Dr. Vasile.  SMF at ¶¶ 75, 81, 83.  Over the course of the next several months, Plaintiff was scheduled for at least three appointments with Dr. Vasile but never underwent the fitness for duty examination, despite being warned on at least two occasions that he would be charged with insubordination and

possibly discharged if he did not cooperate. SMF at ¶¶ 81, 89-91, 101, 102, 105-107. After

hearing from Dr. Vasile that Plaintiff had canceled his appointment scheduled for August 27,

2001, Mr. O'Malley charged Plaintiff with insubordination. SMF at ¶¶ 108, 111.

     In the spring of 2002, in order to determine whether Plaintiff had been insubordinate,

four days of hearings were held before Deborah Gaines, a hearing officer contracted by Amtrak.

SMF at ¶¶ 113-116. Plaintiff was represented by a local union chairman. SMF at ¶114. On

May 13, 2002, Ms. Gaines issued a decision letter concluding that Plaintiff had violated

Amtrak's rules and been insubordinate. SMF at ¶117. His employment was terminated that

same day. SMF at ¶120.

## II.    SUMMARY JUDGMENT STANDARD

     Summary judgment shall be rendered if the evidence shows that "there is no genuine issue

as to any material fact and the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). Motions for summary judgment are intended "to pierce the pleadings and to

assess the proof in order to see whether there is a genuine need for trial," Garside v. Osco Drug,

Inc., 895 F.2d 46, 50 (1st Cir.1990); Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986), and

"whether it is so one-sided that one party must, as a matter of law, prevail over the other." Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Genuine issues of material fact are not the stuff

of an opposing party's dreams. On issues where the non-movant bears the ultimate burden of proof,

he must present definite, competent evidence to rebut the motion." Mesnick v. General Electric Co.,

950 F.2d 816, 822 (1st Cir. 1991); Garside at 48. "Even in cases where elusive concepts such as

motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests

merely upon conclusory allegations, improbable inferences, and unsupported speculation." See

Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996) (citations omitted).

**III.   SUMMARY JUDGMENT MUST BE GRANTED ON COUNTS ONE, TWO, SEVEN AND EIGHT BECAUSE THESE STATE LAW CLAIMS ARE PREEMPTED BY THE RAILWAY LABOR ACT AND BECAUSE THERE ARE NO GENUINE ISSUES OF DISPUTED MATERIAL FACT**

Summary judgment must be granted on Count I - Defamation, Count II – Invasion of Privacy, Count VII – FELA and Intentional Infliction of Emotional Distress, and Count VIII – Wrongful Discharge in Violation of Public Policy because each of these claims is preempted by the federal Railway Labor Act. In the alternative, each of the claims within these Counts must be dismissed because no competent evidence has been submitted that meets the legal requirements of these causes of action. For purposes of clarity, the legal deficiencies of these four Counts will be addressed as follows. First, the general law pertaining to preemption of state claims by the Railway Labor Act and pertinent elements of Amtrak's collective bargaining agreement will be presented. Second, each of the four Counts will be analyzed separately in two parts: (1) RLA preemption of this particular Count; and (2) the alternative argument(s) that the allegations and/or the evidence in the record are insufficient as a matter of law for Plaintiff to overcome his burden of proving the elements of that particular cause of action.

**A.   Preemption of State Law Claims By The Railway Labor Act, and the Collective Bargaining Agreement Between Amtrak and the BLE**

Counts I, II, VII, and VIII, consist respectively of state law claims of: defamation; invasion of privacy; FELA and intentional infliction of emotional distress: and wrongful termination in violation of public policy. Plaintiff supports these legal counts with factual allegations implicating conduct by Amtrak's supervisors, employees and/or agents which is inextricable from Amtrak's rights and obligations under the collective bargaining agreement ("CBA"). Under such circumstances, Plaintiff's state law claims are preempted by the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.*, thereby depriving this Court of subject matter

jurisdiction.[2] Accordingly, summary judgment is appropriate as to these four Counts.

(1)    PREEMPTION UNDER THE RAILWAY LABOR ACT

The purpose of the Railway Labor Act ("RLA") is "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions, [and] … to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. §151a(4) and (5). If the employer and employee/union cannot come to agreement on a dispute, the matter is to be resolved by arbitration as set forth in the RLA. 45 U.S.C. §153(i).

Courts have interpreted the RLA to mean that claims that require interpretation of the contractual provisions of the CBA, or in which the conduct complained of was undertaken pursuant to the employer's rights under the CBA are "minor disputes."[3] Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers, 915 F.2d 43, 49 (1st Cir. 1990). "Minor disputes" are those involving grievances and in which the employer's actions are arguably warranted by the CBA. NRPC v. IAMAW, *supra* at 49-50. They often relate to the significance or proper use of certain provisions of the CBA to a particular event or set of circumstances. Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 723 (1945). "[F]ederal district courts do not have jurisdiction to adjudicate 'minor disputes' which properly belong before an Adjustment Board established under the RLA" or some other arbitration mechanism agreed upon in the CBA. NRPC v. IAMAW, *supra* at 49 (Adjustment Board has

---

[2]    Preemption under the RLA is governed by the same standard as that applied under § 301 of the Labor and Management Relations Act, 29 U.S.C. § 185. Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 262-263 (1994). Accordingly, Amtrak herein refers only to the RLA.

[3]    Major disputes are those between railroads and their employees concerning collective bargaining. NRPC v. IAMAW, *supra* at 49; RLA 45 U.S.C. §151a. They generally concern disputes over the creation of collective bargaining agreements or efforts to change the nature of an existing agreement. Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 723 (1945).

exclusive jurisdiction over "minor disputes"); 45 U.S.C. §153(i). There is a "relatively light burden which the railroad must bear in establishing exclusive arbitral jurisdiction under the RLA." Id. *citing* Conrail v. RLEA, 109 S.Ct. 2477, 2482 (1989).

As a result, state claims that constitute "minor disputes" under the RLA are preempted from both state and federal court and must be resolved through the grievance process established in the CBA or by the RLA's mandated arbitration system. Id.; see Quesnel v. Prudential Ins. Co., 66 F.3d 8, 10-11 (1st Cir. 1995) and Acciavatti v. Prof'l Services Group, Inc., 982 F. Supp. 69, 74-76 (D. Mass. 1997) (state claims preempted by Labor Management Relations Act – "LMRA").

    (2)    THE COLLECTIVE BARGAINING AGREEMENT BETWEEN AMTRAK AND THE BLE

Amtrak had a CBA with the BLE, the union in which Plaintiff was a member, during the relevant time frame of 2001 and 2002. SMF at ¶¶ 16-17. There are a total of 37 rules, as well as addenda incorporated into the CBA, that spell out the mutual responsibilities of Amtrak, the BLE, and the members/employees. SMF at ¶17. Rule 1 of the CBA states that it governs *the working conditions of all BLE members* who are employees of Amtrak. Id. Rule 21, entitled Discipline and Investigation, sets forth the disciplinary process to be used. SMF at ¶18. It states that no engineer will be disciplined "until a full and impartial formal investigation has been conducted by an authorized Corporation officer." Id. This statement implies that the BLE's members may only be disciplined for just cause, i.e. violation of Amtrak rules and regulations or requirements set forth in the CBA itself. Moreover, this is the manner in which Rule 21 has been implemented by Amtrak and the union for many years. Ex. 4 at ¶18. Rule 25, Physical Reexamination, delineates the manner in which Amtrak may examine the health of engineers, including in circumstances in which the employee appears impaired in his or her ability to

perform service. SMF at ¶18.

"Collective bargaining agreements may include implied, as well as express, terms" and "the parties' practice, usage and custom is of significance in interpreting their agreement." Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 311 (1989). "The collective agreement covers the whole employment relationship." Id. at 312 (internal quotes and citations omitted).

    (3)    GENERAL CONCLUSION

Amtrak's CBA with the BLE is a broad agreement that falls within the requirements and purview of the RLA. Plaintiff's state law claims require interpretation of the parties' rights and obligations under the CBA in which Rule 1 states that the agreement will govern the working conditions of all BLE members who are employees of Amtrak. Accordingly, Plaintiff's state law claims are preempted as "minor disputes" by the RLA and are subject to its exclusive adjudicative procedures, and thus must be dismissed as this Court lacks subject matter jurisdiction over them.

Plaintiff and the BLE have already followed the RLA's mandated adjudicative system by grieving Plaintiff's medical disqualification and termination to the Public Law Board, which denied the grievance. SMF at ¶122. Any other grievances by Plaintiff that were not addressed in the afore-mentioned complaint process should have been incorporated therein. Plaintiff's failure to do so does not permit him to circumvent the process required by the RLA and bring such complaints before this Court. The RLA clearly establishes that there is no such jurisdiction.

**B.    Summary Judgment Must Be Granted on Count I, Defamation**

Plaintiff makes a number of allegations in his Second Amended Complaint and in Supplemental Answer No. 5 to Amtrak's Interrogatories (which provides the basis for this

Count), however very few of these constitute allegations that he was defamed. Ex. 37, Plaintiff's
Second Amended Complaint, at ¶¶ 85-124; Ex. 63, Plaintiff's Supplemental Answers to
Amtrak's Interrogatories, at Answer to Interrogatory No. (hereinafter "ATI #") 5. Significantly,
none of Plaintiff's allegations of defamation are subject to this Court's jurisdiction. Moreover,
even if this Court had jurisdiction over these claims, they are not supported by competent
evidence necessary for Plaintiff to meet his burden of proving the required elements of such
claims.

Defamation is the intentional or reckless publication of false material, by one without
privilege to do so, which ridicules or treats the plaintiff with contempt and causes damage to his
or her reputation. Elicier v. Toys "R" Us, Inc., 130 F.Supp.2d 307, 310 (D.Mass. 2001) *citing*
Correllas v. Viveiros, 410 Mass. 314, 319 (1991); see Cornwell v. Dairy Farmers of America,
Inc., 369 F. Supp. 2d 87, 110 (D. Mass. 2005) (citations omitted). It consists of the twin torts of
libel and slander – the former being written and the latter being oral. See LeBeau v. Town of
Spencer, 167 F. Supp. 2d 449, 456 (D. Mass. 2001). To prove a case of defamation, a non-public
figure must show that (1) the defendant made a false and defamatory statement, (2) of and
concerning the plaintiff, (3) that is published to a third party, and (4) which causes harm to the
plaintiff. See Cornwell at 110.

Mere statements of opinion are absolutely privileged under the First Amendment. See id.
(citations omitted). Generally, the determination of whether a statement is an opinion is a
question of law. Id. Further, truth is an absolute defense to slander. See Bander v. Metropolitan
Life Ins. Co., 313 Mass. 337, 342 (1943). And, where "the uncontroverted facts show that the
allegedly libelous statements were true, [summary] judgment for the defendant is warranted."
Milgroom v. News Group Boston, Inc., 412 Mass. 9, 12 (1991). Finally, to survive summary

judgment, Plaintiff must show recklessness in order to overcome the privilege afforded to

employers. See Elicier v. Toys "R" Us, Inc., 130 F. Supp. 2d 307, 311 (D. Mass. 2001).

Plaintiff alleges that he was defamed by Mr. DeModena's statements in his workplace

violence complaint, by comments supposedly made between Amtrak managers about his mental

stability and whether he believes himself to be the devil, by communications by Mr. O'Malley

and Dr. Pinsky to his union representative and Amtrak managers about his medical

disqualification, and by statements by Amtrak in adjudicative forums. See Ex. 37 at ¶¶93-127;

Ex. 63 ATI # 5. None of these statements constitute a valid claim of defamation before this

Court.

(1)     PLAINTIFF'S CLAIM OF DEFAMATION IS PREEMPTED BY THE RLA

All of the above-mentioned alleged defamatory statements are directly related to matters

associated with the termination of Plaintiff's employment. Ex. 37 at ¶¶ 85-128; Ex. 63 ATI # 5;

SMF at ¶¶ 113, 116, 119-120, 130-135. Most of these comments were raised in the Amtrak

hearing held in the spring of 2002 and the BLE's unsuccessful grievance to the Public Law

Board of the outcome of that investigation: adjudication associated with the CBA. Ex. 24; Ex.

48; Ex. 11; SMF at ¶¶ 113-116. Any such complaints that were not raised in that adjudicative

setting, should have been, with the exception of Amtrak's comments in its Position Statement to

the Massachusetts Commission Against Discrimination, which was prepared in defense against

his charge of discrimination arising out of his discharge. SMF at ¶123.

Any judicial resolution of these kinds of allegations must address the nature of the CBA

in order to find whether or not Plaintiff's employment was wrongfully terminated. Cullen v.

E.H. Friedrich Co., Inc., 910 F. Supp. 815, 823-24 (D. Mass. 1995) (plaintiff welder's

defamation claims directly relate to circumstances surrounding his alleged wrongful discharge

for altercation with fellow employee, and thus, are based on facts inextricably intertwined with grievance provisions of CBA); Mouradian v. John Hancock Cos., 751 F.Supp. 262, 267 (D.Mass. 1988) (federal preemption of insurance salesman's libel claim, based on discharge allegedly due to union activities, because the issues were inextricably linked to the requirements and rights set forth in the CBA).

A large number of other jurisdictions with state defamation claims that are very similar to that of Plaintiff have found preemption by federal law. Cullen *supra* at fn5 *citing* Shane v. Greyhound Lines, Inc., 868 F.2d 1057, 1063 (9th Cir. 1989) (federal preemption of defamation claim where alleged statements were contained in notices of termination required under the CBA); Willis v. Reynolds Metals Co., 840 F.2d 254, 254-255 (4th Cir. 1988) (federal preemption of slander claim because it concerned employer's right under the CBA to investigate harassment); Johnson v. Anheuser Busch, Inc., 876 F.2d 620, 624 (8th Cir. 1989) (federal preemption of libel claim because the alleged offending writings were prepared as part of the termination proceedings governed by the CBA); Bagby v. General Motors Corp., 976 F.2d 919 (5th Cir. 1992) (federal preemption of employee's claims that were not grieved in accordance with CBA rules); Durrette v. UGI Corp., 674 F.Supp. 1139, 1143 (M.D.Pa. 1987) (federal preemption of defamation claim related to charges of absenteeism because closely interrelated with his termination); Barbe v. Great Atlantic & Pacific Tea Co., 722 F.Supp. 1257, 1262 (D.Md. 1989) (federal preemption of libel for communications between employer and union concerning falsification of company documents because analysis of CBA was required); Chube v. Exxon Chemical Americas, 760 F.Supp. 557 (M.D.La. 1991) (federal preemption because defamation claim was associated with his termination and required interpretation of CBA); Green v. Hughes Aircraft Co., 630 F.Supp. 423, 426-427 (S.D. Cal. 1985) (federal preemption of

libel claims regarding theft because CBA controlled employee discipline process).

Hence, this Count is preempted by the RLA and this Court lacks jurisdiction to hear this matter.

    (2)      TO THE EXTENT PLAINTIFF'S DEFAMATION CLAIM IS NOT PREEMPTED, SUMMARY JUDGMENT IS APPROPRIATE BECAUSE PLAINTIFF HAS FAILED TO PRODUCE ANY EVIDENCE TO SATISFY THE ESSENTIAL ELEMENTS OF DEFAMATION AND/OR TO OVERCOME AMTRAK'S PRIVILEGES.

Despite Plaintiff's numerous alleged claims of defamatory statements that are featured in Count I of his Second Amended Complaint and in his supplemental response to Interrogatory No. 5, all of these statements are either: (a) not attributable to Amtrak; (b) not published to a third party; (c) not supported by competent evidence; (d) relay factual information which is true; (e) are protected under Amtrak's conditional privilege; and/or (f) are absolutely privileged. Ex. 37 at ¶¶ 84-128; Ex. 63 ATI # 5. As a result, none of Plaintiff's claims are sufficient to meet his burden of proof for a defamation claim, and summary judgment is appropriate.

    *a.* ***Any Conduct by O'Bryan Is Not Attributable to Amtrak and Does Not Constitute Publication by Amtrak of a Statement to a Third Party.***

Summary judgment is appropriate to the extent that Plaintiff attempts to support his defamation claim with conduct by his union representative, Michael O'Bryan, because such conduct does not satisfy the essential element of publication *by the defendant* to a third party. Ex. 63 ATI # 5, p.2, 2nd to last paragraph. See also Schmid v. Boston Edison Co., 914 F. Supp. 697 (D. Mass. 1996) (defamation claim fails where statement not attributed to named defendant).

    *b.* ***Statements Made Solely to Plaintiff or to Managers Involved with the Workplace Violence Complaint Fail to Satisfy the Essential Element of Publication to a Third Party.***

Summary judgment is appropriate to the extent that Plaintiff attempts to support his defamation claim with statements made solely to himself because any such statements do not

constitute publication to a third party. Ex. 63 ATI # 5, pp. 2-3, . See also Cornwell at 110.
Furthermore, conversations among Amtrak's managers about Plaintiff or the filing an internal
work-related document in the normal course of the managers' duties do not qualify as
"publication to a third party." See Ex. 37 at ¶¶85-107, 126; Ex. 63 ATI # 5, pp. 3-5. See also
White v. Blue Cross & Blue Shield of Ma, 442 Mass. 64 (2004).

### c. Many Statements Are Not Supported by Competent Evidence

Plaintiff supports his defamation claim in the Second Amended Complaint and his
Supplemental Answers to Interrogatories with the following allegations which are unsupported
by his personal knowledge, testimony of any witnesses, or documentary evidence and which
consist merely of self-serving conjecture or assumptions: Ex. 37 ¶¶85–93, 101-102, 104, and
122; Ex. 63 ATI#5, pp. 3.

Moreover, certain of Plaintiff's allegations are substantial misrepresentations of these
communications. The actual communications themselves do not rise to the level of defamatory
statements. Ex. 37 ¶¶ 85-93, 101-102, and 104; Ex. 21; Ex. 26; Ex. 27; Ex. 54.

### d. Many of the Allegedly Defamatory Communications Made Are True

Some of the statements and documents upon which Plaintiff's claim of defamation relies
do not qualify as defamatory statements because they are true. Milgroom supra at 12 (summary
judgment appropriate where allegedly libelous statements true). In particular, despite Plaintiff's
groundless mischaracterizations and distortions, Mr. DeModena's statements in the internal
Workplace Violence Complaint constitute reiterations of true facts, i.e the contents of the
offending documents within the "Letters from Hell" and Mr. DeModena's personal reaction
thereto (to which there is no contradictory information in the record). Ex. 22. Hence, Plaintiff's
misrepresentative allegations related thereto cannot be the basis of a defamation claim. Ex. 37 at

¶¶ 93-100; Ex. 63 ATI # 5, pp. 3.

### e. Many of the Allegedly Defamatory Communications Constitute Opinion Rather than Fact and Are Protected by the First Amendment

In addition, certain communications constitute opinion rather than fact, and are protected by the First Amendment. Cornwell, *supra* at 110, *citing* Levinsky's Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 130 (1st Cir. 1997). The determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion." Id. *citing* Friedman v. Boston Broadcasters, Inc., 402 Mass. 376, 379 (1988). The following allegations, even if such statements were made (Amtrak has denied some of these statements were made), concern opinions and therefore do not qualify as defamatory statements: Ex. 37 at ¶¶ 101-102, 104, 106, 108-110, 115, 120, 123, 125; Ex. 63 ATI #5, pp. 3-5.

### f. Many of the Allegedly Defamatory Communications Are Protected by the Employer's Conditional Privilege

Plaintiff also supports his defamation claim with allegations of communications made regarding internal, work-related communications among Amtrak supervisors during the normal course of duties and in furtherance of Amtrak's justified investigation into Plaintiff's behavior and fitness for duty. Ex. 37 at ¶¶ 93-100 (Mr. DeModena had every right to prepare a workplace violence complaint and send it to the TART committee); 103 (Mr. DePhillips acted appropriately as a TART member in providing his opinions to the TART, Mr. O'Malley, and Mr. DeModena about resolving the concerns expressed in Mr. DeModena's workplace violence complaint); 106-107 (Dr. Pinsky and his staff were well within their rights to send Mr. O'Malley tactfully worded statements about Plaintiff's medical disqualification without divulging any confidential medical information) 120 , 123-125; Ex. 63 ATI # 5. Even if these were considered to be publications to a third party, which is not the case as shown in sub-section b immediately above, these are

protected by Amtrak's conditional privilege to "disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." See Thomas v. Sears, Roebuck & Co., 144 F.3d 31, 34 (1st Cir. 1998) (citations omitted); McCone v. New England Tel. & Tel. Co., 393 Mass. 231, 235 (1984). This "privilege protects an employer's statements of opinion and facts, and statements that the employer reasonably believes to be true. It also extends to information which may turn out not to be true." Garrity v. John Hancock Mutual Life Ins. Co., No. 00-12143, 2002 U.S. Dist. LEXIS 8343, *12 (D. Mass. 2002) (citations omitted).

Plaintiff authored the "Letters from Hell" which Mr. DeModena perceived as a threat. Ex. 21; Ex. 22; SMF at ¶ 45. Once Mr. DeModena prepared the Workplace Violence Complaint, dated April 12, 2001, in accordance with Amtrak's Workplace Violence Policy, Amtrak's managers were obligated to view Plaintiff's conduct as a threat, take measures to evaluate Plaintiff's conduct, and determine whether Plaintiff posed any threat of harm to Amtrak employees or the traveling public. SMF at ¶¶ 21-26, 61. All of the actual communications for which there is any competent evidence in Plaintiff's Second Amended Complaint took place between the managers that were addressing this matter and who had reason to be informed about it. Ex. 37 ¶¶ 88-92, 102-103. Hence, none of these communications can support Plaintiff's defamation claim. See Thomas supra at 34 (comments made in internal company feedback and deficiency memoranda, including statement by employee that plaintiff was disloyal, a troublemaker and negative, do not rise to level of reckless publication and do not waive the privilege) (citations omitted); McCone supra at 235 (communications by immediate supervisors to department head in accordance with company's stated policy of conducting employee evaluations clearly serves employer's legitimate interest). Further, as mentioned in sub-section c

above, Plaintiff has failed to produce any evidence to support his conclusory allegations that the subject statements were unreasonable, false and/or the result of recklessness or actual malice. Thus, Plaintiff cannot show forfeiture by the Defendant of its employer's privilege by clear and convincing evidence. See Elicier at 310-11 (publication of defamatory statement to other employees does not alone establish recklessness; no evidence of reckless publication where all attendees at private meeting had direct interest in monitoring plaintiff's performance); Bratt v. Int't Bus. Machines Corp., 392 Mass. 508, 513-14 (1984) (showing of mere negligence is insufficient to establish forfeiture of employer's privilege – minimum level of misconduct required is recklessness; recklessness standard also applies to disclosure of employee medical records).

The communications between Dr. Pinsky and Mr. O'Malley on the one hand, and Mr. O'Bryan, Plaintiff's union representative on the other hand (and also between Mr. Doherty, a Labor Relations manager and Mark Kenny, another union representative) also fall within this conditional privilege. Ex. 37 ¶¶ 106, 108-120, 124-125; Ex. 63 ATI #5, p. 3 last ¶, p. 4. Mr. O'Bryan was acting as Plaintiff's agent. In such capacity he sought information about the basis for the medical disqualification. He also made substantial efforts to persuade the company that the decision to medically disqualify Plaintiff was wrong. As a result, Amtrak was compelled to communicate and deal with Mr. O'Bryan or be in violation of the CBA. Nonetheless, Amtrak's managers, including Dr. Pinsky and Mr. O'Malley, did not divulge any confidential medical information to Mr. O'Bryan. They merely told Mr. O'Bryan the minimal information to explain why Plaintiff had been medically disqualified and ordered to undergo a psychiatric fitness for duty exam.

There is only one unflattering communication concerning Plaintiff that was made beyond

the group of managers who had reason to know about the workplace violence complaint and Plaintiff's questionable conduct. This is the undated e-mail from Christa Cuppernull, a Labor Relations management employee, to John Humes, a payroll manager, that Plaintiff concludes was sent in February 2002. Ex. 65; Ex. 63 ATI # 5. Ms. Cuppernull, who was sending Payroll invalid payment claims received from Plaintiff, mentioned in passing that Plaintiff "had been removed from service due to insanity; I'm not kidding...." Ex. 65. The dissemination of an unflattering comment to other workers does not prove recklessness without something else. Elicier, *supra* at 311. There is no evidence that Ms. Cuppernull harbored any malice against Plaintiff. In fact, Plaintiff testified that, other than this e-mail, he was aware of no instances in which Ms. Cuppernull treated him in a maliciously false manner. Ex. 55 at 378. Importantly, there is no evidence that this e-mail was disseminated to anyone beyond Mr. Humes. Moreover, Plaintiff testified that he has no knowledge of Mr. Humes speaking disparagingly of him at any time. Ex. at 370-374. Additionally, Ms. Cuppernull, an assistant in the Labor Relations Department, was merely offering an opinion. However, even if this statement is considered to be one of fact, rather than opinion, it does not rise to the level of reckless publication because it is a single isolated instance involving only one recipient of the information, rather than the requisite publication to a broad spectrum of persons. McCone, *supra* at 235. Hence, there is no basis to find that Amtrak forfeited its conditional privilege through this stray comment.

Significantly, Plaintiff did not mention this statement in his Second Amended Complaint. In fact, Plaintiff did not reference this alleged defamatory comment until he filed his supplemental answers to Amtrak's interrogatories in mid-2005. Ex. 63 ATI # 5. In his deposition, Plaintiff admits that he had no knowledge of this e-mail until 2005 when he received it from Amtrak's response to his request for documents. Ex. 55 at 372. Consequently, in the

event this e-mail, all by itself, were somehow deemed to waive the conditional privilege via

recklessness, Plaintiff experienced no harm from this communication.  Without evidence of

harm, the fourth element in a defamation claim, there can be no finding of defamation.

### (g) *Statements made during the course of a judicial proceeding are absolutely privileged.*

"[S]tatements made in the course of judicial proceedings which pertain to those judicial

proceedings are absolutely privileged and cannot form the basis for a defamation claim, even if

uttered with malice or in bad faith." <u>Sietins v. Joseph</u>, 238 F. Supp. 2d 366, 378 (D. Mass. 2003).

Plaintiff alleges that Amtrak defamed him through the defenses it expressed in its Position

Statement submitted to the Massachusetts Commission Against Discrimination in opposition to

his Charge of Discrimination. Ex. 37 at ¶¶ 123-125.  Although Amtrak does not agree with

Plaintiff's characterization of Amtrak's comments in the Position Statement, any statement that it

made in its defense therein would be protected by this absolute privilege.  Otherwise parties

would find it difficult to defend themselves without subjecting themselves to defamation claims.

Likewise, any unfavorable references to Plaintiff in the decision letter of Ms. Gaines

(Plaintiff complains of such in Ex. 37 ¶124; and Ex. 63 ATI # 5), the hearing officer who

presided over the insubordination hearing at Amtrak, are protected because they were made in a

quasi-judicial forum.  <u>See</u> <u>Johnson v. Board of Bar Overseers of Mass.</u>, 324 F.Supp. 2d 276, 286

(D.Mass. 2004) *citing* <u>Bettencourt v. Board of Registration in Medicine</u>, 904 F.2d 772, 782 (1st

Cir. 1990).  In the alternative, as mentioned above in sub-section f immediately above, such

statements are protected by Amtrak's conditional privilege to make statements in internal

investigations.  Accordingly, summary judgment is appropriate to any extent that Plaintiff

supports Count One with statements made during the MCAD proceedings.

In conclusion, Plaintiff's defamation claim is preempted by the RLA thereby depriving this Court of jurisdiction over Count I. In the alternative, all of Plaintiff's allegations have been shown to lack any legal or factual basis to be considered defamatory statements. Moreover, there are no genuine issues of disputed material fact on this subject. Consequently, summary judgment must be granted as to Count One.

### C.    Summary Judgment Must Be Granted on Count Two, Invasion of Privacy

Plaintiff claims that Amtrak violated his privacy rights pursuant to M.G.L. c. 214, § 1B because it required him to undergo a psychiatric fitness for duty exam. Ex. 37 at ¶¶ 184-189; Ex. 63 ATI #6 pp. 6 (last ¶), 9-12. This claim necessarily fails because it is preempted by the Federal Railway Labor Act. In the alternative, it fails because Amtrak did not gather and disseminate information of a highly intimate and personal nature concerning Plaintiff without a legitimate reason for doing so. SMF at ¶¶ 36-42, 71. All of the few instances in which Amtrak considered Plaintiff's private medical condition were done in a confidential manner for the limited and appropriate purpose of determining his fitness for duty. SMF at ¶¶ 136-137. There are no genuine issues of disputed material fact on this issue. SMF ¶137. Finally, Massachusetts does not recognize false light invasion of privacy, one of the theories set forth by Plaintiff in Count II. Ex. 37 at ¶¶ 237-239.

### (1)    PLAINTIFF'S CLAIM OF INVASION OF PRIVACY IS PREEMPTED BY THE RLA

All of the activities which allegedly violated Plaintiff's privacy rights are directly related to matters associated with the termination of Plaintiff's employment. Ex. 37 at ¶¶ 129-238; Ex. 63 ATI # 6; SMF at ¶¶ 136-139. Most of these comments were raised in the Amtrak hearing held in the spring of 2002 and the BLE's unsuccessful grievance to the Public Law Board of the outcome of that investigation: adjudication associated with the CBA. Ex. 24; Ex. 48; Ex. 11;

SMF at ¶¶ 57-122. Any such complaints that were not raised in that adjudicative setting, should have been.

Federal preemption of this Count is therefore required because any judicial resolution of these kinds of allegations must address the nature of the CBA in order to find whether or not Plaintiff's employment was wrongfully terminated. See Gore v. TWA, 210 F.3d 944, 951-952 (8th Cir. 2000) (Invasion of privacy claim or airline employee accused of threatening to harm other employees preempted by RLA because company's actions guided by CBA); Connolly v. Boston Edison Co., 2001 WL 575868 (D.Mass.) (Invasion of privacy claim of utility worker accused of violating company drug policies preempted by LMRA because it is "inseparable from what is 'reasonable' under the CBA); Jackson v. Liquid Carbonic Corp., 863 F.2d 111, 114-122 (1st Cir. 1988) (Invasion of privacy claim of truck driver accused of violating company drug policies preempted by LMRA because the claim is inextricably interrelated with the CBA agreed-upon policies and procedures and employees should not be permitted to circumvent established grievance procedures). Hence, this Count is preempted by the RLA.

(2)    AMTRAK DID NOT VIOLATE PLAINTIFF'S PRIVACY RIGHTS PURSUANT TO M.G.L. c. 214 OR THE COMMON LAW

Plaintiff asserts that Amtrak invaded his privacy by inducing him to reveal confidential matters relative to diagnosis and treatment. Ex. 37 at ¶¶ 240-241. However, this claim cannot succeed because Plaintiff has failed to offer any competent evidence to "prove not only that the defendant unreasonably, substantially and seriously interfered with his privacy by disclosing facts of highly personal or intimate nature, but also that it had no legitimate reason for doing so." Martinez v. New England Med. Center Hospitals, Inc., 307 F. Supp. 2d 257 (D. Mass. 2004); see M.G.L. c. 214, § 1B.

In January 2001, in accordance with longstanding Amtrak policies and the CBA (Rule

25), Plaintiff was examined by Amtrak's external medical provider in order to return from a medical leave of absence. SMF at ¶36. Dr. Morris conferred with Plaintiff's psychiatrist at Plaintiff's recommendation. Ex. 63 at ATI # 6. This information, along with information concerning hernias, was relayed to Amtrak's Health Services, but nowhere else. SMF at ¶¶ 136-137.

In May 2001, Amtrak's TART committee sent the "Letters from Hell"[4] to Dr. Pinsky in Health Services for advice on what action should be taken in response to these documents and Mr. DeModena's workplace violence complaint. SMF at ¶¶ 69-71. This procedure was in accordance with Amtrak's workplace violence policy (PERS-42) and Rule 25 of the CBA. SMF at ¶¶ 18, 21. Dr. Pinsky evaluated the documents, found them troubling and medically disqualified Plaintiff until he could undergo a psychiatric fitness for duty exam. SMF at ¶71. Dr. Pinsky then provided an independent psychiatrist, Dr. Vasile, with portions of Plaintiff's medical file and the "Letters from Hell." SMF at ¶¶136-137. Dr. Vasile did not provide these documents or information about Plaintiff's medical history to anyone else. SMF at ¶138.

With respect to Amtrak's conduct from May 2001 forward concerning the fitness for duty exam, Plaintiff has neither alleged facts, nor adduced any evidence, that Amtrak actually gathered or otherwise obtained information of a highly private nature. See French at 132 (quoting Cort v. Bristol-Myers Co., 385 Mass. 300, 302-03 (1982) (no claim for invasion of privacy exists where employer failed to obtain information regarded as confidential or personal)). Despite the numerous allegations with respect to the order that Plaintiff submit to a fitness for duty evaluation, *Plaintiff never underwent the exam.* SMF at ¶¶ 89, 101, 107. There is simply no evidence that confidential matters relative to Plaintiff's diagnosis and treatment

---

[4]    The "Letters from Hell" are certainly not private since Plaintiff himself distributed the "Letters from Hell" to Amtrak employees. Ex. 37 ¶ 81.

were obtained by Amtrak or otherwise revealed to it by Plaintiff or any other person or entity.
SMF at ¶137.

The only other person involved in these matters was Michael O'Bryan, Plaintiff's union
representative, who was acting as Plaintiff's agent, either on direct or apparent authority. SMF at
¶13. He admits he was never given any of Plaintiff's medical records nor provided any medical
information or diagnoses by Dr. Pinsky or Dr. Vasile. SMF at ¶139. The only information he
obtained, at Plaintiff's request, was an explanation of the basis for the medical qualification, i.e.
the troubling nature of the "Letters from Hell." SMF at ¶76.

Amtrak's conduct was reasonable and did not interfere with Plaintiff's privacy
whatsoever. No departmental managers ever learned anything about Plaintiff's medical
condition or history and no one outside of Amtrak, except Dr. Vasile, a psychiatrist subject to
ethical and statutory confidentiality obligations, was provided such information. SMF at ¶¶136-
39.

Moreover, Plaintiff exhibited behavior which obligated Amtrak to conduct an
investigation into Plaintiff's fitness for duty, and more specifically, to determine whether
Plaintiff posed an actual threat to any Amtrak employee and/or the public at large. SMF at ¶¶
22-27, 43-56, 71. In light of Plaintiff's behavior, and pursuant to its rights under the collective
bargaining agreement, Amtrak was both obligated and entitled to order Plaintiff to undergo a
fitness for duty evaluation. Id. Thus, *even if Amtrak had acquired information deemed highly
personal*, it would have had a legitimate reason for "infringing" upon Plaintiff's implicated
privacy rights by obtaining psychiatric information relevant to whether Plaintiff posed a safety
risk to Amtrak employees or the traveling public. See Schlesinger v. Merrill Lynch Pierce,
Fenner & Smith, Inc., 409 Mass. 514, 518 (1991) (summary judgment is appropriate where

serious or substantial interferences are reasonable or justified); see also Cort *supra* at 308 (information that an employee should reasonably be expected to disclose varies depending on the nature of the employment).

Of significance, "there are circumstances in which it is legitimate for an employer to know some 'personal' information about its employees, so long as information reasonably bears upon the employee's fitness for, or discharge of, their employment responsibilities." French v. U.S. Parcel Service, Inc., 2 F. Supp. 2d 128, 131 (D. Mass. 1998). Moreover, "[s]tatements that are limited to issues regarding the plaintiff's fitness [do] not constitute an unreasonable interference with plaintiff's privacy." See Martinez at 267.

Based on the foregoing, summary judgment is appropriate as to Count Two because Plaintiff has failed adduce any evidence that Amtrak engaged in unreasonable and serious or substantial conduct in violation of his privacy rights under M.G.L. c. 214, § 1B.

    (3)    MASSACHUSETTS DOES NOT RECOGNIZE A CAUSE OF ACTION FOR FALSE LIGHT INVASION OF PRIVACY.

Plaintiff alleges that Amtrak placed Plaintiff in a false position in the public eye, by attributing to Plaintiff views which he does not hold, and by communicating and distributing false statements regarding Plaintiff's medical condition, state of mind and performance abilities. Ex. 37 at ¶¶ 239 and 241; Ex. 63 ATI # 6. Summary judgment is appropriate, however, with respect to these claims because Massachusetts does not recognize a cause of action for false light invasion of privacy. See Dasey v. Anderson, 304 F.3d 148, 154 (1st Cir. 2002); Albright v. Morton, 321 F. Supp. 2d 130, 140 (D. Mass. 2004).

Further, to any extent the Court interprets Plaintiff's claim as sounding in defamation, rather than invasion of privacy, Amtrak refers this Court to its discussion *supra* Section III.B. See Albright at 140 (noting that the plaintiff objected to the making of *false* statements, rather

than disclosure of private information, as required under M.G.L c. 214, § 1B).

In conclusion, Plaintiff's invasion of privacy claim is preempted by the RLA thereby depriving this Court of jurisdiction over Count II. In the alternative, all of Plaintiff's allegations have been shown to lack any legal or factual basis to be considered an invasion of his privacy. Moreover, there are no genuine issues of disputed material fact on this subject. Consequently, summary judgment must be granted as to Count Two.

### D.    Summary Judgment Must Be Granted on Plaintiff's Count Seven Claim of Personal Injury in Violation of FELA, and Claim of Intentional Infliction Of Emotional Distress

Plaintiff brings his claims against his employer, Amtrak, a national railroad. As such, his claims for personal injury fall within and are limited by the scope of the Federal Employer's Liabilty Act ("FELA").

### (1)    PLAINTIFF HAS NO VALID CLAIM UNDER FELA

FELA imposes liability on railroad common carriers for injury caused by their *negligence* to persons while they are employed. 45 U.S.C. §51. To prove that an employer was negligent, a plaintiff must establish the common law elements of negligence, including duty, breach, foreseeability, and causation. *Adams v. CSX Transp.,Inc.,* **899 F.2d 536**, 539 (6th Cir. 1990) (quoting *Robert v. Consol. Rail Corp.*, **832 F.2d 3**, 6 (1st Cir. 1987)); *Frieri v. CSX Transp., Inc.,* No. 01 C 7934, 2003 WL 22425022, at 5 (N.D. Ill.). FELA generally applies to physical injury. There is no cause of action under FELA for workplace stress. Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 546 (1994). Claims of emotional distress are only cognizable under the statute for those railroad employees who suffer emotional distress as a result of a physical impact or are a direct result of being in the zone of danger of a physical impact on the job. Id. Workers outside the zone of danger will not will be able to recover for emotional injury. Id.

Plaintiff has made no claim that he suffered emotional harm while on duty as the result of actions taken by Amtrak. In particular, he has not claimed that his emotional distress was caused by being in the zone of danger in the workplace. Consequently, he has no claims that he can bring under FELA and summary judgment should be granted on this portion of Count VII.

(2)    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Summary judgment should be granted on Plaintiff's state claim of intentional infliction of emotional distress because: (a) it is preempted by the Railway Labor Act; (b) it must be brought under FELA but fails to qualify as a compensable claim thereunder; and (c) it cannot meet the requirements of such a claim brought under Massachusetts Common Law.

In Plaintiff's Second Amended Complaint and supplemental answers to interrogatories he describes an intentional ploy by Amtrak managers to use a workplace violence complaint to cause him emotional distress by forcing him to divulge his most private thoughts, feelings, and dreams in a non-confidential psychiatric examination and by having the opportunity to label him as mentally ill. Ex. 37 at ¶¶ 386-395; Ex. 63 ATI # 11.

**(a)    Plaintiff's Claim of Intentional Infliction of Emotional Distress is Preempted by the Railway Labor Act**

Amtrak's conduct, which allegedly constitutes intentional infliction of emotional distress, is once again directly related to matters associated with the termination of Plaintiff's employment. Ex. 37 at ¶¶ 386-385; Ex. 63 ATI # 6; SMF at ¶¶ 116, 119-120, 130-135; Ex. 24. In this instance, with respect to the small portion of these allegations that contains any truth (most are wild and unsupported distortions), Amtrak medically disqualified Plaintiff and arranged for a fitness for duty exam in response to a perceived workplace violence threat in accordance with its workplace violence policy and the CBA, in particular Rule 25. Hence, the merits of Plaintiff's claim are inextricably linked to the CBA and whether or not Amtrak's

conduct appropriately reflected the requirements of the agreement.

This issue was already resolved in the Amtrak hearing held in the spring of 2002 and the

BLE's grievance to the Public Law Board of the outcome of that investigation. Ex. 24; Ex. 48;

Ex. 11; SMF at ¶¶ 113-119. Both of those proceedings were undertaken pursuant to the CBA

and RLA and both decisions validated Amtrak's conduct in this matter. Plaintiff is currently

appealing the Public Law Board's decision in a petition for judicial review filed with this Court

in January 2005. This is the last legal avenue in which Plaintiff can pursue this claim. In light of

these circumstances, any other efforts to adjudicate this issue are preempted by the RLA.

A large number of cases concerning intentional emotional distress claims have been

found to be preempted by the RLA or LMRA in a variety of federal and other jurisdictions on the

same legal basis. Many of them closely parallel the facts and circumstances of this case. See

Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d. 21, 27-28 (1st Cir. 1997) (LMRA

preempted Teamster member's intentional emotional distress claim which was based upon his

termination for failure to take a drug test because a decision on this matter requires review of the

CBA); McDavitt v. Illinois C. G. R. Co., 666 F. Supp. 106, 109 (S.D.Miss. 1987) (RLA

preempted intentional emotional distress claim of engineer who was dismissed for rules

violations because he was seeking a new decision over claims that were essentially the same as

those previously ruled upon by the Public Law Board); Nelson v. Soo Line R. Co., 58 F.2d 1023,

(D.Minn. 1999) (RLA preempted employee's intentional emotional distress claim centered upon

his suspension for failure to comply with requirement to have medical check-up after an accident

on the job because it was a "minor dispute"); Southern Pacific Transp. Co. v Superior Court of

State, (1987, App) 153 Ariz 551, 739 P2d 205 (RLA preempted mechanic's state law intentional

infliction of emotional distress claim based upon being forced to undergo a post-accident

medical examination because the civil action was based on matters that were closely interrelated with the CBA's grievance requirements, and the policies and procedures of his employment).

Similarly, summary judgment should be granted on Plaintiff's claim of intentional infliction of emotional distress so that the policies and procedures of the RLA are not circumvented.

### (b)  Plaintiff's Claim Cannot Prevail as a Matter of Law under FELA under which It Must Be Filed

In the alternative, in the event the Court finds that this claim is not preempted by the RLA, Plaintiff's claim must be brought under FELA because all state claims of negligent and intentional infliction of emotional distress are preempted by FELA. Teague v. National Railroad Passenger Corp., 708 F.Supp. 1344, 1354 (D.Mass. 1989).[5] However, as shown in Section (1) above, Plaintiff's emotional distress claims do not qualify for protection under FELA. Gottshall, *supra* at 546. As a result, summary judgment must be granted on Plaintiff's state claim of intentional infliction of emotional distress.

### (c)  Plaintiff's Claim Fails to Meet the Legal Requirements of a State Claim of Intentional Infliction of Emotional Distress

Again, in the alternative to the extent the Court finds that Plaintiff may make a claim of intentional infliction of emotional distress under the law of the Commonwealth of Massachusetts, summary judgment should be granted on this claim.   To sustain a claim for intentional infliction of emotional distress, Plaintiff must prove that:  (1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of its conduct; (2) the defendant's conduct was extreme and outrageous; (3) the

---

[5]      This is similar to legal doctrine pertaining to employees who do not work for railroads or federal entities whose claims for intentional infliction of emotional distress are barred by the exclusivity provision of the Massachusetts Workers' Compensation Act, M.G.L. c. 152, § 24. See Acciavatti v. Prof'l Services Group, Inc., 982 F. Supp. 69, 77 (D. Mass. 1997) (citing Clarke v. Kentucky Fried Chicken of California, Inc., 57 F.3d 21, 28-29 (1st Cir. 1995) and Foley v. Polaroid Corp., 381 Mass. 545, 548-49 (1980)).

defendant's actions were the cause of the plaintiff's distress; and (4) the emotional distress

sustained by the plaintiff was severe. See Orell v. UMass Memorial Med. Center, Inc., 203 F.

Supp. 2d 52, 69 (D. Mass. 2001) (quoting Haddad v. Gonzalez, 410 Mass. 855, 871 (1991)).

Under the facts in this civil action, Plaintiff cannot prove the second element of this tort,

extreme and outrageous conduct. "Conduct is extreme and outrageous if it goes 'beyond all

possible bounds of decency and is utterly intolerable in a civilized community.'" Orell supra at

69-70 (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 145 (1979)); Flibotte supra at 27.

Thus, Plaintiff "must establish *more than* tortious or even criminal intent or that the employer

has intended to inflict emotional distress, or even that [their] conduct has been characterized by

malice or a degree of aggravation." Id. at 70 (citations and internal quotation marks omitted)

(emphasis added).  Summary judgment is appropriate where the Court determines that the

defendant's conduct cannot reasonably be regarded as so extreme as to permit recovery. Id.

The evidence in the record of Amtrak's conduct in this matter cannot as a matter of law

support this high burden for Plaintiff to overcome.  Amtrak followed the procedures in its

workplace violence policy and Rule 25 of the CBA.  It is well established that a defendant cannot

be held liable for conduct that merely consists of insisting upon its legal rights, even if it knows

the result is likely to be emotional distress. Flibotte, *supra* at 27.  Moreover, there is no evidence

of the scheme alleged by Plaintiff, only self-serving and rather scandalous conjecture and

assumptions.  The only evidence as to the motives related to Plaintiff's medical disqualification

of Amtrak management, including Dr. Pinsky, is attached hereto in the form of sworn

declarations and the testimony at the Amtrak hearing held in the spring of 2002.  Not only has no

one admitted to any such "ploy," but all vociferously deny it.  In fact, all of the evidence shows

that only Dr. Pinsky made the decision to medically disqualify Plaintiff and require that he

undergo the fitness for duty examination.  Dr. Pinsky was not familiar with Plaintiff, did not

work with him, and had no reason to wish to cause him harm or emotional distress.

Consequently, there are no genuine issues of disputed material fact with respect to

whether Amtrak's conduct could be found to be extreme and outrageous, and summary judgment

should be granted.

E.    **Summary Judgment Should Be Granted on Count VIII, Wrongful
      Termination In Violation Of Public Policy**

Summary judgment should be granted on Plaintiff's state claim of wrongful termination

in violation of public policy on the following grounds:  (1) he is not eligible to bring such a claim

because he is not an at-will employee; (2) the civil action is preempted by the Railway Labor

Act; and (3) Plaintiff's allegations and evidence cannot meet the legal requirements of such a

claim brought under Massachusetts Common Law.

Plaintiff alleges that he "publicized personal ideas, political and moral principles,

personal philosophies and religious beliefs" to his union chairman and fellow union members.

Ex. 37 at ¶399; Ex. 63 ATI # 12.  In addition, he claims that Amtrak's managers created a "ruse"

using Amtrak's workplace violence policy to cause his termination for the purpose of quelling

his union-related communications and his exposure of alleged violations of federal regulations.

Ex. 37 at ¶399; Ex. 63 ATI # 12.

(1)    PLAINTIFF CANNOT BRING A CLAIM OF WRONGFUL TERMINATION
       BECAUSE HE IS NOT AN AT-WILL EMPLOYEE

Summary judgment is appropriate with respect to Count VIII because Plaintiff was not an

at-will employee.  "Only an at-will employee may avail [him]self of a cause of action for

wrongful discharge" in violation of public policy.  See Orell v. UMass Memorial Med. Center,

Inc., 203 F. Supp. 2d 52, 68 (D. Mass. 2002).  Plaintiff was a member of the BLE which had a

collective bargaining agreement with Amtrak. SMF at ¶¶ 16-17. Accordingly, he was not an at-will employee and may not state a claim for wrongful termination in violation of public policy, as this "common law exception to the employment at will doctrine simply does not apply to him." See Cullen v. E.H. Friedrich Co., Inc., 910 F. Supp. 815, 821 (D. Mass. 1995) (employee not an at-will employee where his employment was intimately bound by a collective bargaining agreement); Acciavatti v. Professional Services Group, Inc., 982 F. Supp. 69, 74-75 (D.Mass. 1997).

      (2)    PLAINTIFF'S CLAIM OF WRONGFUL TERMINATION IS PREEMPTED BY THE RAILWAY LABOR ACT

In the alternative, if the fact that he is not an at-will employee were not considered, Plaintiff's claims of wrongful termination in violation of public policy should be preempted by the RLA. Plaintiff's allegations in this Count are directly related to matters associated with the termination of his employment. Ex. 37 at ¶¶ 399-402; Ex. 63 ATI #12; SMF at ¶¶ 18, 43-122, 190; Ex. 24. In similar fashion to his claim of Intentional Infliction of Emotional Distress, addressed immediately above in Section D(2)(a), this claim concerns Amtrak's decision to medically disqualify Plaintiff and arrange for a fitness for duty exam in response to a perceived workplace violence threat in accordance with its workplace violence policy and the CBA, in particular Rule 25. Ex. 37 at ¶¶ 386-395; Ex. 63 ATI # 11; SMF at ¶¶ 43-122. Hence, the merits of Plaintiff's claim are inextricably linked to the CBA and whether or not Amtrak's conduct reflected the requirements of the agreement.

This case is similar to that of Acciavatti in which the plaintiff, a plant operator at the Brockton water treatment facility, was discharged for reportedly not doing his job properly. Acciavatti supra at 75-76 Mr. Acciavatti alleged that his employment was terminated because he informed Brockton City officials of ongoing contamination of the water supply. Id. at 72. He

was a member of a union which had a collective bargaining agreement with the defendant

(employer) which addressed disciplinary procedures. The court found that the resolution of the

claim would require analysis of the disciplinary section of the CBA. As a result, Mr.

Acciavatti's state law claim was found to be preempted by the Labor Management Relations Act

("LMRA") which has essentially the same preemption standard as the RLA. A similar result

obtained in another case in which an employee was fired by the defendant in order to prevent the

employee from receiving his earned commissions. Quesnel v Prudential Ins. Co., 66 F.3d 8, 10

(1st Cir. 1995). The LMRA preempted the state claim of wrongful discharge. Id.

    Hence, despite allegations that the defendants were committing substantial wrongdoing in

Acciavatti and Quesnel, potentially in violation of public policy, the courts found that there was

no jurisdiction for these matters which should properly be disposed of through the adjudicative

processes set forth in the CBA. The same result should apply to the instant case and summary

judgment be granted on Plaintiff's claim of wrongful termination in violation of public policy.

    (3)    PLAINTIFF CANNOT OTHERWISE MEET THE LEGAL REQUIREMENTS
            OF A WRONGFUL TERMINATION CLAIM

    In the event it were s determined that Plaintiff can bring this claim despite RLA

preemption and the fact that he is not an at-will employee, Plaintiff, as a matter of law, can still

not prove this cause of action. In order to prove a claim of wrongful termination under

Massachusetts Common Law, Plaintiff must prove that his employment was terminated for

standing up for a legally guaranteed right, doing what the law requires, or refusing to violate the

law. Smith-Pfeffer v. Superintendent of Walter E. Fernald State School, 404 Mass. 145, 149

(1989). Significantly, this cause of action does not protect employees who "perform

'appropriate, socially desirable duties' from being subject to discharge without cause." Cullen

supra at 821 citing Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 474 (1992).

Plaintiff has not stated an actionable public policy claim. At most, Plaintiff alleges that he performed the public deed of "whistleblowing." Ex. 37 at ¶¶ 399; Ex. 63 ATI # 12. However, as in Cullen, Plaintiff never informed any law enforcement agency of conduct which purportedly violated federal regulations. See id. at 822. Plaintiff also did not do as much as the plaintiff in Cullen (who alleged he informed his employer that he would be contacting the District Attorney about an illegal act) whose claim was found lacking by the court. Id. at 822.

Plaintiff admits that the activity for which he was allegedly terminated consisted of his distribution of the "Letters from Hell" to fellow union members. Ex. 37 at ¶ 363. Some of the documents in this package criticize mistakes made by his fellow engineers and other union employees of Amtrak, and malign his union representative, as well as Amtrak management and the MBTA. Ex. 22. In addition, some consist of communications between him and Michael O'Malley, one of Amtrak's managers, regarding the appropriateness of Plaintiff's operation of a train on October 9, 2000 and Amtrak's response thereto. Ex. 22. In some of these letters, Plaintiff suggests that Amtrak violated Rule 21 of the CBA due to the manner in which discipline for the October 9th offense was addressed. Ex. 37 at ¶¶ 36-40; 61-70. Further, he vaguely suggests that Amtrak's handling of that incident violated federal and state law, but he provides no specifics as to what conduct he is referring to and what laws were broken. Id. There is nothing else.

Even if Plaintiff could prove a connection between his "Letters from Hell" correspondence and his discharge, these arguments with his union representative and management do not come close to rising to the level necessary to qualify as whistleblowing such as to support a claim for wrongful termination in violation of public policy.

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT FIVE, UNFAIR LABOR PRACTICES

Plaintiff brings this federal claim directly pursuant to the Railway Labor Act, 45 U.S.C.s. 151 et seq. Ex. 37 at ¶364; Ex. 63 ATI # 9. He makes essentially the same allegations here as he made in Count VIII, Wrongful Termination, suggesting that he "publicized personal ideas, political and moral principles, personal philosophies and religious beliefs" to his union chairman and fellow union members. Ex. 37 at ¶¶ 360, 363; Ex. 63 ATI # 9. In addition, he claims that Amtrak's managers intimidated and harassed him to interfere with, and retaliate against him, for, his union activities. Ex. 37 at ¶¶ 364-366; Ex. 63 ATI No. 9.

As discussed frequently in Section III of the Memorandum, the type of allegations Plaintiff has made within this Count are controversies arising from the "interpretation or application of agreements concerning rates of pay, rules, or working conditions…" *Miller v. Norfolk and Western Ry. Co.*, 843 F.2d 556, 561 (6th Cir. 1987). According to the RLA, such claims are "minor disputes" which must be resolved through the arbitration mechanism set forth in the RLA. 49 U.S.C. §152, 153(a)-(i). Plaintiff and Amtrak have already followed this approach in response to Plaintiff's insubordinate conduct and his associated claims of wrongful termination via the Amtrak hearing in the spring of 2002, and the subsequent union grievances which were all denied and on which Plaintiff is currently seeking judicial review, pursuant to 49 U.S.C. §153(q). SMF at ¶¶ 113-122. Any other "minor disputes" between Plaintiff and Amtrak should have been addressed in the same manner. Moreover, such controversies cannot be resolved by this Court which lacks jurisdiction over such matters. NRPC v. IAMAW, *supra* at 49 (Adjustment Board has exclusive jurisdiction over "minor disputes").

Since Plaintiff has brought this Count solely pursuant to the RLA, there can be no question that the precepts of the Railway Labor Act apply to the allegations made therein.

Therefore this court cannot have subject matter jurisdiction over these alleged claims and summary judgment should be granted on this Count.

## V.    SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT THREE, DISCRIMINATION AND RETALIATION ON THE BASIS OF DISABILITY

Count III is entitled, "Discrimination on the Basis of Disability Americans with Disabilities Act, 42 U.S.C. ss. 12101 et. seq.; Massachusetts Civil Rights Act; M.G.L. c.151B; Rehabilitation Act Of 1973; 29 U.S.C. 701 et. seq." It consists of seven sub-counts in which Plaintiff has brought claims of discrimination and retaliation on the basis of disability under the Americans with Disabilities Act. In addition, scattered throughout this Count, Plaintiff makes several other claims based upon federal statutes which have some relation to disabilities or mental illness, and which will be addressed at the end of this section of Amtrak's Memorandum.

Although the title of this Count references the Rehabilitation Act of 1973, M.G.L. c.151B, and the Massachusetts Civil Rights Act, these are not addressed in any of the text in this Count or in any of the headings or text within the seven sub-counts. As a result, these will not be discussed in this motion other than to seek their dismissal for Plaintiff's failure to provide any factual or legal argument on their behalf. It is important to also note that the legal standard for claims brought under the Rehabilitation Act of 1973 is the same as that used for claims brought under the ADA. See Phelps v. Optima Health, Inc., 251 F.3d 21, 23 n.2 (1st Cir. 2001); Oliveras-Sifre v. Puerto Rico Dept. of Health, 314 F.3d 23, 25 n. 2 (1st Cir. 2000). Similarly, the legal standard for disability discrimination claims brought under M.G.L. c.151B is essentially the same as that of the ADA.[6] Consequently, even if these claims were properly brought before the

---

[6]    To prove disability discrimination under M.G.L. c. 151B, the plaintiff must present a *prima facie case* of discriminatory termination by proving that: (1) he is handicapped within the meaning of the statute; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) he was fired solely because of his disability. Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821 (1997); Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 449 (2002). The employer must then articulate "a

Court, the same result would obtain.

Furthermore, Plaintiff's claim in this Count pursuant to the Massachusetts Civil Rights Act, M.G.L. c. 12, was brought as a separate claim in Count Four. Amtrak refers the Court to its analysis in Section VI of this Memorandum, which is incorporated by reference herein, where Amtrak explains why summary judgment must be granted on this claim as well.

### A.    Plaintiff's Claim of Discrimination in Violation of the Americans with Disability Act Must Be Dismissed as a Matter of Law

Plaintiff has alleged in contradictory fashion that he was discriminated against on the basis of a disability [Ex. 37 at ¶¶ 297-304, 311-333; Ex. 63 pp. 16-18] and, alternatively, that he is not disabled, but was discriminated against by being perceived as suffering from a disability. Ex. 37 at ¶¶ 258, 279-284, 393; Ex. 63 pp. 15, 18. Summary judgment must be granted on both claims on which there are no genuine issues of disputed material fact.

### (1)    ADA LEGAL STANDARD FOR DISABILITY DISCRIMINATION

To state a prima facie claim of termination due to disability discrimination under 42 U.S.C. §§ 12112 (a) of the Americans with Disabilities Act ("ADA"), Plaintiff must establish by a preponderance of the evidence that (1) he was disabled within the meaning of the ADA; (2) he was a qualified individual, i.e. able to perform the essential functions of the position with or without reasonable accommodation; and (3) he was discharged solely because of his disability. See Ward v. Massachusetts Health Research Institute, Inc., 209 F.3d 29, 33 (1st Cir. 2000).

Once the defendant articulates a legitimate business reason for the termination, the plaintiff must prove by a preponderance of the evidence that the defendant's explanation was a

---

lawful reason or reasons for its employment decision [and] produc[ing] credible evidence to show that the reason or reasons advanced were the real reasons." See Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 665-666 (2000); see Labonte supra 821. Finally, the plaintiff must show that the basis of the employer's decision was pretext for unlawful discrimination. See Abramian v. Harvard, 432 Mass. 107, 117 (2000) citing Blare, at 442- 443, 446.

pretext for discrimination. <u>Reeves v. Sanderson</u>, 120 S.Ct. 2097, 2106 (2000); <u>St. Mary's Honor</u>

<u>Center</u>, 509 U.S. 502,507-508, 523-524 (1997); <u>Tobin v. Liberty Mutual Ins. Co.</u>, 2005 WL

2882243 *3 (1st Cir., Mass.).

> (2)    PLAINTIFF WAS NOT A QUALIFIED INDIVIDUAL WITH A DISABILITY
>        UNDER THE ADA

The ADA defines "disability" with respect to an individual as "(A) a physical or mental

impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment;[7] or (C) being regarded as having such an impairment." <u>See</u>

42 U.S.C. § 12102 (2).  Based on this definition of "disability" and the foregoing legal standard

for ADA claims and considerations, Plaintiff has failed to adduce any evidence that he is a

"qualified individual with a disability" under the ADA.  Interestingly, throughout his numerous

factual allegations and claims of disability discrimination (and retaliation) under the ADA,

Plaintiff vacillates between the inconsistent theories of actual disability and perceived disability.

Accordingly, Amtrak addresses each theory in turn.

> *(a)    Plaintiff is not an individual with a physical or mental impairment that*
>        *substantially limits one or more major life activities.*

To sustain a claim based on an actual disability, Plaintiff must establish more than the

mere existence of an impairment. <u>See</u> <u>Cornwell v. Dairy Farmers of Am., Inc.</u>, 369 F. Supp. 2d

87, 101 (D. Mass. 2005) (quoting <u>Toyota Motor Mfg., Kentucky, Inc. v. Williams</u>, 534 U.S. 184,

195 (2002)).  Plaintiff must demonstrate that (1) the impairment limits a major life activity, (2)

the limitation is "substantial," i.e., "considerable" or "to a large degree," and (3) the impact of

the impairment is permanent or long term. <u>See</u> <u>id.</u> at 102 (quoting <u>Toyota</u> at 195-97 and <u>Benoit v.</u>

---

[7] Pursuant to subsection (B) of 42 U.S.C. 12102 (2), an individual with a "record" of a disability as defined by the Act, "has a history of, or has been misclassified as having, a mental or physical impairment that substantial limits one or more major life activities." <u>See</u> 29 C.F.R. § 1630.2 (k).  Plaintiff does not appear to assert a disability under subsection (B).  However, to any extent that he attempts to do so, Amtrak refers this Court to its assertion that Plaintiff fails to establish a disability under subsections (A) and (C), as the analysis is the same.

Technical Mfg. Corp., 331 F.3d 166, 176 (1st Cir. 2003)).

Plaintiff has failed to allege or adduce any evidence of an actual disability. Quite to the contrary, Plaintiff's admissions in his MCAD Complaint and deposition indicate that he *does not believe himself to have a disability* within the meaning of the ADA. Ex. 49; Ex. 55 at 405-406.

As a result, Plaintiff cannot show that his condition limits a major life activity, that the limitation is substantial, and that the impact of the impairment is permanent or long term. Hence, there is no factual dispute that under this legal argument, Plaintiff is unable to prove the very first element of the three necessary elements of a *prima facie case*.

### (b)    *Amtrak did not regard Plaintiff as having a physical or mental impairment that substantially limited one or more major life activities.*

To sustain a claim based upon the theory of a perceived disability under 42 U.S.C. § 12102 (2) (C) of the ADA, Plaintiff must establish that Amtrak "regarded him as disabled *within the meaning of the ADA.*" Cornwell, *supra* at 103 (quoting Benoit at 176). It is insufficient to merely show that Amtrak perceived him as "*somehow* disabled." Id. Instead, Plaintiff must demonstrate that he was regarded as having an impairment that substantially limited one or more major life activities. Id. at 101-103. "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2 (i). Further, "[w]ith respect to the major life activity of working, … [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2 (j) (3); see  Cornwell *supra* at 103.

At no point did Amtrak regard Plaintiff as having an impairment that substantially limited

a major life activity. All of the evidence indicates that Amtrak had concerns in the spring of 2001 about Plaintiff's ability to safely perform his job as a locomotive engineer based upon the troubling language in the "Letters from Hell." SMF at ¶¶43-71. In response, Amtrak temporarily medically disqualified him from work, while continuing to pay his full salary, until he underwent a fitness for duty exam that was scheduled to take place one month after his disqualification. SMF at ¶¶ 71-81. No examination ever occurred. SMF at ¶ 101, 107, 110. If Plaintiff had undergone the evaluation and been found fit for duty, he would have suffered no harm whatsoever.

Plaintiff alleges that he was perceived as being disabled as that term is used in the ADA but provides no evidence other than his own assumptions. Ex. 37 at ¶¶ 279-284. No diagnosis was ever made by Dr. Pinsky, Amtrak's Medical Director, the manager who medically disqualified Plaintiff, or anyone else. SMF at ¶71. No one stated that Plaintiff could not work on this job, let alone a broad range of jobs as is required under the ADA. SMF at ¶¶142, 145-148; Cornwell supra at 103. Dr. Pinsky denies under oath that he ever determined or assumed that Plaintiff was disabled. SMF at ¶148. Mr. O'Malley, the supervisor who temporarily removed Plaintiff from service because of the medical disqualification, and who brought charges against Plaintiff for insubordination, also denies under oath that he determined or even assumed that Plaintiff was disabled, or that he even had the ability to make such a determination. SMF at ¶145. No other manager has stated or written anything to indicate that Plaintiff was considered disabled. SMF at ¶¶ 145-146.

Significantly, Plaintiff has not even stated that he was told by any Amtrak manager that he was considered to be disabled. See Ex. 37 at ¶¶ 244-339; Ex. 63 ATI # 7. Moreover, Michael O'Bryan, Plaintiff's union representative, also has not provided any testimony that Amtrak

38

management informed him of any such perception of Plaintiff. SMF at ¶ 153. There are no documents that state that Plaintiff was temporarily removed from service because he was thought to be disabled. See SMF at ¶¶ 71, 143, 146-147.

It is important to recognize that even if Plaintiff had been found at a psychiatric examination to be unable to safely perform his responsibilities as a locomotive engineer, this does not mean that he would have been deemed "disabled" under the ADA. He might have been found to still be able to perform a broad range of jobs at Amtrak or elsewhere.

Finally, Amtrak was justified in its decision to medically disqualify Plaintiff due to safety considerations pursuant to the direct threat defense. The ADA permits employers to use "qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity." 42 U.S.C. §12113. Amtrak's Workplace Violence policy permits a variety of responses to actual or potentially threatening conduct, including the use of fitness for duty examinations by its medical directors. Ex. 12. In addition, the CBA permits Amtrak to medically disqualify individuals in such situations. Ex. 11 at Rule 25.

Amtrak's actions were premised upon its workplace violence policy – Mr. DeModena filed a complaint explicitly in compliance with Amtrak's policy. SMF at ¶¶ 58, 61. The TART committee, also concerned about the writings, sent the documents to Dr. Pinsky for his review. SMF at ¶¶ 65-71. Dr. Pinsky, also in accordance with the Workplace Violence policy, made a judgment call based upon the documents, and appropriately medically disqualified Plaintiff until a fitness for duty examination occurred. SMF at ¶71. He did not deem Plaintiff disabled, he merely took precautionary action. SMF at ¶71. If he had not done so, and Plaintiff had then

committed an act of violence, not only would someone have been unnecessarily put in harm's way, but Amtrak would have been subject to liability for its failure to follow its own guidelines.

If, in the absence of any competent evidence, the Court were to conclude that Plaintiff's mere self-serving allegations are sufficient to make a *prima facie* showing that Amtrak's temporary medical disqualification of Plaintiff is the legal equivalent of "perceiving someone as disabled" under the ADA, such a decision would undermine the important public policy of encouraging companies to protect their employees through the use of precautionary workplace violence policies. In that event, employees who are the subjects of workplace violence investigations due to erratic and threatening conduct or statements, would have a colorable claim of disability discrimination against the company simply because they said they were perceived as disabled. Employers would then hesitate to take precautionary action except in the most egregious or obvious of situations, thereby exposing their employees to unnecessary risk of harm.

>    (3)    PLAINTIFF CANNOT PROVE HE WAS DISCHARGED SOLELY BECAUSE
>           OF HIS DISABILITY

Even if Plaintiff could establish an issue of fact regarding whether he is a qualified individual with a disability, Plaintiff has still failed to adduce any evidence in support of the third prong of a *prima facie* case of disability discrimination. Plaintiff is unable to make the necessary showing that he was discharged solely because of his disability and that Amtrak's course of conduct in responding to Plaintiff's "Letters from Hell," which ultimately resulted in the discharge of Plaintiff for insubordination, constituted discrimination under the ADA.

The history of Plaintiff's discharge is well documented. He was ordered repeatedly to undergo a fitness for duty evaluation. SMF at ¶¶ 83, 90, 102, 105. Although Amtrak does not believe Plaintiff's claim that he never refused to undergo a psychiatric examination with Dr.

Vasile, for the purposes of this motion it is accepted that this is a disputed issue of material fact. However, there is no dispute that Dr. Vasile informed Amtrak in letters in July 2001, August 2001, and April 2002 that Plaintiff had refused to cooperate with the proposed examination, making it impossible. SMF at ¶¶ 103, 108, 112. Plaintiff again makes a wild and groundless allegation that Amtrak coerced Dr. Vasile to write false statements in these letters. Ex. 37 at ¶302. Dr. Vasile, Dr. Pinsky, and Mr. O'Malley have all signed sworn statements that no such coercion took place. SMF at ¶9; Ex. 4 at ¶¶6,7, 35. Furthermore, Dr. Vasile has sworn that these letters were true and written of his own volition. SMF at ¶108. Plaintiff's allegation of coercion is a ludicrous suggestion in light of the fact that Dr. Vasile did not know any of the participants in this matter, had never worked for Amtrak before, and has never provided any services to it since. Even Mr. O'Bryan testified in his deposition that it was clear to him that Plaintiff did not intend to cooperate with the fitness for duty examination. Ex. 39 at 374-386. Additionally, Mr. O'Bryan did not provide any testimony supporting Plaintiff's claim that Dr. Vasile's letters were coerced by Amtrak.

Hence, the evidence in the record shows that Mr. O'Malley made his decision to charge Plaintiff with insubordination on the reasonable understanding that Plaintiff had refused to cooperate with his orders. SMF at ¶111. Certainly there is nothing in the record to show that Plaintiff ever tried to persuade him otherwise. Whether Plaintiff actually refused to cooperate with Dr. Vasile or not, Amtrak had reason to believe that he had indeed refused. The lengthy Amtrak hearing held in the spring of 2002 directly concerned these issues and Plaintiff's insubordination. SMF at ¶116. The hearing officer, who was not an Amtrak employee, came to the conclusion that Plaintiff was insubordinate. SMF at ¶117. Only then was Plaintiff's employment terminated. SMF at ¶¶ 117, 120. Subsequently, the Public Law Board, a neutral

entity selected jointly by Amtrak and the BLE, agreed that Plaintiff's termination for insubordination was justified. SMF at ¶ 122.

In conclusion, there is more than enough solid evidence in the record to show that Amtrak had every right to discharge Plaintiff regardless of whether he was disabled or perceived to be disabled. Therefore, Plaintiff cannot prove he was discharged solely because he was perceived to be disabled.

(4)    PLAINTIFF CANNOT PROVE FAILURE TO ACCOMMODATE

At various times, Plaintiff has suggested that Amtrak denied him reasonable accommodation.[8] Ex. 37 at ¶¶ 258, 279-284, 299, 393; Ex. 63 ATI # 7. This claim cannot succeed because, as shown in sub-section 2(a) immediately above, Plaintiff denies that he is disabled. Ex. 55 at 405-406. He also admits that prior to the occurrences of May 2003 he was fully able to perform the essential functions of his locomotive engineer position without accommodation from Amtrak. Ex. 55 at 408.

Plaintiff alleges however that in June 2001 he sought special accommodation from Amtrak such that he would not have to undergo the fitness for duty exam. Ex. 37 at ¶299; Ex. 63 ATI # 7. Despite Plaintiff's contentions, under the ADA, "reasonable accommodation" does not include Plaintiff's request that Dr. Vasile permit Plaintiff to make alternate arrangements for Amtrak's evaluation of his medical condition. Nor does it include Plaintiff's request for the opportunity to confront Amtrak supervisors, agents and/or other employees to answer any concerns about materials written by Plaintiff. The only type of special accommodation to which the ADA pertains is the type that would permit individuals to perform their jobs despite their

---

[8] For the Court's convenience, "reasonable accommodation" may include "(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustments or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111 (9).

disability. Again, Plaintiff has stated on numerous occasions in numerous ways that he was not disabled and required no special accommodation in order to safely operate a locomotive. Ex. 49; Ex. 55 at 405-406; SMF at ¶¶140-141. In such circumstances where Plaintiff has failed to "make a threshold showing of disability," there can be no failure to accommodate. Cornwell supra at n13, citing Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002).

Accordingly, summary judgment is appropriate as to Count III because Plaintiff has adduced no facts in support of a *prima facie* showing that (A) he is an individual with a physical or mental impairment that substantially limits one or more major life activities, (B) he is an individual with a record of a physical or mental impairment that substantially limits one or more major life activities, and (C) he was regarded as having an impairment that substantially limits one or more major life activities, and (D) that he was discharged due solely to his disability. See 42 U.S.C. § 12102 (2).

(5)    AMTRAK HAS ARTICULATED A LEGITIMATE BUSINESS REASON

In the event the Court decides that Plaintiff has made the necessary proof of a *prima facie* case, Amtrak has clearly shown that it had compelling reasons to investigate and discharge Plaintiff for his insubordinate conduct in refusing to undergo the fitness for duty examination.

(6)    PLAINTIFF CANNOT PROVE PRETEXT FOR DISCRIMINATION

As shown in sub-sections 2-4, there is no competent evidence that Amtrak had any animus based upon disability for the discharge of Plaintiff. There has been no evidence of any other disability discrimination by Amtrak to show a pattern of conduct. There have been no statements by any managers, written or oral, to show animosity toward persons with disabilities. There has been no evidence that Mr. O'Malley, the manager who brought the charges against

Plaintiff, ever had any knowledge of Plaintiff's medical condition or history.

Plaintiff does make frequent and misguided reference to Amtrak's decision to medically disqualify him as being a pretext for Amtrak to get rid of him because of his allegedly troublesome union activities. Plaintiff constantly suggests that Mr. DeModena, Mr. DePhillips, and Mr. O'Malley conspired to fabricate concerns about his mental stability in order to get rid of him. Ex. 37 at ¶¶ 87-92, 345-347. These admissions show that Plaintiff does not believe, let alone have evidence, that Amtrak's managers fired him because they perceived him as disabled.

Under these circumstances, there are no genuine undisputed issues of material fact on this subject. As a result, Plaintiff's claim of disability discrimination must be dismissed as a matter of law.

**B.    Plaintiff's ADA Claim of Retaliation Must Be Dismissed as a Matter of Law**

To sustain a claim of retaliation, interference, intimidation and/or coercion under 42 U.S.C. § 12203 (a) and (b), Plaintiff must establish that (1) he engaged in activity protected under the ADA, (2) Amtrak knew of his protected activity; (3) Amtrak took adverse employment action against him; and (4) there is a causal connection between Plaintiff's protected activity and the adverse job action. Upon satisfying the foregoing elements and in response to Amtrak's legitimate reason for adverse job action, Plaintiff must show that Amtrak's proffered reason was pretext for retaliation based upon his ADA protected activities.

Summary judgment is appropriate on Plaintiff's claim of retaliation under the ADA because he cannot establish three of the four prongs of a *prima facie* case of retaliation.

First, Plaintiff did not engage in any activity protected by the ADA. The record is devoid of any indication that he testified for anyone bringing a claim of disability discrimination, or that he conducted any activities promoting the rights of disabled individuals. Nor, did he complain

orally or in writing to Amtrak that he was being discriminated against on the basis of a disability.
As previously mentioned, he has steadfastly maintained that he is not disabled and is fully
capable of safely performing his duties as a locomotive engineer. SMF at ¶¶140-141; Ex. 49;
Ex. 55 at 405-406.

Second, Plaintiff did not bring external or internal charges of disability discrimination
against Amtrak until February and March 2002, respectively. SMF at ¶¶ 123-128. Amtrak had
already brought its charges of insubordination against him in September 2001 and would have
conducted the investigative hearing shortly thereafter had the union not sought delays to prepare
Plaintiff's defense. SMF at ¶111. Hence, during the relevant time frame in which the charges
were brought against Plaintiff, Amtrak had no knowledge of Plaintiff's subsequent charges of
discrimination.

Third, there is no causal nexus between Plaintiff's protected activity and his discharge.
As previously mentioned, Amtrak was confronted with Plaintiff's insubordinate conduct in June,
July, and August 2001. SMF at ¶¶ 89, 103, 108. Accordingly, Amtrak charged him with
insubordination on September 10, 2001 and fully expected to terminate his employment at that
time if the charges were proven. SMF at ¶111. If the union had not requested a delay, Plaintiff's
employment would have been terminated long before his external and internal complaints of
disability discrimination were filed. Ex. 4 ¶37.

Furthermore, as mentioned in Section V.A(6) above, Plaintiff himself has steadfastly held
that Amtrak's conduct toward him was based on retaliation for his union activities, not because
he was allegedly disabled. Ex. 37 at ¶¶ 86-87. These admissions eviscerate this claim and
require that summary judgment be granted.

**C.**    **Summary Judgment Must Be Granted on Plaintiff's Allegations Brought in Count III Pursuant to Title 42, Chapter 114 because He Is Not an "Individual with Mental Illness" as Defined Therein**

Throughout Count Three, Plaintiff asserts various claims, rights and/or allegations under Title 42, Chapter 114, which was enacted to protect the rights of individuals with mental illnesses. See 42 U.S.C. §§ 10801 (b) and 10841. Pursuant to 42 U.S.C. § 10802, however, there is no private cause of action. Monahan v. Dorchester Counseling Center, Inc., 770 F.Supp. 43, 47 (D.Mass. 1991); Brooks v. Johnson and Johnson, Inc., 685 F.Supp. 107, 109 (E.D.Penn. 1988); Smart v. Ohiku, 2005 WL 2037559 *3 (E.D.La.). Consequently, summary judgment must be granted on this sub-claim within Count III.

In the alternative, it is unlikely that Plaintiff is a person protected under the bill of rights for mentally ill individuals. This is because an "individual with mental illness" means an individual

(A)    who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the state; and

(B)(i)    (I) who is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of such inpatient are unknown;

(II) who is in the process of being admitted to a facility rendering care treatment, including persons being transported to such a facility; or

(III) who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or

(ii) who satisfies the requirements of subparagraph (A) and lives in a community setting, including their own home.

42 U.S.C. §§ 10802 (4) (emphasis added); see also 42 U.S.C. § 10841. Plaintiff simply does not meet this definition. By his own admissions, he is not disabled and is fully able to work without restriction in the physically and mentally demanding job of locomotive engineer. Accordingly,

any reference to 42 U.S.C. § 10841 should be disregarded as Plaintiff is not a person

contemplated there under.

## VI.    SUMMARY JUDGMENT MUST BE GRANTED ON COUNT FOUR, INTERFERENCE WITH PLAINTIFF'S RIGHTS PURSUANT TO M.G.L. c. 12 AND M.G.L. c. 265 §37

M.G.L. c. §12H states:

"Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to' interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured."

M.G.L. c. 265 §37 states:

"No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate or interfere with, or attempt to injure, intimidate or interfere with, or oppress or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the commonwealth or by the constitution or laws of the United States."

Plaintiff cannot bring a claim under the Massachusetts Civil Rights Act, M.G.L. c. 12, or

M.G.L. c. 265 §37 because M.G.L. c. 151B is the exclusive remedy for Plaintiff's claim in

Massachusetts. Silva v. Hit or Miss, 73 F. Supp. 2d 39, 42 (D. Mass. 1999); Woods v. Friction

Materials, Inc., 836 F. Supp. 899, 908 (D. Mass. 1993). Preempted by c. 151B, Count Four

should be dismissed as a matter of law.

However, even if Plaintiff were able to bring a claim under the Massachusetts Civil

Rights Act, he has adduced no evidence that Amtrak violated any recognized right by way of

threats, intimidation or coercion, the required elements of such a claim.

"The SJC has defined 'threats' as the intentional exertion of pressure to make another

fearful or apprehensive of injury or harm, 'intimidation' as putting in fear for the purpose of

compelling or deterring conduct, and 'coercion' as the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Raymond v. City of Worcester, 142 F. Supp. 2d 145, 149 (D. Mass. 2001) (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994)). The standard is whether a reasonable person would have felt threatened, intimidated, or coerced by the defendant's conduct. Planned Parenthood *supra* at 476.

Plaintiff has failed to adduce any evidence that a reasonable person would have felt the directive to undergo a fitness for duty exam to be threatening, intimidating or coercive. Plaintiff makes much of the harm he supposedly feared from a "non-confidential" psychiatric examination. Ex. 37 at ¶ 240. However, the exam was expected to be completely confidential except that its results would be revealed to Amtrak's Health Services. SMF at ¶ 98. Plaintiff has admitted, as did Mr. O'Bryan, that he knew Amtrak had a strict policy of maintaining the confidentiality of patient medical records which were not provided to the employee's departmental managers. Ex. 39 at 365-366; Ex. 37 at ¶¶ 148-149; Ex. 63 ATI # 6. Consequently, he had nothing to fear. In fact, since he was so confident of his ability to do his job effectively, as apparently was his psychiatrist, he should have had little to fear from such an examination.

## VII.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT SIX, DISCRIMINATION ON THE BASIS OF RELIGION

Plaintiff's claim of discrimination on the basis of religion is undoubtedly the most frivolous of Plaintiff's numerous baseless claims. It should be dismissed as a matter of law for two principal reasons: (A) Plaintiff failed to state such a claim in his MCAD Complaint; and (B) Plaintiff has failed to show any evidence to establish a *prima facie* case of religious discrimination.

### A.    Plaintiff Is Barred from Pursuing a Discrimination Claim on the Basis of Religion because He Failed to Include such a Claim in His MCAD Complaint

"A civil complaint for employment discrimination is confined to the content of the charge filed with MCAD and claims reasonably within the scope of an MCAD investigation based on this claim." Edwin v. Blenwood Associates, Inc., 9 F. Supp. 2d 70, 73 (D. Mass. 1998).  This applies to subsequent discrimination claims pursuant to Title VII and M.G.L. c. 151B. See Lattimore v. Polaroid Corp., 99 F. 3d 456, 464 (1st Cir. 1996) ("Both Title VII and Chapter 151B require an employee to file an administrative charge as a prerequisite to commencing a civil action for employment discrimination."); see also Silva v. Hit or Miss, 73 F. Supp. 2d 39, 41-42 (D. Mass. 1999) (plaintiff's Title VII and c. 151B race discrimination and retaliatory discharge claims were barred by her MCAD complaint which only alleged disability discrimination).  Accordingly, because Plaintiff in the case at bar did not pursue a claim for discrimination on the basis of religion during the MCAD proceedings, and such a claim is not remotely related to the disability discrimination claim he did file, he is barred from pursuing such a claim in this subsequent civil action. See Conroy v. Boston Edison Co., 758 F. Supp 54, (D. Mass. 1991) ("Allegations in the federal complaint of new acts of discrimination ... are inappropriate.").

### B.    Summary Judgment Is Also Appropriate because Plaintiff Failed to Adduce Any Evidence to Establish a Prima Facie Case of Religious Discrimination

To survive summary judgment of his Title VII claim, Plaintiff must first prove a *prima facie* case by establishing that "(1) a bona fide religious practice conflicts with an employment requirement, (2) he ... brought the practice to the employer's attention, and (3) the religious practice was the basis for the adverse employment decision." See Cloutier v. Costco Wholesale, 311 F. Supp. 2d 190, 196 (D. Mass. 2004) (citations omitted).  If Plaintiff establishes a *prima*

*facie* case, "the burden shifts to the employer to show that it made a reasonable accommodation of the religious practice or show that any accommodation would result in undue hardship." Id.

While "Title VII's protection are not limited to beliefs and practices that courts perceive as acceptable, logical, consistent or comprehensible to others," Plaintiff fails to meet the first prong of showing a *prima facie* case because he has simply failed to show that he engaged in any activity which may be deemed "religious." See id. "The first element of [P]laintiff's *prima facie* case requires a demonstration that [his] belief or practice is religious *and* is sincerely held." Id. Plaintiff admitted in his deposition that he is a member of a church in Houston but that he probably has not attended religious services there or anywhere else since he lived in Hartford or Houston more than 25 years ago. SMF at ¶¶165-168. In addition, he admits that his practice now and at relevant time frames was to tell people who inquire that he is a Southern Baptist Atheist. SMF at ¶¶169-170. Moreover, Plaintiff admitted in his deposition that he does not believe in a divine entity when he stated, "[b]ut I deny anything that anyone would try to describe or claim to be God other than what is a human experience based on a ultimately material foundation. It's a spiritual experience, but its foundation is physical, material." SMF at ¶172.

Moreover, even if Plaintiff is given the benefit of the doubt that he did in fact engage in some type of religious activity, Plaintiff has adduced no evidence that he brought his religious beliefs to the attention of Amtrak or that he sought any kind of reasonable accommodation for these beliefs. Plaintiff admits that he did not disseminate any writings about his religious beliefs at Amtrak other than the "Letters from Hell" which do not contain expressions of religious beliefs. Rather, those few pages referencing God suggest merely that they are written to God. In addition, the references to "Lucifer, Prince of Darkness" are used only to suggest that the devil

wrote the document and that the devil prefers a "messy ending." The pages within the "Letters from Hell" in which God or Lucifer are mentioned consist solely of references to Shakespeare's Hamlet and to Amtrak managers (one from the MBTA), and two Amtrak union employees (Plaintiff and Mr. O'Bryan). No religious opinions or ideas are expressed.

Finally, he has shown no evidence that religion had anything to do with his termination. The fact that Mr. DeModena's workplace violence complaint was motivated in part by alarm caused by Plaintiff's apparent identification of himself as the devil, does not somehow transform these inflammatory writings into religious text. Religion was never mentioned in any of the correspondence in this matter, nor did Dr. Pinsky or Mr. O'Malley ever raise any questions or make any comments about Plaintiff's religion, nor did anyone have any notion of Plaintiff's religious beliefs, except for Mr. DeModena who understood him to be an atheist. SMF at ¶¶179-182. There is simply no factual basis to meet this last prong of the *prima facie* case.

The analysis for Plaintiff's M.G.L. c. 151B claim involves a three-stage inquiry that is similar to considerations under Title VII. First, Plaintiff must prove that Amtrak required Plaintiff "to violate a religious practice which is required by [Plaintiff's] sincerely held religious belief." Id. at 201. Second, Plaintiff must prove that he provided sufficient notice to Amtrak of his religion or practice. See id. The final inquiry involves Amtrak's obligation to accommodate Plaintiff's religious needs. Id. at 202. As with his Title VII claim, Plaintiff has simply failed to adduce any evidence implicating a sincerely held religious belief and/or practice, that he put Amtrak on notices of these beliefs, or that he needed or sought any kind of reasonable accommodation.

WHEREFORE, Defendant National Railroad Passenger Corporation respectfully requests that its Motion for Summary Judgment be granted on all 8 Counts of Plaintiff's Second Amended Complaint.

**DEFENDANT,**
**NATIONAL RAILROAD PASSENGER**
**CORPORATION,**
By Its Attorneys,

DATED: November 14, 2005

John A. Kiernan (BBO No. 271020)
Stephen E. Hughes (BBO No. 629644)
BONNER KIERNAN TREBACH & CROCIATA
One Liberty Square - 6th Floor
Boston, MA 02109
(617) 426-3900

### Certificate of Service

I, Stephen E. Hughes, hereby certify that I have on November 14, 2005 served a true copy of the foregoing document by first class mail, postage prepaid, to:

Plaintiff (Pro Se):
Joseph T. Carmack
398 Columbus Ave., PMB 130
Boston, MA 02116-6008

Stephen E. Hughes