UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Joseph T. Carmack | ) | Civil Action No. 03-12488-PBS |
| | ) | |
| Plaintiff, Pro Se | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| The National Railroad Passenger Corporation | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**PLAINTIFF JOSEPH T. CARMACK'S MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND COUNTER MOTION FOR SUMMARY JUDGMENT**

Defendant National Railroad Passenger Corporation (Defendant" or "Amtrak") has denied all allegations set forth in Plaintiff Joseph T. Carmack's ("Plaintiff") Second Amended Complaint associated with the medical disqualification and termination of employment of Plaintiff by the Defendant. As a result, Defendant has moved for summary judgment against the Plaintiff. Plaintiff hereby opposes Defendant's motion by asserting that there are substantial and genuine issues of material fact in dispute. Plaintiff further asserts that there is sufficient evidence in the summary judgment record to allow a reasonable trier of fact to find in the Plaintiff's favor. Therefore, Plaintiff opposes Defendant's summary judgment motion and hereby counter moves for judgment for the Plaintiff pursuant to *Fed.R.Civ.P. 56*.

In particular, Plaintiff states that Defendant has defamed Plaintiff, violated rights to privacy of Plaintiff, discriminated against Plaintiff on the basis of disability and religion, acted under color of state law to violate Plaintiff's civil rights and laws protecting rights of Plaintiff, used unfair labor practices to circumvent contract and labor

i

rights of Plaintiff and Plaintiff's labor organization, the Brotherhood of Locomotive Engineers ("BLE", now the Brotherhood of Locomotive Engineers and Trainmen or "BLET"), is liable for injury of Plaintiff pursuant to the Federal Employers Liability Act ("FELA"), intentionally inflicted emotional distress, and wrongfully terminated Plaintiff in violation of public policy. Defendant has falsely accused Plaintiff of violent behavior as a pretext to so aggrieve the Plaintiff through actions or omissions giving rise to this action. There are substantial issues of material fact supported in the summary judgment record on all accounts in the pleadings of this case. Wherefore, summary judgment in favor of the Plaintiff must be granted.

1.   **OVERVIEW OF FACTS**

The Plaintiff, an employee of Defendant since 1979, entered into engine service as a Locomotive Engineer in commuter services in late 1996 and joined the labor organization representing engineers, the Brotherhood of Locomotive Engineers ("BLE", now called the Brotherhood of Locomotive Engineers and Trainmen "BLET"). *Defendant's Statement of Material Facts ("SMF") at 2, 13 and 30*. In February 2000, Plaintiff was disciplined without an arbitration hearing in violation of the provisions of the *Collective Bargaining Agreement* between Defendant and the BLE and Plaintiff filed a grievance pursuant to the *CBA* and the provisions of the *Railway Labor Act* (hereafter the "*RLA*" or "*the Act*"). *45 U.S.C. ss. 151 et. seq.* In the ensuing months Plaintiff maintained an open debate regarding the grievance with the Defendant's local corporate officer, Assistant General Manager, Mr. Michael J. O'Malley, but the Mr. O'Malley's side of the debate was ghostwritten by the Defendant's local Labor Relations officers. *SDMF 23*. The Labor Relations officers and other officials openly complained to BLE representative Michael J. O'Bryan of the Local BLE organization, Division 57 ("BLE-57")[1]. In May, the Plaintiff's immediate supervisor, Mr. Gerrard DeModena, warned the

---

[1] The local sub-group of the BLE, usually refered to as 'locals' in other unions, are called

2

Plaintiff of an impending retaliation if the Plaintiff didn't cease all grievances. *SDMF 25. Exhibit 57.*

In October 2000, Mr. O'Bryan, who the division referred to as 'God', unilaterally intervened to settle the dispute between the Plaintiff and the Defendant and the Plaintiff commenced an 'Open Letter' campaign critical of Mr. O'Bryan who was nominated for re-election that month.

Simultaneously with these events and in collaboration with Mr. O'Bryan, the Defendant again disciplined the Plaintiff without an arbitration hearing. In the meantime, Mr. O'Bryan was re-elected and Plaintiff re-initiated grievance procedures, as before, but the correspondence wasn't published and distributed. After an exchange of letters, the Plaintiff had a private meeting with Mr. O'Malley and agreed to keep the grievance quiet and process the grievance to the next level through the BLE pursuant to the provisions of *the Railway Labor Act*.

In February, pursuant to grievance machinery outlined by *the Act*, Plaintiff appealed to Mr. O'Bryan in writing. In response, the next month Mr. O'Bryan openly distributed a letter critical of the Plaintiff on MBTA railroad property at various locations including North Station and South Station in Boston and in railyards. The letter included criticism of two political cartoons which Plaintiff had given to Mr. O'Bryan six months earlier, in October. *DE 14 and 22.*

One cartoon included a photograph of Godzilla which had been cut from a movie review in the Local Paper, the Boston Globe. The cartoon included the following disclaimer:

> WARNING! THIS IS ONLY A POLITICAL CARTOON!
> THERE ARE NO <u>REAL</u> MONSTERS!
> ONLY UNION BUREAUCRATS!

---

'divisions' in the BLE.

This cartoon also indicated the address of a fictitious organization, the "Institute of Devastation Awareness".

The other cartoon (hereafter referred to as the "*Rail Satire*") that Mr. O'Bryan was critical of is presented as a satirical letter from "Lucifer, Prince of Darkness" and addresses "God". The body of the letter references a fictitious satirical parody of Shakespeare's Hamlet entitled "Hamlet, the Prince of Commuter Rail". The back page of 'Lucifer's' letter referenced direct quotes from Shakespeare's Hamlet and the title of a 1960's play based on Hamlet entitled "ROSENCRANZ AND GUILDENSTERN ARE DEAD!" by an English playwright, Tom Stoppard.

At the request of fellow union members, the Plaintiff issued a response to Mr. O'Bryan on or about April 4, 2001. Plaintiff's response included a number of supporting documents exonerating the Plaintiff including letters from O'Malley, O'Bryan and other company officials. The collection was packaged with a title page and the title Letters from Hell with a short introductory letter from 'Lucifer' to 'God'. On or about the evening of April 10, 2005, a night manager at South Station who was working out of Mr. DeModena's office, left a copy of "Letters from Hell" on Mr. DeModena's desk.

The next morning, DeModena found the document on his desk and called his immediate supervisor, O'Malley to complain. DeModena claimed that the document constituted a threat. O'Malley, who had seen the document, did not agree and O'Malley told DeModena the DeModena could submit a complaint to the local "Threat Assessment Response Team" or "TART". *DE 24 pages 197 to 199.*

Since O'Malley did not assess any threat, DeModena met with Defendant's Manager of Labor Relations, Lou DePhillips and "showed DePhillips the [document] highlights - [DePhillips] shared [DeModena's] concerns re [Plaintiff's] emotional/mental stability or lack thereof [sic]". *Exhibit 3.*

DePhillips gave DeModena a "Workplace Violence Report Form" which DeModena completed and returned to DePhillips the next day. In the meantime,

4

DePhillips contacted the Defendant's Health Services Department and sent select pages from Letters from Hell to the Manager of Health Services, Ms. Marianne Letterio. The next day, DeModena returned the completed form to DePhillips and DePhillips contacted the remaining members of the TART. However, DePhillips had changed his mind and no longer assessed a threat. *Exhibit 3, DE 25.*

DeModena was disappointed that DePhillips had changed his mind about his initial assessment of Letters from Hell:

> spoke w/ Lou DePhillips & M. J. O'Malley re the [Plaintiff's] literature. Lou is flip-flopping on his opinion & thoughts. Initially Lou was aggressive in his opinions etc. - he viewed them clearly as the work of a mentally imbalanced[sic] individual and a threat of violence now he is playing amateur pschol.[sic] & side stepping. *Exhibit 3.*

The remaining members of the TART included: a member of Defendant's Law Department in Philadelphia, Ms. Suzanne Allan of Human Resources and Captain Robert Smith of the Amtrak Police Department. None of the remaining members of the TART considered Letters from Hell to be a threat. There was neither basis to discipline nor basis to medically disqualify the Plaintiff. *DE 25 pages 145 and 230 through 231.*

Nonetheless DePhillips found Plaintiff's grievances of the previous year, Plaintiff's internal union discussions and "the entire packet was disturbing". *DE 24 at page 259.* DePhillips attempted to convince the TART and O'Malley to accept a "scenario" by which the Plaintiff would be charged with insubordination. O'Malley would have to arbitrarily order the Plaintiff to undergo a non-confidential psychiatric examination and psychological testing. If the Plaintiff voiced any objection to the order, the Plaintiff could be charged with insubordination and terminated. DePhillips sent O'Malley, DeModena and the TART an e-mail detailing the set up. *DE 24.*

However, O'Malley would not order Plaintiff for the exam arbitrarily on his own. O'Malley would have to be told to do so. *Exhibit 70.* DePhillips spoke to Letterio on

5

April 11, and faxed items for the Doctor to review and make a medical assessment. Three weeks later, the TART had no response on any action they could take. On May 3, 2001, Allan contacted Health Services and requested that Letterio review DePhillips e-mail and lend Medical advice to the TART : ("What do you think? *DE 25.*) It was clear to Letterio that the TART wanted Dr. Pinsky to order a Psychiatric exam. Dr. Pinsky obliged Allan and DePhillips and medically disqualified Plaintiff pending a non confidential psychiatric exam and psychological testing. *DE 25 DE 24 pages 128 to 131, DE 44.*

The following day, Friday, May 4, 2001, O'Malley disqualified Plaintiff from service. On Monday, May 7, the O'Bryan unilaterally, with no waiver from the Plaintiff, called Dr. Pinsky in Philadelphia. Dr. Pinsky told O'Bryan that the Godzilla cartoon and the Lucifer document "raised the index of suspicion of a severe psychiatric disorder" such as "Personality Disorder, Bi-Polar disorder, etc.". *DE 57 and DE 24 at page 386.*

Over the course of the next several months, Plaintiff requested his medical file and the basis for his disqualification. Plaintiff directly asked O'Malley why Plaintiff was disqualified. O'Malley stated that he didn't know why and instructed Plaintiff to call the Health Services department. Neither did Letterio know the answer. The only recourse open to the Plaintiff was to write to Dr. Pinsky to ask for Plaintiff's medical file and specific medical explanation of the basis for the disqualification. *Exhibit 71. DE 64.*

In spite of the disqualification, however, O'Malley did not order the exam. On or about May 17, 2005, O'Malley sent a letter to the Plaintiff stating that an exam was scheduled for the Plaintiff for June 4, 2005 with Dr. Russel Vasile in Boston. On or about May 24, 2005, Plaintiff sent the Medical director a letter to request information regarding the purpose of the exam. The Plaintiff consulted with his personal physician regarding his medical condition and his ability to work. Plaintiff's physician stated that "On January 18, 2001, [the Plaintiff] became able to return to work and he continues to be so". *DE 30 and 56.*

On or about June 15, 2001, Mr. O'Malley ordered the Plaintiff to see the Psychiatrist, Dr. Russell Vasile, in Boston. The Plaintiff's Doctor advised the Plaintiff against submitting to the exam. Plaintiff sent O'Malley a letter stating that the his orders were "medically inappropriate". On or about June 15, 2001, Letterio informed O'Bryan that the Medical Director would not respond to Plaintiff's requests for Plaintiff's file or and explanation for the Medical disqualification. *DE 24 at pages 327 through 328.*

O'Bryan requested a number of special accommodations for the Plaintiff. Specifically, O'Bryan asked that Plaintiff be afforded an interview with the TART. O'Bryan also requested that the Plaintiff be given definitive explanation of Plaintiff's medical disqualification and an exact description of the requirements for an exam. Plaintiff wanted to know what Plaintiff's "transgression" was. Plaintiff showed no lack of ability to perform his job safely. *DE 59.* Plaintiff explained to O'Malley that he did not want to talk about medical matters to anyone but the medical department. *DE 58.* Plaintiff and O'Bryan both informed O'Malley on numerous occasions that the medical department was not communicating. In spite of the requests, however, O'Malley warned Plaintiff that if Plaintiff continued making special requests and didn't submit to the psychiatric exam in its entirety, Plaintiff would be charged with insubordination and terminated for failure to provide information on a "previous medical condition". *DE 24 pages 328 through 329 and DE 54.*

Although O'Malley did not believe that Plaintiff was impaired, O'Malley nonetheless sent a letter to the BLE stating that it was "obvious" that Plaintiff was mentally impaired. O'Malley stated that "our doctor's concern" was the Plaintiff's "dark parody". *DE 54.*

On or about August 16, Plaintiff called Dr. Vasile. Plaintiff told Dr. Vasile that Plaintiff needed to undergo the exam to avoid losing his job. Plaintiff said he wanted to take the exam but the Plaintiff would rather not have to tell Amtrak everything about his personal life or medical history and treatment. However, Plaintiff did not mind telling

7

Amtrak about Plaintiff's writings or discussing work relationships, performance or anything related to his job. The Plaintiff also asked Dr. Vasile if Dr. Vasile could talk to Doctor Gurion. Dr. Vasile told Plaintiff that Dr. Vasile was going to ask Amtrak to "get another doctor". *DE 44.*

In September Plaintiff was charged with insubordination and ordered to go to a hearing. In February of 2002, Plaintiff filed a complaint of discrimination on the basis of a disability with the Massachusetts Commission Against Discrimination. After postponement an arbitration hearing was held in the spring of 2002. Plaintiff presented notes from Plaintiff's personal psychiatrist showing Plaintiff was fit for duty and advising Defendant that the medical intervention they were requiring would be medically harmful. Throughout the hearing process, which took place over four days over a one month period, the BLE representative Richard Prone demanded that, in the best interests of the Plaintiff's health, the Defendant should call Plaintiff's personal psychiatrist and accept a report from her. *DE 25 page 413.* The Plaintiff, himself, stated at the hearing the exam would sabotage his treatment. *Ibid. at page 418.* Nonetheless, Plaintiff was terminated on or about May 13, 2002. MCAD dismissed Plaintiff's complaint for lack of probable cause. *DE 50.*

During the investigation, which was carried out simultaneously with the MCAD investigation, DeModena indicated that anyone could get access to his office and he implied that the Plaintiff deliberately entered DeModena's office and placed <u>Letters from Hell</u> on DeModena's desk. O'Bryan witnessed that the office was always locked and that no one had keys and Mr. DeModena, himself, witnessed that the office was "normally" locked. *DE 24 pages 165 and 297.*

In order to explore this contradiction, on or about August 19, 2002, the Plaintiff asked Cheri Thompson, DeModena's personal assistant, if anyone other than DeModena or Rae had keys to the office. Plaintiff had encountered Thompson at the station on his way to the Railroad Retirement Board to file unemployment claims Thompson said that

8

only Rae and DeModena had keys to the office. When the Plaintiff asked Thompson if the night managers had keys, Thompson just shook her head and went back to the office.

DeModena reported this incident to the Amtrak Police in an attempt to get the Amtrak Police to take some action against the Plaintiff. DeModena implied that Plaintiff had unlawful designs. *Exhibits 18 through 21 and Exhibit 44*. However, on the following day, August 20, 2002, Plaintiff testified in a hearing before MCAD, that he asked Thompson about the keys so that Plaintiff could submit to MCAD that Defendant had ascertained Letters from Hell independently in order to interfere in a union discussion. *Exhibit 53 at page 5*.

On that same day O'Malley issued the Plaintiff a letter warning that the Plaintiff would be charged with trespassing if Plaintiff entered unspecified areas at North and South Stations. For fear of arrest, Plaintiff's option to file his own Time Claims was foreclosed. *Exhibit A*.

From May 4, 2001 until August 2002, Plaintiff filed weekly "time claims" pursuant to the grievance machinery of the CBA. After initial denials on appeal, O'Bryan had agreements with DePhillips and Mark Kenny, the representative for all BLE members on Amtrak, that time limits on the claims would be held in abeyance until resolution of the disciplinary hearing. *Exhibit I*.

Amtrak and the BLE held a Public Law Board appeal of Plaintiff's disciplinary hearing in September 2002. Plaintiff's claim was denied on April 21, 2003. In accordance with the CBA, a decision must be rendered within 30 days or the discipline is expunged. Accordingly, Plaintiff's Time Claims from May 4, 2001 were payable and Plaintiff had a right to return to work. O'Bryan was no longer pursuing Time Claims because Kenny would not pursue them to the highest level. They would be futile. Plaintiff submitted grievance to Kenny in June. *Exhibit L*.

In the meantime, Amtrak lost the contract with the MBTA and a new railroad, the Massachusetts Bay Commuter Railroad Co. ("MBCR") was providing the service. Per

9

CBA, all employees were to be subsumed into MBCR if the employees completed the application process. Plaintiff completed the application process in accordance with CBA requirements, but MBCR failed to award Plaintiff a position. Plaintiff's only option was to reinitiate grievances at the initial level. Kenny was refusing to respond to Plaintiffs repeated letters and phone calls. There were not enough members at the June meeting to consider Plaintiff's grievances and O'Bryan began challenging Plaintiff's right to membership. Pursuant to BLE constitution, Plaintiff's only option was to canvas votes in support of his grievance. The only place to canvas votes was in stations. *SDMF*

On July 1, 2003, Plaintiff went to North Station to canvas support for his Time Claims While in the station, talking to union members, the MBTA and the MBCR evicted Plaintiff from the station and threatened Plaintiff with arrest if he returned.

## II. STANDARD OF REVIEW

Summary judgment must be granted when movant can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law", *(F.R. Civ. P. 56[c])*. To survive a summary judgment, the nonmovant must present "genuine disputes over material facts" that "can only sprout out of competent and reasonably definite evidence in the summary judgment record", *Roche v. John Hancock Mutual Life Insurance Co., 81 F.3d 249, 253*. When considering the motion, the Court must "accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the Plaintiff's favor and determine whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory", *Martin v. Applied Cellular Tech, Inc. 284 F.3d 1, 6. (1st.Cir, 2002)*. Quoted from *Meuse v. Pane, Civil Action 04--10255--EFH, 322 F.Supp2d 36, 38 (.Mass 2004)*. The Court should not rely on "bald assertions, insupportable conclusions, and 'opprobrious epithets.'" *Chongris v. Board of Appeals,* 811 F.2d 36, 37 (1st Cir. 1987) (citing *Snowden v. Hughes,* 31 U.S. 1, 10 (1944).

## III.   ARGUMENT

SUMMARY JUDGMENT FOR THE DEFENDANT SHOULD BE DENIED BECAUSE DEFENDANTS ARGUMENTS FOR PREEMPTION ARE MISPLACED AND THE DOCUMENTED FACTS SUPPORT THE ALLEGATIONS IN THE PLEADINGS AND SUMMARY JUDGMENT FOR THE PLAINTIFF.

    **A.    Defendant's preemption arguments are misplaced. Defamation acts create a pretext to circumvent the Railway Labor Act and not to apply it.**

Defendant has claimed summary judgment on their behalf by asserting that Plaintiff's allegations are preempted by the *Railway Labor Act*. The Defendant relies on *45 U.S.C. 151a (4) and (5)*. Among the purposes of *the Act* is: "(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions" and "(5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions" *Ibid*. But the courts have ruled against using this clause to fashion a broad preemption policy because arbitration traditionally only covers that portion of section 151a which refers to "interpretation or application of agreements". *Id.* ("The arbitrator's authority is confined to resolution of questions of contractual rights", *Alexander v. Gardner-Denver co., 415 U.S. 36, 37 [1974]*). In order for the Defendant's argument to apply, the state law claim must be inextricably bound to an interpretation of the *CBA*. *Allis-Chalmers v. Lueck, 471 U.S. 202, 213*. Essentially, this happens when parties "waive" the state law requirements regarding employment and agree to negotiate the same issue independently through collective bargaining. *Ibid.* This does not mean, however, that the wording of a state law and the *CBA* need to be the same. If the Court must analyze the meaning of a particular *CBA* rule, then the state law is pre-empted. "Courts confronted with state law claims must locate the line between the need for mere consultation of a CBA, which does not demand federal preemption, and more active interpretation of that agreement, which

does preempt the state law claims" *Lydon v. Boston Sand & Gravel Co., 175 F.3d 6,10 (1st Cir. 1999)*.

The Defendant has claimed that Plaintiff's Defamation, Privacy, Interference with Rights, and termination in violation of Public Policy claims are preempted because they fall under the category of a "minor dispute" as defined by *the Act*. *Defendant's Memorandum ("DM") at page 7*. But, not all minor disputes involve the *CBA* and they may well involve questions of state law that will apply. In evaluating congressional intent of *the Act*, the Supreme Court has noted that "no proposed interpretation [of *the Act]* demonstrates a clear and manifest congressional purpose to create a regime that broadly preempts substantive protection extended by the States, independent of any negotiated labor agreement". *Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 255, 256 (1945)*. Any dispute falling outside the specific parameters of a work rule defined by the *CBA* falls within the ambit of federal or state law causes of action. There are no rules in the BLE *CBA* covering any of the state law claims alleged in Plaintiff's 2nd Amended Complaint. These disputes, not specifically covered by the *CBA*, are subject to judicial administrative process as causes for action. Traditionally, arbitrators do not review matters that are not specifically articulated by the *CBA*: the arbitration process doesn't permit an analysis of complex legal issues: "The specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land." *Alexander v. Gardner-Denver, supra. at 57*.

In fact, the Defendant defamed the Plaintiff specifically to create a ruse that would circumvent the agreement. In the past, the Plaintiff had filed grievances pursuant to Rule 21, the disciplinary Rule, and the Defendant simply ignored them. The union had tried to apply Rule 25 of the Agreement, a *CBA* rule governing impairments, to the insubordination hearing, but the hearing officer ruled that it didn't apply and found the union's "reading of the contract to be wrong". *DE 45 at 13*. Rule 21 covers discipline and Rule 25 covers independent medical evaluations. But the Defendant made the issues

12

in dispute governed by these rules irrelevant. DePhillips stated that Letters form Hell presented no "discipline or Rule 25 scenario". The TART, including DePhillips, and O'Malley stated that they did not perceive a threat. If there is no basis for discipline, there is no threat. The TART also denied any assessment that an independent medical evaluation was necessary. In accordance with the Rule, it must be "obvious" that the Plaintiff is impaired. The TART specifically stated that it wasn't obvious. DePhillips said so in his e-mail which the TART adopted and forwarded to the Defendant Health Services ("Medical") Department.. If Rule 25 does not apply, then it is not obvious that Plaintiff is impaired. *DE 25.*

The TART's plan was to set up a narrow insubordination charge. The TART merely wanted to fabricate an order that the Plaintiff would likely refuse. It didn't matter if O'Malley arbitrarily required the Plaintiff to undergo an evaluation any more than it mattered if O'Malley were to arbitrarily require the Plaintiff to do a tap dance. In fact, the TART specifically needed to veer away from any work issue that was directly covered by the *CBA* because they needed to present an arbitrator with a vague insubordination charge he could rule on. The goal was to eliminate the Plaintiff from the workforce. The TART needed to charge the Plaintiff with an offense that fits within the narrow doctrine of "work now, grieve later" in order to preclude a defense based on the *CBA*. In choosing this strategy, the Defendant specifically invited state law causes of action that are not "predicated on federally protected language in the context of a labor dispute". *International Association of Machinists v. Allen, 490 N.E.2d 865.*

The Defendant argues that Plaintiff was terminated for "just cause" and they imply that the defamation must be considered in the context of that rule. This is a false reading of the nature of "minor disputes" as defined by *the Act*. "Although the state-law analysis might involve attention to the same factual considerations as the contractual determination whether petitioner was fired for just cause, such parallelism does not render the state-law analysis dependent upon contractual analysis. As long as the state

13

law claim can be resolved without interpreting the collective-bargaining agreement itself, the claim is 'independent' of the agreement for [] preemption purposes". *Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 400 (1988)*, (arguing against preemption by the *Labor Management Relations Act, 29 U.S.C. 151 et. seq.*).

    The defendant charged the Plaintiff with refusal to obey an order. The events that provide the basis for the defamation and free speech claims occur prior to any order being given. They precede the order that was allegedly disobeyed and events do not provide the basis for which the order was allegedly refused. The Court does not even need to consult the *CBA* to rule on the state law claims of defamation or free speech. DeModena presented the thoughts and ideas of Lucifer represented in the Rail Satire as the thoughts and ideas of the Plaintiff and he used that representation as the basis for a workplace violence complaint. *DE 21*. The TART then consulted the Defendant's Medical Director who declared a "suspicion of a severe psychiatric disorder". These events are the bases of both the defamation claim and the medical disqualification, but they occur before Plaintiff was given an order to undergo an examination and they occur independently of the order. This Honorable Court does not need to consider the insubordination charge to evaluate the defamation claims  The *CBA* does not apply.

    The Defendant also claims that Plaintiff's state law Invasion of Privacy claims and *Federal Employers Liability Act* ("*FELA*") emotional distress claims are preempted by Rule 25. But the investigation hearing did not make a charge based on Rule 25. The TART decided that there was no Rule 25 scenario and the Plaintiff was charged with insubordination. The Plaintiff did disagree and attempted to file grievances pursuant to Rule 25. But, the Defendant denied the claims and then precluded further claims or appeals by barring Plaintiff from the property. *Exhibits A, B and I*. Plaintiff was barred from settling a Rule 25 grievance or any other grievance. Any settlement was precluded. Nor was Plaintiff able to canvas votes from BLE members to garner support of the appeals process. The only place to do that was in the stations and the Plaintiff was

14

barred. The Defendant had a right to submit Plaintiff's medical disqualification to arbitration but chose not to do so. The Plaintiff, who did attempt to pursue arbitration remedy of medical disqualification in accordance with Rule 25, was not permitted to. *Exhibits A, B, and I.*

This situation presents a kind of state-federal law conflict which the Supreme Court decided in *San Diego Unions v. Garmon, 359 U.S. 236 (1959)*. The conflict in this case can be viewed in two ways: Either there is a conflict between the Plaintiff's application of Rule 25 to his medical disqualification and a state law right of the Defendant against trespass, or there is a conflict between the Plaintiff's state law right against invasion of privacy and the Defendant's right to pursue independent medical evaluation pursuant to Rule 25. Either case fails in this instance, because in both cases, the Plaintiff's rights are precluded and the result requires state and federal actions for remedy of the dispute. The Supreme Court has ruled in a *National Labor Relations Board* case that when one party is precluded from the arbitration process "primary jurisdiction" of the arbitration process will not apply and the matter falls within federal or state judicial jurisdiction. Applying the rationale of the court to the *Railway Labor Act*, *the Act* "does not provide a sufficient justification for preempting state jurisdiction over arguably protected conduct when, as in this case, the party who could have presented the protection issue to the [*National Railroad Adjustment Board*] has not done so and the other party to the dispute has no acceptable means of doing so". *Sears, Roebuck Co. v. Carpenters, 436 U.S. 180, 202, 203 (1978).*

This same rationale against preemption also applies to the Defendant's reliance on Rule 21 of the *CBA*. Permitting a reference to the *CBA* for consultation purposes, Rule 21 of the *CBA* provides, in pertinent parts that:

> no Passenger Engineer will be disciplined, suspended or
> dismissed from the service until a fair and impartial formal

> investigation has been conducted by an authorized
> Corporation officer. *CBA Rule 21 a.*

and, on appeals to the Public Law Board:

> The Board will render a final and binding decision as
> promptly as possible, but not later than 30 days after the
> case is presented before the Board. *CBA Rule 21 k.5*

and, if the decision is rendered beyond 30 days:

> If the decision on the appeal is not rendered within the time
> limits set forth in this Rule or as extended, the discipline
> assessed will be expunged. *CBA Rule 21 l.2 DE 11 pages
> 39 and 40. DE 11, Rule 21.*

Defendant has referred to this Rule as basis of its preemption claim. Defendant claims that "defamatory statements are directly related to matters associated with the termination of Plaintiff's employment. . . . Any such complaints that were not raised in that adjudicative setting should have been. . . . Any judicial resolution of these kinds of allegations must address the nature of the CBA in order to find whether or not Plaintiff's employment was wrongfully terminated." *MSJ at 10*. Although Plaintiff has argued that "such parallelism does not render the state-law analysis dependent upon contractual analysis" *Lingle v. Norge, supra.*, even if defamation was pre-empted, Defendant has barred Plaintiff from pursuing a complete adjudication of all the tenets of Rule 21 by barring the Plaintiff from the property and precluding the ability to canvas the necessary union support as required by the *BLE Constitution.. DSMF* _____

Pursuant to Rule 21, if the Public Law Board didn't render a decision in 30 days, the discipline assessed should be expunged and Plaintiff would be permitted to resubmit claims pursuant to Rule 21 in order to fully adjudicate the failure of the Award. Plaintiff was prevented from pursuing that remedy and the Defendant has created a dual application of primary jurisdiction. Where Plaintiff is precluded from pursuing remedy under color of state trespassing law, the Defendant cannot "provide a sufficient

justification for pre-empting state jurisdiction over arguably protected conduct" *Sears, Roebuck & Co. v. Carpenters supra*, while they have simultaneously presented cause for action interfering with a federal right to settle disputes pursuant to *the Act* itself. 45 U.S.C. s. 152 First.

      **B.    The evidence supports allegations in the pleadings and summary judgment for the Plaintiff.**

1. Defamation

Plaintiff's claims of Defamation are of four types: 1. Misrepresentation of meaning of Plaintiff's writings that characterize the Plaintiff as a person who is mentally unstable; 2. Actual statements that Plaintiff is mentally unstable; 3. Assertions that Plaintiff is attempting to unlawfully enter company offices; and assertions that the Plaintiff violated the Defendant's Workplace Violence Policy and threatened a fellow employee.

The first example is evidenced in the workplace violence report. In that report, DeModena has misrepresented the character of Lucifer in Plaintiff's writings to falsely indicate that Plaintiff thinks Plaintiff's self to be the devil. Apparently denying the creative and satirical element intended in the Rail Satire DeModena falsely ascribes the words of Lucifer to the Plaintiff. *DE 21 and 22.* In so doing, DeModena convinced the TART to appeal to the company doctor, Dr. Pinsky, to request that Dr. Pinsky order a psychiatric evaluation on the grounds that, although there was no "foundation" for "a Rule 25 or a discipline scenario", the Plaintiff's writings were "disturbing" and cause the Defendant to have "concern" for Plaintiff's own welfare, the welfare of Defendant's employees and "by extension the traveling public" *DE 25. DE 24 at page 386.*

The second example involves statements that Plaintiff is mentally unstable; statements that Plaintiff is "removed from service by reason of insanity", statements that Plaintiff's writings raise the "index of suspicion" that the Plaintiff is suffering from a "severe psychiatric disorder"; statements that it is "obvious" that Plaintiff is mentally

17

impaired; statements that Plaintiff failed "to provide sufficient documentation to explain an existing medical condition"; statements that Plaintiff calls Plaintiff's self "Lucifer"; statements that Plaintiff calls Plaintiff's self "the devil"; or that Plaintiff imagines that Plaintiff himself to be "the devil". *Exhibits 3 and 16, DE 65, DE 57, DE 54 and DE 24 at 187 and 386.*

In the third example, DeModena characterized Plaintiff's investigation of the facts regarding DeModena's Workplace Violence complaint as an attempt to break and enter into secured areas. *Exhibits 18 to 21.*

Defendant's primary defense for these statements rests on a claim of privilege. Defendant claims both conditional privilege and absolute privilege. Defendant claims that communications pursuant to application of Defendant's Workplace violence policy are protected by conditional privilege. "A person may possess a conditional privilege to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest. *Galvin v. N.Y., N.H.H. R.R., 341 Mass. 293, 296, 168 N.E.2d 262 (1960).* By extension the privilege exists "when the publisher and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further it." *Sheehan v. Tobin 326 Mass.. 185, 190-191, 93 N.E.2d 524 (1950).* In these cases, the privilege will stand even though the statements may not be true. *Doane v. Grew, 220 Mass. 171, 107 N.E. 620, 621 (1915).*

Nonetheless the privilege may be lost if malice can be proved. The utterances are protected if the Defendant is "acting in bona fide answer to the needs of the occasion, yet if malice in fact is proved, the defendant is liable. By malice in fact is meant the willful doing of an injurious act without lawful excuse". *Ibid.* Yet the standard involves something less than actual malice. A Plaintiff need only show a statement is made with "knowledge of falsity or reckless disregard for the truth". *Tosti v. Ayik, 386 Mass 721, 726, 437 N.E.2d 1062 (1982).* But the standard requires going beyond mere negligence. In evaluating whether an utterance goes beyond negligence "Courts should weigh

publisher's interest in the defaming matter , should it be true, against harm to Plaintiff's reputation by disclosures of false information". *Retailers commercial Agency, Inc., petitioner, 342 Mass 515, , 520, 174 N.E. 2d 376 (1961)*. Thus, the test for malice by which "the lawful excuse afforded by the privileged occasion may be lost" can be shown in a number of ways: "because of the publisher's lack of belief or reasonable grounds for belief in the truth of the defamatory matter * * *; because the defamatory matter is published for some purpose other than that for which the particular privilege is given * * *; because the publication is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege * * *; because the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged." *Restatement: Torts, s 599, comment a* quoted in *Sheehan v. Tobin, 326 Mass. supra. 192*.

    The evidence of knowledge of falsehood is pervasive in the instances of defamation outlined above. It is obvious that DeModena, at the very least, doubted his own assertions. DeModena attempted to sway DePhillips and the TART by intentionally misrepresenting the Rail Satire. He reported the words of Lucifer, as represented in the Rail Satire, and portrayed them as the ideas, feelings and intentions of the Plaintiff. Where these ideas are presented in a Workplace Violence report, there can be no doubt that DeModena anticipated deleterious consequences for the Plaintiff. But DeModena went beyond the provisions of the Defendant's Workplace Violence policy on several occasions.

    When DeModena became dissatisfied with the response by DePhillips and the TART to his report, DeModena redirected his focus from the Rail Satire and pursued retaliation against the Plaintiff stemming from the Plaintiff's letter to O'Bryan dated April 4, 2001 and grievances that the Plaintiff had filed throughout the previous year. After speaking to DePhillips on April 12, 2001, DeModena was afraid that the TART would not act. DeModena began to take action on his own and faxed Plaintiff's letter (or

O'Bryan's letter to the Plaintiff of March 11) to Defendant's Health Services department in order to convince the Doctor to take action. DeModena's cover letter says:

> Marianne, per our tel-conv. pls. forward this letter to the M.D. This offer's another perspective of [Plaintiff's} behavior & Union's frustrations & views Jerry [sic].
> *Exhibit 16.*

DeModena is apparently attempting to take advantage of his right to have Plaintiff disqualified independently of the actions of the TART. He sent the above message to Letterio three days after DePhillips activated the TART and two days after DePhillips' e-mail to O'Malley and DeModena. The Defendant has implied that DeModena did not receive DePhillips e-mail of April 13, 2001, but DeModena was obviously aware of DePhillips ideas. He wrote about them in his calendar diary. *Exhibit 3, entry of 4/12/2001.* DePhillips, himself, also notes DeModena's dissatisfaction at the end of the e-mail as a "request for another opinion". DE *25.*

If DeModena was dissatisfied, he had the right to appeal to the Health Services physician outside the application of the Workplace Violence policy. If DeModena believes he has a reason to disqualify Plaintiff because Plaintiff is impaired (irrespective of any assessment of a threat), DeModena has the right to contact the Health Services Department on his own to have an employee disqualified:

> An Amtrak supervisor may direct an employee to undergo a fitness-for-duty physical examination if there is a basis to doubt whether the employee's physical condition or mental state will allow him/her to perform his/her job safely. The supervisor's decision must be documented and based on specific contemporaneous, articulable observations that an employee may not be able to perform his/her duty safely. The recommending supervisor must obtain concurrence from Amtrak's Regional Medical Director prior to asking the employee to undergo testing. *Exhibit 11 at page 16.*

DeModena contacted Letterio for concurrence of Dr. Pinsky, in case the TART did not appreciate DeModena's assertion that Plaintiff's writings were the writings of a mentally