unbalanced individual. *Exhibit 3*. Apparently, DeModena believes that the "union" is aware that Plaintiff is impaired by Plaintiff's behavior. These are the same frustrations DeModena claims to be experiencing with the Plaintiff. O'Bryan and the Plaintiff disagree about an interpretation of work rules and an engineer's responsibility. DeModena agrees with O'Bryan and Plaintiff disagrees with DeModena and O'Bryan. As is Plaintiff's right, However, Plaintiff has appealed to his union division and the grievance process pursuant to the provisions of *BLE Constitution* and *the Railway Labor Act*. Plaintiff's behavior is perfectly valid and legal and conforms to acceptable and established business principle and practice. To DeModena, however, Plaintiff's correspondence with O'Bryan is "clearly . . . the work of a mentally imbalanced[sic] individual and a threat of violence". *Exhibit 3*. Presuming that DeModena genuinely believed that it was true that Plaintiff was unbalanced, there was not reason to do more than submit his workplace violence report. There was no reason for DeModena to submit materials to the Medical Director and assert that the union is frustrated with the Plaintiff's behavior. The doctor already knew that the Plaintiff and O'Bryan had been "butting heads for months". *Exhibit 57*. A heated debate is acceptable in the political arena. *DE 24, at Page 353*. DeModena had called O'Bryan three days earlier to complain about the Rail Satire and O'Bryan laughed. *Ibid. at page 296*. It was deceitful for DeModena to indicate that the union had "frustrations".

    It is likewise with Cupernall's comments to Hume. One has to wonder why she would be thinking that Plaintiff was removed from service "by reason of insanity". She certainly would have no knowledge of whether or not it was true that the Plaintiff was 'insane'. It is apparent that she is treating the information as commonly accepted knowledge and not a matter of controversy. She is not concerned (even though she is a manager and understands confidentiality protocols) that there is any breach of confidentiality in the workplace. She must be accustomed to hearing the Plaintiff's sanity as being openly discussed as a common topic.

There is no legitimate business interests protecting Cuprenall's disclosure. Cupernall was DePhillips' assistant. *SDMF* She had to have known, if she knew anything about the workplace violence report, that DePhillips did not find basis for a "rule 25 or disciplinary scenario". A reasonable jury could easily find the comments of DeModena and Cupernall reckless and excessive. There is no conditional privilege at work here. Even if there is, it is lost. A conditional privilege is lost through "unnecessary, unreasonable or excessive publication". *Galvin v. New York. N.H. and H. RR supra.*

DeModena's e-mails to the Amtrak Police are equally dishonest and malicious. DeModena was aware that the Plaintiff and the union were challenging DeModena's claims that he didn't know who had keys to his office or that anyone could come and go as they pleased. *DE 24 at page 165*. DeModena was also aware that Plaintiff had filed an MCAD complaint. He was copied on the internal complaint and a copy of his report of the Plaintiff's conversation with Thompson was copied to the EEOC compliance officer. DeModena contacted the police to limit Plaintiff's right to public access to the stations. Mr. DeModena and Mr. DePhillips attempted to convince the Defendant's police department to apply for a temporary restraining order against the Plaintiff. *Exhibits 18 through 21*. DeModena and DePhillips should at least have explained to the Police that the Plaintiff had a legitimate reason to ascertain who had keys to DeModena's office. DeModena, again, falsely states that the Plaintiff "threaten[ed] the Division Road Foreman". *Exhibit 18*. Wherein DeModena and DePhillips anticipate negative consequences for the Plaintiff, the Defendant's deceitful reports regarding the Plaintiff were "willful doing of injurious act(s) without lawful excuse". *Doane v. Green, supra at 176.*

Finally, Defendant has claimed a defense stating that "work related document(s) in the normal course of the manager's duties do not qualify as 'publication to a third party.'" Even so, "defamatory communication between agents of the same corporation,

22

with reference to some aspect of corporate business, constitutes a publication for purposes of maintenance of a libel action":. *Bander v. Metropolitan Life Inc. Co., 313 Mass 337, 348, 47 N.E.2d 595 (1943).*

Defendant has broadly defended their defamatory statements by claiming that the statements are opinions and not made as fact. DeModena's and Cupernall's statements cannot fit into such a category. DeModena presented material in his reports as factual events and based his assertions on material evidence, specifically, the Letters from Hell. Cupernall, also, stated a matter of alleged fact. She informed a fellow employee that 'insanity' is given as the reason for the Plaintiff's forced absence or "remov[al] from service". *Exhibit 65.*

On the surface, Dr. Pinsky's statements may appear to be opinions, but Dr. Pinsky denied that they are opinions. *DE 24 pages 130 to 131.* In accordance with company policy criteria for fitness-for-duty, Dr. Pinsky, of course, responded to something that was reported to him as fact. Dr. Pinsky, in turn, evaluated these facts as comporting to an established 'index' for medical assessments. *DE 57.* Dr. Pinsky states that there is "ample written documentation to warrant that [Plaintiff] be medically disqualified". Dr. Pinsky also carries through with DeModena's assertion that Plaintiff "sign[ed] off as 'Lucifer, Prince of Darkness'". Dr. Pinsky then proffers the utterly arbitrary and capricious assertion that the imaginary organization 'Institute of Devastation Awareness' is indicative of a psychiatric disorder. This assertion is entirely self-serving and it is concocted merely to justify acceding to DePhillips' request that Dr. Pinsky order an "in-service psychiatric exam" for the Plaintiff. Dr. Pinsky offers no authority for his decision. There is nothing in the literature to justify the assertion that religious reference, allegory, satire, Shakespeare, Tom Stoppard or the "Institution of Devastation Awareness" are 'indices' of any medical condition. To say so is to fraudulently claim a medical basis for a 'medical' opinion. Wherein Dr. Pinsky has stated that there are 'indices' and 'ample written

23

documentation', he is deceiving. He is falsely and fraudulently reporting facts as basis for his decision and therein lies the defamation. *Exhibit 11, page 16 and Exhibit 70.*

The same fraudulent assertion is at work with O'Malley's justification for his disqualification of the Plaintiff. Indeed, pursuant to the criteria for fitness-for-duty outlined above *(Exhibit 70)*, O'Malley would be aware of the comportment of DeModena's "articulable observations" and the ensuing "concurrence from Amtrak's Regional Medical Director". But, however, O'Malley did not believe that such observations made it 'obvious' that the Plaintiff was impaired, even though O'Malley published a letter to the BLE stating that the Plaintiff was impaired. *DE 24 page 199 and DE 24.* Given that O'Malley did not believe that the Plaintiff exhibited any threatening behavior, for him to report that it is obvious that the Plaintiff has not comported with the Defendant's "zero tolerance" workplace violence policy is a deceit intended to maliciously defame the Plaintiff.

2. Discrimination on the basis of a Disability.

The Plaintiff has alleged, as count three in Plaintiff's Second Amended Complaint, that Defendant has discriminated against the Plaintiff on the basis of Disability. *The Americans with Disabilities Act "ADA", 42 U.S.C. 12101 et. seq.* Count three also asserts disability discrimination pursuant to the *Rehabilitation Act, 29 U.S.C. s. 701 et. seq.; 29 U.S.C. s. 794,* and the *Massachusetts Civil Rights Act, M.G.L. c. 151B.* Since the legal criteria for all three statutes are basically the same, Plaintiff hereby focuses on the *ADA.* In proving a prima facie case of discrimination, Plaintiff must: articulate and demonstrate the discriminatory acts or omissions; articulate and demonstrate Defendant's stated reasons for its actions ; and present evidence showing that stated reasons were a pretext. Plaintiff has stated that Defendant has used a false application of their workplace violence policy as pretext for a direct threat defense in order to discriminate against Plaintiff on the basis of a disability and engage in unfair labor practices. Defendant has turned Plaintiff's articulation of a pretext on its head and asserted that the pretext

articulated by the Plaintiff is proof to exonerate the Defendant. Indeed, the Defendant has articulated a maze of preemption arguments and direct threat defenses to obfuscate the facts in this case. However, in order to maintain their defenses, the defense has also left a number of gaps in their evidence presentations and their defenses break down under the full weight of a more complete evidentiary picture.

Pursuant to the requirements of the *ADA*, the Defendant may not "discriminate against a qualified individual with a disability because of the disability . . ." *42 U.S.C. s. 12112(a)*. The initial burden of proof is on the Plaintiff to show through a preponderance of evidence that: he was disabled within the meaning of the *ADA*; that he was a qualified individual able to perform the essential functions of the job with or without a reasonable accommodation; and that the Defendant terminated the Plaintiff because of his disability. *Jacques v. Clean-Up Group, Inc, 96 F.3d 506, 511 (1st Cir. 1996)*.

   a. Plaintiff's Disability.

The Defendant contends that their motion for summary judgment should be granted as a matter of law because the Plaintiff is not disabled as defined by the *ADA*. The *ADA* defines a disability as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

EEOC guidelines highlight several considerations in determining whether a particular "disability" is protected by the *ADA*.

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

*29 C.F.R. s. 1630.2(j)*. In addition, pursuant to decisions of the Supreme Court regarding mitigating measures, The EEOC has added guidelines which consider that an individual who is qualified while using mitigating measures to counteract an impairment, such individual will not be considered to have a disability. *Exhibit 67, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC"), "INSTRUCTIONS FOR FIELD OFFICES: ANALYZING ADA CHARGES AFTER SUPREME COURT DECISIONS ADDRESSING 'DISABILITY' AND 'QUALIFIED'", http://www.eeoc.gov/policy/docs/field-ada.html/. Sutton v. United Air Lines, Inc. (97.1943) 527 U.S. 471, 482-483, (1999). Murphy v. United Parcel Service, Inc. (97-1992) 527 U.S. 516 (1999). The Massachusetts Civil Rights Act* does not require consideration of mitigating measures, however. *M.G.L. c. 151B. section 4 paragraph 16*.

Plaintiff has established with the defendant that he has had a disability. In 1985, Plaintiff was diagnosed with various anomalies and was unable to work due to substantial limitations in the Plaintiff's inability to sleep, eat, care for himself and get along with others. *SDMF at 3 and 4. Exhibits 60 and 62, Plaintiff's Supplemental Response to Defendant's Interrogatories, Defendant's Exhibit ("DE") 63, Questions 13 and 14 at pages 23 to 25.*

During 1985, Plaintiff requested a leave of absence as special accommodation pursuant to the provisions of the *Rehabilitation Act (RA)*. In June and September of that year, Defendant made inquiries into the nature of the Plaintiff's disability and the Plaintiff and his providers corresponded with the Defendant to satisfy those inquiries. *Ibid.* During the leave of absence, Plaintiff established a therapy regimen with his providers that effectively mitigated the impairment. Plaintiff and his providers, who changed somewhat in the ensuing years, continuously monitored the effectiveness of mitigating measures which the Plaintiff regularly reported to Defendant during mandatory physical examinations. On occasions when the Plaintiff's impairment was exacerbated, Plaintiff would again require absences to shore up the effectiveness of the mitigating measures,

but these absences fell within the parameters of the Defendant's policy standard. *SDMF at 38 and 44. SMF at 35 to 42.*

Wherein Plaintiff was suffering from a disability in 1985 that required an extended leave of absence and the Plaintiff corresponded with the Defendant and answered inquiries regarding his impairment, Plaintiff has met the second prong of the requirement; Plaintiff has a record of a disability. However, in January 2000, due to the changes in the law established by the U.S. Supreme Court in *Sutton* and *Murphy supra.*, Plaintiff did not have a disability within the meaning of the *ADA* in January 2000: "A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity" *Sutton, ibid.* In essence the Court established that in assessing whether or not an individual has a disability, one has to take into consideration whether or not the individual is "presently--not potentially or hypothetically--substantially limited in order to demonstrate a disability. A 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken. *Ibid.*

Therefore, the Defendant is correct, to the extent that they assert that the Plaintiff was not impaired or disabled within the meaning of the *ADA* on May 4, 2001, when the Defendant medically disqualified the Plaintiff. Plaintiff was impaired, however, on June 8, 2001, when the Defendant ordered the Plaintiff to undergo a non-confidential psychiatric evaluation, even though, arguably, the Plaintiff did not become fully aware of the impairment until June 27, 2001. Nonetheless, the Plaintiff was "regarded as having an impairment" on May 4, 2001. Since the Supreme Court's ruling in *Sutton* is highly dependent on the "present indicative" of the determination whether an impairment "substantially limits a major life activity", it is important to consider the timeline when the Plaintiff satisfies the required prongs of the determination of his disability.

From 1985 to the present, the Plaintiff had a record of a disability. The evidence of the medical record and correspondence cited above substantiates that prong of the requirement. Since the Plaintiff states that he met the third prong ("regarded as") definition of a disability prior to satisfying the first prong when viewed in the light of *Sutton*, the Plaintiff hereby analyzes the evidence establishing the third ("regarded as") definition first.

The definition of a disability requires that disabilities be evaluated "with respect to an individual" and impairment is determined based on whether the determination limits the "major life activities of such individual." *42 U.S.C. S 12102(2)*. A disability is determined on a case by case basis. *Bragdon v. Abbott, 524 U.S. 624,    (1998). 229 CFR pt. 1630, App. s. 1630.2(j)*. ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual"). The Defendant made such a determination "with respect to [the Plaintiff]" on May 3, 2001. On May 3, 2001, the Defendant's Medical Director, Dr. Timmie Pinsky stated the following. "I received samples of materials reportedly written by Carmack. They justify Carmack being deemed 'medically disqualified' immediately pending a psychiatric FFD exam". *Exhibit 73.*

On other occasions, Dr. Pinsky elaborated on the justification for medical disqualification. Dr. Pinsky wrote and stated that there is "ample written documentation to warrant that [Plaintiff] be medically disqualified". Dr. Pinsky wrote and stated that Plaintiff has "sign[ed] off as 'Lucifer, Prince of Darkness'" Plaintiff listed a mailing address for a fictitious 'Institute of Devastation Awareness'. Dr. Pinsky wrote and stated that; these writings and references to Godzilla and the "content of [Plaintiff's] writings" raised the index of suspicion of an underlying psychiatric disorder to the level where a psychiatric evaluation is appropriate". Dr. Pinsky was convinced that "it is in everyone's best interest that [the Plaintiff] be evaluated for fitness for duty. *DE 57.* And on another

occasion Dr. Pinsky stated: "When someone identifies themselves as Lucifer . . . Institute of Devastation awareness, these are very concerning types of documentation as to whether or not this individual has a severe psychiatric disorder that presents a threat to not only his co-workers but to himself and the traveling public. I'm talking about such things as Personality Disorder, Bi-Polar disorder, etc." *DE 24 at page 386.* Dr. Pinsky made a determination that the Plaintiff was unable to work without posing a threat. Dr. Pinsky painted a picture of an individual who is incapable of evaluating his surroundings or who he is or what he is doing. Dr. Pinsky adopted a literal understanding of the writings. Dr. Pinsky assessed that there is some level or 'index' of concern that the Plaintiff has a distorted personality and 'signs off' as Lucifer. Dr. Pinsky believes that the Plaintiff believes that there is an 'Institution of Devastation Awareness' and that there is a place of Devastation and the Plaintiff must make others aware of that Devastation. Dr. Pinsky has determined that the Plaintiff is suffering from "a severe psychiatric disorder . . . Personality Disorder, Bi-Polar disorder, etc." By reason of the possibility of such disorders, Dr. Pinsky has determined that the Plaintiff cannot work. Dr. Pinsky is not clear what is the specific impairment that would prevent the Plaintiff from working, but he is clear that there is an impairment: the Plaintiff can't work. *Exhibit 57.*

     A qualified person with a disability includes an individual who is "regarded" as having an impairment. To 'regard' means "to take into account, to consider" or "to consider in a certain light or as being something". In order to be regarded as having an impairment, one does not have to have or experience the impairment. On only needs to be treated as though one has an impairment. If one is regarded as being a threat to oneself, one's co-workers or the traveling public, one certainly can't get along with others very easily nor can one work. These are impairments. See *Krocka v. Bransfield, 969 F.supp. 1073, 1085 (N.D. Ill 1997)* (Plaintiff's ability to function generally and to interact with others--and therefore to work--were substantially limited before he was treated for depression with Prozac and therapy). Plaintiff was regarded as having an impairment.

29

See also *Hartog v. Wasatch Academy 7 AD cases 764 (10th circuit 1997)* (Bi-polar affective disorder considered a disorder though major life activity was unspecified) and *Doe v. New Your University, 666 f.2d 761 (2nd Circuit 1981)*. (Record of an inability to handle stressful situations qualified as impairment due to applicant's Borderline personality disorder.)

    Whether by chance or by knowledge through the medical record, Dr. Pinsky was correct in assessing that the Plaintiff was impaired. Plaintiff's doctor records and insurance claims make this clear. *DSMF at 2*. But these problems do not rise to the level of a disability owing exclusively to the fact that the Plaintiff is "using therapy very well". The impairments are effectively mitigated. *Exhibit 60 and 68. DE 63 at 13 and 14, pages 23 and 24*. Since the impairments are mitigated, Plaintiff's impairments do not rise to the level of a disability. However, if the mitigating measure is removed or undermined, Plaintiff would become disabled. The Plaintiff experienced a number of intensifying and disabling symptoms and therapy was increased as symptoms intensified in order that the mitigation would balance out the symptoms and negate the impairment. To maintain this mitigation, Plaintiff required a high degree of confidentiality and trust between the Plaintiff and his doctor.

    Such a mitigating measure which confidentiality as a guarantee of effectiveness is recognized as a matter of law in the form of Psychotherapist-patient privilege. The privilege is established to protect the treatment of patients from disclosure that may be harmful to the individual during court or administrative proceedings. Federally, the protection is a matter of common law, in Massachusetts, the privilege is protected by statute: *M.G.L. c. 233 s. 20B (2001)*. Although the law doesn't mention employment, the rationale informs how confidentiality functions as a mitigating measure. This rationale has been a matter of consideration for congress and the Courts throughout the history of the development of precedence establishing the common law.

    Among physicians, the psychiatrist has a special need to maintain

30

> confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients of confidentiality and, indeed, privileged communication. . . . there is wide agreement that confidentiality is a *sine qua non* for successful psychiatric treatment. . . . Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment. *Report no. 45, Group for the advancement of Psychiatry 92 (1960)* quoted in *Advisory Committee's Notes to Proposed Rules, 56 F.R.D. at 242.* quoted from *In Re Zuniga: 714 F2d 632, 72 ALR Fed 380, 388*

And among considerations from federal courts, the D.C. circuit has observed:

> The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. . . . It would be too much to expect them to do so if they knew that all they say--and all that the psychiatrist learns from what they say-- may be revealed to the whole world. . . .*Taylor v. United States, 222 F.2d 398, 401 (D.C.Cir. 1955)* quoting from *Guttmacher and Weihofen, Psychiatry and The Law (1952), p. 272.* quoted in *In Re Zuniga, supra.*

The Plaintiff enjoyed the benefit of a mitigating measure that effectively suppressed his impairment. However, the Defendant expected the Plaintiff to undermine the effectiveness of this mitigation in order to comply with their directives. This is no different that expecting an individual with a prosthetic leg to walk with his prosthesis removed. If the prosthesis is removed, the individually is effectively disabled. At this point the mitigating measure would become a special accommodation which the Defendant would be required to respect. It is at the point of special accommodation (or discrimination by denial of the accommodation) where the individual in this case becomes disabled. This problem presents a Catch-22 conundrum for the parties and this Court. It is true that the Plaintiff was not disabled on May 4, 2001. It is arguable that he became disabled on June 8, 2001, when the Defendant ordered the Plaintiff to undergo a

31

non-confidential psychiatric evaluation. Had the Defendant allowed a special accommodation, the Court would not need to consider the Plaintiff as actually disabled. Once special accommodation is denied, this Court must accept that the Plaintiff is disabled within the meaning of the *ADA*.

 b. Unitizing standards of criteria, or methods of Administration that have the effect of discrimination on the basis of a Disability: *42 U.S.C. s. 12112(3)(A)*.

 The TART repeatedly denied that they considered the Plaintiff disabled, impaired or suffering from an impairment. However their actions belie their words. DePhillips advocated and In-service psychiatric examination and the other members of the TART agreed to it. *DE 25*. The other members of the TART claimed that they had to send the request to the medical Director because they wouldn't assess a psychiatric condition. They believed that the Medical Director could legitimately detect a psychiatric condition that would allow the TART to disqualify the Plaintiff. *DE 24 pages 156, 157, 232, 233 and 237*. They interpreted the Defendant's workplace policy in a way that required them to look for a impairment that would prevent an individual from working or allow the TART to assess a threat based on the knowledge that an individual is disabled. The standard the Defendant has used has the effect of discriminating on the Basis of a Psychiatric disability, at the very least. *Id. at pages 146 and 147*.

 c. Standards that perpetuate the discrimination of others that are subject to common administrative control. *42 U.S.C. 12112 (3)(B)*

 The process outlined above does not only discriminate against individuals with a disability. As described above, Defendant requested that the Medical Director require a Psychiatric fitness-for-duty evaluation. There basis for doing so was not due to any awareness that the Plaintiff was impaired. All that was required was that the individual was accused of threatening behavior. The TART did not need to assess that any threat actually occurred. Anyone can be accused of threatening behavior. Once an individual is accused of threatening behavior, the TART can ask the Medical Director to assess a direct

threat in order to satisfy the accuser. The Medical director could then arbitrarily base his decision on his authoritative pronouncement that the accused exhibited behavior evidencing a severe psychiatric disorder.

    d. Limiting, segregating or classifying an employee in a way that adversely affects the opportunities or status of such an employee. *42 U.S.C. 12112 (b)(1)*.

    When the TART asked the Medical Director to order an examination of the Plaintiff, Defendant disqualified the Plaintiff in order to justify the request. Doctor Pinsky assessed a severe psychiatric disorder based on an index of suspicion. Doctor Pinsky assigned that disorder with a propensity to do harm to self and others in order justify his actions. The assessment of a disorder and a direct threat are arbitrary. The effect is to classify and disqualify an individual on the basis of a psychiatric disorder. The arbitrary disqualification requires the assumption that one who is suffering from a severe psychiatric is disabled and must be disqualified or at the very least qualified only for specific jobs owing to the psychiatric disorder which is automatically perceived as disabling.

    e. Examinations and inquiries designed to screen out individuals with a disability, *42 U.S.C. s. 12112 (b)(7)*. Medical Examination and inquiries designed to screenout and discriminate against individuals with a Disability, *42 U.S.C. s. 12112 (d)(1), 42 U.S.C. s. 12112 (d)(4)*.

    Whereas this case presents a matter where the Plaintiff was regarded as having an impairment, the Plaintiff was in the unusual position of one who is unaware of what his disability is. Since the Plaintiff was unaware of what disability he was assigned with, he was in the unusual position of inquiring from his employer as to the nature and severity of his own disability. Naturally, being one who is unwittingly suffering from a dangerous condition that poses a threat to the Plaintiff himself and others, including the traveling public, the Plaintiff needed to understand his condition in order to seek immediate treatment. The Plaintiff began making such inquiries immediately. When the verbal

33

requests failed, the Plaintiff mailed letters to the Medical Director. The Medical Director and the Defendant have disengeniously asserted that Letterio mailed the information to the Plaintiff. However, Dr. Pinsky told Letterio that he did not need to respond to Plaintiff's request and He instructed Letterio to forward the requests to the Law Department. *DE 31.*

The Defendant refers to a memorandum from Lettterio to Dr. Pinsky regarding the Plaintiff's request for his medical file. Doctor Pinsky simply stated that he had already discussed issues with Plaintiff's union representative. He justifies a refusal to respond to Plaintiff's request by stating that he has already discussed a private medical matter with a third party with whom he was not authorized to discuss the information. Then to add insult to injury he advises Letterio to refer the matter to the Legal Department and Labor Relations. In compliance, Letterio forwards Plaintiff's entire personal medical file to both the Legal Department and the Labor Relations department to refer any decision on the matter to them. *Ibid.* The information was confidential and defamatory. Dr. Pinsky distributes it throughout the corporation. In late July, the Plaintiff again requested this information. The Defendant has not accounted for the failure to respond. *DE 60.* On or about June 15, 2001, Letterio made it clear to O'Bryan that the Plaintiff was not to receive Plaintiff's medical file and O'Malley was informed. *DE 24 page 328.* In spite of the fact that the Defendant was refusing to supply Plaintiff with his medical file and Plaintiff had no knowledge of what the medical condition was that Dr. Pinsky perceived, O'Malley pressed the Plaintiff to submit to an unlimited examination.

Pursuant to the requirements of the *ADA,* "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." *42 U.S.C. s. 12112 (d)(4).* An inquiry which is "job-related and

34

consistent with business necessity . . . must not exceed the scope of the specific medical condition and its effect on the employee's ability, with or without reasonable accommodation, to perform essential job functions or to work without posing a direct threat." *The Americans with Disabilities Act Manual of the Bureau of National Affairs at 70:1286 page 82.* There was no direct threat. The Defendant already knew that from Doctor Vasile who stated that he "could not make a determination of a basis for medical disqualification or assess whether [the Plaintiff] posed a threat to the health and safety of others. . . " The Plaintiff explained information regarding materials he had written to Dr. Vasile. The Plaintiff was perfectly willing to discuss issues that were job-related and consistent with business necessity. However, the psychiatric evaluation goes far beyond such limitations. *DE 44 and 60.*

Dr. Vasile wanted information, "including obtaining a detailed medical and psychiatric history and obtaining psychological testing". Such inquiries tend to be very personal and include descriptions of sexual proclivities and relationships. They involve family and medical histories and the history of family relationships. Dr. Pinsky said his inquiries would be of a highly personal nature and would examine previous treatment. As indicated above, a patient reveals his feelings both conscious and unconscious. Dr. Vasile made it clear that none of this information would be confidential and it would be forwarded to Amtrak. *Ibid.*

There was never any indication that only the Medical Department would have access to the Plaintiff's private information which would be obtained from Dr. Vasile's examinations. Dr. Pinsky did not talk or write or communicate in any way with the Plaintiff. It was O'Malley who ordered the exam, not Dr. Pinsky. Dr. Pinsky had already discussed private information with O'Bryan. *DE 57.* Even if the *ADA* required Plaintiff to discuss matters beyond the scope of business necessity with Dr. Vasile or Dr. Pinsky, there was no guarantee that O'Bryan or O'Malley would not end up with that information. The medical department did not inform the Plaintiff that there was anything confidential

35

about the exam and Dr. Vasile stated explicitly that "nothing is confidential". He did not specify information would only be sent to Dr. Pinsky or Defendant's Health Resources. *DE 24 at page 302 and DE 44.*

It is important to make note of a letter that the Defendant has produced that was created by Letterio and sent to Dr. Vasile on May 17, 2001. This is a letter that was obviously copied to Plaintiff's medical file. Plaintiff did not see this letter before discovery in 2005. Had Plaintiff been provided with this letter, it is likely that Plaintiff and Dr. Vasile could have constructed a waiver that was job-related and consistent with business necessity. Such a letter would satisfy the requirements outlined in Letterio's letter while allowing the Plaintiff enough control on information that would protect his health. But, Dr. Vasile would not agree to any such limitations. *DE 29 and 44.*

 f. Denial of requests for reasonable accommodation: *42 U.S.C. s. 12112(5)(A).* In June 2001, Plaintiff was a qualified locomotive engineer with a disability. Plaintiff was regarded with a severe psychiatric disorder that allegedly posed a direct threat to the health and safety of the workplace and the Plaintiff was required to submit to an examination. The Plaintiff and the Defendant were advised by the Plaintiff's personal physician regarding the harmful nature of the exam required by the Defendant. Plaintiff requested that the exam be modified or that the Defendant consult with Plaintiff's personal physician. Plaintiff proposed that the exam could conducted by his personal physician. This request was the union's primary theme and goal in investigation. Such requests were denied or ignored and the Plaintiff was terminated for insubordination.

If an employer, aware of an employee's disability, refuses or fails to provide a reasonable accommodation, the employer violates the *Rehabilitation Act* or the *ADA*. A reasonable accommodation may include "appropriate adjustment of modifications of examinations". *42 U.S.C. s. 12111 (9).* "An employee's request for accommodation requires a great deal of communication between the employee and employer ... both parties bear responsibility for determining what accommodation is necessary". *Criado v.*

36

*IBM, 145 F.3d 437 (1st Cir. 1998)* quoting *Bultemeyer v. Fort Wayne Community Schools, 100 f.3d 1281, 1285 (7the Cir. 1996)* (also noting that "in a case involving an employee with mental illness, the communication process becomes more difficult" and "[i]t is crucial that the employer [is] aware of the difficulties, and help the other party determine what specific accommodations is necessary"). See also *Calero-Cerezo v. United States Department of Justice, Et Al. No. 02-2643 1st Circuit January 14, 2004.at 27.*

". . . even if the proposed accommodation might in some way have been less than ideal from defendants' viewpoint . . . the defendant's failed to engage in any good faith interactive process to explore whether some variant of the plaintiff's proposal might have been workable".

    The Defendant not only failed to recognize the need for any accommodation, even after being repeatedly advised, but they made accommodation impossible. They subjected the Plaintiff to the "work now, grieve later" labor doctrine. The application of this doctrine denies the Plaintiff the opportunity to request or communicate with the employer regarding special accommodation. Doctor Vasile stated that it was impossible to undergo a psychiatric exam "under protest". Plaintiff states he did not refuse to submit to the exam and Doctor Vasile stated that he did not wish to proceed if the Plaintiff had intentions of grieving the exam at a later date. Contrary to Doctor's own report to the Defendant, Doctor Vasile himself chose not to perform the exam. He stated that he "did not wish to proceed". At the very least he participated in the decision not to undergo the exam and he made it clear that he would not perform an exam on someone who intended to grieve it. It is important to note also that, had there been a waiver or any agreement to 'willingly' submit to the exam, any grievance process would be foreclosed. Plaintiff did not have any chance to discuss a waiver, however, Dr. Vasile stated it wasn't necessary under the circumstances. *DE 44.*

Had the Defendant communicated to the Plaintiff their concerns as expressed in their letter May 17, 2005, the Defendant or the Plaintiff could have fashioned a special accommodation that would have been job-related and consistent with business necessity to satisfy the Defendants needs. But, they were not interested in special accommodation. Their expressed goal was to charge the Plaintiff with insubordination and to terminate the employee. Had they reached a special accommodation, the ultimate goal of termination would have failed. However, the question of whether the Plaintiff can tell right from wrong, being subjective, would probably require clarification.

    g. Direct Threat Defense

The Defendant has attempted to justify their discriminatory activities pursuant to a Direct Threat defense. The Defendant implies that their Workplace Violence policy comports with *ADA* because the "variety of responses to actual or potentially threatening conduct, including the use of fitness for duty examinations by its medical directors" is permitted by the *ADA's* specification that employers may use "qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown [sic] to be job-related and consistent with business necessity." *42 U.S.C. s. 12113*. The Defendant asserts that the Workplace Violence Policy comports with the 'Direct Threat' standard of the *ADA* as a business necessity.

The Direct Threat standard permits that an employer's qualification standard may include "a requirement that an individual not pose a direct threat to the health or safety to others in the work place", *42 U.S.C. s. 12113b*. "that cannot be eliminated by special accommodation". *42 U.S.C. s. 12111(3)*. The direct threat assessment is an individualized assessment based on present ability to perform essential functions. It should be a reasonable medical judgment which relies on the most correct medical knowledge and/or best available objective evidence. An individualized assessment should include: (1) Duration of risk (2) the nature and severity of the risk, (3) the

38

likelihood that potential harm will occur, and (4) imminence of potential harm. *29 Code of Federal Regulations ("C.F.R.") Part 1630.2(4)*. A medical report based on the unfounded bias of the doctor will not establish a defense. *Equal Employment Opportunity Commission ("E.E.O.C.") v. Texas Bus Lines, 923 F.Supp 965, 979 (S.D. Tex 1996)*. An assessment based on experiences related by other employees is not an individualized assessment *E.E.O.C. v. Chrysler Corporation, 917 F.Supp 1164, 1171-1172 (E.D. Mich. 1996)*.

    Dr. Pinsky does not even pretend to comply with Amtrak's medical Protocols. He even refused to talk to the Plaintiff. Dr. Pinsky references the satirical and allegorical elements of the Rail Satire and arbitrarily assigns them as 'indices' of various psychiatric disorders. Nothing in the *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"* mentions any such indices for the disorders he claims to have detected.

    Nothing that the Defendant describes in their memorandum explains an assessment process that comports with the requirements listed here. The description of their assessment consists of one vague sentence. "All the evidence indicates that Amtrak had concerns in the spring of 2001 about Plaintiff's ability to safely perform his job as a locomotive engineer based upon the troubling language in the 'Letters from Hell." *DM page 38*. Furthermore, in relying on a Direct Threat defense, and the Defendant's have, they are acknowledging perceiption of an impairment. They disqualified the Plaintiff precisely as a safegaurd against the impairment that they perceived and sought to verify. *Exhibit 72 page 3*. They expressly stated that they needed to make a "determination on whether [the Plaintiff] should be disqualified based on a mental impairment". *Exhibit 72 page 3*. But they did disqualify the Plaintiff without determining the impairment. They assumed the the Plaintiff had an impairment. Likewise, however, if they genuinely perceived a threat, they would have just disciplined the Plaintiff in application of their Workplace Violence policy. However, the Workplace Violence policy wasn't what

concerned them, the ideas, principles and grievances are what they found 'disturbing' and 'troubling', there goal was simply to terminate the Plaintiff by whatever means..

It is informative to note, that Defendant has admitted that it is the entire <u>Letters from Hell</u> that they find troubling. This is in keeping with the statements from DeModena and DePhillips. DeModena faxed the Plaintiff's and O'Bryan's letters to the Medical Department because he wanted to highlight the Plaintiff's troubling "behavior" and the unions "frustrations". *Exhibit 16.* DeModena was certain that Plaintiff's thoughts and ideas represented the thoughts and ideas of a mentally unstable and 'unbalanced' individual. *Exhibit 3.* Like DeModena, DePhillips thought that "the entire packet was disturbing". *DE 24 at page 259.*

The source of the controversy between O'Bryan and the Plaintiff is the letter dated October 24, 2000 signed by O'Malley. As indicated before, O'Malley's letters were ghostwritten by the Labor Relations Department and this letter was probably written by Phillips. *see Exhibits 7 and 12.* The entire letter is composed of phrases and sentences taken from the Plaintiff's letters of the previous nine months, particularly a letter written April 30, 2000. The following list of phrases taken from the Plaintiff's letters of the previous months:

1. providing a quality commuter service to the community.
2. threatened the integrity of the service and threatened the safety of the public--the very safety which agreement employees are employed to protect
3. hide behind technicalities
4. illuminate
5. arbitrarily assess and impose discipline.
6. stigmatize your work record
7. My office edition of Webster's dictionary refers to

It is important to note that the word COUNSEL is emphasized. This was the word defined by an 'office edition of Webster's dictionary' in the Plaintiff's letter to O'Malley dated April 30, 2000. O'Malley's letter of October 24, arguably written by DePhillips, is

40