obviously written with contempt and it is intended to mock and avenge. No doubt the Defendant was disappointed that the Plaintiff was grieving it.

The Rail Satire was created on a whim, out of contemplation of the various issues that the Plaintiff had been discussing with O'Bryan and ties them in with O'Bryan's manner of adjusting grievances pursuant to the BLE constitution. The Rail Satire turns on the moral and ethical theme that runs through the Plaintiff's letter of April 4, 2001. *DE 22*. The last line of the letter questions whether O'Bryan is "a false prophet claiming to be God". If anyone is to be identified with Lucifer, it is O'Bryan, and that is the Irony of the satire.

The Rail Satire merely explores whether the BLE approach to business is constructive. The Letters, as with the phrases adopted by the Defendant in their October 24, letter, contemplate preserving the integrity of the service. O'Bryan, himself is concerned that the Plaintiff is just putting a "nail in Amtrak's Coffin". *DE 14*. Hamlet references continue the theme. The Characters in Hamlet are concerned about the integrity of the state of Denmark. O'Bryan and the Plaintiff address the state of Commuter rail. Laxton is listed as Hamlet's father because he was 'fired' from his previous position. The *Rail Satire* questions whether it was justified. DeModena and O'Bryan just happen to fit as characters in service to the 'King' who happens to be taking an action against the Plaintiff. The *Rail Satire* merely asks if the players want to 'play' those roles. They didn't help Denmark, they would be unlikely to help Amtrak Commuter Rail. "Wanna help us fill out all the parts?" It is a moral appeal. The Plaintiff has stated what side he's on, his letters take a moral high ground.

The *Rail Satire* was improvised on a whim in contemplation of ideas promulgated in a radio interview with the authors of a book, Power Plays. *Exhibit 69. SDMF 21*. The Book compares the medieval culture of Shakespeare's plays to contemporary corporate culture. It suggests adopting (or not adopting) and applying certain 'roles' on the corporate stage. But, the plays are merely metaphors for the corporate arena. That is all

41

that is intended by the Plaintiff. The author says he "dispatches. . .Bushy,s Bagots and Greens" while comparing himself to Henry IV executing his enemies. The metaphor is understood. No one would believe he is advocating violence, but he is highlighting the severity of the act. It is the same as to say that an Amtrak employee can be 'axed' for filing a fraudulent workplace violence claim. The metaphor is used in common parlance. But the Defendant has used held the metaphor against the Plaintiff and assigned it with homicidal ideation. Even if the metaphor were truly borne out of homicidal ideation, it would be in the Plaintiff's subconscious and he wouldn't even be aware of it. Likewise, being safely buried in the subconscious by repression, it would be liberated as sublimation in a creative act and disappear. To accuse an individual of homicidal ideation through a subjective interpretation of his words, is discriminatory, slanderous and retaliatory. It is to accuse an individual of something of which he is not even aware. The Defendant "suggests that the [Plaintiff] would like to see physical harm if not death come to Mr. DeModena". *Exhibit 72 page 2.* This is a self-serving suggestion borne of the Defendant own desires to retaliate against the Plaintiff, his freedom of expression, and his exercise of his federal labor rights.

3.   Privacy

Massachusetts General Law provides that "a person shall have a right against unreasonable, substantial or serious interference with his privacy. *M.G.L. c. 214 s. 1B.* The Supreme Judicial Court of Massachusetts has interpreted *section 1B* to "proscribe the required disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest." *Bratt v. International Business Machines Corporation ("IBM"), 392 Mass. 508, 518, 467 N.E.2d 126.* An employer does not enjoy a privilege against an invasion of privacy, however, "because *section 1B* proscribes only unreasonable interference with a person's privacy, legitimate countervailing business interests in certain situations may render the disclosure of personal information reasonable and not actionable under the statute". *Ibid., 520.*

Nonetheless, "in the area of private employment there may be inquiries of a personal nature that are unreasonably intrusive and no business of the employer and that an employee may not be discharged with impunity for failure to answer such requests". *Ibid.* The "reasonableness of requiring employee to disclose personal facts must be weighed against employer's valid business interests" *id.* citing *Cort v. Bristol Myers supra., 312 (Abrams. J. concurring).* An employers liability in a privacy claim includes a liability for discharge when private medical information is required. As with other disclosures, a determination of whether requirement of a medical disclosure is 'reasonable' and therefore actionable this Honorable Court must "balance an employer's valid business interest with the employee's right to privacy". *Bratt v. IBM supra. 522.* The Defendant articulated what those business interests were to Dr. Vasile. *DE 29*. However where the defendant required the disclosure of an entire psychiatric evaluation and psychological testing with a complete medical and personal history, the Defendant went beyond legitimate business concerns. *DE 44*.

    Where the Defendant intention was to analyze the Plaintiff's subconscious, without consideration of his own ability to control the release of that involuntary mechanism, particularly when it is involuntary and to an individual over which the subject (the Plaintiff) has no control, the Defendant has violated the Plaintiff's personal security. The limitations on examinations placed by the *ADA* would protect the Plaintiff's 4th Amendment Constitutional right. This is one reason why the use of the Plaintiff's own doctor was also essential. It was very private information. Without safegaurds, the Plaintiff can't be "secure in [his] person . . . against unreasonable serches and seizures". *U.S. Constitution, Amendment 4*.

4.    Unfair Labor Practice

    Defendant has denied Count Five, Unfair Labor Practices, which is claimed pursuant to *the Railway Labor Act*. Defendant denies Count Five by reiterating claims of preemption pursuant to *the Act*. *DM page 33*. As has been previously submitted, the

Defendant's arguments are misplaced. The Defendant claims that the Unfair Labor Practice charge is a "controversy(y) arising from the 'interpretation or application of agreements concerning rates of pay, rules, or working conditions. . .'". However, the charge of Unfair Labor Practice does not arise out of a claim pursuant to the *CBA*, but pursuant to the provisions of the act itself. As stated in section A above, claims pursuant to *the Act* itself are actionable. *Hawaiian Airlines supra*. Defendant has broadly based their preemption claim by asserting Rule 21 of the *CBA*, the discipline rule. The Defense applies a broad interpretation of this rule to give them the right to circumvent constitutional law. They have interpreted the law to allow them to discipline employees for whatever cause, just or unjust. Rule 21, of course, does not cover causes. Rule 21 merely covers the mechanism by which an employee may be disciplined, not the reason. Plaintiff hereby asserts that every justification that the Defendant gives for its actions that requires their distorted view of Rule 21 demonstrates that issue as a 'major dispute' pursuant to *the Act*. "A dispute is major if the carrier's contractual justification is 'obviously insubstantial.' *International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT" or "Teamsters") v. Pan American World Airways, Inc. ("Pan Am"), 607 F.Supp. 609 (D.C.N.Y. 1985).*

> *The Railway Labor Act* proscribes as purposes:
>
> (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions. *45 U.S.C. s. 151a.*

In addition:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort . . . to settle all disputes, whether arising out of the

44

> application of . . . agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof. *Ibid. section 152. First.*

and further:

> employees shall have the right to organize and bargain collectively. . . No carrier its officers or agents, shall deny or in any way question the right of its employees to join organize or assist in organizing the labor organization of their choice and it shall be unlawful for any carrier to interfere in any way with the organization of its employees. . .or to coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization. . . *Ibid. section 152. Fourth.*

In order to make a *prima facie* case of Unfair Labor Practice pursuant to *the Railway Labor Act*, a plaintiff must first demonstrate that he was engaged in a protected activity. Following this, a plaintiff must demonstrate that the Defendant's explanations for their actions are pretextual. *Hodges v. Tomberlin, 510 F.Supp. 1287, 1293 to 1294 (1981).*

The Defendant has justified their actions by asserting an arbitrary application of their workplace violence policy. They have admitted that there was no violation of this policy and no cause for disciplinary action. *DM at page 3.* The Defendant claims that their policy permits them to intercept an internal union document and use it as basis to require the Plaintiff to undergo "a full psychiatric examination including psychological testing". *DM at 21 and DE 44.* This action is clearly retaliatory. After stating that the internal union document constitutes no infraction of rules or the very policy which they cite, the Defendant has nonetheless treated the Plaintiff as one who is exhibiting symptoms of a "severe psychiatric disorder" and disqualified the Plaintiff. While doing so, they expect that the Plaintiff will claim a violation pursuant to *the Act* and they continuously warn the Plaintiff that any reference to an intention to grieve or settle a dispute will be grounds for a charge of insubordination and dismissal. *DE 25, 34 and 54.* When the Plaintiff submitted to undergo an examination 'under protest' as is the "work now, grieve later" standard, the Defendant terminated his employment.

The causes for action are multi-layered in these actions. Initially, the very document which they have used to justify their actions politicizes Defendant's violation of the *CBA. DE 22 letter of M. J. O'Malley dated October 24, 2000.* This violation in turn gives rise to internal organization controversy which is publicly debated in full exercise of the organization's right to define itself and engage in free open speech and debate. The political controversy is accentuated with creative accouterments which are the Godzilla cartoon and 'Lucifer' quotations to which the Defendant has taken offense. All the parties mentioned in the cartoons have a direct relationship to the issues raised by the Plaintiff and his representative. Where the Defendant has used the workplace violence policy to take an administrative control over this document, they have intefererd with the internal organization of the employee in particular and the employees in general. Where the representative, himself, in order to effectively represent, requires fostering a lively debate, including opposition to his own ideas and actions, the Defendant has also interfered with the representative's rights and responsibilities pursuant to *the Act*. After initially taking aim at the very act of dialogue, the Defendant takes aim at the employee, the Plaintiff, who proffered the dialogue and the internal organizational issues raised.

The Defendant has offered no valid justification for medical disqualification of the Plaintiff. The Defendant admits that their actions are in response to the "troubling" and "disturbing" issues presented in the dialogue between the Plaintiff and the organization's representative. The medical disqualification is purely retaliatory. *DM at 3, Exhibit 3 and DE 24.* The Plaintiff then resolved to protest this action as a violation of the *CBA, the Railway Labor Act*, itself, and *The Railroad Safety Act. 45 U.S.C. s 441.* When the Plaintiff freely stated his intention to protest pursuant to these statutes, the Defendant charged the Plaintiff with insubordination and terminated the Plaintiff. *DE 45.* This trail of responses details a continuos nexus cascading causes and effects demonstrating numerous violations of *the Act*.

And it is the Plaintiff's speech, in exercise of his labor rights, the Defendant has attacked. This speech is clearly protected and the Courts interpretations have given it a very wide berth. If this court is to make a judgment based on the *Rail Satire*, it must do so "against a background of a profound . . commitment to the principle that debate . . .should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks." *New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)*. Offensive language is to be expected regarding labor speech. "Both Labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." *Linn v. Plant Guard Workers, 383 U.S. 53, 58 (1966)*. This Court must take this precedent into consideration in deciding the efficacy of the Defendant using their Workplace Violence policy as a pretext. "Basic to the right guaranteed to employees . . to form, join or assist labor organization, is the right . . . to persuade other employees to join for their mutual aid and protection". *NLRB v. Drivers Local 639, 362 U.S. 274, 279 (1960)*. "Federal law gives a union license to use intemperate abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Letter Carriers v. Austin, 418 U.S. 264 (1974)*. In *Letter Carriers*, the court was evaluating the use of the word 'scab' as 'traitor'. The language in that case involved the use of an exposé over the word 'scab' which implied that the union's opponents should drown themselves. The *Rail Satire* does not even go so far as to reach such an implication, it merely asks a question. However, it is reasonable to compare DeModena with Rosencranz's efforts to undermine Hamlet in service to the King. The evidence in this case clearly demonstrates that Mr. DeModena was certainly pursuing adverse action against the Plaintiff. The comparison to Rosencranz is valid. In *Austin*, the court defended a "rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join". In this case, the Court, needs only decide on a matter of imaginative expression of comparison, not contempt. The *Rail Satire* must be protected.

47

5.  Wrongful Discharge in Violation of Public Policy: *The Railway Safety Act. 45 U.S.C. s. 441* Retaliation and coercion contravening the requirements of the *ADA, 42 U.S.C. s. 12112(5)(B)* and *42 U.S.C. s. 12203 (b)*.

The Plaintiff has charged that the Defendant's termination of the Plaintiff constituted a Wrongful Discharge in Violation of Public Policy and in violation of *the Railway Safety Act. Count Eight, 2nd Amended Complaint at page 61* and *DE 62 at page 5*. The Defendant reiterates their preemption arguments as basis for their summary judgment motion and the Plaintiff has responded to those arguments in Section A above. In addition, the Defendant has also asserted that Massachusetts Courts have preempted Wrongful Discharge in Violation of Public Policy when Plaintiff is a non at-will employee. However, Massachusetts common law mirrors the same preemption arguments that are presented above regarding collective bargaining agreements. Massachusetts common law barring the type of wrongful discharge claim here only applies to agreements that specify 'just cause' basis for wrongful discharge. *Acciavatti v. Professional Services Group, Inc. 982 F.Supp. 69, 73-74 (D. Mass. 1977)*. As previously argued, the *CBA* covering the instant case does not specify 'just cause' as a basis for termination. State law remedies not specifically covered by the *CBA* are actionable. The fact that the parties did not arbitrate just cause "strengthens the case that the statute works no intrusion on collective bargaining. Thus, the statute is a valid and unexceptional exercise of the State's police power, and is compatible with the [*RLA*]. *Halifax Packing Co. v. Coyne, 482 U.S. 1 Pp. 19-22 (1987)*. (Contrasting state law jurisdiction to *National Labor Relations Act* ["*NLRA*"] jurisdiction.) See also *Alexander v. Gardner-Denver supra at 51-52*, "resorting to the arbitral forum petitioner did not waive his cause of action under Title VII". Also, see *Lividas v. Bradshaw, California Labor Commissioner, 512 U.S. 107 126-132 (1993)*: The 'hands off " label, whether barring state or federal claims and " the assertion that represented employees are less 'in need' precisely because they have exercised federal rights poses special dangers that advantages

conferred by federal law will be canceled out and its objectives undermined". *Id. at 129.* In the *Acciavatti* case, upon which the Defendant relies for their argument, the Court specifically stated that "the resolution of [the defendant's claim] depend[ed] upon the just cause provision of [the collective bargaining agreement]." *Acciavatti, supra. at 75* quoting *Cullen v. E.H. Friedrich Co., Inc. 910 F.Supp. 821, 822 (D. Mass. 1995).*

The common law tort for Wrongful Discharge in violation of public policy exists when, in the act of termination of an employee, the employer retaliates against employee for engaging in an activity that constitutes a legally protected right. "A matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed" *Palmateer v. International Harvester Co. 85 Ill 2d 124, 421 N.E. 2d 876, 878-879.* This tort overlaps with Plaintiff's claim pursuant to the *Railway Safety Act.*

Pursuant to the *Railway Safety Act*:

(1) A common carrier by railroad engaged in interstate of foreign commerce may not discharge or in any manner discriminate against any employee for refusing to work when confronted by a hazardous condition related to the performance of the employee's duties, if--
  (A) the refusal is made in good faith and no reasonable alternative to such refusal is available to the employee;
  (B) the hazardous condition is of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that--
    (i) the condition presents an imminent danger of death or serious injury; and
    (ii) there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory channels; and
  (C) the employee, where possible, has notified his employer of his apprehension of such hazardous condition and of his intention not to perform further work unless such condition is corrected immediately.
45 U.S.C. s. 441 (1).

The administration of resolution for such a violation is pursuant to the *Railway Labor Act. Ibid. paragraph (c).* Nonetheless, given that this directive is congressional and not

49

governed by the *CBA*, the grievance machinery is not preemptive. *Hawaiian Airlines, supra.*

In the instant case, the Defendant has violated the statute and the tort on two accounts.. First, they retaliated against the Plaintiff for pursuing the grievance machinery to resolve an unsafe condition on a train the Plaintiff was operating on October 9, 2000. The internal labor dispute that was the very subject of controversy between the Plaintiff and Mr. O'Bryan pertains to discipline in retaliation for warning the Defendant concerning an unsafe condition on his train and the perceived refusal of the Plaintiff to continue until the condition was corrected. *DE 22 letters dated October 24, 2000 and April 4, 2001* and *DE 14*. The Defendant arbitrarily medically disqualified the Plaintiff and then subsequently terminated the Plaintiff when he insisted on continuing the grievance process. Application of the wrongful termination tort and the *Railway Safety Act* stems from the same nexus of actions and omission articulated above in subsection 4.

Within the same chain of events cascading from the October 24, 2000 letter, the Defendant again disciplined and ultimately terminated the Plaintiff when he warned the Defendant of the impending harm presented to the Plaintiff by Dr. Vasile's evaluation and testing. Plaintiff was charged with insubordination when he articulated his intention to grieve. Plaintiff was discharged in spite of the fact that, during investigation, Plaintiff made continuous claims of the impending harm that the Defendants requirements presented. *DE 24, pages 417 to 424. DE 45 at 13.*

These same acts of intimidation and retaliation comport as violations of the *ADA* requirement against retaliation and coercion. In order to protect against the harm presented by the Defendants requirements, Pursuant to the *ADA*, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise of enjoyment of, any right granted or protected by this Act". *42 U.S.C. s. 12203 (b).* Plaintiff requested special

50

accommodation in that he could have his own doctor report to the Defendant pursuant to Plaintiff's right to a special accommodation. *42 U.S.C. s. 12112(5)(B)*. When Plaintiff did so, he was threatened and terminated for doing so. *DE 45 at 14 and DE 54*.

      6. *Federal Employers Liability Act. 45 U.S.C. s. 51.* Intentional Infliction of Emotional Distress.

      a. Comportment with *FELA*.

      The acts of negligence articulated above, including, but not limited to sub-sections 2a-f and section 5, on the part of the Defendant wherein the Defendant ignored the harmful consequences of their directives, qualifies the behavior as an actionable Intentional Infliction of Emotional Distress Pursuant to the *Federal Employers Liability Act* ("*FELA*") which states, in pertinent part:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce." *Ibid.*

The Supreme Court has recognized that a *FELA* claim will include actions for Intentional Infliction of Emotional Distress which is generally a common law tort claim that may be preempted by *FELA*. cf. *Lividas, supra at 116-118*. State rule preempted by federal labor law "because it interfered with congressional purpose". See Also *Snowden v. Hughes, 321 U.S. 1 (1944)* state election laws not a privilege secured by Fourteenth Amendment of which plaintiff's were deprived by application of federal congressional districting laws.

      While the Supreme Court recognized the possibility of an emotional distress claim under *FELA* in *Atchison, Topeka and Santa Fe Railway Co.* ("*A.T.S.F.*") v. Buell, 480 U.S. 557 (1987), the requirement for such a claim was later qualified with a "zone of danger" test in *Consolidated Rail Corp.* ("*Conrail*") v. Gottshall, 512 U.S. 532 (1994) and its companion case, *Conrail v. Carlisle*. Pursuant to these cases, actions are limited to those wherein plaintiffs who "sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." *Ibid. at*

*547-548.* The threshold of the 'zone of danger' test is demonstrated by *Metro-North Commuter Railroad Co. v. Buckley* ("*Metro-North*"), *521 U.S. 424 (1997)* wherein plaintiffs exposed to asbestosis was granted a *FELA* claim. In the *Metro-North* case, plaintiff's were granted claims for experiencing "fear of cancer" resulting from exposure whether or not there was any manifestation of disease.

While Plaintiff acknowledges that the instant case may appear as though it does not comport with the *Gottshall* test, Plaintiff nonetheless submits that wherein the Plaintiff was considered to be under the Defendant's administrative control, and subject to an order to comply a requirement for a medical intervention, that medical intervention would have physical consequences and the zone of danger is the office wherein the examination would be performed. The inevitable physical consequences of the Defendant's requirements are demonstrated by evidence in Plaintiff's own medical history. *Exhibit 68.*

  b. Application of common law tort.

To the extent that Plaintiff's *FELA* claim is not allowable, Plaintiff's state law claim is allowable. Justification for these claims have been articulated above regarding Plaintiff's public policy claim where Plaintiff has asserted there was no congressional intent to bar state law claims by enacting federal labor law, *Lividas v. Bradshaw supra.* Wherein with *FELA*, congressional intent was "follow the lead of those enlightened and progressive states" which had recognized railroad employer personal injury liability, it is clear that congress did not intend to curtail rights and privileges that citizens of a particular state might enjoy had *FELA* not been enacted. *40 Cong.Rec. 4607 (1906).*

  7. Discrimination on the Basis of Religion

Defendant claims that religious discrimination claims are barred because plaintiff DID not pursue a religious discrimination claim during MCAD proceedings. Plaintiff counters that he ,in fact, did pursue such a claim, but MCAD ignored it and, in any case, the

MCAD notice of dismissal was itself discriminatory. The Plaintiff has exhausted all administrative remedies and has not received adequate relief for the violations. The Plaintiff has no effective administrative remedy a, and further efforts by Plaintiff to exhaust those remedies would be futile.

    Pursuant to the *Title VII of the Civil Rights Act of 1964, 42 U.S.C. s. 2000e-2*:

(a) It shall be an unlawful employment practice for an employer--
    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms conditions, or privileges of employment, because of such individual's. . . religion. . .; or
    (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion. . .

"Employers must permit employees to engage in religious expression if employees are permitted to engage in other personal expression at work. . ." *EEOC Field Guide on Religious Discrimination, http://www.eeoc.gov/types/religion.html*.

    In application of their workplace violence policy, Defendant specifically took exception to the religious element of the Rail Satire. Mr. DeModena objected to reference to Lucifer, Prince of Darkness or "the devil" *DE 24 at 187*. The Plaintiff chastised Mr. O'Bryan on moral and ethical grounds as "a false prophet claiming to be God" and highlighted the moral basis of his remarks with the Rail Satire. *DE 22 letter of April 4, 2001 at page 10*. These are the Items the Mr. DeModena took exception to and they are the basis of the workplace violence charge. *Exhibit 3 and DE 21*. All in all, religious expression is the basis for Plaintiff's medical disqualification of the Plaintiff and Religious expression is what the Defendant expressly attached. *DE 21, 57 and DE 24 at 386*. Plaintiff made it clear that he was expressing his own personal ideas and he specifically asked the Defendant to accommodate them. *DE 60, Letter dated 7/31/2001*. The Defendant noted his religious expressions to MCAD as moral and ethical beliefs he was trying to display in the *Rail Satire. Exhibit 77 pages 14-16*. MCAD should have

53

been able to accept the attack on this expression as discrimination on the basis of religion. ""In most cases whether or not a practice or belief is religious is not at issue. However, in those cases in which the issue does exist, the Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views. *Code of Federal Regulations part 1605-- Guidelines on Discrimination Because of Religion. Part 1605.* However, MCAD adopted the Defendant's distorted reporting on the Rail Satire viewed as basis to medically disqualify the Plaintiff as "mentally unstable". *DE Exhibit 50.* Plaintiff submits that MCAD's dismissal notice is discriminatory and that it is unreasonable for the Defendant or this Honorable Court to require the Plaintiff's complaint to be accepted by MCAD as probable cause for this action. "The Constitution .. affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any". *Lynch v. Donnelly, 465 U.S. 668, 672-673, (1984).* "The state must confine itself to secular objectives, and neither advance nor impede religious activity". *Roemer v. Maryland Public Works Bd., 426 U.S. 736, 747, (1976).*

      The Defendant has also attempted to justify their actions by standing directly in judgment of the Plaintiff's personal beliefs. *DM at VII B. page 50.* However, if courts have no business standing in judgment of the Plaintiff's personal belief system or what religious ideas the Plaintiff may proffer in a union discussion, neither does the Defendant enjoy such privilege: "It is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment. Nor is it in the competence of courts under our constitutional scheme to approve, disapprove, classify, regulate or in any manner control sermons delivered at religious meetings". *Fowler v. Rhode Island, 345 U.S. 67, 70 (1953).*

      To the extent that this Honorable Court will not permit recognition of Plaintiff's discrimination claim as an employment discrimination claim, this Honorable Court must nonetheless accept as an Interference with Rights claims pursuant to M.G.L. c. 12 and

M.G.L. c. 265 s. 37 and a 1st Amendment claim pursuant to the establishment clause wherein the Defendant has interpreted their Workplace Violence policy to justify interference with Plaintiff's Labor Rights. "The First Amendment 'lies at the foundation of free government by free men' and [the Court] must in all cases 'weigh the circumstances and appraise. . . the reasons. . . in support of the regulation of (those)rights.'" *Schneider v. State, 308 U.S. 147, 161.* quote in *Marsh v. State of Alabama, 326 U.S. 501, 509 (1946).*

Lastly, Plaintiff calls this Honorable Court's attention to a matter of disparate treatment. Prior to the enactment of the Workplace Violence policy, the Defendant permitted the publication of the BLE entitled AMSCAM that was distributed nationwide on the Railroad out of Boston. This publication contained extremely violent allegory and satire. The corporate leadership of the Defendant publicly lauded the publication in their own internal corporate corporation. *Exhibit 59.* Given the Plaintiff's knowledge of these events, it is unreasonable to expect that the Plaintiff would consider a mere comparison of adversarial corparate relationsips to the events in Hamlet or Rosenzranz and Guildenstern are Dead! as anything offensive up against the AMSCAM "Judgment Day" satire. Rosenzranz and Guildenstern are Dead! highlights the death as metaphor concept through the vehicle of a play within a play in order to highlight its existential precepts of control over destiny. *Exhibit 76.* Judgment day portrays real people actully killing real people, not as clear metaphor and not players, only as satire. It is unfair for the Plaintiff to expect that he would be treated any differently. There wasn't even a warning.

Wherefore, Plaintiff, Joseph T. Carmack respectfully requests that Defendant National Railroad Passenger Corporation's Motion for Summary Judgment be denied and Plaintiff's Counter Motion for Summary Judgment be granted on all 8 Counts of Plaintiff's Second Amended Complaint.

**Respectfully submitted,**

55

January 17, 2006

_[signature: Joseph T. Carmack]_
Joseph T. Carmack, Plaintiff Pro Se
398 Columbus Ave. PMB 130
Boston, MA  02116-6008
Work:  617/727-2310 ext. 7045
Home:  617/536-0772
Page w/Voice Mail 617/798-6466

### Certificate of Service

I, Joseph T. Carmack, hereby certify that I have on January 17, 2006 served a true copy of the foregoing document by First Class U.S. Mail to Stephen A Hughes, Attorney for the Defendant, National Railroad Passenger Corporations at One Liberty Square - 6th Floor, Boston, MA  02109.

DATED:  January 17, 2006            _[signature: Joseph T. Carmack]_
Joseph T. Carmack
Plaintiff, Pro Se
398 Columbus Ave, PMB 130
Boston, MA  02116-6008
Work:  617/727-2310 ext. 7045
Home:  617/536-0772
Pager w/voice mail: 617/798-6466

I, Joseph T. Carmack, hereby certify that I have on January 17, 2006 served a true copy of the foregoing document by First Class U.S. Mail to Robert K. Blaisdell, Attorney for the Massachusetts Bay Commuter Railroad Co. at One Beacon Street, Suite 1320 Boston, Massachusetts 02108-3113

I, Joseph T. Carmack, hereby certify that I have on January 17, 2006 served a true copy of the foregoing document by First Class U.S. Mail to Todd Valicenti, Attorney for Massachusetts Bay Transportation Authority at 10 Park Plaza Room 3910, Boston, MA  02116.

DATED:  January 17, 2006            _[signature: Joseph T. Carmack]_
Joseph T. Carmack
Plaintiff, Pro Se
398 Columbus Ave, PMB 130
Boston, MA  02116-6008

Work: 617/727-2310 ext. 7045 Home: 617/536-0772 Pager w/voice mail: 617/798-6466

56