# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH T. CARMACK )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NATIONAL RAILROAD PASSENGER )<br>CORPORATION )<br>)<br>Defendant. )<br>) | Civil Action No. 03 12488 PBS |

SECOND DECLARATION OF MICHAEL O'MALLEY

I, Michael O'Malley, solemnly swear under the penalties of perjury and upon personal knowledge that the following statements are true:

1. I was Mr. DeModena's supervisor and I can categorically say that he was never fired during his employment by Amtrak. Also, he was never disciplined by Amtrak in any way due to problems that may have occurred on the Old Colony line in 1997 or at any other time.

2. On April 10, 2001, Mr. DeModena informed me that a packet of documents entitled the "Letters from Hell" had been left on his desk. He indicated that they appeared to have been prepared by Mr. Carmack. In addition, he mentioned he was concerned that they might contain threats of physical harm or death against him. He showed me the packet of documents shortly thereafter. While I had previously seen, and even written some of the correspondence included therein, I had never previously seen the complete set of documents. Furthermore, I had never previously seen the title page, the text

purportedly written by Lucifer, or the documents associated with <u>Hamlet</u> or <u>Rosencrantz and Guildenstern</u>.

3. I agreed with Mr. DeModena that the "Letters from Hell" were troubling and that they might constitute a threat. As a result I did not try to dissuade him from filing a workplace violence report. Rather, I instructed him to send the report to the members of the Threat Assessment Response Team.

4. I was not aware that some BLE members referred to Mr. O'Bryan as "God" until the Amtrak hearing concerning the charges of insubordination against Mr. Carmack that was held in April and May 2002.

5. I never warned Mr. Carmack that if he continued making special requests and did not submit to the psychiatric exam in its entirety, that he would be charged with insubordination and terminated for failure to provide information on a previous medical condition. Rather, I merely instructed Mr. Carmack on several occasions that his refusal to undergo the fitness for duty examination would constitute insubordination for which discipline up to and including termination could be assessed.

6. After August 2002, Mr. Carmack could have submitted time claims to Amtrak by mail, by delivering them to the information booth at South Station, or by having them delivered to Amtrak by his union representative or any other employee of Amtrak. Furthermore, BLE union meetings did not take place on Amtrak or MBTA property.

**SIGNED THIS DAY UNDER THE PENALTIES OF PERJURY**

DATED: 2/13/06

_____
Michael O'Malley

# EXHIBIT B

Case 1:03-cv-12488-PBS   Document 121-3   Filed 02/14/2006   Page 4 of 18

```
                              Volume: I
                              Pages: 1-158
                              Exhibits: 1

            UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS


_____
JOSEPH T. CARMACK              )
         Plaintiff,            )
                               )
VS.                            )
NATIONAL RAILROAD PASSENGER    )
CORPORATION                    )
         Defendant.            )
_____)

         DEPOSITION OF MICHAEL O'BRYAN, a witness
called on behalf of the Defendant, taken pursuant
to the applicable provisions of the Massachusetts
Rules of Civil Procedure, before Maryellen Moulaison,
Professional Shorthand Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the Law
Offices of BONNER KIERNAN TREBACH & CROCIATA, One
Liberty Square, Boston, Massachusetts, on August 11,
2005 commencing at 10:00 a.m.
```

781-585-6741 FEDERAL COURT REPORTERS 978-535-8333

```
 1
 2          MR. CARMACK:  Objection.  It wasn't a
 3  letter of warning.  He just said he didn't know if it
 4  was a letter of warning or counseling.
 5          MR. HUGHES:  No, I think he describes that
 6  the letter of warning was more in nature of a letter
 7  of counseling.  Okay.
 8
 9  BY MR. HUGHES:
10     Q.  So the letter you were just referring to and
11  the agreement of Mr. O'Malley to write such a letter,
12  why were you surprised?
13     A.  Every individual has their prejudices, myself
14  included, Mr. Carmack included, Mr. O'Malley
15  included, we're human beings we get fed up sometimes.
16  I know that Mr. O'Malley was -- I could tell by the
17  tones of my conversations of numerous conversations
18  with him and just comments that he made that he --
19  when I say fed up he was sick of having to deal with
20  these letters on a regular basis on issues that he
21  believed should have been closed.
22          And after the attendance policy incident, that
23  coupled with the fact that the service on October
24  9th -- if that's the correct date -- became somewhat
```

```
 1  the brokered discipline arrangement that you had
 2  arranged with Mr. O'Malley?
 3      A.  Yes.
 4      Q.  So what did you do next?
 5      A.  I told Mr. O'Malley that we had a deal.
 6      Q.  And, in addition to the acceptance of the
 7  letter that Mr. O'Malley was going to send, did
 8  Mr. Carmack agree to anything with respect to his
 9  conduct?
10      A.  I apologize.  I got distracted would you repeat
11  that please.
12      Q.  In return for Mr. O'Malley limiting the
13  discipline to this letter did Mr. Carmack agree to do
14  something with respect to his conduct?
15      A.  There was an agreement and part of
16  Mr. O'Malley's conditions were that there would not
17  be a follow-up letter writing campaign.
18      Q.  So what happened next as far as you know with
19  respect to this incident and proposed agreement?
20      A.  Well, Mr. Carmack wrote a letter.
21
22          MR. CARMACK:  Can I just ask to repeat his
23  last answer before that?
24          MR. HUGHES:  Okay.
```

1              (Answer read back.)
2  BY MR. HUGHES:
3      Q.  Well, did you inform Mr. Carmack that
4  Mr. O'Malley had agreed to the arrangement?
5      A.  I informed him of that before we -- during our
6  meeting.  I had Mr. O'Malley's agreement before I met
7  with Mr. Carmack.
8      Q.  So you didn't have any reason to tell
9  Mr. Carmack about your last conversation with
10 Mr. O'Malley?
11     A.  Which conversation?
12     Q.  The one where you told Mr. O'Malley that
13 Mr. Carmack had agreed to the terms or the
14 arrangement?
15     A.  I don't recall whether I did or I didn't.  I
16 may have simply told him in very short terms and I
17 don't recall one way or the other.
18     Q.  So how did you learn that Mr. Carmack had some
19 objections to the agreement?
20     A.  Well, I think that the entire history of what
21 we are going through in this series of questions is
22 contained in -- at least from my perspective -- in
23 this March 11th letter.
24     Q.  Unfortunately, in the field of law, personal

testimony takes on a different significance than just a written document.

So, unfortunately, I need you to help explain what you have written in the letter as long as it is in compliance with your best recollection today.

A. That's fine.

Q. I understand your frustration with the process and it's necessary.

A. No, I don't believe you really do understand my frustrations. You have absolutely no conception. Go ahead.

(Laughter)

Q. So my question was, how did you learn next that there was any concern on Mr. Carmack's part about this arrangement?

A. Well, as I wrote in my letter sometime later so it was a -- I don't know how much longer -- after the letter of warning was issued I received a copy of the letter of warning from Mr. Carmack with a couple of notes on it along with some other documents.

Q. What did Mr. Carmack tell you in this package of documents?

A. Well, the-- What did he tell me?

Q. Strike that. In this packet of documents did

1  he inform you that he was not amenable to the
2  arrangements that you had set up?
3     A.  No, he did not directly tell me that.
4     Q.  So how did you eventually find out that he was
5  not amenable to this arrangements?
6     A.  It become patently clear to me because enclosed
7  in the documents -- in the package -- was a letter
8  addressed to to Mr. O'Malley from Mr. Carmack dated
9  October 16th.
10    Q.  Is that the first page of Exhibit 1?
11    A.  Yes.
12    Q.  So what did you do when you saw this letter
13 from Mr. Carmack?
14    A.  I think I sat down and cried.  I really didn't
15 know, I really don't know.  I probably just threw it
16 across the room and I don't know.
17    Q.  Well, did you contact Mr. Carmack to discuss it
18 with him?
19    A.  I really don't recall.
20    Q.  Did Mr. O'Malley contact you after he received
21 this letter from Mr. Carmack?
22    A.  As I stated before Mr. O'Malley and I were in
23 regular contact on a variety of issues.  If he
24 didn't, I don't believe he would have called me and

1  told me directly specifically for this, but without a
2  doubt it came up in a conversation I had with him at
3  the minimum within a day or so after he received it.
4  I really don't recall when but I can say
5  unequivocally that it was within 48 hours of him
6  having received it he made a point to tell me.
7      Q.  On page five of your letter if you could turn
8  there.  Are you there?
9      A.  Okay.
10     Q.  Does this refresh your memory as to whether
11 there were any handwritten notes on the letter of
12 warning that Mr. Carmack transmitted to you in the
13 package of documents?
14     A.  Yes, I stated earlier that it had -- there was
15 a handwritten note on the copy of the letter of
16 warning.
17     Q.  And that's the handwritten note that's written
18 in these paragraphs on page five, Dear Mike?
19     A.  Yes.
20     Q.  And the next one right below that; correct?
21     A.  Yes.
22     Q.  At some point did you have a discussion with
23 Mr. Carmack in which he indicated that he wanted to
24 go ahead with a hearing on this matter after

1    Mr. O'Malley had issued his letter?

2    A.   We probably discussed it a number of times.

3    Q.   And did you discuss with him your impression of
4 the problems of his decision in doing so?

5    A.   I did.

6    Q.   What did you tell him?

7    A.   That he would be found guilty.

8    Q.   And did you discuss a procedural argument that
9 Mr. Carmack might use to try to avoid being found
10 guilty of --

11   A.   Yes.

12   Q.   -- of violating Amtrak's rules?

13   A.   Yes.

14   Q.   What was your understanding of what Mr. Carmack
15 wanted to do using a procedural argument?

16   A.   He wanted to avoid the disciplinary process by
17 using the agreement.

18   Q.   In what way?

19   A.   As I stated earlier, there is a disciplinary
20 proceeding in the agreement in disciplinary cases
21 where charges have to be issued within seven days of
22 the events.  In this case they were not.

23   Q.   And refresh our memory as to why they were not
24 issued within that seven-day period?

```
 1  locals?
 2     A.   They always had locals.  They were not termed
 3  locals.  The terminology within the BLE is divisions,
 4  but they have always had them.
 5     Q.   When you first joined a BLE division?
 6     A.   Um-hum.
 7     Q.   What division was that?
 8     A.   61.
 9     Q.   Where was that?
10     A.   Here in Boston.
11     Q.   Division 61 in Boston?
12     A.   Yes.
13     Q.   Was there another division in Boston?
14     A.   Yes, there were four or five other division in
15  Boston at the time.
16     Q.   What division was John Mitten the local
17  chairman of?
18     A.   At the time I joined I don't know whether he
19  was local chairman or not but he became local
20  chairman not long after in, oh, let's see was it's in
21  --   101 Fitchburg.
22     Q.   191 in Fitchburg?
23     A.   Yes.
24     Q.   Were you a member of that division at that
```

```
 1  time?
 2      A.  No, I was not.
 3      Q.  Were you a member of Division 61?
 4      A.  Yes, in 1973 I was, yes.
 5      Q.  What is Division 57?
 6      A.  Division 57, is the remaining division within
 7  the commuter service and Division 57 is made up of
 8  all engineers that work in the MBTA commuter service.
 9      Q.  And was it ever more than one division?
10      A.  Actually Division 57, prior to 1987, Division
11  57 was based in Providence.  It was originally a Penn
12  Central or New Haven Division, I don't recall which,
13  then in the course of the mergers it became an on
14  rail division and there was a division in Boston,
15  probably 312, which represented the inner city
16  people.  There may have been other divisions because
17  of the various seniority districts that existed at
18  the time with the crossing, with the Collective
19  Bargaining Agreements allowing the criss-crossing and
20  merging of seniority districts the BLE Divisions were
21  also merged and when the commuter zone was created,
22  Division 57 was designated as the division that would
23  represent all commuter engineers.
24          Now, bare in mind, that it replaced like I
```

1  described on the south side but on the north side it
2  replaced Division 61 and probably two or three other
3  B&M Division - BLE Division who existed prior to
4  Amtrak's take over.
5      Q.  Was John Mitten ever a member of Division 61?
6      A.  I don't know.  I really don't.
7      Q.  Do you know what divisions he's been an
8  officer?
9      A.  The only ones I know for sure 191 and 112, and
10 57.
11     Q.  And, he -- oh, he was an officer in Division
12 57?
13     A.  Yes.
14     Q.  While you were a member?
15     A.  Yes.
16     Q.  What was his position?
17     A.  He was a secretary treasurer.
18     Q.  Secretary treasurer?
19     A.  Yes.
20     Q.  Was he ever local chairman of --
21     A.  -- 57.
22     Q.  Yes?
23     A.  No.
24     Q.  61?

1    A.   No.

2    Q.   191?

3    A.   Yes.

4    Q.   Isn't it possible that as Local Chairman of
5  Division 191 he was referred to as God?

6    A.   I suppose.  I never heard that.

7    Q.   And you would have known that?

8    A.   I would have probably have known.  I never
9  heard that.  It's possible.

10   Q.   Then it would be possible then that's the
11 reason why someone referred to Russ Mitten as The
12 Christ Child when Russ Mitten was born?

13   A.   That's conceivable.

14   Q.   Or when he got the job?

15   A.   It's possible.

16   Q.   So it's possible referring to local chairman as
17 God precedes your being Local Chairman of Division 57
18 or precedes your being referred to as God?

19         MR. HUGHES:  Objection.

20   A.   That's entirely possible.

21   Q.   Was Doug Clark ever a member of any other
22 division than Division 57?

23   A.   Yes.

24   Q.   What divisions was he a member of?

1   A.   To my knowledge he was a member of 61 and one
2   of the north side divisions, one or more of the other
3   north side divisions and I couldn't say which ones
4   before he was put into 57.
5   Q.   In any case, John Mitten was pretty well known
6   in all divisions; wasn't he?
7   A.   Sure was.
8   Q.   What is Amscam?
9   A.   Amscam -- not what is, what was.  Is was a
10  publication an underground publication put out during
11  a contract dispute between the Organization and
12  Amtrak.
13  Q.   One specific dispute?
14  A.   I'm sorry?
15  Q.   It was about one specific dispute?
16  A.   No.  What I said was it was being published
17  during that -- what I should have said was it was
18  being published during that dispute.
19       Amscam was a parity that addressed a number of
20  different subjects in existence on Amtrak and it
21  satirized many of the events, the people on Amtrak.
22  Q.   Were you an employee of Amtrak at that time
23  that Amscam was first publicized?
24  A.   I was.

```
 1      Q.   You were an employee of Amtrak?
 2      A.   Yes.
 3      Q.   So Amscam was published after 1997?
 4      A.   Yes.
 5      Q.   So Amscam was on different issues or variety of
 6  issues morning one?
 7      A.   Yes.
 8      Q.   Were they ever compiled?
 9      A.   Yes.
10      Q.   They were compiled and published?
11      A.   Published?  Is that what you said?
12      Q.   Compiled and published.
13      A.   Well, by published --
14      Q.   I just mean reprinted together in some kind of
15  format for distribution.
16      A.   I believe they were simply bound together.
17  Somebody put a glossy cover on them, yes.
18      Q.   Do you think you could get one today?
19      A.   Today?
20      Q.   Yes.
21      A.   No.
22      Q.   You don't think anybody has one?
23      A.   I don't know if anybody has one but I'm leaving
24  in three minutes so the answer to your question is
```