## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **JOSEPH T. CARMACK** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 03 12488 PBS** |
| | ) | |
| **NATIONAL RAILROAD PASSENGER** | ) | |
| **CORPORATION** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S *CORRECTED*[1] STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The Defendant, National Railroad Passenger Corporation ("Amtrak " or "Defendant"), hereby states that for the purposes of Defendant's Motion for Summary Judgment, the following facts are not in dispute:[2]

### I.    THE PARTIES AND KEY PARTICIPANTS/WITNESSES

1.    Defendant Amtrak is a passenger railroad established by an Act of Congress in 1970. 45 U.S.C. § 501 (1970).

2.    Plaintiff, Joseph T. Carmack ("Plaintiff"), is an individual formerly employed by Amtrak in a variety of capacities from 1979 to May, 2002. His last position was that of locomotive engineer in Amtrak's Commuter Rail Operations. Exhibit 1, Deposition I of Plaintiff at 13-24.

---

[1]    None of the text has been changed or corrected, only the citations to certain exhibits and deposition pages. All of these corrections have been highlighted, and the correct cites are shown in bold text.

[2]    Some of these "facts" are included herein only for the purposes of this motion, but may not be admitted by Amtrak at trial. Amtrak reserves its rights to contest them should trial be necessary.

3.    At relevant times, Gerard DeModena was a Division Road Foreman for Amtrak's South
      Side Commuter Rail Operations. His responsibilities included training, guiding, and
      supervising Amtrak's locomotive engineers.    He is currently employed by the
      Massachusetts Bay Commuter Railroad ("MBCR").   Exhibit 2, Declaration of Gerard
      DeModena, ¶¶ 1, 4.

4.    At relevant times, William Rae was a senior trainmaster for Amtrak's South Side
      Commuter Rail Operations.    His responsibilities included supervising Amtrak's
      conductors and train crews other than locomotive engineers. He is currently employed by
      MBCR. Exhibit. 3, Declaration of William Rae, ¶1,3.

5.    At relevant times, Michael O'Malley was the Director of Commuter Rail Operations for
      Amtrak. He is currently employed by MBCR. Exhibit 4, Declaration of Michael
      O'Malley, ¶¶ 1-2.

6.    At relevant times, Lou DePhillips was Director of Labor Relations for Amtrak's New
      England Division. He is deceased. Exhibit 5, Declaration of Suzanne Allan, ¶9.

7.    Patrick Dougherty works for Amtrak's Labor Relations Department in Philadelphia, PA.
      Ex. 5 at ¶22.

8.    Suzanne Allan was and continues to be Director of Human Resources for Amtrak's
      Empire Division which includes New England. Ex. 5 at ¶1.

9.    Robert Smith was and continues to be Inspector of Amtrak's Police Department for the
      New England Division. Exhibit 6, Declaration of Robert Smith, ¶1.

10.   Timmie Pinsky, D.O., is a physician who was Amtrak's Medical Director for the
      Northeast Corridor at relevant times. He is currently Amtrak's Medical Director for
      Eastern Division. Exhibit 7, Declaration of Dr. Timmie Pinsky, ¶¶ 2-5.

11.    At relevant times, Marianne Letterio was the Manager of Health Services for the Northeast Corridor. Ex. 7 at ¶6.

12.    Deborah Gaines was an independent contractor retained by Amtrak from November 2001 to November 2002 to act as a hearing officer presiding over disciplinary investigations. Exhibit 8, Declaration of Deborah Gaines, ¶3.

13.    At relevant times, Michael O'Bryan was the representative for the local chapter of the Brotherhood of Locomotive Engineers of which Plaintiff was a member. Exhibit 9, Deposition 1 of Michael O'Bryan at 12-16.

14.    At relevant times, Russell Vasile, M.D., was and continues to be a psychiatrist practicing in the Boston area. Exhibit 10, Declaration of Dr. Russell Vasile, ¶1.

15.    At relevant times, Ann Gurian, M.D., was a psychiatrist who provided treatment to Plaintiff. Exhibit 1 at 71.

## II.    THE COLLECTIVE BARGAINING AGREEMENT

16.    At relevant time frames, Amtrak's locomotive engineers were members of the Brotherhood of Locomotive Engineers ("BLE"). Ex. 9 at 12-13. Ex. 11, page 1

17.    The BLE and Amtrak executed a collective bargaining agreement which delineated many of the responsibilities of management and locomotive engineers at relevant times in this matter. Exhibit 11, Collective Bargaining Agreement (BLE).

18.    Rule 25 of the collective bargaining agreement states, "[w]hen it is obvious that a Passenger Engineer is medically (physically or mentally) impaired in a way that affects his service, [Amtrak] may hold that Passenger Engineer out of service pending the outcome of a medical examination." Rule 21 provides an explanation of the agreed upon disciplinary process. It states that no engineer will be disciplined "until a full and

3

impartial formal investigation has been conducted by an authorized Corporation officer."
Ex. 11.

## III.    AMTRAK POLICIES AND PROCEDURES

19.    Among a variety of policies concerning personnel matters, Amtrak has a workplace
       violence policy which is known as PERS-42. Exhibit 12, Workplace Violence Policy
       (PERS-42); Ex. 5 at ¶¶ 2, 6.

20.    Amtrak created its workplace violence policy on or about 1998 in response to some tragic
       killings which took place on Amtrak property in Wilmington, Delaware not long before.
       Ex. 5 at ¶2.

21.    Amtrak's Workplace Violence policy has zero tolerance for threats and violence. Ex. 12
       at 1; Ex. 5 at ¶3.

22.    PERS-42 states that, with respect to reporting behavior, "Amtrak employees should
       notify a supervisor of any threats which they have witnessed, received, or have been told
       that another person has witnessed or received. Even without an actual threat, employees
       should report any behavior they have witnessed which they regard as threatening or
       violent, when that behavior may impact an Amtrak worksite, occurs on a Company-
       controlled site, or may result in violent behavior on a Company-controlled site." Ex. 12
       at 3.

23.    When a threat has been reported, representatives from certain departments form an entity
       known as the Threat Assessment Response Team ("TART") and evaluate what action
       should be taken by the company. Ex. 12 at 3; Ex. 5 at ¶4.

24.    Representatives from the Employee Assistance Program, Human Resources, Labor
       Relations, Amtrak Police, Employee Relations, Health Services, and Law Departments

4

may participate in the TART. However, not all of these departments participate in evaluating each incident. Ex. 12 at 3; Ex. 5 at ¶5.

25.   The Amtrak Policy known as PERS-42 defines the role of the medical director in a TART investigation as to provide guidance on Fitness for Duty evaluations and analyze documentation for medical related issues; consult with senior management regarding safety sensitive employees, assaults, threats, homicides, and suicides and refer for review if appropriate, and review and coordinate medical information from outside sources. Ex. 12 at 8; Ex. 7 at ¶13.

26.   PERS-42 does not require that mental illness be regarded as a threat. Ex. 12 at 3; Ex. 7 at ¶14; Ex. 5 at ¶6.

27.   As a matter of company policy, medical records of employees are provided to Health Services. Employee medical records are considered to be private and confidential. Ex. 7 at ¶15; Ex. 5 at ¶7; Ex. 4 at ¶3.

28.   Amtrak's policies and procedures in 2001 and 2002 required that employee medical records were not to be disclosed to an employee's department or supervisors without the employee's express authorization. Ex. 7 at ¶16.

29.   Amtrak does not use PERS-42 to screen out and discriminate against individuals with mental illness or any disability. Moreover, PERS-42 has not been administered in a manner to permit Amtrak to arbitrarily and falsely accuse employees of violent behavior and regard them as mentally ill. Ex. 5 at ¶8; Ex. 7 at ¶17.

## IV.   BACKGROUND INFORMATION CONCERNING PLAINTIFF

30.   In October 1996, Plaintiff was accepted into Amtrak's training program for locomotive engineers. Exhibit 13, Letter from Suzanne Allan dated 10/17/96.

31.    In the spring of 1998, Plaintiff completed his training and was certified as a locomotive engineer. Ex. 1 at 22.

32.    On or about October 6, 2000, Plaintiff was counseled by Mr. DeModena for contributing to delays in the operation of a train from Stoughton to Boston. Ex. 2 at ¶6.

33.    On or about October 9, 2000, Plaintiff was counseled by Mr. DeModena for violating Amtrak's rules by leaving South Station without the proper paperwork in the locomotive engine and for causing delays to the train he was operating, as well as several trains scheduled to leave Boston after his train. Ex. 2 at ¶7.

34.    Plaintiff's union representative, Michael O'Bryan, believed Plaintiff violated Amtrak and NORAC rules during the incident of October 9, 2000. Ex. 9 at 28-30, 68-69; Exhibit 14, Letter from Michael O'Bryan dated 3/11/01.

35.    On or about late October 2000, Plaintiff took a medical leave of absence. Ex. 1 at 63-64.

36.    On or about late January 2001, Plaintiff underwent a return to work fitness for duty physical examination by Dr. Brian Morris of Health Resources, Inc., an independent medical provider contracted to do medical examinations by Amtrak. Exhibit 15, Health Resources Examination Report dated 01/18/01.

37.    Dr. Morris found that Plaintiff did not meet Amtrak's medical standards for return to work because the physical examination revealed two hernias which were not present in December 1999. As a result, Dr. Morris deferred Plaintiff's return to work to Amtrak's Medical Director, Dr. Pinsky. Ex. 15; Exhibit 16, Hand Written Note from Dr. Timmie Pinsky dated 01/23/01.

38.    Dr. Pinsky reviewed Dr. Morris' records of his examination of Plaintiff. Dr. Pinsky was not aware of why Plaintiff was out of work. Nonetheless, he saw Dr. Morris' deferral

based upon Plaintiff's two hernias which were not present approximately one year earlier. Ex. 16; Ex. 7 at ¶9.

39. On January 24, 2001, Dr. Pinsky permitted Plaintiff's return to work pending receipt of a note from his surgeon within 30 days. Exhibit 17, Memorandum from Dr. Timmie Pinsky dated 01/24/01; Ex. 7 at ¶10; Exhibit 18, Memorandum from Ms. Letterio dated 1/25/01.

40. Plaintiff returned to work as a locomotive engineer in Amtrak's North Side Commuter Rail Operations in late January 2001. Ex. 1 at 104-105.

41. On March 1, 2001, Dr. Pinsky recommended that Plaintiff not lift more than 25 pounds until a report from his surgeon was received. Exhibit 19, Letter from Marianne Letterio dated 3/1/01.

42. Health Services informed Plaintiff's supervisor, Mr. O'Malley, that Plaintiff had undergone a physical exam and should not lift more than 25 pounds. No further information about Plaintiff's medical leave of absence or medical history was disseminated to Plaintiff's department. Ex. 7 at ¶12; Exhibit 20, Memorandum from Marianne Letterio dated 3/1/01.

## V.    THE LETTERS FROM HELL

43. On April 11, 2001, Mr. DeModena found a group of documents, entitled "Letters from Hell," on his desk in the office he shared with Mr. Rae. Ex. 2 at ¶8; Exhibit 21, Workplace Violence Report dated 04/12/01.

44. These documents were not placed on his desk by Mr. Rae who had not seen them before they were brought to his attention by Mr. DeModena. Ex. 3 at ¶4.

45. The documents within the "Letters from Hell" were assembled, and, for the most part,

written and typed by Plaintiff. Exhibit 22, "Letters from Hell;" Ex. 1 at 170-171.

46.     On the second page of the "Letters from Hell" the following text appears, "[a]ll is not as
        it appears. There's more to what you see and hear. Dear God, I hear a fat lady singing.
        Very, very truthfully yours, Lucifer, Prince of Darkness." [emphasis as it appears in the
        text]. Plaintiff admits that he drafted that specific text. Ex. 22; Ex. 1 at 188.

47.     A subsequent page in the group of documents contains text stating, "Dear God.
        We're putting on a play down here. Wanna help us fill out all the parts?" The document
        then states, "[t]he Tragedie of Hamlet, Prince of Commuter Rail." This is followed by a
        list of characters from the play who have the same names as the principal characters in
        Shakespeare's Hamlet. Opposite the names of the characters under the heading "players"
        are the names of Amtrak managers, one MBTA manager, Plaintiff and Mr. O'Bryan,
        Plaintiff's union representative. Plaintiff admits that he wrote this specific text. Ex. 22;
        Ex. 1 at 170.

48.     For the part of "Horatio, friend of Hamlet," Plaintiff wrote "? (too bad GD couldn't play
        this)." GD are the initials of Gerard DeModena. Ex. 22.

49.     For the parts of Rosencrantz and Guildenstern, Mr. DeModena and Mr. O'Bryan are
        listed as the players, respectively. Ex. 22.

50.     In Shakespeare's "Hamlet," Rosencrantz and Guildenstern had been friends of Hamlet.
        Hamlet, Rosencrantz, and Guildenstern were sent by King Claudius to meet the King of
        England. Claudius had provided Rosencrantz and Guildenstern with a note asking the
        King of England to execute Hamlet. After Hamlet discovered this note, he replaced the
        note with one of his own which asked that the bearers, i.e. Rosencrantz and Guildenstern,
        be executed. Later in Shakespeare's Hamlet it is announced that Rosencrantz and

8

Guildenstern are dead. Exhibit. 23, William Shakespeare's Hamlet, at 60, 156, 208.

51.    For the part of Claudius, Jack Flaherty, General Manager of Commuter Rail Operations, was listed as the player. Michael O'Malley, Director of Commuter Rail Operations, was listed as the "alternate" for the part. Claudius is killed by Hamlet in Shakespeare's play. Ex. 22; Ex. 23 at 223; Ex. 1 at 174.

52.    Wayne Gagne, one of Amtrak's road foremen at that time, and a supervisor of Plaintiff, was listed as the player of the part of Polonius, a man who is killed by Hamlet in Shakespeare's play. Ex. 22; Ex. 23 at 136; Ex. 1 at 171.

53.    Jennifer Peals, a trainmaster for Amtrak at that time, who had supervisory authority over locomotive engineers on certain matters, was listed as the player of the part of Ophelia, (the daughter of Polonius) who is driven insane due to the actions of Hamlet.    Ex. 22; Ex. 23 at 171.

54.    At the bottom of the same page listing the players, the following text appears, "If you [God] were in control perhaps we'd have the history plays. Most likely you would have ended up with Henry IV Parts I and II leading into Henry V. But since the fall of Adam, I'm in charge, the play has a messy ending more to my liking. Sinisterly, Lucifer, Prince of Darkness." Plaintiff admits that he wrote this specific text. Ex. 22; Ex. 1 at 174.

55.    On the following page, there are three quotes from Shakespeare's Hamlet. In the first, Hamlet, for whom Plaintiff was listed as the player on the previous page, expresses anger or frustration at being perceived as less than he is and at being manipulated. In the third quote, King Polonius describes Hamlet/Plaintiff as "dangerous" and suggests that Hamlet may act toward him as a scourge and yet receive no punishment. The next and final line of text states, in upper case, "ROSENCRANTZ AND GUILDENSTERN ARE DEAD!"

9

Plaintiff admits that he assembled these quotes and statements on this page. Ex. 22; Ex. 1 at 174-177

56.   Another page in the "Letters from Hell" contains an image of a giant monster moving through a city. The text beneath provides three options for its interpretation, one of which states, "[a]nother futile attempt by Carmack to resist discipline." Beneath that text appears the following words, "[a]ll answers and/or petitions should be sent to 'Institution of Devastation Awareness'…." Ex. 22.

## VI.    WORKPLACE VIOLENCE REPORT AND TART COMMITTEE

57.   Mr. DeModena found these pages of the "Letters from Hell" disturbing and possibly containing a threat from Plaintiff, who seemed to envision himself as the devil, to kill or harm Mr. DeModena. Ex. 2 at ¶9.

58.   Mr. DeModena had been apprised of Amtrak's Workplace Violence policy including Amtrak's zero tolerance for threats and violence. He understood that the policy required him, whether or not he believed it to be the best course of action, to file a workplace violence report in such an instance. Ex. 2 at ¶10.

59.   On the morning of April 11, 2001, Mr. DeModena spoke with Mr. DePhillips in Labor Relations, and showed him the offending documents. Mr. DePhillips found the document to be threatening and disturbing and agreed that Mr. DeModena should fill out a workplace violence report. Ex. 2 at ¶11; Exhibit 24, Amtrak Hearing Testimony Transcript at 239-240, 261.

60.   Mr. DeModena and Mr. DePhillips did not discuss Plaintiff's union activities and alleged reports of safety issues, nor did they plan the termination of his employment, nor did they conspire to have Plaintiff removed from service on pretext of a psychiatric disorder. Ex.

2 at ¶12.

61.    Mr. DeModena filled out a workplace violence form and provided it to a member of the TART committee. He was not assisted in filling out the form by Mr. DePhillips or anyone else. Mr. DeModena was not motivated in filing the workplace violence complaint by a desire to have Plaintiff no longer work at Amtrak. Ex. 2 at ¶13.

62.    Mr. DeModena also contacted Inspector Smith of the Amtrak Police Department to discuss the "Letters from Hell." Inspector Smith asked whether Mr. DeModena wished to make a criminal complaint. Mr. DeModena declined. Inspector Smith did not have an opinion as to whether the documents were threatening – it only mattered that Mr. DeModena perceived them as such. Ex. 2 at ¶14; Ex. 6 at ¶8.

63.    Mr. DePhillips found the "Letters from Hell" disturbing so he sent the five threatening pages to Dr. Pinsky, Amtrak's Medical Director for the Northeast Corridor. Ex. 24 at 257-261.

64.    Mr. DeModena also spoke with his supervisor, Michael O'Malley who instructed him to forward the information that concerned Plaintiff to the TART committee. Ex. 2 at ¶15; Ex. 4 at ¶4.

65.    Mr. DeModena provided the workplace violence complaint to Ms. Allan, a member of the TART committee. Ex. 2 at ¶16.

66.    The members of the TART team in this instance consisted solely of Mr. DePhillips, Ms. Allan, and Inspector Smith. Ex. 6 at ¶10; Ex. 5 at ¶9.

67.    On April 13, 2001, Mr. DePhillips, without consulting the other members of the TART team, addressed an e-mail to Mr. O'Malley and Mr. DeModena in which he recommended a course of action. He suggested that Plaintiff should be required to

11

undergo a fitness for duty examination while continuing to remain in service. Mr. DePhillips also noted that if Plaintiff refused to cooperate, he could be charged with insubordination and removed from service. Exhibit 25, Email from Lou DePhillips dated 04/13/01.

68.    Mr. DeModena did not receive the e-mail because he did not have access to e-mail at that time. Ex. 2 at ¶17; Ex. 4 at ¶5.

69.    Ms. Allan found the "Letters from Hell" troubling and felt they should be reviewed by a medical professional. Ex. 5 at ¶10.

70.    No further action was taken with respect to this matter until May 3, 2001, when Ms. Allan forwarded Mr. DePhillips' e-mail of April 13th to Ms. Letterio in the Amtrak Health Services Department in Philadelphia. Ms. Allan asked that Mr. DePhillips' recommendations be reviewed by Dr. Pinsky. Ms. Allan did not, and lacked the authority to, instruct Ms. Letterio or Dr. Pinsky to medically disqualify Plaintiff. Ex. 5 at ¶12.

## VII.    MEDICAL DISQUALIFICATION OF PLAINTIFF

71.    On that date, Dr. Pinsky reviewed the five offending pages from the "Letters from Hell." He found them alarming. They raised questions in his mind as to whether Plaintiff was suffering from a psychiatric disorder that might compromise the safety of his co-workers, himself, and the traveling public. He did not diagnose Plaintiff as suffering from bi-polar, personality, or any other disorder. However, due to his concerns, he medically disqualified Plaintiff, pending a psychiatric fitness for duty exam to be performed by an experienced psychiatrist. Ex. 7 at ¶18.

72.    Dr. Pinsky did not receive any communications from Amtrak's Labor Relations Department directing him to take such action. Ex. 7 at ¶20.

12

73.    Contrary to Plaintiff's baseless allegation in his Second Amended Complaint, Ms.
       Letterio never informed Ms. Allan that Health Services had not found a basis in
       Plaintiff's writings for medical disqualification. Ex. 5 at ¶13.

74.    Later on May 3, 2001, Ms. Letterio e-mailed Mr. O'Malley informing him that Dr.
       Pinsky had reviewed materials written by Plaintiff and had medically disqualified
       Plaintiff pending a fitness for duty exam.  No medical diagnosis or information about
       Plaintiff was provided to Mr. O'Malley or anyone else, nor did Dr. Pinsky indicate that
       Plaintiff posed a direct threat to anyone. Exhibit 26, Email from Marianne Letterio dated
       05/3/01; Ex. 4 at ¶6; Ex. 7 at ¶19.

75.    On May 4, 2001, Mr. O'Malley notified Plaintiff by letter that Dr. Pinsky had reviewed
       writings reportedly written by Plaintiff and had medically disqualified Plaintiff pending a
       fitness for duty exam.  Mr. O'Malley also stated that Plaintiff was out of service *with* pay
       as of May 4, 2001.  Exhibit 27, Letter from Michael O'Malley dated 05/4/01; Ex. 4 at ¶7.

76.    On May 8, 2001, Michael O'Bryan, Plaintiff's union representative telephoned Dr.
       Pinsky to determine the basis of Plaintiff's medical disqualification.   Dr. Pinsky
       mentioned the "Letters from Hell." Mr. O'Bryan informed Dr. Pinsky that the pages he
       had reviewed were only a small part of a much larger document that addressed an internal
       union dispute between Plaintiff and Mr. O'Bryan.  Mr. O'Bryan also informed Dr. Pinsky
       that he was listed as the player for Guildenstern, who, similar to Rosencrantz, is executed
       in Shakespeare's Hamlet.  Mr. O'Bryan stated he did not feel threatened.  Ex. 7 at ¶21;
       Ex. 9 at 83-85.

77.    Subsequent to his conversation with Mr. O'Bryan, Dr. Pinsky reviewed the other pages in
       the "Letters from Hell," and continued to be troubled by Plaintiff's writings.  Dr. Pinsky

13

did not change his opinion that Plaintiff should undergo a psychiatric fitness for duty exam. Ex. 7 at ¶22.

78.    Dr. Pinsky has not read or been informed of any other writings by Plaintiff to Amtrak management or to his union brethren or representatives and no such writings influenced Dr. Pinsky's opinions in this matter. Ex. 7 at ¶23.

79.    No Amtrak manager, including Lorraine Green, Amtrak's Corporate Director of Human Resources, and George Warrington, at that time Amtrak's President, ordered or otherwise influenced Health Services in any way to medically disqualify Plaintiff. Ex. 7 at ¶24.

80.    Mr. O'Bryan conferred with Plaintiff after his conversation with Dr. Pinsky and relayed the fact that it was the "Letters from Hell" which had inspired Dr. Pinsky to medically disqualify him. Ex. 9 at 88, 82-84, 128-129 & Ex. 1 at 216-217.

## VIII.   FITNESS FOR DUTY EXAM

81.    Ms. Letterio selected Russell Vasile, M.D., a psychiatrist practicing in Boston, to conduct the fitness for duty exam and scheduled an appointment for June 4, 2001.  Amtrak had not used his services previously. Ex. 7 at ¶25; Ex. 10 at ¶6.

82.    On May 16, 2001, Ms. Letterio notified Mr. O'Malley of the scheduling arrangements for Plaintiff's fitness for duty exam, but did not provide any explanation of the nature of the exam or Plaintiff's medical condition or history. Ex. 4 at ¶8.

83.    On May 17, 2001, Mr. O'Malley sent Plaintiff a letter indicating that he was expected to attend a fitness for duty exam with Dr. Vasile on June 4, 2001.  Ex. 4 at ¶9; Exhibit 28, Letter from Michael O'Malley dated 05/17/01.

84.    Dr. Pinsky instructed Ms. Letterio to prepare a letter to Dr. Vasile describing what information Dr. Pinsky was seeking from the fitness for duty exam.   Ms. Letterio

prepared and sent said letter to Dr. Vasile on May 17, 2001. Exhibit 29, Letter from Marianne Letterio dated 5/17/01; Ex. 7 at ¶26.

85.    The results of the fitness for duty exam were to be reported by Dr. Vasile to no one other than Amtrak's Health Services Department. Ex. 7 at ¶27; Ex. 10 at ¶7.

86.    On May 24, 2001, Plaintiff sent a letter to Dr. Pinsky seeking his medical file and an explanation of the medical and legal basis for his medical disqualification. Exhibit 30, Letter from Plaintiff dated 5/24/01; Ex. 7 at ¶28.

87.    Dr. Pinsky, upon the advice of the Amtrak Law Department, did not reply to Plaintiff's letter, but he instructed Ms. Letterio to provide Plaintiff with his medical file. Ex. 7 at ¶29; Exhibit 31, Marianne Letterio notes of 06/4/01 on e-mail of 05/30/01.

88.    Plaintiff's medical file from 1/09/01 to 5/30/01 was sent to Plaintiff on June 4, 2001. Ex. 31; Ex. 7 at ¶30.

89.    On June 4, 2001, Plaintiff left a voice message on Dr. Vasile's voice message machine stating that the fitness for duty exam was cancelled. Dr. Vasile left a message on Plaintiff's voice machine seeking to reschedule. Plaintiff responded with another voice message indicating that the meeting was not to be rescheduled. Ex. 10 at ¶8; Exhibit 32, Email from Marianne Letterio dated 06/5/01; Exhibit 33, Letter from Dr. Russell Vasile dated 06/5/01.

90.    On June 8, 2001, Mr. O'Malley wrote a letter to Plaintiff criticizing him for refusing to undergo the fitness for duty exam and instructing him to contact Ms. Letterio. Mr. O'Malley also informed Plaintiff that his status had been changed to medically disqualified without pay and stated that failure to cooperate would lead to charges of insubordination and could result in his dismissal. Exhibit 34, Letter from Michael

15

O'Malley dated 06/8/01.

91.     Subsequently, Plaintiff contacted Dr. Vasile and scheduled an appointment for June 27, 2001. Exhibit 35, Deposition II of Plaintiff at 269-270.

92.     Plaintiff made it clear to Mr. O'Bryan that he did not want to undergo the psychiatric fitness for duty exam. Ex. 39, Depo III of Michael O'Bryan at 386 376-385, 395-397

93.     On or about June 27, 2001, Plaintiff had determined prior to meeting Dr. Vasile, that he would not undergo the fitness for duty exam that day because he was determined to explain his writings to Amtrak management first.     Exhibit 37, Second Amended Complaint of Plaintiff at 205.

94.     On June 27, 2001, Plaintiff and Mr. O'Bryan met with Dr. Vasile at his office. Exhibit 38, Deposition III of Plaintiff at 380 284

95.     Plaintiff asked Dr. Vasile the basis for the fitness for duty exam. Ex. 38 at 285.

96.     Plaintiff asked Dr. Vasile the medical basis for his disqualification. Ex. 38 at 306.

97.     Plaintiff and Mr. O'Bryan showed Dr. Vasile all the documents from the "Letters from Hell" that had been left on Mr. DeModena's desk. Ex. 38 at 299-301.

98.     Dr. Vasile indicated that the findings from his evaluation of Plaintiff would not be confidential, and would be provided to Amtrak's Health Services. Dr. Vasile did not state at this meeting or in any other conversations with Plaintiff or anyone else that the results of his evaluation would be revealed to other Amtrak managers, including Mr. O'Malley, Mr. DePhillips, and Mr. DeModena. Ex. 9 at 101-104; Ex. 39 at 364-365-366; Ex. 10 at ¶11.

99.     Dr. Vasile did not state that there were no indicators of mental impairment or propensity for violence in Plaintiff's writings. Ex. 10 at ¶13.

100.    Dr. Vasile did not refuse to conduct a psychiatric fitness for duty evaluation of Plaintiff on June 27, 2001 or any other date. Ex. 10 at ¶14.

101.    Plaintiff did not undergo an examination of any kind on June 27, 2001. Ex. 10 at ¶15.

102.    Mr. O'Bryan explained to Plaintiff on several occasions that Plaintiff's failure to undergo the fitness for duty exam was likely to lead to severe discipline, possibly discharge. Ex. 39 at 367, 376-385.

103.    Dr. Vasile stated in a letter to Dr. Pinsky, dated July 16, 2001, that Plaintiff refused, on June 27, 2001, to undergo a fitness for duty exam after Dr. Vasile had explained that the evaluation would include a comprehensive psychiatric history, mental status exam and psychological testing performed by a clinical psychologist. Ex. 10 at ¶18; Exhibit 40, Letter from Dr. Russell Vasile dated 07/16/01.

104.    Dr. Pinsky never instructed Dr. Vasile to write any false statements about Plaintiff. Ex. 7 at ¶32; Ex. 10 at ¶19.

105.    On July 24, 2001, Mr. O'Malley sent a letter to Plaintiff criticizing him for failing to undergo a fitness for duty exam on June 27, 2001 and requiring him to reschedule and undergo such an exam or be charged with gross insubordination. Exhibit 41, Letter from Michael O'Malley dated 07/24/01.

106.    In August 2001, Plaintiff scheduled an appointment with Dr. Vasile for August 27, 2001. Ex. 38 at 324; Exhibit 42, Letter from Dr. Russell Vasile dated 08/28/01.

107.    Plaintiff cancelled the appointment prior to August 27, 2001. Ex. 42.

108.    On August 28, 2001, Dr. Vasile sent Amtrak's Health Services a letter explaining that Plaintiff had decided, after much deliberation, not to present for his scheduled appointment. Ex. 42; Ex. 10 at ¶22.

109. Dr. Pinsky did not ask Dr. Vasile to write the letter of August 28, 2001, nor did he influence in any way what was written in this letter. Ex. 7 at ¶34; Ex. 10 at ¶24.

110. On September 5, 2001, Health Services notified Mr. O'Malley of the cancellation of Plaintiff's appointment. Ex. 4 at ¶14.

111. On September 10, 2001, Mr. O'Malley sent Plaintiff a letter notifying him that he was being charged with violating Amtrak's Standards of Excellence and with being insubordinate and that a hearing would be held on September 17, 2001. Exhibit 43, Letter from Michael O'Malley dated 09/10/01.

112. In response to allegations made by Plaintiff in his internal complaint filed with Amtrak's EEO Compliance Department on or about March 2002, Dr. Vasile sent Mr. O'Malley a notarized letter on April 2, 2002 denying Plaintiff's allegations that concern him. Exhibit 44, Letter from Dr. Russell Vasile dated 04/2/02; Ex. 10 at ¶25.

## IX. AMTRAK'S INVESTIGATIVE HEARING AND RELATED APPEALS

113. A hearing was held on Amtrak's charges against Plaintiff on April 4, 2002, April 23, 2002, April 24, 2002, 2002, and May 7, 2002. Exhibit 45, Decision Letter dated 05/13/02.

114. Throughout the investigative hearing, Plaintiff was represented by Richard Prone, a representative of the Brotherhood of Locomotive Engineers ("BLE"). Ex. 38 at 348.

115. Deborah Gaines was an independent hearing officer and contractor who was retained by Amtrak to preside over investigative hearings into disciplinary charges against employees. Ex. 8 at ¶3.

116. Ms. Gaines presided over the Amtrak hearing concerning the charge of insubordination against Plaintiff. The purpose of the hearing was not to induce Plaintiff to reveal mental

impairments. Ex. 45; Ex. 8 at ¶4.

117.    On May 13, 2002, Ms. Gaines issued a decision letter finding Plaintiff guilty of violating Amtrak's rules. Ex. 8 at ¶5; Ex. 45.

118.    Ms. Gaines' decision did not state that Plaintiff believed himself to be Lucifer. Ex. 45; Ex. 8 at ¶6.

119.    Ms. Gaines decision was based upon the facts presented to her at the hearings in April and May 2002, Amtrak's rules, and the law. Her decision was not influenced by anyone at Amtrak other than the arguments and testimony of those who participated in the four day investigative hearing. Ex. 8 at ¶7.

120.    Later that same day, Francis O'Connor, Assistant General Manager of Commuter Rail Operations, terminated Plaintiff's employment. Exhibit 46, Termination Letter dated 05/13/05; Ex. 4 at ¶19.

121.    Amtrak denied the BLE's appeal of Plaintiff's termination. Exhibit 47, Denial of Appeal dated 8/27/02.

122.    The union appealed Amtrak's termination of Plaintiff to the Public Law Board.  On 1/31/03, the neutral member of the three person denied the union's appeal in a written decision. Exhibit 48, Public Law Board Decision dated 1/31/03.

## X.    PROCEDURAL HISTORY

123.    On February 8, 2002, Plaintiff filed a charge of disability discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). On March 15, 2002, Amtrak filed its Position Statement with MCAD.  Exhibit 49, MCAD Complaint dated 02/08/02; Exhibit 64, Position Statement of Amtrak dated 03/15/02.

124.    MCAD dismissed Plaintiff's charge of discrimination on the same date for lack of

19

probable cause.  Exhibit 50, MCAD Notice of Dismissal dated 05/13/02.

125.    MCAD denied Plaintiff's appeal on November 25, 2002.  Exhibit 51, MCAD Denial of
        Appeal dated 11/25.02.

126.    Plaintiff filed a complaint against Amtrak with this Court on December 2, 2003.

127.    Plaintiff filed his second amended complaint against Amtrak with this Court on
        December 9, 2004.  Ex. 37.

128.    On March 19, 2002, Amtrak's EEO Compliance Department received an internal
        complaint filed by Plaintiff.  Exhibit 52, Internal Complaint.

129.    Amtrak did not respond directly to this complaint because Amtrak responded to the
        similar Charge of Discrimination filed previously, in February 2002, with MCAD.
        Exhibit 53, Letter to Plaintiff from Amtrak's Director of EEO Compliance, dated 4/3/02.

## XI.    DEFAMATION

130.    There has been no testimony by anyone with personal knowledge of false and derogatory
        statements published to third parties by Amtrak managers about Plaintiff.

131.    Mr. DeModena, Mr. O'Malley, Ms. Allan, and Inspector Smith have all provided sworn
        testimony that they did not know whether any medical diagnosis of Plaintiff was made in
        May 2001.  Furthermore, they have testified that they only knew that Plaintiff was
        medically disqualified because of his preparation of the "Letters from Hell."  In addition,
        they have provided sworn statements that they never informed anyone else that they
        believed Plaintiff to be insane, mentally or emotionally ill, or dangerous to himself or
        others.  Ex. 4 at ¶20; Ex. 5 at ¶¶ 14-16; Ex. 6 at ¶ 13-15.

132.    Mr. O'Malley wrote only two letters to Plaintiff's union representative concerning
        Plaintiff's medical disqualification.  He offered no medical details, both because he

lacked knowledge of same and because to share such information with a third party without authorization would have been inappropriate. Mr. O'Malley merely stated that Plaintiff had been temporarily removed from service at the request of Dr. Pinsky until he had passed a fitness for duty exam. Exhibit 54, Letters from Michael O'Malley dated 5/15/01 and 6/21/01; Ex. 4 at ¶21.

133. Dr. Pinsky never informed anyone that Plaintiff was physically or mentally ill, or incapable of safely performing his job. Ex. 7 at ¶36.

134. There is no evidence in the record that Mr. DePhillips, who is now deceased, ever informed anyone that Plaintiff was physically or mentally ill, or incapable of safely performing his job.

135. Rather, all of these individuals only raised the questions, in response to the "Letters from Hell," of whether Plaintiff was ill, whether he envisioned himself as the devil, or whether he was capable of safely performing his job as a locomotive engineer, and did so only in the appropriate forum of the TART committee and with Health Services, and with Dr. Vasile (by Dr. Pinsky). Ex. 5 at ¶17, Ex. 6 at ¶16, Ex. 7 at ¶18.

## XII.   INVASION OF PRIVACY

136. Health Services did not provide Plaintiff's medical records to any member of the TART committee, to any supervisors or colleagues of Plaintiff in the Commuter Rail Department, or to anyone else other than internal or external counsel and Dr. Vasile in order to facilitate his fitness for duty examination of Plaintiff. Ex. 7 at ¶37; Ex. 5 at ¶18.

137. Plaintiff admits he has no knowledge of the dissemination of his medical records or information pertaining to same to anyone other than Health Services, Health Resources, Inc., and Dr. Vasile. Ex. 1 at 105-106. Ex. 63 (answer to Int. # 6); Ex. 55 at 390-398.

21

138.   Dr. Vasile did not provide Plaintiff's records or information about same to anyone. Ex.
       10 at ¶26; Ex. 7 at ¶38; Ex. 4 at ¶23.

139.   Mr. O'Bryan admits that he never received or reviewed Amtrak's medical file for
       Plaintiff. Ex. 9 at 96-90-93.

## XIII.  DISABILITY DISCRIMINATION

140.   Plaintiff admits that he is not disabled. Ex. 49; Exhibit 55, Deposition IV of Plaintiff at
       405-406.

141.   Plaintiff claims that he was, and continues to be, fully capable of performing the essential
       functions of his former job as a locomotive engineer. Ex. 55 at 405-406.

142.   Plaintiff's psychiatrist stated on several occasions in 2001 and 2002 that Plaintiff was
       capable of returning to work without restriction. Exhibit 56, Notes of Dr. Ann Gurian
       dated 1/17/01, 5/30/01, 7/30/01, 4/4/02.

143.   During the time frame when Plaintiff was employed by Amtrak as a locomotive engineer,
       his supervisors were never informed by him or by anyone else that he was monitoring his
       mental health by consulting professional resources. Ex. 4 at ¶¶5, 36; Ex. 2 at ¶24; Ex. 3
       at ¶10.

144.   Mr. O'Malley never stated at the Amtrak Investigative Hearing or anywhere else that he
       did not believe documents written by Plaintiff were threatening in any way. Ex. 4 at ¶25;
       Ex. 24 at 92, 195-200.

145.   Mr. O'Malley, Suzanne Allan, Inspector Smith have never regarded Plaintiff as having an
       impairment caused by mental illness, a severe psychiatric disorder, bipolar disorder,
       and/or personality disorder. Moreover, each of these persons lacks knowledge as to the
       nature of said disorders. Ex. 4 at ¶26; Ex. 5 at ¶16; Ex. 6 at ¶15.

146.    There is no record of statements made by Mr. DePhillips or communications prepared by him indicating that he regarded Plaintiff as having an impairment caused by mental illness, a severe psychiatric disorder, bipolar disorder, and/or personality disorder.

147.    Dr. Pinsky's note to Ms. Letterio, dated May 7, 2001, does not state that Plaintiff suffers from a severe psychiatric disorder.  Exhibit 57, Memorandum from Dr. Timmie Pinsky dated 05/07/01.

148.    Dr. Pinsky's testimony on May 7, 2002 did not state that Plaintiff suffered from bi-polar or personality disorder.  Rather, his testimony indicated that the "Letters from Hell" caused him to question whether Plaintiff suffered from a severe psychiatric condition, such as the above-mentioned disorders.  Ex. 24 at 386; Ex. 7 at ¶39.

149.    Amtrak was not informed until April 2002 that Plaintiff's psychiatrist had prepared a note on May 30, 2001, that a "forced non-confidential psychiatric examination would be inadvisable for medical reasons."  Ex. 55 at 408-409. & EX. 56

150.    Plaintiff did not inform Amtrak until April 2002 that he believed the fitness for duty exam would be harmful to his health.  Ex. 4 at ¶27; Exhibit 60, Letters from Plaintiff to Mr. O'Malley, dated 6/14/01, 7/27/01, 7/31/01; Ex. 30, letters from Plaintiff dated May 24, 2001.

151.    Dr. Vasile did not communicate to Dr. Pinsky in July 2001, or at any other time, that Plaintiff should not be required to undergo a psychiatric fitness for duty exam.  Ex. 7 at ¶40; Ex. 10 at ¶18.

152.    Dr. Vasile never informed Dr. Pinsky that Plaintiff told Dr. Vasile that he and/or his psychiatrist believed that the psychiatric fitness for duty exam would be harmful to his health.  Ex. 7 at ¶41.

153.   Mr. O'Malley and Dr. Pinsky were never informed by Plaintiff or Mr. O'Bryan that Plaintiff had a disability and that he was seeking reasonable accommodation for his disability so that he could adequately perform the essential functions of his job at Amtrak as a locomotive engineer.  Ex. 4 at ¶28; Ex. 7 at ¶42; Exhibit 59, Letters from Michael O'Bryan dated 05/08/01 and 05/28/05; Exhibit 60, Letters from Plaintiff dated 05/24/01, 06/14/01, 07/27/01, 07/31/01.

154.   Ms. Gaines did not declare in her decision letter or anywhere else that Plaintiff was suffering from bi-polar or personality disorder.  Ex. 8; Ex. 45.

155.   Ms. Gaines did not conclude in her decision letter or anywhere else that Plaintiff was insubordinate for asking for reasonable accommodation.  Ex. 45; Ex. 8 at ¶8.

156.   In his workplace violence report dated April 12, 2001, Mr. DeModena did not characterize Plaintiff's ideas, religious beliefs and writings as those of a mentally ill person.  Ex. 21.

## XIV.   INTERFERENCE WITH PLAINTIFF'S RIGHTS

157.   At no time did Mr. DeModena, Mr. O'Malley, or Mr. DePhillips institute a campaign to quell Plaintiff's union and safety-related activities.  Ex. 2 at ¶12; Ex. 4 at ¶29.

158.   On October 24, 2000, Mr. O'Malley did not "publish" a letter.  Rather, he sent a letter of warning to Plaintiff, with a copy to Plaintiff's union representative (as required by the collective bargaining agreement).  This letter, similar to many others sent by Mr. O'Malley or other managers to Amtrak employees, was a mild reprimand for violating Amtrak rules on October 9, 2000.  Even Mr. O'Bryan, Plaintiff's union representative, concurred that Plaintiff had violated Amtrak and NORAC rules on that date.  Hence, the letter did not put Plaintiff's "person or work record in a false light."  Ex. 4 at ¶30; Ex. 9 at

24

27-29-30-44, 68-69; Ex. 14.

159.    Amtrak never ordered Plaintiff to publicly expose and reveal private matters and personal medical information. Exhibit 61, See Exhibits 27, 28, 41, 54.

160.    Amtrak terminated the employment of Plaintiff for insubordination, not for the drafting or dissemination of any written materials. Ex. 4 at ¶31.

## XV.    UNFAIR LABOR PRACTICES

161.    Only one workplace violence report concerning Plaintiff was prepared by any Amtrak manager or employee, the April 12, 2001 report of Mr. DeModena. The dissemination of this report was appropriately limited to the TART committee, Dr. Pinsky, Mr. O'Malley, and William Rae, the charging officer for Amtrak's charge of insubordination against Plaintiff. Ex. 4 at ¶32; Ex. 2 at ¶13.

162.    The "Letters from Hell" which were the subject of Mr. DeModena's workplace violence complaint, contained threatening statements which were the sole motivation for his complaint. Ex. 2 at ¶9.

163.    Likewise, Dr. Pinsky's decision to medically disqualify Plaintiff had nothing to do with Plaintiff's dispute with representatives of his union, or his political and moral principles. Rather, the decision was entirely motivated by threatening statements concerning managers and an employee. Ex. 7 at ¶43.

164.    Amtrak's termination of Plaintiff's employment had nothing to do with, and was not motivated by retaliatory animus for, Plaintiff's filing of grievances and engaging in union discussion or activities. Ex. 4 at ¶31; Ex. 45.

## XVI.    PLAINTIFF'S RELIGIOUS BELIEFS

165.    Plaintiff stated that he is a member of Saint James Episcopal Church in Houston, TX.

Ex. 55 at 425.

166.    Plaintiff has resided in the Boston area since August 1979. Ex. 1 at 12-13.

167.    Plaintiff admits that he rarely goes to church. Ex. 55 at 425.

168.    Plaintiff could not recall the last time he attended services in a church and whether it was in Boston, or prior to 1979 when he lived in Hartford, CT or in Houston, TX. Ex. 55 at 426-427.

169.    Plaintiff admits that he described his religious beliefs as that of a Southern Baptist Atheist to Mr. DeModena in March 2001. Ex. 55 at 429.

170.    Plaintiff admits that this is how he describes his religion to most people that ask him about his religious beliefs. Ex. 55 at 429.

171.    Plaintiff stated that "in order to avoid my being associated with anything anybody else claims about God, I generally refer to myself in an initial incident as a Southern Baptist atheist." Ex. 55 at 429-430.

172.    Plaintiff admitted that he does not believe in a divine entity when he stated, "[b]ut I deny anything that anyone would try to describe or claim to be God other than what is a human experience based on a ultimately material foundation. It's a spiritual experience, but its foundation is physical, material." Ex. 55 at 430-431.

173.    Plaintiff admits that he informed Mr. DeModena of these beliefs in their conversation of March 2001 and that "God was a human experience." Ex. 55 at 431.

174.    Plaintiff does not know if Dr. Pinsky, Mr. DePhillips, Mr. O'Malley, or the other members of the TART committee knew his religious beliefs. Ex. 55 at 427 & 431-432.

175.    Plaintiff admits that he has no knowledge of any adverse action taken against him or any anger or disappointment expressed toward him by any manager at Amtrak prior to May

2001 due to his religious beliefs. Ex. 55 at 432.

176.    Plaintiff admits that he knows of no writings by him in 2000 or 2001 that reference his

religious beliefs other than the "Letters from Hell." Ex. 55 at 433-434.

177.    The "Letters from Hell" do not contain expressions of religious beliefs. Rather, those

few pages referencing God suggest merely that they are written to God. In addition, the

references to "Lucifer, Prince of Darkness" are used only to suggest that the devil wrote

the document and that the devil prefers a "messy ending." The pages within the "Letters

from Hell" in which God or Lucifer are mentioned consist solely of references to

Shakespeare's Hamlet and to Amtrak managers (one from the MBTA), and two Amtrak

union employees (Plaintiff and Mr. O'Bryan). No religious opinions or ideas are

expressed. Ex. 22.

178.    Mr. DeModena filled out the workplace violence form because the "Letters from Hell"

appeared threatening to him and had several references to the killing and death of a

character that Plaintiff identified to be "played" by Mr. DeModena. His report makes no

reference to Plaintiff's religion or to Mr. DeModena's opposition to any such religion.

Ex. 22; Ex. 2 at ¶9.

179.    Dr. Pinsky decided to medically disqualify Plaintiff because he found the references to

the death of characters to be played by real persons to be disturbing and threatening. He

saw no references to religious beliefs in the "Letters from Hell" and was not punishing

Plaintiff for religious beliefs of which Dr. Pinsky was completely unaware. Ex. 7 at ¶43.

180.    Mr. DeModena understood Plaintiff to be an atheist. Ex. 2 at ¶21.

181.    Mr. DeModena did not fill out his Workplace Violence Report on April 12, 2001 due to

animus against any religious beliefs Plaintiff may have held, and did not discriminate

27

then or at any time before or since against Plaintiff on the basis of his religious beliefs. Ex. 2 at ¶21.

182.    Mr. O'Malley, Ms. Allan, Inspector Smith, Mr. Rae, and Dr. Pinsky had no knowledge of Plaintiff's religious beliefs. Furthermore, their interactions with Plaintiff and their responses to the "Letters from Hell" were not influenced in any manner by Plaintiff's religious beliefs. Ex. 4 at ¶33; Ex. 5 at ¶19; Ex. 6 at ¶18; Ex. 7 at ¶44; Ex. 3 at ¶9.

## XVII. PERSONAL INJURY

183.    Plaintiff has not alleged that he suffered any physical injury associated with the claims set forth in this civil action while acting in his capacity as a locomotive engineer employed by Amtrak. Ex. 37.

184.    Amtrak did not ignore notes from Dr. Gurian that the fitness for duty examination could be harmful to his health because it was not aware of these notes until April 2002, long after Plaintiff had committed his acts of insubordination. Ex. 4 at ¶27; Ex. 7 at ¶45.

## XVIII WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

185.    Plaintiff did not publicize his religious beliefs in his letter of April 4, 2001 to Mr. O'Bryan, nor did he do so in any of the documents attached thereto in the "Letters from Hell." Ex. 22.

186.    Plaintiff's letter to Mr. O'Bryan dated April 4, 2001, and the other documents which make up the "Letters from Hell" was not intended to encourage compliance with federal regulations and Amtrak corporate safety policies. Rather, these documents are an attempt by Plaintiff to exculpate himself from charges relating to the incident of October 9, 2000 that he violated Amtrak and NORAC rules by leaving South Station without possession of a properly executed MAP 100 for the train. Ex. 22.

187.    Amtrak's managers paid little attention to the correspondence from Plaintiff to Mr. O'Bryan included within the "Letters from Hell" which concerned their differing interpretations of Plaintiff's conduct on October 9, 2000. These documents do not show that Amtrak was not complying with federal regulations and Amtrak's managers did not interpret the documents to be proving same. Hence, these documents did not motivate Amtrak's managers to try to quell Plaintiff's writings and union activities. Ex. 4 at ¶ 34; Ex. 2 at ¶¶22-23; Ex. 5 at ¶20; Ex. 3 at ¶7.

188.    Mr. DeModena was unaware of Mr. DePhillips' recommendations expressed in his e-mail of April 13, 2001 as to how Amtrak might consider responding to the "Letters from Hell." Ex. 4 at ¶35; Ex. 2 at ¶23.

189.    Mr. O'Malley did not discuss ways in which Amtrak should respond to Plaintiff's "Letters from Hell" with Mr. DePhillips. Furthermore, he did not help "create a ruse or scenario" that would enable Amtrak to discharge Plaintiff. Significantly, Mr. O'Malley first became aware of Mr. DePhillips' recommendations on or about April 13, 2001 when he read the e-mail, but he took no action in response. Rather, it was only when the e-mail from Mr. DePhillips was sent to Ms. Allan that this suggestion was sent by the TART committee to Dr. Pinsky for his evaluation. Dr. Pinsky, not Mr. O'Malley, made the decision to medically disqualify Plaintiff without any pressure from Mr. O'Malley. Ex. 4 at ¶35; Ex. 7 at ¶43; Ex. 5 at ¶11.

190.    Amtrak did not discharge Plaintiff under a pretext of workplace violence, but for the readily proven fact of his insubordination. Ex. 4 at ¶31.

**DEFENDANT,**
**NATIONAL RAILROAD PASSENGER**
**CORPORATION,**
By Its Attorneys,

DATED: November 14, 2005
**Corrected on:  February 9, 2006**

John A. Kiernan (BBO No. 271020)
Stephen E. Hughes (BBO No. 629644)
Bonner Kiernan Trebach & Crociata, LLP
One Liberty Square - 6th Floor
Boston, MA 02109
(617) 426-3900

## Certificate of Service

I, Stephen E. Hughes, hereby certify that I have on November 14, 2005 served a true copy of the foregoing document by first class mail, postage prepaid, and on **February 9, 2006** sent a corrected version of said document in the same manner to:

Plaintiff (Pro Se):
Joseph T. Carmack
398 Columbus Ave., PMB 130
Boston, MA 02116-6008

Stephen E. Hughes