UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH T. CARMACK<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL RAILROAD PASSENGER<br>CORPORATION<br><br>Defendant. | Civil Action No. 03 12488 PBS |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
NATIONAL RAILROAD PASSENGER CORPORATION'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant National Railroad Passenger Corporation ("Amtrak") has already filed its Motion for Summary Judgment with supporting Memorandum, Statement of Material Facts, and various documents and affidavits that show there are no genuine disputed issues of material fact, and that, as a matter of law, summary judgment must be granted for Amtrak. This document, Amtrak's Reply, will not duplicate what has already been presented. Rather, it is meant merely to refute the arguments raised in Plaintiff's Opposition to demonstrate that Amtrak's Motion must be granted with respect to all Counts in Plaintiff's Second Amended Complaint. Consequently, it will follow the order of argument set forth in Plaintiff's Opposition.

I.   **FACTUAL ARGUMENTS**

Amtrak's Reply is a companion to the recently filed Amtrak's Objections to Plaintiff's Statement of Material Facts in Support of His Opposition to Amtrak's Motion for Summary Judgment. Amtrak's Objections demonstrates that Plaintiff has presented no evidence that shows

any of his claims must be decided by a jury due to the existence of genuine disputed issues of material fact. Most of Plaintiff's allegations must be disregarded because either they: (1) cite to no evidentiary support; (2) cite to supporting documents which cannot be deemed to be competent evidence; (3) cite to documents which do not support what is alleged; or (4) concern matters which are not relevant to proving the claims in his Second Amended Complaint and therefore have no bearing on Amtrak's Motion for Summary Judgment. The few remaining allegations which are undisputed by Amtrak do not contradict Amtrak's legal or factual arguments on behalf of Summary Judgment. In order to avoid redundancy, this Reply will not address those same points with any specificity.

Plaintiff has included an eight page "Facts" section in his Opposition Memorandum which is largely duplicative of his Statement of Material Facts. As a result, this Reply will only address those few alleged facts which are *not* raised in Plaintiff's Statement of Material Facts, and in Amtrak's Objections thereto. Therefore, Amtrak's decision in this Reply not to refute Plaintiff's allegations in this portion of his Opposition should not be construed to indicate concurrence with same. As expressed above and in Amtrak's Objections to Plaintiff's Statement of Material Facts, Amtrak finds almost everything Plaintiff alleges to be false, misleading and unsupported by competent evidence.

On page 2, Plaintiff falsely alleges that he was disciplined in February 2000 in violation of the CBA and provides no evidence in support of this statement.

On page 3, Plaintiff's comments about Mr. O'Bryan's alleged unilateral intervention and settlement in October 2000 of the union's dispute with management about letters of reprimand to union members for absenteeism are misleading and unsupported by any evidence.

Plaintiff's self-serving comments on page 3 about the events of October 2000 which were

triggered by his violation of a key safety rule is a misleading, largely false, and unduly prejudicial description that is irrelevant to these proceedings and unsupported by any competent evidence.

**III.   ARGUMENT**

**A.   Plaintiff's Arguments Against Federal Preemption Are Unavailing**

Plaintiff's arguments fail to prove that four of his claims (Count I – Defamation; Count II – Invasion of Privacy; Count VII – FELA and Intentional Infliction of Emotional Distress; and Count VIII – Wrongful Discharge in Violation of Public Policy) should not be dismissed because they are preempted by the federal Railway Labor Act ("RLA").

Amtrak agrees with Plaintiff that the RLA does not require federal preemption of all complaints by employees subject to collective bargaining agreements. Certain federally guaranteed rights, e.g. those against discriminatory practices, cannot be made subject to the interpretation of terms of a CBA. Hence, Amtrak did not argue that Plaintiff's disability or religious discrimination claims (Counts III and VI respectively) are subject to federal preemption.

One of Plaintiff's early arguments against federal preemption is that arbitrators' authority is limited solely to resolving contractual rights. In support of this position, he quotes the Supreme Court stating that, "[t]he specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 57 (1974). However, to the extent that *Alexander* may have stood for such a proposition, it has been overruled by subsequent cases which recognize the competence of an arbitrator to adjudicate controversies based on statutory rights. For example, in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.* the Court instructed that "we are well past the time when judicial suspicion of the desirability of arbitration and the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." 473 U.S. 614, 626-627

(1985).

Furthermore, Plaintiff tries to argue that the RLA only applies to matters that are directly addressed in collective bargaining agreements. If that were true, it is difficult to imagine how so many courts, including the U.S. District Court for the District of Massachusetts, could have found federal preemption on issues such as defamation and invasion of privacy. These cases do not involve CBAs that have clauses directly relating to such issues. To the contrary, courts have found federal preemption because the defamation claims were associated with acts related to the employee's termination. That is precisely the situation with Plaintiff's claims. For instance, all of his defamation claims relate to comments made by Amtrak managers about workplace safety issues from the spring of 2001 through the spring of 2002. The concerns about safety led to Plaintiff's temporary medical disqualification and, soon thereafter, to his refusal to undergo a fitness for duty exam. All of these comments and issues coalesced in, and were addressed at, the Amtrak hearing that took place in April and May 2002 concerning charges of insubordination. Hence, they were inextricably linked to the termination of his employment, a process that had to adhere to requirements set forth in the prominent section (Rule 21) on discipline in the CBA. The very comments which Plaintiff alleges to be defamatory are those of which he complained at the hearing as being false and intended to cause him to become insubordinate and get fired. If the hearing officer, or the Public Law Board arbitrator, had found these comments to be false and defamatory, undoubtedly they would have ruled against his termination.

Plaintiff then goes on (pp. 12-13) to distort the Amtrak hearing officer's decision by claiming that she disregarded the CBA. To the contrary, a review of her decision (Ex. 45), in particular the lengthy paragraph 13, shows that she simply did not agree with the union's interpretation of how some of the provisions of the CBA pertained to the charges against

4

Plaintiff. Her opinion was corroborated by the impartial Public Law Board.

On page 13, Plaintiff conducts an exercise in completely groundless conjecture where he attributes opinions to people who never expressed such, and concocts ludicrous alleged schemes to entrap him for which he has provided absolutely no evidentiary support in his Opposition Memorandum or in his Statement of Material Facts. Remarkably he states, "they needed to present an arbitrator with a vague insubordination charge he could rule on." There was nothing vague about the insubordination charge: Plaintiff repeatedly refused to be examined by Dr. Vasile despite warnings from his supervisor and his union representative that this constituted insubordination. Mysteriously, he ends this paragraph with the conclusory statement that Amtrak was inviting state law causes of action, but offers no explanation for this allegation.

On page 14, Plaintiff tries to argue that the CBA was not addressed at the Amtrak hearing and Rule 25 was never made an issue. In defense of this position, he states, "the investigation hearing did not make a charge based on Rule 25. The TART decided there was no Rule 25 scenario." Again Plaintiff misses the point and distorts the evidence. First, while the charges against Plaintiff solely concerned insubordination, they were made within the context of the CBA. That is why there was a hearing conducted in accordance with Rule 21 of the CBA. Also, the union, in Plaintiff's defense, strongly suggested that Amtrak had violated both Rules 21 and 25. These arguments were considered and rejected by the Amtrak hearing officer, the Labor Relations appeal decision, and the Public Law Board. Amtrak Ex. 45, 47, and 48.

Additionally, although Mr. DePhillips offered the above-quoted opinion in his e-mail on April 13, 2001 that there was no Rule 25 scenario, the rest of the TART never came to the same conclusion. Furthermore, Mr. DePhillips' testimony in the Amtrak hearing in April 2002 did not criticize the actions taken by Dr. Pinsky or Mr. O'Malley, despite the fact that they disregarded

some of Mr. DePhillips' recommendations and essentially followed Rule 25. Mr. O'Malley himself wrote a letter to the union on May 15, 2001 in which he articulated why the medical disqualification of Plaintiff was not a violation of Rule 25. Amtrak Ex. 54.

Plaintiff's next argument against federal preemption relies upon his disingenuous claim that he was unable to bring his various claims before the hearing officer and the Public Law Board. First, he alleges that "Plaintiff did disagree and attempted to file grievances pursuant to Rule 25. But the Defendant denied the claims and then precluded further claims or appeals by barring Plaintiff from the property." Yet, as mentioned above, Plaintiff and the union have already argued that there were violations of Rule 25 and their arguments were rejected by all three arbitrative forums (the Amtrak hearing, the appeal to Amtrak's Labor Relations Department, and the Public Law Board). Plaintiff is currently seeking his final appeal of this decision before this Court in his claim for judicial review, as permitted by the RLA.

Plaintiff's contention that he could not bring other claims or appeals because he was barred from the property is completely nonsensical. Plaintiff could have filed appeals in any number of ways: (1) by mailing them; (2) by delivering them to Amtrak at the Information Booth in South Station, a public area from which he was never excluded access; (3) by mailing or giving them to his union representative; (4) by having a former BLE friend or colleague deliver the claims. Amtrak new Ex. A.

Plaintiff further alleges that he was prevented from garnering support from union colleagues for such appeals because he was denied access to Amtrak and MBTA property. Again, this is sheer nonsense. As of late August 2002, after he asked about how to obtain keys to Mr. DeModena's office, Plaintiff was only denied access to employee-only areas of the station. He was still free to walk about the station and speak with BLE members before or after their

shifts, or during breaks. Furthermore, he had the ability to call or write these members. Additionally, union meetings were not held on company property, so he was not prevented by Amtrak from attending those and seeking support for any other claims he may have wanted to make. Amtrak Ex. A.

On pages 14 and 15, Plaintiff argues that he has the right to bring the claims Amtrak states are subject to federal preemption to federal court because Amtrak and the union prevented him from bringing these claims via the RLA process. As discussed directly above, this argument has no basis with respect to Amtrak.

With respect to his apparent claim that the union prevented him from raising these claims through the RLA process, Plaintiff cites to a Supreme Court decision for legal support. Sears, Roebuck Co. v. Carpenters, 436 U.S. 180, 202-203 (1978). Carpenters stands for the proposition that, *in certain circumstances,* federal preemption can be avoided, and claims may be brought by an employee in state or federal court. However, this doctrine does not apply to the facts at hand. Even if Plaintiff was stating the truth and had provided competent evidence in his Statement of Material Facts that the union had refused to prosecute certain of his grievances against Amtrak, *which he has not done*, he must then prove that the union breached its duty of fair representation. Vaca v. Stipes, 386 U.S. 171, 186 (1967). To do so, Plaintiff must prove that (1) the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* (2) the union prevented him from exhausting his contractual remedies due to a *wrongful* refusal to process the grievance. Id. at 185 (1967). Plaintiff has not presented competent evidence that the union had sole power to invoke the grievance procedure on behalf of its members. Moreover, even if he had proven such, he has not shown that the union's refusal to help him was *arbitrary, discriminatory,* or the result of *bad faith. Id.* at 190. A union does not breach its duty of fair

representation, *and thereby open up a suit by the employee for breach of contract*, merely because it settled the grievance short of arbitration. Id. at 192. In fact, a breach of duty of fair representation cannot be established merely by proving that the underlying grievance is meritorious. Id.

For example, in Williams v. Sea-Land Corporation, the plaintiff filed a complaint against his employer and union for breach of contract and breach of duty of fair representation for failure to file a grievance after he was dismissed for insubordination. 844 F.2d 17, 20 (1st Cir. 1988). The court denied the claim finding that the union neither ignored the plaintiff's complaint nor processed it in a perfunctory way. Rather the court found that the union merely settled the complaint "short of arbitration." Id.

Similarly, in Stevens v. Moore Business Forms, Inc., the plaintiffs sued their employer and union, alleging that the union breached its duty of fair representation when it failed to process their grievance because it deemed it to be without merit. 18 F.3d 1443, 1445 (9th Cir. 1994). The court rejected the claim because the union's decision was not arbitrary in light of its rational attempt to properly interpret the collective bargaining agreement and otherwise handle the grievance, even if its judgment was wrong. Id. at 1447-1448. In addition, the plaintiffs offered no evidence that the union handled their grievance in a perfunctory fashion, showed an egregious disregard for the rights of its members, used suspect reasoning, or showed bad faith or discriminatory conduct. Id. at 1448-1449.

In the same manner, Plaintiff in the instant case has failed to present any evidence that the union showed an egregious disregard for his rights. He has not demonstrated that the union rejected his requests with respect to claims Amtrak states should be subject to federal preemption. In addition, he has not shown that, even if the union did reject prosecuting such

claims, that it did so arbitrarily, discriminatorily, or in bad faith. Hence, this theory fails entirely again for an entire absence of proof and there is no basis to avert federal preemption.

Finally, Plaintiff argues that the Public Law Board failed to issue a decision within the time frame required by Rule 21 of the CBA, thereby requiring that his job be restored. This is not an argument against federal preemption and has no place in this lawsuit. Rather, it is an argument he has already put forth in his claim for judicial review of the Public Law Board's decision that is before the court in Civil Action No. 05-11430 PBS.

### B. Plaintiff's Factual Arguments on Specific Claims Are Unavailing

1. PLAINTIFF'S ARGUMENTS IN SUPPORT OF HIS DEFAMATION CLAIM ARE UNAVAILING

Plaintiff presents various assumptions and misrepresentations about the communications of Dr. Pinsky and Mr. O'Malley, but fails to provide any evidence sufficient to meet the legal requirement of defamation as previously explained in Amtrak's Motion for Summary Judgment and in Amtrak's Objections to Plaintiff's Statement of Material Facts.

Plaintiff also tries to supplement the detailed allegations he made in his Second Amended Complaint about Mr. DeModena's supposedly defamatory statements. He suggests that Mr. DeModena sent a copy of one of Plaintiff's letters to Ms. Letterio a few days after April 11, 2001 to try to influence Doctor Pinsky's opinion. However, this statement is incorrect and misleading simply because the fax cover sheet is dated May 15, 2001, a week after Dr. Pinsky spoke with Mr. O'Bryan and was informed that he had only seen a small selection of the documents in the "Letters from Hell." Furthermore, Plaintiff admits that the letter Mr. DeModena sent to Ms. Letterio was one of those from the "Letters from Hell," all of which Mr. O'Bryan had wanted Dr. Pinsky to review.

Plaintiff goes on to try to suggest that Mr. DeModena was defaming him to Dr. Pinsky by

9

stating that the union had frustrations with him. A review of Mr. O'Bryan's testimony at the Amtrak hearing or his letter of March 11, 2001, or even Plaintiff's letter in response of April 4, 2001, reveals that Mr. DeModena's comment is an understatement of the extraordinary animosity that existed between Plaintiff and his union representative at that time. Amtrak Ex. 14 and 22. In this instance the truth of this statement is a valid defense, as the fact that these comments are clearly opinions, not statements of fact. Moreover, even if Plaintiff's allegations on page 20 were completely true, i.e. that Mr. DeModena was trying to influence Dr. Pinsky, what he wrote to Ms. Letterio was innocuous and in no way defamatory.

On page 21, Plaintiff alleges that Mr. DeModena wrote that Plaintiff's writings were "clearly…the work of a mentally imbalanced individual and a threat of violence." Yet the document to which he cites, Ex. 3, Mr. DeModena's entry in his private diary for April 11, 2001, does not make those statements. Rather, Mr. DeModena wrote, "I notified Lou DePhillips. I met with Lou and showed him the doc highlights – he shared my concerns re Carmack's emotional/mental stability or lack thereof." This statement and the rest of Mr. DeModena's comments in his diary entry cannot constitute a basis for a defamation claim. In fact these notes reference a reasonable and necessary conversation to have with Mr. DePhillips (Amtrak Labor Relations Director) a member of the TART, on the day that Mr. DeModena found the "Letters from Hell" on his desk, and from whom he was seeking guidance as to the proper response. Furthermore, these comments are clearly opinions, not statements of fact. Under these circumstances, Mr. DeModena's communications identified in Ex. 3 cannot result in forfeiting Amtrak's conditional privilege for intracorporate communications and cannot be construed as defamatory statements.

Plaintiff's wild allegations of defamation with respect to Mr. DeModena's motives and

his communications with the Amtrak police in August 2002 have no basis and consist of unfounded conjecture. There is no competent evidence sufficient to show that Mr. DeModena's statements are false, or that he did not believe his statements to be true. Moreover, his statements were limited to his supervisor and the Amtrak police, for a legitimate business purpose of a type reasonably calculated to protect or further the common interest of an Amtrak manager and the police in maintaining safety. There is no evidence to show these statements were published unnecessarily, unreasonably or excessively. Clearly these are conditionally privileged statements and Plaintiff has shown nothing to allow for a ruling to the contrary.

2.   PLAINTIFF'S ARGUMENTS CANNOT PREVENT SUMMARY JUDGMENT ON HIS DISABILITY DISCRIMINATION CLAIM

Plaintiff has presented an unusual and unworkable combination of theories of disability discrimination. First, he now confusingly states that, although he has been purportedly disabled since 1985, he has been able to work due to mitigating measures in the form of regular psychiatric treatment. He therefore claims that he was not disabled on May 4, 2001 when he was medically disqualified and removed from service. Nonetheless, he suggests that on or about June 8, 2001 he became disabled when ordered to schedule an appointment with Dr. Vasile. Furthermore, he suggests that Amtrak discriminated against him by denying his alleged request for "reasonable accommodation" by insisting that he undergo the psychiatric fitness for duty examination. This new theory is transparently self-serving and simply does not hold up to scrutiny. Second, Plaintiff continues to allege that he was discriminated against because he was regarded as being disabled.

Taking these two theories in order, Plaintiff's claim that Amtrak failed to provide reasonable accommodation should be denied because it relies upon evidence of his psychiatric condition from 1985 to 1999 that the Court ruled to be irrelevant and not subject to discovery in

11

its June 29, 2005 decision. For instance, on page 26, he claims to have become disabled due to "various anomalies" in 1985 and to have shared information with Amtrak about his medical condition and therapy on a regular basis. He provides no evidence of this regular reporting. The evidence of his psychiatric treatment is spotty and from unreliable sources as mentioned in Amtrak's Objections to Plaintiff's Statement of Material Facts. Amtrak was prevented from conducting discovery on this subject and is now presented with this information in a classic litigation ambush. As a result, at the very least, any such evidence that precedes 1999 must not be considered in defense against Amtrak's motion for summary judgment on this Count.

Plaintiff's argument against summary judgment on this Count, which must rely on medical evidence solely from January 1, 1999 to the present, is insufficient as a matter of law. Plaintiff has presented no evidence from a medical professional, including his psychiatrist, that he was disabled pursuant to the ADA at any time between January 1, 1999 until the termination of his employment on May 13, 2002. In fact he admits on page 27 that he was "not impaired or disabled within the meaning of the ADA on May 4, 2001." Interestingly, however, he tries to persuade the court that he was disabled one month later, on June 8, 2001, when he was ordered to arrange another appointment with Dr. Vasile. While it is certainly possible for someone to become disabled within a short period of time, Plaintiff's circumstances cannot possibly be seen to warrant such a conclusion. Significantly, his psychiatrist wrote three notes on May 30, 2001, July 30, 2001, and April 4, 2002 indicating that Plaintiff was fully capable of working as of January 2001 and "continues to be so" as of the date of each of those notes. Amtrak Ex. 56. Plaintiff's current self-serving claim that he was disabled as of June 8, 2001 cannot overcome the evidence from his own psychiatrist. Plaintiff is not qualified as an expert to speak to any medically disabling condition, especially in opposition to the evidence from his long treating

psychiatrist, Dr. Gurian. This evidence illustrates that Plaintiff's argument that he was disabled when he visited Dr. Vasile on June 27, 2001 is entirely disingenuous and merely fabricated in a desperate effort to save his disability discrimination claim from being dismissed on summary judgment.

If Plaintiff cannot prove that he was disabled, then he has no basis to claim failure to provide reasonable accommodation. Yet even if he were somehow deemed to have become disabled in June 2001, his claim that Amtrak denied his request for reasonable accommodation is weak and unavailing. Nowhere in the record is there any evidence whatsoever that Plaintiff or his union representative informed Amtrak that he was disabled and needed special accommodation in order to perform his job. The type of reasonable accommodation Plaintiff claims he sought from Amtrak is authorization not to undergo the psychiatric evaluation. This is not the type of "reasonable accommodation" expected of employers pursuant to the ADA. See 42 U.S.C. § 12111(9).[1] He was not seeking an adjustment or modification of the examination – he was seeking its eradication entirely. Moreover, Plaintiff admits that he did not offer information from his doctor supporting such an unusual request until the Amtrak Hearing in April 2002, almost one year later. Amtrak SMF ¶184. However, even when he did so, the cursory and conclusory handwritten notes from Dr. Gurian hardly provided compelling support for the request. In addition, Plaintiff has cited to no legal authority that the type of request he allegedly made is covered by the statute.

---

[1] (9) Reasonable Accommodation
The term "reasonable accommodation" may include—
(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

13

Moreover, under the circumstances in which Mr. DeModena's workplace violence report had been filed, Amtrak had good reason to believe that such a medical exam was the only safe way to ensure that Plaintiff was not a threat to himself, other workers, or the traveling public. It would be entirely unreasonable to force Amtrak to accommodate Plaintiff, and risk harm to others, by preventing it from doing the testing necessary to determine if Plaintiff could safely work. Employers need not provide unreasonable accommodation.

From pages 38 through 42 Plaintiff provides a rambling commentary on how Amtrak has relied upon the direct threat defense of 29 CFR 1630.15(b)(2) and about the only way his creative writings should be interpreted. Again he presents no evidence to contradict the testimony of Mr. DeModena and Dr. Pinsky as to how they interpreted the "Letters from Hell." Additionally, Amtrak has not relied on the direct threat defense for the simple reason that it never took adverse job action against Plaintiff because of an impairment. As has been stated repeatedly, Amtrak took the precaution of temporarily medically disqualifying Plaintiff while continuing to pay his salary, until it could be determined if there was an impairment or a genuine safety risk. Hence, his arguments are misplaced.

Plaintiff also claims that he "has a record of a disability." Yet he has shown no evidence that he informed Amtrak or its Health Services Department that he was disabled and was seeking reasonable accommodation. In fact the only legitimate evidence that he can point to concerning his health is his medical leave of absence that he took between November 2000 and January 2001. Yet that hardly constitutes a "record of disability."

Finally, Plaintiff argues on page 27 that he was "regarded as having an impairment" on May 4, 2001. Amtrak has already addressed this argument at length in its Memorandum. Plaintiff's Opposition Memorandum offers nothing substantive to support this legal theory,

merely further *conjecture and speculation* that Dr. Pinsky had determined that Plaintiff was impaired and therefore Amtrak perceived him as impaired or disabled. His failure to provide competent evidence in support of this legal theory in the face of compelling evidence to the contrary is fatal to this Count and cannot prevent summary judgment.

There are several allegations on page 34 which have little or nothing to do with his claim of disability discrimination, yet which warrant a brief response to prevent undue prejudice against Amtrak. First, Plaintiff complains about Amtrak's alleged failure to send him his medical file. Even if this were true, which Amtrak denies, any such failure has nothing to do with disability discrimination. Any such failure also has nothing to do with his knowledge of the basis for his medical disqualification. He was informed by Mr. O'Malley on May 4, 2001 that his writings were the basis and he was informed by Mr. O'Bryan on May 7, 2001 that the writings at issue were the "Letters from Hell." Amtrak Ex. 27; SMF ¶76, 80. Second, he speculates without any evidentiary basis that his medical file was sent to Labor Relations and the Law Department.

3. PLAINTIFF'S ARGUMENTS ON BEHALF OF HIS INVASION OF PRIVACY CLAIM ARE UNAVAILING

Plaintiff offers no new arguments here except that he now appears to be trying to bring a claim under the Fourth Amendment of the U.S. Constitution. Of course, it is too late to do so now since this Court issued an order, on June 8, 2005, requiring Plaintiff to file any motions to amend his Complaint by July 15, 2005. No such request was made by Plaintiff with respect to violations of the Fourth Amendment.

4. PLAINTIFF'S ARGUMENTS ON BEHALF OF HIS UNFAIR LABOR PRACTICE COUNT ARE UNAVAILING

Plaintiff continues to ignore the obvious fact that his claim of unfair labor practices is a

"minor dispute" as that term is applied with respect to the RLA. Major disputes are those between railroads and their employees concerning collective bargaining. NRPC v. IAMAW, *supra* at 49; RLA 45 U.S.C. §151a. They generally concern disputes over the creation of collective bargaining agreements or efforts to change the nature of an existing agreement. Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 723 (1945). Plaintiff's claim is not that there should be a CBA between the BLE and Amtrak (because there already is one) or that the agreement should be transformed in some fashion. To the contrary, his claim is strictly limited here to wrongful termination for allegedly advocating for his brethren against the company. This is a classic example of the type of grievance that the RLA was designed to address, i.e. to "provide for the prompt and orderly settlement of all disputes growing out of grievances." 45 U.S.C. §151(a). In addition, as a member of a union, Plaintiff's grievance is the type which unions are expected to bring through the arbitration process set forth in 45 U.S.C. §152. If union employees could sue their employer in federal court every time they lose in the RLA process, or every time they differ with the union about the merits of their claim, one of the main purposes of the RLA would be eviscerated.

Plaintiff already had his "day in court" on these specific allegations at his Amtrak hearing in the spring of 2002 and in his two subsequent appeals in which he unsuccessfully argued that he was being punished for his union activities. Moreover, as previously mentioned, he has appealed those decisions by seeking judicial review in this Court. That is the only setting in which he has a right to revisit, to the limited extent permitted by law, these claims.

In the event this Court should decide, despite federal preemption, to consider this claim, it should grant summary judgment. Plaintiff has provided no competent evidence in support of his wild accusations against Amtrak personnel sufficient to create disputed issues of material fact out

of the affidavits, deposition testimony, and documentary evidence submitted by Amtrak.

5.  (a) PLAINTIFF CANNOT PREVAIL IN A CLAIM OF WRONGFUL DISCHARGE

Plaintiff inartfully tries to drag a claim for violation of the Railway Safety Act into his case by discussing it in combination with his claim for wrongful discharge. He cannot do so because he did not make this legal claim in his Second Amended Complaint and did not move to include such a claim prior to July 15, 2005 as directed by this court.

Plaintiff has also confused comments in <u>Acciavatti v. Professional Services Group, Inc.</u> concerning federal preemption with those concerning wrongful termination. 982 F.Supp. 69 (D.Mass. 1997). This and other cases binding in this jurisdiction clearly stand for the proposition that a wrongful discharge claim cannot be brought by an employee such as Plaintiff who is represented by a union, but only by an at-will employee. <u>Id.</u> at 74.[2]

Amtrak must also correct one outrageous statement by Plaintiff on page 50 wherein he states, "Plaintiff was charged with insubordination when he articulated his intention to grieve." Plaintiff never communicated his intention to "grieve" prior to the charge of insubordination brought against him on September 10, 2001. On June 8, 2001 and July 24, 2001, Amtrak's manager, Mr. O'Malley, wrote to Plaintiff and informed him that Plaintiff's failure to comply with his instructions would result in charges of insubordination which could lead to discharge. Only subsequent to those letters, on July 31, 2001, did Plaintiff write to Dr. Pinsky and state that he believed various of his rights were being violated. Consequently, his implication that Amtrak retaliated against his assertion of his rights is indefensible and a complete reversal of the chronology of events as they actually occurred.

---

[2] "The <u>Cullen</u> court reasoned that allowing employees who are party to a collective bargaining agreement to also assert causes of action for wrongful discharge in violation of public policy would 'deprive [the] employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances.'" *Citing* <u>Cullen v. E.H. Friedrich Co. Inc.</u>, 910 F.Supp. 815, 821 (D.Mass. 1995)

5.   (b) PLAINTIFF CANNOT PREVAIL ON AN ADA CLAIM OF RETALIATION

Plaintiff now alleges that the retaliation claim he is bringing under the ADA is that he was retaliated against for requesting to have his own doctor report on his condition, apparently in lieu of Dr. Vasile. There is no document in the record referencing any such request and there is no evidence indicating when and to whom such a request was made. In fact the documents to which he cites make no reference to such matters at all. Significantly, even if there was competent evidence of such a request by Plaintiff, there is no evidence of a nexus between that request and Amtrak's filing of insubordination charges against Plaintiff. On the other hand, there is copious evidence that the insubordination charges were the result of his refusal to undergo the psychiatric fitness for duty evaluation. Hence, Plaintiff cannot prove a *prima facie* case of ADA retaliation.

6.   PLAINTIFF'S CLAIMS UNDER FELA AND FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CANNOT SURVIVE SUMMARY JUDGMENT

Plaintiff admits that his claim for emotional distress under FELA does not appear to "comport with the Gottshall test," i.e. the "zone of danger" test which requires any such claim to concern distress caused by immediate risk of physical harm. Nonetheless, he tries to stretch the meaning of this test by arguing that his fear of the psychiatric examination qualifies under this test. Certainly there is no reason why he would fear physical harm from such a test. More importantly, Plaintiff fails to cite to any legal authority for such a strained interpretation of this test, undoubtedly because there is none.

Amtrak's Memorandum in Support of its Motion for Summary Judgment fully addresses why a common law tort claim cannot prevail in these circumstances.

---

(quoting Azzi v. Western Electric Co., 19 Mass. App. Ct. 406, 410 (1985).)

7.     PLAINTIFF'S ARGUMENTS ON BEHALF OF HIS RELIGIOUS DISCRIMINATION COUNT ARE UNAVAILING

Plaintiff falsely alleges that he pursued a claim of religious discrimination before the Massachusetts Commission Against Discrimination ("MCAD"), an administrative prerequisite to filing such a claim in this Court. Remarkably, despite this allegation in his Opposition Memorandum, Plaintiff's own Charge to MCAD includes no references to religious discrimination. Amtrak Ex. 49. Moreover, Plaintiff fails to offer any other proof that he did file such a claim. Plaintiff did not exhaust this remedy, he failed to seek it in a timely fashion and is therefore barred from bringing it here.

8.     PLAINTIFF'S REMAINING CLAIMS HAVE NO BASIS AND CANNOT SURVIVE SUMMARY JUDGMENT

As previously mentioned in Amtrak's Summary Judgment Memorandum, Plaintiff's claims under M.G.L. c. 12 and c. 265 are preempted by M.G.L. c. 151B. That does not mean that if he fails to use c. 151B, he can now bring a claim under these other statutes. Furthermore, his efforts to allege a violation of his rights under the First Amendment are unavailing because he failed to amend his Second Amended Complaint to include such a claim by July 15, 2005.

Finally, Plaintiff uses the last paragraph of his Opposition on page 55 to argue for a new amorphous claim of "disparate treatment." He suggests that a prior publication disseminated by employees at Amtrak was more violent than his own, and yet the author was never disciplined. Of course there is no viable legal claim pled in this manner. Furthermore, even if there were, Plaintiff neglects to mention that Mr. O'Bryan testified in his deposition that this document was written before 1993. Amtrak's zero tolerance policy regarding workplace violence was implemented in 1998, shortly after a tragic killing occurred on Amtrak property in Wilmington, Delaware.

## CONCLUSION

For the above-mentioned reasons, and those expressed in Amtrak's Objections to Plaintiff's Statement of Material Facts, and Amtrak's Motion for Summary Judgment and attached pleadings and exhibits, it is clear that there are no genuine disputed issues of material fact that would require any of the legal counts in Plaintiff's case to be decided by a jury. Consequently, Amtrak's motion for summary judgment must be granted on all counts of Plaintiff's Second Amended Complaint and the case dismissed.

Additionally, as shown in Amtrak's Objections to Plaintiff's Statement of Material Facts, Plaintiff has submitted no evidence that would require that summary judgment be granted on his behalf on any of the Counts in his Second Amended Complaint. In the event that the Court should decide that any of the Counts in Plaintiff's civil action should not be dismissed, these legal claims must be decided by the jury.

Respectfully submitted,
**DEFENDANT,**
**NATIONAL RAILROAD PASSENGER CORPORATION,**
By Its Attorneys,

DATED: February 16, 2006

s/Stephen E. Hughes
John A. Kiernan (BBO No. 271020)
Stephen E. Hughes (BBO No. 629644)
BONNER KIERNAN TREBACH & CROCIATA
One Liberty Square - 6th Floor
Boston, MA 02109
(617) 426-3900

### Certificate of Service

I, Stephen E. Hughes, hereby certify that I have on February 16, 2006 served a true copy of the foregoing document by first class mail, postage prepaid, to Plaintiff (Pro Se) Joseph T. Carmack 398 Columbus Ave., PMB 130, Boston, MA 02116-6008.

s/Stephen E. Hughes
Stephen E. Hughes