UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH T. CARMACK, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. 03-12488-PBS |
| | ) | |
| NATIONAL RAILROAD | ) | |
| PASSENGER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION ON
<u>CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>**

February 5, 2007

DEIN, U.S.M.J.

**I.   <u>INTRODUCTION</u>**

The plaintiff, Joseph T. Carmack ("Mr. Carmack"), has brought this action <u>pro se</u> against his former employer, National Railroad Passenger Corporation ("Amtrak"), challenging his treatment leading up to and surrounding his termination from employment as a locomotive engineer.  In his Second Amended Complaint ("Complaint"), Mr. Carmack has asserted claims against Amtrak for slander, libel and defamation (Count One), invasion of privacy (Count Two), disability discrimination and retaliation (Count Three), violation of his civil rights (Count Four), violation of the Railway Labor Act, 45 U.S.C. §§ 151 <u>et seq.</u> (Count Five), discrimination on the basis of religion (Count Six), personal injury under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 ("FELA") and intentional infliction of emotional distress (Count Seven), and wrongful

discharge in violation of public policy (Count Eight).  Presently before the court are the

parties' cross-motions for summary judgment on all of the plaintiff's claims.  For the

reasons detailed herein, this court finds that based on the undisputed facts set forth in the

record, Amtrak is entitled to summary judgment on all of the Counts of the Second

Amended Complaint.  Therefore, this court recommends to the District Judge to whom

this case is assigned that Amtrak's motion for summary judgment (Docket No. 99) be

ALLOWED and that Mr. Carmack's cross-motion for summary judgment (Docket No.

110) be DENIED.

## II.  STATEMENT OF FACTS[1]

The following material facts are undisputed unless otherwise indicated.

### Mr. Carmack's Employment at Amtrak

Defendant Amtrak is a passenger railroad that was established pursuant to 45

U.S.C. § 501 (1970).  (DF ¶ 1).  Mr. Carmack became an employee of Amtrak in 1979,

and from 1998 until his termination on May 13, 2002, Mr. Carmack worked as a

locomotive engineer for Amtrak's commuter rail operations.  (DF ¶¶ 2, 31; PF ¶¶ 14, 16,

---

[1]  The facts are derived from the following materials: (1) Defendant's Corrected Statement
of Undisputed Material Facts in Support of its Motion for Summary Judgment (Docket No. 123)
("DF"); (2) Exhibits to Defendant's Motion for Summary Judgment (Docket No. 102) ("Def.'s
Ex. __"); (3) Plaintiff Joseph T. Carmack's Corrected Statement of Material Facts in Support of
Opposition to Defendant National Railroad Corporation's Motion for Summary Judgment
(Docket No. 127) ("PF"); (4) Exhibits to Plaintiff's Opposition to Defendant National Railroad
Passenger Corporation's Motion for Summary Judgment (Docket No. 114) ("Pl.'s Ex. __"); and
(5) Defendant's Objections to Plaintiff's Statement of Material Facts in Support of His Opposition
to National Railroad Passenger Corporation's Statement of Material Facts (Docket No. 121)
("DOF").

111).  At all relevant times, Amtrak's locomotive engineers were members of a union, the

Brotherhood of Locomotive Engineers ("BLE").  (DF ¶ 16).  The BLE and Amtrak were

parties to a collective bargaining agreement ("CBA"), which governed "the rates of pay,

rules and working conditions of employees of Amtrak employed in its engine service

operations."  (Def.'s Ex. 11 at 1).

### The "Letters From Hell"

The events giving rise to this litigation occurred after Mr. Carmack's supervisor,

Gerard DeModena, discovered a group of documents on his office desk on April 10, 2001

that were entitled "Letters from Hell."[2]  (DF ¶ 43).  The record indicates that Mr.

Carmack prepared these documents in connection with a conflict that he was having with

his union representative, Michael O'Bryan, regarding Mr. O'Bryan's handling of a

dispute between the plaintiff and Amtrak management.  (See Def.'s Exs. 14, 22).  Thus,

the documents contained a letter from Mr. Carmack to Mr. O'Bryan dated April 4, 2001,

in which Mr. Carmack criticized Mr. O'Bryan's actions in his capacity as Mr. Carmack's

union representative, as well as copies of correspondence between Mr. Carmack and

Amtrak management reflecting the plaintiff's underlying dispute with the railroad.

(Def.'s Ex. 22).  Additionally, the second page of the materials, which Mr. Carmack

describes as satire, provided, "[a]ll is not as it appears theres (sic) more to what you see

---

[2] It is unclear who placed the "Letters from Hell" on Mr. DeModena's desk.  The plaintiff
asserts that one of Amtrak's transportation managers left the documents on Mr. DeModena's
desk, but Amtrak disputes that contention.  (PF ¶ 57; DOF ¶ 57).

3

and hear.  Dear God: I hear a fat lady singing.  Very, very **truthfully** yours, Lucifer

Prince of Darkness."  (DF ¶ 46; PF ¶ 52 (emphasis in original)).

      Also included among these materials was a two-page document, based on

Shakespeare's <u>Hamlet</u>, which Mr. Carmack refers to as his "Lucifer satire."  (PF ¶ 51;

Def.'s Ex. 22 at 33-34).  The first page of the document provided, "Dear God, We're

putting on a play down here.  Wanna help us fill out all the parts?" followed by the title,

"The Tragedie of HAMLET Prince of Commuter Rail."  (DF ¶ 47; Def.'s Ex. 22 at 33).

Beneath the title was a list of characters having the same names as the principal charac-

ters in the play <u>Hamlet</u>, as well as a corresponding list of players, which included the

names of various Amtrak managers as well as the plaintiff and Mr. O'Bryan.  (DF ¶ 47;

Def.'s Ex. 22 at 33).  In particular, Mr. Carmack cast himself as Hamlet and cast Mr.

DeModena and Mr. O'Bryan as the characters Rosencrantz and Guildenstern.  (DF ¶ 49;

Def.'s Ex. 22 at 33).  In Shakespeare's work, Rosencrantz and Guildenstern had been

friends of Hamlet, and King Claudius had sent them, along with Hamlet, to meet the King

of England.  (DF ¶ 50).  Claudius also had provided Rosencrantz and Guildenstern with a

note asking the King of England to execute Hamlet, but Hamlet found the note and

replaced it with his own note asking that Rosencrantz and Guildenstern be executed.

(<u>Id.</u>).  Later, in Shakespeare's <u>Hamlet</u>, it is announced that Rosencrantz and Guildenstern

are dead.  (<u>Id.</u>).

At the bottom of the page listing the characters and players, Mr. Carmack wrote:

> If you were in control, perhaps we'd have the history plays. Most
> likely you would have ended up with Henry IV parts I and II leading
> into Henry the V. But since the fall of Adam, I'm in charge and this
> play has a messy ending more to my liking[.] Sinisterly, Lucifer,
> prince of darkness

(DF ¶ 54; Def.'s Ex. 22 at 33(emphasis in original)). Moreover, on the following page,

Mr. Carmack included three quotes from Shakespeare's Hamlet, including one in which

Hamlet expresses anger or frustration at how he has been perceived and manipulated and

one in which the King declares "[h]ow dangerous is it that [Hamlet] goes loose!" (Def.'s

Ex. 22; see also DF ¶ 55). At the bottom of this page, Mr. Carmack wrote,

"ROSENCRANTZ AND GILDENSTERN ARE DEAD!" (DF ¶ 55; Def.'s Ex. 22 at 33).

Although Mr. Carmack had sent the Shakespeare parody to Mr. O'Bryan previously,

Amtrak denies that Mr. DeModena or other Amtrak officials saw these documents prior

to April 10, 2001. (See PF ¶¶ 40, 48; DOF ¶ 40).

### Mr. DeModena's Complaint to
### Amtrak's Threat Assessment Response Team

Mr. DeModena's response to the "Letters from Hell" triggered a series of events

that ultimately culminated in Mr. Carmack's termination from employment at Amtrak.

According to Mr. DeModena, he was disturbed by the "Letters from Hell," and believed

that they contained a potential threat of harm against him. (DF ¶ 57; DOF ¶ 64).

Consequently, he spoke with his supervisor, Mr. O'Malley, who advised Mr. DeModena

to notify Amtrak's Threat Assessment Response Team ("TART"), the group that was

charged with evaluating workplace violence complaints and determining what if any

action should be taken.  (PF ¶ 58; DF ¶¶ 23, 64; Def.'s Ex. 45 ¶ 6).  Mr. DeModena also

spoke with Lou DePhillips, Amtrak's Director of Labor Relations and a member of

TART, and was provided with a complaint form, which Mr. DeModena completed and

submitted to TART.  (Def.'s Ex. 45 ¶¶ 5, 6; DF ¶ 61).

In his Workplace Violence Report Form, Mr. DeModena described the "Letters

from Hell" as a "threat" and further stated that they consisted of a "compilation of letters

and writings authored by Joe Carmack.  In one addressed to 'God,' he maintains that he is

in 'control' now then proceeds to recast 'Hamlet' [with managers], proclaiming to change

the ending to his 'liking,' and kills off my character."  (Def.'s Ex. 21).  Mr. DeModena

also noted that "[t]his episode followed a few incidents where I had to speak [with]

Carmack [regarding] his conduct."  (Id.).

Mr. DeModena's actions in complaining about the documents were consistent with

Amtrak's workplace violence policy, which allowed zero tolerance of threats and

violence.  (DF ¶¶ 19, 21, 58).  The policy provided, in relevant part:

> Amtrak employees should notify a supervisor of any threats which
> they have witnessed, received, or have been told that another person
> has witnessed or received.  Even without an actual threat, employees
> should report any behavior they have witnessed which they regard as
> threatening or violent, when that behavior may impact an Amtrak
> worksite, occurs on a Company-controlled site, or may result in
> violent behavior on a Company-controlled site.

(DF ¶ 22 (quoting Def.'s Ex. 12 at 3)).  The policy also provided that when a threat is

reported, representatives from certain departments within Amtrak form a TART team and

evaluate the company's response.  (DF ¶ 23).  The members of the TART team that

considered Mr. DeModena's complaint consisted of Mr. DePhillips, one of Amtrak's

Directors of Human Resources, Suzanne Allan, and Inspector Robert Smith of Amtrak's

Police Department.  (DF ¶¶ 8, 9, 66).

### Amtrak's Decision to Medically Disqualify Mr. Carmack

Mr. DePhillips found the "Letters from Hell" disturbing and he decided to seek

input from Amtrak's medical staff.  (DF ¶ 63).  Accordingly, Mr. DePhillips sent selected

portions of the documents to Amtrak's health services department.  (DF ¶ 63; PF ¶ 80).

Pursuant to Amtrak's workplace violence policy, Amtrak's medical director may assist in

a TART investigation by consulting with senior management regarding safety sensitive

employees, assaults, threats, homicides, and suicides.  (DF ¶25).  The medical director

also may provide guidance on fitness for duty evaluations, analyze documentation for

medical related issues, and review and coordinate medical information from outside

sources.  (Id.).  Employee medical records that are provided to Amtrak's health services

department are considered private and confidential.  (DF ¶ 27).  Furthermore, the policies

and procedures that were in place during the relevant time period prohibited the

disclosure of employee medical records to the employee's department or supervisors

without the employee's express authorization.  (DF ¶ 28; see also PF ¶ 77).

In addition to notifying the health services department, on April 13, 2001,

Mr. DePhillips sent an e-mail to Mr. O'Malley and Mr. DeModena in which he stated in

relevant part:

> In my view, I would not recommend either a rule 25 or disciplinary scenario. What I believe you do here is a foundation to have the employee undergo an in-service (psychiatric) evaluation. After determining that he did in fact author the correspondence, you would the[n] advise that his letters are troubling and that you have concern for his own well-being and by extension, the traveling public. Because of your concerns, you will be directing him to undergo an in-service examination. (The physician we have used in the past is Dr. Martin Kelly. He is an associate professor of Psychiatry at Harvard Medical School and is affiliated with Brigham and Women's Hospital – Boylston Consultation Center...) The consequence of the employee's refusal to cooperate could be your issuance of a direct order to undergo the exam and a continued refusal would be grounds for gross insubordination and a removal from service.

(Def.'s Ex. 25; see also DF ¶ 67). Mr. Carmack suggests that Mr. DePhillips' recommendation constituted a scheme to have him charged with insubordination and improperly terminated. (PF ¶¶ 88-90). Amtrak vigorously denies this accusation. (See DOF ¶¶ 88-90).

Subsequently, on May 3, 2001, Mr. DePhillips forwarded his e-mail to Ms. Allan, who then forwarded it to the health services department for comment. (DF ¶ 70; Def.'s Ex. 25). On that same date, Amtrak's Medical Director, Dr. Timmie Pinsky, reviewed selected portions of the "Letters from Hell" and made a determination to medically disqualify Mr. Carmack pending a psychiatric fitness for duty examination to be performed by an experienced psychiatrist. (DF ¶¶ 10, 71). Accordingly, the Manager of Amtrak's health services, Marianne Letterio, notified Mssrs. O'Malley, DeModena and DePhillips, as well as Ms. Allan, that "Amtrak's Medical Director/NEC, Dr. Tim Pinsky, has reviewed samples of materials reportedly written by Mr. Carmack. Following his

8

review, Dr. Pinsky stated that the samples justify Mr. Carmack being deemed medically

disqualified immediately pending a . . . FFD exam." (Def.'s Ex. 26 (internal quotations

omitted)). On May 4, 2001, Mr. O'Malley notified Mr. Carmack of Dr. Pinsky's

decision, and informed the plaintiff that he would be held "out of service, *with* pay,"

beginning that day. (DF ¶ 75).

Shortly thereafter, on about May 7, 2001, Mr. O'Bryan contacted Dr. Pinsky and

expressed his disagreement with the decision to medically disqualify Mr. Carmack

pending a psychiatric fitness for duty examination. (Def.'s Ex. 57). In particular,

Mr. O'Bryan informed Dr. Pinsky that the documents comprising the "Letters from Hell"

consisted of 40 pages, that they were authored in response to what Mr. Carmack had

considered inadequate representation by Mr. O'Bryan, that he felt Mr. Carmack was

being treated unfairly, and that he did not believe that Mr. Carmack posed a threat to

himself or others. (Id.). He also told Dr. Pinsky that Mr. Carmack and other employees

referred to him as "God," and that Mr. Carmack's letter to "God" was actually a letter to

Mr. O'Bryan. (Id.). Nevertheless, Dr. Pinsky told Mr. O'Bryan "that there was ample

written documentation to warrant that Mr. Carmack be medically disqualified pending a

fitness for duty exam" and that "[t]he content of his writings raised the index of suspicion

of an underlying psychiatric disorder to the level where a psychiatric evaluation is

appropriate." (Id.).

Following his conversation with Mr. O'Bryan, Dr. Pinsky reviewed the remaining

pages of the "Letters from Hell," but did not alter his opinion. (DF ¶ 77). Mr. O'Bryan

informed Mr. Carmack that Dr. Pinsky's decision to medically disqualify him was based on the "Letters from Hell."  (DF ¶ 80).

### Mr. Carmack's Refusal to Submit to an Examination

Amtrak's ultimate decision to terminate Mr. Carmack's employment occurred following the plaintiff's decision not to submit to a psychiatric fitness for duty examination.  Ms. Letterio selected Dr. Russell Vasile, a psychiatrist, to conduct an examination of the plaintiff, and on May 16, 2001, she notified Mr. O'Malley that she had scheduled an appointment for the examination on June 4, 2001.  (DF ¶¶ 81, 82).  On May 17, 2001, Mr. O'Malley sent a letter to Mr. Carmack notifying him that a fitness for duty examination had been scheduled for him with Dr. Vasile on June 4, 2001.  (PF ¶ 98; Def.'s Ex. 28).  In addition, Ms. Letterio sent Dr. Vasile a letter describing the information that Dr. Pinsky was seeking as a result of the examination, including, among other things, any special accommodations needed for Mr. Carmack, any reasons why Mr. Carmack could not perform the duties of a passenger engineer, whether Mr. Carmack presented a danger to himself or others, and a determination of Mr. Carmack's long-term fitness for the position of a passenger engineer.  (DF ¶ 84; Def.'s Ex. 29).  Dr. Vasile was to report the results of his examination to Amtrak's health services department, but to no one else.  (DF ¶ 85).

On May 24, 2001, Mr. Carmack sent a letter to Dr. Pinsky in which he requested all documents and correspondence referring to the plaintiff, the medical basis for disqualifying him, including a specific diagnosis, Dr. Pinsky's qualifications for making

such a judgment, a complete explanation of an "FFD exam," including what it is and what it entails, and the legal basis for Dr. Pinsky's decision. (Def.'s Ex. 30). Thereafter, Ms. Letterio sent Mr. Carmack his medical file, but Dr. Pinsky did not reply to the plaintiff's letter. (DF ¶¶ 87-88).

On June 4, 2001, Mr. Carmack notified Dr. Vasile that he was cancelling the appointment scheduled for that day, and that the appointment would not be rescheduled. (DF ¶ 89). Consequently, on June 8, 2001, Mr. O'Malley wrote to the plaintiff and informed him that effective June 4, 2001, his status had been changed to "'medically disqualified' without pay." (Def.'s Ex. 34). Additionally, Mr. O'Malley ordered Mr. Carmack to arrange for another appointment, and informed Mr. Carmack that if he failed to comply, he would be subject "to charges of insubordination, which, if proved, could result in your permanent dismissal from service." (Id.).

Mr. Carmack contends that his own physician advised him against submitting to the examination. (PF ¶ 101). However, the record shows only that his physician advised him that "a forced, non-confidential psychiatric consultation, because of its coercive and intrusive nature, would be medically harmful to him and ethically suspect." (Def.'s Ex. 56, Letter dated 4/4/02). In any event, Mr. Carmack contacted Dr. Vasile and scheduled an appointment for June 27, 2001. (DF ¶ 91).

On June 27, 2001, Mr. Carmack and Mr. O'Bryan met with Dr. Vasile at his office. (DF ¶ 94). Mr. Carmack questioned Dr. Vasile about the basis for the proposed fitness for duty examination and the medical support for the decision to disqualify him.

11

(DF ¶¶ 95, 96).  Additionally, the plaintiff and Mr. O'Bryan showed Dr. Vasile the entire contents of the "Letters from Hell."  (DF ¶ 97).  Dr. Vasile informed Mr. Carmack that he could not make a determination regarding the basis for medical disqualification or assess whether the plaintiff posed a threat to others without conducting a full psychiatric evaluation.  (Def.'s Ex. 44 at ¶ II).  He also informed Mr. Carmack that any findings from his evaluation would be provided to Amtrak's health services department.  (DF ¶ 98).  Mr. Carmack expressed concerns regarding confidentiality, and after Dr. Vasile explained that the evaluation would include a comprehensive psychiatric history, mental status exam and psychological testing, the plaintiff declined to undergo an examination.  (Def.'s Ex. 44 ¶ IV; DF ¶¶ 101, 103).

Mr. O'Malley again wrote to Mr. Carmack on July 24, 2001 and directed him to schedule another appointment for an examination or be charged with gross insubordination.  (DF ¶ 105).  The plaintiff did schedule an appointment with Dr. Vasile for August 27, 2001, but after much deliberation, he decided not to appear for the examination.  (DF ¶¶ 106-108).

## Mr. Carmack's Termination from Employment

Mr. O'Malley initiated formal proceedings against Mr. Carmack as a result of his failure to submit to the examination.  On September 5, 2001, the health services department notified Mr. O'Malley that Mr. Carmack had cancelled his appointment.  (DF ¶ 110).  On September 10, 2001, Mr. O'Malley sent the plaintiff a Notice of Formal Investigation directing him to appear for an investigation and informing him that his

12

failure to comply with the order to appear for a fitness for duty examination constituted a direct violation of Amtrak's "Standard of Excellence," which required that employees "comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers." (Def.'s Ex. 43 (internal quotations omitted)).

An investigative hearing took place over the course of four separate days in the Spring of 2002. (DF ¶ 113). It was presided over by an independent hearing officer retained by Amtrak for the purpose of presiding over hearings into disciplinary charges against employees, and Mr. Carmack was represented by the BLE throughout the investigation. (DF ¶¶ 114, 115). On May 13, 2002, the hearing officer issued a Decision Letter in which she found that Amtrak had proved the charges against Mr. Carmack for insubordination in violation of Amtrak's Standard of Excellence, and described the basis for her determination. (Def.'s Ex. 45). Later that same day, Amtrak's Assistant General Manager for Commuter Rail Operations terminated Mr. Carmack's employment at Amtrak based on the findings of the hearing officer and the nature of the offense. (Def.'s Ex. 46).

Amtrak denied the BLE's appeal of Mr. Carmack's termination, and the union further appealed to the Public Law Board. (DF ¶¶ 121, 122). On January 31, 2003, the Public Law Board denied the appeal. (DF ¶ 122).

## Mr. Carmack's Visit to South Station

Several months after he had been discharged from Amtrak, in August 2002, Mr. Carmack visited the South Station train station in Boston and spoke with Mr. DeModena's personal assistant, Cheri Thompson.  (Pl.'s Ex. 18; PF ¶ 114).  Mr. Carmack's defamation claim against Amtrak in the instant case is based in part on statements that Mr. DeModena made after learning of Mr. Carmack's discussion with Ms. Thompson.

During his conversation with Ms. Thompson, Mr. Carmack requested information on the location of Mr. DeModena's office and the road foremen's office, as well as the identity of employees who would have keys to those offices.  (Id.).  According to Mr. Carmack, the purpose of his questions was to obtain evidence to show that someone from Amtrak, and not Mr. Carmack, had left the "Letters from Hell" on Mr. DeModena's desk.  (See PF ¶¶ 112-114, 116).  However, after Mr. DeModena learned of the discussion, he notified other Amtrak officials and asked Mr. O'Malley "to consider imposing a restraining order which would prohibit Mr. Carmack from contacting Amtrak managers and their staff, also from trespassing in areas other than those accessed by the public . . . ."  (Pl.'s Ex. 18).  Mr. DeModena also discussed the possibility of a restraining order with Inspector Smith, and told him that "[w]e have concerns about Mr. Carmack's intentions on a broader scope [regarding] Amtrak management and staff."  (Pl.'s Ex. 20). Additionally, Mr. O'Malley issued a letter to Mr. Carmack advising him that he had been barred from Amtrak property, and that Amtrak was seeking legal guidance regarding the plaintiff's contact with Amtrak employees on Amtrak property.  (Pl.'s Ex. A).  The

14

plaintiff asserts that Mr. DeModena's communications defamed him by "characteriz[ing] Plaintiff's investigation of the facts regarding DeModena's Workplace Violence complaint as an attempt to break and enter into secured areas."  (Pl.'s Mem. at 18).

Additional factual details relevant to the court's analysis are described below.

### III.  ANALYSIS

#### A.    Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal citations omitted).  A material fact is one which has the "potential to affect the outcome of the suit under the applicable law."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (internal citations and quotation omitted).  In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (internal citations and quotations omitted), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994.  In evaluating motions for summary judgment, however, the court will not

consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (internal citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991).

### B.     Counts One, Two, Seven and Eight: Defamation, Invasion of Privacy, FELA/ Intentional Infliction of Emotional Distress and Wrongful Discharge

Amtrak has moved for summary judgment on Mr. Carmack's claims for defama-tion, invasion of privacy, intentional infliction of emotional distress and wrongful discharge in violation of public policy, which are set forth in Counts One, Two, Seven and Eight of the Complaint, on the grounds that the claims are preempted by the Railway Labor Act, 45 U.S.C. §§ 151 et seq. ("RLA"). Furthermore, Amtrak contends that it is entitled to summary judgment because Mr. Carmack has failed to present sufficient evidence to support any of these claims on the merits. Mr. Carmack disputes Amtrak's preemption arguments and contends that he is entitled to judgment as a matter of law on each cause of action. As set forth below, this court finds that Amtrak is entitled to summary judgment on each cause of action either because it is preempted by the RLA or

16

because the plaintiff has not presented adequate evidence to warrant a jury trial on any of the claims asserted therein.

### 1.    RLA Preemption Generally

"Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent." Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252, 114 S. Ct. 2239, 2243, 129 L. Ed. 2d 203 (1994). With respect to the RLA, "Congress' purpose in passing the [statute] was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes. To realize this goal, the RLA establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of disputes." Id. at 252, 114 S. Ct. at 2243-44 (quoting 45 U.S.C. § 151a). One class, known as "major" disputes, concerns "rates of pay, rules or working conditions," and "relate[s] to the formation of collective [bargaining] agreements or efforts to secure them." Id. at 252, 114 S. Ct. at 2244 (second alteration in original; quotations and citations omitted). The other class, "known as 'minor' disputes, 'gro[ws] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.'" Id. at 252-53, 114 S. Ct. at 2244 (quoting 45 U.S.C. § 151a). Accordingly, "[m]inor disputes involve 'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.'" Id. at 253, 114 S. Ct. at 2244 (quoting Trainmen v. Chicago R. & I.R. Co., 353 U.S. 30, 33, 77 S. Ct. 635, 637, 1 L. Ed. 2d 622 (1957)). Because minor disputes must be resolved only

through the mechanisms established by the RLA, "a determination that [the plaintiff's] complaints constitute a minor dispute would pre-empt his state-law actions."  Id.

"Given that a state law claim requiring interpretation of the CBA is [a minor dispute that is] preempted, the key question becomes whether resolution of a dispute 'hinges upon' such interpretation."  Adames v. Executive Airlines, Inc., 258 F.3d 7, 11 (1st Cir. 2001) (quoting Flibotte v. Penn. Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997)).  Accordingly, "[i]f 'the asserted state-law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement,' federal law preempts the claim."  Id. (quoting Flibotte, 131 F.3d at 26)).  On the other hand, "a state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA[.]"  Hawaiian Airlines, 512 U.S. at 260, 114 S. Ct. at 2247.  Accordingly, where the resolution of a state law claim turns on purely factual questions that "do not 'requir[e] a court to interpret any term of a collective-bargaining agreement,'" that claim will not be preempted.  Id. at 261, 114 S. Ct. at 2248 (quoting Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 407, 108 S. Ct. 1877, 1882, 100 L. Ed. 2d 410 (1988)).  As the Supreme Court stated in Lingle,

> even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for ... pre-emption purposes.

486 U.S. at 409-410, 108 S.Ct. at 1883.[3]

There is no dispute that Mr. Carmack was subject to the CBA between Amtrak and the BLE.  (DF ¶ 16; Def.'s Ex. 11).  At issue, therefore, is whether his claims are independent of the CBA or are "'inextricably intertwined' with the meaning of terms in the CBA and are thus preempted by federal labor law."  Adames, 258 F.3d at 12 (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213, 105 S. Ct. 1904, 1912, 85 L. Ed. 2d 206 (1985)).  Each of Mr. Carmack's claims will be addressed separately.

## 2.    Count One: Defamation[4]

Mr. Carmack's defamation claim, which is alleged in Count One, is based on (1) the statements made by Mr. DeModena in his Workplace Violence Report; (2) statements by Mr. DeModena to Mr. DePhillips regarding the plaintiff's mental condition; (3) Dr. Pinsky's comments that the content of Mr. Carmack's writings "raised the index of suspicion of an underlying psychiatric disorder" and that Mr. Carmack "sign[ed] off as 'Lucifer;'" (4) Mr. O'Malley's statement in a letter to Mr. O'Bryan that Dr. Pinsky's decision to medically disqualify the plaintiff "is no different than an engineer being

---

[3]  Although Lingle addressed preemption under the Labor Management Relations Act, 29 U.S.C. §§ 141 et seq., see 486 U.S. at 407-11, 108 S. Ct. at 1882-84, the Supreme Court in Hawaiian Airlines adopted the standard articulated in Lingle to resolve claims of preemption under the RLA.  See Hawaiian Airlines, 512 U.S. at 263, 114 S. Ct. at 2249.

[4]  In Count One of his Complaint, Mr. Carmack asserts claims for "Slander, Libel and Defamation."  (Compl. (Docket No. 26) ¶¶ 84-128).  Because defamation includes libel and slander, this court has referred to this claim as one for defamation.  See LeBeau v. Town of Spencer, 167 F. Supp. 2d 449, 456 (D. Mass. 2001) ("Libel and slander are not, however, distinct from defamation.  Rather, they are two kinds of defamation.").

categorized as medically disqualified for failing to provide sufficient documentation to explain an existing medical condition;" (5) testimony by witnesses during the disciplinary hearing that Mr. Carmack refers to or imagines himself to be the devil; (6) statements made by Mr. DeModena allegedly characterizing Mr. Carmack's visit to South Station "as an attempt to break and enter into secured areas;" and (7) a statement by Amtrak employee Christa Cuppernull that Mr. Carmack "has been removed from service for reasons of insanity."  (Pl.'s Mem. (Docket No. 112) at 17-18 and exhibits cited).[5]  This court finds, for the reasons detailed below, that the claim is preempted by the RLA with respect to all the statements preceding Mr. Carmack's termination, i.e., those numbered 1-5, inclusive.  Nevertheless, this court also concludes that Amtrak is entitled to summary judgment on the defamation claim because the record supports the defendant's assertion that the remaining statements were privileged.

## Preemption of Defamation Claim

"[I]n order to determine whether a particular state-based cause of action is preempted . . . a court must analyze the specific elements of the state-based claim." Cullen v. E.H. Friedrich Co., Inc., 910 F. Supp. 815, 820 (D. Mass. 1995).  Under Massachusetts law, "[d]efamation is the intentional or reckless publication, without

---

[5]  Although Mr. Carmack indicates that these particular statements are only examples of the defamatory statements on which his claims are based, he has not described with specificity what if any additional statements allegedly defamed him.  Even assuming Mr. Carmack's defamation claim is broader than these particular statements, the analysis set forth below would be applicable.

privilege to do so, of a false statement of fact which causes damage to the plaintiff's reputation." LeBeau v. Town of Spencer, 167 F. Supp. 2d 449, 456 (D. Mass. 2001) (citing Corellas v. Viveiros, 410 Mass. 314, 319, 572 N.E.2d 7 (1991)). "The elements of a defamation claim include (1) a false and defamatory communication (2) of and concerning the plaintiff which is (3) published or shown to a third party." Cornwell v. Dairy Farmers of Am., Inc., 369 F. Supp. 2d 87, 110 (D. Mass. 2005) (quoting Dorn v. Astra USA, 975 F. Supp. 388, 396 (D. Mass. 1997)). "Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn or ridicule, or tend to impair his or her standing in the community." Id. (quoting Dorn, 975 F. Supp. at 396). However, statements that constitute "[m]ere expressions of opinion are protected by the *First Amendment* and are not actionable." Id. (emphasis in original). Moreover, "an employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of the employee to perform his or her job." Elicier v. Toys "R" Us, Inc., 130 F. Supp. 2d 307, 310 (D. Mass. 2001) (quotations and citations omitted).

Amtrak argues that the defamation claim is preempted by the RLA because all of the alleged defamatory statements were "directly related to matters associated with the termination of Plaintiff's employment." (Def.'s Mem. (Docket No. 100) at 10; see also Def.'s Reply Mem. (Docket No. 126) at 4-5). Thus, any judicial resolution of whether the statements were defamatory "must address the nature of the CBA in order to find

21

whether or not Plaintiff's employment was wrongfully terminated." (Def.'s Mem. at 10). This court agrees as to most, but not all, of the statements at issue.

Where claims for defamation have involved the circumstances surrounding an employee's discharge and the disciplinary or termination proceedings conducted pursuant to the terms of a CBA, courts have held that those claims are preempted.  See, e.g., Bagby v. Gen. Motors Corp., 976 F.2d 919, 921-22 (5th Cir. 1992) (defamation claim based on temporary suspension and removal from workplace that occurred in accordance with CBA required interpretation of the CBA); Willis v. Reynolds Metals Co., 840 F.2d 254, 254-55 (4th Cir. 1988) (plaintiff's claim against employer for slander preempted because it arose in connection with employer's right under CBA to conduct investigations into possible harassment and its associated right to confront suspected employee); Johnson v. Anheuser Busch, Inc., 876 F.2d 620, 624 (8th Cir. 1989) (libel claim based on accusations that served as the basis for plaintiff's discharge preempted where resolution of claim would require construction of CBA to determine whether plaintiff was wrongfully discharged); Cullen, 910 F. Supp. at 824 (defamation claims based on statements made in termination letters preempted where resolution of such claims would involve construction of the CBA to determine whether discharge was wrongful).  Therefore, the defamation claim is preempted to the extent that the alleged defamatory statements were made in connection with Amtrak's investigation pursuant to its workplace violence policy and by witnesses who testified during the disciplinary hearing, as such claims would involve the construction of the CBA to assess whether the discharge was wrongful.  These involve

22

the statements numbered 1-5 above, which all involve the events leading up to the decision to require the psychiatric examination, the events surrounding Mr. Carmack's refusal to take the exam and Amtrak's decision consequently to terminate his employment. In fact, these challenged statements and actions were considered or could have been considered by the hearing officer in determining whether Amtrak's charges against Mr. Carmack for gross insubordination were substantiated, and whether Amtrak had violated the CBA. (See Def.'s Ex. 45). Therefore, the claims of defamation based on these statements are preempted.

Mr. Carmack's claim for defamation based upon Ms. Cuppernull's statement that Mr. Carmack "has been removed from service for reasons of insanity," or upon Mr. DeModena's remarks allegedly mischaracterizing Mr. Carmack's August 2002 visit to South Station as an attempt to enter Amtrak's offices unlawfully, however, arose in a different context and are not preempted. The record shows that these statements occurred under circumstances that were unrelated to the disciplinary and termination proceedings against Mr. Carmack. (See Def.'s Ex. 65; Pl.'s Ex. 18 & 20). They were made after Mr. Carmack had been terminated from Amtrak, and Amtrak has not pointed to any provisions in the CBA as having relevance to these incidents. Thus, Mr. Carmack is not prevented, under the doctrine of preemption, from pursuing his claim to the extent that it is based on the statements numbered 6 and 7 above.

## Substantive Claim of Defamation

23

Even assuming that Mr. Carmack's defamation claims are not preempted, Amtrak nevertheless has demonstrated that it is entitled to summary judgment on Count One. Amtrak argues that the defamation claim must fail because, among other reasons, the alleged defamatory statements were not all attributable to the defendant, were not published to a third party, were true, or warrant protection pursuant to a conditional or absolute privilege.  (Def.'s Mem. at 12).  This court agrees.

"Massachusetts courts have recognized that a person may possess a conditional privilege to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest."  Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508, 512-13, 467 N.E.2d 126, 131 (1984).  They "also have recognized a qualified or conditional privilege 'where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it.'"  Foley v. Polaroid Corp., 400 Mass. 82, 95, 508 N.E.2d 72, 80 (1987) (quoting Sheehan v. Tobin, 326 Mass. 185, 190-91, 93 N.E.2d 524, 528 (1950)).  "Thus, the privilege applies to statements about an employee's job performance and conduct made to the employee's supervisor, department head or others who should be informed provided 'the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job.'"  Cornwell, 369 F. Supp. 2d at 111 (internal citation omitted).

The record demonstrates that the alleged defamatory statements that occurred prior to the initiation of disciplinary proceedings against Mr. Carmack were made by Amtrak

24

personnel acting pursuant to the company's workplace violence policy. In particular, the statements were made as a result of Mr. DeModena's concern about a potential threat and in furtherance of an effort to develop a response to the "Letters from Hell" and obtain an evaluation of Mr. Carmack's fitness to perform the duties of a locomotive engineer. Therefore, they concerned Mr. Carmack's conduct while on the job and were made in order to serve the company's legitimate business interests in ensuring the safety of its employees as well as Mr. Carmack's ability to operate commuter trains and otherwise perform his job safely. Accordingly, this court concludes that the statements contained in Mr. DeModena's Workplace Violence Report, as well as all of the statements made in the course of communications by and between TART members, health services employees, management personnel, and Mr. Carmack's union representative regarding Mr. Carmack's writings, mental condition and medical disqualification, are protected by the conditional privilege and cannot support a claim of defamation.

The undisputed evidence also shows that statements by Mr. DeModena allegedly characterizing Mr. Carmack's visit to South Station as an attempt to break and enter into secured areas were contained in communications in which Mr. DeModena expressed concern regarding Mr. Carmack's intentions and requested assistance in preventing the plaintiff from accessing the offices of Amtrak management and their staff. (See Pl.'s Ex. 18-20). Thus, the record demonstrates that the statements were made in order to pursue a legitimate business interest in ensuring safety in the workplace in light of what Mr.

DeModena perceived as a potential threat from a former employee. Consequently, those statements are entitled to the conditional privilege as well.

Similarly, this court finds that the conditional privilege extends to the statement by Amtrak employee Christa Cuppernell that Mr. Carmack "has been removed from service for reasons of insanity." (Pl.'s Mem. at 17 (listing allegedly defamatory statements); Def.'s Ex. 65). The record demonstrates that the statement was made in an internal e-mail in which Ms. Cuppernell was seeking information about dates for which she believed Mr. Carmack had been paid, but for which he was seeking payment. The statement was made in passing and it was intended to convey Mr. Carmack's employment status. (See Def.'s Ex. 65). Because the statement was made as part of Ms. Cuppernull's attempt to carry out her job responsibilities, this court finds that it was reasonably related to a legitimate business interest in handling the plaintiff's claims, and cannot support Mr. Carmack's defamation claim.

## Loss of the Conditional Privilege

Mr. Carmack asserts that even if a conditional privilege applies to the challenged statements, any such privilege was forfeited by the defendant's knowledge that the statements were untrue and by their reckless publication of the statements. (Pl.'s Mem. at 19-24). "The conditional privilege is lost if the defendant (1) knew the information was false, (2) had no reason to believe it to be true, or (3) recklessly published the information unnecessarily, unreasonably, or excessively. The burden is on the employee, [Carmack], to prove that the privilege has been abused." Cornwell, 369 F. Supp. 2d at 111-12

(internal quotations and citation omitted).  In the instant case, Mr. Carmack has not

presented sufficient evidence to overcome the privilege.

Despite Mr. Carmack's assertions that Mr. DeModena and Mr. O'Malley knew or

should have known that statements they made regarding the plaintiff's mental condition

were false, there is no evidence showing that these individuals or any other Amtrak

personnel "intentionally made up the allegations or did not actually believe what [they]

saw or heard, or what [they were] told."  Id. at 112.  In particular, there is no evidence

that Mr. DeModena did not reasonably perceive the "Letters from Hell" as a threat or that

any of the challenged statements were, as the plaintiff suggests, made as part of a

coordinated effort to terminate his employment rather than an effort to evaluate Mr.

Carmack's ability to perform his job and to ensure the safety of Amtrak employees and

the commuting public.  Moreover, although Mr. Carmack claims that Mr. DeModena's

statements regarding the plaintiff's visit to South Station were dishonest and maliciously

made, there is no evidence that Mr. DeModena did not perceive Mr. Carmack's visit to

South Station and his inquiries regarding the location of offices and access to keys as a

possible effort by a disgruntled former employee to obtain unauthorized access to private

office areas.  See Foley, 400 Mass. at 95 (no evidence that statements "were made with

reckless disregard for their truth or falsity" where there was no evidence that speaker's

"belief was not reasonably grounded").

Nor is there any evidence that any of the challenged statements were published

"unnecessarily, unreasonably or excessively."  The record illustrates that Mr. DeModena,

consistent with Amtrak's workplace violence policy, notified the appropriate individuals about a perceived threat. It also shows that Mr. DePhillips acted in accordance with Amtrak's workplace violence policy when he requested input from Amtrak's medical staff. Moreover, "there is no evidence that any [Amtrak] personnel acted for any reason other than [Amtrak's] legitimate business interest." Cornwell, 369 F. Supp. 2d at 112. The plaintiff has not met his burden of establishing facts by which a jury could find that Amtrak abused its conditional privilege. Consequently, this court recommends that summary judgment enter for the defendant on Count One of the Complaint.

### 3.    Count Two: Invasion of Privacy

In Count Two of his Complaint, Mr. Carmack alleges that Amtrak violated his right to privacy under Mass. Gen. Laws ch. 214, § 1B. The statute provides, in relevant part, that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." Mass. Gen. Laws ch. 214, § 1B. "In order for a plaintiff to succeed on an invasion of privacy claim, he must prove not only that the defendant unreasonably, substantially and seriously interfered with his privacy by disclosing facts of highly personal or intimate nature, but also that it had no legitimate reason for doing so." Martinez v. N.E. Med. Ctr. Hosps., Inc., 307 F. Supp. 2d 257, 267 (D. Mass. 2004). Therefore, "[i]n determining whether there is a violation of § 1B [in the employment context], it is necessary to balance the employer's legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure." Bratt, 392 Mass. at 521, 467 N.E.2d

28

at 135-36.  For substantially the same reasons as detailed above, this court concludes that

Mr. Carmack's privacy claim is preempted by the RLA.  In addition, this court finds that

Amtrak is entitled to summary judgment on the merits of the invasion of privacy claim.

## **Preemption of the Privacy Claim**

Mr. Carmack claims that his privacy was invaded by Amtrak's effort to obtain "an

entire psychiatric evaluation and psychological testing with a complete medical and

personal history . . . ."  (Pl.'s Mem. at 43).[6]  Amtrak argues that this claim is preempted

by the RLA because "[a]ll of the activities which allegedly violated Plaintiff's privacy

rights are directly related to matters associated with the termination of Plaintiff's

employment."  (Def.'s Mem. at 19).  For the reasons detailed above, whether or not

Amtrak had the right to demand the psychiatric evaluation and psychological testing

"hinges upon" an interpretation of the CBA, and is, in fact, the analysis undertaken by the

hearing officer.  Thus, the claim of invasion of privacy is preempted by the RLA.  See,

e.g., Jackson v. Liquid Carbonic Corp., 863 F.2d 111, 112-20 (1st Cir. 1988) (invasion of

privacy claims preempted where claims challenged drug testing policy that was

implemented pursuant to a broad management rights clause in CBA); Gore v. Trans

World Airlines, 210 F.3d 944, 951 (8th Cir. 2000) (where employee was wrongfully

suspended based on co-worker's complaint that he posed a security risk, invasion of

---

[6]  To the extent Mr. Carmack has alleged an invasion of privacy based on circumstances
other than the defendant's attempt to have the plaintiff undergo a psychiatric fitness for duty
examination, he has waived any such claims by failing to address them in his brief.  See Kelley v.
LaForce, 288 F.3d 1, 9 (1st Cir. 2002) (arguments not briefed are waived).

privacy claim preempted by RLA since whether employer acted properly requires an interpretation of its duties under the CBA).

## Substantive Claim of Invasion of Privacy

Even if Mr. Carmack's privacy claim is not preempted by federal law, the plaintiff has failed to present sufficient evidence to warrant a jury trial on the merits of his claim. As an initial matter, Mr. Carmack has failed to show that any interference with his privacy occurred because no psychiatric examination ever took place and no results were ever disclosed.  See Jackson, 863 F.2d at 116 (interference with privacy under Massachusetts law involves both "obtaining information and disclosing it"); French v. United Parcel Serv., Inc., 2 F. Supp. 2d 128, 132 (D. Mass. 1998) (attempted invasion of privacy not actionable under Mass. Gen. Laws ch. 214, § 1B).  Furthermore, even if Amtrak had successfully completed the examination, it would have been reasonable under the circumstances presented by the undisputed facts in the record.  See Jackson, 863 F.2d at 116 (privacy statute "proscribes only unreasonable interferences with a person's privacy [and] legitimate countervailing business interests in certain situations may render the disclosure of personal information reasonable and not actionable under the statute") (quoting Bratt, 392 Mass. at 520, 467 N.E.2d at 135).

"In determining whether an employee's privacy right under § 1B is violated by [the] disclosure of personal medical data to his employer, [the court must] consider the degree of intrusion on privacy and the public interest in preserving the confidentiality of a physician-patient relationship balanced against the employer's need for the medical

30

information." Bratt, 392 Mass. at 523, 467 N.E.2d at 137. As the courts in Massachusetts have recognized, "an employer may have a substantial and valid interest in aspects of an employee's health that could affect the employee's ability effectively to perform job duties." Id. at 524, 467 N.E.2d at 137. Accordingly, "when medical information is necessary reasonably to serve such a substantial and valid interest of the employer, it is not an invasion of privacy, under § 1B, for a physician to disclose such information to the employer." Id. That is the situation here.

The evidence demonstrates that Amtrak ordered Mr. Carmack to undergo a psychiatric examination as a result of a perceived threat by Mr. Carmack, and that it did so in order to determine whether he was fit to safely perform his job responsibilities, which involved the provision of passenger rail services to the public. In particular, the evidence shows that Dr. Vasile was asked by Amtrak's health services personnel to determine any reasons why Mr. Carmack could not perform the duties of a passenger engineer and whether Mr. Carmack presented a danger to himself or others. (DF ¶ 84; Def.'s Ex. 29). Therefore, the record indicates that the primary purpose of the examina- tion was to assess a potential threat to safety. Moreover, although the results of any examination were to be shared with Amtrak's health services department, under company policy, any medical records provided to the health department were to be considered private and confidential and were not to be disclosed to the employee's department or supervisors without express authorization from the employee. (DF ¶¶ 27, 28; PF ¶ 77). Thus, while "information concerning an employee's medical conditions is . . . within the

31

realm of one's privacy interest," Amtrak had policies in place to limit the dissemination

of that information.  Webster v. Motorola, Inc., 418 Mass. 425, 431, 637 N.E.2d 203, 207

(1994).  Under the circumstances presented by the record in this case, this court finds that

Amtrak's proposed examination was reasonable and did not threaten to infringe upon Mr.

Carmack's privacy rights under Massachusetts law.  See id. at 432-33, 637 N.E.2d at 207-

08 (defendant's legitimate business interest in ensuring plaintiff's safe operation of

company motor vehicle outweighed plaintiff's privacy interest and justified random

urinalysis testing for drugs); O'Connor v. Police Comm'r of Boston, 408 Mass. 324, 328-

30, 557 N.E.2d 1146, 1149-50 (1990) (no invasion of privacy caused by warrantless,

suspicionless drug testing of police cadets where police department's compelling interest

in ensuring safety, maintaining integrity and promoting confidence in law enforcement

personnel outweighed plaintiff's interest in avoiding intrusive urinalysis procedures).

Consequently, this court recommends that Amtrak's motion for summary judgment be

allowed with respect to Count Two of the Complaint.[7]

---

[7]  Amtrak also argues that it is entitled to summary judgment on Count Two because
Massachusetts does not recognize a cause of action for false light invasion of privacy.  Mr.
Carmack does not argue that Amtrak violated his privacy rights by casting him in a false light.  To
the extent he has attempted to allege such a claim in his Complaint, Amtrak is correct that it is not
cognizable under Massachusetts law.  See Dasey v. Anderson, 304 F.3d 148, 154 (1st Cir. 2002)
("Massachusetts does not recognize a cause of action for false light invasion of privacy").

### 4.    Count Seven: Claim of Personal Injury Under FELA and Intentional Infliction of Emotional Distress

In Count Seven, Mr. Carmack asserts a claim for personal injury under FELA and an alternative common law claim for intentional infliction of emotional distress.  (See Compl. ¶¶ 382-97; Pl.'s Mem. at 51-52).  In support of these claims, Mr. Carmack alleges, inter alia, that "[o]n or about April 11, 2001 DeModena and DePhillips maliciously and intentionally filed a false workplace violence complaint in order to coerce Plaintiff to undergo a non-confidential psychiatric exam and psychological testing."  (Compl. ¶ 386).  He also alleges that Amtrak,

> through it agents Pinsky, Vasile and others, has falsely and publicly labeled, stigmatized and otherwise assessed the Plaintiff as a mentally ill person in order to use its administrative control over Plaintiff to induce Plaintiff to forgo fundamental rights and privileges including rights of privacy and confidentiality and thereby to wantonly and maliciously injure Plaintiff and undermine Plaintiff's health, safety and medical treatment.

(Id. ¶ 393).  Mr. Carmack claims to have suffered "severe emotional distress with physical repercussions" as a result of the willful conduct of the defendant's agents.  (Id. ¶ 397).  Amtrak is seeking summary judgment with respect to the FELA claim on the grounds that Mr. Carmack sustained no physical injury and was not within the zone of danger of sustaining a physical injury.  It also seeks summary judgment with respect to the common law claim for intentional infliction of emotional distress on the grounds that (1) the claim is preempted by the RLA; (2) the claim must be brought under FELA, but is not compensable under FELA; and (3) the record does not support such a claim.  For the

reasons articulated below, this court finds that Mr. Carmack has not shown that he

sustained the type of harm for which recovery is available under FELA.  This court

further finds that to the extent Mr. Carmack has asserted a viable common law claim, it is

preempted by the RLA.  Moreover, the claim cannot survive summary judgment because

Mr. Carmack has not presented evidence that the defendant engaged in the type of

extreme and outrageous behavior that is necessary to support such a claim.

## Claims for Emotional Distress Under FELA

"Section I of the FELA renders common carrier railroads 'liable in damages to any

person suffering injury while . . . employed by [the] carrier' if the 'injury or death

result[ed] in whole or in part from the [carrier's] negligence.'" Norfolk & W. Ry. Co. v.

Ayers, 538 U.S. 135, 144, 123 S. Ct. 1210, 1216-17, 155 L. Ed. 2d 261 (2003) (quoting

45 U.S.C. § 51) (alterations in original).[8]  The question presented with respect to the

plaintiff's FELA claim in the instant action is whether any emotional distress Mr.

Carmack claims to have suffered as a result of Amtrak's conduct may constitute "injury"

under the statute.  (See Def.'s Mem. at 24-25; Pl.'s Mem. at 51-52).  This court finds that

Mr. Carmack has failed to show that any emotional harm that he may have suffered

constitutes a compensable "injury"  under FELA.

---

[8]  While "[t]he FELA statute on its face appears to reach negligent, but not intentional,
acts[,] ... it is now clear beyond peradventure that the FELA covers at least some intentional
torts."  Teague v. Nat'l R.R. Passenger Corp., 708 F. Supp. 1344, 1350 (D. Mass. 1989).

In Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 114 S. Ct. 2396, 129 L. Ed. 2d 427 (1994), the Supreme Court considered "the proper standard for evaluating claims for negligent infliction of emotional distress that are brought under the [FELA]." 512 U.S. at 535, 114 S. Ct. at 2400.[9] In doing so, the Court addressed the types of emotional injuries that may be compensated under FELA. See id. at 555-56, 114 S. Ct. at 2410-11. Significantly, the Court determined that "an emotional injury constitutes 'injury' resulting from the employer's 'negligence' for purposes of FELA only if it would be compensable under the terms of the zone of danger test." Id. at 555, 114 S. Ct. at 2410.

> That test confines recovery for stand-alone emotional distress claims to plaintiffs who: (1) "sustain a physical impact as a result of a defendant's negligent conduct"; or (2) "are placed in immediate risk of physical harm by that conduct" – that is, those who escaped instant physical harm, but were "within the zone of danger of physical impact."

Ayers, 538 U.S. at 146, 123 S. Ct. at 1217 (quoting Gottshall, 512 U.S. at 547-48, 114 S. Ct. at 2406). Thus, railroad employees seeking compensation under FELA are only able

---

[9] The Supreme Court's decision in Gottshall involved a claim for negligent infliction of emotional distress under FELA and did not concern "the separate tort of intentional infliction of emotional distress." Gottshall, 512 U.S. at 541 n. 2, 114 S. Ct. at 2403 n.2. Nevertheless, the Court's ruling in that case focused on the types of injuries that FELA was designed address. See id. at 542, 114 S. Ct. at 2403 ("Our task today is determining under what circumstances emotional distress may constitute 'injury' resulting from 'negligence' for purposes of the statute."). Thus, while Mr. Carmack's FELA claim is based on the defendant's alleged intentional acts rather than on a negligence theory, the parties agree that the Court's ruling in Gottshall is applicable to Mr. Carmack's claim in that it defines that type of emotional injury for which Mr. Carmack may seek compensation. (See Def.'s Mem. at 24-25 (arguing that under Gottshall, "[c]laims of emotional distress are only cognizable under [FELA] for those railroad employees who suffer emotional distress as a result of a physical impact or are a direct result of being in the zone of danger of a physical impact on the job"); Pl.'s Mem. at 51-52 (arguing that emotional distress claim falls within scope of Gottshall because plaintiff was in the zone of danger)).

35

to recover for emotional injuries "caused by the negligent conduct of their employers that threatens them imminently with physical impact."  <u>Gottshall</u>, 512 U.S. at 556, 114 S. Ct. at 2411.

The plaintiff does not argue, and the record provides no evidence, that Mr. Carmack sustained any type of physical injury or impact as a result of Amtrak's conduct. Moreover, nothing in the record suggests that any of the defendant's actions placed Mr. Carmack in imminent danger of sustaining physical harm.  Mr. Carmack argues that because he "was considered to be under the Defendant's administrative control, and subject to an order to comply [with] a requirement for a medical intervention, that medical intervention would have [had] physical consequences and the zone of danger is the office wherein the examination would be performed."  (Pl.'s Mem. at 52).  However, Mr. Carmack's assertion is not supported by any facts showing that the examination would have caused him to sustain physical harm.  The only evidence regarding the potential for harm from an examination is the opinion of the plaintiff's physician that "a forced, non-confidential psychiatric consultation, because of its coercive and intrusive nature, would be medically harmful to him . . . ."  (Def.'s Ex. 56, Letter dated 4/4/02). Not only is there no evidence of the nature of any potential medical harm and whether or not it may have included physical harm, but there also is no evidence that Amtrak was proposing a non-confidential examination.  Under Amtrak's policies, any employee medical records provided to Amtrak's health services department were deemed private and confidential, and were not to be disclosed to the employee's department or

36

supervisors without the employee's authorization.  (DF ¶¶ 27-28; PF ¶ 77).  Accordingly,

the record does not support Mr. Carmack's claim under FELA.

### Preemption of Common Law Claim of Emotional Distress

Alternatively, Mr. Carmack is seeking recovery under state law for the intentional

infliction of emotional distress.  Amtrak argues that any such claim is preempted by the

RLA because Amtrak's conduct is "directly related to matters associated with the

termination of Plaintiff's employment."  (Def.'s Mem. at 25).  As described above,

Amtrak's reaction to the "Letters from Hell" and its effort to evaluate Mr. Carmack are

part and parcel of its decision to demand a psychiatric evaluation which, in turn, led to

the initiation of disciplinary and termination proceedings against the plaintiff.  Thus, the

complained of conduct must be evaluated in light of Amtrak's duties and responsibilities

under the CBA, and Mr. Carmack's claim is therefore preempted.  See Flibotte, 131 F.3d

at 27 (intentional infliction of emotional distress claim preempted where defendant's

rights and obligations under CBA were central to inquiry into its intentions and whether

its conduct was sufficiently outrageous to give rise to liability under state tort law).

Accordingly, Amtrak is entitled to summary judgment on Count Seven on the basis of

RLA preemption.[10]

───────────────────

[10]  In light of this conclusion, this court does not need to reach Amtrak's alternative
argument that "all state claims of negligent and intentional infliction of emotional distress are
preempted by FELA."  (Def.'s Mem. at 27).  This court notes, however, that it is an open
question under Teague v. Nat'l R.R. Passenger Corp., 708 F. Supp. 1344 (D. Mass. 1989), on
which Amtrak relies, "whether the infliction of purely emotional injury is cognizable under the
FELA."  Id. at 1354.  Moreover, neither the Supreme Court nor the First Circuit has decided the

## **State Claim of Intentional Infliction of Emotional Distress**

Even if Mr. Carmack's claim is not preempted by the RLA, Amtrak is still entitled to summary judgment since the evidentiary record does not support an inference that Amtrak engaged in the type of behavior necessary to support the claim. In order to prevail on a claim for intentional infliction of emotional distress under Massachusetts law, the plaintiff must establish:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community, (3) that the actions of the defendant were the cause of the plaintiff's distress, and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

Agis v. Howard Johnson Co., 371 Mass. 140, 145, 355 N.E.2d 315, 318-19 (1976) (quotations and citations omitted). The record here does not support a claim that the defendant's actions were "extreme and outrageous" or "utterly intolerable in a civilized community." The undisputed facts show that Mr. DeModena was acting pursuant to Amtrak's workplace violence policy when he reported what he perceived as a threat from the "Letters from Hell." There is no evidence that Mr. DeModena did not actually feel threatened or that his report was part of a plot to force Mr. Carmack to undergo a mental health analysis. Furthermore, the record shows that Amtrak's actions in response to

---

issue, and "[a]t least one circuit has declined to recognize the tort of intentional infliction of emotional distress under the FELA where no physical injury was alleged." Id. (citing Sixth Circuit cases).

Mr. DeModena's complaint, including its effort to have Mr. Carmack evaluated, were

consistent with the company's workplace violence policy and were directed at ensuring

that the plaintiff remained capable of performing his job in a safe manner.  There are no

facts indicating that any of the Amtrak personnel involved in the matter were seeking to

harm Mr. Carmack or were otherwise engaged in the type of behavior that exceeded the

bounds of decency.  Because the record supports neither Mr. Carmack's FELA claim nor

his alternative emotional distress claim, this court recommends that summary judgment be

granted to Amtrak with respect to Count Seven of the Complaint.

### 5. Count Eight: Wrongful Discharge in Violation of Public Policy

In Count Eight, Mr. Carmack claims that he was wrongfully discharged in

violation of public policy.  Specifically, the plaintiff alleges that Amtrak discharged him

"under a pretext of workplace violence" in order "to quell Plaintiff's writings and union

activities because Plaintiff's writings and activities expose Defendant's non-compliance

with federal regulations."  (Compl. ¶¶ 401-402).  The defendant has moved for summary

judgment on the grounds that Mr. Carmack cannot maintain a cause of action for

wrongful discharge because he was not an at-will employee, the claim is preempted by

the RLA, and the evidence cannot satisfy the elements of such a claim.  (Def.'s Mem. at

29).  This court agrees that because Mr. Carmack was not an at-will employee, he has

failed to state a claim for  wrongful discharge in violation of public policy under

Massachusetts law.  This court further agrees that his claim is preempted by federal law.

## **Availability of Claim for Wrongful Discharge**

"In Massachusetts, the 'cause of action for wrongful discharge in violation of public policy is a judicially created exception to the 'employment at will' doctrine.'" Acciavatti v. Prof'l Servs. Group, Inc., 982 F. Supp. 69, 74 (D. Mass. 1997) (quoting Cullen, 910 F. Supp. at 821). Consequently, "only at will employees may effectively avail themselves of this cause of action." Id. Moreover, "[a]llowing employees governed by a CBA to assert an independent, common law claim for wrongful discharge would not be 'a commendable practice. It would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances.'" Cullen, 910 F. Supp. at 821 (quoting Azzi v. Western Elec. Co., 19 Mass. App. Ct. 406, 410, 474 N.E.2d 1166, 1169 (1985)) (additional quotations and citation omitted).

Mr. Carmack was not an at-will employee. Rather, his employment with Amtrak was governed by the contractual provisions of the CBA, which provided that with certain exceptions, "no Passenger Engineer will be disciplined, suspended or dismissed from the service until a fair and impartial formal investigation has been conducted by an authorized Corporation officer." (Def.'s Ex. 11 at 30 ¶ a). It also provided for an appeals process, including expedited procedures for dismissal cases. (Id. at 35-39). "The public policy exception to the employment at will doctrine simply does not apply to him. Accordingly, [Mr. Carmack] – who does not contest that he is not an at-will employee – is unable to assert a viable common law cause of action of wrongful discharge in

40

violation of public policy." <u>Cullen</u>, 910 F. Supp. at 821. <u>See</u> <u>also</u> <u>Acciavatti</u>, 982 F.

Supp. at 74-75 (plaintiff could not present a viable claim for wrongful discharge in

violation of public policy where he was governed by a CBA containing a discharge

provision and a grievance and arbitration procedure by which he could object to the

employer's actions).

**Preemption of Wrongful Discharge Claim**

Even if Mr. Carmack had a viable cause of action, his claim would be preempted

by the RLA.  As discussed above, the CBA between the BLE and Amtrak set forth

procedures for the discipline and dismissal of locomotive engineers, and provided an

appeals process by which a dismissed employee could challenge his termination.

Therefore, a determination as to whether Mr. Carmack was wrongfully terminated would

require this court "to immerse itself in the CBA's terms." <u>Quesnel v. Prudential Ins.</u>, 66

F.3d 8, 11 (1st Cir. 1995) (wrongful termination claim preempted by LMRA where

employee covered by CBA).  Because the claim is "'inextricably intertwined' with the

meaning of terms in the CBA," it is preempted.  <u>Adames</u>, 258 F.3d at 12 (quoting <u>Allis-</u>

<u>Chalmers Corp.</u>, 471 U.S. at 213, 105 S. Ct. at 1912).[11]  Amtrak is entitled to  summary

judgment with respect to Count Eight.

### C.    Count Three: Disability Discrimination

---

[11]  Because this court has determined that Mr. Carmack cannot maintain his claim for
wrongful discharge in violation of public policy, it is unnecessary at this time to evaluate whether
there is enough evidence in the record to satisfy the elements of the claim.

Mr. Carmack alleges, in Count Three, that Amtrak violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., and Mass. Gen. Laws ch. 151B ("Chapter 151B") by discriminating against him on the basis of a real or perceived disability, by denying his request for a reasonable accommodation and by retaliating against him. (Compl. ¶¶ 244-339).[12] Additionally, Mr. Carmack alleges that the defendants deprived him of certain rights afforded to individuals with mental illness in violation of 42 U.S.C. § 10841. (See id. ¶¶ 285-305). Mr. Carmack's claim under 42 U.S.C. § 10841 must fail because the statute creates no enforceable federal rights. Additionally, this court finds that Mr. Carmack has failed to present sufficient evidence to support a prima facie case of disability discrimina-

---

[12] Amtrak argues that the Complaint does not adequately allege claims under the Rehabilitation Act or Chapter 151B because those statutes, although cited in the initial heading set forth in Count Three, "are not addressed in any of the text in this Count or in any of the headings or text within the seven sub-counts." (Def.'s Mem. at 34). However, under the liberal notice pleading standard of Fed. R. Civ. P. 8(a), "[p]laintiffs are only obligated to set forth in their complaint 'factual allegations either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory.'" Raytheon Co. v. Continental Cas. Co., 123 F. Supp. 2d 22, 27 (D. Mass. 2000) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)). Amtrak has neither argued nor attempted to show that Mr. Carmack's factual allegations are insufficient to state claims under the Rehabilitation Act or Chapter 151B. Therefore, Amtrak has not shown that it is entitled to summary judgment on these claims on the grounds that they were inadequately pleaded.

tion or retaliation under the ADA.[13]  Therefore, this court recommends that Amtrak's

motion for summary judgment be allowed with respect to Count Three.

## 1.    42 U.S.C. § 10841

42 U.S.C. § 10841, entitled "Restatement of Bill of Rights for Mental Health

Patients," restates the provisions of Title V of the Mental Health Systems Act, 42 U.S.C.

§ 9501 et seq.  See 42 U.S.C. § 10841; Monahan v. Dorchester Counseling Ctr., Inc., 961

F.2d 987, 994 (1st Cir. 1992).  It provides, in relevant part, that

> [i]t is the sense of the Congress that, as previously stated in title V of
> the Mental Health Systems Act [42 U.S.C.A. § 9501 et seq.], each
> State should review and revise, if necessary, its laws to ensure that
> mental health patients receive the protection and services they
> require, and that in making such review and revision, States should
> take into account the recommendations of the President's
> Commission on Mental Health and the following ....

42 U.S.C. § 10841.  "The statute goes on to list the specific kind of treatment which

mental patients 'should' receive."  Monahan, 961 F.2d at 994.

The statute's "use of the terms 'should' and 'the sense of Congress' indicate[s]

that the statute is merely precatory."  Id. at 994-95 (quoting 42 U.S.C. § 10841).  It

---

[13]  Both of the parties contend that the legal standards for evaluating Mr. Carmack's
claims under the Rehabilitation Act and Chapter 151B are essentially the same as the standards for
evaluating his ADA claims.  (Def.'s Mem. at 34-35; Pl.'s Mem. at 24).  Case law generally
supports the parties' position.  See Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 33
n.2 & n.5 (noting that "[t]he Supreme Judicial Court of Massachusetts has indicated that federal
case law construing the ADA should be followed in interpreting the Massachusetts disability law"
and that for purposes of the case at issue, "the standards applied in the Rehabilitation Act of 1973
are identical to those of the ADA.").  Because the parties agree that the Rehabilitation Act and
Chapter 151B claims in this case should rise or fall in accordance with the plaintiff's ADA claims,
and because neither party has addressed the substance of those claims apart from the ADA, this
court will focus its analysis exclusively on the ADA.

"neither requires nor prohibits any action on the part of the states or any other party." <u>Id.</u> at 995 (quoting <u>Brooks v. Johnson & Johnson, Inc.</u>, 685 F. Supp. 107, 108 (E.D. Pa. 1988). Consequently, "§ 10841 creates no enforceable federal rights." <u>Id.</u>  Therefore, Amtrak is entitled to summary judgment on Count Three to the extent that it states a claim for violations of 42 U.S.C. § 10841.[14]

2.    <u>Disability Discrimination and Failure to Accommodate</u>

Amtrak also is entitled to judgment in its favor on Mr. Carmack's claims of disability discrimination.  In order to establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove by a preponderance of the evidence that: (1) he was disabled within the meaning of the ADA; (2) he was able to perform the essential functions of his job, either with or without reasonable accommodation; and (3) the defendant took an adverse employment action against him because of his disability.  <u>See Carroll v. Xerox Corp.</u>, 294 F.3d 231, 237 (1st Cir. 2002); <u>Ward v. Mass. Health Research Inst., Inc.</u>, 209 F.3d 29, 32-33 (1st Cir. 2000).  "As to his reasonable accommodation claim, [Mr. Carmack] needs to show, in addition to the first two prongs set forth above, that [Amtrak], despite knowing of his alleged disability, did not reasonably accommodate it."  <u>Carroll</u>, 294 F.3d at 237.  This court finds that there is no evidence in the record from which a reasonable jury could conclude that Mr. Carmack was disabled within the

---

[14]  In light of this clear holding, this court does not need to address Amtrak's additional argument that even if Mr. Carmack may pursue a claim against Amtrak under 42 U.S.C. 10841, it still would be entitled to summary judgment because the plaintiff does not qualify as an "individual with mental illness" under the statute.

44

meaning of the ADA. Therefore, the plaintiff cannot establish a prima facie case of discrimination or failure to accommodate.

"The ADA defines 'disability' with respect to an individual as '(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" Cornwell, 369 F. Supp. 2d at 101(quoting 42 U.S.C. § 12102(2)). "Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195, 122 S. Ct. 681, 690, 151 L. Ed. 2d 615 (2002). Additionally, "[t]o qualify as disabled, a claimant must further show that the limitation on the major life activity is 'substantial.'" Id. (quoting 42 U.S.C. § 12102(2)(A)). This requires evidence that the impact of the impairment is "permanent or long-term." Id. at 198, 122 S. Ct. at 691.

Mr. Carmack contends that he became impaired on June 8, 2001, the date when Mr. O'Malley wrote to Mr. Carmack to inform him that his status was being changed to medically disqualified without pay, and that if he failed to submit to a fitness for duty examination, he would be subject to charges of insubordination. (Pl.'s Mem. at 27; Def.'s Ex. 34). However, the defendant's decision to medically disqualify Mr. Carmack does not establish that the plaintiff suffered a long-term or permanent impairment that limited a major life activity. The record demonstrates that Amtrak never had an opportunity to examine Mr. Carmack to determine whether or not he was impaired and

45

the extent of any such impairment, and whether or not he had the ability to perform his job.  Moreover, to the extent Amtrak's decision to medically disqualify the plaintiff suggests that he was incapable of working as a locomotive engineer, that is not enough to establish a disability.  "[T]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Carroll, 294 F.3d at 240 (quoting Lebron-Torres v. Whitehall Labs., 251 F.3d 236, 240 (1ˢᵗ Cir. 2001)) (additional quotations and citations omitted).  Instead, the plaintiff must present evidence "that he was precluded by his [claimed] impairment from a substantial class of jobs or a broad range of jobs." Id. (alteration in original; internal quotations omitted).  Mr. Carmack has not done that.  To the contrary, Mr. Carmack has consistently maintained that he was capable of performing his job with Amtrak.  (See PF ¶ 103 (claiming that "Plaintiff showed no lack of ability to perform his job safely"); PF ¶¶ 88-90 (suggesting that Amtrak concocted a scheme to have him wrongfully terminated)).  In fact, on May 30, 2001, July 30, 2001 and April 4, 2002, his physician, Dr. Anne Gurian, issued written letters in which she stated that Mr. Carmack was able to work.  (Def.'s Ex. 56).

Mr. Carmack argues that his disability was mitigated by his use of therapy, but that Amtrak's demand that he submit to a psychological examination effectively rendered him disabled.  (Pl.'s Mem. at 30-32).  "[T]o withstand summary judgment [Mr. Carmack] must produce sufficient evidence that his impairment was 'profound enough and of sufficient duration, given the nature of [his] impairment,' to significantly restrict him in working." Carroll, 294 F.3d at 240 (internal citations omitted).  The plaintiff has not

attempted to make this showing. Even if the factual record supported his assertion that Amtrak's actions caused him to become impaired, at best the record would show only that he was unable to perform his particular job at a particular period of time. He simply has produced no evidence of any medical condition that restricted significantly his ability to work or to perform any other activities that were centrally important to his daily life. See Toyota Motor Mfg., Kentucky, Inc., 534 U.S. at 197, 122 S. Ct. at 691 (describing "major life activities" as "those activities that are of central importance to daily life").

Similarly, the plaintiff has failed to present evidence to show that he had a record of an impairment that substantially limited his ability to work or to perform other major life activities. Mr. Carmack argues that in 1985, he took an extended leave of absence, and that the defendant was aware of the nature of his impairment. (Pl.'s Mem. at 26-27). It is undisputed, however, that the plaintiff returned to work and that from 1998 until his termination in May 2002, he worked for Amtrak as a locomotive engineer. (See DF ¶¶ 2, 31; PF ¶¶ 14, 16, 111). Therefore, Mr. Carmack has not shown that his impairment was permanent or long-term, or that it precluded him from performing a broad range of jobs or engaging in other major life activities.[15]

Finally, Mr. Carmack claims that Amtrak "regarded" him as disabled and points to evidence of Amtrak's decision to medically disqualify him and to require a psychiatric

---

[15] Even if the plaintiff could establish a record of a disability based on the circumstances surrounding his leave of absence in 1985, there is no evidence linking those events to the defendant's actions in 2001 and 2002, and Mr. Carmack has not shown that any of Amtrak's alleged adverse actions against him occurred because of his 1985 record of disability.

examination, as well as evidence of Dr. Pinsky's comments suggesting that the plaintiff

was suffering from a psychiatric disorder. (Pl.'s Mem. at 28-29). "However, '[a] plaintiff

claiming that he is disabled cannot merely show that his employer perceived him as

*somehow* disabled; rather he must prove that the employer regarded him as disabled

*within the meaning of the ADA*.'" Cornwell, 369 F. Supp. 2d at 103 (quoting Benoit v.

Technical Mfg. Corp., 331 F.3d 166, 176 (1st Cir 2003)) (internal quotations and citation

omitted). In the instant case, there is no evidence to support the conclusion that Amtrak

perceived the plaintiff as permanently impaired or as incapable of performing a broad

range of jobs.

   The fact that Amtrak medically disqualified Mr. Carmack pending the outcome of

an examination does not give rise to an inference that the company regarded him as

disabled. See, e.g., Eustace v. S. Buffalo Mercy Hosp., 36 Fed. Appx. 673, 674-75, 2002

WL 1275475, at *2 (2d Cir. June 10, 2002) (unpub. op.) (evidence that employer required

plaintiff to submit to a non-confidential counseling session in order to assess plaintiff's

health and fitness does not, without more, establish that employer perceived her as

substantially impaired in one or more major life activities); Sullivan v. River Valley Sch.

Dist., 197 F.3d 804, 808 (6th Cir. 1999) (ordering employee to submit to mental and

physical fitness for duty examinations and suspending him for refusing to do so does not

establish that employer regarded employee as disabled), cert. denied, 530 U.S. 1262, 120

S. Ct. 2718, 147 L. Ed. 2d 983 (2000); Cody v. CIGNA Healthcare of St. Louis, Inc., 139

F.3d 595, 599 (8th Cir. 1998) (employer's offer of paid medical leave and requirement

that employee obtain a mental evaluation before returning to work not enough to show that employer regarded employee as disabled). "A request for an evaluation is not equivalent to treatment of the employee as though [he] were substantially impaired. Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims[.]" Cody, 139 F.3d at 599 (internal citations omitted).[16]  At most, the record shows that Amtrak considered Mr. Carmack's mental condition an open question, which Amtrak was hoping to resolve by means of a comprehensive fitness for duty examination.  (See Def.'s Ex. 29 (requesting that Dr. Vasile determine, among other things, the plaintiff's diagnosis, whether he was capable of performing his job and his long-term fitness for the position of a passenger engineer)).

The plaintiff's inability to present evidence to support an inference that he was disabled within the meaning of the ADA is fatal to his claims of disability discrimination

---

[16]  Nothing in the record indicates that Amtrak's decision to order an examination was unjustified, as Mr. Carmack argues.  Under the ADA, "[p]ost-hiring demands for examinations can only be made where shown to be 'job-related and consistent with business necessity.'" Sullivan, 197 F.3d at 811 (quoting 42 U.S.C. § 12112(d)(4)(A)).  The evidence regarding the contents of the "Letters from Hell" and Dr. Pinsky's assessment that a mental fitness for duty examination was warranted, as well as the fact that Mr. Carmack was responsible for transporting commuter rail passengers, show that Amtrak's decision to order the examination was reasonably necessary to determine whether the plaintiff was capable of performing his job.

and failure to accommodate.[17]  Therefore, this court recommends that Amtrak's motion

for summary judgment be allowed with respect to these claims.

### 3.    Retaliation

The ADA's prohibition against retaliation provides that

> No person shall discriminate against any individual because such
> individual has opposed any act or practice made unlawful by this
> chapter or because such individual made a charge, testified, assisted,
> or participated in any manner in an investigation, proceeding, or
> hearing under this chapter.

42 U.S.C. § 12203(a).  Thus, in order to prove his claims that Amtrak violated the ADA

by retaliating against him, Mr. Carmack must establish that "(1) he engaged in protected

conduct, (2) he suffered adverse employment action, and (3) there was a causal

connection between his conduct and the adverse action."  Benoit, 331 F.3d at 177.

There is no evidence, and Mr. Carmack does not argue, that Amtrak took any

adverse action against him because he engaged in protected conduct.  The only protected

conduct suggested in the record is the complaint Mr. Carmack filed with the Massachu-

setts Commission Against Discrimination ("MCAD") in February 2002, about five

months after Mr. O'Malley issued a Notice of Formal Investigation charging him with

insubordination for failing to comply with the order to undergo a fitness for duty

---

[17]  Because the record is insufficient to support Mr. Carmack's claim that he was disabled
within the meaning of the ADA, it is unnecessary at this stage to address the parties' remaining
arguments regarding Mr. Carmack's claims of disability discrimination and failure to
accommodate.

examination.  (See Def.'s Exs. 43, 49).[18]  Nothing in the record suggests that the hearing

officer's May 2002 decision in favor of Amtrak on the insubordination charge was

influenced in any way by Mr. Carmack's charges of discrimination.  Moreover, the

evidence shows that Amtrak terminated Mr. Carmack's employment based on the

findings of the hearing officer.  (Def.'s Ex. 46).  There are no facts that would support an

inference that Amtrak's decision was motivated by the MCAD complaint.  Accordingly,

Amtrak is entitled to summary judgment on the claim of retaliation under the ADA.

### D.    Count Four: Violation of Massachusetts Civil Rights Act

In Count Four, Mr. Carmack asserts state civil rights claims pursuant to Mass.

Gen. Laws ch. 12, §§ 11H & 11I and Mass. Gen. Laws ch. 265, § 37.  In particular, Mr.

Carmack alleges that the defendant accused him of workplace violence, medically

disqualified him, ordered him "to publicly expose and reveal private matters and personal

medical information," subjected him to an investigation and charges of insubordination,

and terminated him from employment for writing a letter "expressing personal ideas,

---

[18]  Other than Mr. Carmack's complaint to the MCAD, there is no evidence that Mr.
Carmack complained of disability discrimination or otherwise engaged in protected activity under
the ADA.  Mr. Carmack did allege in his complaint that Amtrak retaliated against him by charging
him with insubordination for requesting accommodations in connection with the proposed fitness
for duty examination. (Compl. ¶¶ 306-334).  However, he has not addressed those allegations in
his brief, and any such arguments are thereby waived.  Moreover, a reasonable accommodation is
something that "enables a qualified individual with a disability to perform the essential functions of
[his] position."  Ward, 209 F.3d at 36.  As discussed above, Mr. Carmack has not presented
sufficient evidence to show that he was a qualified individual with a disability.  Therefore, any
claim that he was retaliated against for requesting a reasonable accommodation must fail.

political and moral principles, personal philosophies and religious beliefs . . . ."  (Compl.

¶¶ 347-353).  He further asserts that as a result of these actions,

> Defendant has by force and threat of force willfully injured,
> intimidated, interfered with, oppressed and threatened Plaintiff in the
> free exercise and enjoyment of rights and privileges secured to
> Plaintiff by the constitution and laws of the United States of America
> and the Commonwealth of Massachusetts including, but not limited
> to the right of free, speech and assembly (Amendment 1 of the
> Constitution of the [United] States), the right to toil in Plaintiffs
> chosen profession and the right to organize and participate in a
> railway labor organization (USCA 45 ss.. 151 et. seq.).

(Id. ¶ 354).  Amtrak argues that it is entitled to summary judgment because Chapter 151B

is the only remedy available for these claims, and because there is no evidence showing

that Amtrak violated any of the plaintiff's rights "by way of threats, intimidation or

coercion."  (Def.'s Mem. at 47).  Mr. Carmack has neither responded to Amtrak's

arguments nor presented any arguments in support of his cross-motion for summary

judgment.  As detailed herein, Amtrak is entitled to summary judgment on these claims.

As an initial matter, Mass. Gen. Laws ch. 265, § 37, the state criminal civil rights

statute, does not apply to Mr. Carmack's civil claims.  Additionally, to the extent Mr.

Carmack is alleging that Amtrak discriminated against him on the basis of his protected

status, his claim pursuant to the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12,

§ 11 ("MCRA") is preempted by Chapter 151B.  See Silva v. Hit or Miss, 73 F. Supp. 2d

39, 42 (D. Mass. 1999) ("M.G.L. c. 151B is the exclusive remedy for employment

discrimination complaints. [Plaintiff's] M.G.L. c. 12, § 11I claim, which alleges

discrimination in employment, is therefore preempted.") (internal quotations and citation

omitted).  To the extent Mr. Carmack is asserting a claim based on unlawful retaliation for protected conduct, he cannot establish, based on the record before this court, that the defendant's actions constituted "threats, intimidation or coercion," as required under the MCRA.

In order to prove a claim under sections 11H & 11I[19] of the MCRA, the plaintiff must establish that "1) his/her exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, 2) has been interfered with, or attempted to be interfered with, and 3) that the interference or attempted interference was by 'threats, intimidation or coercion.'"  Ali v. Univ. of Mass. Med. Ctr., 140 F. Supp.2d 107, 110 (D. Mass. 2001) (quoting Swanset Dev. Corp. v. City of Taunton, 423 Mass. 390, 395, 668 N.E.2d 333, 337 (1996)).  The Massachusetts Supreme Judicial Court has defined the words "threats, intimidation or coercion" as follows:

> "Threat" ... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.  "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct. ["Coercion" is] "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

---

[19]  Mass. Gen. Laws ch. 12, § 11H reads in relevant part: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured."  Mass. Gen. Laws ch. 12, § 11I authorizes civil actions by any person who has suffered the interference or attempted interference of the rights described in § 11H.

Id. (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, 631

N.E.2d 985, 990 (1994)) (alteration in original).  Therefore, violations of the MCRA

"typically involve 'actual or potential physical confrontation accompanied by a threat of

harm.'" Id. (quoting Planned Parenthood League of Mass., Inc., 417 Mass. at 473, 631

N.E.2d at 989).

      Amtrak's actions in responding, pursuant to its workplace violence policy, to what

Mr. DeModena perceived as a threat "does not, as a matter of law, constitute the kind of

physical confrontation contemplated by the words 'threats, intimidation or coercion.'"

Id.  Amtrak did not threaten to harm Mr. Carmack physically and did not use physical

force to interfere with his rights.  Compare Brunelle v. Lynn Pub. Sch., 433 Mass. 179,

183, 740 N.E.2d 625, 629 (2001) (defendant's initiation of a criminal complaint against

plaintiffs did not constitute intimidation or coercion where it did not prevent plaintiff

from exercising rights and did not involve the use of physical force or unwarranted use of

police power), with Planned Parenthood League of Mass., Inc., 417 Mass. at 475, 631

N.E.2d at 990 (conduct constituted "threats, intimidation, and coercion" where  defen-

dants trespassed on private property and used their bodies or bicycle locks "to prevent

others physically from entering, leaving, or using medical facilities to obtain abortions to

which they were constitutionally and lawfully entitled").  Furthermore, although "non-

physical harassment in retaliation for the exercise of a constitutional [or statutory] right

can violate the MCRA," Mr. Carmack has not presented any facts showing that Amtrak's

actions were done in retaliation for the plaintiff's exercise of his rights.  Ali, 140 F. Supp.

2d at 110.  The undisputed facts show that Amtrak conducted a TART investigation,

made a decision to medically disqualify the plaintiff and ordered him to undergo a

psychiatric examination in order to determine whether Mr. Carmack  presented an actual

threat to safety and to ensure that he was capable of performing his job as a passenger

engineer.  They further show that Amtrak conducted disciplinary proceedings and

ultimately terminated Mr. Carmack because he refused to submit to an examination.

Nothing in the record indicates that Amtrak's true motivation was to punish Mr. Carmack

for communicating with his union representative or for exercising his right to free speech.

Compare Langton v. Sec'y of Pub. Safety, 37 Mass. App. Ct. 15, 20, 636 N.E.2d 299,

302-03 (1994) (genuine issues of disputed fact prevented judgment as a matter of law

regarding whether defendant's actions constituted threats, coercion and intimidation

where plaintiff presented evidence that defendants retaliated against him for complaining

of prison conditions with threats of retribution, including demanding a psychological

exam and threatening solitary confinement, among other things).  Accordingly, this court

recommends that summary judgment enter for Amtrak with respect to Count Four.

### E.    Count Five: Violation of the Railway Labor Act

Mr. Carmack alleges in Count Five of the Complaint that all of Amtrak's conduct

to which he has repeatedly objected constitutes a violation of his rights under the RLA.

(Compl. ¶¶ 357-367).  Amtrak argues that this court lacks jurisdiction over this claim

because it involves a "minor dispute" which must be resolved through arbitration.  (Def.'s

Mem. at 33).  Furthermore, Amtrak argues that Mr. Carmack has failed to put forward

sufficient evidence to sustain his claim.  This court agrees that Amtrak is entitled to summary judgment on Count Five.

As discussed above, "[f]ederal courts lack subject matter jurisdiction over disputes which are grounded in the [collective bargaining agreement] and involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.  Such disputes, labeled 'minor' disputes under the RLA, are subject to mandatory arbitration."  Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 881 (9th Cir. 2002).  Here, Mr. Carmack is objecting to Amtrak's actions in response to his "Letters from Hell," the requirement that he submit to a psychiatric examination and his eventual termination from employment.  He argues that Amtrak was improperly motivated and used the workplace violence policy as a pretext.  This direct challenge to Amtrak's treatment of him is the type of conduct appropriately pursued through the grievance process and, in fact, was explored at the hearing at which Mr. Carmack was represented by his union.  The dispute centers on the CBA and is not appropriately brought in federal court.

Mr. Carmack attempts to bring his case under the RLA by alleging in a conclusory manner that Amtrak interfered with his union organizing efforts or retaliated against him for his union organizing efforts.  See id. at 881 (claim of interference with union organizing efforts states a statutory claim which may be brought in court, not a minor dispute that must be brought under the CBA).  However, he has failed to put forth sufficient evidence to support his claim.

56

The RLA provides in relevant part:

> Employees shall have the right to organize and bargain collectively
> through representatives of their own choosing ... No carrier, its
> officers or agents, shall deny or in any way question the right of its
> employees to join, organize, or assist in organizing the labor
> organization of their choice, and it shall be unlawful for any carrier
> to interfere in any way with the organization of its employees ....

45 U.S.C. § 152, Fourth.  This court will assume, although it has not been finally decided

in this Circuit, that this provision creates a private right of action under the circumstances

presented here.  See e.g.,  Davin v. Delta Air Lines, Inc., 678 F.2d 567, 569 n.1 (5th Cir.,

Unit B 1982) (assuming, without deciding, that 45 U.S.C. § 152, Fourth implies "a

private cause of action for reinstatement, back pay and damages in favor of any employee

whose employment is terminated for engaging in concerted activity to improve conditions

of employment"); Hodges v. Tomberlin, 510 F. Supp. 1287, 1293 (S.D. Ga. 1981) (42

U.S.C. § 152, Fourth creates a private cause of action with respect to aggrieved

employees where "union activity played some impermissible role in their terminations").

Nevertheless, Mr. Carmack has failed to support his claim.  Not only has he failed to

establish that he was engaged in protected union organizing activity, but there is no

evidence that Amtrak acted with anti union animus.  Rather, the union was actively

involved in representing Mr. Carmack and Amtrak did not interfere with this representa-

tion.  Therefore, summary judgment should enter in favor of Amtrak on Count Five.

**F.**    **Count Six: Discrimination on the Basis of Religion**

57

Mr. Carmack also alleges, in Count Six of his Complaint, that he was discriminated against on the basis of his religion.  In particular, Mr. Carmack asserts that in his "Letters from Hell," he "expressed aspects of his personal moral, ethical and political beliefs" including his "belief in spiritual forces exerting positive and negative moral, spiritual and ethical influence of human beings," and used "standard cultural and religious expressions of God and, conversely, Satan or Lucifer, Prince of Darkness to refer to the positive and negative spiritual forces in which Plaintiff believes."  (Compl. ¶¶ 369-371).  He further alleges that Amtrak employees accused him of workplace violence, medically disqualified him, harassed and retaliated against him, charged him with insubordination, and terminated him from employment because he wrote a letter expressing his religious beliefs.  (Id. ¶¶ 374-378).  Mr. Carmack claims that by these actions, Amtrak "has by force and threat of force willfully injured, intimidated, interfered with, oppressed and threatened Plaintiff in the free exercise and enjoyment of religion secured to Plaintiff by Title VII of the Civil Rights Act of 1964[20] and the First Amendment to the Constitution of the United States of America."  (Id. ¶ 379).[21]

---

[20] Title VII of the Civil Rights Act of 1964 ("Title VII") is found at 42 U.S.C. §§ 2000e et seq.

[21] Mr. Carmack's First Amendment claim is asserted pursuant to 42 U.S.C. § 1983, which provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...."  In order to prove a claim under section 1983, the plaintiff must show that the challenged conduct was "attributable to a person acting under color of state law" and that the conduct "worked a

Moreover, when construed liberally, Count Six also alleges a claim under Chapter 151B, the Massachusetts analogue to Title VII. This court recommends that summary judgment enter for Amtrak on each of these claims.     **1.     Employment**

**Discrimination Claims**

Amtrak has moved for summary judgment with respect to the plaintiff's Title VII and Chapter 151B claims on the grounds that Mr. Carmack failed to exhaust his administrative remedies and has failed to present evidence necessary to support a prima facie case of discrimination on the basis of religion. (Def.'s Mem. at 49-51). Because the evidence shows that Mr. Carmack's complaint to the MCAD alleged only disability discrimination, he is barred from raising claims in this court based on religious discrimination. Moreover, even if Mr. Carmack had satisfied the exhaustion requirement, he has not presented sufficient evidence to support a claim of discrimination on the basis of religion.

**Exhaustion**

"Both Title VII and Chapter 151B require an employee to file an administrative charge as a prerequisite to commencing a civil action for employment discrimination." Lattimore v. Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996) (citing 42 U.S.C. § 2000e-5(f) and Mass. Gen. Laws ch. 151B, §§ 5-9). "The purpose of that requirement is to provide the employer with prompt notice of the claim and to create an opportunity for

denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997), cert. denied, 522 U.S. 819, 118 S. Ct. 71, 139 L. Ed. 2d 32 (1997).

early conciliation."  Id.  Because "[t]hat purpose would be frustrated if the employee

were permitted to allege one thing in the administrative charge and later allege something

entirely different in a subsequent civil action[,]" "in employment discrimination cases,

'[t]he scope of the civil complaint is . . . limited by the charge filed with the [MCAD] and

the investigation which can reasonably be expected to grow out of that charge.'"  Id.

(quoting Powers v. Grinnell Corp., 915 F.2d 34, 38 (1st Cir. 1990)) (additional citation

omitted).  See also Stephenson v. State Street Bank & Trust Co., 924 F. Supp. 1258, 1276

(D. Mass. 1996) ("What controls is not what the [MCAD] did but what it was given the

opportunity to do.") (quoting Borase v. M/A-Com, Inc., 906 F. Supp. 65, 68 (D. Mass.

1995)).[22]

    The scope of the investigation that could reasonably be expected to grow out of

Mr. Carmack's MCAD charge does not encompass a claim for discrimination on the basis

of religion.  The particulars of the claim set forth in Mr. Carmack's MCAD complaint

provide:

---

    [22] It is unclear whether Mr. Carmack's claims under Title VII and Chapter 151B are
subject to the same exhaustion requirements or whether his Chapter 151B claim is governed by a
more stringent standard.  While federal courts "have confined 151B claims in civil actions to the
content of the charge filed with the MCAD and claims reasonably within the scope of an MCAD
investigation based on this claim," some Massachusetts case law suggests "that a plaintiff cannot
bring a [Chapter 151B] discrimination claim in court unless the MCAD complaint explicitly stated
and described the type of discrimination alleged."  Silva, 73 F. Supp. 2d at 41 (citing cases).
Nevertheless, in the instant case, it is unnecessary to determine the precise parameters of the
exhaustion requirement under Chapter 151B because Mr. Carmack's Chapter 151B claim of
religious discrimination is barred even under the broader "scope of the investigation" rule of
exhaustion that is applicable to Title VII claims.

I, Joseph Carmack, the Complainant believe that I was discriminated against by Amtrak, on the basis of Disability, Other.  This is in violation of M.G.L. 151B Section 4 Paragraph 16[23] and ADA.

I was hired by Amtrak in October of 1979.  Most recently, I have worked as a locomotive engineer until I was removed from my position on May 4, 2001.  The reason I was given for my removal was that I was medically disqualified.  I have never presented any medical documentation that would prevent me from performing my job functions and do not have a disability.

In the past, I have made many complaints to the management of Amtrak regarding other non-discriminatory related problems in the workplace.  Also in April 2001, a manager named Gerard Demodena, made a complaint against me, concerning workplace violence.  The company has since used this complaint as a reason to justify their removal of me from my job.

In May of 2001 I requested documentation explaining what the reason was for my medical disqualification.  I requested my diagnosis, and the doctor's qualifications.  I did not receive any of this information.

To date, I am still not working as a locomotive engineer, and all of my complaints are still pending.  Most recently, I sent another complaint on February 5th, 2002 and still have not received any information.  I feel I have been discriminated against on the basis of my perceived disability, mental illness.

(Def.'s Ex. 49).  There are no allegations of religious discrimination, no references to

Mr. Carmack's religious beliefs or practices and nothing indicating that Amtrak personnel

engaged in any conduct that related in any way to Mr. Carmack's exercise of religion.

Mr. Carmack's administrative complaint relates solely to discrimination on the basis of a

---

[23]  Mass. Gen. Laws ch. 151B, § 4 para. 16 makes it unlawful to discriminate on the basis of a physical or mental handicap.

perceived disability.[24]  Accordingly, this court concludes that the allegations contained in

the MCAD complaint cannot reasonably be construed to include religious discrimination.

"Although an investigation is not strictly confined to allegations in the charge, it is not a

'fishing expedition' that should be expected to extend to matters unrelated to the charge."

Lattimore, 99 F.3d at 465.  Because Mr. Carmack's administrative complaint contains no

hint of any claim that Amtrak's conduct related to his religious beliefs or practices, this

court also concludes that his claims of religious discrimination were not reasonably

within the scope of MCAD's investigation of the complaint.[25]

     This conclusion is supported by the MCAD investigator's written recommendation

for the dismissal of Mr. Carmack's complaint.  Therein, the investigator described Mr.

Carmack's claim as one of discrimination "on the basis of his perceived mental illness,

and retaliat[ion] against him for having complained of discrimination."  (Def.'s Ex. 50 at

3).  She further described the findings from the MCAD investigation as follows:

> Investigation revealed that the Complainant did in fact leave cryptic
> messages for his coworkers and supervisors that could be construed
> as posing a threat to their safety.  Specifically, he re-wrote parts of
> the play *Hamlet* placing his coworkers in different roles.  With this,
> he left a message stating that "I'm in charge and this play has a

---

[24]  Mr. Carmack's assertion that he pursued a claim of discrimination based on religion during the MCAD proceedings, but that MCAD ignored it is not supported by the record.  (See Pl.'s Mem. at 52).

[25]  In his brief, Mr. Carmack argues that he received disparate treatment from Amtrak because it disciplined him for the "Letters from Hell" but allowed the BLE to distribute a publication containing "extremely violent allegory and satire."  (Pl.'s Mem. at 55).  Because Mr. Carmack neither alleged a claim of disparate treatment in this action nor raised the issue in his MCAD complaint, this court will not consider his argument.

> messy ending more to my liking.  Sincerely, Lucifer, Prince of
> Darkness."  The Complainant does not dispute that he wrote this.  A
> review of the Respondent's policies regarding workplace violence
> shows that the Respondent did act according to the policy, and did
> not single out the Complainant based on their perception of any
> disability, or for his having complained in the past.  Further, the
> Complainant admits that when he complained in the past, it was
> because of union/labor problems and only complained of disability
> related discrimination after he had left the statements for his
> supervisors and disciplinary action had been taken against him.  The
> Respondent also has shown that they have disqualified and/or
> terminated other employees for workplace violence complaints in the
> past, who do not have known disabilities.

(Id. at 3-4).  Thus, the investigator's findings contained no references to any claims of

religious discrimination.

Having determined that the claims of religious discrimination are beyond the scope

of the plaintiff's administrative complaint, this court finds that Mr. Carmack has failed to

fulfill the exhaustion requirement necessary to maintain his Title VII and Chapter 151B

claims in this action.  Therefore, this court recommends that summary judgment be

granted to Amtrak with respect to these claims.

## Substantive Claim of Discrimination

Even if Mr. Carmack's religious discrimination claim could be deemed to have

been within the scope of the MCAD investigation, the record does not support such a

claim.  In order to establish a prima facie case of religious discrimination under either

Title VII or Chapter 151B where, as here, there is no direct evidence that the defendant

discriminated against the plaintiff on the basis of his religious practice, the plaintiff must

establish that (1) he was a member of a protected class, (2) he suffered a materially

adverse employment action, and (3) the adverse employment action occurred because of his religion.  See Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004) (describing elements necessary to prove prima facie case of religious discrimination); Benoit v. Technical Mfg. Corp., 331 F.3d at 173-74 (setting forth elements of discrimination claim under Title VII and Chapter 151B); Rivera v. Puerto Rico Aqueduct & Sewers Auth., 331 F.3d 183, 189 (1st Cir. 2003) (describing elements of harassment claim based on religion).

In the instant matter, Mr. Carmack has not presented any evidence showing that he was engaged in any religious practice or that the complained of actions occurred because of his religion.  Notwithstanding Mr. Carmack's arguments to the contrary, nothing in the record suggests that the plaintiff's use of the terms "God" and "Lucifer, Prince of Darkness" in the "Letters from Hell" constituted religious expression or had anything to do with Mr. Carmack's religious practices.  Rather, according to Mr. Carmack, his use of these terms was intended as satire.  (PF ¶¶ 51, 52).  The evidence also shows that "God" was the term that Mr. Carmack and other employees used to refer to Mr. O'Bryan. (Def.'s Ex. 57).

Even assuming the "Letters from Hell" did contain religious expression, there are no facts from which a reasonable inference could be drawn that Mr. DeModena's complaint about the writings and Amtrak's handling of the complaint were in any way related to Mr. Carmack's religion.  It is undisputed that the challenged conduct occurred because Mr. DeModena perceived the "Letters from Hell" as a threat.  The record also

64

shows that Amtrak's conduct was consistent with the company's workplace violence

policy. Although Amtrak personnel may have expressed concern that Mr. Carmack had

referred to himself as "Lucifer" or had addressed his writings to "God," there is nothing

in the record to suggest that Mr. DeModena or anyone else viewed Mr. Carmack's use of

those terms as a means of religious expression. Nor is there any evidence indicating that

Amtrak's actions in response to the "Letters from Hell" were driven by any antipathy

towards Mr. Carmack's religious beliefs rather than an obligation to investigate a

complaint that Mr. Carmack's writings constituted a threat. Therefore, Mr. Carmack is

unable to make out a prima facie case of discrimination.

### 2.    First Amendment Claim

Mr. Carmack argues that if the court rejects his employment discrimination claim,

it "must nonetheless accept as an Interference with Rights claims pursuant to M.G.L. c.

12 and M.G.L. c. 265 s. 37 and a 1st Amendment claim pursuant to the establishment

clause wherein the Defendant has interpreted their Workplace Violence policy to justify

interference with Plaintiff's Labor Rights." (Pl.'s Mem. at 54-55). This court finds,

however, that the evidence does not support Mr. Carmack's First Amendment claim,

which is the only one of these claims that is asserted in Count Six of the Complaint.

"When a plaintiff attempts to use § 1983 as a parallel remedy to a Title VII claim,

the *prima facie* elements to establish liability are the same under both statutes." Rivera ,

331 F.3d at 192. "In either case, the plaintiff must prove that the defendants acted with

discriminatory intent." Id. (internal punctuation and citation omitted). Because the

evidence is insufficient to make out a prima facie case of religious discrimination under Title VII, Mr. Carmack's claim pursuant to Section 1983 also must fail. See id. ("The inadequacy of [the plaintiff's] Title VII claim establishes the inadequacy of her § 1983 claim."). Consequently, Amtrak is entitled to summary judgment with respect to Count Six.

## IV.  CONCLUSION

For all of the reasons set forth above, this court recommends to the District Judge to whom this case is assigned that Amtrak's motion for summary judgment (Docket No. 99) be ALLOWED and that Mr. Carmack's cross-motion for summary judgment (Docket No. 110) be DENIED.[26]

   / s / Judith Gail Dein   
Judith Gail Dein
United States Magistrate Judge

---

[26]    The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).