UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Joseph T. Carmack <br>         Plaintiff, Pro Se <br><br> v. <br><br> National Railroad Passenger Corporation <br><br>         Defendants | Civil Action No. 03-12488-PBS |

# PLAINTIFF JOSEPH T. CARMACK'S MEMORANDUM IN SUPPORT OF OBJECTION TO REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Joseph T. Carmack ("Plaintiff") hereby submits this memorandum in support of opposition to the **REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** ("Report or R&R") in the above captioned case. As grounds therefore, Plaintiff submits that the Report fails to properly consider genuine material facts in the summary judgment record that are in dispute between the parties. There is substantial material evidence in the record that either permits a rational fact finder to resolve material issues in favor of the Plaintiff or would permit a resolution in favor of either party.

## I. Overview of Material Issues in Dispute

### A. Workplace Violence Complaint

1

On or about April 11, 2001, Mr. Gerard DeModena, a supervisor of the Plaintiff, received a copy of an internal union document from another supervisor which was compiled by the Plaintiff and entitled "Letters from Hell". The compilation included a 10-page response to an open letter of equal length distributed by the Local Chairman of the Brotherhood of Locomotive Engineers which was critical of the Plaintiff, another Locomotive Engineer. The compilation, including a number of union and railroad documents totaling more than forty pages, presented with a few creative satirical accoutrements. Most of the documents in the compilation are letters.

The satirical element is provided in the form of 'Letters from Hell' written by Lucifer and addressed to God. In the letters, Satan (not the Plaintiff) references Shakespeare's play Hamlet as a metaphor for Amtrak corporate culture and casts the Plaintiff, Mr. DeModena and Mr. O'Bryan as Hamlet, Rosencranz and Guilenstern, respectively. The Report circumvents the satirical element of the satire and prejudices the Plaintiff in the process by equating Lucifer with the Plaintiff. The satire presents the casting and the metaphor to reflect the attitude of Lucifer, not the Plaintiff. The Report further prejudices the Plaintiff by stating that "Hamlet expresses anger or frustration at how he has been perceived and manipulated" in an attempt to imply that Plaintiff is attempting to express anger and frustration. Plaintiff submits that Hamlet is merely mocking and that, in any case, the portrayal is intended to be Lucifer's. All the dialogue included in the satire are quotes from the plays, including "ROSENCRANZ AND GUILDENSTERN ARE DEAD!". The "Letter" represents them as quotes provided by Lucifer, not the Plaintiff. (*R&R, pages 5 and 6*)

In response to reading the "Letters from Hell", Mr. DeModena spoke with his superior, Mr. Michael O'Malley and filed a workplace violence report with copies of the "Letters From Hell" compilation, which was submitted to Amtrak's Threat Assessment Response Team ("TART") (*Def. Ex. 21*). The members of the TART included Mr. Lou DePhillips, Ms. Suzanne Allan of Human Resources and Captain Robert Smith of the Amtrak Police Department. In his workplace violence report, Mr. DeModena represents the words of 'Lucifer' in the satire as though they reflected the attitude and feelings of the Plaintiff. (*Id.*). Mr. DeModena's engaged this turn on the satire in order to portray the Plaintiff as "mentally [un]balanced":

> Spoke w/ Lou DePhillips & M.J. O'Malley re the [Plaintiff's] literature. Lou is filp-flopping on his opinion & thoughts. Initially Lou was aggressive in his opinions etc. – he viewed them clearly as the work of a mentally imbalanced[sic] individual and a threat of violence now he is playing amateur pschol.[sic] & side stepping. (*Pl.'s Ex. 3*).

Ultimately, Mr. DePhillips advised the TART to conduct a 'scenario' which include a psychological evaluation and the ultimate termination of the Plaintiff. (*R&R, page 8, Def.Ex 25*). The TART agreed to send the report to the Amtrak's Medical Department to see if they could take any action.

### B. Medical Disqualification of Plaintiff

DePhillips faxed the report and materials to the Amtrak Medical Department in Philadelphia, PA on April 11, 2001. Afterwards Letterio called Amtrak Health Resources Manager, Ms. Marianne Letterio, and told her he wanted the Amtrak Medical Director, Dr. Timmie Pinsky, to order a psychiatric exam. After no response, Suzanne Alan contacted the Medical Department. On that same date, Dr. Pinsky Made a

determination to medically disqualify the Plaintiff pending a psychiatric fitness for duty examination. The following day, Mr. O'Malley had the crew dispatcher call the Plaintiff and advise him not to return to work. A few hours later, the Plaintiff called O'Malley for instructions. Mr. O'Malley told the Plaintiff that Mr. O'Malley could tell the Plaintiff nothing. Mr. O'Malley advised the Plaintiff to take all his instructions from the medical department. (*PF at 97*).

Soon after, Mr. O'Bryan spoke to Dr. Pinsky by telephone to challenge the medical disqualification of the Plaintiff. Dr. Pinsky later made a report of the phone call and noted; "there was ample written documentation to warrant that Mr. Carmack be medically disqualified pending a fitness for duty exam" and that "[t]he content of his writings raised the index of suspicion of an underlying psychiatric disorder to the level where a psychiatric evaluation is appropriate." (*Def.'s Ex. 57*).

### C. Non-confidentiality of Fitness-for-Duty Exam

Amtrak's ultimate termination of the Plaintiff resulted from Plaintiff expressing concerns about the lack of confidentiality in the fitness-for-duty exam. Plaintiff has continuously denied refusing to submit to the exam and any evidence of Plaintiff's refusal is insubstantial.

On May 4, 2001, Plaintiff followed the instructions of Mr. O'Malley and called Ms. Letterio. Ms. Letterio said that she had no medical information as to why Plaintiff was disqualified from service and stated that she would contact the Plaintiff later with instructions. Ms. Letterio did not contact the Plaintiff again, however. Instead, on May 17, 2001, Mr. O'Malley sent the Plaintiff a letter informing the Plaintiff that an examination had been scheduled with Dr. Russell Vasile in Boston. (*Def.'s Ex. 28*).

Having no instructions from the medical department to follow per Mr. O'Malley's instructions of May 24, 2001, Plaintiff wrote to Dr. Pinsky to inquire about the purpose and nature of the exam. In the letter to Dr. Pinsky, the Plaintiff requested all documents and correspondence referring to the Plaintiff, the medical basis for disqualifying the Plaintiff, including a specific diagnosis, Dr. Pinsky's qualifications for making such a judgment, a complete explanation of an "FFD exam," including what is and what it entails, and the legal basis for Dr. Pinsky's decision. (*Def's. Ex. 30*). Plaintiff never received any document at all from Dr. Pinsky or Letterio at any time relevant to this case. Dr. Pinsky did not reply to the Plaintiff's letter. (*Def.'s Ex. 60*).

On or about June 4, 2001, Plaintiff called Dr. Vasile to explain that he had no specific instruction for the exam. The Plaintiff and Dr. Vasile agreed to cancel the exam. On or about, June 8, 2007, Mr. O'Bryan called the Amtrak Medical Department in Philadelphia to ask if Dr. Pinsky was going to contact the Plaintiff regarding the exam. Ms. Letterio informed Mr. O'Bryan that no one in Amtrak's Medical Department was going to contact the Plaintiff. In response Mr. 'Bryan called Mr. O'Malley to inform Mr. O'Malley that the Medical Department was not communicating with the Plaintiff. The Plaintiff wrote Mr. O'Malley to state that he had no medical information from the medical department and that he had been advised that contact with Mr. O'Malley regarding medical matters was "inappropriate". (*Pl.'s Ex____*). Nonetheless, Mr. O'Malley wrote the Plaintiff and ordered the Plaintiff to contact Ms. Letterio. Plaintiff complied.

The Report states, on page 11, that Ms. Letterio sent the Plaintiff his medical file. Plaintiff denies that Ms. Letterio sent the Plaintiff any medical information.

5

She stated that she had none. (*Pl.'s Ex.* _____). Mr. O'Bryan also testified that ms. Letterio informed him that Dr. Pinsky would provide no medical information to the Plaintiff:

> I called Ms. Letterio and I said is Dr. Pinsky going to provide anything to Mr. Carmack? And Ms. Letterio told me she would get back to me, and she informed me that Dr. Pinsky had stated that he would not be replying to any requests.

(*Def. Ex. 24 at 328*)

Mr. O'Bryan also informed Mr. O'Malley of the Medical department's refusal to communicate:

> O'Bryan: I had conversation with r. O'Malley; and I told him that…Mr. Carmack had made Repeated requests for his information from Dr. Pinsky.
>
> …
>
> As I was saying, I was speaking directly with Mr. O'Malley and I explained to him that Mr. Carmack has complained to me about failure of response, and what Mr. O'Malley did with that Complaint that I directed to him, I don't know. Whether he spoke to the Medical Department, or he let is drop, I have, I don't know.

(*Def.'s Ex. 24 at 328 to 32*)

Nonetheless, Mr. O'Malley ordered Plaintiff to call Ms. Letterio and Mr. O'Malley threatened Plaintiff with a charge of insubordination.

Plaintiff complied with Mr. O'Malley's order and called Ms. Letterio on June 15, 2001. Plaintiff asked Ms. Letterio to send Plaintiff his medical file. Ms. Letterio claimed she didn't have access and suggested that Plaintiff get the information from Dr. Vasile. (*Pl.'s Ex. 74 and Def.'s Ex. 24 at 415*)

On June 27, 2001 Plaintiff and Mr. O'Bryan met with Dr. Vasile to speak with Vasile prior to the exam. Plaintiff asked Vasile for Plaintiff's medical File. Dr. Vasile claimed he had no file and he would not give it if he did. Mr. O'Bryan and the Plaintiff asked if there was basis for medical disqualification. Vasile said No. Mr. O'Bryan gave

6

Dr. Vasile a copy of "Letters from Hell". Dr. Vasile said he was going to ask Plaintiff a lot of intimate personal questions. Dr. Vasile stated that Plaintiff would have to be forthcoming. Dr. Vasile then said "Nothing is Confidential". Plaintiff stated that he thought the exam was inappropriate. Dr. Vasile then said that he can't do his job. Dr. Vasile said that he would have to call Amtrak and ask if "some other solution might be found." (*Def.'s Ex. 24 pages 302-303, 329-331, 358, 413-416.*)

What is reported here, in the preceding paragraph represents the full extent of what happened at the meeting at the meeting with Dr. Vasile on June 27, 2001 when Mr. O'Bryan accompanied the Plaintiff so that Plaintiff could undergo the examination. Plaintiff states that Dr. Vasile merely stated that "Nothing is confidential". There was no reference to confidentiality within the Amtrak medical department or on the part of Pinsky or any qualification or confidentiality protocols whatsoever. Dr. Vasile merely stated that "Nothing is confidential". Dr. Vasile did not want any limitation on the exam. Dr. Vasile did not inform the Plaintiff that "any findings would be provided to Amtrak's medical Department." (*R&R, Page 11*) Nor did the Plaintiff refuse to undergo the exam. (*"Def. Ex. At 419*).

Mr. O'Malley again wrote to the Plaintiff on July 24 and ordered Plaintiff to make another appointment. Plaintiff called Vasile and Vasile told Plaintiff that Vasile needed to talk to Amtrak first. On July 29, Plaintiff sent another request to Pinsky repeating his May 24th letter as a Freedom of Information Act request. Plaintiff wrote to Dr. Pinsky again on July 24 and complained that he thought that Mr. O'Malley's order was designed to solicit information about his private affairs. (*Pl.'s Ex.____*).

7

On or about August 16, 2001 Plaintiff voluntarily called Dr. Vasile as a favor to Mr. O'Malley. Plaintiff stated to Vasile that Plaintiff needed to undergo examination to keep from losing his job. Plaintiff did not decline the exam. nor did he decline to sign a waiver. *(Def.'s. Ex. 24 at 419, Def.'s Ex. 44)*

On July 28, Dr. Vasile wrote a letter to Dr. Pinsky stating that Plaintiff "declined to present for evaluation". *(Def.'s Ex. ___)*

### D. Termination of Plaintiff

Mr. O'Malley initiated formal proceeding against the Plaintiff in September 2001. Plaintiff was charged with violation of Amtrak's Standards of Excellence which requires that employees comply with "Directions and orders from supervisors and managers". The standard also includes the caveat that "The only exception to the above requirement arises when compliance with a particular instruction would cause a clear, immediate danger to you, your fellow employees, our customers, the public or company property." *(Def.'s Ex. 43)*

An investigation was held in the Spring of 2002. Plaintiff again denied that he declined any examination. Pinsky elaborated on the reasons for the medical disqualification:

> When someone identifies themselves as Lucifer...Institute of Devastation Awareness, these are very concerning types of documentation as to whether or not this individual has a severe psychiatric disorder that presents a threat to not only his co-workers but to himself and the traveling public. I'm talking about such things as Personality disorder, Bi-Polar disorder, etc."

*(Def.'s Ex. 24 at page 386)*

During the investigation, Dr. Vasile sent a letter which was addressed to Mr. O'Malley and presented as evidence. The letter equivocates on Dr. Vasile's original claim that

8

Plaintiff "Declined to present" for evaluation while it corroborates Mr. O'Bryan's and the Plaintiff's version of events:

> ...
>
> ... I was not in the role of Mr. Carmack's and informed him that as an evaluator employed by Amtrak, any issues we discussed were not confidential and could be included in my report to Dr. Pinsky. . . . I clearly informed him of the fact that our communication was not confidential. ...
>
> ...
>
> In telephone conversations with Mr. Carmack, I reiterated to him that the psychiatric evaluation I was asked to conduct would not be confidential. Mr. Carmack expressed reluctance to submit to a psychiatric evaluation if such evaluation were not confidential. I indicated that I did not wish to proceed given his concerns. I did indicate that if he had a change of heart it might be appropriate to have him review and sign a formal waiver of confidentiality to assure that there was no misunderstanding of the lack of confidentiality in this evaluation. It became clear Mr. Carmack did not wish to pursue the evaluation. I indicated that signing a waiver of confidentiality was not pertinent as he clearly did not wish to proceed with an evaluation that would not be confidential.
>
> ...
>
> (*Def.'s Ex. 44*)

On may 13, 2002 the hearing officer issued a "Decision Letter" finding that the Plaintiff was insubordinate with the following statement:

> The letter which was received by the medical department on September 4, 2001 indicated that You refused to undergo the exam. While you testified that you did not specifically refuse, find that the conditions you placed upon the exam constituted a refusal.
>
> (*Def.'s Ex. ___*)

The Decision was appealed to the highest labor relations officer for Amtrak. The appeal was denied because "claimant refused to sign a standard release so that the results of the exam could be reported back to Amtrak". The appeal denial does not specify that any confidentiality protocols would be maintained.

## II. Disability Discrimination, Non-confidential Medical Exam and Failure to Accommodate

### A. Plaintiff's Disability

9

### 1. Substantially Limited in Major Life Activity

The Report and Recommendations entitles Amtrak to Summary Judgment in Amtrak's favor regarding disability discrimination claims because: "there is no evidence in the record from which a reasonable jury could conclude that Mr. Carmack was disabled within the meaning of the ADA" ( *R&R, pages 44 to 45* ); and the Plaintiff "simply has produced no evidence of any medical condition that restricted significantly his ability to work or to perform any other activities that were centrally important to his daily life" (*Ibid. page 47*). Therefore, an initial principal issue regarding the Plaintiff's discrimination claim is: (1) whether the Plaintiff suffered from an impairment of a "major life activity" as defined by the ADA; and (2) whether the impairment is substantial.

The EEOC's regulations lists 'major life activities' as defined by the ADA to include "basic activities that the average person in the general population can perform with little or no difficulty," These activities include "caring for one's self". (*29 C.F.R. ss. 1630.2(i)*, see also *45 C.F.R. ss 84.3(j)(2)(ii); 29 C.F.R. part 1630, Appendix, 56 Fed. Reg. 35741*) Also, the *EEOC's 1997 Guidance on the ADA and Psychiatric Disabilities* lists additional major life activities including "thinking, concentrating, interacting with others, and sleeping". (*EEOC Guidance on the ADA and Psychiatric Disabilities (March 25, 1997) at Bureau of National Affairs "BNA" ADA Manual ss. 70: 1282-1285, "EGPD"*) An individual is 'substantially limited' by an impairment if he is "(i) unable to perform a major life activity that the average person in the general population can perform;" or "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition,

10

manner or duration under which the average person in the general population can perform that same major life activity." *(29 C.F.R. ss 1630.2(j)(1).*

The Plaintiff contends that he has supplied sufficient evidence of an impairment and a substantial limitation. The Plaintiff has presented medical records as evidence showing that he has been limited in the major life activities of sleeping, ability to concentrate, ability to care for himself, eating, and ability to establish relationships. From June 1985 to January 1986 Plaintiff engaged in intermittent correspondence with Amtrak regarding impairments and a sixth month medical leave of absence resulting from the severity of the impairments. As part of the correspondence, Plaintiff sent Amtrak a copy of his application for sickness benefits which includes a statement from his doctor. Under the section entitled "objective findings from exam", the Plaintiff's doctor wrote "insomnia, palpitations… inability to concentrate". *(Pl.'s Ex. 62, PF at paragraph 2)*[1] These impairments comport with the specific guidelines listed above qualifying them as impairments as defined by the ADA. These impairments have also been substantial. They have been of extended duration to the degree that the Plaintiff was unable to work for more than 6 months during 1985.

Although the Plaintiff was eventually able to return to work, the Plaintiff's impairment nonetheless continued. Plaintiff was only able to work with treatment that helps minimize the effect of the impairments to the degree that he could work.

---

[1] For purposes of this memorandum, the Plaintiff adopts the abbreviations for factual materials used in the R&R: (1) Defendant's Corrected Statement of Undisputed Material Facts in Support of its Motion for Summary judgment (Docket No. 123) ("DF"); (2) Exhibits to Defendant's Motion for Summary Judgment (Docket No. 102)("Def.'s Ex.___"); (3) Plaintiff Joseph T. Carmack's Corrected Statement of Material Facts in Support of Opposition to Defendant national Railroad Corporations' Motion for Summary Judgment (Docket No. 127) ("PF"); (4) Exhibits to Plaintiff's Opposition to Defendant National Railroad Passenger Corporation's Motion for Summary Judgment (Docket No. 114) ("Pl.'s Ex. __"); and (5) Defendant's Objections to Plaintiff's Statement of Material Facts in Support of is Opposition to National Railroad Passenger Corporation's Statement of Material Facts (Docket No. 121) ("DOF").

11

Nonetheless, the evidence shows that Plaintiff has continued to work with severe impairments since 1985. In 1996, ten years after Plaintiff's leave of absence, the Plaintiff's Doctor's Third Party Communications include reports listing "Problems" including problems with sleeping as "severe". Other impairments include inability to care for himself, inability to concentrate, flashbacks, problems with thinking and maintaining relationships. The Plaintiff was significantly restricted in the manner and condition in which he was able to partially ameliorate these conditions. Plaintiff was receiving treatment from two to five times a week in order to allow the Plaintiff to work with his impairments. Continuing on to the period from 2000 to 2002, the Plaintiff's Doctor's records substantiate that Plaintiff's impairments did persist at times relevant to this complaint despite his ability to work. The Doctor's records list the impairments in notes regarding every treatment. Although Plaintiff's difficulty sleeping is not specifically mentioned, the notes indicate "somatic symptoms prominent"[2]. Sample entries for the year 2000 are as follows:

Sept. 2000 J. Carmack

Sep. 6, 13, 15, 20, 22, 27, 29

… somatic symptoms prominent. Needing Frequent meetings for safety. Using therapy very well. Safety Plan working. Very difficult work relationships. Flashbacks worsening …uses therapy very well. Does not need meds.

Nov. 2000 J. Carmack

1, 8, 10, 15, 21, 29, 4

…needs Med. Leave of absence from work.

---

[2] Plaintiff can provide a statement from his doctor stating that symptoms included continued severe problems sleeping and loss of sleep.

>    Somatic [symptoms] too severe
>
>    *(Pl.'s Ex. 68)*

The sole qualification that the doctor provides is that the Plaintiff's treatment is 'working'. It is clear from this record that the Plaintiff is impaired within the meaning of the ADA. The Plaintiff suffers from a number of recognized "major life activity" limitations. Wherein the doctors continue to list the limitations in their records from 1985 through August 2002, the impairments are of extended duration and are substantial. Wherein the Plaintiff's doctor references impairments during the period from January 2000 to August 2002, the Plaintiff was disabled within the meaning of the ADA at all times relevant to the complaint.

In retrospect, it seems that the Plaintiff erred in one aspect of the description of his disability in his Cross-Motion for Summary Judgment (Docket 110) ("PCM"). In the motion, Plaintiff likened his disability to the disability described in *Sutton v. United Air Lines, Inc(7.1943) 527 U.S.471, 482-483, (1999)*. In *Sutton*, near-sighted airline pilot's vision was completely corrected to 20/20 vision or better and, therefore, they were not substantially limited in the major life activity of seeing while they were wearing corrective lenses. In summary judgment motion, the Plaintiff in the instant case erroneously equated the treatment of his mental impairments with the corrective lenses in Sutton. In the instant case, the Plaintiff's disability was not corrected and they were not mitigated, as the Plaintiff originally claimed. According to his doctor's records, the Plaintiff continued to be limited in his major life activities, but the limitations did not always prevent him from working. *(PF at 2-5, Pl.'s Ex. 60, 62 and 68, Def.'s Ex. 63, Questions 13 and 14 at 23 to 25)*

## 2. Record of Impairment

As stated above, the Plaintiff was on a leave of absence from his employment with the Defendant during 1985. During the leave of absence, the Plaintiff communicated with his supervisor regarding his disability and treatment. In July and again in September, the Plaintiff's supervisor asked the Plaintiff for documentation concerning his disability and his inability to work. In July, Plaintiff sent the supervisor a copy of his claim for sickness benefits. The claim includes a statement from his doctor concerning the limitation on Plaintiff's major life activities including Plaintiff's inability to sleep ("insomnia"). (*Pl.'s Ex. 62*) The record of the correspondence and the leave of absence was maintained in Dr. Pinsky's files and submitted to the Plaintiff in response to discovery requests. Plaintiff had a record of an impairment.

## 3. Perception of Direct Threat due to a Disability

Plaintiff objects to the assertion in the Report stating that "Amtrak's ultimate decision to terminate Mr. Carmack's employment occurred following the plaintiff's decision not to submit to a psychiatric fitness for duty examination" (*R&R, page 10*). Plaintiff denies that he decided not to submit to psychiatric fitness for duty examination and asserts that there is substantial evidence supporting Plaintiff's version of the facts. Plaintiff also objects to the reports assertion that "the evidence demonstrates that Amtrak ordered Mr. Carmack to undergo a psychiatric examination as a result of a perceived threat by Mr. Carmack..."(*R&R, page 31*). On the contrary, the evidence demonstrates that the Plaintiff was ordered to undergo a psychiatric examination due to a perceived threat resulting from an impairment caused by a "severe psychiatric disorder".

Dr. Pinsky stated that the reason that he ordered the exam was because the satire in the "Letters from Hell" indicates that the Plaintiff "Identifies himself as Lucifer and "has a severe psychiatric disorder that presents a threat to not only his co-workers but to himself and the traveling public. I'm talking about such things as Personality Disorder, Bi-Polar disorder, etc." (*Def's Ex. At page 386*) In addition, DeModena wrote that DePhillips viewed the "Letters from Hell" as the work of a "mentally imbalanced[sic] individual and a threat of violence...". (*Pl.'s Ex. 3*)

The ADA states that an employers qualification standards may include "a requirement that an individual shall not pose a direct threat to the health and safety of others in the workplace" *42 U.S.C 12113(b)*. A Direct Threat is "a significant risk that cannot be eliminated by reasonable accommodation." A risk is significant if there is "a high probablility of substantial harm; a speculative risk is insufficient". The threat posed by the individual with a disability must not be based on "generalizations, misperceptions, ignorance, irrational fears, patronizing attitude`s or pernicious mythologies." *House Education and Labor Committee at 56-57, 1990 U.S. Code Congressional and Administrative news, 267 et.seq.* The evidence shows that Dr. Pinsky medically disqualified the Plaintiff as a Direct Threat because fellow employees perceived the Plaintiff as one who thought he was the devil. Plaintiff was unable to work because of other employees concerns and irrational fears. The Defendant stated that "all the evidence indicates that Amtrak had concerns in the spring of 2001 about Plaintiff's ability to safely perform his job as a locomotive engineer based upon the troubling language in the "Letters from Hell" (*Defendant's Motion for Summary Judgment Docket 102 page 38* and *Def.'s Ex. 25*). Plaintiff suffers from a perceived inability to

communicate. Plaintiff was unable to get along with others because he suffered from "Bi-Polar disorder" or "Personality disorder". Dr. Pinsky perceived the disorder as "severe". Plaintiff was substantially limited ("severe"ly) in the major life activity of "getting along with others" caused by a psychiatric disorder.

### B. Scope of Medical Examination

An employer may lawfully ask an employee about a psychiatric disability when the employer has a reasonable belief based on objective evidence that the employee's ability to perform essential job functions will be impaired by a medical condition or the employee will pose a direct threat. *EEOC Guidance on the ADA and Psychiatric Disabilities (March 25, 1997) at BNA ADA Manual 70:1281, 1286.* Inquiries or examinations must not exceed the scope of the specific medical condition and its effect on the employee's ability to perform the essential job junction or work without posing a direct threat. *Krocka v Bransfield, 969 F.Supp. 1073, 1089-1095 (N.D.Ill 1997)*

Accordingly, the examination should exceed the scope of the Plaintiff's ability to get along with others or the perception that he identifies himself as Lucifer. However, "Dr. Vasile intended to include a comprehensive psychiatric history, mental status exam and psychological testing". (*R&R, page 12*) A comprehensive psychological history, particularly in an evaluation context, including all the personal matters it entails, is beyond the scope of Plaintiff's disqualification. Ms. Letterio sent Dr. Vasile a letter describing the information that Dr. Pinsky was seeking as a result of the examination, including, among other things, any special accommodations needed for Mr. Carmack, any reasons why Mr. Carmack could not perform the duties of a passenger engineer, whether r. Carmack presented a danger to himself or others, and a determination of Mr.

16

Carmack's long-term fitness for the position of passenger engineer (*DF Para. 84; Def's Ex. 29*). The Plaintiff was never advised that the examination (or any report of it) would be limited to these parameters. Vasile's intentions went beyond them.

### C. Confidentiality Requirements of the ADA and Failure to Implement Amtrak Confidentiality Policy. Disparate Impact.

Information obtained through a medical examination or questioning permitted by the ADA must be collected and maintained on separate forms and treated as confidential pursuant to *ss. 102(c)(3)(B) of the ADA. 42 U.S.C. 12112(d)(3)(B)*. Although the report claims that Amtrak's policies and procedures prohibit the disclosure of employee medical records (R&R Page 7), the evidence indicates that Amtrak violated these protocols regarding the Plaintiff. Even if the Amtrak policies were to be followed, the Plaintiff had a right and a need to know about it. Amtrak policy requires that request for medical information should be sent directly to the employee from the medical department. Amtrak policy requires the medical department to make medical requests directly to the employee free of supervisory interference. Amtrak's medical department requested nothing. When the Plaintiff attempted to communicate with the medical department, there was no response. Mr. O'Malley, the Amtrak supervisor who ordered the Plaintiff to undergo the medical exam, was aware that the Medical department was not communicating with the Plaintiff and the supervisor refused to take any action. As stated above, Ms. Letterio sent Dr. Vasile a letter describing the information that Dr. Pinsky was seeking as a result of the examination, including, among other things, any special accommodations needed for Mr. Carmack, any reasons why Mr. Carmack could not perform the duties of a passenger engineer, whether Carmack presented a danger to

himself or others, and a determination of Mr. Carmack's long-term fitness for the position of passenger engineer (*DF Para. 84; Def's Ex. 29*). As before, the Plaintiff was never advised that the examination (or any report of it) would be limited to these parameters. Vasile's intentions went beyond them. Amtrak made no attempt to communicate with the Plaintiff about them.

If employees ask questions about a co-worker with a disability, the employer must not disclose any medical information. *EEOC Guidance on the ADA and Psychiatric Disabilities (March 25, 1997) at BNA ADA Manual 70:1281, 1287*. Dr. Pinsky not only spoke to Mr. O'Bryan without authorization. He also spoke to others about Plaintiff's perceived disability and Plaintiff's "severe psychological disorder".

### D. Special Accommodation

If an employer, aware of an employee's disability, refuses or fails to provide a reasonable accommodation, the employer violates the *Rehabilitation Act* or the *ADA*. A reasonable accommodation may include "appropriate adjustment of modifications of examination". *42 U.S.C. s. 12111 (9)*. "An employee's request for accommodation requires a great deal of communication between the employee and employer…both parties bear responsibility for determining what accommodation is necessary". *Criado v. IBM 145 f.3d 437 (1st cir. 1998)* quoting *Bultemeyer v. Fort Wayne Community Schools, 100 F3d 1281, 1285 (7th Cir. 1996)*(also noting that "in a case involving an employee with mental illness, the communication process becomes more difficult" and "[i]t is crucial that the employer [is] aware of the difficulties, and help the other party determine what specific accommodations is necessary"). The letter from Letterio to Vasile, which could have served as a limit on the scope of a waiver of confidentiality which the medical

department could have offered would have been a reasonable accommodation. However, the Medical Department was not communicating. Mr. O'Malley's orders left no room for them.

### E. Retaliation

The ADA's prohibition against retaliation provides that:

> No person shall discriminate against any individual because such individual has opposed any act of practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

*42 U.S.C. ss 12203(a).* The Plaintiff was terminated for engaging in a protected activity. He was terminated for putting conditions on the exam for expressing concerns about confidentiality. The hearing officer stated:

> The letter which was received by the medical department on September 4, 2001 indicated that You refused to undergo the exam. While you testified that you did not specifically refuse, find that the conditions you placed upon the exam constituted a refusal.

(*Def.'s Ex. ___*)

The concerns about confidentiality expressed by the Plaintiff were legitimate and protected by the ADA. The Plaintiff was terminated for expressing them.

WHEREFORE, Plaintiff hereby respectfully requests that this honorable court reject the report and recommendations on cross-motions for summary judgment.

Date: March 8, 2007

**Respectfully submitted,**

*/s/ Joseph T. Carmack*
Joseph T. Carmack
Plaintiff, Pro Se
398 Columbus Ave PMB 130
Boston, MA 02116-6008
Work: 617/727-2310 ext. 7045

19

## Certificate of Service

Joseph T. Carmack hereby certify that I have on March 8, 2007 served a true copy of the foregoing document by First Class U.S. Mail to Mr. Stephen Hughes, Attorney for National Railroad Passenger Corporation at One Liberty Square, 6th Floor, Boston, MA 02109

Date: March 8, 2007

*[signature]*

Joseph T. Carmack
Plaintiff, Pro Se
398 Columbus Ave PMB 130
Boston, MA 02116-6008
Work: 617/727-2310 ext. 7045